## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

STATE OF MISSOURI,               )
STATE OF ARKANSAS,          )
STATE OF FLORIDA,           )
STATE OF GEORGIA,          )
STATE OF NORTH DAKOTA,    )
STATE OF OHIO, and           )   Civil Action No. _____
STATE OF OKLAHOMA       )
                              )
       *Plaintiffs*,         )
                              )
v.                             )
                              )
JOSEPH R. BIDEN, Jr., in his official   )
capacity as President of the United States,   )
                              )
MIGUEL A. CARDONA, in his official   )
capacity as Secretary, United States   )
Department of Education, and      )
                              )
UNITED STATES DEPARTMENT OF   )
EDUCATION,                 )
                              )
       *Defendants*.       )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Yet again, the President is unilaterally trying to impose an extraordinarily expensive and controversial policy that he could not get through Congress.  This latest attempt to sidestep the Constitution is only the most recent instance in a long but troubling pattern of the President relying on innocuous language from decades-old statutes to impose drastic, costly policy changes on the American people without their consent.

2.     The President has attempted this in area after area of the economy, from imposing unlawful vaccine mandates across the country, to imposing unlawful and backbreaking regulations on energy producers, to arrogating for himself the power to prohibit every landlord in the nation

from initiating eviction proceedings. *West Virginia v. EPA*, 597 U.S. 697 (2022); *Natl. Fedn. of Indep. Bus. v. Dept. of Lab., Occupational Safety and Health Administration*, 595 U.S. 109 (2022); *Alabama Ass'n of Realtors v. Dep't of Health and Human Servs*., 141 S. Ct. 2485 (2021); *see also Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022) (vaccine mandate executive order exceeded the President's authority under major questions doctrine); *Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) (same); *Texas v. NRC*, 78 F.4th 827 (5th Cir. 2023) (temporary licensing program exceeded agency's authority under major questions doctrine); *cf. Texas v. United States*, 50 F.4th 498, 526 (5th Cir. 2022) (DHS final rule on DACA was foreclosed as it "undoubtedly implicates questions of deep economic and political significance" without "clear congressional authorization").

3.      He has also done so in express defiance of the Supreme Court.  The eviction-moratorium case provides a good example.  The President unlawfully attempted to impose a nationwide eviction moratorium just one month after five justices on the Supreme Court noted that the President lacked legal authority to do so.  *Alabama Ass'n of Realtors*, 141 S. Ct. at 2488 (stating that four justices voted to block the moratorium in June 2021 and a fifth, while declining to block the moratorium because it was expiring imminently, made clear that "the CDC's moratorium exceeded its statutory authority").  The President recognized that a majority of the Supreme Court justices had already said his eviction moratorium was unlawful and "that lawmakers would need to pass legislation to extend the moratorium after a recent Supreme Court decision signaled the CDC couldn't lawfully extend its moratorium again absent congressional authorization," but the President imposed the moratorium anyway.  Ackerman, *Biden Administration Issues New Eviction Moratorium*, WSJ (Aug. 3, 2021).[1]  When he did so, the Supreme Court was forced to block the

---

[1] https://www.wsj.com/articles/biden-administration-set-to-issue-new-eviction-moratorium-11628022282

executive action, declaring that the President's statutory argument "strains credulity." *Alabama Ass'n of Realtors*, 141 S. Ct. at 2486.

4.     His student loans actions are no different.  Just last year, the Supreme Court struck down an attempt by the President to force teachers, truckers, and farmers to pay for the student loan debt of other Americans—to the enormous tune of $430 billion.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).  In striking down that attempt, the Court declared that the President cannot "unilaterally alter large sections of the American economy."  *Id.* at 2375.

5.     Undeterred, the President is at it again, even bragging that "the Supreme Court blocked it.  They blocked it.  But that didn't stop me."[2]

6.     Indeed, just 10 days after the Supreme Court issued its decision in *Biden v. Nebraska*, the Federal Government published a rule that seeks to "cancel" an even *larger* amount of student loan debt, forcing American taxpayers to pick up the tab.  The Final Rule is titled "Improving Income Driver Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL Program)."  *See* 88 Fed. Reg. 43,820.  A true and correct copy of the Final Rule is attached hereto as Exhibit #1.

7.     That new rule is the subject of this lawsuit—referred to by Defendants as the "SAVE Plan"—and is set to take full effect on July 1, 2024.

8.     The Wharton School of the University of Pennsylvania estimates the economic cost of the President's newest rule at $475 billion across 10 years, $45 billion more than the program struck down by the Supreme Court.  *Biden's New Income-Driven Repayment ("SAVE") Plan: Budgetary Cost Estimate Update*, Penn Wharton University of Pennsylvania (July 17, 2023).[3]

---

[2] Remarks by President Biden on the Saving on a Valuable Education Plan, Culver City, CA, (Feb. 21, 2024), https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/02/21/remarks-by-president-biden-on-the-saving-on-a-valuable-education-plan-culver-city-ca/
[3] https://budgetmodel.wharton.upenn.edu/issues/2023/7/17/biden-income-driven-repayment-budget-update

Others estimate the total economic cost as even higher, more than $1 trillion—more than double the cost of the program declared unlawful last summer. *See, e.g.*, Travis Hornsby, *New REPAYE Plan Could Save Borrowers Over $1 Trillion Over 10 Years*, Student Loan Planner (Dec. 20, 2023).[4]

9.     The President, in fact, was in such a rush to defy the Supreme Court that the Federal Government failed to update the Final Rule to account for the Supreme Court's decision.  Not only does the rule never cite *Biden v. Nebraska*, but it even goes so far as to conduct a cost-benefit analysis on the false assumption that the Supreme Court had *upheld* the rule, *see* 88 Fed. Reg. 43875, when the Supreme Court in fact did the opposite, *Biden v. Nebraska*, 143 S. Ct. at 2375. This alone is arbitrary and capricious, and it is just the tip of the iceberg.

10.     The Federal Government admits that Congress created an income-driven repayment system—called "Income Based Repayment" or "IBR"—that statutorily permits student-loan cancellation only after a borrower pays 15% of disposable income (defined to be income above 150% of the federal poverty line "FPL") for up to 25 years.  (The amounts are 10% and 20 years for loans taken out after July 1, 2014, and the time is shortened to 10 years for individuals working in public service.)  *See* 20 U.S. Code §§ 1098e, 1087e(m)(1); 34 C.F.R. §§ 682.221(b), 685.219.

11.     Yet the Federal Government seeks to evade these statutory limits by relying on purported authority from older amendments to the HEA, the ICR amendments.  88 Fed. Reg. 43826–27 ("This statutory language clearly grants the Secretary authority to make the changes in this rule related to the amount of income protected from payments, the amount of income above the income protection threshold that goes toward loan payments, and the amount of time borrowers

---

[4] https://www.studentloanplanner.com/new-repaye-plan-ten-year-cost/

must pay before repayment ends."). The Federal Government seeks to hike the exempt-income threshold from 150% to 225%, slash the payment obligation from 15% to 5% for undergraduates, and permit forgiveness after as few as 10 years instead of 25.

12.    This rule unlawfully seeks to evade the limits Congress set out in statute for the IBR program. It also would gut the statutory purpose of providing loans. By their nature, loans require repayment except in extenuating circumstances. The Federal Government's thresholds are set so high—arbitrarily so—that it creates a grant for most borrowers. In other words, unlike every other loan program, the *majority* of borrowers will receive a grant. Indeed, the Federal Government bragged in March that the clear majority of individuals on this new plan—57%—are paying *nothing*. This is not a student loan program. It is a grant program that Congress never authorized.

13.    As Defendant Biden once remarked, "The framers intentionally chose not to create a parliamentary system of government. They meant for the President and Congress to be independent of and co-equal with one another. Maintaining each of those branches as strong and independent is fundamental to the Constitution's very structure--a structure they designed to safeguard the liberty of the governed against abuses of power by those who govern." *Proceedings of the United States Senate in the Impeachment Trial of President William Jefferson Clinton, Volume IV: Statements of Senators Regarding the Impeachment Trial of President William Jeffreson Clinton*, S. Doc. 106-4 (1999).[5] By usurping Congressional authority to the tune of hundreds of billions of dollars (if not more), and flouting the Supreme Court, Defendants seek to strike a blow to the Constitution's very structure and centralize power within the executive alone.

---

[5] https://www.govinfo.gov/content/pkg/CDOC-106sdoc4/html/CDOC-106sdoc4-vol4.htm

14.     The President's "Plan B" attempt to force taxpayers to pay for the debts of others is no stronger than his "Plan A" attempt that was blocked last year.  In fact, just days after Plaintiffs announced they would file this suit, the President announced a Plan C, which his "advisers hope to use the rules to begin canceling waves of student debt in the run-up to the November election." Andrew Restuccia, *Biden to Make Second Attempt at Large-Scale Student Loan Forgiveness*, WSJ (Apr. 5, 2024).[6]  This Court should speedily put a stop to the President's unlawful attempt— again—to skirt Congress and the Constitution.

## THE PARTIES

15.     Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, financial, employment, and proprietary interests.

16.     Andrew Bailey is the 44th Attorney General of the State of Missouri.  Attorney General Bailey is authorized to bring actions on behalf of Missouri that are "necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary."  Mo. Rev. Stat. § 27.060.

17.     Plaintiff State of Arkansas is a sovereign state of the United States of America. Arkansas sues to vindicate its sovereign, quasi-sovereign, financial, employment, and proprietary interests.

18.     Tim Griffin is the Attorney General of Arkansas.  Attorney General Griffin is authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts."  Ark. Code Ann. 25-16-703.

---

[6] https://www.wsj.com/politics/policy/biden-to-make-second-attempt-at-large-scale-student-loan-forgiveness-ef1da5fe

19.     Plaintiff State of Florida is a sovereign state of the United States of America. Florida sues to vindicate its sovereign, quasi-sovereign, financial, employment, and proprietary interests and those interests of its political subdivisions.  *See Florida v. Becerra*, 544 F. Supp. 3d 1241, 1253 (M.D. Fla. 2021) (recognizing that for standing purposes the State of Florida includes its political subdivisions).

20.     Ashley Moody is the Attorney General of the State of Florida.  She is authorized by Florida law to sue on the State's behalf.  *See* § 16.01, Fla. Stat.

21.     Plaintiff State of Georgia is a sovereign state of the United States of America. Georgia sues to vindicate its sovereign, quasi-sovereign, financial, employment, and proprietary interests.

22.     Christopher M. Carr is the Attorney General of the State of Georgia.  He is authorized by Georgia law to sue on the State's behalf.  GA Code § 45-15-3(6).

23.     Plaintiff State of North Dakota is a sovereign State of the United States of America. North Dakota sues to vindicate its sovereign, quasi-sovereign, financial, employment, and proprietary interests.

24.     Drew Wrigley is the Attorney General of North Dakota.  Attorney General Wrigley is authorized to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state."  N.D.C.C. § 54-12-01(2).

25.     Plaintiff State of Ohio is a sovereign state of the United States of America.  Ohio sues to vindicate its sovereign, quasi-sovereign, financial, employment, and proprietary interests.

26.     Dave Yost is the Attorney General of Ohio.  Attorney General Yost is Ohio's chief law enforcement officer and "shall appear for the state in the trial and argument of all civil and

criminal causes in the supreme court in which the state is directly or indirectly interested."  Ohio Rev. Code § 109.02.

27.     Plaintiff State of Oklahoma is a sovereign state of the United States of America. Oklahoma sues to vindicate its sovereign, quasi-sovereign, financial, employment, and proprietary interests.

28.     Gentner Drummond is the duly elected Attorney General for the State of Oklahoma. Being the chief law officer of the state, General Drummond is empowered "[t]o appear for the state and prosecute and defend all actions and proceedings in any of the federal courts in which the state is interested as a party."  OKLA. STAT. tit. 74, § 18b(A)(2).

29.     Defendants are officials of the United States Government and United States governmental agencies responsible for implementing the Final Rule and the SAVE Plan.

30.     Defendant Joseph R. Biden, Jr., is the President of the United States of America. He is sued in his official capacity.

31.     Defendant Miguel A. Cardona is the United States Secretary of Education (the "Secretary") and is responsible for the operation of the Department, including the issuance of the challenged rule. 20 U.S.C. § 3411.  He is sued in his official capacity.

32.     Defendant United States Department of Education (the "Department") is an agency of the United States government, located at 400 Maryland Avenue, S.W., Washington, D.C. 20202.

**JURISDICTION AND VENUE**

33.     This Court has jurisdiction pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 1331, 1361, and 2201,

34.     This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201–2202, and its inherent equitable powers.

35.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1).  Defendants are United States agencies or officers sued in their official capacities.  Plaintiff Missouri is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the Complaint occur within this district.

36.     Plaintiff States Missouri, Arkansas, Florida, Georgia, North Dakota, Ohio, and Oklahoma bring this action to redress harms to their sovereign, quasi-sovereign, financial, employment, and proprietary interests, including their interests under 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

### A.     The Higher Education Act of 1965 and Amendments

37.     The Higher Education Act of 1965 ("the HEA") was enacted "to increase educational opportunities and 'assist in making available the benefits of postsecondary education to eligible students in institutions of higher education.'"  *Biden*, 143 S. Ct. at 2362 (quoting 20 U.S.C. § 1070(a) (cleaned up).

38.     Among other things, the HEA provided for two different forms of financial assistance: grants and loans.  *See* 20 U.S.C. § 1070-1070h, § 1071-1087-4.

39.     Initially, the HEA authorized the Federal Government only to guarantee private loans.  20 U.S.C. §§ 1071 et seq.  In 1993, however, Congress amended the HEA to authorize direct loans from the Federal Government to students through the William D. Ford Federal Direct Loan Program ("DLP") and allowed the Department to offer plans for repayment of student loans. 20 U.S.C. §§ 1087a *et seq.*

40.     Among the repayment plans authorized by the 1993 amendments was an Income-Contingent Repayment plan ("ICR") requiring "repayment of such loan, including principal and interest," with "varying annual repayment amounts based on the income of the borrower, paid over

an extended period of time prescribed by the Secretary, not to exceed 25 years."  *See* 20 U.S.C. § 1087e(d)(1)(D).  Defendants try to invoke this authority to justify their SAVE Plan.

41.     Unlike statutory authority passed years later for the "Income-Based Repayment" program, this statute contains no textual authorization for cancelling loans.

42.     In 1994, the Department implemented the first income-contingent repayment plan, which limited annual loan payments to 20% of a borrower's income in excess of 100% of the federal poverty line.  The Department also, without explicit authorization, established by rule that borrowers who had a remaining balance after 25 years of timely payments would have the remaining balance forgiven.  *See The Federal Direct Student Loan Program*, Congressional Research Service, at 15 (1995).[7]

43.     Any incidental cancellation under that rule was small.   The Government Accountability Office estimated that only nine percent of borrowers participated in ICR.  GAO *Direct Student Loans: Analysis of Borrowers' Use of Income Contingent Repayment Option* 7 (1997).[8] And of that subset, the Department estimated that only "approximately 12% of [participating] borrowers would not [fully] repay within the 25-year period." *Id.* at 11.  That meant that, consistent with the statutory purpose of the ICR in obtaining "repayment of such loan, including principal and interest," 20 U.S.C. § 1087e(d)(1), nearly everybody was expected to pay their loans: only about 1 percent of borrowers received some cancellation of debt.

44.     In 2007, Congress determined that the income-contingent program was not sufficiently protective, so it enacted three significant changes to the HEA.

45.     First, Congress established an updated program, called the Income-Based Repayment ("IBR") plan—which became available in addition to the income-*contingent*

---

[7] https://files.eric.ed.gov/fulltext/ED378875.pdf
[8] https://www.gao.gov/assets/hehs-97-155.pdf

repayment plan.  This new program provided relief for borrowers facing a *temporary* "financial hardship" by increasing the exempt-income threshold from 100% of the federal poverty line to 150% and decreasing the annual repayment cap from 20% to 15% of disposable income.  *See* 20 U.S.C. § 1098e(a)(3)(B), (b)(1).  Eligibility for this program remains only "during any period the borrower has the partial financial hardship," *id.*, as that term is defined in 20 U.S.C. § 1098e(a)(3).

46.     Second, unlike with the ICR program, Congress included statutory text expressly giving the Department authority to cancel debt.  *Id.* § 1098e(b)(7).  The Secretary was directed to "cancel any outstanding balance" for persons under the IBR program who have met certain requirements, including payment for a period of time "not to exceed 25 years."  *Id.*  For the first time, Congress also expressly authorized forgiveness for persons who have "made payments under an income-*contingent* repayment plan," but *only* if those borrowers joined the income-*based* repayment plan.  *Id.* § 1098e(b)(7)(A), (b)(7)(B)(iv) (emphasis added).  The statute does not contain authorization for persons who are on ICR plans only.

47.     Third, the IBR program (unlike the ICR program) expressly authorizes the Secretary to subsidize the interest of borrowers—but only for a limited time.  If the amount of a borrower's monthly payment under the program is not sufficient at that time to cover monthly interest, then the Secretary must, "on subsidized loans," pay the difference between the borrower's payment and the interest due that month.  § 1098e(b)(3).  But the Secretary may do so only during the first 3 years after the borrower elects to participate in the IBR program.  *Id.*  In contrast, the ICR provisions expressly permit the Secretary only to "limit[ ] the amount of interest that may be capitalized."  § 1087e(e)(5).  In other words, borrowers under the ICR program still must pay the interest.  They may simply avoid the interest becoming capitalized into the principal.

48.     The 2007 amendments also established the Public Service Loan Forgiveness ("PSLF") program.  Under the PSLF, the Secretary was granted the authority to "cancel the balance of principal and interest" of borrowers who made 120 eligible monthly payments while employed in a "public service job."  *See* 20 U.S.C. § 1087e(m)(1).  By reducing the statutory amount of time to receive forgiveness from 25 years to 10, this program offered a powerful incentive to pursue public service employment.

49.     The last significant statutory amendments to loan repayment statutes were made in 2010.  That year, the President urged Congress to pass a "bill" to make IBR more generous by lowering the payment cap to 10% (from 15%) of income above 150% of the federal poverty guideline and ensure that "debt will be forgiven after 20 years," down from 25 years under IBR. Barack Obama, *Remarks by the President in State of the Union Address* at 5 (Jan. 27, 2010).[9]  The President did not lay claim to being able to accomplish those changes unilaterally.  Instead, the President "urge[d] the Senate to follow the House and pass a bill" to that effect.  *Id.*

50.     Congress did so in the Health Care and Education Reconciliation Act of 2010 but expressly restricted the amended terms to "new borrower[s] on or after July 1, 2014."  20 U.S.C. § 1098e(e).

51.     While Congress has set specific statutory limits on loan forgiveness, the Department has routinely tried to exercise power to lower the eligibility thresholds.  Moreover, the Department has unilaterally overridden some of these provisions in the rulemaking process to make them higher.  For example:

   i.     In 2012, the Department established the Pay as You Earn (PAYE) plan, which retroactively extended the 2010 statutory amendments to loans taken out as far

---

[9] https://www.govinfo.gov/content/pkg/DCPD-201000055/pdf/DCPD-201000055.pdf

back as 2007, despite statutory language stating that the amendments should apply only to loans taken out after July 1, 2014.  *See* 77 Fed. Reg. 66,088.

    ii.    In 2015, the Department established the REPAYE plan, extending the 2010 amendments to all borrowers regardless of when they took out the loans.  80 Fed. Reg. 67,204.

52.    Even with the Department's changes, the average individual borrower under the REPAYE plan would still ultimately pay back more than the amount that they took out in loans. 88 Fed Reg. 43,880.

53.    While the HEA includes a variety of provisions allowing the secretary to promulgate regulations for income-driven repayment and other repayment programs, no provision of the HEA delegates to the Secretary authority to convert a student "loan" program into what is effectively a student "grant" program for the majority of borrowers.  By statute, loan forgiveness is supposed to be the exception, not the rule—an acknowledgment that writing off bad loans is unavoidable in any industry.  Nor does the HEA include authority for the Department to use the ICR program to evade the statutory limits of the IBR program.

**B.    Congressional Inaction and Defendants' Failed Attempt at Mass Cancellation**

54.    Congress has not enacted any substantial amendments to the HEA, or otherwise passed laws providing amending the treatment of student debt, since 2010.  But that does not mean that Congress has left the issue un-considered.

55.    In July 2019, Senator Elizabeth Warren introduced the Student Loan Debt Relief Act of 2019, a bill that would have automatically canceled $50,000 of student loan debt for those

who make under $100,000.  Congress chose not to pass the bill.  *See* Student Loan Debt Relief Act of 2019, S. 2235, 116th Cong. (2019).[10]

56.     In March 2021, Representative Al Lawson introduced the Income-Driven Student Loan Forgiveness Act, which would have cancelled the outstanding balance on loans for all borrowers under a certain income cap.  *See* Income-Driven Student Loan Forgiveness Act, H.R. 2034, 117th Cong. (2021).[11]  Congress chose not to pass the bill.

57.     Frustrated by their lack of success in the legislative arena, some members of Congress then began to assert that the President could skirt Congress and cancel loans through executive action.   In February 2021, Senators Elizabeth Warren and Chuck Schumer and Representatives Alma Adams, Ilhan Omar, and Mondaire Jones introduced resolutions asserting that the Biden Administration has statutory power to cancel student debt immediately.  Elizabeth Warren, *Warren, Schumer, Pressley, Colleagues: President Biden Can and Should Use Executive Action to Cancel up to $50,000 in Federal Student Loan Debt Immediately* (Feb. 4, 2021).[12]

58.     But even this unbinding resolution was too controversial to pass.  The Senate resolution was signed by 20 members and still failed.  S.R. 46, *A Resolution Calling on the President of the United States to Take Executive Action to Broadly Cancel Federal Student Loan Deb*t, 117th Congress (2021).[13]  The same is true of the House resolution, which was signed by 68 members of the House but was not popular enough to get a vote.  H.R. 100, *Calling on the President of the United States to Take Executive Action to Broadly Cancel Federal Student Loan Debt*, 117th Cong. (2021).[14]

---

[10] https://www.congress.gov/bill/116th-congress/house-bill/3887
[11] https://www.congress.gov/bill/117th-congress/house-bill/2034
[12] https://www.warren.senate.gov/newsroom/press-releases/warren-schumer-pressley-colleagues-president-biden-can-and-should-use-executive-action-to-cancel-up-to-50000-in-federal-student-loan-debt-immediately
[13] https://www.congress.gov/bill/117th-congress/senate-resolution/46
[14] https://www.congress.gov/bill/117th-congress/house-resolution/100

59.     Still, the resolutions had their desired effect.   On August 24, 2022, the Administration announced that, under the HEROES Act, it would cancel $10,000 to $20,000 in student debt for all borrowers who have loans owned by the Department and whose annual income was less than $125,000 (or $250,000 for married borrowers who file jointly).   *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022).[15]

60.     The Wharton School of the University of Pennsylvania released a study concluding that the Department's Mass Debt Cancellation would cost up to $519 billion over ten years, and the overall cost could rise to more than $1 trillion when factoring in the other components of the Department's announcement.   *See The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, Penn Wharton University of Pennsylvania (Aug. 26, 2022).[16]

61.     On September 29, 2022, six states—including Plaintiff States Missouri and Arkansas here—sued in federal court to block that unlawful executive action.   They were successful.

62.     In *Biden v. Nebraska*, the Supreme Court rejected Defendants' assertion that they could use a vague provision of the HEROES Act as authority to transfer half a trillion dollars in wealth from taxpayers to student loan borrowers.   143 S. Ct. 2355.

63.     In holding that "the HEROES Act provides no authorization for the Secretary's plan," the Supreme Court also found that "the 'economic and political significance' of the Secretary's action is staggering by any measure."   *Id.* at 2373 (citing *West Virginia v. EPA*, 597 U.S. 697 (2022) (cleaned up)).   Beyond "the ordinary tools of statutory interpretation," the

---

[15] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/
[16] https://budgetmodel.wharton.upenn.edu/issues/2022/8/26/biden-student-loan-forgiveness

Defendants' efforts were unlawful because "the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." *Id.* at 2375 (cleaned up).

64.     The ruling confirmed what the Democratic Speaker of the House had already professed: "People think that the President of the United States has the power for debt forgiveness. He does not. . . . That has to be an act of Congress. . . . The President can't do it." *See* Lauren Camera, *Pelosi: Biden Lacks Authority to Cancel Student Debt*, U.S. News & World Report (July 28, 2021).[17]

**C.     The Proposed Rule**

65.     After the six States sued over the August 2022 rule, the President's administration began working feverishly on a Plan B.  On January 11, 2023, just one month after the Supreme Court granted certiorari in *Biden v. Nebraska*, Defendant Department issued the Proposed Rule, entitled, "Notice of Proposed Rulemaking on Improving IDR for the Direct Loan Program."  *See* 88 Fed. Reg 1894.

66.     The Proposed Rule was characterized as an effort "to amend the regulations governing income-contingent repayment plans by amending the Revised Pay as You Earn (REPAYE) repayment plan, and to restructure and rename the repayment plan regulations under the William D. Ford Federal Direct Loan (Direct Loan) Program, including combining the Income Contingent Repayment (ICR) and the Income-Based Repayment (IBR) plans under the umbrella term of 'Income-Driven Repayment (IDR) plans.'"  *Id.*

67.     The Proposed Rule required that any and all comments must be submitted "on or before February 10, 2023," *id.*, a mere thirty days later.

---

[17] https://www.usnews.com/news/education-news/articles/2021-07-28/pelosi-biden-lacks-authority-to-cancel-student-debt

68.     The provisions in the Proposed Rule were "estimated to have a net budget impact of $137.9 billion across all loan cohorts through 2032." *Id.* at 1895.  Critically, the Department arrived at this number only by assuming that the Supreme Court would *uphold* its August 2022 mass cancellation effort.  88 Fed. Reg. 43875.

**D.      Commenting Period for the Proposed Rule**

69.     Despite the economic and political significance of the Proposed Rule, the Department denied all requests for extensions beyond the thirty-day period it had originally established. *Id.* at 43821.

70.     By its nature, the condensed timeline reduced the number of people who could have otherwise provided valuable comments and prohibited other individuals and entities that ultimately submitted comments to develop their arguments adequately given the truncated period.

71.     Despite these limitations, commenters raised concerns about the legal authority of the Department to impose this new rule.

72.     Specifically, commenters raised concerns that: (1) the Secretary and Department were acting in excess of statutory authority, *id.* at 43826; (2) the provisions in the Final Rule implicated the major questions doctrine and violated the federal separation of powers, *id.* at 43830; and (3) the provisions in the Final Rule are arbitrary and capricious, *id.* at 43848, -58.

73.     Another commenter raised concerns with the Proposed Rules "cost estimates, which account for the Administration's onetime debt relief plan to forgive $20,000 for Pell Grant eligible borrowers and $10,000 for other borrowers," and  "suggest[ed] that [the Department] should produce a secondary cost estimate in the event that the loan cancellation plan does not go into effect." *Id.* at 43875.  In other words, the commenter noted that if the Supreme Court rejected

17

the President's August 2022 mass cancellation attempt, the Proposed Rule would artificially discount the cost estimate by tens, if not hundreds, of billions of dollars.

74.     In a March 13, 2023 public letter, the Congressional Budget Office ("CBO") expressed a belief that the Proposed Rule would cost $230 million. *See Congressional Budget Office, Re: Costs of the Proposed Income-Driven Repayment Plan for Student Loans,* (Mar. 13, 2023).[18]   The letter also noted that the cost estimate employed by the Department relied on assumptions that "there would be no increase in enrollment in the IDR plan among current or future borrowers[,] no increase in borrowing among eligible students in the future," and that the Supreme Court would rule in its favor in *Biden v. Nebraska. Id.* at 2, 7–8.  In the event the Supreme Court ruled against the Department, the CBO found that the cost estimate would increase by another $46 billion in the first year alone. *Id.* at 2.

**E.     The Final Rule**

75.     Shortly after the Supreme Court's ruling in *Biden v. Nebraska*, Defendant Biden released a statement calling "the Court's decision . . . wrong" and promising to "stop at nothing" to evade the ruling.  *Statement from President Joe Biden on Supreme Court Decision on Student Loan Debt Relief*, The White House (June 30, 2023).[19]

76.     True to his word, the President's administration released the Final Rule just 10 days after *Biden v. Nebraska*, on July 10, 2023.  *See* 88 Fed. Reg. 43,820.

77.     Eager to evade the Supreme Court's ruling as quickly as possible, the President's administration released the Final Rule without bothering to update any analysis in light of *Biden*

---

[18] https://www.cbo.gov/system/files/2023-03/58983-IDR.pdf
[19] https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/30/statement-from-president-joe-biden-on-supreme-court-decision-on-student-loan-debt-relief/

*v. Nebraska* or amend financial assumptions that were wholly reliant on the administration prevailing in that case.  In fact, the Final Rule does not even cite that case.

78.     The Final Rule amends 34 C.F.R. §§ 682, 685.  *See* 88 Fed. Reg. 43,889–905.

79.     The Final Rule, except for limited designated provisions, is set to take effect on July 1, 2024.  88 Fed. Reg. 43820.

80.     As an initial matter, the Final Rule "rename[s] the REPAYE [plan] as the Saving on a Valuable Education (SAVE) plan."  *Id.* at 43822.  Under the Final Rule, all borrowers on a "REPAYE" plan are categorized under the "SAVE" plan.  *Id.*  Although the "REPAYE" and "SAVE" plans are the same under the Final Rule, "the Department [] refer[s] to the SAVE plan as REPAYE throughout this final rule."  *Id.*  The Final Rule also "combin[es] the Income Contingent Repayment (ICR) and the Income-Based Repayment (IBR) plans under the umbrella term of 'Income-Driven Repayment' (IDR) plans."  *Id.* at 43820.

81.     The Final Rule makes several significant changes to preexisting regulations: for the "REPAYE" or "SAVE" plan, the Final Rule: (1) defines "discretionary income" to be income above 225% of the applicable Federal poverty guideline, up from the current 150%; (2) sets the monthly payment amount at $0 if the borrower's income falls below that threshold; (3) caps the monthly payment amount at 5% of the borrower's income that goes above that threshold for undergraduate loans, down from the current 10% to 15%; (4) forgives any interest that is not paid off each month, despite the statutory limit in the IBR program permitting interest subsidization only for the first 3 years; and (5) accelerates cancellation to as quick as 10 years, even if a borrower is not enrolled in Public Service Loan Forgiveness.  *See id.* at 43900–05.

82.     Under the Final Rule, loans are eligible for complete cancellation after 10 years if the original balance was less than $12,000.  The number of years increases for every $1,000 in

original principle balance, so a person with an original principal amount of $13,000 will be eligible for complete cancellation after 11 years. *Id.* at 43903.

83.     Under authority proscribed by the HEA, *see* 20 U.S.C. 1089(c)(2), Defendant Cardona designated certain provisions for "early implementation" in the Final Rule, including:

i.     "Adjusting the treatment of spousal income in the REPAYE plan for married borrowers who file separately as described in § 685.209(e)(1)(i)(A) and (B);"

ii.     "Increasing the income exemption to 225 percent of the applicable poverty guideline in the REPAYE plan as described in § 685.209(f);"

iii.     "Not charging accrued interest to the borrower after the borrower's payment on REPAYE is applied as described in § 685.209(h);"

iv.     "Designating in § 685.209(a)(1) that REPAYE may also be referred to as the Saving on a Valuable Education (SAVE) plan;"

v.     "[C]hanges to the definition of family size for Direct Loan borrowers in IBR, ICR, PAYE, and REPAYE in § 685.209(a) to exclude the spouse when a borrower is married and files a separate tax return;" and

vi.     "[T]he provision awarding credit toward forgiveness for certain periods of loan deferment prior to the effective date of July 1, 2024, as described in § 685.209(k)(4)."

*Id.* at 43820–21. Defendants used this designation to implement those identified provisions before the July 1, 2024 effective date of the Final Rule.

84.     The Final Rule emphasizes that the goal of the changes is to help more borrowers avert delinquency and default as well as the negative consequences associated with those events, *see id.* at 43280, but not to create a "grant," *see id.* at 43832.

85.     The data within the Final Rule tells a different story.  The Final Rule states that it will apply to a clear majority of borrowers.  *Id.* at 43823.  And according to the Department's own figures, the typical undergraduate borrower under this new "SAVE" plan would pay only about $6,121 for every $10,000 borrowed.  *Id.* at 43880.

86.     Under the current/pre-Rule "REPAYE" plan, that amount is $10,956 for every $10,000 borrowed.  *Id.*

87.     In other words, while the typical borrower under the current plan repays at least as much as they borrowed, the typical borrower under the new plan will only pay 61% of what they borrowed.  Thus, the Final Rule transforms the typical "loan" into a 39% "grant"—without any appropriation from Congress for the resulting billions of dollars in additional federal spending.

88.     In fact, the Final Rule is so forgiving that it would benefit borrowers in *every* quintile of lifetime income.  *Id.* at 43878.  Undergraduate borrowers with *above*-median incomes will have the total amounts of their payments across the life of their loans reduced by as much as 30%.  *Id.*  Far from a program to help atypical Americans avoid default, this is a program to turn loans into grants even for borrowers making more money than most Americans.

89.     The Final Rule rejects challenges to the Department's legal authority by ignoring the entire absence of statutory authority to forgive loans under the ICR program (under which the Final Rule proceeds) and then arguing that the HEA "sets an explicit upper limit, but no lower limit for the 'extended period' time that a borrower must spend in repayment" and that the Secretary has "discretion as to how much a borrower must pay, specifying only that payments must be set based upon the borrower's annual adjusted gross income."  *Id.* at 43826-27.

90.     The Final Rule asserts that the Secretary has the "authority to make the changes in this rule related to the amount of income protected from payments, the amount of income above

the income protection threshold that goes toward loan payments, and the amount of time borrowers must pay before repayment ends."  *Id.* at 43827.

91.     The Department seems to believe that the only limitation on its authority under the HEA is to provide a "reasoned basis for the parameters it chose." *Id.*

92.     The Final Rule does not acknowledge any statutory limiting principle on the Secretary's authority to abolish debts and does not dispute that the Department's interpretation of the relevant statutes would permit the Department to de facto cancel all student loans.

93.     The Final Rule expressly states, for example, that the Department believes it could exempt even 400% or more of the federal poverty line from income.  The Department simply is not doing so "at this time."  *Id.* at 43831.

94.     Under this view, there is nothing in the HEA that would prevent the Secretary from limiting debt repayment on income-contingent repayment plans to: 0.01% of income over $1,000,000 for 1 year only, with all remaining debt—typically 100%—cancelled by the Federal Government.

95.     The Final Rule brushes off comments that the program was a matter of economic significance that did not have clear Congressional authorization by stating that there is not anything "unprecedented or novel about the Department relying on section 455 of the HEA as statutory authority for designing and administering repayment plans based on income."  *Id.* at 43830.

96.     But by the Department's own estimates, the Final Rule would abolish extraordinary amounts of debt and convert loans into grants for the *typical* borrower.  That is incontestably unprecedented and novel—especially when Congress expressly placed statutory limits in place in the IBR program that prohibit the Department from doing the same thing to IBR loans, as the Department is forced to acknowledge.  *See id.* at 43851.

97.     While the Final Rule notes that commenters argued that its provisions are matters of economic and political significance that require "clear Congressional authorization," it includes no discussion as to whether the Final Rule was an issue of economic or political significance that required clear Congressional authorization.  *Id.* at 43830.  To the contrary, the Final Rule suggests that the Secretary's power is unlimited unless Congress stops him.  *See id.* ("Yet Congress has taken no action to limit the Secretary's discretion . . . .").

98.     It is also uncontestable that the Final Rule does not accurately estimate the extraordinary cost of the program.  The Final Rule estimates that the cost of the program would be $156 billion across the span of ten years.  *Id.* at 43820, 43886.  But that estimate is expressly based on the (false) assumption that the Department would prevail at the Supreme Court in *Biden v. Nebraska*.  The Final Rule says that the Department's cost estimates "account for the Administration's one-time debt relief plan to forgive $20,000 for Pell Grant eligible borrowers and $10,000 for other borrowers" and then falsely says "[t]his issue remains before the Supreme Court" even though the Supreme Court had already issued its decision rejecting that program 10 days earlier.  *Id.* at 43875; *see also id.* at 43886 ("This estimate is based on … the August 2022 announcement that the Department will discharge up to $20,000 in Federal student loans for borrowers ….").  Rather than heed the advice by one commenter to create a "cost estimate in the event that the loan cancellation plan does not go into effect," the Department dismissed the suggestion and stated it was "confident in our authority" on the issue.  *Id.* at 43875.

99.     Unlike the Department, which steadfastly refuses to assess costs after *Biden v. Nebraska*, other organizations have assessed the cost of the Final Rule.  Before the Final Rule was published, the CBO informed Congress that, if the administration lost *Biden v. Nebraska*, the Department's Final Rule could cost an additional $46 billion in the first year alone, on top of its

10-year estimate of $230 billion. *See Congressional Budget Office, Re: Costs of the Proposed Income-Driven Repayment Plan for Student Loans,* at 2 (Mar. 13, 2023).[20]  After the Supreme Court decided *Biden v. Nebraska* and the Department published the Final Rule, the CBO scored a joint resolution that would repeal the Final Rule. *See At a Glance H.J. Res. 88, a joint resolution providing for Congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Department of Education relating to "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program,"* CBO at 1 (Sept. 18, 2023).[21]  The CBO assessed the 10-year cost of the Departments plan at $260.7 billion. *Id.*  That total is $104 billion more than the estimate in the Final Rule.

100.    The CBO also stated that the actual cost of the Final Rule by itself would be higher, but CBO decided to discount the cost because of anticipated savings provided by a separate rule. *Id.* at 6.

101.    The CBO also noted that the Department's estimate was "much lower" than CBO's because the "the department's estimate incorporates the costs of the Administration's plan to cancel up to $20,000 in outstanding balances for eligible borrowers" even though "[t]he Supreme Court invalidated the loan cancellation plan on June 30, 2023." *Id.*  The Department also failed to "include any costs for increased borrowing among eligible students in the future." *Id.*

102.    Similarly, shortly after the Final Rule was released, the Wharton School of the University of Pennsylvania published a budget model that found the Final Rule's would have a net cost *three times higher* than the government projected, coming in at over $475 billion across a 10-year budget, more than the program struck down in *Biden v. Nebraska. See Biden's New Income-*

---

[20] https://www.cbo.gov/system/files/2023-03/58983-IDR.pdf
[21] https://www.cbo.gov/system/files/2023-09/hjres88.pdf

*Driven Repayment ("SAVE") Plan: Budgetary Cost Estimate Update*, Penn Wharton University of Pennsylvania (July 17, 2023).[22]

103.    More recently, commentators estimated that the true costs of the Final Rule could exceed one trillion dollars, or *more than double* the economic impact of the loan-cancellation rule the Supreme Court last year declared illegal, in part because of the total's "staggering" economic significance.  *See, e.g.*, Travis Hornsby, *New REPAYE Plan Could Save Borrowers Over $1 Trillion Over 10 Years*, Student Loan Planner (Dec. 20, 2023).[23]

**F.    Congressional Inaction on the SAVE Plan**

104.    Perhaps sensing the legal vulnerability with Defendants' unprecedented actions, several members of Congress have introduced legislation to codify the SAVE Plan.  A bill was introduced in the House signed by 16 members, and in the Senate signed by 14 members.  *See* Codifying SAVE Plan Act, H.R. 6593, 118th Cong. (2023);[24] *Gillibrand Announces Legislation To Protect Historic Student Loan Debt Relief; Urges Borrowers To Apply For "SAVE Plan"* (Apr. 2, 2024).[25]  Neither chamber in Congress has passed this legislation.

**G.    Defendants Rush to Cancel Loans Months Earlier Than Scheduled**

105.    Even though loan cancellation was not supposed to occur under the Final Rule until July 2024, Defendants decided earlier this year—with almost no notice—to accelerate.

106.    On January 16, the Department of Education published a half-page notice in the Federal Register saying that it would begin implementing early cancellation just 5 days later, on

---

[22] https://budgetmodel.wharton.upenn.edu/issues/2023/7/17/biden-income-driven-repayment-budget-update
[23] https://www.studentloanplanner.com/new-repaye-plan-ten-year-cost/
[24] https://www.congress.gov/bill/118th-congress/house-bill/6593
[25] https://www.gillibrand.senate.gov/news/press/release/gillibrand-announces-legislation-to-protect-historic-student-loan-debt-relief-urges-borrowers-to-apply-for-save-plan/

January 21—despite previously saying Defendants would wait until July.  89 Fed. Reg. 2489.  The Department provided no explanation for this change in policy.

107.    On February 21, 2024, Defendant Biden announced in a "Fact Sheet" that this had occurred.  He announced the "approval of $1.2 billion in student debt cancellation for almost 153,000 borrowers" pursuant to "a SAVE plan policy that provides debt forgiveness to borrowers who have been in repayment after as little as 10 years and took out $12,000 or less in student loans." *FACT SHEET: President Biden Cancels Student Debt for more than 150,000 Student Loan Borrowers Ahead of Schedule*, The White House (Feb. 21, 2024).[26]

108.    In the same "Fact Sheet," Defendant Biden boasted that while "[o]riginally planned for July, the Biden-Harris Administration implemented this provision of SAVE and is providing relief to borrowers nearly six months ahead of schedule."  *Id.*

109.    The "SAVE plan policy" and "provision of SAVE" referenced by Defendant Biden is found in the Final Rule at 34 C.F.R. § 685.209(k)(3), which provides that "a borrower receives forgiveness if the borrower's total original principal balance on all loans that are being paid under the [SAVE] plan was less than or equal to $12,000, after the borrower has satisfied 120 monthly payments or the equivalent, plus an additional 12 monthly payments or the equivalent over a period of at least 1 year for every $1,000 if the total original principal balance is above $12,000."  88 Fed. Reg. 43903.

110.    Section 685.209(k)(3) was not designated in the Final Rule for early implementation.

111.    An "Issue Brief" published by White House Counsel of Economic Advisors on February 21, 2024, explains that "the full SAVE regulations will go into effect on July 1, 2024,

---

[26] https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/21/fact-sheet-president-biden-cancels-student-debt-for-more-than-150000-student-loan-borrowers-ahead-of-schedule/

but the Department of Education has implemented three key benefits already," and identifies the provisions in Paragraphs 51(i), 51(ii), and 51(iii).  *See Issue Brief: The Benefits of SAVE*, The White House Counsel of Economic Advisors (Feb. 21, 2024).[27]  While the brief notes that "[a]s of February 2024, borrowers who borrowed $12,000 or less will receive forgiveness after making the equivalent of 10 years of payments," it provides no justification for the early implementation of this provision.  *Id.*

**H.      The Final Rule Irreparably Harms Plaintiff**

**i.      The Final Rule harms a public instrumentality that services loans in Missouri**

112.    The Higher Education Loan Authority of the State of Missouri ("MOHELA") is "a public instrumentality and body corporate" of the State of Missouri that performs "an essential public function" by providing residents access to student loans.  Mo. Rev. Stat. § 173.360; *see also Biden*, 143 S. Ct. at 2366.

113.    Because it is a public instrumentality of Missouri, "harm to MOHELA is also a harm to Missouri."  *Biden*, 143 S. Ct. at 2366.

114.    MOHELA's purpose is to ensure that all eligible post-secondary education students in Missouri have access to guaranteed student loans.  Since 2010, MOHELA has provided roughly $100 million in funding for college scholarships in the State of Missouri.  As of 2022, MOHELA "owns over $1 billion in FFELs"—that is, MOHELA owns asset-backed securities made up of student loans.  *Id.* at 2365.  As of 2022, "[i]t also services nearly $150 billion worth of federal loans, having been hired by the Department of Education to collect payments and provide customer service to borrowers."  *Id.*  "MOHELA receives an administrative fee for each of the five million federal accounts it services, totaling $88.9 million in revenue [in 2022] alone."  *Id.*  "Its profits

---

[27] https://www.whitehouse.gov/cea/written-materials/2024/02/21/issue-brief-the-benefits-of-save/

help fund education in Missouri: MOHELA has provided $230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships for Missouri students." *Id.*

115.    MOHELA is authorized to act as a servicer for student loan debt, see Mo. Rev. Stat. § 173.385.1(18), and it may use fees and charges from that activity "to pay the costs of the authority," § 173.385.1(12).

116.    MOHELA is a servicer for federally held student debt, including Direct Loan program loans, under contracts with the Education Department.  The amount of federally held student debt MOHELA services is substantial.  As of June 30, 2023, (the date of the most recent financial statement) the entity services roughly $344.4 billion in federal direct loans representing over 7.8 million accounts, which are primarily DLP loans.  *See Financial Statements and Schedule of Expenditures of Federal Awards: Higher Education Loan Authority of the State of Missouri As of and for the Years Ended June 30, 2023 and 2022 With Reports of Independent Auditors* 4, MOHELA (2023) ("FY 2023 Financial Statement").[28]  Servicing revenue for fiscal year 2023 were $279.2 million.  *Id.* at 4.

117.    And while much of what MOHELA does is service loans owned by the Federal Government, MOHELA also owns $874 million of legacy FFELP loans.  *Id.* at 6, 8.  The entity generates revenue from those outstanding FFELP loans.  *See Financial Statements: Higher Education Loan Authority of the State of Missouri As of and for the Years Ended June 30, 2021 and 2020 With Reports of Independent Auditors* 7, MOHELA (2021).[29]

118.    Since 2020, MOHELA has greatly expanded the number of loans it services.  While the organization now services 7.8 million accounts, in 2020, it serviced just 2.4 million.

---

[28] Available at https://www.mohela.com/DL/common/publicInfo/financialStatements.aspx
[29] *Id.*

MOHELA, *Letter to Senators Warren, Blumenthal, Van Hollen, Markey, Brown, and Menendez* at 2 (Aug. 8, 2023).[30]

119.    "The majority of the increase was net direct loan servicing fees."  FY 2023 Financial Statement at 4.  But part of that increase comes from MOHELA obtaining status as the sole servicer of all PSLF loans.  *Id.*  In 2022, the Federal Government "completed [a] transfer of all PSLF borrowers from FedLoan Servicing to MOHELA."  Federal Student Aid, Department of Education, *Public Service Loan Forgiveness Program Transitioning from FedLoan Servicing to MOHELA* (Dec. 14, 2022).[31]  Borrowers interested in PSLF are directed to seek loan consolidation, which would create a "new loan [that] will be sent to MOHELA for general servicing."  *Id.*

120.    MOHELA faces the imminent loss of revenue in its role as a servicer of loans owned by the Federal Government.  MOHELA's revenue as a servicer of those loans is a function of the number of accounts it services.  "MOHELA receives an administrative fee for each of the five million federal accounts it services"—now 7.7 million loans.  *See Biden*, 143 S. Ct. at 2366. The Supreme Court determined that MOHELA suffers financial harm whenever loans that it services are discharged.  *Id.*  So when student loan balances go to zero, as they will under the Final Rule, MOHELA will lose the revenue from servicing those loans.  Thus, by accelerating the forgiveness timeline for the typical borrower by as much as 15 years, the Final Rule imposes financial harm on MOHELA, and thus the State of Missouri, by depriving MOHELA of up to 15 years in servicing fees.

121.    MOHELA also faces past loss and imminent future loss of revenue in its role as owner or holder of loans—specifically, legacy FFELP loans.  Unlike the current loan program,

---

[30] https://www.warren.senate.gov/imo/media/doc/Servicers%20Responses.pdf#page=43
[31] https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-06-03/public-service-loan-forgiveness-program-transitioning-fedloan-servicing-mohela-updated-dec-14-2022

where the Federal Government owns and issues loans, FFELP loans were commonly issued by private lenders and commercially owned. As of MOHELA's most recent financial statement, it owns $874 million in outstanding FFELP loans.

122.    But the Final Rule drastically reduces the value of those assets by providing borrowers an enormous incentive to consolidate FFELP loans into loans owned by the government and eligible for the new cancellation plan. The Federal Government is even permitting consolidation of FFELP loans *ineligible* for consolidation and is, for the first time ever, conferring benefits retroactively so that forgiveness arrives sooner. Before the Final Rule, consolidated loans had always been considered new loans, with the clock for forgiveness beginning at the time of consolidation. Now, Defendants are permitting borrowers to consolidate loans into new loans and immediately shave off years from forgiveness. This dramatically encourages borrowers to consolidate their FFELP loans into Defendants' new plan.

123.    The Federal Government in fact expressly tells borrowers to do so. *E.g.*, Federal Student Aid, Department of Education, *What to Know About Federal Family Education Loan (FFEL) Program Loans* (last visited April 4, 2024)[32] (encouraging borrowers to consolidate because "if your loan isn't held by ED [Department of Education], you won't be able to qualify for some federal student loan relief programs unless you consolidate into a Direct Consolidation Loan"); Federal Student Aid, Department of Education, *Which Federal Student Loans Qualify for the Saving on a Valuable Education (SAVE) Plan?* (last visited April 4, 2024)[33] ("FFEL Program loans and Perkins Loans are not eligible for this plan but can become eligible through loan consolidation.").

---

[32] https://studentaid.gov/articles/what-to-know-about-ffel-loans/
[33] https://studentaid.gov/help-center/answers/article/federal-student-loan-qualifications-for-repaye-plan

124.    By making consolidation of FFELP loans much more likely, the Final Rule harms MOHELA with respect to the loans it owns in several ways.

125.    First, if a borrower consolidates a FFELP loan to take advantage of the SAVE Plan, MOHELA will no longer own that loan.  MOHELA will thus lose its ability to earn interest income generated by the FFELP assets that it owned.

126.    Second, MOHELA will lose the ability to service most of these loans.  Because MOHELA is a smaller participant in the servicing industry, it is allocated only a minority percentage of all direct loans to service.  Even if MOHELA were able to service every consolidated loan, the service fee is less than the interest income MOHELA would otherwise earn.

127.    Third, the SAVE Plan makes it much less likely that a borrower will pay off a FFELP loan in full.  Many borrowers will instead consolidate.  That decreases the expected return on investment for owners of FFELP loans and thus decreases the value for selling those loans on the tradeable market.

128.    The Final Rule impairs MOHELA's ability to provide services to Missouri residents, and harms Missouri's interest in ensuring its citizens receive an education.  *See* Mo. Const. art. IX, § 9(b) ("The general assembly shall adequately maintain the state university and such other educational institutions as it may deem necessary.").

**ii.      The Final Rule impairs the ability of public-service employers to recruit employees**

129.    The Final Rule also injures all Plaintiff States' interests in recruiting and retaining employees.

130.    For example, the Final Rule harms Missouri's interest in hiring and retaining employees across state and local government who use PSLF program for undergraduate and graduate student loans.  Missouri relies upon a robust and dedicated public workforce.  As a matter

of statute, and the reality of public budgets, the State cannot always offer salaries on par with that of private employers around the state.  To bridge the gap and make public employment more attractive, the State of Missouri and its political subdivisions, as employers, rely on the PSLF to recruit and retain employees who would otherwise seek private employment but for the benefits of the PSLF program.

131.     The Missouri Attorney General's Office ("AGO") heavily emphasizes PSLF benefits when recruiting employees.  *See* Declaration of Rachael Houser ¶¶ 5–7 ("Houser Decl."), attached hereto as Exhibit #4.  The Office tells potential recruits this information at "career fairs" and "in interviews with potential employees."  *Id.* ¶ 5.  "[A]t every single one" of the Office's ten recruiting events each year, "students have asked about whether the AGO is a qualifying employer for PSLF."  *Id.*  The program is so popular that, of the 13 law school graduates hired by the Office last year, "[a]lmost every one of these attorneys indicated that their decision to work for the AGO was informed, in part, due to the fact that employees in the public sector are eligible for PSLF." *Id.*  AGO employees commonly are "attracted to public service . . . because of the rewarding and valuable work," but it is much easier for them to accept much lower salaries by the availability of "eventual public-service loan forgiveness."  *See* Declaration of Jason Lewis ¶ 14 ("Lewis Decl."), attached hereto as Exhibit #2.

132.     Part of what makes the program so valuable is that it is *comparatively* much more generous than other repayment programs.  "[I]f programs were rolled out that would have reduced my lower monthly payments or allowed my loans to be forgiven earlier, it would have been less likely that I would have chosen to advance my career in public service and the AGO."  *Id.* ¶ 17; *see also id.* ¶ 22 ("If my monthly student loan payments were reduced significantly enough without

needing to work in qualifying public service employment, then there would also be less financial reason for me to continue employment with the AGO or public service more generally.").

133.    The program is also valuable for retaining employees.  "In the last 18 months, 2 attorneys in the labor division completed their PSLF requirements, and quickly left the AGO for jobs that pay substantially more.  These attorneys stayed with the AGO for 10 years in pursuit of PSLF, and would otherwise have left much sooner.  An employee leaving the office after satisfying PSLF often tells the office they stayed only because of PSLF."  Houser Decl. ¶ 8.  "Another attorney in the labor division was seeking new career opportunities, but limited her job search to other public sector employers because she was only 3 years away from PSLF, and its benefits far outweighed the higher salaries available to her in the private sector.  This attorney had determined that the benefits of PLSF meant that she would rather continue working in the public sector than seek private employment."  *Id.* ¶ 9.  PSLF becomes especially valuable the longer a person stays in public service because forgiveness grows nearer.  Lewis Decl. ¶ 16 (PSLF "has been critical to my decision to continue to work in public service").

134.    PSLF is so important for government agencies because, before the Final Rule, PSLF was comparatively much more generous than any other federal loan repayment program.  That gave borrowers a sizeable incentive to work for public service employers.  Borrowers in the program could receive loan forgiveness after just 10 years rather than the 25 years under the other programs.  In addition, PSLF borrowers do not face tax liability on the amount forgiven, unlike borrowers under other programs.  In exchange for these generous benefits, borrowers make a commitment to work for public service organizations, such as state or local governments and agencies.

135.    Once the Final Rule takes effect, however, PSLF will not be nearly as attractive compared to other income-driven repayment programs.  Its comparative advantage will shrink or disappear entirely.  Under the SAVE Plan, most individuals on an income-contingent repayment plan will have monthly payments that equal $0 per month.  Other individuals with $12,000 or less in loans will have them forgiven after ten years of repayment—the same amount of time required for public service loan forgiveness.  And because of the American Rescue Plan Act of 2021, individuals who receive accelerated loan forgiveness through a program outside PSLF before 2026 will be exempt from tax liability for the amount forgiven.

136.    All these factors make PSLF much less attractive.  Because many borrowers will no longer need PSLF to obtain accelerated loan forgiveness and to obtain a tax exemption on the amount of loans forgiven, those borrowers will be unlikely to commit themselves to the PSLF program.  The same is true even for borrowers who will not receive substantial accelerated forgiveness.  Because the repayment on a typical loan under the SAVE Plan is so much less than previous plans, many borrowers will choose to accept that plan rather than limit their employment options to public service for the next 10 years.  Fewer borrowers will enter the PSLF program, and many in the program will leave their jobs because the program no longer carries the comparative benefits it once did.

137.    The Final Rule impairs Missouri's interests by discharging the debt held by public employees, harming the ability of the State and its political subdivisions to recruit and retain employees.  *See*, *e.g.*, *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (A party "suffer[s] constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" against them).

138.    The same is true for Arkansas.  The challenged rule will impair and hamper Arkansas's ability to recruit and retain employees with educational debt.  Like many public sector employers, Arkansas's state agencies, constitutional offices, and various political subdivisions typically cannot offer compensation on par with private sector employers.  As a result, Arkansas's state agencies, constitutional offices, and various political subdivisions rely upon the public sector student loan forgiveness program to help attract and retain talent.  By waiving away undergraduate and graduate debt, the challenged rule will weaken that incentive and make it more difficult for Arkansas to fill public sector jobs.

139.    For instance, the Office of the Arkansas Attorney General currently relies upon the public sector student loan forgiveness program to attract and retain legal talent.  Many of the office's current employees participate in that program to obtain relief for undergraduate and graduate loans, and potential employees consider that program in evaluating whether to accept public sector employment.  Indeed, that is particularly true for lawyers, who often incur substantial debts.

140.    PSLF is an important recruitment and retention tool for Arkansas.  "The Arkansas Attorney General's Office actively advertises its participation in the PSLF program on its website to attract potential applications for employment."  *See* Declaration of Dawnetta Calhoun ¶ 8 ("Calhoun Decl."), attached hereto as Exhibit #3.  "The State of Arkansas also advertises the participation of state agencies in the PSLF program on its websites to attract potential employees."  *Id.*  Currently, 23 out of 159 employees rely on the program.  *Id.* ¶¶ 6, 12.  Other current employees have participated in the program, as have past employees.  *Id.*

141.    "A reduction in student loan obligations otherwise eligible for relief under the PSLF program will make participation in that program less attractive to current and potential employees.

Thus, if the published rule takes effect, the Arkansas Attorney General's Office will lose a valuable tool for recruiting potential employees and retaining existing employees because the PSLF program will no longer carry the same comparative benefit that it once did." *Id.* ¶ 13.

142.    The challenged rule's blanket forgiveness waters down the PSLF incentive, makes public sector employment less attractive, and will make it more difficult for the office to retain and attract legal talent.

143.    Indeed, recognizing the importance of the public sector student loan forgiveness program to attracting and retaining employees, Arkansas does not tax debt forgiven pursuant to the public sector student loan forgiveness program.  See Ark. Code Ann. 26-51-404(b)(10).  That contrasts with cancellation pursuant to other federal programs and statutes—including cancellation pursuant to the challenged rule.  See Ark. Code Ann. 26-51-404(a)(1)(E).

144.    Arkansas likewise faces financial harm.  As detailed above, Arkansas currently relies upon the public sector student loan forgiveness program to attract and retain employees. Employees and potential employees consider that forgiveness in calculating overall compensation. Absent that financial incentive, Arkansas will have to increase other forms of compensation to attract and retain employees.  Those additional expenses will reduce Arkansas's ability to fund other state expenses and programs.

145.    For similar reasons to the above, Florida, Georgia, North Dakota, Ohio, and Oklahoma are also harmed by the Final Rule.

146.    For example, the State of Florida relies on public sector loan forgiveness to recruit employees.  In general, Florida's state agencies do not offer compensation at the same level as private employers, and the prospect of public sector loan forgiveness is an important tool to recruit

and retain qualified employees. By removing the need for such programs, the challenged rule impairs Florida's ability to recruit top talent to serve the people of the State of Florida.

147.    The Office of the Florida Attorney General relies on public sector loan forgiveness as a recruiting tool. *See, e.g.*, John R. *Justice Grant Program, Florida Attorney General's Office* (last visited April 5, 2024) (providing information on grant programs available to public sector attorneys).[34]   The availability of such programs is particularly important for employees like lawyers who may have debt incurred from both graduate and undergraduate degrees.

148.    Similarly, for the State of Ohio, public sector loan forgiveness has a significant, positive impact on recruitment and retention efforts.  In general, Ohio state agencies do not always offer compensation at the same level as private employers, and the prospect of public sector loan forgiveness is an important tool to recruit and retain qualified employees. *See, e.g*., *Why Work for The State of Ohio*, Education and Development (last visited April 5, 2024)[35] ("Working for the state government gives employees the unique opportunity to apply for student loan forgiveness after making 10 years of qualifying payment while working for the state government.").  Such programs are particularly important for employees like lawyers who may have incurred student debt from both graduate and undergraduate degrees.

149.    Indeed, Ohio law generally does not tax student loan debt that has been forgiven. *See Income – General Information, Does Ohio Tax Student Loan Debt That Has Been Forgiven?* (last visited April 5, 2024).[36]   By removing the comparative advantages for public sector loan forgiveness programs, the challenged rule impairs Ohio's ability to recruit top talent to serve the People of the State of Ohio.

---

[34] https://www.myfloridalegal.com/home-page/john-r-justice-grant-program
[35] https://careers.ohio.gov/why-work-for-state-of-ohio/education-and-development/03-education-and-development
[36] https://dam.assets.ohio.gov/image/upload/tax.ohio.gov/documents/studenloan.pdf

### iii.    The Final Rule Harms State Revenue

150.    Missouri will face financial harm from the Final Rule.  Under Missouri tax law, an individual's taxable state income is based on their federal adjusted gross income ("AGI") as a baseline.  *See* Mo. Rev. Stat. § 143.121.  While the federal AGI normally includes student loan discharge, *see* 26 U.S.C. § 61(a)(11), that input was removed under the American Rescue Plan Act of 2021 for student loan debt discharged before January 1, 2026, *see* 26 U.S.C. § 108(f)(5).  Thus, the student loan debts that will receive accelerated forgiveness under Final Rule and be forgiven before 2026 will not be considered taxable income under Missouri law.  This will reduce the State's tax revenues until 2026.

151.    Specifically, under the plans in existence before the Final Rule, the Government Accountability Office (GAO) estimated that by 2030, "about 1.5 million loans held by about 600,000 borrowers" would be eligible for loan cancellation.  *Federal Student Aid: Education Needs to Take Steps to Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness* 15, U.S. Gov't Accountability Office (Mar. 2022).[37]  Of those loans, just 0.3 million would be forgiven before 2026.  *See id.* at 16 fig. 3.

152.    But for the Final Rule, significant numbers of federal loan cancellations would occur after 2026 for residents of Missouri and would result in taxable income being recognized from the loan forgiveness and thus increased payments of income taxes to Missouri.

153.    The Final Rule's income and payment threshold numbers make the harm from early cancellation even worse.  By increasing the income exemption to 225% and decreasing the payment amount to 5%, the unpaid loan balances will be even higher through 2025, meaning Missouri and similar States will lose out on even more taxation revenue.

---

[37] https://www.gao.gov/assets/gao-22-103720.pdf

154. The challenged Final Rule, however, will reduce that tax revenue by accelerating some debt forgiveness that would otherwise occur in a period in which it would be taxable income (*i.e.*, 2026 and on) into a period where it is not taxable (*i.e.*, through December 31, 2025). As a result, the Defendants' actions will reduce Plaintiff Missouri's tax revenue.

155. Missouri also faces a separate sovereign injury from the Final Rule, as a result of having to either accept the lost tax revenues identified above or change state tax law for the determination of an individual's taxable state income.

156. Most other Plaintiff States will likewise face similar sovereign and financial harm from the rule. For example, under Georgia and Oklahoma tax law (like under Missouri law), an individual's taxable state income is based on adjustments to their federal AGI. *See* O.C.G.A. § 48-7-27(a); OKLA. STAT. tit. 68, §§ 2353, 2358.

### iv. The Final Rule Directly Harms the Business of the State of North Dakota

157. The State of North Dakota is engaged in the business of banking "[f]or the purpose of encouraging and promoting agriculture, commerce, and industry." N.D.C.C. § 6-09-01. For that purpose, North Dakota "maintain[s] a system of banking owned, controlled, and operated by it, under the name of the Bank of North Dakota." *Id.*

158. In this capacity, the Bank of North Dakota funds and administers a state-sponsored student loan program and a student loan consolidation program. *See* N.D.C.C. ch. 15-62.1. The Bank of North Dakota's student loan offerings include the "Dakota Education Alternative Loan" or "DEAL" program for eligible borrowers attending institutions of higher education in North Dakota. *See* Bank of North Dakota, *DEAL Student Loan* (last visited Apr. 8, 2024).[38]  Interest

---

[38] https://bnd.nd.gov/education-funding/apply-for-student-loan/deal-student-loan/

earned by the Bank of North Dakota from student loans is used to implement, maintain, and administer state programs.  *See* N.D.C.C. §§ 15-62.1-01; 15-62.1-05.

159.     Student loan recipients that received or consolidated their student loans through the Bank of North Dakota will not be eligible to have their loans absolved under the Final Rule. Consequently, despite the convenience of the Bank of North Dakota working directly with in-state post-secondary institutions, the Final Rule will foreseeably cause many would-be student loan borrowers to forego borrowing from the Bank of North Dakota in the future if loans issued by the federal government may systematically not require repayment under their terms, if at all.

160.     Since the Bank of North Dakota's student loan program is the State of North Dakota engaged in business, harms to the Bank of North Dakota or its student loan programs are direct harms to the State of North Dakota itself.  *See Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (a party "suffer[s] constitutional injury in fact when agencies lift regulatory restrictions on their competitors").

## CLAIMS FOR RELIEF

### COUNT I – Violation of Administrative Procedures Act
### Agency Action in Excess of Statutory Jurisdiction and in Violation of Separation of Powers
### U.S. Const. art. I, § 1

### Major Questions Doctrine

161.     Plaintiffs re-allege all the above paragraphs as if fully set out herein.

162.     The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

163.     The Department is an "agency" under the APA.  *Id*. § 701(b)(1).

164.    The Final Rule is a "rule[]" under the APA.  *Id*. § 701(b)(2).

165.    The Final Rule is final agency action subject to judicial review.  *Id*. § 704.

166.    Separation-of-powers principles prohibit an agency from deciding an issue of great economic or political significance, or issues traditionally governed by state or local law, absent clear authorization from Congress to do so, under what Courts have recognized as the "major questions doctrine."  *West Virginia*, 597 U.S. at 724 (discussing the "major questions doctrine").

167.    The major questions doctrine is triggered when an agency attempts to seize broad authority over matters of great economic and political significance.  *See id*. at 721-22.

168.    The Final Rule concerns matters of vast political significance and salience because its provisions and outcomes relate to issues subject to earnest and profound debate in the American body politic for several decades where Congress has actively legislated.  *See Ian Krietzberg, Key events on the path to student loan forgiveness, from Occupy Wall Street to the 2020 presidential primaries*, CNBC (Aug. 24, 2022);[39] *see also Biden*, 143 S. Ct. at 2374 ("A decision of such magnitude and consequence on a matter of earnest and profound debate across the country must rest with Congress itself, or an agency acting pursuant to a clear delegation from that representative body.") (citing *West Virginia*, 597 U.S. at 735) (cleaned up).

169.    The Final Rule also concerns matters of great economic significance because the net updated cost of its provisions are projected to be at least $475 billion over a ten-year period, and maybe over $1.1 trillion according to some estimates.  That is more than the $430 billion at issue in *Biden v. Nebraska*.  Even under the Department's calculation of $156 billion—which is patently arbitrary because the calculation assumed the Department would prevail in *Biden v. Nebraska* even though the Department had already lost—that number is still sufficient to trigger

---

[39] https://www.cnbc.com/2022/08/24/timeline-key-events-on-the-path-to-student-loan-forgiveness.html

the major questions doctrine. *See Alabama Ass'n of Realtors*, 141 S. Ct. at 2489 ($50 billion triggered major questions doctrine). Nothing in the HEA nor its amendments give the Department of Education clear authorization to unilaterally spend between $475 billion and $1.1 trillion.

170. Moreover, departure from longstanding practice without new authorization from Congress is strong evidence the agency is acting without Congressional authorization. *See Nat'l Fed'n Indp. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022).

171. The Final Rule departs from the Department's nearly thirty-year definition of "income contingent repayment plan" by effectively turning a repayment plan into a grant for the typical borrower. Nothing in the HEA and its amendments gives the Department of Education the authority to resolve this debate by turning the terms of income-contingent loan repayment into a grant. The Final Rule's suggestion that the Secretary's authority on these plans is unlimited unless Congress acts to stop him has it exactly backward.

172. In addition, the Department has never once attempted to use rulemaking authority to use the ICR program to subsidize interest.

173. Nor has the Department ever sought to use its authority to permit forgiveness sooner than 20 years—which is the statutory term of years created for forgiveness by the IBR program. 20 U.S.C. 1098e(e).

174. The Final Rule triggers the major questions doctrine and violates principles of separation-of power by seizing broad authority over matters of great economic and political significance without clear congressional authorization.

175. Even if the Final Rule does not implicate the major questions doctrine, it still violates separation of powers. Congress only gave the Department authority to cancel student

loans in very "limited circumstances."  *See Biden*, 143 S. Ct. at 2362–63.  As the Supreme Court

put it last year, the Department may only cancel loans held by:

      i.    "some public servants … who work in their professions for a minimum number of years;"

      ii.    "borrowers who have died or been 'permanently and totally disabled;'"

      iii.    "[b]ankrupt borrowers;" or

      iv.    "borrowers falsely certified by their schools, borrowers whose schools close down, and borrowers whose schools fail to pay loan proceeds they owe to lenders."  *Id.*

176.    And while Congress is no doubt aware of the issue, it has chosen not to rewrite the

HEA by adding a new category of loan forgiveness as the Department has unilaterally done.  By

doing so unilaterally, Defendants have "seiz[ed] the power of the Legislature."  *Id.* at 2373.

177.    Members of Congress have introduced legislation that would accomplish this, *see,*

*e.g.,* Affordable Loans for Any Student Act, S.R. 3953, 117th Cong. (2022);[40] Student Loan

Borrowers' Bill of Rights Act of 2019, H.R. 3027, 116th Cong. (2019),[41] but that legislation did

not become law.

178.    The Department therefore has no authorization to forgive student loans in this

context, and the Department exceeded its authority when it issued the Final Rule.  Because the

Final Rule violates separation of powers, it should be set aside.

### COUNT II – Violation of the Administrative Procedures Act
### Agency Action That Is In Excess of Statutory Authority (5 U.S.C. § 706)

179.    Plaintiffs re-allege all the above paragraphs as if fully set out herein.

---

[40] https://www.congress.gov/bill/117th-congress/senate-bill/3953
[41] https://www.congress.gov/bill/116th-congress/house-bill/3027

180.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

181.    The Final Rule is contrary to law and exceeds the Department's statutory authority.

182.    *First*, the HEA does not authorize the Defendants to create a broad-based grant program or permit loan forgiveness outside the context of the IBR program.  The HEA and its amendments separate grants and loans into separate chapters.  The income-contingent repayment plan is in the chapter that addresses loans and anticipates actual *repayment* of the principal and interest borrowed.

183.    While Defendants have *some* discretion in setting the terms of loan repayment under the statute and there are circumstances where someone on this program might pay less than they would otherwise owe, the broad nature of the Department's actions in the Final Rule make it so that the *typical* undergraduate borrower only repays $6,121, including interest, for every $10,000 borrowed.

184.    Further, more than half the participants currently enrolled in the plan are expected to pay nothing.

185.    At this point, the loan is *at least* a partial or full grant because most borrowers will pay back significantly less than the principal they borrowed, and will be freed from their interest obligations.

186.    Congress already spoke in a separate chapter of the HEA and its amendments about what qualifies as a grant.  There is no authority for the proposition that Congress intended to turn the terms of a loan into a grant.

187.    *Second*, the HEA does not authorize Defendants to reduce the extended payment term to ten years.  The HEA states that the standard term of loan repayment is ten years.  The statute that authorizes income-driven repayment plan requires payment to occur over a period of time that is "extended" beyond the standard repayment period.  20 U.S.C. §1087e(d)(1)(D).  Yet the Final Rule allows borrowers to have their loans canceled after only ten years, the same amount of time as the standard repayment plan.

188.    This erases any meaningful difference between a standard repayment plan and an extended repayment plan because an extended repayment plan necessarily envisions a longer repayment period than the standard repayment plan.

189.    *Third*, the HEA does not authorize Defendants to completely nullify repayment limits set by Congress.  When Congress created the IBR program, Congress statutorily defined the terms of repayment for someone facing financial hardship as payments capped at 10% of income above 150% of the federal poverty line over the course of 20 years.  Congress also statutorily authorized the Secretary to subsidize interest for these financial hardship borrowers, but only "for a period of not more than 3 years."  20 U.S. Code § 1098e(b)(3).

190.    The Final Rule evades these limits without statutory authority.  The ICR program—which is the authority the Secretary attempts to rely on here—does not include *any* authorization to cancel loans.  Congress knows how to authorize forgiveness and expressly did so in the IBR program.  "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning."  *Bittner v. United States*, 598 U.S. 85, 94 (2023).  Here, Congress expressly included forgiveness in the income-based repayment section of the Higher Education Act but excluded it

from the income-contingent repayment section—the section the Secretary purports to rely on for authority.

191.    The Secretary is trying to use the ICR program to skirt the limits Congress placed in the IBR program.  The Final Rule would render the IBR limits pure surplusage.  The Secretary cannot use ICR authority to cancel loans at all, but at the very least, the Secretary cannot promulgate rules under the ICR program that are more forgiving than the statutorily promulgated limits in the IBR program.

192.    Congress has already given Defendants limited ability to "waive" FFELP loans. *See* 20 U.S.C.§ 1082(a)(6).  This provision shows the limits of what Congress authorized the Secretary to do with respect to "waiving" student loans.  Defendants disclaim reliance on this provision.  88 Fed. Reg. 43,834.  By cancelling loan debt on a mass basis through the income-driven loan repayment plan, Defendants are sidestepping those limits and flouting their statutory authority.

193.    *Fourth*, the HEA did not authorize Defendants to create new 10-year repayment plans.  Congress only provided one avenue where a borrower can receive loan forgiveness after ten years of repayment: the PSLF program.  *See* 20 U.S.C. § 1087e(m)(1).  The timeline for that program is defined in statute as 10 years.  The Final Rule renders this program pure surplusage for a substantial proportion of borrowers.

194.    Debates surrounding the bill that authorized public service loan forgiveness emphasized the importance of forgiving loans through this program because of the need to gear specific relief for those who pursue a career in public service.  *See* H.R. Rep. No. 110–210 at 48–49 (2007) ("the Committee is concerned with the growing number of individuals who do not choose to enter into lower paying professions, such as public service . . . . To further encourage

public service, the legislation includes revisions to the Direct Loan Income Contingent Repayment program.  Individuals who choose public service will have the option to have their loans forgiven after 10 years if payments are made during that time period.")

195.    This Final Rule provides forgiveness after ten years for anyone who has an original balance of $12,000 or less.  In fact, the Department has already retroactively forgiven hundreds of thousands of such loans regardless of the amount of interest accumulated on the principle balance.

196.    There is no authority for the proposition that anyone—regardless of career, income, or even unemployment—would have the same timeline for loan forgiveness as those who dedicated a decade of their career to public service.

197.    *Fifth*, the HEA did not authorize the Defendants to establish a repayment plan with a payment threshold at 5% of discretionary income above 225% of the federal poverty guidelines. In its 2012 Final Rule, the Department provided that the changes to Pay As You Earn ("PAYE") plan payment thresholds "will be consistent with the statutory changes to IBR."  77 Fed. Reg. 66116.  During the comment period for that same rule, commenters requested that the Department "[r]educ[e] the maximum IBR payment amount to five percent of adjusted gross income."  *Id.* at 66099.  The 2012 Final Rule responds that "[t]he Department does not have the authority to change this statutory provision."  *Id.* at 66100.  The 2012 Final Rule did not reduce the IBR or PAYE payment thresholds to 5% and claimed no authority to do so.

198.    In the 2015 Final Rule, the Department created the Revised Pay As You Earn "REPAYE" plan, which was "modeled on the existing Pay As You Earn repayment plan," but extended eligibility to "borrowers regardless of when the borrower took out the loans."  80 Fed. Reg. 67204.  The 2015 Final Rule adopted the same 10% payment threshold for REPAYE that was used in PAYE.  *Id.* at 67205.  While the commenter suggested that the REPAYE plan use a

5% payment threshold, the Department dismissed the idea. *Id.* at 67213. Separately, certain commenters "expressed support for streamlining the multiple IDR plans into one improved IDR plan that would cap monthly payments at 10 percent of income[ and] provide loan forgiveness after 20 years of payments" and suggested the Department use REPAYE as a model. *Id.* at 67209. The Department responded, without caveat, that "such a change would require congressional action." *Id.* at 67210. The 2015 Final Rule did not reduce the IBR or REPAYE payment thresholds to 5% and disclaimed authority to do so.

199. There has been no congressional action since the 2012 and 2015 Final Rules. The Defendants have not gained discretionary authority to reduce the 10% payment threshold prescribed by the HEA to 5%. The Final Rule's purported goal of "streamlin[ing] the number of IDR options available to borrowers" through the REPAYE/SAVE plan, with a 5% payment threshold is directly contrary to the discretionary limits that the Department itself expressed in 2015. The Final Rule's amendment of this threshold to 5% is contrary to the HEA.

200. *Finally*, the HEA did not authorize the Defendants "to establish a structure for a repayment option for borrowers who fail to recertify their income information on REPAYE" under Section 455(d)(4). *See* 88 Fed. Reg. 43827. The Final Rule asserts that "Sec. 455(d)(4) of the HEA provides the Secretary with discretion to craft 'an alternate repayment plan,' under certain circumstances." *Id.* (quoting 20 U.S.C. § 1087e(d)(4)). But the Final Rule omits necessary and relevant portions of that section. The full section reads: "[t]he Secretary may provide, *on a case by case basis*, an alternative repayment plan *to a borrower of a loan made under this part who demonstrates to the satisfaction of the Secretary that the terms and conditions of the repayment plans available under paragraph (1) are not adequate to accommodate the borrower's exceptional circumstances.*" 20 U.S.C. § 1087e(d)(4) (emphasis added).

201.    The Final Rule's reliance on the section is improper because the establishment of "a structure" for a group of borrowers is antithetical to the HEA's requirement that this subsection be applied "on a case by case basis."  Moreover, the reliance is improper where the section dictates that its application requires any borrower make a personalized showing that "the terms and conditions of the repayment plans available under paragraph (1) are not adequate to accommodate the borrower's exceptional circumstances."  20 U.S.C. § 1087e(d)(4).  Section 455(d)(4) of the HEA does not provide the Secretary with the discretion he now claims.

202.    Additionally, the Final Rule provides no evidence or argument that section 455(d)(4) is being used with respect to borrowers in "exceptional circumstances."  To the contrary, the Final Rule admits that "large numbers of borrowers currently fail to recertify" their information for their loans.  88 Fed. Reg. 43882.  Failure to meet this minimum requirement, which apparently many borrowers do, is by its own terms not an exceptional circumstance and thus cannot serve as the basis for invocation of this section.

203.    In all respects, Defendants' interpretation of the relevant statutory law is inferior.  But even if their interpretations made sense, they would create grave constitutional concerns that Congress has violated the nondelegation doctrine by giving the Secretary unbounded authority without an intelligible principle and that Congress has violated the Appropriations Clause by giving the Secretary authority to appropriate hundreds of billions of dollars in perpetuity.  At the very least, the canon of constitutional avoidance cautions strongly against adopting Defendants' position.

204.    The Final Rule is contrary to the HEA and its amendments.  It should be set aside.

### COUNT III – Violation of the Administrative Procedures Act
### Arbitrary and Capricious Agency Action (5 U.S.C. § 706)

205.    Plaintiffs re-allege all paragraphs above as if fully set out herein.

206.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, [or] an abuse of discretion"  5 U.S.C. § 706(2)(A).

207.    "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commun. Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

208.    The Final Rule is arbitrary and capricious for a number of independent reasons, including that Defendants failed to consider numerous important factors, including the full cost of the rule and important reliance interests.  Despite being aware of the shortcomings, Defendants declined to address them in the Final Rule or provided wholly inadequate explanations, brushing off concerns.  Elsewhere, the Final Rule's explanation is internally inconsistent.

209.    The Final Rule is unlawful even measured on its own.  It is even worse when measured against the cumulative effect it would have with the President's other mass loan cancellation policies, one of which was struck down and one of which was announced just last week.

210.    *First*, the Final Rule fails to capture, account for, or report the full cost of its implementation.  The Proposed Rule estimated the provisions would cost $137.9 billion over ten years.  That total was increased to $156 billion in the Final Rule.

211.    The Final Rule cost estimates, however, are based on the assumption that Defendants would prevail in *Biden v. Nebraska*.  Even though a commenter highlighted this limitation and offered a suggestion for avoiding a (likely) pitfall, the Department refused to produce a secondary estimate that reflected that possibility.

212. That would have been bad enough, and arbitrary enough, had the Final Rule been released before the Supreme Court's decision. It is even worse that the Department adopted this assumption *after* the Supreme Court had already ruled against the Department.

213. By relying on an assumption that had already been publicly and saliently proven false, the Department's cost calculation was by definition unreasonable. This is a violation of Defendants' statutory duty to "reasonably explain" the Rule, including by responding to "significant points" raised by the comments. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 343-344 (D.C. Cir. 2019).

214. When the Supreme Court rejected the Departments' mass debt cancellation plan, the Final Rule's estimated costs calculation became entirely untethered to reality. According to the CBO, a rejection of the mass debt cancellation plan would increase the estimated cost by nearly $50 billion *in the first year alone*. That does not even include the concomitant increases over the remaining nine years of the estimated period.

215. Separately, independent reviews have found the estimated cost identified in the Final Rule discounts the true cost of by a factor of three to seven over ten years.

216. Further, the Final Rule is does not have a ten year sunset provision. Thus, future borrowers will also be able to have their loans forgiven under this plan. The Department has acknowledged as much. *See* 88 Fed. Reg. 43823–33. The total cost of forgiving those loans and any other loans forgiven after 2033 are not calculated, or accounted for, as part of the Final Rule. They are sure to be staggering as the number of borrowers increase.

217. Though the number of future borrowers (and the amount of loans they will have forgiven) is currently unknown and unknowable, it is certain that future forgiveness under the Final Rule will drive up the total cost of its implementation. And Defendants forced it through anyway.

218.    Additionally, drastically reducing or eliminating the PSLF incentive will cause Plaintiff States to incur additional compensation expenses to recruit and retain employees.  The Final Rule does not consider this.

219.    *Second*, the Final Rule is arbitrary and capricious because it did not consider States' financial interest on tax revenue from loan forgiveness.

220.    Normally, "forgiveness" through income-contingent repayment is considered taxable income under by the Internal Revenue service.  The exception is for borrowers in the PSLF program.

221.    Many States, including Missouri, follow the federal definitions when defining income tax for state purposes, which normally includes student loan discharge.  Therefore, income-contingent repayment "forgiveness" is taxable income at the tate level for borrowers in many States.

222.    The American Rescue Plan Act of 2021, however, removed student loan discharge as an income for purposes of federal AGI through December 31, 2025.  *See* 26 U.S.C. § 108(f)(5).

223.    Despite being aware of this law, *see* 88 Fed. Reg. 43836 (referencing "American Rescue Plan"), the Department still unilaterally forgave hundreds of thousands of loans retroactively as they roll out this program.  Many of those loans would have been forgiven after December 31, 2025.  This accelerated forgiveness timeline deprives States of tax revenue.

224.    The Final Rule disregards this concern despite acknowledging comment raising concerns about the effect of the rule on "State tax revenue from loans that have been forgiven." *Id.* at 43877.

225.    *Third*, the Final Rule is arbitrary and capricious because it fails to consider the reliance interests of the Plaintiffs and their entities.  *See*, *e.g.*, *DHS v. Regents of the Univ. of Calif.*,

140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" (cleaned up) (citation omitted)).

226.    The Final Rule fails to consider the Plaintiff States' interest in using PSLF to recruit talent and remain competitive.  State and local government employers cannot pay as much as private sector employers because they are primarily funded by taxpayer dollars and operate on yearly, limited budgets.

227.    One of the tools they rely on to recruit and retain talent is the PSLF program.

228.    The Final Rule drastically reduces the power of that incentive by a) reducing the monthly payments of most borrowers to $0, regardless of loan size, and b) drastically accelerating the forgiveness timeline up to and including the same timeline that Congress reserved for public service borrowers.

229.    Commenters on the Proposed Rule also warned of this issue, but Defendant Department brushed aside these concerns despite noting "the benefits discussed in this regulation would also be available to those seeking PSL[F]."  88 Fed. Reg. 43,880.  This ignores Congress's explicit intent of creating a benefit specific to the PSLF program that would encourage young American to choose employment in the public sector.

230.    The Final Rule did not consider the Plaintiff States' reliance interest in this important program and therefore it is arbitrary and capricious.

231.    *Fourth*, the Final Rule is arbitrary and capricious because it changes course from nearly 30 years of Department practice on loan forgiveness.  Never before have the terms of loan repayment been unilaterally changed into loan forgiveness such that the *typical* undergraduate borrower repays *less* than what they took out: only $6,121 for every $10,000 borrowed.  These

borrowers no longer have to repay the full principal of their debts, not to mention the accumulated interest on those. This is a huge change of course.

232.    The Department has not only changed course without explanation but is wrongly denying changing course at all.  The Department states that it has taken actions similar to this in the past through the PAYE and REPAYE programs, but was never challenged on it.

233.    The absence of a challenge of course does not excuse the unlawful action.

234.    Regardless of the legality of past actions, their own data demonstrate this is not true.  Prior to this change, the average undergraduate borrower paid *more* than what they owed. This makes sense as they are loans that collect interest.

235.    This is the first time that the Department has tried to redefine the loan programs so that the *typical* borrower pays back *less* than the principal borrowed, with the remainder of the tab picked up by the American public.  This is a huge change of course that the Department refuses to acknowledge.

236.    In addition, the Department also changed course on the timing of loan forgiveness. Previously, all income-contingent loans would only be forgiven after 20-25 years.  Only public service loan forgiveness had a 10-year repayment timeline.

237.    The Final Rule now allows many borrowers outside the PSLF program to receive forgiveness after as few as 10 years.  This is a significant change of course from past practice.

238.    The Department refuses to acknowledge this change of course and instead tries to state that always had this authority.

239.    The Department also refuses to acknowledge its previous interpretations. "[U]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  *Encino Motorcars, LLC v. Navarro*, 579

U.S. 211, 222 (2016) (internal quotation marks omitted).  The Department previously disclaimed legal authority to reduce the 10% payment threshold prescribed by the HEA to 5% but now claims that authority.  *See* ¶¶ 198–199.

240.     *Fifth*, the Final Rule is arbitrary and capricious because it contains numerous internal contradictions.  As an example, the Final Rule repeatedly states that it is designed to avoid delinquencies and defaults by offering a more lenient income-contingent repayment plan.

241.     However, the Final Rule also states that the last change to the income-contingent repayment plan that lowered payments for individuals resulted in an increase is delinquencies and defaults.

242.     *Sixth*, the Final Rule is arbitrary and capricious because it failed to consider meaningfully the inflationary effects of the Final Rule, both specifically in the secondary education market and more generally for the entire U.S. economy.  The enormous inflationary pressures are an "important aspect of the problem" that Defendants were obliged to evaluate.  *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015)) (cleaned up).  They failed to do so and thereby violated the APA.

243.     *Seventh*, the Final Rule is arbitrary and capricious because it insists that the provisions do not offer a grant when they plainly do just that.  The Final Rules' statement is belied by the Department's own data demonstrating that most undergraduate borrowers would pay back significantly less than what they borrowed, regardless of whether the borrowers are suffering financial hardship, are at risk of default, or have undertaken a decade of valuable public service employment.

244.     This only makes sense when viewed through the lens of the Defendants using these justifications as a pretext and post hoc justification for improper ends.

245.    This Final Rule is not the product of a well-reasoned decision.  It is a pretext to evade a Supreme Court decision.

246.    The Final Rule was published ten days after the Supreme Court in *Biden v. Nebraska* struck down the Defendants' last ill-considered attempt at unlawful loan forgiveness. Just in February, Defendant Biden said, "The Supreme Court blocked it.  They blocked it.  But that didn't stop me," and, Defendant Cardona stated that if the Final Rule was not challenged in court "that means I'm not pushing hard enough."

247.    *Eighth*, the Department's income-exemption threshold (an increase from 150% to 225%) and the payment threshold (down to 5% from 10%) are arbitrary and capricious

248.    The Department justifies the 225% threshold, for example, by arguing that persons at that income threshold are "statistically indistinguishable from those with incomes below 100 percent of the FPL [federal poverty line]."  88 Fed. Reg. 43839.  The Department arrived at this unlikely conclusion by relying on data where persons self reported experiencing financial hardship. *Id.* at 43840.

249.    But the idea that certain individuals are "indistinguishable" financially from others making more than *twice* their income is self-refuting.  Americans of many different income levels experience financial difficulties, but the financial difficulties of a person with twice the income of another are qualitatively and quantitatively different.

250.    For all these reasons, the Final Rule is arbitrary and capricious.

### COUNT IV – Violation of the Administrative Procedures Act
### Agency Action in Violation of Statutory Procedures (5 U.S.C. § 706(2)(D))

251.    Plaintiffs re-allege all the above paragraphs as if fully set out herein.

252.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

253.    The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, *id.* § 553(b), and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c).  The Final Rule, therefore, only can be issued, if at all, pursuant to notice-and-comment rulemaking under the APA.  5 U.S.C. § 553.

254.    Here, when the Proposed Rule was issued, the comment period was limited to the minimum thirty days.  Defendants rejected requests to extend this period to 60 days, which would have allowed additional participation in the rule-making process.  This limited time period violated the APA.

255.    The Final Rule is not an interpretive rule, general statement of policy, nor is it a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.  Instead, the Final Rule is a substantive rule for APA purposes.   *See* 5 U.S.C. § 551(4)–(5).  Further, it is a final rule because it represents the culmination of the agency's consideration and affects rights and obligations.  *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

256.    "[A] thirty-day period is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals *that are complex* or based on scientific or technical data.'  The Administrative Conference itself thus suggests 'a sixty-day period as a more reasonable *minimum* time for comment.'"  *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (cleaned up) (emphasis added) (citation omitted).

257.    Executive Orders 12866 and 13563 both state that comment periods should generally be at least 60 days.  *See* 58 Fed. Reg. 51735 (Sept. 30, 1995) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most

cases should include a comment period of *not less than* 60 days." (emphasis added)); 76 Fed. Reg. 3821-22 (Jan. 21, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days." (emphasis added)).  The proposed rule asks for the public's help in "complying with the specific requirements of Executive Orders 12866 and 13563 and their overall requirement of reducing regulatory burden that might result from these proposed regulations."  88 Fed. Reg. 1895.

258.    For these reasons, most other agencies routinely provide at least sixty days of commenting for major rules.

259.    Providing only thirty days for commenting on a major rule such as this one is an outlier—and one for which the Department offered no meaningful explanation.

260.    Here the Final Rule is both complex and enormously impactful—tens or hundreds of billions of dollars turn on each of its major parameters

261.    In these circumstances, Defendants violated the APA by only providing thirty days for comment.

262.    This error was prejudicial and denied the public (including Plaintiffs) an adequate opportunity to comment on the proposed rule.

### COUNT V – Violation of the Administrative Procedures Act
### Arbitrary and Capricious Agency Action (5 U.S.C. § 706)

263.    Plaintiffs re-allege all paragraphs above as if fully set out herein.

264.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short

of statutory right; [or] (D) without observance of procedure required by law."   5 U.S.C. § 706(2)(A), (C), & (D).

265.   The HEA requires that regulations affecting programs under title IV of the HEA be published in final form by November 1 prior to the start of the award year—July 1—to which they will apply.   *See* 20 U.S.C. § 1089(c)(1).   The HEA provides the Secretary with discretion to "designate any regulatory provision that affects the programs under this subchapter and is published in final form after November one as one that an entity subject to the provision may . . . choose to implement prior to the effective date in [section 1089(c)(1)]."   *Id.* § 1089(c)(2)(A).   Even with that discretion, however, the statute requires the Secretary to "publish any designation under this subparagraph in the Federal Register."   *Id.*

266.   The Final Rule was published on July 10, 2023, and under 20 U.S.C. § 1089(c)(1), it was required to have an effective date of July 1, 2024.

267.   Though Defendant Cardona designated certain provisions for early implementation in the Final Rule, no designation was made at that time for the implementation of 34 C.F.R. § 685.209(k)(3) before July 1, 2024.

268.   Defendant Cardona did not make a designation until January 16, 2024, and announced that loan cancellation would begin commencing just 5 days later.   Defendants never made any comment to explain why they were shifting position.

269.   Defendants implemented 34 C.F.R. § 685.209(k)(3), in whole or in part, between January 21 and February 21, 2024.

270.   The implementation of 34 C.F.R. § 685.209(k)(3) occurred prior to its originally announced effective date under the Final Rule.

271.    Defendants implementation of 34 C.F.R. § 685.209(k)(3) resulted in the "approval of $1.2 billion in student debt cancellation for almost 153,000 borrowers."

272.    This early implementation was arbitrary and capricious because it resulted in a substantial effect on the public treasury without any reasoned explanation for why Defendants were accelerating loan cancellation by nearly 6 months.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

Plaintiff States respectfully request this Court:

a.      issue an order and judgment declaring that the Final Rule violates the separation of powers established by the U.S. Constitution;

b.      issue an order and judgment declaring that the Final Rule violates the APA because it is contrary to law, is in excess of statutory authority, is arbitrary and capricious, is an abuse of discretion, and is without observance of procedure required by law;

c.      issue an order and judgment declaring that the early implementation of 20 U.S.C. § 1089(c)(2) violates the APA because it is contrary to law, is in excess of statutory authority, and is without observance of procedure required by law;

d.      temporarily restrain and preliminarily and permanently enjoin implementation and enforcement of the Final Rule;

e.      vacate and set aside the Final Rule;

f.      award Plaintiff States reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

g.      grant any additional and further relief as the Court may deem just and appropriate.

Date: April 09, 2024

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine_____
Joshua M. Divine, #69875MO
   *Solicitor General*
Reed C. Dempsey #1697941DC
   *Deputy Solicitor General*
Samuel Freedlund, #73707MO
   *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
josh.divine@ago.mo.gov
samuel.freeland@ago.mo.gov
reed.dempsey@ago.mo.gov

*Counsel for Plaintiff*
*State of Missouri*
*Lead Counsel for State Plaintiffs*

**TIM GRIFFIN**
**Attorney General of Arkansas**

/s/Nicholas Bronni_____
Nicholas J. Bronni
   *Solicitor General*
Dylan L. Jacobs
   *Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for*
*State of Arkansas*

Respectfully Submitted,

**ASHLEY MOODY**
**Attorney General**

/s/James H. Percival_____
James H. Percival
   *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

**CHRISTOPHER M. CARR**
**Attorney General**

/s/Stephen J. Petrany_____
Stephen J. Petrany
   *Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

**DREW H. WRIGLEY**
**Attorney General**

/s/ Philip Axt_____
Philip Axt
   *Solicitor General*
North Dakota Attorney General's Office
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

**DAVE YOST**
**Ohio Attorney General**

/s/ T. Elliot Gaiser
T. Elliot Gaiser
   *Solicitor General*
Mathura J. Sridharan
   *Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for Plaintiff State of Ohio*

**GENTNER DRUMMOND**
**Attorney General of Oklahoma**

/s/ Garry M. Gaskins, II
Gentner Drummond, OBA #16645
   *Attorney General*
Garry M. Gaskins, II, OBA #20212
   *Solicitor General*
Office of the Attorney General
State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Fax:  (405) 522-4815
gentner.drummond@oag.ok.gov
garry.gaskins@oag.ok.gov

*Counsel for*
*State of Oklahoma*