# EXHIBIT 6

NEW ISSUE—BOOK-ENTRY-ONLY

**$197,500,000**

**MOHELA®** **Higher Education Loan Authority of the State of Missouri**
**Taxable Student Loan Asset-Backed Notes,**
**Series 2021-3**

The Higher Education Loan Authority of the State of Missouri (the "Issuer"), a public instrumentality and body politic and corporate of the State of Missouri (the "State") is issuing $197,500,000 aggregate principal amount of its Taxable Student Loan Asset-Backed Notes, Series 2021-3 (the "Notes") in three classes as set forth below:

| Class | Principal Amount | Interest Rate | Offering Price | Maturity Date | Ratings (DBRS/S&P) |
|---|---|---|---|---|---|
| Fixed Rate Class A-1A Notes | $15,000,000 | 1.58% | 99.98398% | August 25, 2061 | AAA (sf)/AA+ (sf) |
| Floating Rate Class A-1B Notes[1] | $178,000,000 | One-Month LIBOR plus 0.57% | 100.00000% | August 25, 2061 | AAA (sf)/AA+ (sf) |
| Floating Rate Class B Notes[1] | $4,500,000 | One-Month LIBOR plus 1.15% | 99.06001% | August 25, 2061 | A (sf)/AA (sf) |

[1] Each class of floating rate notes will accrue interest at a floating rate based on a benchmark, which will initially be One-Month LIBOR. However, the benchmark may change in certain situations. For more information on how One-Month LIBOR is determined and the circumstances under which the benchmark may change, see the caption "DESCRIPTION OF THE NOTES—Calculation of LIBOR" and "—Benchmark Transition Event" in this Offering Memorandum.

The Notes are limited obligations of the Issuer and are payable solely from the discrete trust estate created under the Indenture consisting primarily of the pool of student loans originated under the Federal Family Education Loan Program as described more fully herein and not from any of the other assets of the Issuer. Credit enhancement for the Notes will consist of overcollateralization, excess spread, cash on deposit in certain funds created under the Indenture (as defined herein), and, for the Class A Notes, the subordination of the Class B Notes, as described in this Offering Memorandum.

The Notes shall be issued in fully registered form only, without coupons, and when issued will be registered in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York. DTC is to act as securities depository for the Notes. Individual purchases of the Notes are to be made in book-entry form only, in the principal amount of $100,000 and integral multiples of $1,000 in excess thereof. Purchasers of the Notes will not receive certificates representing their interest in the Notes purchased. The Notes will receive monthly distributions of principal and interest on the twenty-fifth day (or the next Business Day if it is not a Business Day) of each calendar month as described in this Offering Memorandum, commencing November 26, 2021. Receipts of principal and certain other payments received on the student loans held in the trust estate established under the Indenture will generally be allocated for payment of principal first to the Class A Notes until paid in full and then to the Class B Notes until paid in full. All distributions of principal on the Notes through DTC will be treated by DTC, in accordance with its rules and procedures, as "Pro Rata Pass-Through Distribution of Principal."

*Investors should consider carefully the risks involved in purchasing the Notes, including those described under the caption "RISK FACTORS" in this Offering Memorandum.*

**THE NOTES SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR LIABILITY OR OBLIGATION OF THE STATE OF MISSOURI OR OF ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OF MISSOURI, NOR SHALL THE NOTES AND THE OBLIGATIONS OF THE ISSUER CONTAINED IN THE INDENTURE BE DEEMED TO CONSTITUTE A PLEDGE OF THE FULL FAITH AND CREDIT OF THE STATE OF MISSOURI OR OF ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OF MISSOURI. THE NOTES SHALL NOT DIRECTLY, INDIRECTLY OR CONTINGENTLY, OBLIGATE THE STATE OF MISSOURI OR ANY AGENCY OR POLITICAL SUBDIVISION THEREOF TO LEVY ANY FORM OF TAXATION THEREFOR OR TO MAKE ANY APPROPRIATION FOR THEIR PAYMENT. THE NOTES ARE SPECIAL, LIMITED OBLIGATIONS OF THE ISSUER AND ARE SECURED BY AND PAYABLE SOLELY FROM THE TRUST ESTATE PLEDGED AS SECURITY THEREFOR AS PROVIDED IN THE INDENTURE. NO OTHER ASSETS OF THE ISSUER ARE PLEDGED TO THE PAYMENT OF THE NOTES. THE STATE OF MISSOURI SHALL NOT BE LIABLE IN ANY EVENT FOR THE PAYMENT OF THE PRINCIPAL OF OR INTEREST ON THE NOTES OR FOR THE PERFORMANCE OF ANY PLEDGE, MORTGAGE, OBLIGATION, OR AGREEMENT OF ANY KIND WHATSOEVER WHICH MAY BE UNDERTAKEN BY THE ISSUER. NO BREACH OF ANY SUCH PLEDGE, MORTGAGE, OBLIGATION, OR AGREEMENT MAY IMPOSE ANY PECUNIARY LIABILITY UPON THE STATE OF MISSOURI OR ANY CHARGE UPON THE GENERAL CREDIT OR TAXING POWER OF THE STATE OF MISSOURI.**

**THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY OTHER STATE SECURITIES OR BLUE SKY LAWS, NOR HAS THE INDENTURE BEEN QUALIFIED UNDER THE TRUST INDENTURE ACT OF 1939, AS AMENDED, IN RELIANCE UPON CERTAIN EXEMPTIONS SET FORTH IN SUCH ACTS. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

The Issuer is not registered or required to be registered as an "investment company" under the Investment Company Act of 1940, as amended, pursuant to Section 2(b) thereof, and is not a "covered fund" for purposes of the Volcker Rule under the Dodd-Frank Act. See the caption "CERTAIN INVESTMENT COMPANY ACT CONSIDERATIONS" in this Offering Memorandum.

The Notes are being offered through the underwriter named below (the "Underwriter"), subject to prior sale and to the right of the Issuer or the Underwriter to withdraw, cancel or modify such offer and to reject orders in whole or in part. It is expected that delivery of the Notes will be made in book-entry-only form through DTC on or about September 21, 2021.

**BofA Securities**

**September 9, 2021**

The information in this Offering Memorandum supersedes in its entirety any information contained in any prior offering memorandum, other disclosure or statistical information relating to the Notes that you may have received.  You should rely only on the information in this Offering Memorandum in making your investment decision.

This Offering Memorandum does not constitute an offer of, or an invitation by or on behalf of the Issuer or the Underwriter to subscribe for or purchase, any of the Notes in any circumstances or in any state or other jurisdiction where such offer or invitation is unlawful.  Except as set forth herein, no action has been taken or will be taken to register or qualify the Notes or otherwise to permit a public offering of the Notes in any jurisdiction where actions for that purpose would be required.  The distribution of this Offering Memorandum and the offering of the Notes in certain jurisdictions may be restricted by law.  Persons into whose possession this Offering Memorandum comes are required by the Issuer and the Underwriter to inform themselves about and to observe any such restrictions.  This Offering Memorandum has been prepared by the Issuer solely for use in connection with the proposed offering of the Notes described herein.

No dealer, broker, salesman or other person has been authorized by the Issuer or the Underwriter to give any information or to make any representations other than those contained in this Offering Memorandum.  If given or made, such information or representations must not be relied upon as having been authorized by the Issuer or the Underwriter.  Certain information set forth herein has been obtained from the Issuer, and other sources believed to be reliable, but is not guaranteed as to accuracy or completeness, and is not to be construed as a representation by the Underwriter.  Neither the delivery of this Offering Memorandum nor any sale made hereunder shall, under any circumstances, create any implication that there has not been any change in the facts set forth in this Offering Memorandum or in the affairs of any party described herein after the date hereof.

In making an investment decision, prospective investors must rely on their own independent investigation of the terms of the offering and weigh the merits and the risks involved with ownership of the Notes.  Representatives of the Issuer and the Underwriter will be available to answer questions from prospective investors concerning the Notes, the Issuer and the Financed Eligible Loans.

Prospective investors are not to construe the contents of this Offering Memorandum, or any prior or subsequent communications from the Issuer or the Underwriter or any of their officers, employees or agents as investment, legal, accounting, regulatory or tax advice.  Prior to any investment in the Notes, a prospective investor should consult with its own advisors to determine the appropriateness and consequences of such an investment in relation to that investor's specific circumstances.

No representation or warranty, express or implied, is made by the Underwriter as to the accuracy or completeness of the information set forth herein, and nothing contained herein is, or shall be relied upon as, a promise or representation as to the past or the future.  The Underwriter has not independently verified any such information or assumed responsibility for its accuracy or completeness.  The Underwriter has reviewed the information in this Offering Memorandum pursuant to its responsibilities to investors under the federal securities laws, but the Underwriter does not guarantee the accuracy or completeness of such information.

There currently is no secondary market for the Notes.  There are no assurances that any market for the Notes will develop or, if it does develop, how long it will last.  The Issuer does not intend to list the Notes on any exchange.

The Notes are being offered subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to the approval of certain legal matters by counsel and certain other conditions.  No Notes may be sold without delivery of this Offering Memorandum.

In connection with the offering, the Underwriter may over allot or effect transactions with a view to supporting the market price of the Notes at levels above that which might otherwise prevail in the open market for a limited period.  However, there is no obligation to do this.  Such stabilizing, if commenced, may be discontinued at any time.

THIS OFFERING MEMORANDUM CONTAINS SUMMARIES OF CERTAIN DOCUMENTS THAT ARE BELIEVED TO BE ACCURATE, BUT REFERENCE IS HEREBY MADE TO THE ACTUAL DOCUMENTS, WHICH ARE INCORPORATED BY REFERENCE, AND ALL SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ACTUAL DOCUMENTS.  THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUER OR THE UNDERWRITER AND ANY ONE OR MORE PURCHASERS OR OWNERS OF THE NOTES.

### U.S. RISK RETENTION

The transaction described herein is not subject to the U.S. risk retention rules (Regulation RR (17 C.F.R. Part 246) promulgated under Section 15G of the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act").

### SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Offering Memorandum contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act").  In some cases, investors can identify forward-looking statements by terminology such as "may," "will," "should," "could," "would," "expect," "plan," "anticipate," "believe," "estimate," "project," "predict," "intend," "potential," and the negative of such terms or other similar expressions.

Any forward-looking statements reflect the Issuer's current expectations and views about future events.  The forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the Issuer's actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements.  Given these risks and uncertainties, investors should not place undue reliance on the forward-looking statements.

Investors should understand that the following factors, among other things, could cause the Issuer's results to differ materially from those expressed in forward-looking statements:

- changes in terms of Financed Eligible Loans and the educational credit marketplace arising from the implementation of applicable laws and regulations and from changes in these laws and regulations that may reduce the average term and yields or increase the costs on education loans under the Federal Family Education Loan Program;

- changes resulting from the termination of the origination of new loans under the Federal Family Education Loan Program effective June 30, 2010;

- changes in the general interest rate environment and in the securitization market for student loans, which may increase the costs or limit the marketability of financings;

- losses from student loan defaults; and

- changes in prepayment rates and interest rate spreads.

Many of these risks and uncertainties are discussed throughout this Offering Memorandum and particularly in greater detail under the caption "RISK FACTORS" herein.

Investors should read this Offering Memorandum and the documents that are referenced in this Offering Memorandum completely and with the understanding that the Issuer's actual future results may be materially different from what the Issuer expects.  The Issuer is not obligated to update the forward-looking statements, even though the Issuer's situation may change in the future, unless the Issuer has obligations under the federal securities laws to update and disclose material developments related to previously disclosed information.  All of the forward-looking statements are qualified by these cautionary statements.

Table of Contents

SUMMARY OF TERMS ................................................ 1
RISK FACTORS ........................................................ 14
   Purchasers may have difficulty selling their Notes ............ 14
   The Notes are not a suitable investment for all
      investors .......................................................... 14
   Purchasers of the Notes may be unable to reinvest
      principal payments at the yield earned on the Notes ....... 14
   The Notes are payable solely from the Trust Estate
      and investors will have no other recourse against
      the Issuer or the State of Missouri ........................ 15
   There will be no market valuation of the Financed
      Eligible Loans .................................................. 15
   State not liable with respect to the Notes .................... 15
   The ratings of the Notes are not a recommendation to
      purchase and may change ................................... 16
   There is the potential for conflicts of interest and
      regulatory scrutiny with respect to the Rating
      Agencies rating the Notes .................................... 17
   Subordination of the Class B Notes may result in a
      greater risk of loss for holders of Class B Notes ........... 17
   Holders of the Notes may be required to accrue
      original issue discount as income for tax purposes
      before they receive cash attributable to such
      original issue discount ........................................ 17
   EU and UK Securitization Regulations may affect the
      liquidity of the Notes ......................................... 18
   Funds available in the Reserve Fund and Capitalized
      Interest Fund are limited and, if depleted, there may
      be shortfalls in payments to Noteholders ................... 20
   The target overcollateralization level may not be
      reached or maintained ........................................ 20
   Certain amendments to the Indenture and other actions
      may be taken without the consent of Noteholders,
      upon satisfaction of a Rating Agency Condition or
      by less than all of the Noteholders ......................... 20
   Rights to waive defaults may adversely affect
      Noteholders .................................................... 21
   The rate of payments on the Financed Eligible Loans
      may affect the maturity and yield of the Notes ............ 21
   Different rates of change in interest rate indexes may
      affect Trust Estate cash flow ................................ 22
   The timing of changes in the interest rates payable on
      the Class A-1B Notes and Class B Notes as
      compared to the Financed Eligible Loans may
      affect cash flow to the Trust Estate ........................ 23
   Social and economic factors may adversely affect
      repayment of the Financed Eligible Loans .................. 23
   Deterioration of general economic conditions and
      turmoil in the credit markets as a result of
      COVID-19 Pandemic ......................................... 24
   Impact of turmoil in the credit markets on the business
      of the Issuer .................................................... 25
   Cashflows to the Trust Estate may be affected by
      natural disasters or pandemics .............................. 25
   Impact of COVID-19 Pandemic on the Issuer and
      student loan related legislation resulting from
      COVID-19 Pandemic ......................................... 25
   Forbearance granted as a result of the COVID-19
      Pandemic may delay payments of interest and
      principal ........................................................ 28
   LIBOR is being discontinued as a floating rate
      benchmark, and various aspects of the
      discontinuation are uncertain and will affect the
      financial markets and may also affect the Financed
      Eligible Loans and the Class A-1B Notes and the
      Class B Notes .................................................. 30
   Federal financial regulatory legislation may affect the
      Notes ........................................................... 34

Changes to the Higher Education Act, including the
      enactment of the Health Care and Education
      Reconciliation Act of 2010, changes to other
      applicable law and other Congressional action may
      affect investors' Notes and the Financed Eligible
      Loans ........................................................... 36
Competition from the Federal Direct Student Loan
      Program ......................................................... 37
Other litigation risks ................................................ 38
The Issuer may be subject to student loan industry
      investigations .................................................. 38
Military service obligations, natural disasters and
      pandemics may cause a delay in payments on the
      Financed Eligible Loans ...................................... 38
Higher Education Relief Opportunities for Students
      Act of 2003 may result in delayed payments from
      borrowers ...................................................... 39
Consumer protection laws may affect enforceability of
      Financed Eligible Loans ...................................... 40
Noteholders will rely on the Servicers for the
      servicing of the Financed Eligible Loans .................. 40
Bankruptcy or insolvency of PHEAA could result in
      payment delays to Noteholders ............................. 40
A default by a Servicer could adversely affect the
      Notes ........................................................... 40
If a Servicer or a successor Servicer fails to comply
      with the Department of Education's or State
      License Regulator's regulations, payments on the
      Notes could be adversely affected .......................... 41
Servicing Fees may increase over time in relation to
      the outstanding principal balance of the Financed
      Eligible Loans .................................................. 41
Failure to comply with loan origination and servicing
      procedures for Financed Eligible Loans may result
      in loss of Guarantee or other benefits ...................... 42
Limitation on enforceability of remedies against the
      Issuer could result in payment delays or losses ........... 42
Lewis and Clark Discovery Initiative .......................... 43
The obligations of each of the Trustee, the Servicer
      and the Backup Servicer are limited ....................... 43
Certain factors relating to security ............................. 43
The use of master promissory notes for the Financed
      Eligible Loans may compromise the Trustee's
      security interest ............................................... 43
Investors may incur losses or delays in payment on
      their Notes if borrowers do not make timely
      payments or default on their Financed Eligible
      Loans ........................................................... 44
Risk of geographic concentration of the Financed
      Eligible Loans .................................................. 45
The Trustee may be forced to sell the Financed
      Eligible Loans at a loss after an event of default .......... 45
The Notes may be repaid early due to an optional
      prepayment, which may affect their yield, and
      investors will bear reinvestment risk ....................... 45
The characteristics of the portfolio of Financed
      Eligible Loans may change ................................... 45
Payment offsets by a Guaranty Agency or the
      Department of Education could prevent the Issuer
      from paying Noteholders the full amount of the
      principal and interest due on the Notes ..................... 46
The Financed Eligible Loans are unsecured and the
      ability of the applicable Guaranty Agency to honor
      its Guarantee may become impaired ........................ 47
Commingling of payments on Financed Eligible
      Loans could prevent the Issuer from paying the full
      amount of the principal and interest due on the
      Notes ........................................................... 47

iv

Table of Contents
(continued)

Incentive or borrower benefit programs may affect the Notes ..................................... 48
The Notes are expected to be issued only in book-entry form .................................... 48
Structuring tables are based upon assumptions and models ........................................ 48
HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI ............................ 48
General ........................................................... 48
Members and Staff ...................................... 49
Permissible Activities; Limitations .............. 52
Previous Financings of the Issuer ................ 53
Financial and Other Information .................. 53
Repurchase Requests ................................... 54
Lewis and Clark Discovery Initiative; Scholarship Funding ........................................ 54
Direct Loan Servicing .................................. 54
Direct Loan Servicing Performance Metrics ....... 55
THE ISSUER'S FFEL PROGRAM ................... 55
General ........................................................... 55
Change to Index for Calculation of Special Allowance Payments ........................... 57
SERVICING OF THE FINANCED ELIGIBLE LOANS .... 57
Servicing by the Issuer ................................. 58
Backup Servicing by PHEAA ....................... 59
GUARANTY AGENCIES ................................ 65
Information Regarding the State Guaranty Agency .... 66
Information Regarding PHEAA ..................... 67
Information Regarding Ascendium ................. 69
FEES AND EXPENSES ................................. 73
USE OF PROCEEDS ...................................... 74
CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS ................................ 74
General ........................................................... 74
Borrower Benefits ........................................ 86
DESCRIPTION OF THE NOTES .................... 86
General ........................................................... 86
Interest Payments ......................................... 86
Calculation of LIBOR ................................... 88
Benchmark Transition Event ......................... 88
Principal Distributions .................................. 94
Optional Prepayment of Notes When the Then Outstanding Pool Balance is 10% or Less of Initial Pool Balance ......................... 95
Prepayment, Yield and Maturity Considerations .... 96
SECURITY AND SOURCES OF PAYMENT FOR THE NOTES .......................... 97
General ........................................................... 97
Funds ............................................................. 98
Fund Deposits ............................................... 98
Student Loan Fund; Deposit of Financed Eligible Loans ........................................ 98
Reserve Fund ................................................ 99
Capitalized Interest Fund .............................. 99
Department SAP Rebate Fund ....................... 100
Costs of Issuance Fund ................................. 100
Collection Fund; Flow of Funds .................... 100
Flow of Funds After Events of Default and Acceleration ................................... 103
Investment of Funds Held by Trustee ............ 103
BOOK-ENTRY REGISTRATION ................... 103
TRUSTEE ...................................................... 106
SUMMARY OF THE INDENTURE PROVISIONS .... 107
Parity and Priority of Lien ............................ 107
Representations and Warranties ..................... 108
Sale of Financed Eligible Loans .................... 109
Further Covenants ........................................ 109
Statements to Noteholders ............................ 110

Servicing and Enforcement of the Servicing Agreements ........................................ 110
Additional Covenants With Respect to the Higher Education Act ................................ 111
Continued Existence; Successor .................... 112
Events of Default .......................................... 113
Remedies on Default ..................................... 113
The Trustee ................................................... 117
Force Majeure ............................................... 121
Supplemental Indentures ............................... 121
Trusts Irrevocable ......................................... 123
Satisfaction of Indenture ............................... 123
Optional Release of All Financed Eligible Loans .... 124
CREDIT ENHANCEMENT ............................ 124
CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ................................ 125
Characterization of the Notes ........................ 126
Taxation of Interest Income and Original Issue Discount ........................................... 127
Sale or Exchange of Notes ............................ 130
Backup Withholding ...................................... 131
State, Local or Foreign Taxation ................... 131
Tax-Exempt Investors .................................... 132
Foreign Investors .......................................... 132
Foreign Account Tax Compliance Act ............ 132
MISSOURI INCOME TAX ............................. 133
ERISA CONSIDERATIONS ........................... 133
Plan Assets Regulation .................................. 134
Prohibited Transactions ................................. 135
Purchaser's/Transferee's Representations and Warranties .................................... 136
Consultation with Counsel ............................ 136
CERTAIN INVESTMENT COMPANY ACT CONSIDERATIONS ................................ 136
ADDITIONAL INFORMATION; REPORTS TO NOTEHOLDERS ................................. 136
UNDERWRITING ........................................... 137
FINANCIAL ADVISOR ................................. 137
LEGAL PROCEEDINGS ................................ 138
LEGAL MATTERS ........................................ 138
CONTINUING DISCLOSURE ........................ 138
RELATIONSHIPS AMONG FINANCING PARTICIPANTS ................................... 138
RATINGS ....................................................... 139
OTHER MATTERS ......................................... 139
GLOSSARY OF TERMS ................................. 141

APPENDIX A    DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM
APPENDIX B    WEIGHTED AVERAGE LIVES, EXPECTED MATURITIES AND PERCENTAGES OF ORIGINAL PRINCIPAL REMAINING AT CERTAIN MONTHLY DISTRIBUTION DATES FOR THE NOTES
APPENDIX C    FORM OF CONTINUING DISCLOSURE AGREEMENT

## SUMMARY OF TERMS

This summary highlights selected information from this document and does not contain all of the information you need to make your investment decision. To understand all of the terms of this offering, read this entire document.

References in this Offering Memorandum to the "Issuer" refer to the Higher Education Loan Authority of the State of Missouri. This Offering Memorandum contains forward-looking statements that involve risks and uncertainties. See the caption "SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS" herein. Certain terms used in this Offering Memorandum are defined under the caption "GLOSSARY OF TERMS" herein.

### Principal Parties and Dates

*Issuer*. Higher Education Loan Authority of the State of Missouri (the "Issuer").

*Servicer*. The Issuer (the "Servicer").

*Backup Servicer*. Pennsylvania Higher Education Assistance Agency ("PHEAA").

*Guaranty Agencies*. Missouri Department of Higher Education and Workforce Development (the "State Guaranty Agency"), Pennsylvania Higher Education Assistance Agency, Ascendium Education Solutions, Inc. (f/k/a Great Lakes Higher Education Guaranty Corporation) or any other entity authorized to guarantee student loans under the Higher Education Act identified under the caption "THE GUARANTY AGENCIES" herein (each, a "Guaranty Agency" and collectively, the "Guaranty Agencies").

*Trustee*. U.S. Bank National Association, as trustee (in such capacity, the "Trustee").

*Monthly Distribution Dates*. The monthly distribution dates for the Notes will be the twenty-fifth day of each calendar month, or, if not a Business Day, the next Business Day, commencing November 26, 2021. These dates are sometimes referred to herein as "Monthly Distribution Dates." Certain fees and expenses of the Trust Estate established under the hereinafter described Indenture (such as the Administration Fee, the Servicing Fee and the Trustee Fee) will also be paid on the Monthly Distribution Dates. The calculation date for each Monthly Distribution Date generally will be the second Business Day before such Monthly Distribution Date.

*Collection Periods*. The Collection Period with respect to a Monthly Distribution Date will be the calendar month preceding such Monthly Distribution Date (each, a "Collection Period"). However, the Collection Period for the initial Monthly Distribution Date of November 26, 2021 will begin on the Date of Issuance and end on October 31, 2021. With respect to any other Monthly Distribution Date, the "related" or the "preceding" Collection Period shall be the Collection Period ending on the last day of the month immediately preceding the month in which such Monthly Distribution Date occurs.

*Interest Accrual Periods*. The initial Interest Accrual Period for the Class A-1A Notes begins on the Date of Issuance and ends on November 24, 2021 and the initial Interest Accrual Period for the Class A-1B Notes and the Class B Notes begins on the Date of Issuance and ends on November 25, 2021. For all other Monthly Distribution Dates, (a) the Interest Accrual Period for the Class A-1A Notes, will begin on (and include) the twenty-fifth day of a month, whether or not a Business Day, and end on (and include) the twenty-fourth day of the following month (notwithstanding that the actual Monthly Distribution Date may occur after the twenty-fifth day of either such month); and (b) the Interest Accrual Period for the Class A-1B Notes and Class B Notes will begin on the prior Monthly Distribution Date and end on the day before such Monthly Distribution Date (each, an "Interest Accrual Period").

*Financed Eligible Loans*. The loans made to finance post-secondary education that are made under the Higher Education Act (each, an "Eligible Loan") that are pledged by the Issuer to the Trustee under the Indenture and not released from the lien thereof are sometimes referred to herein as the "Financed Eligible Loans." The information presented in this Offering Memorandum under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein relating to the Eligible Loans the Issuer expects to pledge to the Trustee on the Date of Issuance is as of June 30, 2021, which is referred to as the "Statistical Cut-Off Date." The Issuer believes that the information set forth in this Offering Memorandum with respect to the Eligible Loans as of the Statistical Cut-Off Date is representative of the characteristics of the Financed Eligible Loans as they will exist on the Date of Issuance for the Notes.

*Date of Issuance*. On or about September 21, 2021.

**Description of the Notes**

*General*. The Higher Education Loan Authority of the State of Missouri is issuing $197,500,000 of its Taxable Student Loan Asset-Backed Notes, Series 2021-3 in the following classes:

- $15,000,000 Taxable Student Loan Asset-Backed Notes, Senior Series 2021-3A-1A Notes (the "Class A-1A Notes")

- $178,000,000 Taxable Student Loan Asset-Backed Notes, Senior Series 2021-3A-1B Notes (the "Class A-1B Notes" and together with the Class A-1A Notes, the "Class A Notes")

- $4,500,000 Taxable Student Loan Asset-Backed Notes, Subordinate Series 2021-3B (the "Class B Notes").

The Class A Notes and the Class B Notes (collectively, the "Notes") will be issued pursuant to the terms and provisions of the Indenture of Trust, dated as of September 1, 2021 (the

"Indenture"), between the Issuer and the Trustee. The Notes will receive payments primarily from collections on a discrete pool of Eligible Loans held by the Issuer and pledged to the Trustee under the Indenture.

The Class A Notes will be senior Notes and the Class B Notes will be subordinate Notes. The Notes will be issued in minimum denominations of $100,000 and in integral multiples of $1,000 in excess thereof. Interest and principal on the Notes will be payable to the owners of record of the Notes as of the close of business on the day before the related Monthly Distribution Date.

*Interest on the Notes*. The Class A-1A Notes will bear interest at a fixed rate equal to 1.58% per annum.

The Class A-1B Notes will bear interest at an annual rate equal to the applicable Benchmark (initially One-Month LIBOR), except for the initial Interest Accrual Period, plus 0.57%.

The Class B Notes will bear interest at an annual rate equal to the applicable Benchmark (initially One-Month LIBOR), except for the initial Interest Accrual Period, plus 1.15%.

If One-Month LIBOR or the then current benchmark is less than 0.00% for any Interest Accrual Period, it shall be deemed to be 0.00% and the interest rate for the Class A-1B Notes and the Class B Notes for such Interest Accrual Period shall be deemed to be the interest rate margin set forth above for such class of Notes.

The Trustee will obtain One-Month LIBOR and the Issuer will calculate the applicable interest rate on the Notes (other than the Class A-1A Notes) on the second Business Day prior to the start of the applicable Interest Accrual Period; provided that if One-Month LIBOR does not appear on a page of a financial reporting service in general use in the financial services industry, the Issuer will obtain One-Month LIBOR. Additionally, if One-Month LIBOR is no longer an available benchmark rate, the Issuer will cause an alternative rate to be calculated as described under the caption "DESCRIPTION OF

2

THE NOTES—Benchmark Transition Event" herein.

Interest on the Class A-1A Notes will be calculated on the basis of a 360-day year consisting of twelve 30-day months, and interest on the Class A-1B Notes and the Class B Notes will be calculated on the basis of the actual number of days elapsed during the Interest Accrual Period divided by 360 and rounding the resultant figure to the fifth decimal place.

The rate of interest on the Class A-1B Notes and the Class B Notes for the initial Interest Accrual Period will be determined by reference to the following formula:

$x + [(a / b) * (y-x)] + 0.57\%$ for the Class A-1B Notes and $+ 1.15\%$ for the Class B Notes

where:

x = two-month LIBOR;

y = three-month LIBOR;

a = the actual number of days from the maturity date of two-month LIBOR to the first Monthly Distribution Date; and

b = the actual number of days from the maturity date of two-month LIBOR to the maturity date of three-month LIBOR.

Interest accrued on the outstanding principal balance of the Notes during each Interest Accrual Period will be paid on the following Monthly Distribution Date in the order and priority described under the caption "—Flow of Funds" below.

Failure to pay interest on the Class B Notes is not an Event of Default so long as any of the Class A Notes remain outstanding.

***Principal Distributions***. Principal distributions will be allocated to the Notes on each Monthly Distribution Date in an amount equal to the funds available to pay principal, in the amount equal to the lesser of:

> (a)    the Principal Distribution Amount for that Monthly Distribution Date; and

> (b)    funds available for the payment of principal as described under the caption "—Flow of Funds" below and under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.

Principal will be paid, first, on the Class A Notes (pro rata) until paid in full and, second, on the Class B Notes until paid in full.

"*Principal Distribution Amount*" means, as determined by the Issuer for each Monthly Distribution Date other than a Note Final Maturity Date, the amount, not less than zero, by which (i) the Outstanding Amount of the Notes immediately prior to such Monthly Distribution Date exceeds (ii) the Adjusted Pool Balance for that Monthly Distribution Date less the Specified Overcollateralization Amount. Notwithstanding the foregoing; (A) on or after the Maturity Date for a class of Notes, the Principal Distribution Amount shall not be less than the amount that is necessary to reduce the outstanding principal balance of such class of Notes to zero; and (B) the Principal Distribution Amount shall not exceed the Outstanding Amount of the Notes as of any Monthly Distribution Date (before giving effect to any distributions on such Monthly Distribution Date).

"*Specified Overcollateralization Amount*" means, for any Monthly Distribution Date, the greater of:

> (a)    6.5% of the Adjusted Pool Balance for that Monthly Distribution Date; and

> (b)    $4,000,000.

"*Adjusted Pool Balance*" means, for any Monthly Distribution Date, the sum of the Pool Balance as of the end of the immediately

preceding Collection Period and the amounts on deposit in the Capitalized Interest Fund and the Reserve Fund on such Monthly Distribution Date after giving effect to any payments to or releases from the Capitalized Interest Fund and the Reserve Fund.

The Principal Distribution Amount is intended to provide credit support so that, if sufficient funds are available on each Monthly Distribution Date, the Adjusted Pool Balance will continue to exceed the Outstanding Amount of the Notes by the greater of (a) 6.5% of the Adjusted Pool Balance for that Monthly Distribution Date, and (b) $4,000,000.

"*Pool Balance*" means, for any date, the aggregate principal balance of the Financed Eligible Loans on that date, including accrued interest that is expected to be capitalized, after giving effect to the following, without duplication:

> (a) all payments received by the Issuer through that date from borrowers;

> (b) all amounts received by the Issuer through that date from required purchases or repurchases of Financed Eligible Loans by Servicers or sellers;

> (c) all Liquidation Proceeds and Realized Losses on the Financed Eligible Loans through that date;

> (d) the amount of any adjustment to balances of the Financed Eligible Loans that the Servicer makes under its related servicing agreement, if any, recorded through that date; and

> (e) the amount by which Guaranty Agency reimbursements of principal on defaulted Financed Eligible Loans through that date are reduced from 100% to 97%, or other applicable percentage, as required by the risk sharing provisions of the Higher Education Act.

See the caption "DESCRIPTION OF THE NOTES—Principal Distributions" herein.

In addition to the principal payments described above, (i) if a Principal Acceleration Trigger (as defined under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein) is in effect for any Monthly Distribution Date occurring on and after the October 2026 Monthly Distribution Date through and including the September 2031 Monthly Distribution Date, (ii) on and after the October 2031 Monthly Distribution Date or (iii) if the Financed Eligible Loans are not released from the lien of the Indenture when permitted pursuant to the optional release described below, the Notes may receive supplemental payments of principal from certain money remaining in the Collection Fund as described under the caption "—Flow of Funds" below and under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.

Each principal payment on a class of Notes will be allocated to all Noteholders of such class of Notes on a pro rata basis, based upon the principal amounts of such class of Notes held by each such Noteholder.

***Final Maturity***. The final Maturity Date for each class of the Notes will be August 25, 2061.

The final payment of the Notes is expected to occur prior to the above date (see Appendix B hereto) and could be earlier than expected to the extent that:

> (a) there are significant prepayments on the Financed Eligible Loans;

> (b) additional payments of principal are made from money available in the Collection Fund to pay the Notes in full prior to maturity;

> (c) the Issuer exercises its option to direct the release of all of the Financed Eligible Loans remaining in the Trust Estate established under the Indenture from the lien of the Indenture (which will not occur until a date when the then outstanding Pool Balance is 10% or less of the initial Pool Balance); or

(d)   the Trustee sells all of the remaining Financed Eligible Loans upon an Event of Default.

**Description of the Issuer and the Trust Estate**

*General*. The Issuer is a body politic and corporate constituting a public instrumentality of the State. The Issuer was established in 1981 pursuant to the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Section 173.350 to 173.445 of the Missouri Revised Statutes, inclusive, as amended (the "Authorizing Act") for the purpose of assuring that all eligible post-secondary education students have access to guaranteed student loans. The Authorizing Act was amended, effective August 28, 1994, to provide the Issuer with generally expanded powers, including the power to finance, acquire and service student loans, including, but not limited to, those guaranteed or insured pursuant to the Higher Education Act.

*Use of Proceeds.* As described under the caption "USE OF PROCEEDS" herein, certain of the proceeds from the sale of the Notes will be used to make the initial deposits to the Capitalized Interest Fund, Cost of Issuance Fund and the Reserve Fund described below. Certain of the remaining proceeds from the sale of the Notes will be used to refinance student loans originated under the Federal Family Education Loan Program ("FFELP" or the "FFEL Program" and such loans, "FFELP Loans" or "Eligible Loans") presently pledged by the Issuer under the Warehouse Agreement (as defined herein) or held unencumbered by the Issuer, all of which have been identified and are described under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein. The FFELP Loans will be pledged to the Trustee on the Date of Issuance and will be subject to the lien of the Indenture. See the caption "USE OF PROCEEDS" herein.

The only sources of funds for payment of the Notes issued under the Indenture are the Financed Eligible Loans and investments pledged to the Trustee and the payments the Issuer receives on those Financed Eligible Loans and investments. On the Date of Issuance, the parity ratio will be not less than 108.0% of the principal amount of the Class A Notes and not less than 105.5% of the principal amount of all of the Notes.

*The Trust Estate Assets*. The assets of the trust estate securing the Notes issued under the Indenture will be a discrete trust estate that will include (collectively, the "Trust Estate"):

(a)   the Available Funds (other than moneys deposited in the Department SAP Rebate Fund and moneys released from the lien of the Trust Estate as provided in the Indenture);

(b)   all moneys and investments held in the funds created under the Indenture (other than the Department SAP Rebate Fund), and other than moneys and investments released from the lien of the Trust Estate as provided in the Indenture), including all proceeds thereof and all income thereon;

(c)   the Financed Eligible Loans held by the Issuer and pledged under the Indenture and all obligations of the obligors thereunder including all moneys received thereunder on or after the Cut-Off Date (but in no event including any Financed Eligible Loans released from the lien of the Trust Estate as provided in the Indenture);

(d)   the rights of the Issuer in and to any Servicing Agreement, any Backup Servicing Agreement, any Joint Sharing Agreement, any Student Loan Purchase Agreement, any Custodian Agreement, any Origination Agreement and the Guarantee Agreements as the same relate to the Financed Eligible Loans;

(e)   to the extent constituting or directly related to the components of the Trust Estate described in clauses (a) through (f), inclusive, property of the Issuer in the nature of Accounts, General Intangibles (including Payment Intangibles), Promissory Notes, and Instruments (each as defined in the Uniform Commercial Code of the State of

5

Missouri), but it shall not be necessary that an item be an Account, General Intangible, Payment Intangible, Promissory Note or Instrument for such item to be part of the Trust Estate if it is otherwise described, referenced, or included in clauses (a) through (d), or in this clause (e), but in no event shall this interest attach to any properties, cash or other trust estates of the Issuer which are unrelated to the properties described in clauses (a) through (d) above or this clause (e); and

(f)    all proceeds from any property described in clauses (a) through (e) above and any and all other property, rights and interests of every kind or description that from time to time is specifically granted, conveyed, pledged, transferred, assigned or delivered to the Trustee as additional security under the Indenture.

All of the Eligible Loans pledged to the Trustee under the Indenture will be serviced by the Issuer.  See the caption "RISK FACTORS— Failure to comply with loan origination and servicing procedures for Financed Eligible Loans may result in loss of guarantee or other benefits" herein.  All of the Eligible Loans pledged to the Trustee under the Indenture are, as of the time of such pledge, guaranteed by a Guaranty Agency and reinsured by the U.S. Department of Education (sometimes referred to herein as the "Department of Education").  See the caption "GUARANTY AGENCIES" herein.

Except under limited circumstances set forth in the Indenture, Financed Eligible Loans may not be transferred out of the Trust Estate established under the Indenture.  See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Sale of Financed Eligible Loans" herein.

*The Student Loan Fund*.  The Eligible Loans being pledged by the Issuer will be deposited into the Student Loan Fund on the Date of Issuance. See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein. Except for any acquisition of Eligible Loans that were previously Financed Eligible Loans from a

Guaranty Agency or a Servicer as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein, there will be no acquisitions of Eligible Loans into the Trust Estate after the Date of Issuance.

*The Collection Fund*.  The Trustee will deposit into the Collection Fund upon receipt all revenues derived from Financed Eligible Loans and money or investments of the Issuer on deposit with the Trustee, amounts received under any Joint Sharing Agreement and all amounts transferred from the Capitalized Interest Fund, the Student Loan Fund, the Department SAP Rebate Fund and the Reserve Fund.  Money on deposit in the Collection Fund will be used to make any required payments under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, to make any required payments to the Department of Education, to pay Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees and Trustee Fees, to pay interest and principal on the Notes and to replenish the Reserve Fund.  See the captions "—Flow of Funds" below and "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.

*The Capitalized Interest Fund*.  On the Date of Issuance, $6,000,000 will be deposited into the Capitalized Interest Fund.  If on any Monthly Distribution Date, money on deposit in the Collection Fund is insufficient to pay amounts owed to the Department of Education or to a Guaranty Agency (other than to recall claims with respect to or repurchases of Eligible Loans), to pay amounts payable under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, or to pay Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Trustee Fees and interest on the Notes, then money on deposit in the Capitalized Interest Fund will be transferred to the Collection

6

Fund to cover the deficiency, prior to any amounts being transferred from the Reserve Fund. Amounts released from the Capitalized Interest Fund will not be replenished. Amounts will be transferred from the Capitalized Interest Fund to the Collection Fund as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Capitalized Interest Fund" herein. On the September 2023 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $4,400,000 shall be transferred by the Trustee to the Collection Fund. On the September 2025 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $2,400,000 shall be transferred by the Trustee to the Collection Fund. On the September 2027 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund shall be transferred by the Trustee to the Collection Fund.

***The Reserve Fund***. On the Date of Issuance, a deposit will be made to the Reserve Fund in an amount equal to 0.65% of the initial Pool Balance. The Reserve Fund is to be maintained at an amount equal to the greater of (a) 0.65% of the Pool Balance as of the close of business on the last day of the immediately preceding Collection Period; and (b) $201,159; provided that in no event will such balance exceed the Outstanding Amount of the Notes; and provided further, that such Specified Reserve Fund Balance may be reduced upon satisfaction of the Rating Agency Condition (as defined under the caption "GLOSSARY OF TERMS" herein). On each Monthly Distribution Date, to the extent that money in the Collection Fund is not sufficient to pay amounts owed to the Department of Education or to a Guaranty Agency (other than to recall claims with respect to or for repurchases of Eligible Loans), to pay amounts payable under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, or to pay Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Trustee Fees and the interest then due on the Notes, an amount equal to the deficiency will be transferred from

the Reserve Fund to the Collection Fund, if such deficiency has not been paid from the Capitalized Interest Fund. To the extent the amount in the Reserve Fund falls below the Specified Reserve Fund Balance, the Reserve Fund will be replenished on each Monthly Distribution Date from funds available in the Collection Fund as described under the captions "—Flow of Funds" below and "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein. Funds on deposit in the Reserve Fund in excess of the Specified Reserve Fund Balance will be transferred to the Collection Fund upon Issuer Order. Other than such excess amounts, principal payments due on the Notes will be made from the Reserve Fund only (a) on the respective Note Final Maturity Date for the related class of Notes; (b) on any Monthly Distribution Date when the market value of securities and cash in the Reserve Fund and the Collection Fund is sufficient to pay the remaining principal amount of and interest accrued on the Notes; or (c) upon the exercise of the option to prepay the Notes described below.

***The Department SAP Rebate Fund***. The Trustee will establish a Department SAP Rebate Fund as part of the Trust Estate established under the Indenture. The Higher Education Act requires holders of Eligible Loans first disbursed on or after April 1, 2006 to rebate to the Department of Education interest received from borrowers on such loans that exceeds the applicable special allowance support levels. The Issuer expects that the Department of Education will reduce the special allowance and interest benefit payments payable to the Issuer by the amount of any such rebates owed by the Issuer. However, in certain circumstances the Issuer may owe a payment to the Department of Education or to another trust if amounts were deposited into the Trust Estate that represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans. If the Issuer believes that it is required to make any such payment, the Issuer will direct the Trustee to deposit into the Department SAP Rebate Fund from the Collection Fund the estimated amounts of any such payments. Money in the Department SAP Rebate Fund will be transferred to the Collection Fund to the extent amounts have been deducted

by the Department of Education from payments otherwise due to the Issuer, or will be paid to the Department of Education or to another trust if necessary to discharge the Issuer's rebate obligation. See "DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Special Allowance Payments" in Appendix A hereto.

***Characteristics of the Student Loan Portfolio***. The Issuer will pledge to the Trustee under the Indenture a portfolio of Eligible Loans originated under the FFELP, having, as of the Statistical Cut-Off Date, an aggregate outstanding principal balance of approximately $201,530,098, which includes $9,664,923 of interest expected to be capitalized upon commencement of repayment. As of the Statistical Cut-Off Date (and based on the aggregate outstanding principal balances of the Financed Eligible Loans as of such date), the weighted average annual interest rate of the Eligible Loans expected to be pledged to the Trustee under the Indenture (excluding Special Allowance Payments and not giving effect to currently utilized borrower benefit programs) was approximately 5.14% and their weighted average remaining term to scheduled maturity was approximately 169 months. The portfolio of Eligible Loans expected to be pledged by the Issuer to the Trustee is described more fully below under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

In the event that the principal amount of Eligible Loans required to provide collateral for the Notes varies from the amounts anticipated herein, whether by reason of a change in the collateral requirement necessary to obtain the expected ratings on the Notes (see the caption "—Ratings of the Notes" below), the rate of amortization or prepayment on the portfolio of Eligible Loans from the Statistical Cut-Off Date to the Date of Issuance varying from the rates that were anticipated, or otherwise, the portfolio of Eligible Loans to be pledged to the Trustee under the Indenture may consist of a subset of the pool of Eligible Loans described herein or may include additional Eligible Loans not described above under the

caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

The Issuer believes that the information set forth in this Offering Memorandum with respect to the Eligible Loans as of the Statistical Cut-Off Date is representative of the characteristics of the Financed Eligible Loans as they will exist on the Date of Issuance of the Notes.

As of the Statistical Cut-Off Date, approximately 4.71% of the Financed Eligible Loans by aggregate outstanding principal balance are "rehabilitation loans," which are Eligible Loans that have previously defaulted, but for which the borrower thereunder has made a specified number of on-time payments as described under "APPENDIX A— DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto.

***Flow of Funds***. Administration Fees and Servicing Fees will be paid to the Issuer and the Servicer (initially the Issuer) on each Monthly Distribution Date from money available in the Collection Fund. The amounts of the initial Trustee Fee, Administration Fee and the Servicing Fee payable in clauses Second, Third and Fourth below (including the amounts allocated for the payment of Program Fees) are specified under the caption "FEES AND EXPENSES" herein and are subject to increase upon satisfaction of the Rating Agency Condition. Carryover Servicing Fees in clause eleventh below are initially $0.00 and may only be increased to the extent permitted by the Indenture. The Issuer, as administrator, will be responsible for paying when due any fees or expenses owed to the Backup Servicer, the Rating Agencies and any other Program Fees. In addition, each month money available in the Collection Fund will be used to pay amounts due with respect to the Financed Eligible Loans to the Department of Education and to the Guaranty Agencies (including the State Guaranty Agency), to make any payments required under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable

8

to Eligible Loans that are not Financed Eligible Loans, to purchase from the lien of the Indenture Financed Eligible Loans in the limited circumstances described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein and to transfer amounts required to be deposited into the Department SAP Rebate Fund. On each Monthly Distribution Date, prior to an Event of Default, money in the Collection Fund will be used to make the following deposits and distributions, to the extent funds are available, as set forth in the following chart:

[Remainder of page intentionally left blank]



**COLLECTION FUND**

First — To make any payments required under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans

Second — Trustee
(Trustee Fee and any prior unpaid Trustee Fees)

Third — Servicers (initially the Issuer)
(Servicing Fee and any prior unpaid Servicing Fees)

Fourth — Issuer
(Administration Fee, and any prior unpaid Administration Fees)

Fifth — Class A Noteholders
(Interest on the Class A Notes of each class pro rata based on amounts owed)

Sixth — Class B Noteholders*
(Interest on the Class B Notes)

Seventh — Reserve Fund
(Amounts necessary to restore the Reserve Fund to the Specified Reserve Fund Balance)

Eighth — Noteholders
(Principal Distribution Amount will be allocated, *first*, to the Class A Notes pro rata among the Class A-1A Notes and Class A 1B Notes, until they have been paid in full and, *second*, to the Class B Notes, until they have been paid in full)

Ninth — Noteholders
((A) if a Principal Acceleration Trigger (as defined under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein) is in effect for any Monthly Distribution Date occurring on and after the October 2026 Monthly Distribution Date through and including the September 2031 Monthly Distribution Date, or (B) on and after the October 2031 Monthly Distribution Date, to the Noteholders, supplemental payments of principal, *first*, to the Class A Notes pro rata among the Class A-1A Notes and Class A-1B Notes, until they have been paid in full and, *second*, to the Class B Notes until they have been paid in full)

Tenth — Trustee
(Aggregate unpaid amount of any expenses and indemnities)

Eleventh — Issuer
(Aggregate unpaid amount of any Carryover Servicing Fees)

Twelfth — Noteholders
(if the Financed Eligible Loans are not released when permitted pursuant to the optional release, to the Noteholders, supplemental payments of principal, *first*, to the Class A Notes pro rata among the Class A-1A Notes and Class A-1B Notes, until they have been paid in full and, *second*, to the Class B Notes until they have been paid in full)

Thirteenth — Released to the Issuer
(all remaining funds)

---

* On and after the Maturity Date of the Class A Notes, the Noteholders of each class of Class A Notes will receive amounts representing payment of the principal balance of each class of Class A Notes after clause Fifth above until each such class is paid in full prior to the Class B Notes receiving payments of any payments of interest pursuant to clause Sixth above.

*Payments on Maturity Dates*. Notwithstanding the foregoing, on and after the Class A-1A Maturity Date and the Class A-1B Maturity Date, the Class A-1A Noteholders and the Class A-1B Noteholders will receive amounts representing payment of the principal balance of the Class A-1A Notes and the Class A-1B Notes after clause Fifth above until the Class A-1A Notes and Class A-1B Notes have been paid in full and prior to the Class B Noteholders receiving interest payments on their Class B Notes pursuant to clause Sixth above.

*Flow of Funds After Events of Default and Acceleration*. Following the occurrence of an Event of Default that results in an acceleration of the maturity of the Notes and after the payment of certain fees and expenses, payments of principal and interest on the Notes will be made, ratably, without preference or priority of any kind, first, to the Class A Notes ratably and second, to the Class B Notes, in that order, until the Notes are repaid in full. See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Remedies on Default" herein.

## Credit Enhancement

Credit enhancement for the Notes will consist of overcollateralization, excess spread and cash on deposit in the Capitalized Interest Fund and the Reserve Fund and, for the Class A Notes, the subordination of the Class B Notes, as described under the caption "CREDIT ENHANCEMENT" herein.

## Servicing and Administration

The Issuer will act as the Servicer for all the Financed Eligible Loans. The Issuer will be responsible for servicing and making collections on the Financed Eligible Loans and will be paid monthly Servicing Fees not to exceed the amounts set forth under the caption "FEES AND EXPENSES" herein.

PHEAA will act as the backup servicer (the "Backup Servicer") and will service the Financed Eligible Loans upon the occurrence of certain events described herein under the caption "SERVICING OF THE FINANCED ELIGIBLE LOANS—Backup Servicer and Backup Servicing Agreement" herein.

The Issuer will act as the administrator of the Trust Estate and will be paid a monthly Administration Fee not to exceed the amount set forth under the caption "FEES AND EXPENSES" herein. The Issuer, as administrator, will be responsible for paying when due any fees or expenses owed to the Backup Servicer, the Rating Agencies and any other Program Fees.

## Optional Prepayment of Notes When the Then Outstanding Pool Balance is 10% or Less of Initial Pool Balance

The Issuer shall have the option to direct the release of the Financed Eligible Loans from the lien of the Indenture on the Monthly Distribution Date next succeeding the last day of the Collection Period on which the then outstanding Pool Balance is 10% or less of the initial Pool Balance, and on any Monthly Distribution Date thereafter. If this option is exercised, the Financed Eligible Loans and any other remaining assets of the Trust Estate will be released to the Issuer free from the lien of the Indenture.

For the Issuer to exercise its release option, the Issuer must deposit in the Collection Fund an amount that, when combined with amounts on deposit in the other funds and accounts held under the Indenture (other than the Department SAP Rebate Fund), would be sufficient to:

(a)    reduce the Outstanding Amount of the Notes then outstanding on the related Monthly Distribution Date to zero;

(b)    pay to the Noteholders the interest payable on the related Monthly Distribution Date; and

(c)    pay any Monthly Consolidation Rebate Fees and other amounts payable to the Department of Education, pay amounts payable under any Joint Sharing Agreements or otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not

Financed Eligible Loans, and pay unpaid Administration Fees, Servicing Fees, Trustee Fees and Program Fees.

**Book-Entry Registration**

The Notes will be delivered in book-entry form through The Depository Trust Company. Purchasers of the Notes will not receive a certificate representing their Notes except in very limited circumstances. See the caption "BOOK-ENTRY REGISTRATION" herein.

**U.S. Federal Income Tax Consequences**

Kutak Rock LLP will deliver an opinion to the effect that, for U.S. federal income tax purposes and assuming the accuracy of and compliance with certain assumptions, representations and covenants, when issued, the Notes will be characterized as debt if and to the extent beneficially acquired on the Date of Issuance by persons or entities unaffiliated with the Issuer. By accepting its Notes, each Noteholder agrees to treat its Notes as indebtedness for U.S. federal income tax and all applicable state and local income and franchise tax purposes in all tax filings, reports and returns and otherwise, and will not take, or participate in the taking of or permit to be taken, any action that is inconsistent with such tax treatment and tax reporting of the Notes, unless required by applicable law.

Although the Class A-1A Notes and the Class B Notes will be issued with a de minimis discount from par, the Class A-1A Notes, the Class A-1B Notes and the Class B Notes will not be issued with original issue discount ("OID") as defined in Section 1273 of the Internal Revenue Code of 1986, as amended (the "Code"), in each case, based on their initial offering prices to the public. Except as described below with respect to the Class B Notes, the stated interest on the Class A-1A Notes, the Class A-1B Notes and the Class B Notes will be includible in gross income when received or accrued by the Noteholders in accordance with their respective methods of tax accounting and the applicable provisions of the Code. However, the Class B Notes may be treated as issued with OID due to the possibility

of interest deferral under the terms of the Class B Notes, and stated interest and the de minimis discount from par at issuance on the Class B Notes would be includible in gross income in accordance with the method under the Code that applies to OID. Absent official guidance on this point, the Issuer does not intend to treat the possibility of interest deferral on the Class B Notes as creating OID, although it may revise such treatment in the future if it should determine a change to be appropriate. See the caption "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS" herein.

**ERISA Considerations**

Fiduciaries of employee benefit plans, retirement arrangements and other entities in which such plans or arrangements are invested may choose to invest in the Notes subject to the Code, the Employee Retirement Income Security Act of 1974, as amended, other applicable law, and the considerations and representations addressed under the caption "ERISA CONSIDERATIONS" herein.

**Certain Investment Company Act Considerations**

The Issuer is not registered or required to be registered as an "investment company" under the Investment Company Act of 1940, as amended (the "Investment Company Act"), pursuant to Section 2(b) of the Investment Company Act. The Issuer does not rely upon the exclusions from the definition of "investment company" set forth in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act. The Issuer does not constitute a "covered fund" for purposes of Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), also known as the Volcker Rule (the "Volcker Rule"). Since the Issuer has not registered, and does not intend to register, as an investment company under the Investment Company Act, Noteholders will not be afforded protections of the provisions of the Investment Company Act designed to protect investment company investors.

12

**Ratings of the Notes**

It is a condition to the Underwriter's obligation to purchase the Notes that the Notes are rated at least as follows:

Class A Notes:

    DBRS: "AAA (sf)"
    S&P: "AA+(sf)"

Class B Notes:

    DBRS: "A (sf)"
    S&P: "AA(sf)"

A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. See the caption "RATINGS" herein.

See the caption "RISK FACTORS—The ratings of the Notes are not a recommendation to purchase and may change" herein.

**CUSIP Numbers†**

Class A-1A Notes: 606072 LJ3
Class A-1B Notes: 606072 LK0
Class B Notes: 606072 LL8

**International Securities Identification Numbers ("ISIN")**

Class A-1A Notes: US606072LJ37
Class A-1B Notes: US606072LK00
Class B Notes: US606072LL82

---

†CUSIP is a registered trademark of the American Bankers Association. CUSIP and ISIN data herein is provided by Standard & Poor's CUSIP Global Services. The CUSIP and ISIN numbers listed above are being provided solely for the convenience of Noteholders only at the time of issuance of the Notes and the Issuer does not make any representation with respect to such numbers or undertake any responsibility for their accuracy now or at any time in the future.

13

# RISK FACTORS

Potential investors in the Notes should consider the following risk factors together with all other information in this Offering Memorandum in deciding whether to purchase the Notes.  The following discussion of possible risks is not meant to be an exhaustive list of the risks associated with the purchase of the Notes and does not necessarily reflect the relative importance of the various risks.  The order in which these considerations are presented is not intended to represent the magnitude of the risks discussed.  Additional risk factors relating to an investment in the Notes are described throughout this Offering Memorandum, whether or not specifically designated as risk factors.  There can be no assurance that other risk factors will not become material in the future.

Although the various risks discussed in this Offering Memorandum are generally described separately, prospective investors in the Notes should consider the potential effects of the interplay of multiple risk factors.  Where more than one significant risk factor is present, the risk of loss to an investor may be significantly increased.

**Purchasers may have difficulty selling their Notes**

There currently is no secondary market for the Notes.  There is no assurance that any market will develop or, if it does develop, that it will continue or will provide investors with a sufficient level of liquidity for their investment.  If a secondary market for the Notes does develop, the spread between the bid price and the asked price for the Notes may widen, thereby reducing the net proceeds to investors from the sale of their Notes.  The Issuer does not intend to list the Notes on any exchange.  From time to time, any existing secondary market for the Notes may be adversely affected by periods of general market illiquidity or by events in the global financial markets in general or in the securitization market in particular.  Accordingly, investors may not be able to sell their Notes when they want to do so (and may be required to bear the financial risks of an investment in the Notes for an indefinite period of time) or they may not be able to obtain the price that they wish to receive for their Notes and, as a result, they may suffer a loss on their investment.  The market values of the Notes may fluctuate and movements in price may be significant.

Additionally, recent events in the United States and the global financial markets as the result of the coronavirus pandemic may cause a reduction of liquidity in any existing secondary market for the Notes.

**The Notes are not a suitable investment for all investors**

The Notes are not a suitable investment if an investor requires a regular or predictable schedule of payments of interest or principal on any specific date.  The Notes are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment, and the interaction of these factors.

**Purchasers of the Notes may be unable to reinvest principal payments at the yield earned on the Notes**

Asset-backed securities usually produce increased principal payments to investors when market interest rates fall below the interest rates on the collateral—the Financed Eligible Loans in this case—and decreased principal payments when market interest rates rise above the interest rates on the collateral.  As a result, Noteholders may receive more money to reinvest at a time when other investments generally are

producing lower yields than the yield on the Notes. Similarly, Noteholders may receive less money to reinvest when other investments generally are producing higher yields than the yield on the Notes.

**The Notes are payable solely from the Trust Estate and investors will have no other recourse against the Issuer or the State of Missouri**

Interest and principal on the Notes will be paid solely from the funds and assets held in the discrete Trust Estate created under the Indenture. There will be no subsequent acquisitions of or recycling of Eligible Loans into the Trust Estate after the Date of Issuance. There may, however, be recall claims with respect to or for any repurchase of Eligible Loans that were previously Financed from a Guaranty Agency or a Servicer as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.

No insurance or guarantee of the Notes will be provided by any government agency or instrumentality, including the State of Missouri, by any insurance company or by any other person or entity. Therefore, an investor's receipt of payments on the Notes will depend solely on:

(a)    the amount and timing of payments and collections on the Financed Eligible Loans and interest paid or earnings on the amounts held in the funds and accounts established pursuant to the Indenture; and

(b)    amounts on deposit in the Collection Fund, the Capitalized Interest Fund, the Reserve Fund and certain other funds and accounts held in the Trust Estate.

Investors will have no recourse against any party if the Trust Estate created under the Indenture is insufficient for repayment of the Notes.

**There will be no market valuation of the Financed Eligible Loans**

The Financed Eligible Loans are all currently owned by the Issuer and are not being acquired pursuant to a bidding process, and the value of the Financed Eligible Loans is based on the amount necessary to release such Financed Eligible Loans from the lien of the Warehouse Agreement and is not based upon their fair market value as determined by any independent advisor.

**State not liable with respect to the Notes**

The Notes shall not be deemed to constitute a debt or liability or obligation of the State of Missouri or of any agency or political subdivision of the State of Missouri, nor shall the Notes and the obligations of the Issuer contained in the Indenture be deemed to constitute a pledge of the full faith and credit of the State of Missouri or of any agency or political subdivision of the State of Missouri. The Notes shall not directly, indirectly or contingently, obligate the State of Missouri or any agency or political subdivision thereof to levy any form of taxation therefor or to make any appropriation for their payment. The Notes are special, limited obligations of the Issuer and are secured by and payable solely from the trust estate pledged as security therefor as provided in the Indenture. No other assets of the Issuer are pledged to the payment of the Notes. The State of Missouri shall not be liable in any event for the payment of the principal of or interest on the Notes or for the performance of any pledge, mortgage, obligation, or agreement of any kind whatsoever which may be undertaken by the Issuer. No breach of any such pledge, mortgage, obligation,

or agreement may impose any pecuniary liability upon the State of Missouri or any charge upon the general credit or taxing power of the State of Missouri.

The Notes are not insured or guaranteed by any other government agency or instrumentality, by any insurance company or by any other person or entity. The Authorizing Act does not in any way create a so-called moral obligation of the Issuer, the State or of any political subdivision thereof to pay debt service in the event of a default. The Issuer does not have taxing power.

**The ratings of the Notes are not a recommendation to purchase and may change**

It is a condition to the Underwriter's obligation to purchase the Notes that DBRS assign a rating of at least "AAA (sf)" to the Class A Notes and "A (sf)" to the Class B Notes. It is a condition to the Underwriter's obligation to purchase the Notes that S&P assign a rating of at least "AA+(sf)" to the Class A Notes and "AA(sf)" to the Class B Notes. The S&P rating for the Class A Notes and the Class B Notes is a result of S&P's August 5, 2011 action lowering the long-term sovereign debt rating of the United States to "AA+" from "AAA." S&P has identified the Notes as being of a type that are impacted by the United States' credit rating due to the Notes being secured by Financed Eligible Loans originated under the FFEL Program. There can be no assurance that the ratings of the Notes will not be downgraded or placed on negative watch by DBRS or S&P or any other Rating Agency in the future.

Ratings are based primarily on the creditworthiness of the underlying Financed Eligible Loans, the amount of credit enhancement and the legal structure of the transaction. The ratings are not a recommendation to any investor to purchase, hold or sell the Notes inasmuch as the ratings do not comment as to the market price or suitability for any investor. The assignment of a credit rating to a class of Notes should not be interpreted to mean that there is no risk, or a reduced risk, of loss on that class. Further, no credit rating should be interpreted to be an indication of the expected return on a class of Notes. Ratings may be increased, lowered or withdrawn by any Rating Agency at any time if in the Rating Agency's judgment circumstances so warrant. A downgrade in the rating of the Notes is likely to decrease the price a subsequent purchaser will be willing to pay for an investor's Notes.

Certain actions affecting the Financed Eligible Loans and the Trust Estate, including actions relating to the servicing of the Financed Eligible Loans and the administration of the Trust Estate, including changes in the fees for such Servicing Fees and Administration Fees (including the amounts allocated for the payment of Program Fees), may be taken by the Issuer or the Trustee (at the written direction of the Issuer) upon satisfaction of a Rating Agency Condition.

Under the Indenture, a "Rating Agency Condition" is defined as a requirement, with respect to any proposed action, failure to act or other event expressly conditioned thereon in the Indenture that, prior to the effectuation thereof: (a) the Issuer shall have provided prior written notice to each Rating Agency at least 30 calendar days prior to such proposed action, failure to act, or other event specified therein; and (b) the Issuer shall have delivered an Issuer Order to the Trustee dated no less than 30 calendar days subsequent to the date of such written notice stating that, as of the date of such Issuer Order, the Issuer reasonably believes that completion of such proposed action, failure to act or other event will not result in a downgrade to any Rating then assigned to any of the Notes by any Rating Agency or cause such Rating Agency to suspend, withdraw or qualify any such Rating (other than a Rating that is then applicable only to Notes that will no longer be outstanding upon such completion).

**There is the potential for conflicts of interest and regulatory scrutiny with respect to the Rating Agencies rating the Notes**

The Issuer will pay fees to the Rating Agencies to assign the initial credit ratings to the Notes on or before the Date of Issuance and to maintain the ratings on the Notes. The SEC has said that being paid by an issuer to issue and/or maintain a credit rating on asset-backed securities creates a conflict of interest for a rating agency, and that this conflict is particularly acute because arrangers of asset-backed securities transactions provide repeat business to such a rating agency. This conflict of interest may affect the ratings that the Rating Agencies hired by the Issuer assign to the Notes and other functions that the Rating Agencies perform relating to the Notes.

Furthermore, the Rating Agencies have been and may continue to be under scrutiny by federal and state legislative and regulatory bodies and such scrutiny and any actions such legislative and regulatory bodies may take as a result thereof may also have an adverse effect on the price that a subsequent purchaser would be willing to pay for the Notes and an investor's ability to resell its Notes.

**Subordination of the Class B Notes may result in a greater risk of loss for holders of Class B Notes**

Payments of interest on the Class B Notes are subordinated in priority of payment to payments of interest on the Class A Notes. Similarly, payments of principal on the Class B Notes are subordinated to payments of interest and principal on the Class A Notes. Principal on the Class B Notes will not be paid until the Class A Notes have been paid in full. Thus, investors in the Class B Notes will bear a greater risk of loss than the holders of Class A Notes. Investors in the Class B Notes will also bear the risk of any adverse changes in the anticipated yield and weighted average life of their Class B Notes resulting from any variability in payments of principal or interest on the Class B Notes.

The Class B Notes are subordinated to the Class A Notes as to the direction of remedies upon an Event of Default. In addition, as long as any of the Class A Notes are outstanding, the failure to pay interest or principal on the Class B Notes will not constitute an Event of Default under the Indenture. Consequently, holders of the Class B Notes may bear a greater risk of losses or delays in payment than holders of Class A Notes.

**Holders of the Notes may be required to accrue original issue discount as income for tax purposes before they receive cash attributable to such original issue discount**

Although the Class A-1A Notes and the Class B Notes will be issued with a de minimis discount from par, the Class A-1A Notes, the Class A-1B Notes and the Class B Notes will not be issued with OID for U.S. federal income tax purposes, in each case, based on their initial offering prices to the public. However, the Class B Notes may be treated as issued with OID for U.S. federal income tax purposes due to the possibility of interest deferral under the terms of the Class B Notes, and stated interest and the de minimis discount from par at issuance on the Class B Notes would be includible in gross income in accordance with the method under the Code that applies to OID. However, absent official guidance on this point, the Issuer does not intend to treat the possibility of interest deferral on the Class B Notes as creating OID, although it may revise such treatment in the future if it should determine a change to be appropriate. If the Class B Notes were to be treated as issued with OID, a pro rata portion of OID would be allocable to each day in any "accrual period" using a constant yield method under the Code that takes into account both

17

the prepayment assumption used in pricing the Class B Notes and the actual prepayment experience. As a result, the amount of OID on the Class B Notes that would accrue in any given accrual period may either increase or decrease depending upon the actual prepayment rate and may increase due to any compounding of interest on the Class B Notes. No representation is made as to the actual rate at which the Financed Eligible Loans will prepay or that the Notes will prepay in accordance with any prepayment assumption. Such accrual of any OID could result in a holder of the Class B Notes being required to include OID in gross income in advance of the receipt of cash attributable to such income regardless of such holder's method of accounting. Also, if losses on the Financed Eligible Loans exceed available credit support, some or all of this cash may not be received. See the caption "TAX MATTERS—Taxation of Interest Income and Original Issue Discount" herein.

**EU and UK Securitization Regulations may affect the liquidity of the Notes**

If prospective investors' investment activities are subject to investment laws and regulations, regulatory capital requirements or review by regulatory authorities in the European Union ("EU") or the United Kingdom ("UK"), prospective investors may be subject to due diligence and monitoring requirements with respect to their investment in the Notes. Prospective investors should consult legal, tax and accounting advisers for assistance in determining the suitability of and consequences of the purchase, ownership and sale of the Notes.

Regulation (EU) 2017/2402 of the European Parliament and of the Council of 12 December 2017 (the "EU Securitization Regulation") has direct effect in member states of the EU and will be applicable in any non-EU states of the European Economic Area (the "EEA") in which it has been implemented.

Investors should independently assess and determine whether they are subject to the investor due diligence and monitoring requirements (the "EU Due Diligence Requirements") of Article 5 of the EU Securitization Regulation, which apply to "institutional investors," which are defined under the EU Securitization Regulation to include (a) a credit institution or an investment firm as defined in and for purposes of Regulation (EU) No 575/2013, as amended, known as the Capital Requirements Regulation (the "EU CRR"), (b) an insurance undertaking or a reinsurance undertaking as defined in Directive 2009/138/EC, as amended, known as Solvency II, (c) an alternative investment fund manager as defined in Directive 2011/61/EU that manages and/or markets alternative investment funds in the EU, (d) an undertaking for collective investment in transferable securities ("UCITS") management company, as defined in Directive 2009/65/EC, as amended, known as the UCITS Directive, or an internally managed UCITS, which is an investment company that is authorized in accordance with that Directive and has not designated such a management company for its management, and (e) with certain exceptions, an institution for occupational retirement provision falling within the scope of Directive (EU) 2016/2341, or an investment manager or an authorized entity appointed by such an institution for occupational retirement provision as provided in that Directive. Pursuant to Article 14 of the EU CRR, the EU Due Diligence Requirements also apply to investments by certain consolidated affiliates, wherever established or located, of institutions regulated under the EU CRR (such affiliates, together with all such institutional investors, "EU Affected Investors").

No party to the transaction described in this Offering Memorandum or any of their respective affiliates is required, or undertakes, to retain a material net economic interest in the securitization transaction described in this Offering Memorandum in accordance with the EU Securitization Regulation, or makes any representation or agreement that it or any other party is undertaking or will undertake to take or refrain from taking any other action to facilitate or enable the compliance by EU Affected Investors with the EU Due Diligence Requirements, or to comply with the requirements of any other law or regulation now or hereafter in effect in the EU or the EEA, in relation to risk retention, due diligence and monitoring, credit granting standards or any other conditions with respect to investments in securitization transactions

by EU Affected Investors. The transaction described in this Offering Memorandum is structured in a way that may not allow EU Affected Investors to comply with the EU Due Diligence Requirements.

Failure by an EU Affected Investor to comply with the EU Due Diligence Requirements with respect to an investment in the Notes described in this Offering Memorandum may result in the imposition of a penalty regulatory capital charge on such investment or of other regulatory sanctions by the competent authority of such EU Affected Investor.

With respect to the UK, relevant UK established or UK regulated persons (as described below) are subject to the restrictions and obligations of Regulation (EU) 2017/2402 as it forms part of UK domestic law by operation of the European Union (Withdrawal) Act 2018, as amended (the "EUWA"), and as amended by the Securitisation (Amendment) (EU Exit) Regulations 2019 (and as it may be further amended, supplemented or replaced, from time to time) (the "UK Securitization Regulation", and together with the EU Securitization Regulation, the "Securitization Regulations").

Article 5 of the UK Securitization Regulation places certain conditions on investments in a "securitisation" (as defined in the UK Securitization Regulation) (the "UK Due Diligence Requirements", and together with the EU Due Diligence Requirements, the "Due Diligence Requirements") by an "institutional investor", defined by the UK Securitization Regulation to include (a) an insurance undertaking as defined in section 417(1) of the Financial Services and Markets Act 2000, as amended ("FSMA"); (b) a reinsurance undertaking as defined in section 417(1) of the FSMA; (c) an occupational pension scheme as defined in section 1(1) of the Pension Schemes Act 1993 that has its main administration in the UK, or a fund manager of such a scheme appointed under section 34(2) of the Pensions Act 1995 that, in respect of activity undertaken pursuant to that appointment, is authorised for the purposes of section 31 of the FSMA; (d) an AIFM as defined in regulation 4(1) of the Alternative Investment Fund Managers Regulation 2013 which markets or manages AIFs (as defined in regulation 3 of those Regulations) in the UK; (e) a management company as defined in section 237(2) of the FSMA; (f) a UCITS as defined by section 236A of the FSMA, which is an authorized open ended investment company as defined in section 237(3) of the FSMA; and (g) a CRR firm as defined by Article 4(1)(2A) of Regulation (EU) No 575/2013, as it forms part of UK domestic law by virtue of the EUWA. The UK Due Diligence Requirements may also apply to investments by certain consolidated affiliates, wherever established or located, of such CRR firms (such affiliates, together with all such institutional investors, "UK Affected Investors", and together with EU Affected Investors, "Affected Investors").

No party to the transaction described in this Offering Memorandum or any of their respective affiliates is required, or undertakes, to retain a material net economic interest in the securitization transaction described in this Offering Memorandum in accordance with the UK Securitization Regulation, or makes any representation or agreement that it or any other party is undertaking or will undertake to take or refrain from taking any other action to facilitate or enable the compliance by UK Affected Investors with the UK Due Diligence Requirements, or to comply with the requirements of any other law or regulation now or hereafter in effect in the UK, in relation to risk retention, due diligence and monitoring, credit granting standards or any other conditions with respect to investments in securitization transactions by UK Affected Investors. The transaction described in this Offering Memorandum is structured in a way that may not allow UK Affected Investors to comply with the UK Due Diligence Requirements.

Failure by a UK Affected Investor to comply with the UK Due Diligence Requirements with respect to an investment in the Notes may result in the imposition of a penalty regulatory capital charge on that investment or of other regulatory sanctions by the competent authority of such UK Affected Investor.

Prospective investors should analyze their own regulatory position and are encouraged to consult with their own investment and legal advisors regarding compliance with the Securitization Regulations and

19

the suitability of the Notes for investment.  None of the Issuer, the Servicer, the Backup Servicer, the Underwriter, the Trustee nor any other party to the transaction makes any representation to any prospective investor or purchaser of the Notes regarding the regulatory capital treatment of their investment in the Notes on the Date of Issuance or at any time in the future.  Failure by a UK Affected Investor to comply with the UK Due Diligence Requirements with respect to an investment in the Notes may result in the imposition of a penalty regulatory capital charge on that investment or of other regulatory sanctions by the competent authority of such UK Affected Investor.

**Funds available in the Reserve Fund and Capitalized Interest Fund are limited and, if depleted, there may be shortfalls in payments to Noteholders**

The Reserve Fund and the Capitalized Interest Fund will each be funded on the Date of Issuance.  Amounts on deposit in the Reserve Fund will be replenished to the extent of available funds in the Collection Fund so that the amount on deposit in the Reserve Fund will be maintained at the Specified Reserve Fund Balance.  The Capitalized Interest Fund will not be replenished and will be available only for a limited period of time.  Funds may be transferred out of the Reserve Fund and the Capitalized Interest Fund from time to time as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES" herein.  In the event that the funds on deposit in the Capitalized Interest Fund and the Reserve Fund are exhausted and there are insufficient available funds in the Collection Fund, the Noteholders will bear any risk of loss.

**The target overcollateralization level may not be reached or maintained**

The Specified Overcollateralization Amount is intended to protect the Noteholders from losses on the Financed Eligible Loans in excess of those anticipated.  No assurances can be provided as to whether or when the target overcollateralization level will be met or, if such level is met, whether such level will be maintained.

**Certain amendments to the Indenture and other actions may be taken without the consent of Noteholders, upon satisfaction of a Rating Agency Condition or by less than all of the Noteholders**

The Indenture permits the Issuer and the Trustee (at the written direction of the Issuer) to take certain actions based upon satisfaction of a Rating Agency Condition, without the consent of the Noteholders.  These include, without limitation, increases in certain fees, reduction of the Specified Reserve Fund Balance, addition of permitted investments and a change in a Servicer.  In addition, subject to the limitations described under the caption "SUMMARY OF THE INDENTURE PROVISIONS—Supplemental Indentures—Supplemental Indentures Requiring Consent of Noteholders," changes may be made to the Indenture or other actions taken without the consent of the Noteholders and without satisfaction of a Rating Agency Condition.  See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Supplemental Indentures—Supplemental Indentures Not Requiring Consent of Noteholders" herein.

Under the Indenture, Noteholders of specified percentages of the Outstanding Amount of the Notes may amend or supplement or waive provisions of the Indenture without the consent of the other Noteholders, including, but not limited to, the ability to redeem the Notes at a price of par or greater with the consent of the Noteholders of a majority of the Outstanding Amount of the Notes.  Investors have no

recourse if the required percentage of Noteholders vote and other investors disagree with the vote on these matters.  The Noteholders may vote in a manner which impairs the ability to pay principal and interest on the Notes.

**Rights to waive defaults may adversely affect Noteholders**

Generally, the Noteholders of at least a majority of the outstanding principal amount of the Notes of the highest priority (initially the Class A Notes and thereafter the Class B Notes) (the "Highest Priority Notes") have the ability, with specified exceptions, to waive certain defaults under the Indenture, including defaults that could materially and adversely affect the Noteholders who did not vote to waive such default.

**The rate of payments on the Financed Eligible Loans may affect the maturity and yield of the Notes**

Financed Eligible Loans may be prepaid at any time without penalty.  If the Issuer receives prepayments on the Financed Eligible Loans, those amounts will be used to make principal payments as described below under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein, which could shorten the average life of the Notes.  Factors affecting prepayment of loans include general economic conditions, legislative, executive orders and administrative initiatives, prevailing interest rates and changes in the borrower's job, including transfers and unemployment.  Refinancing opportunities that may provide more favorable repayment terms, including those that may be offered under potential government initiatives to consolidate or otherwise refinance existing FFELP Loans to the Federal Direct Loan Program (the "Direct Loan Program"), also affect prepayment rates.  For example, legislation has been proposed periodically that would allow eligible student loan borrowers with FFELP Loans or private loans to refinance those student loans at lower interest rates currently offered to new borrowers, with refinanced FFELP Loans to be fully paid and reissued as loans under the Direct Loan Program, and with borrower eligibility requirements to be established by the Department of Education based on income or debt-to-income financial need metrics.  Also, the President of the United States has indicated his support for legislation or a potential executive order providing for the cancellation or prepayment of up to $50,000 per student in student debt.  In addition, defaults on Financed Eligible Loans owned by the Issuer and pledged under the Indenture result in guarantee payments being made on such Financed Eligible Loans, which will accelerate the prepayment of the Notes.

Scheduled payments with respect to the Financed Eligible Loans may be reduced and the maturities of Financed Eligible Loans may be extended as authorized by the Higher Education Act.  Also, periods of deferment and forbearance may lengthen the remaining term of the Financed Eligible Loans and the average life of the Notes.

The rate of principal payments to investors on the Notes will be directly related to the rate of payments of principal on the Financed Eligible Loans.  Changes in the rate of prepayments may significantly affect investors' actual yield to maturity, even if the average rate of principal prepayments is consistent with investors' expectations.  In general, the earlier a prepayment of principal of a loan, the greater the effect may be on an investor's yield to maturity.  The effect on an investor's yield as a result of principal payments occurring at a rate higher or lower than the rate anticipated by an investor during the period immediately following the issuance of the Notes may not be offset by a subsequent like reduction, or increase, in the rate of principal payments on the Notes.  Investors will bear entirely any reinvestment risks resulting from a faster or slower incidence of prepayment of the Financed Eligible Loans.

As of the Statistical Cut-Off Date, $9,496,737 of the principal amount of the Financed Eligible Loans (representing approximately 4.71% of the Financed Eligible Loans by principal amount) are "rehabilitation loans," which are Eligible Loans that have previously defaulted, but for which the borrower thereunder has made a specified number of on-time payments as described in "APPENDIX A— DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto. Although rehabilitation loans benefit from the same guarantees as other FFELP student loans, rehabilitation loans have generally experienced re-default rates that are higher than default rates for FFELP student loans that have not previously defaulted.

**Different rates of change in interest rate indexes may affect Trust Estate cash flow**

The interest rates on the Class A-1B Notes and Class B Notes may fluctuate from one Interest Accrual Period to another in response to changes in the specified index rates. The Eligible Loans that will be refinanced with the proceeds from the sale of the Notes bear interest either at fixed rates or at rates which are generally based upon the bond equivalent yield of the 91-day U.S. Treasury Bill rate. In addition, the Financed Eligible Loans may be entitled to receive Special Allowance Payments from the Department of Education based upon a one-month LIBOR rate or the 91-day U.S. Treasury Bill rate. See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein and "DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" in Appendix A hereto. If there is a decline in the rates payable on Financed Eligible Loans, the amount of funds representing interest deposited into the Collection Fund may be reduced. If the interest rate payable on the Class A-1B Notes and Class B Notes does not decline in a similar manner and time, the Issuer may not have sufficient funds to pay interest on the Notes when due. Even if there is a similar reduction in the rate applicable to the Class A-1B Notes and Class B Notes, there may not necessarily be a reduction in the other amounts required to be paid by the Issuer, such as certain expenses, causing interest payments to be deferred to future periods. Similarly, if there is a rapid increase in the interest rate payable on the Class A-1B Notes and Class B Notes without a corresponding increase in rates payable on the Financed Eligible Loans, the Issuer may not have sufficient funds to pay interest on the Notes when due. Sufficient funds may not be available in future periods to make up for any shortfalls in the current payments of interest on the Notes or expenses of the Trust Estate created under the Indenture. In addition, if One-Month LIBOR is no longer available, the interest rate on the Class A-1B Notes and Class B Notes will bear interest based upon a replacement index as described under the caption "—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" below and the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein. The Department of Education has not indicated what index it will use to calculate Special Allowance Payments presently based upon one-month LIBOR if one-month LIBOR is no longer available, and any such replacement index may differ from the index used to calculate interest on the Class A-1B Notes and the Class B Notes. A bill was recently introduced in the House of Representatives (the "Sherman Bill") that, at one point in its drafting, would have changed the index used to calculate Special Allowance Payments from One-Month LIBOR to a replacement benchmark rate established by the Board of Governors of the Federal Reserve System. This language related to Special Allowance Payments has been removed from the current version of the Sherman Bill, but if reinserted during the committee process could tie Special Allowance Payment to a replacement benchmark rate based upon SOFR that could take effect no later than June 30, 2023, unless the Board of Governors of the Federal Reserve System determines that any LIBOR tenor will cease to be published or ceases to be representative on a different date. No assurance can be given that the proposed Sherman Bill will be adopted or, if adopted, will be adopted in its current form or in a form containing a provision relating to a change in the calculation of Special Allowance Payments. If the Department of Education uses an alternative index to one-month LIBOR other than the Benchmark Replacement selected by the Issuer as described above to calculate Special Allowance Payments, the Issuer and the Trustee (at the written direction of the Issuer) may enter

into a LIBOR Related Amendment to change the index used to calculate the interest rate on the Class A-1B Notes and the Class B Notes to the applicable alternative index to one-month LIBOR selected by the Department of Education plus or minus a comparable spread and any associated changes that are reasonably necessary in the opinion of the Issuer to adopt or to implement such rate change, which shall become effective upon either (i) obtaining the consent of the Noteholders of not less than a majority of the Outstanding Amount of the Class A-1B Notes and the Class B Notes and satisfaction of the Rating Agency Condition, or (ii) obtaining the consent of the Noteholders of not less than a majority of the Outstanding Amount of each class of the Notes.

For Eligible Loans disbursed prior to April 1, 2006, lenders are entitled to retain interest income in excess of the special allowance support level in instances when the Eligible Loan interest rate exceeds the special allowance support level. However, owners of the Eligible Loans are not allowed to retain interest income in excess of the special allowance support level on loans disbursed on or after April 1, 2006 and are required to rebate any such "excess interest" to the federal government on a quarterly basis. This modification effectively limits such owners' returns on those loans to the special allowance support level and could require a lender to rebate excess interest accrued but not yet received. For fixed rate loans, the excess interest owed to the federal government will be greater when one-month LIBOR rate is relatively low, causing the special allowance support level to fall below the student loan rate. There can be no assurance that such factors or other types of factors will not occur or that, if they occur, such occurrence will not materially adversely affect the sufficiency of the Trust Estate established under the Indenture to pay the principal of and interest on the Notes, as and when due.

**The timing of changes in the interest rates payable on the Class A-1B Notes and Class B Notes as compared to the Financed Eligible Loans may affect cash flow to the Trust Estate**

The interest rates payable on most of the Eligible Loans held in the Trust Estate are fixed rates, with Special Allowance Payments that reset on a daily basis, while the interest rates payable on the Class A-1B Notes and Class B Notes reset on a monthly basis. In a declining interest rate environment, the differences in the timing of the interest rate resets may lead to a compression of the spread between the amount of Eligible Loan interest the Trust Estate receives, and the amount of interest paid on the Notes. In a rising interest rate environment, the spread may increase. If the spread between the amount of Eligible Loan interest received by the Trust Estate and the amount of interest paid on the Notes compresses, there may not be sufficient funds available in future periods to pay the expenses of the Trust Estate and interest and principal on the Notes.

**Social and economic factors may adversely affect repayment of the Financed Eligible Loans**

Collections on the Financed Eligible Loans during a Collection Period may vary greatly in both timing and amount from the payments actually due on the Financed Eligible Loans for that Collection Period due to a variety of economic, social and other factors. Economic factors include interest rates, unemployment levels, housing price declines, commodity prices, adjustments in the borrower's payment obligations under other indebtedness incurred by the borrower, the rate of inflation and consumer perceptions of economic conditions generally. Social factors include changes in consumer confidence levels and changing attitudes in respect of incurring debt and changing attitudes regarding the stigma of personal bankruptcy. Economic conditions may also be impacted by global or localized economic or political conditions, weather events, environmental disasters, national or localized outbreaks of a highly contagious or epidemic disease or pandemics and any related quarantines and terrorist events or wars or a

deterioration or improvement in economic conditions in one of the markets where borrowers of the Financed Eligible Loans are concentrated. The Issuer is unable to determine and has no basis to predict to what extent social or economic factors will affect the Financed Eligible Loans.

Following the financial crisis that began in 2008, the United States experienced an extended period of economic weakness or recession. This period was marked by high unemployment, substantial decreases in home value, increased mortgage and consumer loan delinquencies, decreased availability of consumer credit, increased volatility in financial markets, general deleveraging of consumer balance sheets, and defaults and losses on consumer loans and receivables, including personal loans similar to the Financed Eligible Loans. The United States began to experience a recession as a result of the COVID-19 pandemic and a significant increase to the unemployment rate as described under "—Deterioration of general economic conditions and turmoil in the credit markets as a result of COVID 19 Pandemic" below. The number of delinquencies and defaults on consumer receivables is significantly influenced by the employment status of borrowers. There can be no assurance that high levels of unemployment or underemployment will not recur, or that other factors relating to the uncertain economic climate will not result in increased delinquencies and defaults with respect to consumer receivables in the future. Such adverse economic conditions may also materially impair the ability of the Issuer, the Servicer, the Backup Servicer or the Trustee to meet their respective obligations under the transaction documents. The occurrence of any increased delinquencies or defaults with respect to the Financed Eligible Loans or material impairment of the ability of the above referenced parties to meet their respective obligations under the transaction documents could affect the timing and amount of Available Funds for any Collection Period and the payment of principal of and interest on the Notes.

Failures by borrowers to pay the principal of and interest on their Financed Eligible Loans on schedule or an increase in deferments or forbearances could affect the timing and amount of Available Funds for any Collection Period and the payment of principal of and interest on the Notes. The effect of these factors, including the effect on the timing and amounts of Available Funds for any Collection Period and the payment of principal of and interest on the Notes, is difficult to predict.

**Deterioration of general economic conditions
and turmoil in the credit markets as a result of
COVID-19 Pandemic**

Beginning at the end of March 2020, financial markets began to experience significant volatility as a result of the outbreak of COVID-19, and the United States economy and various other world economies experienced a sudden downturn. The COVID-19 Pandemic has adversely impacted local, state and national economic conditions and has resulted in substantial employment disruption in the United States and record unemployment claims. Additionally, several eviction moratoriums have been put into place by the U.S. Centers for Disease Control and Prevention since the beginning of the COVID-19 Pandemic which may result in widespread eviction actions once they fully expire. The long-term impact of a continuation of these developments, while currently unknown, could result in an increase in delays by borrowers in paying Financed Eligible Loans, thus causing increased default claims to be paid by a Guaranty Agency (including the State Guaranty Agency). It is impossible to predict the status of the economy or unemployment levels or at what point a downturn in the economy would significantly reduce Issuer revenues or a Guaranty Agency's (including the State Guaranty Agency's) ability to pay default claims. The COVID-19 Pandemic and the economic downturn might also affect the ability of the transaction parties to perform their duties and obligations under the transaction documents, which could adversely affect the market value of the Notes or limit the ability of an investor to resell its Notes.

General economic conditions may also be affected by other events including the prospect of increased hostilities abroad. Certain of such events may have other effects, the impact of which is difficult to project.

**Impact of turmoil in the credit markets on the business of the Issuer**

There have been changes in the national credit markets since the fall of 2007 and more recently since March 2020 that have dramatically changed the way that the Issuer does business. Since the Issuer's creation pursuant to the Authorizing Act in 1981, the Issuer regularly financed its student loan purchases on a long-term basis through the issuance of revenue bonds or notes secured by the student loans it had originated or purchased with the proceeds of such bonds or notes. Due to the turmoil in the credit markets, the cost of asset-backed financings has increased. Some of the issues that have made asset-backed borrowings more difficult include: the recession that began in March 2020 as the result of the COVID-19 Pandemic, the collapse of the auction rate securities market; the downgrade of national bond insurers; the investigations and related matters as to the manipulation of LIBOR; limited availability of credit support and liquidity in the market; the requirement by those credit and liquidity providers that are in the market of higher amounts of equity and higher fees payable to such credit and liquidity providers; the establishment by the credit rating agencies of significantly more rigorous cash flow assumptions and requirements; and the downgrading of the long-term sovereign credit rating on the obligations of the United States by S&P. In addition to the turmoil in the credit markets, the changes in the FFEL Program imposed by the Health Care and Education Reconciliation Act of 2010 (as discussed herein) have adversely impacted the profitability of financing FFELP Loans. In addition, the elimination of the FFEL Program described below has impacted the Issuer's business.

**Cashflows to the Trust Estate may be affected by natural disasters or pandemics**

Student loan borrowers in regions affected by natural disasters or pandemics may experience difficulty in timely payment of their Eligible Loans. This could reduce the funds available to the Issuer to pay principal and interest on the Notes.

**Impact of COVID-19 Pandemic on the Issuer and student loan related legislation resulting from COVID-19 Pandemic**

On January 31, 2020, the United States Department of Health and Human Services Secretary declared a public health emergency in response to the spread of the novel coronavirus ("COVID-19" and the "COVID-19 Pandemic"). On March 13, 2020, the President of the United States declared a national emergency beginning March 1, 2020. On April 3, 2020, the Missouri Governor issued an order restricting certain activities in the state, which restrictions were in effect from April 6, 2020 until May 4, 2020. The President's declaration of a national emergency allowed the Issuer to begin granting administrative forbearance under the federal regulations. In addition, the Department of Education's Office of Federal Student Aid ("FSA") has published several announcements permitting lenders of FFELP Loans to voluntarily grant the same relief that the Department of Education is granting to federally owned loans. The Issuer has advised its loan borrowers that it or the Department of Education has adopted a number of temporary relief measures, including:

- disaster forbearance allowing a borrower facing financial hardship to suspend interest and principal payments for up to 90 days; then 30-day increments at the verbal request of the borrower following the original 90 days;

25

- all otherwise available options to suspend or reduce monthly payments remain in full force;

- availability of reduced monthly payments for FFELP borrowers requesting relief continues to be available and is based on regulations and eligibility;

- temporary waiver or reduction of certain non-negotiable funds fees and late fees (as of July 1, 2020, the Issuer no longer assesses late fees and all outstanding late fees for the period prior to July 1, 2020 have been waived); and

- reports of delinquencies on non-defaulted loans to credit reporting agencies does not occur until 90 days past due.

The Issuer reserves the right to adopt additional relief measures in response to the COVID-19 Pandemic.

During the first few weeks of the COVID-19 Pandemic, the Issuer successfully increased the percentage of operations performed in a remote or "work-at-home" manner utilizing full system interfaces. The Issuer has begun to gradually phase in personnel to begin working in its facilities while complying with applicable federal, state and county restrictions.  The Issuer has the ability to redeploy its employees to work from home if needed based on the future status of the COVID-19 Pandemic.  Management continually reviews this strategy and expects to be able to adjust current staffing arrangements if necessary.  The Issuer has never had to run its operations to such extent remotely for an extended period of time, and it is possible the Issuer will encounter significant challenges to running its businesses.  The Issuer's operations rely on the efficient and secure collection, processing, storage, and transmission of personal, confidential, and other information in a significant number of customer transactions on a continuous basis through its computer systems and networks and those of its third-party service providers.  Unanticipated issues arising from handling personal, confidential, and other information from a less efficient work-at-home environment could adversely impact the Issuer's operations and lead to greater risks for the Issuer, including cybersecurity risks.  Approximately 73% of the Issuer's loan servicing portfolio is from the Federal Direct Loan Program.  As a result of the Federal Relief Acts (defined below), approximately 1,625,000 borrowers in repayment were placed in a Federal Relief Acts forbearance status, which significantly reduced the call volume to the Issuer's call center and resulted in a reduction of approximately 20% of the Issuer's workforce.

***The Federal Relief Acts***.  The United States Congress has enacted several COVID 19-related bills, including the Coronavirus Aid, Relief, and Economic Security Act, signed into law on March 27, 2020 ("CARES Act"), the Paycheck Protection and Health Care Enhancement Act, signed into law on April 24, 2020, the Student Veteran Coronavirus Response Act, signed into law on April 28, 2020, the COVID–19 Consumer Protection Act (Title XIV of the Consolidated Appropriations Act, 2021), signed into law on December 27, 2020 and the American Rescue Plan Act of 2021, signed into law on March 11, 2021 (collectively, the "Relief Acts"), that authorize numerous measures in response to the economic effects of the COVID-19 Pandemic.  Such measures include, but are not limited to: direct financial aid to American families; temporary relief from certain federal tax requirements (including forgiveness of indebtedness on student loans), the scheduled payment of federally owned education loans, including federally owned FFELP Loans and loans originated under the Direct Loan Program ("Direct Loans"), and from certain other federal higher education aid requirements; temporary relief for borrowers with federally-related mortgage loans; payroll and operating expense support for small businesses and nonprofit entities; federal funding of higher education institutions' emergency aid to students and operations and support for the capital markets loan assistance for distressed industries; financial assistance to governmental entities; and capital market support.

26

The Relief Acts also authorized the United States Department of the Treasury (the "Treasury") to provide up to approximately $450 billion in loans, loan guarantees and other investments to support programs and facilities established by the Board of Governors of the Federal Reserve System (the "Federal Reserve") that are intended to provide liquidity to the financial system and facilitate lending to eligible businesses and to states, political subdivisions and instrumentalities. Such injection of liquidity followed actions by the Federal Reserve, including the purchase of Treasury securities and mortgage backed securities, facilitating the flow of credit to municipalities by expanding its Money Market Mutual Fund Liquidity Facility to include a wider range of securities, including certain municipal variable rate demand notes, and facilitating the flow of credit to municipalities by expanding its Commercial Paper Funding Facility to include high quality, tax exempt commercial paper as eligible securities. No assurance can be given that such liquidity assistance from the federal government will assure that a secondary market exists for Issuer debt obligations, including the Notes, or the availability to the Issuer of adequate liquidity to fully fund its program needs at any particular time.

On August 6, 2021, the President of the United States signed an executive order instructing the Department of Education to continue to extend the student loan payment forbearance and the halting of interest accrual and collections activities through January 31, 2022 for federally-owned loans (which do not include the Financed Eligible Loans). It is possible such period could be extended to a later date, although the Department of Education has stated that this extension will be the final extension. The Issuer provides COVID-19 related forbearances to borrowers of the Financed Eligible Loan upon request for 30-day periods. Interest continues to accrue on any Financed Eligible Loans for which a COVID-19 related forbearance is requested and granted. Such forbearances could cause the rate of repayment of the Financed Eligible Loans to be slower than expected, which would have a corresponding impact on the payment of the Notes.

***Uncertainty of Future Impacts***. As of the date hereof, the Issuer is not aware of federal or state consumer lending law changes in response to the COVID-19 Pandemic that it expects to materially and adversely affect its operation of its student loan program. Any further COVID-19 Pandemic relief measures that may be required by law or voluntarily implemented by the Issuer and that are applicable to the Financed Eligible Loans would be expected to result in a delay in the receipt of, or in a reduction of, the revenues received from the Financed Eligible Loans. The Issuer cannot accurately predict the number of Financed Eligible Loan borrowers that would utilize any benefit program that requires borrower action. The greater the number of borrowers that utilize any relief measures, the lower the total current loan receipts on the Financed Eligible Loans. If actual receipt of Financed Eligible Loan revenues or actual Financed Eligible Loan administrative expenditures were to vary materially from those projected, the ability of the Trust Estate created under the Indenture to provide sufficient revenues to fund interest and administrative costs and to amortize the Notes might be adversely affected.

The full impact of the COVID-19 Pandemic, and of directly and indirectly related developments, on the Issuer's finances and operations, on the performance of the Financed Eligible Loans constituting security for the Notes, and on the security, market value and liquidity of the Notes cannot be predicted at this time. It is not currently possible to project with certainty the nature, degree and duration of economic and legal changes that may result from the COVID-19 Pandemic. The COVID-19 Pandemic could adversely affect global, national, regional or local economies in a manner that might reduce the ability of certain Financed Eligible Loan borrowers to make full and timely loan repayment. The number and aggregate principal balance of Financed Eligible Loans for which repayment may be so affected by the COVID-19 Pandemic is not known at this time but may be significant. As a result, there may be a delay in, or reduction of, total Financed Eligible Loan collections that might materially and adversely affect the ability of the Trust Estate created under the Indenture to provide sufficient revenues to fund interest and administrative costs and to amortize the Notes, as initially projected or as projected herein. Further federal legislative or administrative action, including forgiveness of principal on Financed Eligible Loans by the

27

Department of Education, could result in an increase in the percentage of incidence of on-time payments of Financed Eligible Loan or of prepayments of Financed Eligible Loans. There can be no assurance, however, that such further federal action will occur, or as to the number or aggregate principal balance of Financed Eligible Loans that might be so affected. The Issuer is monitoring and assessing the economic and legal impact of the COVID-19 Pandemic and of governmental responses thereto, including orders, laws, regulations and mandates adopted by the State of Missouri or the federal government, on its operations and financial position.

**Forbearance granted as a result of the COVID-19 Pandemic may delay payments of interest and principal**

The Issuer, as the Servicer, has agreed to service the Financed Eligible Loans. The Higher Education Act permits, and in some cases requires, "forbearance" periods from loan collection in some circumstances. Interest that accrues during a forbearance period is never subsidized. Forbearance is most often granted to borrowers for periods of economic hardship affecting the borrower, which may occur for a variety of reasons. During periods of deteriorating economic conditions in the United States or globally, such as during disruptive political, social or economic events, forbearance requests typically increase. Forbearance is also often granted to borrowers when a federal disaster or emergency has been declared such as in response to COVID-19. See the caption "Impact of COVID-19 Pandemic on the Issuer and student loan related legislation resulting from COVID-19 Pandemic" above.

The COVID-19 Pandemic has resulted in a temporary increase in the number of borrowers of Financed Eligible Loans who have requested forbearance. In April of 2020, the Issuer placed the borrowers of any of its FFELP Loans, including any Financed Eligible Loans, that were more than 15 days' delinquent in their payments into a 90-day disaster forbearance period (which also deemed such borrowers to be "current" in their payments) As more borrowers contacted the Issuer to request such forbearances, delinquency rates dropped significantly as delinquent borrowers were moved from delinquent status to disaster forbearance status. For qualified loan borrowers who are adversely impacted by the COVID-19 pandemic, the Issuer continues to provide short-term, extended forbearance relief from payments upon request.

In May 2021, per a Dear Colleague Letter ("DCL") issued by the Department of Education, the Issuer reinstated the automatic disaster forbearance. All loans that were more than 30 days delinquent were brought current and a placed into a disaster forbearance. In addition, any loan that becomes more than 30 days delinquent will also have a 90-day disaster forbearance placed on the account. The Issuer will also clear any negative credit reported on borrowers eligible for the disaster forbearance retroactive to March 13, 2020. While the Department of Education has recently extended the automatic disaster forbearance for direct student loans to January 31, 2022, the Issuer is currently assessing whether to end its automatic disaster forbearance policies for FFELP Loans (including the Financed Eligible Loans) on September 30, 2021 or to extend such policies to January 31, 2022. If the Issuer terminates the automatic disaster forbearance, disaster forbearance would remain available to borrowers, at their request, during the disaster forbearance declaration period. As shown below, the reinstatement of this automatic disaster forbearance has caused the percentage of both the Issuer's portfolio of FFELP Loans and the Financed Eligible Loans in this status to increase.

Forbearance usage rates by principal amount of FFELP Loans owned by the Issuer in forbearance as a percentage of all FFELP Loans owned by the Issuer for the months indicated were approximately as follows:

| Month-End | Percentage of Issuer's FFELP Loans in Regular Forbearance | Percentage of Issuer's FFELP Loans in Disaster Forbearance | Total Percentage of Issuer's FFELP Loans in Forbearance |
|---|---|---|---|
| December 2019 | 8.78% | 0.19% | 8.96% |
| January 2020 | 9.23% | 0.02% | 9.25% |
| February 2020 | 12.55% | 0.02% | 12.58% |
| March 2020 | 12.96% | 0.06% | 13.03% |
| April 2020 | 7.05% | 18.49% | 25.54% |
| May 2020 | 3.34% | 28.47% | 31.81% |
| June 2020 | 3.67% | 19.87% | 23.54% |
| July 2020 | 4.04% | 18.45% | 22.49% |
| August 2020 | 6.78% | 12.64% | 19.42% |
| September 2020 | 10.61% | 3.83% | 14.44% |
| October 2020 | 9.89% | 4.37% | 14.26% |
| November 2020 | 8.51% | 4.66% | 13.17% |
| December 2020 | 8.26% | 4.98% | 13.24% |
| January 2021 | 9.22% | 3.99% | 13.20% |
| February 2021 | 14.46% | 2.96% | 17.42% |
| March 2021 | 15.38% | 2.70% | 18.08% |
| April 2021 | 8.90% | 14.69% | 23.59% |
| May 2021 | 6.12% | 18.96% | 25.08% |
| June 2021 | 5.82% | 23.22% | 29.04% |
| July 2021 | 4.83% | 26.19% | 31.02% |

[Remainder of page intentionally left blank]

Forbearance usage rates by principal amount of Financed Eligible Loans in forbearance as a percentage of all Financed Eligible Loans for the months indicated were approximately as follows:

| Month-End | Percentage of the Financed Eligible Loans in Regular Forbearance | Percentage of the Financed Eligible Loans in Disaster Forbearance | Total Percentage of the Financed Eligible Loans in Forbearance |
|---|---|---|---|
| December 2019 | 8.35% | 0.09% | 8.44% |
| January 2020 | 8.85% | 0.00% | 8.85% |
| February 2020 | 11.49% | 0.01% | 11.50% |
| March 2020 | 11.53% | 0.03% | 11.55% |
| April 2020 | 6.24% | 17.44% | 23.68% |
| May 2020 | 3.09% | 26.69% | 29.78% |
| June 2020 | 3.43% | 18.50% | 21.94% |
| July 2020 | 3.82% | 15.92% | 19.74% |
| August 2020 | 5.94% | 10.73% | 16.67% |
| September 2020 | 9.25% | 3.54% | 12.79% |
| October 2020 | 9.43% | 4.05% | 13.48% |
| November 2020 | 8.00% | 4.53% | 12.54% |
| December 2020 | 7.67% | 4.55% | 12.23% |
| January 2021 | 8.57% | 3.31% | 11.88% |
| February 2021 | 12.90% | 2.66% | 15.56% |
| March 2021 | 13.56% | 2.37% | 15.93% |
| April 2021 | 8.98% | 14.36% | 23.34% |
| May 2021 | 6.34% | 18.55% | 24.89% |
| June 2021 | 5.75% | 22.18% | 27.93% |
| July 2021 | 4.98% | 25.50% | 30.48% |

For details of forbearance policies under the FFELP see "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Deferment and Forbearance Periods" herein. An increase in forbearances on the Financed Eligible Loans may result in a delay in payments of interest or principal on the Financed Eligible Loans, which could negatively affect the ability of the Issuer to generate sufficient cash flow to pay its obligations and which, in turn, may cause losses on the Notes.

**LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes**

The interest rates payable on the Class A-1B Notes and Class B Notes and the Special Allowance Payments on substantially all of the Financed Eligible Loans are currently based on a spread over one-month LIBOR. See "APPENDIX B—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Special Allowance Payments" hereto. The London Interbank Offered Rate, or LIBOR, serves as a global benchmark for home mortgages, student loans and what various issuers pay to borrow money. As a result of longstanding initiatives, LIBOR is being discontinued as a floating rate benchmark.

The United Kingdom's Financial Conduct Authority (the "FCA") assumed regulatory oversight and supervision of LIBOR and the regulator of the administration of LIBOR, which is ICE Benchmark Administration Ltd. (the "IBA").

On March 5, 2021, the FCA announced that, after specified dates (the "Cessation Dates"), LIBOR settings will cease to be provided by any administrator or will no longer be representative which Cessation Dates will be:

- June 30, 2023, in the case of the principal U.S. dollar LIBOR tenors (overnight and one, three, six and 12 months); and

- December 31, 2021, in all other cases (i.e., one week and two-month U.S. dollar LIBOR and all tenors of non-U.S. dollar LIBOR).

The FCA's announcement and a related announcement made by IBA on March 5, 2021 are referred to herein as the "FCA/IBA Announcements." The FCA and certain U.S. regulators have emphasized that, despite expected publication of U.S. dollar LIBOR through June 30, 2023, no new contracts using U.S. dollar LIBOR should be entered into after December 31, 2021 and that, for certain purposes, market participants should transition away from U.S. dollar LIBOR sooner.

As to any particular LIBOR-based obligation, the actual transition from LIBOR to another reference rate will generally require two events to occur. The first event includes the FCA/IBA Announcements; the second event is the occurrence of a contractually defined benchmark replacement date. Although in most cases the benchmark replacement date will correspond to the relevant Cessation Date, some may not, depending on the relevant contractual terms; as a result, the actual transition date in any one situation will not necessarily be the same in another situation (even if the two situations are similar).

Although the foregoing reflects the likely timing of the LIBOR discontinuation, and the balance of this risk factor reflects certain related details and consequences, there is no assurance that LIBOR, of any particular currency or tenor, will continue to be published until any particular date or in any particular form.

See the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein for a description of the process for determining a replacement benchmark rate under the Indenture if One-Month LIBOR is no longer an available benchmark rate. The Department of Education has not indicated what index it will use to calculate Special Allowance Payments presently based upon One-Month LIBOR if One-Month LIBOR is no longer available, and any such replacement index may differ from the index used to calculate interest on the Class A-1B Notes and Class B Notes. If the Department of Education uses an alternative index to One-Month LIBOR other than the Benchmark Replacement selected by the Issuer as described under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein to calculate Special Allowance Payments, the Issuer and the Trustee (at the written direction of the Issuer) may enter into a LIBOR Related Amendment to change the index used to calculate the interest rate on the Class A-1B Notes and the Class B Notes to the applicable alternative index to One-Month LIBOR used by the Department of Education plus or minus a comparable spread and any associated changes that are reasonably necessary in the opinion of the Issuer to adopt or to implement such rate change, which shall become effective upon either (i) obtaining the consent of the Noteholders of not less than a majority of the Outstanding Amount of the Class A-1B Notes and the Class B Notes and satisfaction of the Rating Agency Condition, or (ii) obtaining the consent of the Noteholders of not less than a majority of the Outstanding Amount of each class of the Notes. The Issuer cannot provide any assurances that any replacement benchmark rate will be representative of market interest rates or consistent with previously published One-Month LIBOR during the life of the Notes. If a published One-Month LIBOR is unavailable at any time prior to the occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date

(each as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein), One-Month LIBOR will be the same as the rate of interest for the immediately preceding Interest Accrual Period, and could remain the rate of interest for the remaining life of the Class A-1B Notes and the Class B Notes. See the caption "DESCRIPTION OF THE NOTES—Calculation of LIBOR" herein.

In addition, as described under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein, One-Month LIBOR will be replaced as the benchmark for the Class A-1B Notes and Class B Notes following the occurrence of a Benchmark Transition Event (which has occurred, as described below) and its related Benchmark Replacement Date (which has not occurred, as described below). The Benchmark Transition Events generally include the making of public statements or publication of information by the administrator of the benchmark, its regulatory supervisor or certain other governmental authorities that the benchmark will no longer be provided or is no longer representative of market interest rates, and such benchmark administrator permanently or indefinitely ceasing to provide the benchmark or when a specified percentage of the underlying assets convert to an alternate index. In the Issuer's opinion, the FCA/IBA Announcements on future cessation and loss of representativeness of the LIBOR benchmarks constitute a "Benchmark Transition Event" under the Indenture. It appears, based on the FCA/IBA Announcements, that the related Benchmark Replacement Date will not occur until the first interest determination date after June 30, 2023. It is possible for additional Benchmark Transition Events to occur under the Indenture, which may result in a different (and possibly earlier) Benchmark Replacement Date. The Class A-1B Notes and the Class B Notes will accrue interest by reference to LIBOR until the Benchmark Replacement Date.

Further, as described under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein, the Benchmark Replacement (as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein), will depend on the availability of various alternative benchmarks, the first of which is Term SOFR, the second of which is Compounded SOFR or Simple Average SOFR, at the option of the Issuer (each as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein) and the last two of which are not currently specified. The Secured Overnight Financing Rate, or "SOFR," was selected by the Alternative Reference Rates Committee, or "ARRC," of the Federal Reserve Bank of New York, or the "FRBNY," as the replacement for LIBOR plus, in the case of existing LIBOR contracts and obligations, a spread adjustment; as a consequence of the FCA/IBA Announcements, the spread adjustments for different tenors of U.S. dollar LIBOR have been set. There are important fundamental differences between LIBOR and SOFR. LIBOR is an unsecured rate that represents interbank funding costs for different short-term maturities or "tenors." LIBOR is a forward-looking rate reflecting expectations regarding interest rates for those tenors. LIBOR is intended to be sensitive, in certain respects, to bank credit risk and to term interest rate risk. SOFR, on the other hand, is a secured, risk-free rate, intended to be a broad measure of the cost of borrowing funds overnight in transactions that are collateralized by U.S. Treasury securities. Thus, SOFR is largely insensitive to credit risk considerations and to short-term interest rate risks. As a result, SOFR will not be representative of LIBOR. The FRBNY started publishing SOFR in April 2018. The FRBNY has also started publishing historical indicative SOFR dating back to 2014, although such historical indicative data inherently involves assumptions, estimates and approximations. Since the initial publication of SOFR, daily changes in SOFR have, on occasion, been more volatile than daily changes in comparable benchmark or market rates, and SOFR over the term of the Notes may bear little or no relation to the historical actual or historical indicative data. For these reasons, among others, there is no assurance that SOFR or rates derived from SOFR will perform in the same or similar ways as LIBOR would have performed at any time, and there is no assurance that SOFR-based rates will be a suitable substitute for LIBOR and that SOFR-based rates, as modified by an applicable spread adjustment, will be the economic equivalent of LIBOR.

Term SOFR, which is expected to be a similar forward-looking term rate which will be based on SOFR, is the first alternative among the Benchmark Replacement alternatives. On July 29, 2021, the ARRC

announced its recommendation of Term SOFR rates published by the CME Group Inc. An earlier ARRC announcement stated that legacy contracts that have adopted the ARRC's recommended fallback provisions will fall back to rates based on the Term SOFR rates when the legacy contracts' contractual LIBOR replacement date occurs. The fallback provisions of the Class A-1B Notes and Class B Notes are based on the ARRC's recommended fallback provisions, and, accordingly, it is expected that Term SOFR (plus the Benchmark Replacement Adjustment) will be the benchmark replacement as of the Benchmark Replacement Date. Nonetheless, there is no assurance that such form of Term SOFR, or any other form, will be available as of the Benchmark Replacement Date. For example, it is possible, though not expected, that the ARRC could revise or withdraw its recommendation regarding Term SOFR rates before the Benchmark Replacement Date and, in the latter case, that neither the ARRC nor another Relevant Governmental Body may have selected or recommended another forward-looking term rate based on SOFR. If Term SOFR for the appropriate tenor is not available as of the Benchmark Replacement Date, the next available Benchmark Replacement is Compounded SOFR or Simple Average SOFR, at the option of the Issuer. In order to compensate for these differences in the benchmark, a Benchmark Replacement Adjustment (as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein) will be included in any Benchmark Replacement. However, the Issuer cannot provide any assurances that any Benchmark Replacement Adjustment will be sufficient to produce the economic equivalent of the then-current benchmark, either at the Benchmark Replacement Date or over the life of the Class A-1B Notes and the Class B Notes. As a result of each of the foregoing factors, the Issuer cannot provide any assurances that the characteristics of any Benchmark Replacement will be similar to the then-current benchmark that it is replacing, or that any Benchmark Replacement will produce the economic equivalent of the then-current benchmark that it is replacing. However, if the initial Benchmark Replacement is either Compounded SOFR or Simple Average SOFR and the Issuer later determines that Term SOFR can be determined, then, in the absence of a LIBOR Related Amendment, Term SOFR will become the new Unadjusted Benchmark Replacement and will, together with a new Benchmark Replacement Adjustment for Term SOFR, replace Compounded SOFR or Simple Average SOFR, as applicable on the next Benchmark determination date for Term SOFR, which could lead to further volatility in the interest rate on the Class A-1B Notes and the Class B Notes.

Finally, the Issuer will have discretion in certain elements of the Benchmark Replacement process, including determining when a Benchmark Replacement Date will occur, determining which Benchmark Replacement (and related Benchmark Replacement Adjustment) is available and, if no other designated Benchmark Replacements are available, selecting a Benchmark Replacement and determining its Benchmark Replacement Adjustment, and making Benchmark Replacement Conforming Changes (as defined under the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein). The Noteholders will not have any right to approve or disapprove of these changes and will be deemed to have agreed to waive and release any and all claims relating to any such determinations.

As a result of the foregoing, the rate at which the Class A-1B Notes and Class B Notes bear interest could be adversely affected by misconduct in the rate-setting process for One-Month LIBOR, changes to such process or the phasing out of the rate entirely. There may be a negative effect on the interest rate on, or the market value of, the Class A-1B Notes and Class B Notes if the One-Month LIBOR global benchmark is no longer available or if any Benchmark Replacement does not produce the economic equivalent of the then-current benchmark that it is replacing.

The discontinuation of LIBOR, particularly if the replacement for LIBOR is not well received by borrowers, the CFPB, the Department of Education or other governmental authorities that regulate education lending, may also have an adverse impact on the Issuer and could give rise to litigation or regulatory actions. The Issuer continues to evaluate the potential impact of the LIBOR transition and the establishment of an alternative reference rate, and it cannot predict what impact any related changes may have on the Financed Eligible Loans or the Class A-1B Notes and the Class B Notes.

Financial markets, particularly the trading market for LIBOR-based obligations, may be adversely affected by the discontinuation of LIBOR, the remaining uncertainties regarding its discontinuation, the alternative reference rates that will be used when LIBOR is discontinued (including SOFR-based rates) and other developments related to LIBOR and its replacement.

The occurrence and implementation of a Benchmark Transition Event also may have certain adverse U.S. federal income tax consequences to the Noteholders.  See the captions "DESCRIPTION OF THE NOTES—Benchmark Transition Event" and "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS—Sale or Exchange of Notes" herein.

**Federal financial regulatory legislation may affect the Notes**

The Dodd Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (the "Dodd-Frank Act"), which was enacted in July 2010, represented a comprehensive overhaul of the financial services industry within the United States, and established the federal Consumer Financial Protection Bureau (the "CFPB").  The CFPB, an independent agency within the Federal Reserve, regulates consumer financial products, including education loans, and other financial services offered primarily for personal, family, or household purposes, and the CFPB and other federal agencies, including the Securities and Exchange Commission (the "SEC") and the Commodity Futures Trading Commission (the "CFTC"), are required to undertake various assessments and rulemakings to implement the law.  The majority of the provisions in the Dodd-Frank Act are aimed at financial institutions.  However, there are components of the law that have impacted the Issuer.

In December 2014, the SEC and federal banking agencies published final regulations, effective December 24, 2016 for issuers of student loan asset-backed securities, generally requiring issuers of asset-backed securities or persons who organize and initiate asset-backed securities transactions to retain a portion of the underlying assets' credit risk; however, the Issuer is exempt from these risk retention rules. In addition, the SEC approved changes to the rules applicable to issuers of asset-backed securities under the Securities Act and the Securities Exchange Act, that substantially revise Regulation AB and other rules governing the offering process, disclosure and reporting for asset-backed securities issued in registered and certain unregistered transactions.  It is not clear how the revisions to Regulation AB will be implemented, and to what extent the Issuer may be affected.  No assurance can be given that the new standards contained in the amended Regulation AB will not have an adverse impact on the Issuer or on the value or marketability of the Notes.

The documents entered into in connection with prior Issuer sponsored securitization transactions and this transaction contain covenants requiring the repurchase or replacement of Eligible Loans in the case of a breach of certain representations and warranties.  Therefore, pursuant to Rule 15Ga-1, the Issuer is responsible for disclosure of all fulfilled and unfulfilled repurchase requests for student loans in such securitization transactions.  There have not been any unfulfilled repurchase requests for student loans with respect to any of the Issuer sponsored securitization transactions.  With respect to the Notes, the Issuer will furnish a Form ABS-15G at the times required by and pursuant to Rule 15Ga-1 of the Securities Exchange Act as required by the SEC, which will be furnished on the Municipal Securities Rulemaking Board through its EMMA system ("EMMA") at www.emma.msrb.org, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.

In September 2014, the SEC adopted new rules further regulating rating agencies' activities with respect to rating asset-backed securities, and requiring that issuers of asset-backed securities, effective June 15, 2015, disclose third-party due diligence findings, including certain agreed-upon procedure reviews.  The Issuer engaged Ernst & Young LLP to perform certain agreed-upon procedures which

compared or recomputed information contained in a data file containing information with respect to the Financed Eligible Loans to or based upon the corresponding information in the loan files for certain randomly selected Financed Eligible Loans, and no exceptions were noted. The Issuer has made such report publicly available on EMMA at www.emma.msrb.org, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.

Student loans and student loan servicing are top priorities for the CFPB. In May 2015, the CFPB launched a public inquiry into student loan servicing practices throughout the industry. In September 2015, the CFPB issued a report discussing public comments submitted in response to the inquiry and, in consultation with the Department of Education and Department of the Treasury, released recommendations to reform student loan servicing to improve borrower outcomes and reduce defaults. In July 2016, the Department of Education expanded on these joint principles by outlining enhanced customer service standards and protections that will be incorporated into federal servicing contracts and guidelines. The CFPB has also announced that it may issue student loan servicing rules in the future.

The Dodd-Frank Act gave the CFPB authority to supervise private education lenders. In addition, the CFPB adopted a rule in December 2013 that enables it to federally supervise certain non-bank student loan servicers that service more than one million borrower accounts, to ensure that bank and non-bank servicers follow the same rules in the student loan servicing market. The rule covers both federal and private student loans. Both the Issuer and the Backup Servicer currently service more than one million student loan borrower accounts and would therefore be subject to this rule. The CFPB has on several occasions audited various aspects of the Issuer's servicing activities. These audits have not resulted in any threats of or actual legal actions against the Issuer or the imposition of any financial penalties. See also the caption "SERVICING OF THE FINANCED ELIGIBLE LOANS—Backup Servicer and Backup Servicing Agreement—Consumer Protection and Similar Laws" herein. If the CFPB were to determine that a servicer is not in compliance, it is possible that this could result in material adverse consequences to such servicer, including, without limitation, settlements, fines, penalties, adverse regulatory actions, changes in a servicer's business practices, or other actions. However, it is not possible to estimate at this time any potential financial or other impact to any such Servicer, including any impact on its ability to satisfy its obligations with respect to the Financed Eligible Loans, that could result from the CFPB's examinations, in the event that any adverse regulatory actions occur.

In addition to its supervisory authority, the CFPB has broad authority to enforce compliance with federal consumer financial laws applicable to private student lenders and student loan servicers, including the Dodd-Frank Act's prohibition on unfair, deceptive or abusive acts or practices, by conducting investigations and hearings, imposing monetary penalties, collecting fines and requiring consumer restitution in the event of violations. It may also bring a federal lawsuit or administrative proceeding.

Also in December 2013, the banking regulators and other agencies principally responsible for banking and financial market regulation in the United States implemented the final rule under the so-called Volcker Rule under the Dodd-Frank Act, which in general prohibits "banking entities" (as defined therein) from (a) engaging in proprietary trading; (b) acquiring or retaining an ownership interest in or sponsoring certain hedge funds, private equity funds (broadly defined to include any entity that would be an investment company under the Investment Company Act but for the exemptions provided in Section 3(c)(1) or 3(c)(7) of the Investment Company Act) and certain similar funds; and (c) entering into certain relationships with such funds. Although the Issuer is not registered or required to be registered as an "investment company" under the Investment Company Act pursuant to Section 2(b) thereof and, as such, is not a covered fund, the general effects of the final rules implementing the Volcker Rule remain uncertain. Any prospective investor in the Notes, including a U.S. or foreign bank or an affiliate or subsidiary thereof, should consult its own legal advisors regarding such matters and other effects of the Volcker Rule and regulatory implementation.

At this time, it is also difficult to predict the extent to which the Dodd-Frank Act or the resulting regulations will impact the Issuer's business and operations and the business and operations of a Servicer, the Backup Servicer and their affiliates. As rules and regulations are promulgated by the federal agencies responsible for implementing and enforcing the provisions of the Dodd-Frank Act, the Issuer, each Servicer, and the Backup Servicer will need to apply adequate resources to ensure that they are in compliance with all applicable provisions. Compliance with these new laws and regulations may result in additional costs and may otherwise adversely impact the Issuer's, another Servicer's and the Backup Servicer's results of operations, financial condition, or liquidity.

**Changes to the Higher Education Act, including the enactment of the Health Care and Education Reconciliation Act of 2010, changes to other applicable law and other Congressional action may affect investors' Notes and the Financed Eligible Loans**

On March 30, 2010, the Health Care and Education Reconciliation Act of 2010 ("HCERA" or the "Reconciliation Act") was enacted into law. Effective July 1, 2010, the Reconciliation Act eliminated the origination of new FFELP Loans. All loans made under the Higher Education Act beginning on July 1, 2010 have been, and in the future will be, originated under the Direct Loan Program. The terms of FFELP Loans originated prior to July 1, 2010 are not materially affected by the Reconciliation Act and continue to be subject to the terms of the FFEL Program.

The curtailment of the FFEL Program could have a material adverse impact on the Issuer, the Servicer, the Backup Servicer and the Guaranty Agencies. For example, the Servicers (including the Issuer and the Backup Servicer) may experience increased costs due to reduced economies of scale to the extent the volume of loans serviced by such Servicers is reduced. Those cost increases could affect the ability of the Servicers to satisfy their obligations to service the Financed Eligible Loans held in the Trust Estate securing the Notes. FFELP Loan volume reductions could further reduce revenues received by the Guaranty Agencies available to pay claims on defaulted FFELP Loans. In addition, the level of competition currently in existence in the secondary market for FFELP Loans could be reduced, resulting in fewer potential buyers of FFELP Loans and lower prices available in the secondary market for those FFELP Loans.

In addition to the passage of the Reconciliation Act, Title IV of the Higher Education Act and the regulations promulgated by the Department of Education thereunder have been the subject of frequent and extensive amendments and reauthorizations. See "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto for more information on the Higher Education Act and various amendments thereto. There can be no assurance that the Higher Education Act or other relevant federal or state laws, rules and regulations may not be further amended or modified in the future in a manner that could adversely affect the Issuer or its student loan programs, the Trust Estate created under the Indenture, the Financed Eligible Loans, or the financial condition of or ability of the Issuer, the Servicer, the Backup Servicer or the Guaranty Agencies to comply with their obligations under the various transaction documents or the Notes. Future changes could also have a material adverse effect on the revenues received by the Guaranty Agencies that are available to pay claims on defaulted Financed Eligible Loans in a timely manner. In addition, if legislation were to be passed in the future requiring the sale of the Financed Eligible Loans held in the Trust Estate to the federal government, proceeds from such sale would be deposited to the Collection Fund and used to pay the Notes in advance of their current expected Maturity Date. No assurance can be given as to the amount that would be received from such sale or whether such amount would be sufficient to pay all principal and accrued interest due on the Notes, as there

is no way to know what purchase price would be paid by the federal government for the Financed Eligible Loans.

Funds for payment of Interest Benefit Payments, Special Allowance Payments and other payments under the FFEL Program are subject to annual budgetary appropriations by Congress. Federal budget legislation has contained provisions that restricted payments made under the FFEL Program to achieve reductions in federal spending. For example, federal budget provisions that became effective on July 1, 2014 reduced payments by the Department of Education to Guaranty Agencies for assisting student loan borrowers with the rehabilitation of defaulted loans under the FFEL Program. As a result, the revenue earned by the Issuer from rehabilitating defaulted FFEL Program loans (collection services) on behalf of Guaranty Agencies decreased, and the Issuer anticipates such revenue will continue to be negatively impacted by these federal budget provisions. Future federal budget legislation may adversely affect expenditures by the Department of Education, and the financial condition of the Issuer, the Servicer, the Backup Servicer and Guaranty Agencies.

Bills have been proposed which would forgive all or part of existing federal student loans. If such bills were to pass, if FFELP Loans are included in such loan forgiveness, or if such legislation creates an incentive for FFELP Loan borrowers to consolidate their loans into Federal Direct Consolidation loans, repayment rates on the Eligible Loans could increase, thereby increasing monthly distributions of principal on the Notes.

The Issuer cannot predict whether any other changes will be made to the Higher Education Act or other relevant federal laws, and rules and regulations promulgated by the Secretary of Education in future legislation, or the effect of such legislation or executive orders on the Issuer, the Servicer, the Backup Servicer, the Guaranty Agencies, the Financed Eligible Loans or the Issuer's loan programs.

**Competition from the Federal Direct Student Loan Program**

The Direct Loan Program was established under the Student Loan Reform Act of 1993. Under the Direct Loan Program, approved institutions of higher education, or alternative loan originators approved by the Department of Education, make loans to students or parents without application to or funding from outside lenders or guaranty agencies. The Department of Education provides the funds for such loans, and the program provides for a variety of flexible repayment plans, including consolidations under the Direct Loan Program of existing FFEL Program student loans. Such consolidation permits borrowers to prepay existing student loans and consolidate them into a Federal Direct Consolidation Loan under the Direct Loan Program. As a result of the enactment of the Reconciliation Act, no FFELP Loans have been, or in the future will be, originated after June 30, 2010, and all loans made under the Higher Education Act will be originated under the Direct Loan Program. The Direct Loan Program may result in prepayments of Financed Eligible Loans if such Financed Eligible Loans are consolidated under the Direct Loan Program.

Because of the limited recourse nature of the Trust Estate created under the Indenture for the Notes, competition from the Direct Loan Program should not impact the payment of the Notes unless it causes (a) erosion in the finances of the Issuer to such an extent that it cannot honor any administration or similar obligations under the Indenture; or (b) prepayments of Financed Eligible Loans if such Financed Eligible Loans are consolidated under the Direct Loan Program. See the caption "—The rate of payments on the Financed Eligible Loans may affect the maturity and yield of the Notes" above.

**Other litigation risks**

The Issuer may be subject to various claims, lawsuits, tax audits and proceedings that arise from time to time. See the caption "LEGAL PROCEEDINGS" herein.

**The Issuer may be subject to student loan industry investigations**

A number of state attorneys general and the U.S. Senate Committee on Health, Education, Labor and Pensions have conducted broad inquiries or investigations of the activities of various participants in the student loan industry, including, but not limited to, activities that may involve perceived conflicts of interest.

The Issuer has made loans to students from across the country. The Issuer has been periodically contacted by various Attorneys General over the years, but none of those Attorneys General have ever followed-up on those initial contacts and it has been nearly a decade since the last contact. Since such processes are typically confidential, the Issuer will not necessarily be able to advise of any such contacts or its involvement in such matters. The activity and number of investigations nationally appears to have greatly diminished.

The Department of Education has adopted regulations that impact the practices which are the subject of the foregoing investigations. See the caption "—Changes to the Higher Education Act, including the enactment of the Health Care and Education Reconciliation Act of 2010, changes to other applicable law and other Congressional action may affect investors' Notes and the Financed Eligible Loans" above.

There is no assurance that the Issuer will not be subject to inquiries or investigations. While the ultimate outcome of any inquiry or investigation cannot be predicted, it is possible that these inquiries or investigations and regulatory developments may materially affect the Issuer's ability to perform its obligations under the Indenture or the Issuer's ability to pay principal of and interest on the Notes from assets in the Trust Estate.

**Military service obligations, natural disasters and pandemics may cause a delay in payments on the Financed Eligible Loans**

Military service obligations, natural disasters and pandemics may result in delayed payments from borrowers. Congress has enacted, and may enact in the future, statutes and other guidelines that provide relief to borrowers who enter active military service, to borrowers in reserve status who are called to active duty after the origination of their Eligible Loan, and to individuals who live in a disaster area or suffer a direct economic hardship as a result of a national emergency.

The number and aggregate principal balance of the Financed Eligible Loans that may be affected by the application of these statutes and other guidelines will not be known at the time the Notes are issued. If a substantial number of borrowers of the Financed Eligible Loans become eligible for the relief under these statutes and other guidelines, or any actions Congress may take to respond to natural disasters or pandemics, there could be an adverse effect on the total collections on those Financed Eligible Loans and the Issuer's ability to provide for payments of principal and interest on the Notes.

The Servicemembers Civil Relief Act limits the ability of a lender under the FFELP to take legal action against a borrower during the borrower's period of active duty and, in some cases, during an additional three-month period thereafter, and may limit the interest rate on a Financed Eligible Loan to 6%

per annum while the borrower is in military service if the loan was incurred before the borrower's entry into military service.

The Issuer does not know how many Financed Eligible Loans have been or may be affected by the application of the Servicemembers Civil Relief Act.  Payments on Financed Eligible Loans may be delayed as a result of these requirements, which may reduce the funds available to the Issuer to pay principal and interest on the Notes.

**Higher Education Relief Opportunities for Students Act of 2003 may result in delayed payments from borrowers**

The Higher Education Relief Opportunities for Students Act of 2003 ("HEROS Act of 2003"), signed into law on August 18, 2003, authorizes the Secretary of Education to waive or modify any statutory or regulatory provisions applicable to student financial aid programs under Title IV of the Higher Education Act as the Secretary deems necessary for the benefit of "affected individuals" who:

      (a)    are serving on active military duty or performing qualifying national guard duty during a war or other military operation or national emergency;

      (b)    reside or are employed in an area that is declared by any federal, state or local office to be a disaster area in connection with a national emergency; or

      (c)    suffered direct economic hardship as a direct result of war or other military operation or national emergency, as determined by the Secretary.

The Secretary is authorized to waive or modify any provision of the Higher Education Act to ensure that:

      (a)    such recipients of student financial assistance are not placed in a worse financial position in relation to that assistance;

      (b)    administrative requirements in relation to that assistance are minimized;

      (c)    calculations used to determine need for such assistance accurately reflect the financial condition of such individuals;

      (d)    provision is made for amended calculations of overpayment; and

      (e)    institutions of higher education, eligible lenders, guaranty agencies and other entities participating in such student financial aid programs that are located in, or whose operations are directly affected by, areas that are declared to be disaster areas by any federal, state or local official in connection with a national emergency may be temporarily relieved from requirements that are rendered infeasible or unreasonable.

The number and aggregate principal balance of Financed Eligible Loans that may be affected by the application of the HEROS Act of 2003 is not known at this time.  Accordingly, payments the Issuer receives on Financed Eligible Loans made to a borrower who qualifies for such relief may be subject to certain limitations.  If a substantial number of borrowers become eligible for the relief provided under the HEROS Act of 2003, there could be an adverse effect on the total collections on the Financed Eligible Loans and the Issuer's ability to pay principal and interest on the Notes.

**Consumer protection laws may affect enforceability of Financed Eligible Loans**

Numerous federal and state consumer protection laws, including various state usury laws and related regulations, impose substantial requirements upon lenders and servicers involved in consumer finance. Some states impose finance charge ceilings and other restrictions on certain consumer transactions and require contract disclosures in addition to those required under federal law. These requirements impose specific statutory liability that could affect an assignee's ability to enforce consumer finance contracts such as the Financed Eligible Loans. In addition, the remedies available to the Trustee or the Noteholders upon an Event of Default under the Indenture may not be readily available or may be limited by applicable state and federal laws.

**Noteholders will rely on the Servicers for the servicing of the Financed Eligible Loans**

Noteholders will be relying on the Issuer to service all of the Financed Eligible Loans. The Issuer is dependent on PHEAA to provide certain equipment, software, training and related support with respect to the Financed Eligible Loans serviced by the Issuer, and PHEAA will also be engaged to act as the Backup Servicer upon the occurrence of certain events described under the caption "SERVICING OF THE FINANCED ELIGIBLE LOANS—Backup Servicer and Backup Servicing Agreement" herein. The cash flow projections relied upon by the Issuer in structuring the issuance of the Notes were based upon assumptions with respect to servicing costs which the Issuer based on its costs to service the Financed Eligible Loans and PHEAA's costs to act as Backup Servicer. No assurance can be made that the costs to the Issuer and the Backup Servicer for servicing the Financed Eligible Loans will not increase, or that the Issuer would be successful in entering into servicing agreements with other Servicers that would be acceptable to the Rating Agencies at the assumed level of servicing cost. Although the Issuer and the Backup Servicer are obligated to service the Financed Eligible Loans in accordance with the Higher Education Act and the Indenture, the timing of payments to be actually received with respect to the Financed Eligible Loans will be dependent upon the ability of the Issuer or any future Servicer to adequately service the Financed Eligible Loans. In addition, the Noteholders will be relying on the Issuer's and any future Servicer's compliance with applicable federal and state laws and regulations.

**Bankruptcy or insolvency of PHEAA could result in payment delays to Noteholders**

The Financed Eligible Loans are on PHEAA's servicing system, which the Issuer uses pursuant to PHEAA's Remote Servicing line of business. PHEAA provides the Issuer with certain equipment, software, training and related support necessary for the Issuer to service the Financed Eligible Loans. PHEAA also acts as the Backup Servicer for the Issuer. In the event of PHEAA's insolvency or bankruptcy, the Issuer may lose its ability to access the servicing system, software and support provided by PHEAA and would have to develop or contract with a new provider of a computer servicing system and engage a substitute Backup Servicer, and delays in collections in respect of the Financed Eligible Loans may occur. Any delay in the collections of Financed Eligible Loans may delay payments to Noteholders.

**A default by a Servicer could adversely affect the Notes**

If the Issuer defaults on its obligations to service the Financed Eligible Loans serviced by it, the Backup Servicer would become the successor Servicer for those Financed Eligible Loans. In the event of a default by any third-party Servicer or the removal of any Servicer, including the Issuer, and the appointment of a successor Servicer, there may be additional costs associated with the transfer of servicing

to the successor Servicer, including, but not limited to, an increase in the Servicing Fees the successor Servicer charges.  In addition, the Issuer cannot predict the ability of the successor Servicer to perform the obligations and duties under any servicing agreement.  If any such successor third-party Servicer defaults on its obligations to service the loans serviced by it, the Issuer may remove the third-party successor Servicer without the consent of any other party.

**If a Servicer or a successor Servicer fails to comply with the Department of Education's or State License Regulator's regulations, payments on the Notes could be adversely affected**

The Department of Education regulates each servicer of federal student loans.  Numerous states have implemented legislation requiring the licensing and regulation of student loan servicers.  Under these regulations, a servicer is jointly and severally liable with its client lenders for liabilities to the Department of Education arising from its violation of applicable requirements.  Liabilities are also imposed for violations of state servicer licensing laws.  In addition, if any lender or servicer fails to meet standards of financial responsibility or administrative capability included in the federal regulations, or violates other requirements, the Department of Education may impose penalties or fines and limit, suspend, or terminate the lender's ability to participate in or a servicer's eligibility to contract to service loans originated under the FFEL Program.

If a Servicer (including the Issuer as lender or as Servicer) were so fined, or its FFEL Program eligibility were limited, suspended or terminated, payment on the Notes could be adversely affected.  If any successor Servicer were so fined or held liable, or its FFEL Program eligibility were limited, suspended, or terminated, its ability to properly service the Financed Eligible Loans and to satisfy any remedies owed by it to the Issuer under a servicing agreement relating to Financed Eligible Loans could be adversely affected. In addition, if the Department of Education terminates a Servicer's eligibility, a servicing transfer will take place and there may be delays in collections and temporary disruptions in servicing.  Any servicing transfer may temporarily adversely affect payments to the Noteholders.

**Servicing Fees may increase over time in relation to the outstanding principal balance of the Financed Eligible Loans**

The amount of monthly Servicing Fees payable out of the Trust Estate is equal to the greater of the percentage specified under "FEES AND EXPENSES" of the Pool Balance as of the last day of the preceding month and a Servicing Fee Floor equal to a monthly per borrower amount specified under "FEES AND EXPENSES" as adjusted for inflation.  To the extent that the Servicing Fees are calculated based on the per borrower Servicing Fee Floor rather than as a percentage of the Pool Balance, the amount of Servicing Fees (stated as a percentage of the principal balance of the Financed Eligible Loans) would increase over time.  If the optional release of the Financed Eligible Loans from the lien of the Indenture is not exercised when the Pool Balance is 10% or less of the Initial Pool Balance as described under "DESCRIPTION OF THE NOTES—Optional Release," the likelihood that the Servicing Fees would be calculated based on the Servicing Fee Floor is expected to increase, affecting the timing of payment of the Notes.  It is not expected that such increase in Servicing Fees would have an adverse effect on the ultimate payment of the Notes.

**Failure to comply with loan origination and servicing procedures for Financed Eligible Loans may result in loss of Guarantee or other benefits**

The Issuer and other lenders must meet various requirements in order to maintain the federal guarantee on the Financed Eligible Loans. These requirements establish servicing requirements and procedural guidelines and specify school and borrower eligibility criteria.

A Guaranty Agency (including the State Guaranty Agency and any other Guaranty Agency guaranteeing the Financed Eligible Loans) may reject an Eligible Loan for claim payment due to a violation of the FFEL Program due diligence collection and servicing requirements. In addition, a Guaranty Agency may reject claims under other circumstances, including, for example, if a claim is not timely filed or adequate documentation is not maintained. Once a Financed Eligible Loan ceases to be guaranteed, it is ineligible for federal interest benefit and Special Allowance Payments. If a Financed Eligible Loan is rejected for claim payment by a Guaranty Agency, the Issuer continues to pursue the borrower for payment or institutes a process to reinstate the guarantee. Guaranty agencies may reject claims as to portions of interest for certain violations of the due diligence collection and servicing requirements even though the remainder of a claim may be paid.

Examples of errors that cause claim rejections include isolated missed collection calls, or failures to send collection letters as and when required. Violations of due diligence collection and servicing requirements can result from human error. Violations can also result from computer processing system errors, or from problems arising in connection with the implementation of a new computer platform or the conversion of additional loans to a servicing system.

**Limitation on enforceability of remedies against the Issuer could result in payment delays or losses**

The remedies available to the Trustee or the Noteholders upon an Event of Default under the Indenture are in many respects dependent upon regulatory and judicial actions which are often subject to discretion and delay. Under existing constitutional and statutory law and judicial decisions, including specifically Title 11 of the United States Code, the remedies specified by the Indenture and such other documents may not be readily available or may be limited. The various legal opinions to be delivered concurrently with the delivery of the Notes and the Indenture will be qualified as to the enforceability of the various legal instruments by limitations imposed by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors generally.

In addition, the Higher Education Act provides that a security interest in FFELP Loans may be perfected by the filing of notice of such security interest in the manner in which security interests in accounts may be perfected by applicable state law, which, under the Missouri Uniform Commercial Code, is accomplished by filing a financing statement with the Missouri Secretary of State. Nonetheless, if through fraud, inadvertence or otherwise a third-party lender or purchaser acting in good faith were to obtain possession of any of the promissory notes evidencing the Financed Eligible Loans (or, in the case of a master promissory note, a copy thereof), any security interest of the Trustee in the related Financed Eligible Loans could be preempted. The Issuer currently maintains control and shall continue to maintain control of all Financed Eligible Loans that are evidenced by an electronically signed note in compliance with applicable federal and state laws. Custody of all other promissory notes relating to Financed Eligible Loans will be maintained by the Issuer, or a custodial agent on its behalf, or by the Servicer (if other than the Issuer).

**Lewis and Clark Discovery Initiative**

The Issuer has been and may be significantly financially impacted by a Missouri law which established the Lewis and Clark Discovery Initiative (the "Initiative") and became effective August 28, 2007. See "THE HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI—Lewis and Clark Discovery Initiative; Scholarship Funding" herein for a more complete discussion of such law and its impact on the Issuer.

Due to the limited recourse nature of the Notes, the Initiative should not impact the payment of the Notes unless it causes erosion in the finances of the Issuer to such an extent that it cannot honor any repurchase, administration or similar obligations under the Indenture.

**The obligations of each of the Trustee, the Servicer and the Backup Servicer are limited**

The duties, actions and obligations of each of the Trustee, the Servicer and the Backup Servicer are limited to such duties, actions and obligations specifically set forth in the transaction documents and no implied covenants, duties or obligations are read into such documents. The remedies available against such transaction parties are similarly limited by the terms of the transaction documents. None of the foregoing transaction parties has any duty or obligation to take any additional action unless specifically directed to take such action and satisfactorily indemnified therefor. Additionally, certain of the duties and obligations of such parties are dependent upon receipt of information from other parties. Any failure of one party to timely and accurately deliver any information, or perform its duties and obligations, could prevent another party from being able to fulfill its duties and obligations.

**Certain factors relating to security**

The Issuer has covenanted in the Indenture that the assets constituting the trust estate pledged by the Issuer under the Indenture are and will be owned by the Issuer free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto prior to, of equal rank with or subordinate to the respective pledges created by the Indenture, and that all action on the part of the Issuer to that end has been duly and validly taken. The Issuer acquired the Financed Eligible Loans by purchasing such loans from other lenders. When purchasing student loans, the Issuer obtained warranties from the sellers as to certain matters, including that the loans were originated in accordance with the Higher Education Act and that the loans will be transferred to the Issuer free of any liens and that all filings (including UCC filings) necessary in any jurisdiction to give the Trustee, on behalf of the Issuer, ownership of the Financed Eligible Loans have been made. Notwithstanding the foregoing, under applicable law, security interests in such loans may exist and may not be ascertained by the Issuer. Therefore, no absolute assurance can be given that liens other than the lien of the Indenture do not and will not exist.

**The use of master promissory notes for the Financed Eligible Loans may compromise the Trustee's security interest**

Student loans made under the FFEL Program may be evidenced by a master promissory note. Once a borrower executes a master promissory note with a lender, additional FFELP Loans made by the lender to such borrower are evidenced by a confirmation sent to the borrower, and all Eligible Loans are governed by the single master promissory note.

A FFELP Loan evidenced by a master promissory note may be sold independently of the other Eligible Loans governed by the master promissory note. If the Issuer originated a Financed Eligible Loan

43

governed by a master promissory note and does not retain possession of the master promissory note, other parties could claim an interest in the Financed Eligible Loan. This could occur if the holder of the master promissory note were to take an action inconsistent with the Issuer's rights to a Financed Eligible Loan, such as delivery of a duplicate copy of the master promissory note to a third-party for value. Although such action would not defeat the Issuer's rights to the Financed Eligible Loan or impair the security interest held by the Trustee for the investors' benefit, it could delay receipt of principal and interest payments on the Financed Eligible Loan.

**Investors may incur losses or delays in payment on their Notes if borrowers do not make timely payments or default on their Financed Eligible Loans**

For a variety of economic, social and other reasons all the payments that are actually due on Financed Eligible Loans may not be made or may not be made in a timely fashion. Borrowers' failure to make timely payments of the principal and interest due on the Financed Eligible Loans will affect the revenues of the Trust Estate created under the Indenture, which may reduce the amounts available to pay principal and interest due on the Notes.

The cash flow from the Financed Eligible Loans, and the Issuer's ability to make payments due on the Notes will be reduced to the extent interest is not currently payable on the Financed Eligible Loans. The borrowers on most Eligible Loans are not required to make payments during the period in which they are in school and for certain authorized periods thereafter, as described in the Higher Education Act. The Department of Education will make all interest payments while payments are deferred under the Higher Education Act on certain subsidized Eligible Loans that qualify for interest benefit payments. For all other Eligible Loans, interest generally will be capitalized and added to the principal balance of the Eligible Loans. The Financed Eligible Loans will consist of Eligible Loans for which payments are deferred as well as Eligible Loans for which the borrower is currently required to make payments of principal and interest. The proportions of the Financed Eligible Loans for which payments are deferred and currently in repayment will vary during the period that the Notes are outstanding.

In general, a Guaranty Agency (including the State Guaranty Agency) reinsured by the Department of Education will guarantee 98% of each Financed Eligible Loan with a first disbursement after October 1, 1993 and before July 1, 2006, and 97% of each Financed Eligible Loan with a first disbursement on or after July 1, 2006. All but an insignificant component of the Financed Eligible Loans had their first disbursements on or after October 1, 1993. As a result, if a borrower of a Financed Eligible Loan defaults, the Issuer will experience a loss of approximately 2% or 3% of the outstanding principal and accrued interest on each of the defaulted loans depending upon when it was first disbursed. The Issuer does not have any right to pursue the borrower for the remaining portion that is not subject to the guarantee. If defaults occur on the Financed Eligible Loans and the credit enhancement described herein is not sufficient, investors may suffer a delay in payment or a loss on their investment.

As of the Statistical Cut-Off Date, $9,496,737 of the principal amount of the Financed Eligible Loans (representing approximately 4.71% of the Financed Eligible Loans by principal amount) are "rehabilitation loans," which are Eligible Loans that have previously defaulted, but for which the borrower thereunder has made a specified number of on-time payments as described in "APPENDIX A— DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto. Although rehabilitation loans benefit from the same guarantees as other Eligible Loans, rehabilitation loans have generally experienced re-default rates that are higher than default rates for Eligible Loans that have not previously defaulted.

**Risk of geographic concentration of the Financed Eligible Loans**

The concentration of the Financed Eligible Loans in specific geographic areas may increase the risk of losses on the Financed Eligible Loans. Economic conditions in the states where borrowers reside may affect the delinquency, loan loss and recovery experience with respect to the Financed Eligible Loans. As of the Statistical Cut-Off Date, approximately 44.9%, 9.7% and 5.3% of the Financed Eligible Loans by principal balance were to borrowers with current billing addresses in the States of Missouri, Mississippi and Arkansas, respectively. As of the Statistical Cut-Off Date, no other State accounts for more than 5.0% of the Financed Eligible Loans by principal balance. Economic conditions in any state or region may decline over time and from time to time. Because of the concentrations of the borrowers in the above referenced states any adverse economic conditions, including the ongoing COVID-19 Pandemic, adversely and disproportionately affecting those states may have a greater effect on the performance of the Notes than if these concentrations did not exist.

**The Trustee may be forced to sell the Financed Eligible Loans at a loss after an event of default**

Generally, if an Event of Default occurs under the Indenture, the Trustee may sell, and, at the direction of Noteholders (in varying percentages and priority class as specified in the Indenture), will sell the Financed Eligible Loans. However, the Trustee may not find a purchaser for the Financed Eligible Loans, or the market value of the Financed Eligible Loans plus other assets in the Trust Estate created under the Indenture might not equal the principal amount of outstanding Notes plus accrued interest. Competition currently existing in the secondary market for student loans made under the FFEL Program also could be reduced, resulting in fewer potential buyers of the Financed Eligible Loans and lower prices available in the secondary market for the Financed Eligible Loans. Investors may suffer a loss if the Trustee is unable to find purchasers willing to pay prices for the Financed Eligible Loans sufficient to pay the principal amount of the Notes plus accrued interest.

**The Notes may be repaid early due to an optional prepayment, which may affect their yield, and investors will bear reinvestment risk**

The Notes may be repaid before investors expect them to be in the event of an optional release when the then outstanding Pool Balance is 10% or less of the initial Pool Balance of the Financed Eligible Loans, as described under the caption "DESCRIPTION OF THE NOTES—Optional Prepayment of Notes When the Then Outstanding Pool Balance is 10% or Less of Initial Pool Balance" herein. Such event would result in the early retirement of the Notes outstanding on that date. If this happens, the yield on the Notes may be affected and investors will bear the risk that they cannot reinvest the money they receive in comparable investments at an equivalent yield.

**The characteristics of the portfolio of Financed Eligible Loans may change**

The characteristics of the pool of Eligible Loans expected to be pledged to the Trustee under the Indenture are described herein as of the Statistical Cut-Off Date. The aggregate characteristics of the entire pool of Eligible Loans, including the composition of the Eligible Loans and the related borrowers, the related Guaranty Agencies, the distribution by student loan type, the distribution by interest rate, the distribution by principal balance and the distribution by remaining term to scheduled maturity, may vary from the information presented herein, since the information presented herein is as of the Statistical Cut-Off

Date, and the date that the Financed Eligible Loans will be pledged to the Trustee under the Indenture will occur after that date.

In the event that the principal amount of Eligible Loans required to provide collateral for the Notes varies from the amounts anticipated herein, whether by reason of a change in the collateral requirement necessary to obtain the rating on the Notes from each Rating Agency that will rate the Notes as indicated under "SUMMARY OF TERMS—Rating of the Notes" herein, the pricing of the interest rate on the Notes, the principal amount of Notes to be offered, the rate of amortization or prepayment on the portfolio of Eligible Loans from the Statistical Cut-Off Date to the Date of Issuance varying from the rates that were anticipated, or otherwise, the portfolio of Eligible Loans to be pledged to the Trustee under the Indenture may consist of a subset of the pool of Eligible Loans described herein or may include additional Eligible Loans not described under "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

The Issuer believes that the information set forth in this Offering Memorandum with respect to the pool of Eligible Loans as of the Statistical Cut-Off Date is representative of the characteristics of the pool of Eligible Loans as they will exist on the Date of Issuance for the Notes. However, investors should consider potential variances when making their investment decision concerning the Notes. See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

**Payment offsets by a Guaranty Agency or the Department of Education could prevent the Issuer from paying Noteholders the full amount of the principal and interest due on the Notes**

The Issuer uses the same Department of Education lender identification number for the Financed Eligible Loans included in the Trust Estate established under the Indenture as it uses for certain other Eligible Loans it holds. These include the Eligible Loans held under the Warehouse Agreement released upon issuance of the Notes and the resolutions and indentures securing other notes issued by the Issuer. See the caption "THE HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI—Previous Financings of the Issuer" herein. As a consequence, the billings submitted to the Department of Education and the claims submitted to the applicable Guaranty Agency (including the State Guaranty Agency) for the Financed Eligible Loans will be consolidated with the billings and claims for payments for Eligible Loans that are not included in the Trust Estate but using the same lender identification number. Payments on those billings by the Department of Education as well as claim payments by any applicable Guaranty Agency will be made to the Issuer in lump sum form. Those payments must be allocated by the Issuer to the Trust Estate and to the other trust estates or indentures of the Issuer or other Eligible Loans held by the Issuer that use the same lender identification number.

If the Department of Education or a Guaranty Agency determines that the Issuer owes any amount on any Eligible Loan held by it under a lender identification number, the Department of Education or a Guaranty Agency may seek to collect such amount by offsetting it against any payments due to the Issuer under that lender identification number. If the amount of any such offset exceeds the amount owed to the Trust Estate or other holder of such Eligible Loan, the offset could reduce the amounts otherwise available for payment in respect of Eligible Loans in the other trust estates, indentures and bond resolutions, including the Financed Eligible Loans pledged to secure the Notes. Any offsetting or shortfall of payments due to the Issuer could adversely affect the amount of funds available to the Trust Estate created under the Indenture and the Issuer's ability to pay principal and interest on the Notes.

**The Financed Eligible Loans are unsecured and the ability of the applicable Guaranty Agency to honor its Guarantee may become impaired**

The Higher Education Act requires that all FFELP Loans be unsecured.  As a result, the only security for payment of the Financed Eligible Loans are the guarantees provided by the applicable Guaranty Agency.

A deterioration in the financial status of an applicable Guaranty Agency and its ability to honor guarantee claims on defaulted Financed Eligible Loans could delay or impair that Guaranty Agency's ability to make claims payments to the Trustee.  The financial condition of a Guaranty Agency can be adversely affected if it submits a sufficiently large number of reimbursement claims to the Department of Education, which results in a reduction of the amount of reimbursement that the Department of Education is obligated to pay a Guaranty Agency.  The Department of Education may also require a Guaranty Agency to return its reserve funds to the Department of Education upon a finding that the reserves are unnecessary for a Guaranty Agency to pay its program fees or to serve the best interests of the Federal Family Education Loan Program.  The inability of a Guaranty Agency to meet its guarantee obligations could reduce the amount of money available to pay principal and interest to the owners of the Notes or delay those payments past their due date.

If the Department of Education has determined that the applicable Guaranty Agency is unable to meet its guarantee obligations, the Eligible Loan holder may submit claims directly to the Department of Education and the Department of Education is required to pay the full guarantee claim amount due with respect to such claims.  However, the Department of Education's obligation to pay guarantee claims directly in this fashion is contingent upon the Department of Education making the determination that a Guaranty Agency is unable to meet its guarantee obligations.  The Department of Education may not ever make this determination with respect to a Guaranty Agency and, even if the Department of Education does make this determination, payment of the guarantee claims may not be made in a timely manner.  See the caption "GUARANTY AGENCIES" herein and "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees" hereto.

**Commingling of payments on Financed Eligible Loans could prevent the Issuer from paying the full amount of the principal and interest due on the Notes**

Payments received on the Financed Eligible Loans generally are deposited into an account in the name of the Issuer each Business Day.  Payments received on the Financed Eligible Loans may not always be segregated from payments the Issuer receives on other Eligible Loans it owns or services, and payments received on the Financed Eligible Loans that are part of the Trust Estate created under the Indenture may not be segregated from payments received on other Eligible Loans that are not part of the Trust Estate created under the Indenture.  Such amounts that relate to the Financed Eligible Loans once identified by the Issuer as such are transferred to the Trustee for deposit into the Collection Fund within an average of two Business Days of receipt.  If the Issuer fails to transfer such funds to the Trustee, Noteholders may suffer a loss.

**Incentive or borrower benefit programs may affect the Notes**

Substantially all of the Financed Eligible Loans are eligible to receive an interest rate reduction for enrolling in automatic bank draft payments. Certain of the Financed Eligible Loans are subject to other borrower benefit programs, which may vary. Any incentive program that effectively reduces borrower payments or principal balances on Financed Eligible Loans may result in the principal amount of Financed Eligible Loans amortizing faster than anticipated. The Issuer may discontinue, increase or modify such benefits at any time, but only subject to the provisions of the Indenture. The Issuer cannot accurately predict the number of borrowers that will utilize the borrower benefits provided under these programs. The greater the number of borrowers that utilize such benefits with respect to Financed Eligible Loans, the lower the total loan receipts on such Financed Eligible Loans. Although such borrower benefits may decrease the payments to be received from the Financed Eligible Loans, the Issuer does not expect these borrower benefits to impair its ability to make payments of principal and interest on the Notes when due. See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS—Borrower Benefits" herein.

**The Notes are expected to be issued only in book-entry form**

The Notes are expected to be initially represented by certificates registered in the name of Cede & Co., the nominee for DTC, and will not be registered in any investor's name or the name of any investor's nominee. Unless and until definitive securities are issued, holders of the Notes will not be recognized by the Trustee as Noteholders as that term is used in the Indenture. Until definitive securities are issued, holders of the Notes will only be able to exercise the rights of Noteholders indirectly through DTC and its participating organizations. See the caption "BOOK-ENTRY REGISTRATION" herein.

**Structuring tables are based upon assumptions and models**

The decrement tables appearing in Appendix B hereto have been prepared on the basis of the modeling assumptions set forth in such Appendix B. The model used in this Offering Memorandum for prepayments does not purport to be an historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of loans, including the Financed Eligible Loans in the pool. It is highly unlikely that the Financed Eligible Loans will prepay at the rates specified. The prepayment assumptions are for illustrative purposes only. For these reasons, the actual weighted average lives of the Notes may differ significantly from the weighted average lives shown in the decrement tables.

## HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI

**General**

The Issuer was established in 1981 pursuant to the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Sections 173.350 to 173.445 of the Missouri Revised Statues, inclusive, as amended (the "Authorizing Act") for the purpose of assuring that all eligible post-secondary education students have access to guaranteed student loans. The Authorizing Act has been amended over the years to provide the Issuer with generally expanded powers, including the power to finance, acquire and service student loans including, but not limited to, those guaranteed or insured pursuant to the Higher Education Act, and in certain other respects.

The headquarters of the Issuer is 633 Spirit Drive, Chesterfield, Missouri 63005-1243 (at which approximately 272 employees are located). The Issuer also has facilities in Columbia, Missouri (at which

approximately 72 employees are located) and Washington, D.C. (at which approximately 4 employees are located).  The telephone number of the Issuer is (636) 733-3700.  The Issuer's website address is http://www.mohela.com, where its financial statements and additional information can be found in the "About Us" section.  The Issuer's website is not incorporated into and shall not be deemed to be a part of this Offering Memorandum.

The Issuer provides full-service loan servicing for private student loans and FFELP Loans owned by the Issuer and by third parties.  The Issuer also services Direct Loans for the Department of Education, having been awarded a servicing contract as a not-for-profit servicer (an "NFP Servicer") in September 2011.  As of June 30, 2021, MOHELA was servicing $1.1 billion in FFELP loans representing 59,181 accounts, $18.6 billion in third-party lender owned private loans representing 320,566 accounts, $132.8 million in MOHELA-owned private loans representing 6,202 accounts and $59.1 billion in Direct Loans representing 2,726,179 accounts.

As described herein, the Issuer has significant private loan experience, including the third-party lender-owned private loans referred to above.  It also originated and services loans for its own private loan program which it began in 1995.  The Issuer originated and serviced over $370 million in private loans for over 30,000 borrowers before ending the program in 2008.  Through an affiliate and since 2013, the Issuer also services the Missouri Family Education Loan Program ("MOFELP"), an interest-free loan program for Missouri students meeting certain financial need and academic achievement standards.  As of June 30, 2021, MOFELP had approximately $23.5 million outstanding with 4,465 borrowers in repayment.

The Issuer licenses COMPASS, the servicing system used by PHEAA.

The Issuer's present contract to service Federal Direct Loans runs to March 31, 2022.  However, the Issuer was one of five bidders awarded a contract on June 24, 2020 by the Department of Education pursuant to its Business Process Operations Solicitation (the "BPO Contract") to service all Federal Direct Loans.  The Department of Education procedures for the BPO Contract may not be operational for some time.  In a related development, the Department of Education on October 28, 2020 issued a Solicitation to acquire an "Interim Servicing Solution" ("ISS") impacting the servicing of student loans and the BPO Contract.  The Issuer filed a Pre-Award Protest with the U.S. Government Accountability Office (the "GAO") as to the terms of this ISS Solicitation.  The Department of Education recently advised the GAO that it would be taking corrective action by either amending or cancelling the ISS Solicitation.  In response thereto, the GAO dismissed the Issuer's protest on January 12, 2021.

**Members and Staff**

The Issuer is governed by a board of seven members, five of whom are appointed by the Governor of the State, subject to the advice and consent of the Senate of the State, and two others who are designated by statute: the State Commissioner of Higher Education and a member of the State Coordinating Board for Higher Education. A member continues to serve after the expiration of his or her term until a successor is appointed and qualified or he/she is reappointed. The present members are listed on the next page:

| Name | Term Expires | Occupation/Affiliation |
|------|-------------|------------------------|
| Mr. Jason C. Ramsey, Chair<br>Columbia, Missouri | October 2017 | Lending Institution Representative<br>Assistant Vice President<br>The Callaway Bank |
| Mr. Robert Ballsrud, Vice Chair<br>St. Louis, Missouri | October 2025 | Public at Large<br>Retired Attorney, Private Practice |
| Mr. Marvin E. Wright, Secretary<br>Columbia, Missouri | October 2019 | Public Higher Education Representative<br>Retired General Counsel, University of Missouri |
| Ms. Tonya K. Grimm, Treasurer<br>Kirksville, Missouri | October 2018 | Private Higher Education Representative<br>Assistant Vice President, Finance<br>A.T. Still University |
| Mr. Peter W. Detweiler<br>Kirksville, Missouri | October 2016 | Lending Institution Representative<br>President and CEO<br>Alliant Bank |
| Mr. Dudley McCarter<br>St. Louis, Missouri | Indefinite | CBHE Designate |
| Ms. Zora Mulligan<br>Jefferson City, Missouri | Indefinite | MDHEWD Designate<br>Commissioner, Missouri Department of Higher Education and Workforce Development |

The following is biographical information on the executive staff of the Issuer.

**Raymond H. Bayer, Jr.** serves as Executive Director, Chief Executive Officer, and Assistant Secretary of the Issuer. Reporting directly to the Issuer's Board of Directors, he is responsible for all of the Issuer's operations and oversees each of its business units. Mr. Bayer joined the Issuer in 1985. Prior to becoming the Executive Director in 2006, he oversaw various business units including Loan Servicing, Loan Origination, and Business Development. He holds a Bachelor of Science degree in Business Administration from the University of Missouri-St. Louis, a Master of Business Administration degree from Webster University, and a Master of Arts in Finance degree from Webster University. Mr. Bayer serves as Secretary and Director of First State Bancshares of St. Charles of Missouri. Additionally, Mr. Bayer serves as the Board Chair of the Missouri Scholarship and Loan Foundation and the Board Chair of Knowledge Finance, both non-profit companies controlled by the Issuer. Mr. Bayer announced recently that he plans to retire on September 30, 2021 and he will be succeeded by Scott Giles, the Issuer's Deputy Executive Director.

**Scott D. Giles** serves as the Deputy Executive Director and Chief Operating Officer for the Issuer and, as of October 1, 2021, will become the Executive Director and Chief Executive Officer of the Issuer. Mr. Giles previously served as the Director of Finance and the Chief Financial Officer for the Issuer from 2006 to 2018 and as Treasurer for the Issuer from 2005 to 2006. In his prior roles with the Issuer, he was responsible for the Finance, Accounting, Treasury Management, Procurement, Printing and Mail Support Services, Facilities, Contracted Loan Servicing, and Lender Services and Reconciliation areas, as well as the Issuer's capital structure strategy, financing transactions, interest rate risk management, cash management, investing, and insurance. Mr. Giles most recently served as the President and Chief Executive Officer of Trellis Company from 2018 to 2021. Prior to joining the Issuer in 2005, he served as the Director of the Missouri Student Loan Group of the Missouri Department of Higher Education. Mr. Giles is currently the Chairman of the Board of Directors of the National Council of Higher Education Resources and he previously served as a member and Chairman of the Board for Mapping Your Future. He has also served as a commissioned bank examiner with the Federal Reserve Bank of St. Louis and as an assistant bank examiner with the Missouri Division of Finance. Mr. Giles holds a Bachelor of Science degree in Business Administration with an emphasis in Finance from Southeast Missouri State University and Master of Public Administration degree from the University of Missouri-Columbia.

**Ginny Burns** serves as Director of Borrower Experience & Processing. She is responsible for the overall Borrower Experience of the Issuer, including the Customer Advocacy Team, Specialty Servicing, Loan Servicing and Quality Assurance Group. Ms. Burns joined the Issuer in 2013. For the 28 years prior, she served as the Vice President-Manager of the Student Services division of Commerce Bank. Ms. Burns holds a Bachelor of Arts degree in Business Communication and a Master of Arts in Business Management from Lindenwood University, located in St. Charles, Missouri.

**Laura Catlett** serves as the Director of the Contact Center and Digital Customer Care for the Issuer. She is responsible for the Customer Service Operations and Contact Center strategic direction in addition to the customer experience on digital platforms like the website and mobile app. Customer Service units include: Inbound and Outbound call center teams at the Issuer's three locations, Chesterfield and Columbia, Missouri, and Washington D.C., Contact Center Workforce and Dialing Strategy, and Contact Center Operations/Systems Analysis. Ms. Catlett holds a Bachelor of Science in Business Administration from the University of Missouri-St. Louis and a Master of Business Administration from Webster University. Prior to joining the Issuer in June 2013, Ms. Catlett had oversight of Brown Shoe Company contact center operations. Ms. Catlett has over 18 years prior experience in the contact center industry and has served on expert panels.

**Jennifer Farmer** serves as Director of Federal Contracts. She is responsible for initiating, building and maintaining relationships with the Federal government and others related to Education Loan Services. Ms. Farmer is also responsible for oversight of the planning, design, and implementation of new and existing systems, processes and procedures, and borrower and school services associated with Federal Contracts. She has served on NCHELP Operations and Debt Management committees and currently participates in various workgroups associated with Federal Servicing. Ms. Farmer holds a Bachelor of Science degree in Business Administration from Lindenwood University located in Saint Charles, Missouri. Ms. Farmer joined the Issuer in 1995 and has held various senior and executive management roles throughout the organization.

**Marie George** serves as Chief Information Officer of the Issuer. She is responsible for Information Systems strategic direction, IT operations, software development, information security and business continuity management. Prior to joining the Issuer, Ms. George served in critical leadership roles for Mercy between 2007 and 2018, most recently serving as Executive Director IT—ERP, Supply Chain, Revenue. Prior to Mercy, her experience included quality assurance management responsibilities for Express Scripts. She is a graduate of Saint Louis University with a degree in Aerospace Engineering and received her

Master's Degree in Business Administration from Fontbonne University. She also holds a Graduate Certificate of Information Management from Washington University.

**Frank Reyes** serves as Director of Finance and the Chief Financial Officer for the Issuer. Mr. Reyes previously served as the Controller for the Issuer for 3 years. Prior to serving as Controller, he served as Assistant Controller for the Issuer for nearly 7 years. His duties are primarily in the Accounting, Finance, Treasury Management, Accounts Payable, Accounts Receivable, Procurement and Lender Services and Reconciliation areas. Mr. Reyes is a certified public accountant and holds a Bachelor of Science degree with an emphasis in Accounting from Saint Louis University and a Master of Business Administration degree from Webster University. Mr. Reyes joined the Issuer in April 2011 and has experience in auditing and financial reporting and analysis with large accounting firms and private companies.

**Dr. James Matchefts** serves as General Counsel for the Issuer. Dr. Matchefts joined the Issuer in 2008. Prior to joining the Issuer, Dr. Matchefts served for 10 years as General Counsel to the Missouri Department of Higher Education ("MDHE"). As part of his duties with MDHE, Dr. Matchefts oversaw the operation of the MDHE Student Loan Program, which is Missouri's state-designated guaranty agency under the Federal Family Education Loan Program. For five years before joining MDHE, he worked in the St. Louis, Missouri City Counselor's Office, representing the City of St. Louis in various civil litigation and corporate matters. He received his Juris Doctorate degree from Washington University in 1985 and his Doctor of Education degree from Saint Louis University in 2002.

**William C. Shaffner** serves as the Director of Business Development and Governmental Relations. Starting with the Issuer in 2004 to help expand the Issuer's presence across the country, his duties have expanded to include Business Development, School Channel Sales and Lender Channel Support, E-Commerce, Marketing and Industry and Government Relations. He also serves on the Missouri Scholarship & Loan Foundation Board of Directors. Mr. Shaffner has over 38 years of experience in the Federal Family Education Loan Program working at University of Central Florida, USA Funds, USA Group, Sallie Mae and American Student Assistance. Mr. Shaffner is a graduate of the University of Central Florida and holds a Bachelor of Science degree in Business Administration.

**Paul J. Mosquera** serves as Chief Compliance and Risk Management Officer of the Issuer. He is responsible for the compliance management system as well as the internal audit and risk management functions. Prior to joining the Issuer in 2017, Mr. Mosquera held senior and executive management roles in the financial services industry spanning over 25 years with an emphasis in banking. His most recent position was at Scottrade, Inc., where he oversaw the audit teams for the $17 billion Scottrade Bank and brokerage operations. He holds a Bachelor of Arts degree in Economics from the University of Arizona and a Juris Doctorate from Harvard Law School. Mr. Mosquera also served four years as General Counsel and Legislative Liaison for a college in the western suburbs of Chicago.

**Permissible Activities; Limitations**

The Issuer was not formed as a "special purpose" entity and is legally authorized to and does operate as an active student loan lender and servicer and in related activities. The Issuer generally does not have any significant restrictions on its activities to serve as a student loan lender and servicer under the Authorizing Act, including with respect to issuing bonds or other debt obligations or borrowing money or making student loans. Under existing constitutional and statutory law and judicial decisions, specifically including Title XI of the United States Code, the remedies specified by the trust indentures and such other documents may not be readily available or may be limited.

**Previous Financings of the Issuer**

The Issuer has previously issued a significant number of series of bonds and notes secured by student loans.  The Issuer inadvertently made an underpayment of debt service on a recent transaction that resulted from a miscalculation of debt service due.  This underpayment was promptly corrected.  Otherwise, the Issuer has paid in full all scheduled interest due and payable on each outstanding series of bonds and notes, and there are no prior payment defaults on any debt securities issued by the Issuer.  As of June 30, 2021, the Issuer had outstanding bonds and notes in the following amounts issued under the following indentures and loan agreement.  The following table does not give effect to the issuance of the Notes as described herein or the use of certain proceeds from the sale of the Notes as described under the caption "USE OF PROCEEDS" herein to partially pay down the Warehouse Agreement listed below.

| Financing | Amounts Outstanding |
|---|---|
| 2021-1 Indenture[1] | $  431,313,961 |
| 2021-2 Indenture[2] | 521,277,229 |
| Warehouse Agreement[3] | 145,819,000 |
| Total | $1,098,410,190 |

_____
[1]Notes were issued pursuant to the Indenture of Trust dated as of February 1, 2021.

[2]Notes were issued pursuant to the Indenture of Trust dated as of April 1, 2021.

[3]The Issuer borrowed funds pursuant to the Revolving Credit and Security Agreement, dated as of December 19, 2018, as amended, among the Issuer, Bank of America, N.A., as the lender, and U.S. Bank National Association, as collateral agent (the "Warehouse Agreement").

These outstanding notes issued by the Issuer were issued under the indentures and Warehouse Agreement referred to above, are secured by separate collateral from and are not subject to the lien of the Indenture under which the Notes will be issued.  Furthermore, the Notes to be issued under the Indenture will not be secured by the indentures or the Warehouse Agreement referred to above, or any other resolution or transaction document with respect to the Issuer's prior issuances of bonds and notes or other debt obligations.

In addition, as of June 30, 2021, the Issuer had outstanding short-term indebtedness of $67.4 million, including arbitrage rebate payable, trade payables and Special Allowance Payments and Monthly Consolidation Rebate Fees payable to the Department, all of which is either unsecured or is secured by collateral separate and distinct from, and none of which has any interest in, the trust estate under the Indenture.  The Issuer also has a note payable to Commerce Bank in the principal amount as of June 30, 2021 of $10,745,708.  This loan is not secured by student loans.

**Financial and Other Information**

The most recent audited financial statements of the Issuer are available on the Issuer's website located at https://www.mohela.com/DL/common/publicInfo/financialStatements.aspx, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.  The Issuer's financial statements include information with respect to its loan programs generally, including its FFELP Loan program and other information regarding the Issuer.  These financial statements are referenced for general background purposes only and for the convenience of Noteholders.  Since the Notes are limited obligations of the Issuer, payable solely from the Financed Eligible Loans and other assets pledged to the Trustee under the Indenture, the overall financial status of the Issuer, or that of its other programs, does not indicate and does not affect whether the Trust Estate created under the Indenture will be sufficient to fund

the timely and full payment of principal and interest on the Notes.  See "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES."

The Issuer's financial information included in this Offering Memorandum that is reported as of any date other than for the year ended June 30, 2020 is unaudited.

**Repurchase Requests**

The documents entered into in connection with prior Issuer sponsored securitization transactions and this transaction contain covenants requiring the repurchase or replacement of Eligible Loans in the case of a breach of certain representations and warranties.  Therefore, pursuant to Rule 15Ga-1, the Issuer is responsible for disclosure of all fulfilled and unfulfilled repurchase requests for Eligible Loans in such securitization transactions.  There have not been any unfulfilled repurchase requests for Eligible Loans with respect to any of the Issuer sponsored securitization transactions.  With respect to the Notes, the Issuer will furnish a Form ABS-15G at the times required by and pursuant to Rule 15Ga-1 of the Securities Exchange Act as required by the SEC, which will be furnished on the Municipal Securities Rulemaking Board through its EMMA system at www.emma.msrb.org, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.

**Lewis and Clark Discovery Initiative; Scholarship Funding**

In 2007, state legislation was enacted relative to the then Missouri Governor's Lewis and Clark Discovery Initiative (the "Initiative") providing for the Issuer to fund designated capital projects at Missouri's public higher education institutions (the "Projects").  Pursuant to the legislation, the Issuer was to distribute $350 million for the Projects into a fund in the State treasury known as the "Lewis and Clark Discovery Fund" (the "Fund").  The payments were scheduled to begin with $230 million in Fall of 2007 and $5 million quarterly thereafter.  The Issuer distributed $245 million into the Fund by early 2008 but further distributions were then delayed due to Issuer determinations made pursuant to the terms of the legislation.  The determinations were based on dramatic changes in the federal student loan program and the credit market crisis and related great recession.  Shortly thereafter, in early 2009, the new Governor suspended the Projects and the Initiative became dormant.  Accordingly, with no Projects to fund and changes in the student loan program continuing, no further contributions to the Fund have been made by the Issuer pursuant to the terms of the legislation.  Related to the foregoing, successive Governors have made scholarship funding requests of the Issuer which are more consistent with its historical mission.  In response to those Governors' requests, since 2010, the Issuer has provided nearly $100 million in funding for college scholarships in the State of Missouri.  The Issuer has also established another vehicle for providing significant scholarship and grant funding to students at Missouri colleges and universities through its nonprofit Missouri Scholarship and Loan Foundation established in 2010.

**Direct Loan Servicing**

Prior to July 1, 2010, the Issuer primarily originated, acquired and serviced FFELP Loans.  The Issuer has not originated FFELP Loans since July 1, 2010.  This is due to the enactment of the Reconciliation Act, including the Student Aid and Fiscal Responsibility Act ("SAFRA"), which prohibited the origination of new FFELP Loans after June 30, 2010.  As of July 1, 2010, all loans made under the Higher Education Act are originated under the Direct Loan Program.  The terms of existing FFELP Loans are not materially affected by the Reconciliation Act.

The Issuer obtained a contract with the Department of Education to service Direct Loans in accordance with the HCERA, which requires the Department of Education to contract with each eligible

and qualified NFP Servicer to service loans. On April 29, 2010, the Department of Education began the process to identify eligible NFP Servicers by issuing a Sources Sought Notice (Solicitation Number: NFP-SS-2010) (the "Sources Sought Notice") requesting that interested entities submit information to the Department of Education demonstrating eligibility as an eligible NFP servicer under the criteria set forth in the Reconciliation Act.

The Issuer responded to the Sources Sought Notice and was among the first twelve NFP Servicers that the Department of Education determined met the NFP Servicer eligibility criteria under the Reconciliation Act. The Issuer applied to the Department of Education on November 24, 2010, to be permitted to proceed to develop a Memorandum of Understanding. On February 2, 2011, the Department of Education published a determination that the Issuer was permitted to enter into a Memorandum of Understanding to pursue an Authorization to Operate ("ATO") and a contract award as an NFP Servicer. The Pennsylvania Higher Education Assistance Agency ("PHEAA") was identified as a key subcontractor for this arrangement. On March 30, 2011, the Issuer entered into a Memorandum of Understanding with the Department of Education. The Issuer was awarded an ATO on September 22, 2011 and a servicing contract to become an NFP Servicer to service federal assets including Direct Loans on September 27, 2011. As of June 30, 2021, the Issuer had entered into "teaming arrangements" with 18 other NFP Servicers and was servicing approximately 2.7 million federal asset accounts, which are primarily Direct Loans, representing approximately $59.1 billion in student loans.

In addition to a federal loan servicing contract, the Issuer services approximately $1.1 billion of its own FFELP Loans which secure the bonds issued by the Issuer and will provide the Issuer ongoing revenue streams for many years to come. This legacy portfolio and its related revenue have assisted and will continue to assist the Issuer in a gradual and smooth transition to a federal asset servicing business model. See the further discussion of the Issuer's Direct Loan Program servicing under the caption "HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI—General" herein.

**Direct Loan Servicing Performance Metrics**

Pursuant to its contractual agreement with each of its Direct Loan servicers, the Department of Education measures servicer performance in the areas of customer satisfaction and default prevention on a quarterly basis. The Department of Education has stated its intention use such metrics to determine each servicer's allocation of future Direct Loan volume.

The Department of Education has provided the Issuer with its most recent Direct Loan servicer performance results for the quarters ended September 30, 2020 and December 31, 2020, and the allocations in effect from March 1, 2021 through August 31, 2021. The average results for September 30, 2020 and December 31, 2020 were used to rank all servicers, both the original Title IV Additional Servicers ("TIVAS") and the NFP Servicers. Based upon these recent performance scores, the Issuer was ranked 1st among all Direct Loan servicers on a combined pool basis. The most current Direct Loan servicer customer service performance results are available by visiting the following web site: https://studentaid.gov/data-center/business-info/contracts/loan-servicing/servicer-performance, which information and website are not part of, and are not incorporated by reference into, this Offering Memorandum.

## THE ISSUER'S FFEL PROGRAM

**General**

Since its inception, the Issuer has established a program for financing certain student loans originated pursuant to the Federal Family Education Loan Program ("FFELP" or the "FFEL Program"), authorized by Title IV of the federal Higher Education Act (such loans, "FFELP Loans"). The FFEL

Program authorized by the Higher Education Act is described in "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" attached hereto.

On March 30, 2010, the Reconciliation Act was enacted into federal law.  Included in the Reconciliation Act were provisions that eliminated the origination of new FFELP Loans under the FFEL Program.  As of July 1, 2010, no additional FFELP Loans may be originated and all new federal student loans will be originated solely under the Direct Loan Program.  However, FFELP Loans originated under the Higher Education Act prior to July 1, 2010 which have been acquired by the Issuer (including the loans described in this Offering Memorandum under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein) continue to be subject to the provisions of the FFEL Program, and are not materially affected by the Reconciliation Act.

The Issuer has established its loan purchase program with respect to FFELP Loans (the "Program") in order to effectuate the general purposes of the Issuer and the specific objective of assisting students in obtaining a post-secondary education.  It has modified the Program over the years and regularly reviews the Program.  Through its Program, the Issuer seeks to increase the availability of funds for such purposes by financing:  (a) loans that are guaranteed by a Guaranty Agency and reinsured by the Secretary pursuant to the Higher Education Act; (b) loans that are insured by the Secretary of Health and Human Services under the Public Health Service Act ("HEAL loans"); or (c) other educational loans permitted under the Authorizing Act.  Such loans may be financed through the issuance of bonds and notes, subject to the terms and conditions of the particular bond resolutions or indentures securing such obligations.  The Financed Eligible Loans pledged to the Trustee under the Indenture will consist only of loans described in clause (a) above.

Under the Authorizing Act and pursuant to the Program, the Issuer is authorized to either originate or acquire certain types of student loans.  While the Issuer has, for some time, been permitted to either originate or acquire PLUS loans, Consolidation loans, HEAL loans, and loans by the Issuer to certain institutions of higher education pursuant to the Issuer's qualified institution loan program, until about 2008 it could not originate subsidized and unsubsidized Stafford loans.  In 2008, a Missouri law was adopted allowing the Issuer to originate a limited amount of Stafford loans for borrowers attending Missouri institutions of higher education.  As a result of the recent changes to the FFEL Program, as of July 1, 2010, no entity, including the Issuer, can originate new FFELP Loans under the FFEL Program.

In order to participate in the Issuer's finance programs with respect to FFEL Loans, each third-party lender had to enter into a loan purchase agreement with the Issuer and must have been an "eligible lender" under the Higher Education Act or be otherwise approved by the Issuer.  An "eligible lender" under the Higher Education Act included certain commercial banks, mutual savings banks, savings and loan associations, credit unions, insurance companies, pension funds, certain trust companies and educational institutions.  In its agreement with the Issuer, the selling lender had to make certain representations with respect to the loans to be sold, and agree to repurchase the loan at the Issuer's request if any representation or warranty made by the lender regarding the loan proves to be materially incorrect, if a maker or endorser of a note evidencing the loan asserts a defense which raises a reasonable doubt as to its legal enforcement or if the Secretary refuses to honor a claim with respect to the loan because of circumstances which occurred prior to the Issuer's purchase of the loan.  See "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto.

Most Financed Eligible Loans purchased or originated by the Issuer prior to July 1, 2008, were eligible, subject to certain conditions precedent in the Indenture, for rate relief programs offered by the Issuer (the "RR Programs").  Except for the 0.25% interest rate reduction for borrowers using auto-debit to make loan payments, the other RR Programs closed to new enrollments on January 1, 2010.  Financed Eligible Loans purchased or made by the Issuer prior to July 1, 2008, which were participating in the RR

Programs prior to January 1, 2010, will continue to be eligible for certain interest rate reductions on such loans. Substantially all of the Financed Eligible Loans securing the Notes are eligible to receive an interest rate reduction for enrolling in automatic bank draft payments. Some of the Financed Eligible Loans are eligible to participate in other borrower benefit programs, which may vary. See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS—Borrower Benefits" herein. The RR Programs and other benefits offered by the Issuer with respect to Financed Eligible Loans may be modified or terminated by the Issuer, provided the Issuer may not modify the RR Programs or other benefits other than as provided in the Indenture.

HEAL loans will not be eligible to be financed under the Indenture.

In addition, the Issuer may, to the extent permitted under the Authorizing Act, enter into agreements to finance loans that are not guaranteed or insured under the Higher Education Act. Any such agreement may or may not have conditions similar to the Issuer's current agreements, including certain limitations on the principal amount of such loans. Student loans subject to such agreements will not be eligible to be financed under the Indenture.

**Change to Index for Calculation of Special Allowance Payments**

The Issuer made an affirmative election under Public Law 112-74 to permanently change the index for Special Allowance Payment calculations on substantially all FFELP Loans in its portfolio disbursed after January 1, 2000 (including all of the Financed Eligible Loans with such disbursement dates) from the three-month commercial paper rate to the one-month LIBOR index, commencing with the Special Allowance Payment calculations for the calendar quarter beginning on April 1, 2012. See the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS— Distribution of the Financed Eligible Loans by SAP Interest Rate Index" herein and "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Special Allowance Payments" hereto.

## SERVICING OF THE FINANCED ELIGIBLE LOANS

The Issuer and each other Servicer is required under the Higher Education Act, the rules and regulations of the Guaranty Agencies and, in the case of the Issuer, the Indenture, to use due diligence in the servicing and collection of the Financed Eligible Loans. The Higher Education Act defines due diligence as requiring the use of collection practices at least as extensive and forceful as those generally practiced by financial institutions for the collection of consumer loans. The Higher Education Act also requires the exercise of reasonable care and diligence in the making and servicing of student loans originated under the Higher Education Act and provides that the Secretary may disqualify an "eligible lender" (which could include the Issuer or the Trustee as holder of student loans originated under the Higher Education) from further federal insurance if the Secretary is not satisfied that the foregoing standards have been or will be met. An eligible lender may not relieve itself of its responsibility for meeting these standards by delegation of its responsibility to any servicing agent and, accordingly, if any Servicer fails to meet such standards, the Issuer's ability to realize the benefits of insurance may be adversely affected.

The Higher Education Act requires that a Guaranty Agency ensure that due diligence will be exercised by an eligible lender in making and servicing student loans originated under the Higher Education Act guaranteed by such Guaranty Agency. Each Guaranty Agency establishes procedures and standards for due diligence to be exercised by the servicer and by eligible lenders which service loans subject to such guaranty agencies' guarantee. If the Issuer or any other Servicer does not comply with the established due diligence standards, the Issuer's ability to realize the benefits of any guaranty may be adversely affected.

The Trustee has no duties or obligations to service, collect or monitor the servicing and collecting of the Financed Eligible Loans. The Trustee also is not responsible for accounting and reporting functions required under the Higher Education Act to preserve the guarantee of any Guaranty Agency or the insurance of the Secretary on the Financed Eligible Loans.

## Servicing by the Issuer

The Issuer currently services the Financed Eligible Loans serviced by it with the assistance of software developed and maintained by PHEAA. The Issuer has entered into an agreement with PHEAA pursuant to which PHEAA has agreed to provide the equipment, software, training and related support necessary to enable the Issuer to comply with the provisions of the Higher Education Act. As of June 30, 2021, the Issuer was servicing $1.1 billion in FFELP loans representing 59,181 accounts. The Issuer services education loans for other lenders in addition to servicing most of the Issuer's own loan portfolio. As of June 30, 2021, the Issuer was also servicing $18.6 billion in third-party lender owned private loans representing 320,566 accounts, $132.8 million in Issuer-owned private loans representing 6,202 accounts and $59.1 billion in Direct Loans representing 2,726,179 accounts.

In its capacity as servicer of FFELP student loans, the Issuer submits default claims to guaranty agencies that guarantee the payment of principal and interest of such student loans. See "APPENDIX A— DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees" hereto. A default claim package must include all information and documentation required under the FFELP regulations and the guaranty agency's policies and procedures. Under certain circumstances, a guaranty agency may reject a default claim. Set forth below is a table showing the Issuer's gross claim rejection ratio for the calendar years listed.

| Calendar Year | Gross Claim Reject Rate |
|---|---|
| 2020 | 0.16% |
| 2019 | 0.44 |
| 2018 | 0.12 |
| 2017 | 0.21 |
| 2016 | 0.33 |

All of the Financed Eligible Loans will, when pledged to the Trustee under the Indenture, be serviced by the Issuer pursuant to the servicing provisions set forth in the Indenture. See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Additional Covenants With Respect to the Higher Education Act" herein. Under the Indenture, the Issuer has agreed to service the Financed Eligible Loans diligently and in accordance with the Higher Education Act, the policies and procedures of the Guaranty Agency and the terms of the Indenture, and the Servicer's standard practices and procedures. Pursuant to the Indenture, the Issuer as Servicer will be paid the Servicing Fee (as defined under the caption "GLOSSARY OF TERMS" herein). The Issuer may from time to time enter into other servicing agreements and arrangements in accordance with the terms of the Indenture.

The Issuer has covenanted in the Indenture that the Issuer will always have a Backup Servicing Agreement with a third-party servicer with respect to all Financed Eligible Loans serviced by it. Below is certain additional information with respect to PHEAA as Backup Servicer and the Backup Servicing Agreement.

**Backup Servicing by PHEAA**

PHEAA is expected to initially act as Backup Servicer with respect to the Financed Eligible Loans serviced by the Issuer, and currently acts as backup servicer with respect to Eligible Loans currently serviced by the Issuer and previously financed by the Issuer under various indentures.

### *PHEAA*

*The following information has been furnished by PHEAA for use in this Offering Memorandum. Neither the Issuer nor the Underwriter makes any guarantee or any representation as to the accuracy or completeness thereof or the absence of material adverse change in such information or in the condition of PHEAA subsequent to the date hereof.*

PHEAA is a body corporate and politic constituting a public corporation and government instrumentality created pursuant to an act of the Pennsylvania Legislature. Under its enabling legislation, PHEAA is authorized to issue bonds or notes, with the approval of the Governor of the Commonwealth of Pennsylvania for the purpose of purchasing, making, or guaranteeing loans. Its enabling legislation also authorizes PHEAA to undertake the origination and servicing of loans made by PHEAA and others. PHEAA's headquarters are located in Harrisburg, Pennsylvania with regional offices located throughout Pennsylvania. For further information on PHEAA, see the caption "GUARANTY AGENCIES—Information Regarding PHEAA" herein.

As of March 31, 2021, PHEAA had approximately 2,400 employees and contractors. PHEAA services student loans through its Commercial Servicing line of business, FedLoan Servicing ("FLS") line of business and Remote Servicing line of business. The Commercial Servicing line of business services private student loans and FFELP Loans for customers which consist of national and regional banks and credit unions, secondary markets, and government entities. The FLS line of business services federally owned FFELP and Direct Loan Program loans. The Remote Servicing line of business provides PHEAA's systems to guarantors, other servicers and Not-for-Profit ("NFP") servicers, who were awarded servicing contracts under the Direct Loan Program for use in servicing borrowers.

As of March 31, 2021, PHEAA serviced approximately 9.7 million student borrowers representing an aggregate of approximately $416.2 billion outstanding principal amount under its Commercial Servicing and FLS lines of business.

Through its Commercial Servicing line of business, PHEAA serviced $26.9 billion for lenders as of March 31, 2021, with an approximately $7.4 billion principal balance of private student loans outstanding, which makes PHEAA one of the nation's largest servicers of private student loans.

PHEAA is also one of four primary servicers that were awarded a contract to service Title IV loans owned by the Department of Education. The initial phase of the Title IV Servicing Management contract involved FFELP Loans, which were sold to the Department of Education under the Ensuring Continued Access to Student Loans Act ("ECASLA"). ECASLA gave the Department of Education authority to purchase FFELP Loans from private lenders. In addition, PHEAA began servicing student loans originated under the Federal Direct Program during the 2010-2011 academic year. PHEAA's FLS line of business services the federally owned program loans, and as of March 31, 2021, the portfolio balance of loans and grants serviced by FLS was $389.3 billion.

Under PHEAA's Remote Servicing line of business, the remote clients service approximately 3.3 million student loan borrowers representing an approximately $82.3 billion outstanding principal amount, including $58.5 billion owned by the Department of Education.

### *FFELP Net Reject Rate*

As a servicer, PHEAA works to minimize the net reject rate, which is the amount of claims submitted for payment that are rejected by the guarantor and are subsequently unable to be cured. The net reject rate for both the number and dollar value of PHEAA's FFELP loans for the last three calendar years is listed below.

**FFELP Net Reject Rate**

| Year | Loans | Dollars |
|------|-------|---------|
| 2020 | 0.021% | 0.016% |
| 2019 | 0.020% | 0.011% |
| 2018 | 0.008% | 0.008% |

The net reject rate is calculated based on claims submitted three years prior which were unable to be cured during the three-year cure period which ended during the calendar years noted above. The number and dollar value of rejected claims not cured is divided by the total claims filed during that same period three years prior.

PHEAA's most recent audited financial reports are available from PHEAA.

### *Litigation and Inquiries*

PHEAA is subject to various claims, lawsuits and other actions that arise in the normal course of business. PHEAA believes that these claims, lawsuits and other actions will not, individually or in the aggregate, have a material adverse effect on its business, financial condition or results of operations. Most of these matters are claims against its servicing and collection operations by borrowers and debtors alleging the violation of state or federal laws in connection with servicing or collection activities on such borrower's or debtor's student loans. In addition, PHEAA is routinely named in lawsuits in which the plaintiffs allege that PHEAA has violated a federal or state law in the process of collecting their accounts.

In the ordinary course of its business, it is common for PHEAA to receive information and document requests and investigative demands from legislative committees and administrative and enforcement agencies. These requests may be informational or regulatory in nature and may relate to PHEAA's business practices, the industries in which it operates, or other companies with whom it conducts business. PHEAA's practice has been, and currently is, to cooperate with these bodies and to be responsive to any such requests. However, PHEAA may find it necessary to initiate litigation to enforce its rights, to protect its business operations and practices or to determine the scope and validity of the rights of such bodies. Litigation is costly and time-consuming, and there can be no assurance that PHEAA's litigation expenses will not be significant in the future or that it will prevail in any such litigation.

Such inquiries and related information demands increase costs and resources PHEAA must dedicate to timely respond to these requests and may, depending on their outcome, result in payments of additional amounts of restitution, fines and penalties in addition to those described below under "Consumer Protection and Similar Laws."

### Commonwealth of Massachusetts

In September 2017, the Attorney General's Office for the Commonwealth of Massachusetts ("MA AG") commenced litigation against PHEAA in state court in Massachusetts, generally alleging that PHEAA's federal student loan servicing activities violated various state and federal consumer protection laws.  After substantial discovery and thorough negotiations, on February 9, 2021 the trial court approved a settlement agreement between PHEAA and the MA AG.  Most notably, the settlement agreement included no admission of liability, and did not assess any fine or penalty against PHEAA.  Instead, PHEAA agreed, upon the submission of a claim-form, to review the accounts of federal student loan borrowers in Massachusetts for alleged errors or discrepancies.  To the extent errors are discovered, accounts will be adjusted accordingly.  In addition, out of approximately 250,000 federal student loan borrowers in Massachusetts, PHEAA agreed to remediate 25 borrowers through account-edits, or where edits could not be made, a limited refund of payments received.  PHEAA also agreed to provide enhanced quality-assurance reviews for Massachusetts borrowers.  Ultimately, the settlement agreement resulted in no financial impact to PHEAA, and the outcome demonstrates PHEAA's strong commitment to assisting borrowers.

### State of New York

Similar to the Massachusetts litigation described above, on October 3, 2019, the Attorney General for the State of New York filed an action against PHEAA in the United States District Court for the Southern District of New York.  This action predominantly focuses on PHEAA's federal student loan servicing activities related to federal loans eligible for Public Service Loan Forgiveness ("PSLF"), as well as various types of unique deferments and repayment options.  New York alleges violations of the Consumer Financial Protection Act, as well as a variety of New York statutory and common law claims.  PHEAA strongly disagrees with the allegation of the Complaint.  PHEAA believes that the risk of loss is remote and will continue to contest this matter vigorously.

### Multi-District Litigation

Similar to both actions noted above, several individual borrowers previously filed lawsuits against PHEAA and the Department of Education in several different federal courts related to PHEAA's activities as a federal student loan servicer.  These lawsuits challenge PHEAA's servicing activities surrounding PSLF, deferment and forbearance, and loan repayment programs.  These actions were previously ordered to be consolidated into one lawsuit to be filed in the United States District Court for the Eastern District of Pennsylvania.  In October 2019, the plaintiffs collectively filed their one, Amended Complaint which purports to state all claims on behalf of all plaintiffs.  The allegations against PHEAA and the Department of Education include a variety of tort-based statutory and common law claims.  As of the date of this report, PHEAA and the Department of Education have filed their respective Motions to Dismiss, which have yet to be adjudicated.  PHEAA believes the risk of loss is remote and will continue to contest this matter vigorously.

### Consumer Protection and Similar Laws

The CFPB has issued regulations subjecting PHEAA to the supervision of the CFPB as a "larger participant" (as defined for purposes of the Dodd-Frank Act).  Applicable regulations provide for the examination and monitoring by the CFPB of larger participants in student loan servicing, such as PHEAA, thus giving the CFPB broad authority to examine, investigate, supervise, and otherwise regulate PHEAA's business, including the authority to impose fines and require changes with respect to any requirements that the CFPB finds to be unfair, deceptive or abusive.  The CFPB seeks to make sure that all relevant federal consumer financial laws are followed by nonbank student loan servicers, such as PHEAA, and that such

rules are applied to both federal and private student loans, from origination through servicing to debt collection. The CFPB has substantial power and discretion to define the rights of consumers and the responsibilities of certain entities, such as PHEAA. There is continuing uncertainty regarding how the CFPB's strategies and priorities will impact PHEAA's, and other large nonbank student loan servicers', business and results of operations going forward. Additionally, the Dodd-Frank Act gives the CFPB authority to pursue administrative proceedings and litigation for violations of federal consumer financial laws. In these proceedings, the CFPB can obtain cease and desist orders (which can include orders for restitution or rescission of contracts, as well as other kinds of affirmative relief) and monetary penalties ranging from $5,000 per day for minor violations of federal consumer financial laws (including the CFPB's own rules) to $25,000 per day for reckless violations and $1 million per day for knowing violations. Also, where an entity has violated Title X of the Dodd-Frank Act (the Consumer Financial Protection Act of 2010) or CFPB regulations under Title X, the Dodd-Frank Act empowers state attorneys general and state regulators to bring civil actions for the kind of cease and desist orders available to the CFPB (but not for civil penalties). If the CFPB or one or more state or other federal officials find that PHEAA or its affiliates have violated the foregoing or other laws, they could exercise their enforcement powers in ways that may have a material adverse effect on PHEAA.

In addition to enforcing consumer financial laws directed at specific loan origination and servicing functions, such as loan disclosures and debt collection procedures, the CFPB is directed to prohibit "unfair, deceptive or abusive" acts or practices, and to ensure that all consumers have access to fair, transparent and competitive markets for consumer financial products and services. The review of services and practices to prevent unfair, deceptive or abusive conduct will be a continuing focus of the CFPB, as well as PHEAA's own internal reviews. Such ongoing internal and regulatory reviews are likely to result in changes in PHEAA's policies and practices, increased costs related to regulatory oversight, compliance, supervision and examination and may result in regulatory actions, including civil monetary penalties.

Since 2013, the CFPB has been a party to numerous public enforcement actions, either independently or in conjunction with other federal and state enforcement agencies, to enforce consumer protection laws within its jurisdiction or to support consumer protection efforts nationwide. The CFPB has also been investigating, based on potentially problematic practices identified by the CFPB or reported by consumers or others or investigations transferred to the CFPB by regulators or other federal agencies, potential violations of federal consumer financial laws. Potential penalties are significant, and several large settlements have been entered into by the CFPB and/or other federal and state agencies with, among others, consumer loan originators, servicers and other consumer credit businesses.

Because such supervision and enforcement authority continues to be subject to intensive rulemaking and public comment, which may result in further regulations and/or regulatory interpretations, PHEAA is unable to predict the final form that this regulatory regime will take or the ultimate effect such supervision or required examinations or enforcement actions, if any, could have on PHEAA's operations. PHEAA's operational expenses will likely increase to address new or additional compliance requirements that could be imposed on PHEAA's operations as a result of these developments and CFPB supervision and examination and, depending on their outcome, result in payments of additional amounts of restitution, fines and penalties in addition to those described above.

In response to the evolving regulatory environment, PHEAA has enhanced its compliance management system, has conducted and continues to conduct internal reviews, and has engaged outside firms to assist in compliance and risk assessments. This initiative has enabled PHEAA to better identify deficiencies in its existing processes, policies and procedures. PHEAA has made a commitment to continue to dedicate significant resources to address and remediate any deficiencies it has identified as well as those which may be identified as a result of future reviews and assessments. Notwithstanding such efforts, it is possible that PHEAA may be found to be out of compliance with certain laws applicable to servicing or

originating student loans, including the Financed Eligible Loans. Although management of PHEAA does not believe any such deficiencies would materially and adversely affect the ability of PHEAA to perform its obligations as a servicer, such an outcome cannot be assured.

### COVID-19 Pandemic

An outbreak of a new coronavirus, detected in China in December 2019, spread internationally in the first quarter of calendar year 2020 causing widespread disruption of the global economy and a rise in market volatility. Health officials have declared this to be a pandemic. The course of the pandemic and its ultimate effect on the United States, the global economy and markets are not fully known at this time. Management's evaluation is ongoing and it is not possible to predict the extent of the effect that the pandemic may have on PHEAA's financial position as the financial environment continues to change.

### Backup Servicing Agreement

The Issuer covenants in the Indenture to maintain a Backup Servicing Agreement with a third-party servicer with respect to all of the Financed Eligible Loans serviced by it and to pay all fees and expenses of such third-party servicer associated therewith.  PHEAA will initially act as backup servicer (the "Backup Servicer") with respect to all of the Financed Eligible Loans serviced by the Issuer pursuant to a backup third-party servicing agreement dated July 9, 2021 (the "Backup Servicing Agreement"), between the Issuer and the Backup Servicer.  The following is a summary of some of the provisions included in the Backup Servicing Agreement.  All statements included in this summary are intended to be descriptive of the provisions of the Backup Servicing Agreement, but does not address all of the provisions of the Backup Servicing Agreement, does not fully state the provisions addressed and is subject to all of the definitive terms and conditions of the Backup Servicing Agreement in its entirety.

The Backup Servicing Agreement has a two-year term commencing on its effective date, unless earlier terminated by the Issuer or the Backup Servicer for the events described below (after notice of the same to the breaching party and the expiration of any applicable cure period) and automatically extends for successive one-year periods unless a party provides the other party of written notice of termination not less than 90 days prior to the annual termination date.  In addition, to the extent the Backup Servicing Agreement is no longer required pursuant to the terms of the Indenture (which would require an amendment to the Indenture), the Backup Servicing Agreement will terminate 90 days after receipt of written notice from the Issuer of such event.

The Issuer may terminate the Backup Servicing Agreement upon the occurrence of any of the following events (with respect to the first, second and fourth bullet points below, after notice to the Backup Servicer and the right within 60 days to cure any such breach or error to the full satisfaction of the Issuer and the Trustee):

• material breaches of representations or warranties made by the Backup Servicer in or pursuant to the Backup Servicing Agreement (or any information or report delivered by it) that has a Material Adverse Effect or Servicer Material Adverse Effect;

• failure in any material respect of the Backup Servicer to perform or observe any term, covenant or agreement under the Backup Servicing Agreement which has a Material Adverse Effect or Servicer Material Adverse Effect;

• the Backup Servicer discontinues its business, generally fails to pay its debts as such debts become due, makes a general assignment for the benefit of creditors, is subject to a voluntary or involuntary bankruptcy, reorganization, insolvency or other proceeding (whether

federal or state) relating to relief of debtors, or any judgment, decree or order, entered by a court of competent jurisdiction, which approves a petition seeking the Backup Servicer's reorganization or appoints a receiver, custodian, trustee, interim trustee or liquidator for itself or all or a substantial part of its assets continues in effect for thirty (30) consecutive days;

- a Servicer Material Adverse Effect shall have occurred;

- the Backup Servicer fails to remain eligible to service FFELP Loans under the Higher Education Act and related regulations; or

- certain force majeure events continue for over 20 days or to the extent that the Backup Servicer is unable to perform any obligations arising under the Backup Servicing Agreement as a result of having to give priority to administer existing programs on behalf of the Commonwealth of Pennsylvania.

A "Material Adverse Effect" means (a) a material adverse change in the value of a material portion of the Financed Eligible Loans or (b) any event which could reasonably be viewed as having a material adverse effect on (1) the validity, enforceability or collectability of a material portion of the Financed Eligible Loans or the Notes; (2) the status, existence, perfection, priority or enforceability of the Trustee's security interest in a material portion of the Financed Eligible Loans or (3) a Guaranty Agency's obligation to continue to guarantee payment of a material portion of the Financed Eligible Loans.

A "Servicer Material Adverse Effect" means the occurrence of an event or a change in circumstances that would have a material adverse effect on the ability of the Backup Servicer to perform its obligations under the Backup Servicing Agreement.

The Backup Servicer may terminate the Backup Servicing Agreement upon the occurrence of any of the following events:

- failure by the Issuer to perform or observe any of the material provisions or covenants of the Backup Servicing Agreement which materially and adversely affects the Backup Servicer's ability to perform its obligations thereunder;

- the Backup Servicer determines that it is no longer able to perform its obligations as a back-up third party servicer, upon one hundred eighty (180) days written notice to the Issuer and the Trustee;

- the Issuer and the Backup Servicer are unable to agree on a proposed increase in fees of the Backup Servicer (which increase may result from changes in applicable governmental regulations, guaranty agency program requirements or regulations, or any change in postage rates), after 270 days prior written notice to the Trustee and the Issuer; or

- failure of the Issuer to pay the Backup Servicer its fees due under the Backup Servicing Agreement (subject to the notice and cure periods specified therein).

If the Issuer determines that it does not want to continue servicing the Financed Eligible Loans (and provides 60 days written notice to the Backup Servicer) or if the Issuer is in material violation of its obligations to service the Financed Eligible Loans serviced by it as set forth in the Indenture, as determined by the Issuer (in which case it will promptly notify the Trustee of such), the Trustee (which has no duty to make such determination but is required to provide notice of any such material violation to the Noteholders) or the Noteholders of at least a majority of the principal amount of the Notes outstanding, and such violation

remains uncured after notice thereof and the expiration of any applicable cure period, and the Trustee (at the written direction of the Issuer or the Noteholders of at least a majority of the principal amount of the Notes outstanding) gives 60 days written notice to the Issuer and the Backup Servicer, the Backup Servicer would become the successor Servicer for the Financed Eligible Loans serviced by the Issuer.

## GUARANTY AGENCIES

All of the Financed Eligible Loans expected to be financed with proceeds of the Notes offered hereby are loans guaranteed (with respect to payments of principal and interest) by a Guaranty Agency and reinsured by the Secretary under the Higher Education Act. The Guarantee provided by a Guaranty Agency is an obligation solely of that Guaranty Agency and is not supported by the full faith and credit of the federal or any state government. However, the Higher Education Act provides that if the Secretary determines that a Guaranty Agency is unable to meet its insurance obligations, the Secretary shall assume responsibility for all functions of that Guaranty Agency under its loan insurance program. Additional discussion that relates to Guaranty Agencies generally under the FFEL Program is included in "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto.

In the issuance of Guarantees on loans, each Guaranty Agency is required to review loan applications to verify the completion of required information. In addition, each Guaranty Agency is required to make a determination that the applicant has not borrowed amounts in excess of those permitted under the Higher Education Act. In addition to the Guaranty Agencies described below, the Indenture provides that Financed Eligible Loans may be guaranteed by any entity authorized to guarantee student loans under the Higher Education Act and with which the Issuer has entered into a Guarantee Agreement.

As of the Statistical Cut-Off date (and based on the aggregate outstanding principal balances of the Financed Eligible Loans as of such date), of the Financed Eligible Loans to be held in the Trust Estate created under the Indenture, approximately:

—54.3% are guaranteed by the Missouri Department of Higher Education (the "State Guaranty Agency");

—18.9% are guaranteed by Pennsylvania Higher Education Assistance Agency;

—10.6% are guaranteed by Ascendium Education Solutions, Inc. (f/k/a Great Lakes Higher Education Guaranty Corporation); and

—the remaining approximately 16.2% are guaranteed by other Guaranty Agencies (each such Guaranty Agency guarantees less than 10% of the Financed Eligible Loans as of the Statistical Cut-Off Date).

[Remainder of page intentionally left blank]

The following is certain additional information with respect to the Guaranty Agencies which are expected to guarantee at least 10% of the Financed Eligible Loans held under the Indenture.

**Information Regarding the State Guaranty Agency**

*The following information has been furnished by the State Guaranty Agency for use in this Offering Memorandum. The Issuer makes no guarantee or representation as to the accuracy or completeness thereof or the absence of material adverse change in such information or in the condition of the State Guaranty Agency subsequent to the date hereof.*

In 1978, the Missouri General Assembly enacted legislation authorizing the Missouri Guaranteed Student Loan Program. The State Guaranty Agency has been designated to administer the FFEL Program on behalf of the Coordinating Board for Higher Education. The Missouri Guaranteed Student Loan Program became operative during October 1979. To be eligible for FFEL Program funds under the Missouri Guaranteed Student Loan Program, students must have attended institutions which are eligible institutions under the Higher Education Act.

The State Guaranty Agency has offices at 301 W High Street, Jefferson City, Missouri 65101 and currently employs 19 full time equivalent employees to administer the Federal subsidized and unsubsidized Stafford, SLS and PLUS programs. Certain processing and operational functions for these programs are performed by Educational Credit Management Corporation, Minneapolis, Minnesota, pursuant to a contract with the State Guaranty Agency.

The State Guaranty Agency's "reserve ratio" represents a measure of its ability to meet its future obligations on the existing portfolio of loans. The "reserve ratio" is computed by dividing the State Guaranty Agency's total Reserve Account balance by the amount of outstanding loans. The State Guaranty Agency's "reserve ratio" exceeds the regulatory minimum. The State Guaranty Agency's "federal trigger rate" represents the percentage of default claims (based on dollar value) submitted as reinsurance claims to the Secretary relative to its existing portfolio of loans in repayment. For the last five fiscal years, the State Guaranty Agency's "federal trigger rate" was as follows:

| Fiscal Year | Federal Trigger Rate |
|---|---|
| 2020 | -0.32%[*] |
| 2019 | 1.49% |
| 2018 | 5.37% |
| 2017 | 1.72% |
| 2016 | 0.76% |

_____

[*]The negative percentage is due to the number of accounts that were moved out of default status (mostly through rehabilitation of such loans) being greater than the number of accounts that were moved into default status (defaulted claims) during that Fiscal Year.

Since December 2015, the State Guaranty Agency has been reimbursed by the Secretary 100% of the amount the State Guaranty Agency paid lenders on claims.

The State Guaranty Agency's "recovery rate" is an indicator of the effectiveness of the State Guaranty Agency's collection efforts regarding student loans with respect to which the State Guaranty

Agency has paid default claims.  One method of calculating the "recovery rate" is by dividing the gross amount recovered during the year by the amount of defaulted loans in the State Guaranty Agency's portfolio at the beginning of the year.  Using this calculation method, the State Guaranty Agency's "recovery rate" for the last five fiscal years was as follows:

| Fiscal Year | Recovery Rate |
|---|---|
| 2020 | 24.06% |
| 2019 | 31.19% |
| 2018 | 26.33% |
| 2017 | 27.39% |
| 2016 | 24.99% |

The 1998 Amendments to the Higher Education Act required the State Guaranty Agency to establish an Agency Operating Fund and a Federal Student Loan Reserve Fund.  The primary purpose of the Agency Operating Fund is to finance guaranty agency and other student financial aid related activities, as selected by the State Guaranty Agency.  The primary purpose of the Federal Student Loan Reserve Fund is to purchase defaulted student loans from lending institutions.  The unobligated moneys not currently needed are invested by the state treasurer.  As of June 30, 2020, the State Guaranty Agency had total assets of $24,734,752, deferrals, accounts payable and other liabilities of $375,134, and an Agency Operating Fund balance of $24,359,618.

**Information Regarding PHEAA**

*The following information has been furnished by PHEAA for use in this Offering Memorandum. The Issuer makes no guarantee or representation as to the accuracy or completeness thereof or the absence of material adverse change in such information or in the condition of PHEAA subsequent to the date hereof.*

Pennsylvania Higher Education Assistance Agency ("PHEAA") is a body corporate and politic constituting a public corporation and government instrumentality created pursuant to the Pennsylvania Act of August 7, 1963, P.L. 549, as amended (the "Pennsylvania Act").  For further information on PHEAA, see the caption "SERVICING OF THE FINANCED ELIGIBLE LOANS—Backup Servicing by PHEAA—*PHEAA*" herein.

PHEAA has been guaranteeing student loans since 1964.  As of March 31, 2021, PHEAA has guaranteed a total of approximately $48.8 billion principal amount of Stafford Loans, $7.9 billion principal amount of PLUS and SLS Loans, and $52.1 billion principal amount of Consolidation Loans under the Higher Education Act.  PHEAA initially guaranteed loans only to residents of the Commonwealth of Pennsylvania (the "Commonwealth") or persons who planned to attend or were attending eligible education institutions in the Commonwealth.  In May 1986, PHEAA began guaranteeing loans to borrowers who did not meet these residency requirements pursuant to its national guarantee program.  Under the Pennsylvania Act, guarantee payments on loans under PHEAA's national guarantee program may not be paid from funds appropriated by the Commonwealth.

Effective April 1, 2013, PHEAA was designated as the guarantor for the State of Georgia.  PHEAA accepted the transfer and assignment of the rights, duties and responsibilities as a Guaranty Agency under the Federal Family Education Loan Program from the Georgia Higher Education Assistance Corporation's (GHEAC), the previous designated guarantor for the State of Georgia.  As a result, PHEAA accepted the transfer and assignment of student loans with an aggregate of $687.8 million in original principal, net of

cancellations.  All percentages and results for PHEAA in the charts below for periods of activity after April 1, 2013, include the impact of the additional guaranty volume received in the transfer.

PHEAA has adopted a default prevention program consisting of (i) informing new borrowers of the serious financial obligations incurred by them and stressing the financial and legal consequences of failure to meet all terms of the loan, (ii) working with institutions to make certain that student borrowers are enrolled in sound education programs and that the proper individual enrollment records are being maintained, (iii) assisting lenders with operational programs to ensure sound lending policies and procedures, (iv) maintaining up-to-date student status and address records of all borrowers in the guaranty program, (v) initiating prompt collection actions with borrowers who become delinquent on their loans, do not establish repayment schedules or "skip," (vi) taking prompt action, including legal action and garnishment of wages, to collect on all defaulted loans, and (vii) adopting a general policy that no loan will be automatically "written off."  Since the loan servicing program was initiated in 1974, PHEAA has never exceeded an annual default claims percentage of 5 percent and, as a result, federal reimbursement for default claims has thus far been at the maximum federal reimbursement level.

For the last five federal fiscal years (ended September 30), the annual default claims percentages have been as follows:

| Federal Fiscal Year | Annual Default Claims |
|---|---|
| 2016 | 0.46% |
| 2017 | 0.59 |
| 2018 | 1.10 |
| 2019 | 1.49 |
| 2020 | 0.82 |

As of March 31, 2021, PHEAA had total federal reserve fund assets of approximately $93.0 million.  Through March 31, 2021, the outstanding amount of original principal on loans that had been directly guaranteed by PHEAA and loans transferred from GHEAC under the Federal Family Education Loan Program was approximately $16.4 billion.  In addition, as of March 31, 2021, PHEAA had total assets of $4.1 billion, which does not include Federal Reserve Fund assets.

*Guarantee Volume*.  PHEAA's new origination guaranty volume (the approximate aggregate principal amount of federally reinsured education loans, including PLUS Loans but excluding federal consolidation loans) was zero for each of the last five federal fiscal years (ended September 30).

*Reserve Ratio*.  Under current law, PHEAA is required to manage the Federal Fund so net assets are greater than 0.25% of the original principal balance of outstanding guarantees.  The table below shows the reserve ratio for PHEAA for the last five federal fiscal years (ended September 30):

| Federal Fiscal Year | Reserve Ratio |
|---|---|
| 2016 | 0.37% |
| 2017 | 0.50 |
| 2018 | 0.60 |
| 2019 | 0.56 |
| 2020 | 0.61 |

68

The table displays PHEAA's calculation of the reserve ratio on a regulatory basis of accounting. Each year the reserve ratio includes an adjustment for gain contingencies not recognized under generally accepted accounting principles.

*Recovery Rates*. A guarantor's recovery rate, which provides a measure of the effectiveness of the collection efforts against defaulting borrowers after the guarantee claim has been satisfied, is determined for each year by dividing the current year collections by the total outstanding claim portfolio for the prior fiscal year.

The recovery rate decreased in 2020 due to the decrease in recoveries as a result of the COVID-19 Pandemic. The CARES Act provided an interest reprieve and implemented an automatic forbearance effective March 2020, for any borrower with a student loan held by the Department of Education. PHEAA took into account this guidance and addressed management of the default portfolio by suspending active garnishments and ceased referral of accounts to outside collection vendors. In addition, PHEAA suspended the series of standard default due diligence letters hence accounts were treated as deferred from further collections effective March 2020. PHEAA also limited outbound calls to borrowers.

The table below shows the cumulative recovery rates for PHEAA for the five federal fiscal years (ended September 30):

| Federal Fiscal Year | Reserve Ratio |
|---|---|
| 2016 | 28.35% |
| 2017 | 28.96 |
| 2018 | 25.82 |
| 2019 | 27.48 |
| 2020 | 23.91 |

**Information Regarding Ascendium**

Ascendium Education Solutions, Inc. f/k/a Great Lakes Higher Education Guaranty Corporation ("Ascendium") is a Wisconsin nonstock, nonprofit corporation, the sole member of which is Ascendium Education Group, Inc. f/k/a Great Lakes Higher Education Corporation ("Ascendium Education Group"). Ascendium's predecessor organization, Ascendium Education Group, was organized as a Wisconsin nonstock, nonprofit corporation and began guaranteeing student loans under the Higher Education Act in 1967. Ascendium is the designated guaranty agency under the Higher Education Act for Wisconsin, Arkansas, Iowa, Minnesota, Montana, North Dakota, Ohio, South Dakota, Puerto Rico and the Virgin Islands. On January 1, 2002, Ascendium Education Group (and Ascendium directly and through its support services agreement with Ascendium Education Group), outsourced certain aspects of its student loan program guaranty support operations to Great Lakes Educational Loan Services, Inc. Ascendium continues as the "guaranty agency" as defined in Section 435(j) of the Higher Education Act and continues its default aversion, claim purchase and compliance, collection support and federal reporting responsibilities as well as custody and responsibility for all revenues, expenses and assets related to that status. The primary operations center for Ascendium Education Group and its affiliates (including Ascendium) is in Madison, Wisconsin, which includes operational staff offices for guaranty functions. Ascendium also maintain offices in: Eagan, Minnesota; Aberdeen, South Dakota; and Indianapolis, Indiana. Ascendium will provide a copy of Ascendium Education Group's most recent consolidated financial statements on receipt of a written request directed to 2501 International Lane, Madison, Wisconsin 53704, Attention: Chief Financial Officer.

United Student Aid Funds, Inc. ("USAF") was organized as a private, nonprofit corporation under the General Corporation Law of the State of Delaware in 1960.  USAF (i) maintained facilities for the provision of guarantee services with respect to approved education loans made to or for the benefit of eligible students attending approved educational institutions; (ii) guaranteed education loans made pursuant to certain loan programs under the Higher Education Act, as well as loans made under certain private loan programs; and (iii) served as the designated guarantor for education-loan programs under the Higher Education Act in Arizona, Hawaii and certain Pacific Islands, Indiana, Kansas, Maryland, Mississippi, Nevada and Wyoming.

USAF was the sole member of the Northwest Education Loan Association ("NELA"), a guarantor serving the states of Washington, Idaho and the Northwest.  Ascendium Education Group became a member of USAF effective January 1, 2017.

Effective as of December 31, 2018, NELA was dissolved, with its remaining assets going to its sole member, USAF.  Immediately thereafter, USAF was merged into Ascendium.  Thus, the portfolios previously held by USAF and NELA are now held by Ascendium.

The information in the following tables has been provided to the Issuer from reports provided by or to the U.S. Department of Education and has not been verified by the Issuer,  Ascendium, or the Underwriter.  No representation is made by the Issuer, Ascendium, or the Underwriter as to the accuracy or completeness of this information.  Prospective investors may consult the U.S. Department of Education Data Books and Web sites http://www2.ed.gov/finaid/prof/resources/data/opeloanvol.html and http://www.fp.ed.gov/pubs.html for further information concerning Ascendium or any other guaranty agency.  Such websites are not incorporated into this Offering Memorandum.

*Guaranty Volume*.  Pursuant to the Reconciliation Act of 2010, Ascendium, the former USAF, and the former NELA ceased issuing new loan guarantees on June 30, 2010.  The most recent year for which the U.S. Department of Education has issued guaranty volume information is 2009.  Ascendium issued $7.0 billion in new loan guarantees in that year.

*Reserve Ratio*.  The reserve ratios for Ascendium, the former USAF and the former NELA are as follows:

### The Ascendium Portfolio[*]

Following are Ascendium's reserve fund levels as calculated in accordance with 34 CFR 682.410(a)(10) for the last five federal fiscal years:

| Federal Fiscal Year | Federal Guaranty Reserve Fund Level[1] |
|---|---|
| 2016 | 1.37% |
| 2017 | 1.80 |
| 2018 | 2.21 |
| 2019 | 0.64 |
| 2020 | 0.96 |

The U.S. Department of Education's website has posted reserve ratios for Ascendium for federal years 2016, 2017, 2018, 2019 and 2020 of  0.827%, 1.000%,1.480%, 0.49% and 0.59% respectively. Ascendium believes the Department of Education has not calculated the reserve ratio in accordance with the Act and the correct ratio should be 1.37%, 1.80%, 2.21%, 0.64% and 0.96% respectively, as shown

above and as explained in the following footnote. On November 17, 2006, the U.S. Department of Education advised Ascendium that beginning in Federal Fiscal Year 2006 it will publish reserve ratios that include loan loss provision and deferred revenues. Ascendium believes this change more closely approximates the statutory calculation. According to the U.S. Department of Education, available cash reserves may not always be an accurate barometer of a guarantor's financial health.

[1/] In accordance with Section 428(c)(9) of the Higher Education Act, does not include loans transferred from the former Higher Education Assistance Foundation, Northstar Guarantee Inc., Ohio Student Aid Commission, Puerto Rico Higher Education Assistance Corporation, Student Loan Guarantee Foundation of Arkansas, Student Loans of North Dakota, Montana Guaranteed Student Loan Program, or designated states of Arizona, Hawaii, Idaho, Indiana, Kansas, Maryland, Mississippi, Nevada, Washington, Wyoming, and certain Pacific Trust Territories. (The minimum reserve fund ratio under the Higher Education Act is 0.25%.)

[*] The percentages for 2015-2018 include only the Ascendium portfolio; the percentage for 2019 include the combined portfolios of Ascendium, USAF and NELA.

### The Former USAF Portfolio Now Held by Ascendium

Following are USAF's reserve fund levels as calculated in accordance with 34 CFR 682.410(a)(10) for the five federal fiscal years presented:

| Federal Fiscal Year | Federal Guaranty Reserve Fund Level[1] |
|---|---|
| 2014 | 0.277% |
| 2015 | 0.251 |
| 2016 | 0.308 |
| 2017 | 0.350 |
| 2018 | 0.363 |

[1/] In accordance with Section 428(c)(9) of the Higher Education Act, does not include loans transferred from the former Higher Education Assistance Foundation, Northstar Guarantee Inc., Ohio Student Aid Commission, Puerto Rico Higher Education Assistance Corporation, Student Loan Guarantee Foundation of Arkansas, Student Loans of North Dakota, Montana Guaranteed Student Loan Program, or designated states of Arizona, Hawaii, Idaho, Indiana, Kansas, Maryland, Mississippi, Nevada, Washington, Wyoming, and certain Pacific Trust Territories. (The minimum reserve fund ratio under the Higher Education Act is 0.25%.)

### The Former NELA Portfolio Now Held by Ascendium

Following are NELA's reserve fund levels as calculated in accordance with 34 CFR 682.410(a)(10) for the five federal fiscal years presented:

| Federal Fiscal Year | Federal Guaranty Reserve Fund Level[1] |
|---|---|
| 2014 | 0.377% |
| 2015 | 0.295 |
| 2016 | 0.373 |
| 2017 | 0.430 |
| 2018 | 0.460 |

[1/] In accordance with Section 428(c)(9) of the Higher Education Act, does not include loans transferred from the former Higher Education Assistance Foundation, Northstar Guarantee Inc., Ohio Student Aid Commission, Puerto Rico

Higher Education Assistance Corporation, Student Loan Guarantee Foundation of Arkansas, Student Loans of North Dakota, Montana Guaranteed Student Loan Program, or designated states of Arizona, Hawaii, Idaho, Indiana, Kansas, Maryland, Mississippi, Nevada, Washington, Wyoming, and certain Pacific Trust Territories. (The minimum reserve fund ratio under the Higher Education Act is 0.25%.)

***Claims Rate***. The claims rate for Ascendium, USAF and NELA are as follows:

### The Ascendium Portfolio[*]

For the past five federal fiscal years, Ascendium's claims rate has not exceeded 5%, and, as a result, the highest allowable reinsurance has been paid on all Ascendium's claims. The actual claims rates are as follows:

| Federal Fiscal Year | Claims Rate |
|---------------------|-------------|
| 2016 | 1.00% |
| 2017 | 0.35 |
| 2018 | 0.35 |
| 2019 | 2.00 |
| 2020 | 1.40 |

[*] The percentages for 2016 through 2018 include only the Ascendium portfolio; the percentages for 2019 and 2020 include the combined portfolios of Ascendium, USAF and NELA.

### The Former USAF Portfolio Now Held by Ascendium

For the five federal fiscal years presented, USAF's claims rate has not exceeded 5%, and, as a result, the highest allowable reinsurance has been paid on all USAF's claims. The actual claims rates are as follows:

| Federal Fiscal Year | Claims Rate |
|---------------------|-------------|
| 2014 | 4.73% |
| 2015 | 4.71 |
| 2016 | 0.60 |
| 2017 | 0.67 |
| 2018 | 2.15 |

### The Former NELA Portfolio Now Held by Ascendium

For the five federal fiscal years presented, NELA's claims rate has not exceeded 5%, and, as a result, the highest allowable reinsurance has been paid on all NELA's claims. The actual claims rates are as follows:

| Federal Fiscal Year | Claims Rate |
|---------------------|-------------|
| 2014 | 1.37% |
| 2015 | 0.60 |
| 2016 | 1.31 |
| 2017 | 0.63 |
| 2018 | 1.52 |

As a result of various statutory and regulatory changes over the past several years, historical rates may not be an accurate indicator of current delinquency or default trends or future claims rates.

## FEES AND EXPENSES

The maximum Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees and the Trustee Fees payable by the Issuer under the Indenture are set forth in the table below.  The priority of payment of such fees and expenses is described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.  The amounts below are subject to increase upon satisfaction of a Rating Agency Condition.

| Fees | Recipient | Amount |
|------|-----------|--------|
| Administration Fee | The Issuer | 0.05% per annum[1] |
| Servicing Fee | The Issuer | 0.80% per annum[2] |
| Trustee Fee | U.S. Bank National Association | 0.03% per annum[3], plus expenses |

---

[1] As a percentage of the Pool Balance, payable monthly in arrears and determined as of the last day of the preceding calendar month, with no inflation adjustment.  The Administration Fee will also include annual reimbursement of expenses incurred by the Issuer under the Indenture (such as fees and expenses due to the Rating Agencies and the Backup Servicer and other fees of the Program (including compliance audits), limited to $100,000, less the portion of the Expense Cap (as hereafter defined) paid to the Trustee as described below during such year, which amount shall be payable solely on the Monthly Distribution Date in September of each year beginning in 2022.

[2] As a percentage of the Pool Balance, payable monthly in arrears and determined as of the last day of the preceding month, with no inflation adjustment.  The Servicing Fee for each month will not exceed the greater of the amount specified above and a servicing fee floor equal to $2.50 per borrower per month, subject to 3% annual inflation from the date of issuance.

[3] As a percentage of the outstanding principal amount of the Notes, payable quarterly in arrears, with a quarterly minimum of $1,500.

The Trustee is also entitled, as a part of the Trustee Fee, to expense reimbursement up to a maximum annual amount (prior to an Event of Default) equal to $50,000 (the "Expense Cap").  Any amounts described in the prior sentence that are not paid or reimbursed to the Trustee in any year shall be available to the Issuer (as administrator), as a part of the Administration Fee, on the September Monthly Distribution Date of each year beginning in 2022 to pay or reimburse the Issuer for Program Fees and other expenses of the Issuer incurred under the Indenture.

[Remainder of page intentionally left blank]

**USE OF PROCEEDS**

The estimated sources and uses are expected to be applied as follows.  All amounts reflected in the table below are estimates and the final amounts will not be determined until the Date of Issuance.

| | |
|---|---:|
| Source of Funds: | |
| Proceeds of the Notes | $197,500,000 |
| Less original issue discount | 44,703 |
| Less underwriting discount | 1,055,930 |
| Total | $196,399,367 |
| | |
| Uses: | |
| Deposit to Student Loan Fund[1] | $188,421,083 |
| Deposit to Capitalized Interest Fund | 6,000,000 |
| Deposit to the Reserve Fund | 1,307,534 |
| Deposit to Cost of Issuance Fund | 670,750 |
| Total | $196,399,367 |

_____
[1] To be used to refinance the Financed Eligible Loans as described below.

Certain of the proceeds deposited into the Student Loan Fund on the Date of Issuance will be (i) transferred by the Trustee to the lender under the Warehouse Agreement to refinance certain Eligible Loans that are being pledged to the Indenture and (ii) transferred by the Trustee to the Issuer in consideration of the pledge by the Issuer of certain Eligible Loans held unencumbered by the Issuer.  Contemporaneously with the receipt of such proceeds by the lender under the Warehouse Agreement, the applicable Eligible Loans under the Warehouse Agreement will be released, such Eligible Loans will be deposited to the credit of the Student Loan Fund, and such Eligible Loans will constitute Financed Eligible Loans under the Indenture.  Contemporaneously with the receipt of such proceeds by the Issuer, the Eligible Loans previously held unencumbered by the Issuer will be pledged by the Issuer under the Indenture, will be deposited to the credit of the Student Loan Fund and will constitute Financed Eligible Loans under the Indenture.

**CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS**

**General**

The Eligible Loans expected to be pledged pursuant to the Indenture are loans made to finance post-secondary education made under the Higher Education Act (the "Eligible Loans").  Loans that meet the foregoing criteria are sometimes referred to in this Offering Memorandum as "Financed Eligible Loans."  As of the Statistical Cut-Off Date (June 30, 2021), the characteristics of the pool of Eligible Loans the Issuer expects to pledge to the Trustee pursuant to the Indenture on the Date of Issuance were collectively as described below.  The aggregate outstanding principal balance of the Eligible Loans in each of the following tables includes the principal balance due from borrowers and approximately $9,664,923 of interest expected to be capitalized upon commencement of repayment.  The percentages set forth in the tables below may not always add to 100% and the balances may not always add to $201,530,098 due to rounding.

In the event that the principal amount of Eligible Loans required to provide collateral for the Notes varies from the amounts anticipated herein, whether by reason of a change in the collateral requirement necessary to obtain the rating on the Notes from each Rating Agency that will rate the Notes as indicated under the caption "SUMMARY OF TERMS—Rating of the Notes" herein, the pricing of the interest rate

on the Notes, the principal amount of Notes to be offered, the rate of amortization or prepayment on the portfolio of Eligible Loans from the Statistical Cut-Off Date to the Date of Issuance varying from the rates that were anticipated, or otherwise, the portfolio of Eligible Loans to be pledged to the Trustee under the Indenture may consist of a subset of the pool of Eligible Loans described below or may include additional Eligible Loans not described below.

The aggregate characteristics of the entire pool of Eligible Loans expected to be pledged on the Date of Issuance, including the composition of the Eligible Loans and the related borrowers, the distribution by student loan type, the distribution by interest rate, the distribution by Special Allowance Payment ("SAP" or "Special Allowance Payment") index, the distribution by principal balance and the distribution by remaining term to scheduled maturity, may vary from the information presented below since the information presented below is as of the Statistical Cut-Off Date, and the date that the Financed Eligible Loans will be pledged to the Trustee under the Indenture will occur after that date.

The Consolidated Appropriations Act of 2012 authorized eligible lenders under the FFEL Program to make an irrevocable election to permanently convert the index upon which Special Allowance Payment calculations would be based, effective April 1, 2012, for all FFELP Loans owned by an electing lender that were disbursed after January 1, 2000 (except for excluded FFELP Loans as to which a third party had a contractual right to approve such an election, if such approval had not been obtained). The Special Allowance Payment calculations for FFELP Loans to which such an election applies are based on the one-month London Interbank Offered Rate for United States dollars in effect for each day of the applicable calendar quarter, as compiled and released by the British Bankers Association ("SAP One-Month LIBOR"), rather than on the three-month commercial paper (financial) rate, which remains applicable with respect to other FFELP Loans that were disbursed after January 1, 2000. The Issuer elected to permanently convert its FFELP Loans that were disbursed after January 1, 2000 to a SAP One-Month LIBOR basis.

An Eligible Loan originated under the FFELP that has previously defaulted, but satisfies the conditions described below, is known as a "rehabilitation loan." Approximately 4.73% of the Financed Eligible Loans will be rehabilitation loans. To rehabilitate an Eligible Loan originated under the FFELP, a borrower must pay the applicable Guaranty Agency at least nine full payments of an amount that is reasonable and affordable, as agreed to by the borrower and the Guaranty Agency, within twenty days of their monthly due dates over a 10-month period. Once the borrower has made the required payments, the loan may be purchased by an eligible lending institution. After a rehabilitation loan is purchased, it is eligible for all benefits under the Higher Education Act for which it would have been eligible if no default had occurred. See "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto.

[Remainder of page intentionally left blank]

**Composition of the Financed Eligible Loan Portfolio**
**(as of the Statistical Cut-Off Date)**

| | |
|---|---:|
| Aggregate Outstanding Principal Balance[*] | $201,530,098 |
| Accrued Interest to be Capitalized | $9,664,923 |
| Accrued Interest to be Capitalized Upon Commencement of Repayment | $3,219,625 |
| Accrued Interest to be Capitalized for Loans in Income Based Repayment | $6,445,298 |
| Accrued Interest not to be Capitalized | $618,190 |
| Aggregate Outstanding Principal Balance—Treasury Bill SAP | $3,831,917 |
| Percentage of Aggregate Outstanding Principal Balance—Treasury Bill SAP | 1.90% |
| Aggregate Outstanding Principal Balance—One-Month LIBOR SAP | $197,698,181 |
| Percentage of Aggregate Outstanding Principal Balance—One-Month LIBOR SAP | 98.10% |
| Total Number of Borrowers | 15,387 |
| Average Principal Balance per Borrower | $13,097 |
| Total Number of Loans | 29,132 |
| Weighted Average Borrower Age | 48 |
| Weighted Average Remaining Term (months) | 169 |
| Weighted Average Annual Interest Rate | 5.14% |
| Weighted Average Annual Interest Rate after Borrower Benefits | 5.05% |
| Aggregate Outstanding Principal Balance of Rehabilitated Loans | $9,496,737 |
| Percentage of Aggregate Outstanding Principal Balance of Rehabilitated Loans | 4.71% |

_____
[*]Includes accrued interest to be capitalized.

**Distribution of the Financed Eligible Loans by**
**Loan Type**
**(as of the Statistical Cut-Off Date)**

| Loan Type | Number of Loans | Aggregate Outstanding Principal Balance | Percent of Aggregate Outstanding Principal Balance |
|---|---:|---:|---:|
| Consolidation Loans - Unsubsidized | 5,000 | $ 71,733,005 | 35.6% |
| Stafford Loans - Unsubsidized | 8,985 | 47,281,282 | 23.5 |
| Stafford Loans - Subsidized | 11,194 | 39,826,026 | 19.8 |
| Consolidation Loans - Subsidized | 3,449 | 36,378,428 | 18.1 |
| PLUS Loans | 504 | 6,311,357 | 3.1 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by
School Type
(as of the Statistical Cut-Off Date)**

| School Type | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| 4-Year + | 19,879 | $148,934,398 | 73.9% |
| 2-Year | 5,676 | 22,785,634 | 11.3 |
| Proprietary | 3,118 | 21,155,582 | 10.5 |
| Consolidation Loan (Unknown) | 408 | 8,520,891 | 4.2 |
| Other | 51 | 133,592 | 0.1 |
| Totals | 29,132 | $201,530,098 | 100.0% |

**Distribution of the Financed Eligible Loans by
Range of Annual Borrower Interest Rate
(as of the Statistical Cut-Off Date)**

| Range of Annual Borrower Interest Rate | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Less than 1.00% | 7 | $ 48,717 | 0.0[*]% |
| 1.01% to 2.00% | 687 | 3,210,105 | 1.6 |
| 2.01% to 3.00% | 12,489 | 55,464,145 | 27.5 |
| 3.01% to 4.00% | 968 | 8,435,032 | 4.2 |
| 4.01% to 5.00% | 2,338 | 24,076,340 | 11.9 |
| 5.01% to 6.00% | 1,748 | 19,817,268 | 9.8 |
| 6.01% to 7.00% | 8,771 | 56,610,259 | 28.1 |
| 7.01% to 8.00% | 1,427 | 23,377,759 | 11.6 |
| 8.01% to 9.00% | 675 | 10,412,605 | 5.2 |
| 9.01% or more | 22 | 77,866 | 0.0[*] |
| Totals | 29,132 | $201,530,098 | 100.0% |

_____
[*]Less than 0.05%, but greater than 0.00%.

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by**
**Payment Rate Reduction**
**(as of the Statistical Cut-Off Date)**

| Payment Rate Reduction | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| None | 22,518 | $160,487,805 | 79.6% |
| Currently Receiving 0.25% | 5,592 | 37,957,075 | 18.8 |
| Currently Receiving 2.00% | 115 | 261,789 | 0.1 |
| Currently Receiving 2.50% | 18 | 93,087 | 0.0* |
| Currently Receiving 3.00% | 887 | 2,726,665 | 1.4 |
| Interest Rate set at 3.25% | 1 | 1,859 | 0.0* |
| Currently Receiving 4.00% | 1 | 1,817 | 0.0* |
| Totals | 29,132 | $201,530,098 | 100.0% |

_____
*Less than 0.05%, but greater than 0.00%.

**Distribution of the Financed Eligible Loans by**
**Range of Outstanding Principal Balance**
**(as of the Statistical Cut-Off Date)**

| Range of Outstanding Principal Balance | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| $2,000.00 or less | 7,688 | $   7,588,880 | 3.8% |
| $2,000.01 to $4,000.00 | 6,664 | 19,699,148 | 9.8 |
| $4,000.01 to $6,000.00 | 4,397 | 21,571,159 | 10.7 |
| $6,000.01 to $8,000.00 | 3,584 | 24,737,301 | 12.3 |
| $8,000.01 to $10,000.00 | 2,045 | 18,160,188 | 9.0 |
| $10,000.01 to $15,000.00 | 2,077 | 25,047,708 | 12.4 |
| $15,000.01 to $20,000.00 | 937 | 16,063,393 | 8.0 |
| $20,000.01 to $25,000.00 | 508 | 11,365,282 | 5.6 |
| $25,000.01 to $30,000.00 | 319 | 8,723,779 | 4.3 |
| $30,000.01 to $40,000.00 | 385 | 13,237,771 | 6.6 |
| $40,000.01 to $50,000.00 | 192 | 8,539,265 | 4.2 |
| $50,000.01 to $60,000.00 | 113 | 6,161,966 | 3.1 |
| $60,000.01 or more | 223 | 20,634,259 | 10.2 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by
Date of Disbursement (dates correspond to changes in guarantee percentage)
(as of the Statistical Cut-Off Date)**[*]

| Date of Disbursement (and corresponding guarantee percentage) | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| On or after July 1, 2006 (97%) | 12,476 | $109,311,170 | 54.2% |
| October 1, 1993 – June 30, 2006 (98%) | 16,572 | 91,903,173 | 45.6 |
| Before October 1, 1993 (100%) | 84 | 315,755 | 0.2 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[*]Student loans disbursed prior to October 1, 1993 are 100% guaranteed by the Guaranty Agency. Student loans disbursed on or after October 1, 1993 and before July 1, 2006 are 98% guaranteed by the applicable Guaranty Agency. Student loans for which the first disbursement is made on or after July 1, 2006 and before July 1, 2010 are 97% guaranteed by the applicable Guaranty Agency.

**Distribution of the Financed Eligible Loans by
Number of Days Delinquent
(as of the Statistical Cut-Off Date)**

| Number of Days Delinquent | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| 30 days or less | 29,127 | $201,521,422 | 100.0% |
| 31-60 days | 4 | 8,479 | 0.0[*] |
| 91-120 days | 1 | 196 | 0.0[*] |
| Totals | 29,132 | $201,530,098 | 100.0% |

[*]Less than 0.05%, but greater than 0.00%.

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by
Remaining Term to Scheduled Maturity (in months)
(as of the Statistical Cut-Off Date)**

| Range of Remaining Term to Scheduled Maturity (in months) | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| 12 or less | 1,120 | $ 614,837 | 0.3% |
| 13 to 24 | 1,406 | 1,490,642 | 0.7 |
| 25 to 36 | 1,185 | 2,045,896 | 1.0 |
| 37 to 48 | 1,109 | 2,811,538 | 1.4 |
| 49 to 60 | 1,302 | 4,840,957 | 2.4 |
| 61 to 72 | 1,460 | 6,505,528 | 3.2 |
| 73 to 84 | 1,221 | 6,031,206 | 3.0 |
| 85 to 96 | 1,122 | 5,985,178 | 3.0 |
| 97 to 108 | 1,366 | 7,572,312 | 3.8 |
| 109 to 120 | 2,034 | 12,919,449 | 6.4 |
| 121 to 132 | 1,760 | 12,877,460 | 6.4 |
| 133 to 144 | 2,303 | 17,393,800 | 8.6 |
| 145 to 156 | 2,806 | 18,457,770 | 9.2 |
| 157 to 168 | 2,278 | 17,425,754 | 8.6 |
| 169 to 180 | 1,282 | 13,188,118 | 6.5 |
| 181 to 192 | 826 | 10,839,331 | 5.4 |
| 193 to 204 | 873 | 9,965,236 | 4.9 |
| 205 to 216 | 673 | 7,841,951 | 3.9 |
| 217 to 228 | 521 | 6,194,071 | 3.1 |
| 229 to 240 | 398 | 5,280,277 | 2.6 |
| 241 to 252 | 393 | 5,167,815 | 2.6 |
| 253 to 264 | 297 | 4,050,439 | 2.0 |
| 265 to 276 | 221 | 3,533,350 | 1.8 |
| 277 to 288 | 220 | 3,605,560 | 1.8 |
| 289 to 300 | 162 | 2,311,598 | 1.1 |
| 301 to 312 | 166 | 1,939,546 | 1.0 |
| 313 to 324 | 108 | 1,858,942 | 0.9 |
| 325 to 336 | 65 | 972,605 | 0.5 |
| 337 to 348 | 48 | 765,684 | 0.4 |
| 349 to 360 | 53 | 1,111,234 | 0.6 |
| 361 or greater | 354 | 5,932,016 | 2.9 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by
Borrower Payment Status
(as of the Statistical Cut-Off Date)**

| Borrower Payment Status | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Deferment | 1,559 | $    9,490,558 | 4.7% |
| Forbearance | 1,360 | 11,510,515 | 5.7 |
| Disaster Forbearance (including COVID-19) | 6,003 | 44,571,557 | 22.1 |
| Grace | 12 | 113,047 | 0.1 |
| In-School | 52 | 267,825 | 0.1 |
| Repayment (First Year) | 8 | 47,101 | 0.0* |
| Repayment (Second Year) | 9 | 52,122 | 0.0* |
| Repayment (Third Year) | 11 | 42,149 | 0.0* |
| Repayment (More than 3 Years) | 20,118 | 135,435,224 | 67.2 |
| Totals | 29,132 | $201,530,098 | 100.0% |

_____
*Less than 0.05%, but greater than 0.00%.

**Distribution of the Financed Eligible Loans by
Geographic Location
(as of the Statistical Cut-Off Date)**

| Geographic Location | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Missouri | 13,733 | $  90,411,934 | 44.9% |
| Mississippi | 3,121 | 19,467,282 | 9.7 |
| Arkansas | 1,712 | 10,760,777 | 5.3 |
| California | 1,351 | 9,380,274 | 4.7 |
| Texas | 1,184 | 8,489,347 | 4.2 |
| Illinois | 1,110 | 8,361,005 | 4.1 |
| Georgia | 627 | 4,954,273 | 2.5 |
| Kansas | 649 | 4,503,883 | 2.2 |
| Florida | 566 | 4,155,813 | 2.1 |
| New York | 396 | 3,474,257 | 1.7 |
| Tennessee | 419 | 2,857,366 | 1.4 |
| North Carolina | 339 | 2,170,062 | 1.1 |
| Massachusetts | 150 | 2,014,674 | 1.0 |
| New Jersey | 133 | 1,932,177 | 1.0 |
| Arizona | 250 | 1,872,579 | 0.9 |
| South Carolina | 122 | 1,745,642 | 0.9 |

| Geographic Location | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Virginia | 240 | 1,652,380 | 0.8 |
| Colorado | 261 | 1,593,022 | 0.8 |
| Washington | 226 | 1,536,495 | 0.8 |
| Pennsylvania | 133 | 1,402,844 | 0.7 |
| Oklahoma | 210 | 1,359,746 | 0.7 |
| Alabama | 245 | 1,323,297 | 0.7 |
| Maryland | 141 | 1,253,474 | 0.6 |
| Michigan | 97 | 1,227,892 | 0.6 |
| Minnesota | 132 | 1,175,867 | 0.6 |
| Indiana | 119 | 1,170,261 | 0.6 |
| Ohio | 159 | 1,087,382 | 0.5 |
| Nevada | 98 | 1,048,829 | 0.5 |
| Kentucky | 98 | 957,001 | 0.5 |
| Iowa | 118 | 925,728 | 0.5 |
| Oregon | 191 | 881,628 | 0.4 |
| Connecticut | 59 | 620,759 | 0.3 |
| Louisiana | 116 | 618,041 | 0.3 |
| Nebraska | 100 | 613,468 | 0.3 |
| Wisconsin | 80 | 578,601 | 0.3 |
| Hawaii | 56 | 526,423 | 0.3 |
| Foreign Country | 48 | 438,457 | 0.2 |
| District of Columbia | 34 | 339,854 | 0.2 |
| Maine | 15 | 328,874 | 0.2 |
| New Hampshire | 33 | 325,759 | 0.2 |
| New Mexico | 25 | 322,119 | 0.2 |
| North Dakota | 25 | 246,658 | 0.1 |
| Idaho | 31 | 219,215 | 0.1 |
| Utah | 35 | 215,652 | 0.1 |
| Rhode Island | 25 | 190,781 | 0.1 |
| West Virginia | 13 | 151,180 | 0.1 |
| Delaware | 13 | 145,587 | 0.1 |
| Wyoming | 11 | 144,579 | 0.1 |
| Montana | 25 | 85,202 | 0.0[*] |
| South Dakota | 16 | 79,720 | 0.0[*] |
| Alaska | 15 | 59,765 | 0.0[*] |
| Vermont | 6 | 56,361 | 0.0[*] |
| Armed Forces Europe | 14 | 39,586 | 0.0[*] |
| Armed Forces Pacific | 3 | 25,982 | 0.0[*] |
| Puerto Rico | 3 | 9,310 | 0.0[*] |
| Virgin Islands | 1 | 974 | 0.0[*] |
| Totals | 29,132 | $201,530,098 | 100.0% |

[*]Less than 0.05%, but greater than 0.00%.

**Distribution of the Financed Eligible Loans by
Current Repayment Schedule
(as of the Statistical Cut-Off Date)**

| Current Repayment Schedule | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Non-Income-Based Repayment | 12,430 | $ 84,065,423 | 41.7% |
| Income-Based Repayment (Partial Financial Hardship)[1] | 8,774 | 71,772,757 | 35.6 |
| Income-Based Repayment (Permanent Standard)[2] | 7,928 | 45,691,917 | 22.7 |
| Totals | 29,132 | $201,530,098 | 100.0% |

[1] A borrower has a partial financial hardship if the annual payment amount on all eligible FFELP and Direct Loans exceeds 15% of the difference between the borrower's adjusted gross income and 150% of the U.S. Department of Health and Human Services poverty guideline applicable to the borrower's family size and state of residence. Eligible FFELP and Direct loans include the outstanding balances on all loans except a defaulted loan, a FFELP or Direct parent PLUS loan and a FFELP or Direct Consolidation loan that repaid a FFELP or Direct parent PLUS loan.

[2] For repayment schedules available to a borrower under the income-based repayment plan. The payment amount is calculated on the basis of both of the following: the borrower's outstanding loan balance when the borrower begins repayment under an income-based repayment plan and a 10-year repayment period.

**Distribution of the Financed Eligible Loans by
Date of Disbursement
(Dates Correspond to Changes in Special Allowance Payment)
(as of the Statistical Cut-Off Date)**

| Date of Disbursement | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Pre-April 1, 2006* | 14,869 | $ 77,199,885 | 38.3% |
| April 1, 2006 through September 30, 2007 | 11,820 | 103,512,592 | 51.4 |
| October 1, 2007 and after** | 2,443 | 20,817,620 | 10.3 |
| Totals | 29,132 | $201,530,098 | 100.0% |

*The Higher Education Act provides that for certain FFELP Loans first disbursed prior to April 1, 2006 lenders are entitled to retain student loan interest income in excess of the special allowance support level for such loans, in instances when the loan rate exceeds the Special Allowance Payments. However, lenders are not allowed to retain such excess interest income on other loans, including FFELP Loans disbursed on or after April 1, 2006, and are required to rebate any such "excess interest" to the Secretary on a quarterly basis. For FFELP Loans disbursed on or after April 1, 2006 and before July 1, 2010, if the stated interest rate is higher than the rate applicable to such FFELP Loan including Special Allowance Payments ("SAP"), the holder of the FFELP Loan must credit the difference to the Department of Education. See the caption "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Special Allowance Payments" hereto.

**FFELP Loans disbursed on or after October 1, 2007 have a higher SAP margin for eligible not-for-profit lenders such as the Issuer than for profit lenders, but have a 40 bps to 70 bps lower Special Allowance Payment margin than loans originated on or after January 1, 2000 and before October 1, 2007.

**Distribution of the Financed Loans by Date of Disbursement and Loan Type[1]**
**(Dates Correspond to Changes in Special Allowance Payment)**
**(As of the Statistical Cut-Off Date)**

| Date of Disbursement and Loan Type[1] | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| **Consolidation Loans:** | | | |
| Before April 1, 2006[2] | 2,356 | $ 25,241,509 | 12.5% |
| April 1, 2006 – September 30, 2007 | 5,476 | 70,134,608 | 34.8 |
| On or After October 1, 2007 | 617 | 12,735,316 | 6.3 |
| Sub-Total | 8,449 | $108,111,433 | 53.6% |
| **Non-Consolidation Loans:** | | | |
| Before April 1, 2006[3] | 12,513 | $51,958,376 | 25.8% |
| April 1, 2006 – September 30, 2007 | 6,344 | 33,377,984 | 16.6 |
| On or After October 1, 2007 | 1,826 | 8,082,304 | 4.0 |
| Sub-Total | 20,683 | $93,418,665 | 46.4% |

---

[1] The Higher Education Act provides that for certain FFELP Loans first disbursed prior to April 1, 2006 lenders are entitled to retain student loan interest income in excess of the special allowance support level for such loans, in instances when the loan rate exceeds the Special Allowance Payments. However, lenders are not allowed to retain such excess interest income on other loans, including FFELP Loans disbursed on or after April 1, 2006, and are required to rebate any such "excess interest" to the Secretary on a quarterly basis. For FFELP Loans disbursed on or after April 1, 2006 and before July 1, 2010, if the stated interest rate is higher than the rate applicable to such FFELP Loan including Special Allowance Payments ("SAP"), the holder of the FFELP Loan must credit the difference to the Department of Education. FFELP Loans disbursed on or after October 1, 2007 have a higher SAP margin for eligible not-for-profit lenders such as the Corporation than for-profit lenders, but have a 40 bps to 70 bps lower SAP margin for such eligible not-for-profit lenders than loans originated on or after January 1, 2000 and before October 1, 2007.

[2] The weighted average annual interest rate of loans in this category is 4.31%.

[3] The weighted average annual interest rate of loans in this category is 2.45%.

[Remainder of page intentionally left blank]

**Distribution of the Financed Eligible Loans by Guaranty Agency (as of the Statistical Cut-Off Date)**

| Guaranty Agency | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Missouri Department of Higher Education | 17,015 | $109,385,309 | 54.3% |
| Pennsylvania Higher Education Assistance Agency | 2,377 | 38,079,751 | 18.9 |
| Ascendium Education Solutions, Inc. | 4,064 | 21,341,252 | 10.6 |
| Education Credit Management Corporation | 2,862 | 17,873,035 | 8.9 |
| National Student Loan Program | 1,890 | 10,842,238 | 5.4 |
| Texas Guaranteed Student Loan Corporation | 329 | 1,927,564 | 1.0 |
| Kentucky Higher Education Assistance Authority | 134 | 698,355 | 0.3 |
| New York State Higher Education Services Corporation | 225 | 565,303 | 0.3 |
| American Student Assistance | 143 | 482,883 | 0.2 |
| Illinois Student Assistance Commission | 92 | 330,816 | 0.2 |
| Other | 1 | 3,592 | 0.0[*] |
| Totals | 29,132 | $201,530,098 | 100.0% |

[*] Less than 0.05%, but greater than 0.00%.

**Distribution of the Financed Eligible Loans by Borrower Age (as of the Statistical Cut-Off Date)**

| Borrower Age | Number of Loans | Aggregate Outstanding Principal Balance | Percent by Aggregate Outstanding Principal Balance |
|---|---|---|---|
| Unknown | 25 | $ 126,522 | 0.1% |
| 31 - 40 | 11,241 | 51,287,834 | 25.4 |
| 41 - 50 | 10,850 | 78,908,287 | 39.2 |
| 51 - 60 | 4,056 | 34,300,633 | 17.0 |
| 61 - 70 | 2,329 | 27,457,101 | 13.6 |
| 71 - 80 | 603 | 8,803,745 | 4.4 |
| 81 - 90 | 28 | 645,976 | 0.3 |
| Totals | 29,132 | $201,530,098 | 100.0% |

**Borrower Benefits**

With respect to the Financed Eligible Loans that are expected to be pledged to the Trustee under the Indenture, the Issuer offers certain borrower benefits in the form of interest rate and principal reductions for prompt and regular payments or payments made by automatic loan draft, as well as loan forgiveness for certain borrowers. All percentages of the Financed Eligible Loans described below are based on the outstanding principal balance of the Financed Eligible Loans as of the statistical cut-off date.

*Rate Relief Programs*. As of the Statistical Cut-off Date, all of the Financed Eligible Loans are eligible (of which approximately 18.8% of the Financed Eligible Loans are receiving), an interest rate reduction of 0.25% for borrowers using auto-debit to make loan payments. In addition, approximately 1.5% of the Financed Eligible Loans are receiving an interest rate reduction that ranges from 2.0% to 4.0%. Except for the 0.25% interest rate reduction for borrowers using auto-debit to make loan payments, the rate relief programs closed to new enrollments on January 1, 2010. Any borrower on a Financed Eligible Loan who is not currently participating in a rate relief program or is hereafter disqualified from a rate relief program for any reason will only be eligible for the 0.25% interest rate reduction for borrowers using auto-debit to make loan payments in the future.

*Missouri Public Service Reward Program*. Less than 0.001% of the Financed Eligible Loans are receiving an interest rate reduction from an original borrower rate to a fixed rate of 3.25%. The remaining Financed Eligible Loans are not eligible for such interest rate reduction.

*Repayment Balance Reduction*. All of the Financed Eligible Loans which are eligible for this program have already received a principal balance reduction of 2.0% in principal after making a prompt first month payment. No Financed Eligible Loans are eligible for any further principal balance reduction.

The Issuer may discontinue, increase or modify the benefits offered by these programs at any time, but only subject to the provisions of the Indenture. The Issuer cannot accurately predict the number of borrowers that will utilize the borrower benefits provided under these programs. The greater the number of borrowers that utilize such benefits with respect to Financed Eligible Loans, the lower the total loan receipts on such Financed Eligible Loans. See the captions "RISK FACTORS—Incentive or borrower benefit programs may affect your Notes" and "THE ISSUER'S FFEL PROGRAM" herein.

## DESCRIPTION OF THE NOTES

**General**

The Notes will be issued pursuant to the terms of the Indenture between the Issuer and U.S. Bank National Association, as Trustee. The Indenture and the Notes will each be governed by the laws of the State of Missouri. The following summary describes the material terms of the Notes and related provisions of the Indenture. However, it is not complete and is qualified in its entirety by the actual provisions of the Indenture and the Notes. Certain other provisions of the Indenture are described under the captions "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES" and "SUMMARY OF THE INDENTURE PROVISIONS" herein.

**Interest Payments**

Interest will accrue on the Notes at the interest rate described below during each Interest Accrual Period. The initial Interest Accrual Period for the Class A-1A Notes begins on the Date of Issuance and ends on November 24, 2021 and the initial Interest Accrual Period for the Class A-1B Notes and the Class B Notes begins on the Date of Issuance and ends on November 25, 2021. For all other Monthly Distribution

Dates, (a) the Interest Accrual Period for the Class A-1A Notes, will begin on (and include) the twenty-fifth day of a month, whether or not a Business Day, and end on (and include) the twenty-fourth day of the following month (notwithstanding that the actual Monthly Distribution Date may occur after the twenty-fifth day of either such month); and (b) the Interest Accrual Period for the Class A-1B Notes and Class B Notes will begin on the prior Monthly Distribution Date and end on the day before such Monthly Distribution Date.

Interest on the Notes will be payable to the Noteholders on each Monthly Distribution Date commencing November 26, 2021. Monthly Distribution Dates for the Notes will be on the twenty-fifth day of each calendar month, or if any such day is not a Business Day, the next Business Day. Interest accrued but not paid on any Monthly Distribution Date will be due on the next Monthly Distribution Date together with an amount equal to interest on the unpaid amount at the applicable rate per annum described below.

The Class A-1A Notes will bear interest at a fixed rate equal to 1.58% per annum.

The Class A-1B Notes will bear interest at an annual rate equal to the applicable Benchmark (initially One-Month LIBOR), except for the initial Interest Accrual Period, plus 0.57%.

The Class B Notes will bear interest at an annual rate equal to the applicable Benchmark (initially One-Month LIBOR), except for the initial Interest Accrual Period, plus 1.15%.

If One-Month LIBOR or the then current Benchmark is less than 0.00% for any Interest Accrual Period, the Benchmark shall be deemed to be 0.00% and the interest rate for the Class A-1B Notes and the Class B Notes for such Interest Accrual Period shall be deemed to be the interest rate margin set forth above for such class of Notes.

The Trustee will obtain One-Month LIBOR and the Issuer will calculate the applicable interest rate on the Class A-1B Notes and Class B Notes on the second Business Day prior to the start of the applicable Interest Accrual Period; provided that if One-Month LIBOR does not appear on a page of a financial reporting service in general use in the financial services industry, the Issuer will obtain One-Month LIBOR. Additionally, if One-Month LIBOR is no longer an available benchmark rate, the Issuer will cause an alternative rate to be calculated as described under the caption "Benchmark Transition Event" below.

The rate of interest on the Class A-1B Notes and the Class B Notes for the initial Interest Accrual Period will be determined by reference to the following formula:

$x + [(a / b) * (y–x)] + 0.57\%$ for the Class A-1B Notes and $+ 1.15\%$ for the Class B Notes

where:

$x$ = two-month LIBOR;

$y$ = three-month LIBOR;

$a$ = the actual number of days from the maturity date of two-month LIBOR to the first Monthly Distribution Date; and

$b$ = the actual number of days from the maturity date of two-month LIBOR to the maturity date of three-month LIBOR.

Interest accrued on the outstanding principal balance of each class of the Notes during each Interest Accrual Period will be paid on the following Monthly Distribution Date in the order and priority described under the caption "—Flow of Funds" below.

Failure to pay interest on the Class B Notes is not an Event of Default so long as any of the Class A Notes remain outstanding.

The Issuer will calculate the rate of interest on the Class A-1B Notes and the Class B Notes on the LIBOR determination date described below. The amount of interest distributable to holders of the Notes for each $1,000 in original principal amount will be calculated by applying the applicable interest rate for the Interest Accrual Period to the outstanding principal amount of each original principal amount of $1,000, multiplying that product by (a) 30 days for the Class A-1A Notes divided by 360; and (b) the actual number of days in the Interest Accrual Period for the Class A-1B Notes and the Class B Notes divided by 360, and rounding the resulting figure to the fifth decimal point.

**Calculation of LIBOR**

For each Interest Accrual Period, One-Month LIBOR will be determined by the Issuer by reference to the London Interbank Offered Rate (LIBOR) for deposits in U.S. Dollars having a maturity of one month which appears on Reuters LIBOR01 Page, or another page of this or any other financial reporting service in general use in the financial services industry, as of 11:00 a.m., London time, on the related LIBOR determination date. The LIBOR determination date will be the second Business Day before the beginning of each Interest Accrual Period. If this rate does not appear on Reuters LIBOR01 Page, or another page of this or any other financial reporting service in general use in the financial services industry, and the Issuer has not made a determination that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred, One-Month LIBOR in effect for the applicable Interest Accrual Period will be One-Month LIBOR in effect for the previous Interest Accrual Period.

**Benchmark Transition Event**

Interest on the Class A-1B Notes and Class B Notes will accrue at a floating rate based on a "Benchmark," which will initially be One-Month LIBOR, but will be replaced by the Benchmark Replacement following the occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date as described below. As described under the caption "RISK FACTORS—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" herein, in the Issuer's opinion, the FCA/IBA Announcements on future cessation and loss of representativeness of the LIBOR benchmarks constitute a "Benchmark Transition Event" under the Indenture; however, the related Benchmark Replacement Date has not yet occurred and so the Class A-1B Notes and the Class B Notes will accrue interest by reference to LIBOR until such related Benchmark Replacement Date or another Benchmark Transition Event and its related Benchmark Replacement Date occur. If the Issuer determines that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any determination of the Benchmark on any date, the Benchmark Replacement will replace the then current Benchmark for all purposes relating to the Class A-1B Notes and Class B Notes in respect of such determination on such date and all determinations on all subsequent dates. If the Benchmark for the Class A-1B Notes and Class B Notes changes from One-Month LIBOR to another Benchmark, it is possible that the change may result in a deemed taxable exchange. Whether a particular investor recognizes gain will depend upon the investor's basis in the Class A-1B Notes and Class B Notes, the relationship between One-Month LIBOR and the other Benchmark at the time of the change, and other factors such as whether quotations on the Class A-1B Notes and Class B Notes are readily available.

The Internal Revenue Service (the "Service") has proposed regulations and issued additional guidance (the "LIBOR Proposed Regulations") concerning certain U.S. federal income tax consequences resulting from the transition from interbank offered rates (such as LIBOR) to other reference rates in debt instruments. The LIBOR Proposed Regulations, among other things, establish a safe harbor under which certain changes to the terms of a debt instrument in connection with the elimination of LIBOR will not be treated as a significant modification of the debt instrument resulting in a deemed exchange of the debt instrument under Section 1001 of the Code, including an alteration of the terms of a debt instrument to include a qualified rate as a fallback to a LIBOR reference rate and any associated alteration that is reasonably necessary to adopt or to implement the inclusion of a qualified fallback rate. A "qualified rate" is any one of the rates specified in the LIBOR Proposed Regulations; provided that the fair market value of the debt instrument after the alteration is substantially equivalent to the fair market value of the debt instrument before the alteration. Specified qualified rates include the Secured Overnight Financing Rate published by the Federal Reserve Bank of New York (SOFR), any rate that is determined by reference to another qualified rate (including a rate determined by adding or subtracting a specified number of basis points to or from the rate or by multiplying the rate by a specified number), certain qualified floating rates specified in the Treasury Regulations, and certain other rates that may be selected, endorsed or recommended by a central bank, reserve bank, monetary authority or similar institution (including any committee or working group thereof) or the Service in the future. See the caption "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS—Sale or Exchange of Notes" herein.

In connection with the implementation of a Benchmark Replacement, the Issuer will have the right from time to time to make "Benchmark Replacement Conforming Changes," which are any technical, administrative or operational changes (including changes to the definition of "Interest Accrual Period," timing and frequency of determining rates and making payments of interest, and other administrative matters) that the Issuer decides may be appropriate to reflect the adoption of such Benchmark Replacement in a manner substantially consistent with market practice (or, if the Issuer decides that adoption of any portion of such market practice is not administratively feasible or if the Issuer determines that no market practice for use of the Benchmark Replacement exists, in such other manner as the Issuer determines is reasonably necessary).

Notice of the occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date, the determination of a Benchmark Replacement and the making of any Benchmark Replacement Conforming Changes will be included in the monthly report to Noteholders and the Issuer shall also provide written notice to the Trustee of a Benchmark Transition Event and its Benchmark Replacement Date no later than one Business Day after the occurrence of such Benchmark Transition Event. Notwithstanding anything in the transaction documents to the contrary, upon the inclusion of such information in the monthly report to the Noteholders, the relevant transaction documents will be deemed to have been amended to reflect the new Unadjusted Benchmark Replacement, Benchmark Replacement Adjustment and/or Benchmark Replacement Conforming Changes without further compliance with the amendment provisions of the relevant transaction documents.

Any determination, decision or election that may be made by the Issuer in connection with a Benchmark Transition Event or Benchmark Replacement, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error, may be made in the Issuer's sole discretion, and, notwithstanding anything to the contrary in the documentation relating to the Class A-1B Notes and Class B Notes, shall become effective without consent from any other party. None of the Issuer, the Trustee, the Servicer, or the Backup Servicer will have any liability for any determination made by or on behalf of the Issuer in connection with a Benchmark Transition Event or a Benchmark Replacement as described above, and each Noteholder, by its acceptance of a Class A-1B Note or a Class B Note or a beneficial interest in a Class A-1B Note or Class B Note, will

be deemed to waive and release any and all claims against the Issuer, the Trustee, the Servicer, or the Backup Servicer relating to any such determinations.

The Trustee shall not be under any obligation to (a) monitor, determine or verify the unavailability or cessation of LIBOR (or other applicable Benchmark), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any Benchmark Transition Event or Benchmark Replacement Date; (b) select, determine or designate any Benchmark Replacement, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied; (c) select, determine or designate any Benchmark Replacement Adjustment, or other modifier to any replacement or successor index; or (d) determine whether or what Benchmark Replacement Conforming Changes are necessary or advisable, if any, in connection with any of the foregoing. The Trustee shall not be liable for any inability, failure or delay on its part to perform any of its duties set forth in the Indenture as a result of the unavailability of LIBOR (or other applicable Benchmark) and absence of a designated replacement Benchmark, including as a result of any inability, delay, error or inaccuracy on the part of any other transaction party, including without limitation the Issuer, in providing any direction, instruction, notice or information required or contemplated by the terms of the Indenture and reasonably required for the performance of such duties. The Trustee shall not be liable to any Noteholder for any losses, claims, damages, liabilities, forfeitures, fines, penalties, costs, fees or expenses (including attorneys' fees) sustained by any Noteholder resulting from the adoption of, a Benchmark Replacement or any related actions taken pursuant to the Indenture. The Trustee shall not be obligated to obtain LIBOR or determine the interest rate on any Notes after a Benchmark Replacement has taken effect in accordance with the Indenture.

"*Asset Replacement Percentage*" means, on any date of calculation, a fraction (expressed as a percentage) where the numerator is the aggregate outstanding principal balance of the Financed Eligible Loans, the Special Allowance Payments on which were indexed to the Benchmark Replacement, as of such calculation date and the denominator is the aggregate outstanding principal balance of the Financed Eligible Loans as of such calculation date.

"*Benchmark*" means, initially, One-Month LIBOR; provided that if the Issuer determines that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to One-Month LIBOR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement.

"*Benchmark Replacement*" means the first alternative set forth in the order below that can be determined by the Issuer as of the Benchmark Replacement Date:

(a)     the sum of: (i) Term SOFR; and (ii) the Benchmark Replacement Adjustment;

(b)     in the sole discretion of the Issuer, either (i) the sum of: (A) Compounded SOFR; and (B) the Benchmark Replacement Adjustment; or (ii) the sum of: (A) Simple Average SOFR; and (B) the Benchmark Replacement Adjustment;

(c)     the sum of: (i) the alternate rate of interest that has been selected or recommended by the Relevant Governmental Body as the replacement for the then-current Benchmark for the applicable Corresponding Tenor; and (ii) the Benchmark Replacement Adjustment; or

(d)     the sum of: (i) the alternate rate of interest that has been selected by the Issuer as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to any industry-accepted rate of interest as a replacement for the then-current

Benchmark for U.S. dollar denominated securitization transactions at such time; and (ii) the Benchmark Replacement Adjustment.

If a Benchmark Replacement is selected pursuant to clause (b) above, then on the first day of each month following such selection, if a redetermination of the Benchmark Replacement on such date would result in the selection of a Benchmark Replacement under clause (a) above, then (A) the Benchmark Replacement Adjustment shall be redetermined on such date utilizing the Unadjusted Benchmark Replacement corresponding to the Benchmark Replacement under clause (a) above; and (B) such redetermined Benchmark Replacement shall become the Benchmark on each determination date on or after such date. If redetermination of the Benchmark Replacement on such date as described in the preceding sentence would not result in the selection of a Benchmark Replacement under clause (a) above, then the Benchmark shall remain the Benchmark Replacement as previously determined pursuant to clause (b) above.

"*Benchmark Replacement Adjustment*" means the first alternative set forth in the order below that can be determined by the Issuer as of the Benchmark Replacement Date:

(a)     the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected or recommended by the Relevant Governmental Body for the applicable Unadjusted Benchmark Replacement; or

(b)     the spread adjustment (which may be a positive or negative value or zero) that has been selected by the Issuer giving due consideration to any industry-accepted spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then-current Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar denominated securitization transactions at such time.

"*Benchmark Replacement Date*" means:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein, and (ii) the date on which the administrator of the Benchmark permanently or indefinitely ceases to provide the Benchmark;

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein; or

(c)     in the case of clause (d) of the definition of "Benchmark Transition Event," the Business Day following the date of such monthly report to the Noteholders.

provided, however, that on or after the sixtieth day preceding the date on which such Benchmark Replacement Date would otherwise occur (if applicable), the Issuer may give written notice to security holders in which the Issuer designates an earlier date (but not earlier than the thirtieth day following such notice) and represents that such earlier date will facilitate an orderly transition of the transaction to the Benchmark Replacement, in which case such earlier date shall be the Benchmark Replacement Date.

For the avoidance of doubt, if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination.

"*Benchmark Transition Event*" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

      (a)     a public statement or publication of information by or on behalf of the administrator of the Benchmark announcing that such administrator has ceased or will cease to provide the Benchmark, permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark;

      (b)     a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark, the central bank for the currency of the Benchmark, an insolvency official with jurisdiction over the administrator for the Benchmark, a resolution authority with jurisdiction over the administrator for the Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for the Benchmark, which states that the administrator of the Benchmark has ceased or will cease to provide the Benchmark permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark;

      (c)     a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark announcing that the Benchmark is no longer representative; or

      (d)     the Asset Replacement Percentage is greater than 50%, as reported in the most recent monthly report to the Noteholders.

On March 5, 2021, the ICE Benchmark Administration (the "IBA"), the administrator of LIBOR, and the Financial Conduct Authority, the regulatory supervisor of the IBA, declared in public statements (the "Public Statements") that the final publication or representativeness date for USD LIBOR for (i) one week and two month LIBOR settings will be December 31, 2021 and (ii) overnight, one month, three month, six month and 12 month LIBOR settings will be June 30, 2023.  At the time of the Public Statements no successor administrator was named to continue to provide the Benchmark.  The Public Statements resulted in the occurrence of a Benchmark Transition Event with respect to LIBOR and any obligation to notify of this Benchmark Transition Event shall be deemed satisfied.

As described above and under the caption "RISK FACTORS—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" herein, the FCA/IBA Announcements on future cessation and loss of representativeness of the LIBOR benchmarks constitute a "Benchmark Transition Event" under the Indenture; however, the related Benchmark Replacement Date has not yet occurred and so the Class A-1B Notes and the Class B Notes will accrue interest by reference to LIBOR until such related Benchmark Replacement Date or another Benchmark Transition Event and its related Benchmark Replacement Date occur.

"*Business Day*" means (a) for purposes of calculating LIBOR, any day on which banks in New York, New York, United States of America and London, England are open for the transaction of international business; and (b) for all other purposes, any day other than (i) a Saturday; (ii) a Sunday; or (iii) a day on which the Federal Reserve Bank or banks located in St. Louis, Missouri or the city in which the office of the Trustee from which the Indenture is being administered is located (initially Cincinnati, Ohio), are not authorized or required by law, regulation or executive order to remain closed.

"*Carryover Servicing Fees*" shall mean any fee for servicing the Financed Eligible Loans not permitted to be paid from funds available under clause THIRD described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein; the

Carryover Servicing Fees shall initially be equal to $0.00 and may only be increased upon satisfaction of the Rating Agency Condition.

"*Compounded SOFR*" means the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which, for example, may be compounded in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Accrual Period or compounded in advance) being established by the Issuer in accordance with:

      (a)     the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; provided that

      (b)     if, and to the extent that, the Issuer determines that Compounded SOFR cannot be determined in accordance with clause (a) above, then the rate, or methodology for this rate, and conventions for this rate that have been selected by the Issuer giving due consideration to any industry-accepted market practice for U.S. dollar denominated securitization transactions at such time.

"*Corresponding Tenor*" means, with respect to a Benchmark Replacement, a tenor (including overnight) having approximately the same length (disregarding Business Day adjustment) as the applicable tenor for the then-current Benchmark.

"*Federal Reserve Bank of New York's Website*" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"*Reference Time*" means, with respect to any determination of the Benchmark, (a) if the Benchmark is LIBOR, 11:00 a.m., London time, on the day that is two Business Days preceding the date of such determination; and (b) if the Benchmark is not LIBOR, the time determined by the Issuer in accordance with the Benchmark Replacement Conforming Changes or LIBOR Related Amendment, as applicable.

"*Relevant Governmental Body*" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"*Simple Average SOFR*" means the simple average of SOFRs for the applicable Corresponding Tenor, with the conventions for this rate (which, for example, may be in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period or in advance) being established by the Issuer in accordance with:

      (a)     the conventions for this rate selected or recommended by the Relevant Governmental Body for determining simple average SOFR; provided that

      (b)     if, and to the extent that, the Issuer determines that Simple Average SOFR cannot be determined in accordance with clause (a) above, then the conventions for this rate that have been selected by the Issuer giving due consideration to any industry-accepted market practice for U.S. dollar denominated securitization transactions at such time.

"*SOFR*" means, with respect to any day, the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"*Term SOFR*" means the forward-looking term rate for the applicable Corresponding Tenor based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"*Unadjusted Benchmark Replacement*" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

**Principal Distributions**

The final Maturity Date for each class of the Notes will be August 25, 2061.

The actual date on which the final distribution on each class of the Notes will be made is expected to be earlier than the final Maturity Date set forth above as a result of a variety of factors. Principal payments will be made to the Noteholders on each Monthly Distribution Date in an amount equal to the lesser of:

(a)    the Principal Distribution Amount for that Monthly Distribution Date; and

(b)    funds available for the payment of principal as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein.

There may not be sufficient funds available to pay the full Principal Distribution Amount on each Monthly Distribution Date. Amounts on deposit in the Reserve Fund in excess of the Specified Reserve Fund Balance will be transferred to the Collection Fund and will be applied as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein. Principal payments due on the Notes will be made from the Reserve Fund only (a) on the final Maturity Date for the Notes; or (b) on any Monthly Distribution Date when the market value of securities and cash in the Reserve Fund and the Collection Fund is sufficient to pay the remaining principal amount of and interest accrued on the Notes; or (c) upon the exercise of the option to prepay the Notes as described in the subsequent caption.

Principal will be paid, first, on the Class A Notes ratably until paid in full and, second, on the Class B Notes until paid in full.

"*Principal Distribution Amount*" means, as determined by the Issuer for each Monthly Distribution Date other than a Note Final Maturity Date, the amount, not less than zero, by which (a) the Outstanding Amount of the Notes immediately prior to such Monthly Distribution Date exceeds (b) the Adjusted Pool Balance for that Monthly Distribution Date less the Specified Overcollateralization Amount. Notwithstanding the foregoing; (i) on or after the Maturity Date for a class of Notes, the Principal Distribution Amount shall not be less than the amount that is necessary to reduce the outstanding principal balance of such class of Notes to zero; and (ii) the Principal Distribution Amount shall not exceed the Outstanding Amount of the Notes as of any Monthly Distribution Date (before giving effect to any distributions on such Monthly Distribution Date).

"*Specified Overcollateralization Amount*" means for any Monthly Distribution Date, the greater of:

(a)    6.5% of the Adjusted Pool Balance for that Monthly Distribution Date; and (b) $4,000,000.

"*Adjusted Pool Balance*" means, for any Monthly Distribution Date, the sum of the Pool Balance as of the end of the immediately preceding Collection Period and the amounts on deposit in the Capitalized

Interest Fund and the Reserve Fund on such Monthly Distribution Date after giving effect to any payments to or releases from the Capitalized Interest Fund and the Reserve Fund.

The Principal Distribution Amount is intended to provide credit support so that, if sufficient funds are available on each Monthly Distribution Date, the Adjusted Pool Balance will continue to exceed the Outstanding Amount of the Notes by the greater of (a) 6.5% of the Adjusted Pool Balance for that Monthly Distribution Date; and (b) $4,000,000.

"*Pool Balance*" means, for any date, the aggregate principal balance of the Financed Eligible Loans on that date, including accrued interest that is expected to be capitalized, after giving effect to the following, without duplication:

(a)    all payments received by the Issuer through that date from borrowers;

(b)    all amounts received by the Issuer through that date from required purchases or repurchases of Financed Eligible Loans by Servicers or sellers;

(c)    all Liquidation Proceeds and Realized Losses on the Financed Eligible Loans through that date;

(d)    the amount of any adjustment to balances of the Financed Eligible Loans that the Servicer makes under its related servicing agreement, if any, recorded through that date; and

(e)    the amount by which Guaranty Agency reimbursements of principal on defaulted Financed Eligible Loans through that date are reduced from 100% to 97%, or other applicable percentage, as required by the risk sharing provisions of the Higher Education Act.

In addition to the principal payments described above, (i) if a Principal Acceleration Trigger is in effect for any Monthly Distribution Date occurring on and after the October 2026 Monthly Distribution Date through and including the September 2031 Monthly Distribution Date, (ii) on and after the October 2031 Monthly Distribution Date or (iii) if the Financed Eligible Loans are not released from the lien of the Indenture when permitted pursuant to the optional prepayment described below, the Notes may receive supplemental payments of principal from certain money remaining in the Collection Fund as described under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" herein. Such supplemental payments of principal could result in the Notes being paid in full prior to their final maturity.

Each principal payment on a class of Notes will be allocated to all Noteholders of such class of Notes on a pro rata basis, based upon the principal amounts of such class of Notes held by each such Noteholder.

**Optional Prepayment of Notes When the
Then Outstanding Pool Balance is 10% or
Less of Initial Pool Balance**

The Issuer shall have the option to direct the release of all of the Financed Eligible Loans in whole on the Monthly Distribution Date next succeeding the last day of the Collection Period on which the then outstanding Pool Balance is 10% or less of the initial Pool Balance and on any Monthly Distribution Date thereafter. If this release option is exercised, the Financed Eligible Loans and other remaining trust assets will be released to the Issuer free from the lien of the Indenture.

For the Issuer to exercise this release option, the Issuer must deposit in the Collection Fund an amount that, when combined with amounts on deposit in the other funds and accounts held under the Indenture, would be sufficient to:

(a)    reduce the Outstanding Amount of the Notes then outstanding on the related Monthly Distribution Date to zero;

(b)    pay to the Noteholders the interest payable on the related Monthly Distribution Date; and

(c)    pay any Monthly Consolidation Rebate Fees and other amounts payable to the Department of Education, pay amounts payable under any Joint Sharing Agreements or otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, and pay unpaid Administration Fees, Servicing Fees, Trustee Fees and Program Fees.

**Prepayment, Yield and Maturity Considerations**

Generally, all of the Financed Eligible Loans are pre-payable in whole or in part, without penalty, by the borrowers at any time, or as a result of a borrower's default, death, disability or bankruptcy and subsequent liquidation or collection of guarantee payments with respect to such loans. The rates of payment of principal on the Notes and the yield on the Notes may be affected by prepayments of the Financed Eligible Loans. Because prepayments generally will be paid through to Noteholders as distributions of principal, it is likely that the actual final payments on the Notes will occur prior to the final Maturity Date of the Notes. Accordingly, in the event that the Financed Eligible Loans experience significant prepayments, the actual final payments on the Notes may occur substantially before the final Maturity Date, causing a shortening of the weighted average life of the Notes. Weighted average life refers to the average amount of time that will elapse from the Date of Issuance of a Note until each dollar of principal of such Note will be repaid to the investor.

The rate of prepayments on the Financed Eligible Loans cannot be predicted and may be influenced by a variety of economic, social and other factors. See the caption "Social and economic factors may adversely affect repayment of the Financed Eligible Loans" above.

Generally, the rate of prepayments may tend to increase to the extent that alternative financing becomes available on more favorable terms or at interest rates significantly below the interest rates payable on the Financed Eligible Loans. In addition, the Issuer is obligated to purchase from the Trust Estate created under the Indenture (or substitute a similar Eligible Loan) any Financed Eligible Loan that is determined to be encumbered by a lien other than the lien of the Indenture and if the same is not cured within the applicable cure period. If any Financed Eligible Loan ceases to be Guaranteed or Insured, and as a result thereof, a Guarantee or Insurance claim with respect to such Financed Eligible Loan is rejected by the applicable Guaranty Agency or an Insurance claim is not paid by the Secretary and the same is not cured within 180 days after such rejection, or if any Financed Eligible Loan is determined to be encumbered by any lien other than the lien of this Indenture, then the Issuer shall, if it is the Servicer, or shall cause the Servicer to, either: (i) purchase such Financed Eligible Loan from the Trust Estate for a purchase price equal to its principal amount plus unamortized premium, if any, and interest accrued thereon; or (ii) replace such Financed Eligible Loan with another Financed Eligible Loan of substantially identical characteristics; and provided, however, that, with respect to a third-party Servicer, this provision shall be applicable only to the extent that such repurchase or replacement is provided by the applicable Servicing Agreement. As of the Statistical Cut-Off Date, $9,496,737 of the principal amount of the Financed Eligible Loans (representing

approximately 4.71% of the Financed Eligible Loans by principal amount) are "rehabilitation loans," which are Eligible Loans that have previously defaulted, but for which the borrower thereunder has made a specified number of on-time payments as described in "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Insurance and Guarantees—*Rehabilitation of Defaulted Loans*" hereto.  Although rehabilitation loans benefit from the same guarantees as other FFELP student loans, rehabilitation loans have generally experienced re-default rates that are higher than default rates for FFELP student loans that have not previously defaulted.

Scheduled payments with respect to the Financed Eligible Loans may be reduced and the maturities of Financed Eligible Loans may be extended, including pursuant to grace periods, deferral periods and forbearance periods.  The rate of payment of principal on the Notes and the yield on the Notes may also be affected by the rate of defaults resulting in losses on the Financed Eligible Loans that may have been liquidated, by the severity of those losses and by the timing of those losses, which may affect the ability of the Guaranty Agencies (including the State Guaranty Agency) to make guarantee payments on such Financed Eligible Loans.  In addition, the maturity of certain of the Financed Eligible Loans may extend beyond the final Maturity Date for the Notes.

More information on weighted average lives, expected maturities and percentages of original principal remaining at certain Monthly Distribution Dates for the Notes is set forth in "APPENDIX B—WEIGHTED AVERAGE LIVES, EXPECTED MATURITIES AND PERCENTAGES OF ORIGINAL PRINCIPAL REMAINING AT CERTAIN MONTHLY DISTRIBUTION DATES FOR THE NOTES" hereto.

## SECURITY AND SOURCES OF PAYMENT FOR THE NOTES

### General

The Notes will be limited obligations of the Issuer secured by and payable solely from the discrete Trust Estate pledged by the Issuer to the Trustee under the Indenture.  The following assets will serve as security for the Notes (collectively, the "Trust Estate"):

(a)     the Available Funds (other than moneys deposited in the Department SAP Rebate Fund and moneys released from the lien of the Trust Estate as provided in the Indenture);

(b)     all moneys and investments held in the funds created under the Indenture (other than the Department SAP Rebate Fund), and other than moneys and investments released from the lien of the Trust Estate as provided in the Indenture), including all proceeds thereof and all income thereon;

(c)     the Financed Eligible Loans held by the Issuer and pledged under the Indenture and all obligations of the obligors thereunder including all moneys received thereunder on or after the Cut-Off Date (but in no event including any Financed Eligible Loans released from the lien of the Trust Estate as provided in the Indenture);

(d)     the rights of the Issuer in and to any Servicing Agreement, any Backup Servicing Agreement, any Joint Sharing Agreement, any Student Loan Purchase Agreement, any Custodian Agreement, any Origination Agreement and the Guarantee Agreements as the same relate to the Financed Eligible Loans;

(e)     to the extent constituting or directly related to the components of the Trust Estate described in clauses (a) through (f), inclusive, property of the Issuer in the nature of Accounts,

General Intangibles (including Payment Intangibles), Promissory Notes, and Instruments (each as defined in the Uniform Commercial Code of the State of Missouri), but it shall not be necessary that an item be an Account, General Intangible, Payment Intangible, Promissory Note or Instrument for such item to be part of the Trust Estate if it is otherwise described, referenced, or included in clauses (a) through (d), or in this clause (e), but in no event shall this interest attach to any properties, cash or other trust estates of the Issuer which are unrelated to the properties described in clauses (a) through (d) above or this clause (e); and

(f)    all proceeds from any property described in clause (a) through (e) above and any and all other property, rights and interests of every kind or description that from time to time is specifically granted, conveyed, pledged, transferred, assigned or delivered to the Trustee as additional security under the Indenture.

**Funds**

The following funds will be created by the Trustee under the Indenture for the benefit of the Noteholders:

(a)    Student Loan Fund;

(b)    Capitalized Interest Fund;

(c)    Collection Fund;

(d)    Department SAP Rebate Fund;

(e)    Reserve Fund; and

(f)    Costs of Issuance Fund.

Money transferred from the Issuer or any other Servicer to the Trustee on account of the Financed Eligible Loans will be deposited into the Collection Fund for distribution in accordance with the terms of the Indenture. The Trustee will invest money held in funds created under the Indenture in Investment Securities at the written direction of the Issuer. Investment Securities may be purchased by the Trustee, through an affiliate of the Trustee or through a broker agent. Money in any fund created under the Indenture may be pooled for purposes of investment.

**Fund Deposits**

As described under the caption "USE OF PROCEEDS" herein, certain of the proceeds from the sale of the Notes will be used to make the initial deposits to the Capitalized Interest Fund, the Cost of Issuance Fund and the Reserve Fund described below. Certain of the remaining proceeds will be credited to the Student Loan Fund and immediately used to refinance certain of the Eligible Loans presently pledged by the Issuer under the Warehouse Agreement and certain Eligible Loans held unencumbered by the Issuer. Such refinanced Eligible Loans will be pledged to the Trustee under the Indenture and credited to the Trust Estate in the books and records of the Servicer.

**Student Loan Fund; Deposit of Financed Eligible Loans**

Certain proceeds of the Notes will be transferred to the lender under the Warehouse Agreement and to the Issuer in order to refinance the Financed Eligible Loans. On the Date of Issuance, such Eligible

Loans will be deposited into the Student Loan Fund created under the Indenture. Such Eligible Loans expected to be pledged on or about the Date of Issuance have been identified and are described under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein. Eligible Loans that are pledged to the Trust Estate created under the Indenture will be held by the Issuer and accounted for as a part of the Student Loan Fund.

**Reserve Fund**

On the Date of Issuance, a deposit will be made to the Reserve Fund in an amount equal to $1,307,534, which is 0.65% of the initial Pool Balance. On each Monthly Distribution Date, to the extent that money in the Collection Fund is not sufficient to pay amounts owed to the Department of Education and the Guaranty Agencies (other than to recall claims with respect to or for repurchases of Eligible Loans), to pay amounts payable under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, or to pay certain of the Issuer's operating expenses, including Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Trustee Fees and the interest then due on the Notes, the amount of the deficiency will be transferred from the Reserve Fund to the Collection Fund to the extent moneys are not available to be transferred to the Collection Fund from the Capitalized Interest Fund. Money withdrawn from the Reserve Fund will be restored through transfers from the Collection Fund as available. The Reserve Fund may also be used in connection with the optional release of Financed Eligible Loans and related prepayment of the Notes.

The Reserve Fund is subject to a Specified Reserve Fund Balance equal to the greater of (a) 0.65% of the Pool Balance as of the close of business on the last day of the immediately preceding Collection Period; and (b) $201,159; provided that in no event will such balance exceed the sum of the Outstanding Amount of the Notes; and provided further, that such Specified Reserve Fund Balance may be reduced upon satisfaction of the Rating Agency Condition.

The Reserve Fund is intended to enhance the likelihood of timely distributions of interest to the Noteholders and to decrease the likelihood that the Noteholders will experience losses. In some circumstances, however, the Reserve Fund could be reduced to zero. Amounts on deposit in the Reserve Fund in excess of the Specified Reserve Fund Balance will be transferred to the Collection Fund and will be applied as described under the caption "—Collection Fund; Flow of Funds" below. Other than such excess amounts, principal payments due on the Notes will be made from the Reserve Fund only (a) on the final Maturity Date for a class of Notes, or (b) on any Monthly Distribution Date when the market value of securities and cash in the Reserve Fund and the Collection Fund is sufficient to pay the remaining principal amount of and interest accrued on the Notes. The Reserve Fund may also be used in connection with the optional release of Financed Eligible Loans and prepayment of the Notes described under the caption "DESCRIPTION OF THE NOTES—Optional Prepayment of Notes When the Then Outstanding Pool Balance is 10% or Less of Initial Pool Balance" herein.

**Capitalized Interest Fund**

On the Date of Issuance, $6,000,000 will be deposited into the Capitalized Interest Fund. If on any Monthly Distribution Date, money on deposit in the Collection Fund is insufficient to pay amounts owed to the Department of Education and to the Guaranty Agencies (other than to recall claims with respect to or for repurchases of Eligible Loans), to pay amounts payable under any applicable Joint Sharing Agreement or to otherwise remove amounts deposited in the Trust Estate which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, or to pay Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Trustee Fees and interest on the Notes, then money on deposit in the Capitalized Interest Fund will be transferred to the Collection Fund to

cover the deficiency, prior to any amounts being transferred from the Reserve Fund. Amounts released from the Capitalized Interest Fund will not be replenished. On the September 2023 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $4,400,000 shall be transferred by the Trustee to the Collection Fund. On the September 2025 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $2,400,000 shall be transferred by the Trustee to the Collection Fund. On the September 2027 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund shall be transferred by the Trustee to the Collection Fund.

**Department SAP Rebate Fund**

The Trustee will establish the Department SAP Rebate Fund as part of the Trust Estate created under the Indenture. The Higher Education Act requires holders of Eligible Loans first disbursed on or after April 1, 2006 to rebate to the Department of Education interest received from borrowers on such loans that exceeds the applicable special allowance support levels. The Issuer expects that the Department of Education will reduce the special allowance and interest benefit payments payable to the Issuer by the amount of any such rebates owed by the Issuer. However, in certain circumstances the Issuer may owe a payment to the Department of Education or to another trust if amounts were deposited into the Trust Estate that represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans. If the Issuer believes that it is required to make any such payment, the Issuer will direct the Trustee to deposit into the Department SAP Rebate Fund from the Collection Fund the estimated amounts of any such payments. Money in the Department SAP Rebate Fund will be transferred to the Collection Fund to the extent amounts have been deducted by the Department of Education from payments otherwise due to the Issuer or will be paid to the Department of Education or another trust if necessary to discharge the Issuer's rebate obligation or to the Issuer to reimburse it for the amount so deducted. See "APPENDIX A— DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto.

**Costs of Issuance Fund**

On the Date of Issuance, $670,750 will be deposited into the Costs of Issuance Fund. Amounts deposited to the Costs of Issuance Fund shall be used to pay the costs of issuing the Notes as set forth in closing settlement instructions or an Issuer Order. On the November 2021 Monthly Distribution Date, the Trustee upon written instructions of the Issuer will transfer any amounts remaining in the Costs of Issuance Fund to the Collection Fund, unless the Issuer instructs the Trustee to retain an amount therein through a later date.

**Collection Fund; Flow of Funds**

The Trustee will credit to the Collection Fund all revenues derived from Financed Eligible Loans; all proceeds of any sale of Financed Eligible Loans; all amounts received under any Joint Sharing Agreement; any amounts transferred from the Student Loan Fund, Capitalized Interest Fund, the Reserve Fund, and the Department SAP Rebate Fund; and any earnings on investment of funds and accounts established under the Indenture as they are earned.

Administration Fees, Servicing Fees and Trustee Fees will be paid to the Issuer, the Servicer (initially the Issuer) and the Trustee on each Monthly Distribution Date from money available in the Collection Fund. The amounts of the initial Servicing Fee, Administration Fee (including the amounts allocated for the payment of Program Fees) and Trustee Fee are specified under the caption "FEES AND EXPENSES" herein and each such fee is subject to increase upon satisfaction of a Rating Agency Condition. In addition, each month money available in the Collection Fund will be used to pay amounts due to the Department of Education with respect to Financed Eligible Loans, to deposit amounts required to be deposited into the Department SAP Rebate Fund and to recall claims with respect to or repurchase

Financed Eligible Loans in the limited circumstances described under the caption "Insurance and Guarantee—Loans Subject to Repurchase" in "APPENDIX A—DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" hereto.

Upon written direction from the Issuer to the Trustee, moneys in the Collection Fund shall be used on any Business Day to pay to the Backup Servicer, when due, the one-time fees and expenses, in an amount not to exceed $300,000, associated with the conversion of the Financed Eligible Loans from the Servicer to the Backup Servicer.

On each Monthly Distribution Date, prior to an Event of Default, money available in the Collection Fund will be used to make the following deposits and distributions, to the extent funds are available, solely in accordance with the related Monthly Distribution Date Statement:

FIRST, to make any payments required under any applicable Joint Sharing Agreement or to otherwise pay to the appropriate Person, trust or other entity amounts deposited in the Collection Fund which represent amounts that are allocable to Eligible Loans which are not financed under the Indenture;

SECOND, to the Trustee, the Trustee Fee due and any prior unpaid Trustee Fees;

THIRD, to the Servicer (initially the Issuer), any Servicing Fee due and any prior unpaid Servicing Fees;

FOURTH, to the Issuer, the Administration Fee due and any prior unpaid Administration Fees;

FIFTH, to the Class A Noteholders of each class, interest payable on such Class A Notes on such Monthly Distribution Date, pro rata, based on amounts owed to each such party, without preference or priority of any kind;

SIXTH, to the Class B Noteholders, interest payable on the Class B Notes payable on such Monthly Distribution Date;

SEVENTH, to the Reserve Fund the amount, if any, necessary to reinstate the balance of the Reserve Fund up to the Specified Reserve Fund Balance;

EIGHTH, to the applicable Noteholders, the Principal Distribution Amount in the following order:

(a)    to pay, on a pro rata basis, based on the principal amount of Class A Notes Outstanding, principal to the Class A-1A Noteholders and Class A-1B Noteholders until the Class A-1A Notes and Class A-1B Notes have been paid in full; and

(b)    to pay principal to the Class B Noteholders until the Class B Notes have been paid in full;

NINTH, (A) if a Principal Acceleration Trigger is in effect for any Monthly Distribution Date occurring on and after the October 2026 Monthly Distribution Date through and including the September 2031 Monthly Distribution Date or (B) on and after the October 2031 Monthly Distribution Date, to pay as supplemental payments of principal on the Notes then Outstanding, to the Noteholders in the same order and priority as is set forth in EIGHTH above until the principal amount of the Notes is paid in full; and

TENTH, to the Trustee, any unpaid expenses or indemnities owed to the Trustee;

ELEVENTH, to the Issuer, the aggregate unpaid amount of any Carryover Servicing Fees;

TWELFTH, if the Financed Eligible Loans are not released when permitted by the Indenture for the optional redemption of the Notes, to pay as supplemental payments of principal on the Notes then Outstanding, to the Noteholders in the same order and priority as is set forth in EIGHTH above until the principal amount of the Notes is paid in full; and

THIRTEENTH, the Issuer all remaining funds.

Notwithstanding the foregoing, on and after the Maturity Date of the Class A-1A Notes and the Class A-1B Notes, the Class A-1A Noteholders and the Class A-1B Noteholders will receive amounts representing payment of the principal balance of the Class A-1A Notes and the Class A-1B Notes after clause FIFTH above until the Class A-1A Notes and the Class A-1B Notes have been paid in full and prior to the Class B Notes receiving payments of any payments of interest pursuant to clause SIXTH above.

The "Principal Acceleration Trigger" will be in effect for any Monthly Distribution Date occurring during the following periods (each, a "Principal Acceleration Measurement Period"):

- on and after the October 2026 Monthly Distribution Date and through and including the September 2027 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2026 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $121,000,000;

- on and after the October 2027 Monthly Distribution Date and through and including the September 2028 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2027 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $106,000,000;

- on and after the October 2028 Monthly Distribution Date and through and including the September 2029 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2028 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $92,000,000;

- on and after the October 2029 Monthly Distribution Date and through and including the September 2030 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2029 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $78,000,000; and

- on and after the October 2030 Monthly Distribution Date and through and including the September 2031 Monthly Distribution Date, if the outstanding principal amount of the notes as of the September 2030 Monthly Distribution Date (after giving effect to all payments of principal made on the notes on such Monthly Distribution Date) exceeds $64,000,000;

provided, however, if the Principal Acceleration Trigger is in effect for two Principal Acceleration Measurement Periods (regardless of whether they are consecutive), the Principal Acceleration Trigger will be deemed to be in effect for each remaining Principal Acceleration Measurement Period.

**Flow of Funds After Events of Default and Acceleration**

Following the occurrence of an Event of Default that results in an acceleration of the maturity of the Notes, and after the payment of certain fees and expenses, payments of principal and interest on the Class A Notes will be made, ratably, without preference or priority of any kind, until the Class A Notes are paid in full.  Payments of principal and interest on the Class B Notes will only be made after all principal and interest on the Class A Notes has been made in full.  See the caption "SUMMARY OF THE INDENTURE PROVISIONS—Remedies on Default" herein.

**Investment of Funds Held by Trustee**

The Trustee will invest amounts credited to any fund established under the Indenture in Investment Securities as directed in writing (or orally, confirmed in writing) by an authorized representative of the Issuer.  In the absence of such direction, such amounts will be held un-invested by the Trustee.  Unless an Event of Default shall have occurred under the Indenture, the Issuer acting by and through an authorized representative is entitled to, and will, provide written direction, or oral direction confirmed in writing to the Trustee with respect to any discretionary acts required or permitted of the Trustee under any Investment Securities and the Trustee will not take such discretionary acts without such written direction.

The Trustee will not in any way be held liable for the selection of Investment Securities purchased in accordance with the written investment directions of the Issuer or by reason of any insufficiency in any fund or account resulting from any market loss on any Investment Security so purchased or sold, including without limitation from any loss incurred as a result of the liquidation of any investment prior to its stated maturity in accordance with the written investment directions of the Issuer or the failure of the Issuer to provide timely written investment directions, in each case, in the absence of a breach of the Trustee's standard of care in the implementation of such investment directions.

## BOOK-ENTRY REGISTRATION

The following information concerning DTC and DTC's book-entry system has been obtained from information made publicly available by DTC and contains statements that are believed to describe accurately DTC, the method of effecting book-entry transfers of securities distributed through DTC and certain related matters, but the Issuer and the Underwriter take no responsibility for the accuracy of such statements.

Investors acquiring beneficial ownership interests in the Notes issued in book-entry form may hold their Notes in the United States through DTC (as defined under the caption "—DTC" below).

Principal and interest payments on the Notes are to be made to Cede & Co.  DTC's practice is to credit direct participant's accounts upon receipt of funds and corresponding detail information from the Issuer on the payable date in accordance with their respective holdings shown on DTC's records.  Payments by participants to beneficial owners are governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and shall be the responsibility of the participant and not of DTC, the Trustee or the Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time.  Payment of principal and interest is the responsibility of the Issuer, which the Trustee (acting at the direction of the Issuer) shall forward to Cede & Co. Disbursement of such payments to direct participants shall be the responsibility of DTC, and disbursement of such payments to the beneficial owners shall be the responsibility of direct and indirect participants.  Under a book-entry format, Noteholders may experience a delay in their receipt of payments, since payments will be forwarded by the Trustee to Cede & Co., which will forward the payments to its

participants who will then forward them to indirect participants or Noteholders. Under a book-entry format, Noteholders may experience a delay in their receipt of payments, since payments will be forwarded by the Trustee to Cede & Co., which will forward the payments to its participants who will then forward them to indirect participants or Noteholders.

Redemption notices shall be sent to DTC. If less than all of the Notes are being redeemed, DTC's practice is to determine by lot the amount of the interest of each direct participant in the Notes to be redeemed.

DTC has advised that it will take any action permitted to be taken by a Noteholder under the Indenture only at the direction of one or more participants to whose accounts with DTC the Notes are credited.

Neither DTC nor Cede & Co. will consent or vote with respect to the Notes. Under its usual procedures, DTC mails an omnibus proxy to the trust, or the Trustee, as appropriate, as soon as possible after the record date. The omnibus proxy assigns Cede & Co.'s consenting or voting rights to those direct participants to whose accounts the Notes are credited on the record date.

None of the Issuer, the Trustee or the Underwriter will have any responsibility or obligation to any DTC participants or the persons for whom they act as nominees with respect to the accuracy of any records maintained by DTC or any participant, the payment by DTC or any participant of any amount due to any beneficial owner in respect of the principal amount or interest on the Notes, the delivery by any DTC participant of any notice to any beneficial owner which is required or permitted under the terms of the Indenture to be given to Noteholders or any other action taken by DTC.

In certain circumstances, the Issuer may discontinue use of the system of book-entry transfers through DTC or a successor securities depository. In that event, Note certificates are to be printed and delivered. DTC may discontinue providing its services as securities depository with respect to the Notes at any time by giving reasonable notice to the Issuer or the Trustee. In the event that a successor securities depository is not obtained, Note certificates are required to be printed and delivered in accordance with the Indenture.

The Notes will be issued in minimum denominations of $100,000 and in integral multiples of $1,000 in excess thereof, and may be held and transferred, and will be offered and sold, in principal balances of not less than these minimum denominations.

The Issuer will apply to DTC for acceptance in its book-entry settlement systems of the Notes. The Notes will have the CUSIP numbers and ISINs, as applicable, set forth in under the caption "SUMMARY OF TERMS" herein. Payments of principal, interest and any other amounts payable on the Notes will be made to or to the order of the relevant clearing system's nominee as the Noteholder of the Notes.

*DTC*. The Depository Trust Company, or DTC, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants, known as direct participants, deposit with DTC. DTC also facilitates the post-trade settlement among direct participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between direct participants' accounts. This eliminates the need for physical movement of securities

certificates. Direct participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a direct participant, either directly or indirectly as an indirect participant. DTC has an S&P rating of "AA+." The DTC Rules applicable to its participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com. This website is not incorporated into and shall not be deemed to be a part of this Offering Memorandum.

Purchases of the Notes under the DTC system must be made by or through direct participants, which will receive a credit for the Notes on DTC records. The ownership interest of each actual purchaser of Notes, or beneficial owner, is in turn to be recorded on the direct and indirect participants' records. Beneficial owners shall not receive written confirmation from DTC of their purchase. Beneficial owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the direct or indirect participant through which the beneficial owner entered into the transaction. Transfers of ownership interests in the Notes are to be accomplished by entries made on the books of direct and indirect participants acting on behalf of beneficial owners. Beneficial owners will not receive certificates representing their ownership interests in the Notes, except in the event that use of the book-entry system for the class of any Notes is discontinued.

To facilitate subsequent transfers, all Notes deposited by participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of such Notes with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual beneficial owners of Notes; DTC's records reflect only the identity of the direct participants to whose accounts such Notes are credited, which may or may not be the beneficial owners. The direct and indirect participants remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants, and by direct participants and indirect participants to beneficial owners are governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Notes unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those direct participants to whose accounts the Notes are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Notes are to be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit direct participants' accounts upon DTC's receipt of funds and corresponding detailed information from the Issuer or the Trustee, on payable date in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such participant and not of DTC, the Issuer or the Trustee, subject to any statutory or regulatory requirements as may be in effect from time

to time.  Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other name as may be requested by an authorized representative of DTC) is the responsibility of the Issuer (through the Trustee), disbursement of such payments to direct participants will be the responsibility of DTC, and disbursement of such payments to the beneficial owners will be the responsibility of direct and indirect participants.

## TRUSTEE

The Issuer will issue the Notes pursuant to the Indenture by and between the Issuer and U.S. Bank National Association, as Trustee.  The Trustee's duties are limited to those duties specifically set forth in the Indenture.

The following information has been furnished by U.S. Bank National Association ("U.S. Bank") for use in this Offering Memorandum.  Neither the Issuer nor the Underwriter guarantees or makes any representation as to the accuracy or completeness thereof or the absence of material adverse change in such information or in the condition of the Trustee subsequent to the date hereof.

U.S. Bank, a national banking association, will act as Trustee.  U.S. Bancorp, with total assets exceeding $559 billion as of June 30, 2021, is the parent company of U.S. Bank, the fifth largest commercial bank in the United States.  As of June 30, 2021, U.S. Bancorp operated over 2,200 branch offices in 26 states.  A network of specialized U.S. Bancorp offices across the nation provides a comprehensive line of banking, brokerage, insurance, investment, mortgage, trust and payment services products to consumers, businesses, and institutions.

U.S. Bank has one of the largest corporate trust businesses in the country with office locations in 48 domestic and 2 international cities.  U.S. Bank has provided corporate trust services since 1924.

As of June 30, 2021, U.S. Bank was acting as trustee with respect to over 111,000 issuances of securities with an aggregate outstanding principal balance of over $5 trillion.  This portfolio includes corporate and municipal bonds, mortgage backed and asset backed securities and collateralized debt obligations.

U.S. Bank and other large financial institutions have been sued in their capacity as trustee or successor trustee for certain residential mortgage backed securities ("RMBS") trusts.  The complaints, primarily filed by investors or investor groups against U.S. Bank and similar institutions, allege the trustees caused losses to investors as a result of alleged failures by the sponsors, mortgage loan sellers and servicers to comply with the governing agreements for these RMBS trusts. Plaintiffs generally assert causes of action based upon the trustees' purported failures to enforce repurchase obligations of mortgage loan sellers for alleged breaches of representations and warranties, notify securityholders of purported events of default allegedly caused by breaches of servicing standards by mortgage loan servicers and abide by a heightened standard of care following alleged events of default.

U.S. Bank denies liability and believes that it has performed its obligations under the RMBS trusts in good faith, that its actions were not the cause of losses to investors, that it has meritorious defenses, and it has contested and intends to continue contesting the plaintiffs' claims vigorously.  However, U.S. Bank cannot assure you as to the outcome of any of the litigation, or the possible impact of these litigations on the Trustee or the RMBS trusts.

On March 9, 2018, a law firm purporting to represent fifteen Delaware statutory trusts (the "DSTs") that issued securities backed by student loans (the "Student Loans") filed a lawsuit in the Delaware Court of Chancery against U.S. Bank in its capacities as indenture trustee and successor special servicer, and three

other institutions in their respective transaction capacities, with respect to the DSTs and the Student Loans. This lawsuit is captioned *The National Collegiate Student Loan Master Trust I, et al. v. U.S. Bank National Association*, et al., C.A. No. 2018 0167 JRS (Del. Ch.) (the "NCMSLT Action"). The complaint, as amended on June 15, 2018, alleged that the DSTs have been harmed as a result of purported misconduct or omissions by the defendants concerning administration of the trusts and special servicing of the Student Loans. Since the filing of the NCMSLT Action, certain Student Loan borrowers have made assertions against U.S. Bank concerning special servicing that appear to be based on certain allegations made on behalf of the DSTs in the NCMSLT Action.

U.S. Bank has filed a motion seeking dismissal of the operative complaint in its entirety with prejudice pursuant to Chancery Court Rules 12(b)(1) and 12(b)(6) or, in the alternative, a stay of the case while other prior filed disputes involving the DSTs and the Student Loans are litigated. On November 7, 2018, the Court ruled that the case should be stayed in its entirety pending resolution of the first filed cases. On January 21, 2020, the Court entered an order consolidating for pretrial purposes the NCMSLT Action and three other lawsuits pending in the Delaware Court of Chancery concerning the DSTs and the Student Loans, which remains pending.

U.S. Bank denies liability in the NCMSLT Action and believes it has performed its obligations as indenture trustee and special servicer in good faith and in compliance in all material respects with the terms of the agreements governing the DSTs and that it has meritorious defenses. It has contested and intends to continue contesting the plaintiffs' claims vigorously.

U.S. Bank has not furnished or verified any information or statements contained in this Offering Memorandum other than the information contained in the third through tenth paragraphs of this caption "TRUSTEE", and U.S. Bank is not responsible for the sufficiency, completeness or accuracy of any information or statement contained in this Offering Memorandum other than the information provided directly by U.S. Bank.

The Issuer may maintain customary banking relations on arm's-length terms with the Trustee.

Subject to the terms of the Indenture, the Trustee will act on behalf of the Noteholders and represent their interests in the exercise of its rights under the Indenture. See the caption "SUMMARY OF THE INDENTURE PROVISIONS—The Trustee" herein for additional information regarding the responsibilities of the Trustee. The Trustee will not have any obligation to administer, service or collect the Financed Eligible Loans or to maintain or monitor the administration, servicing or collection of those Financed Eligible Loans.

## SUMMARY OF THE INDENTURE PROVISIONS

The following is a summary of some of the provisions in the Indenture. This summary does not cover every detail contained in the Indenture and reference should be made to the Indenture and is subject to all of the terms and conditions of the Indenture in its entirety for a full and complete statement of its provisions.

### Parity and Priority of Lien

The provisions of the Indenture are generally for the equal benefit, protection and security of the Noteholders under the Indenture except as expressly provided in the Indenture with respect to certain payments and other priorities, including priority of payment of the Class A Notes before payment of the Class B Notes.

THE NOTES SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR LIABILITY OR OBLIGATION OF THE STATE OF MISSOURI OR OF ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OF MISSOURI, NOR SHALL THE NOTES AND THE OBLIGATIONS OF THE ISSUER CONTAINED IN THE INDENTURE BE DEEMED TO CONSTITUTE A PLEDGE OF THE FULL FAITH AND CREDIT OF THE STATE OF MISSOURI OR OF ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OF MISSOURI.  THE NOTES SHALL NOT DIRECTLY, INDIRECTLY OR CONTINGENTLY, OBLIGATE THE STATE OF MISSOURI OR ANY AGENCY OR POLITICAL SUBDIVISION THEREOF TO LEVY ANY FORM OF TAXATION THEREFOR OR TO MAKE ANY APPROPRIATION FOR THEIR PAYMENT.  THE NOTES ARE SPECIAL, LIMITED OBLIGATIONS OF THE ISSUER AND ARE SECURED BY AND PAYABLE SOLELY FROM THE TRUST ESTATE PLEDGED AS SECURITY THEREFOR AS PROVIDED IN THE INDENTURE.  NO OTHER ASSETS OF THE ISSUER ARE PLEDGED TO THE PAYMENT OF THE NOTES.  THE STATE OF MISSOURI SHALL NOT BE LIABLE IN ANY EVENT FOR THE PAYMENT OF THE PRINCIPAL OF OR INTEREST ON THE NOTES OR FOR THE PERFORMANCE OF ANY PLEDGE, MORTGAGE, OBLIGATION, OR AGREEMENT OF ANY KIND WHATSOEVER WHICH MAY BE UNDERTAKEN BY THE AUTHORITY.  NO BREACH OF ANY SUCH PLEDGE, MORTGAGE, OBLIGATION, OR AGREEMENT MAY IMPOSE ANY PECUNIARY LIABILITY UPON THE STATE OF MISSOURI OR ANY CHARGE UPON THE GENERAL CREDIT OR TAXING POWER OF THE STATE OF MISSOURI.

The revenues and other money, Financed Eligible Loans and other assets the Issuer pledges under the Indenture will be free and clear of any pledge, lien, charge or encumbrance, other than that created by the Indenture.  If any Financed Eligible Loan is found to have been subject to a lien at the time such Financed Eligible Loan was pledged to the Trust Estate created under the Indenture, the Issuer will cause such lien to be released, will purchase such Financed Eligible Loan from the Trust Estate for a purchase price equal to its principal amount plus unamortized premium, if any, and interest accrued thereon or will replace such Financed Eligible Loan with another Eligible Loan with substantially identical characteristics which replacement Eligible Loan will be free and clear of liens at the time of such replacement.

Except as otherwise provided in the Indenture, the Issuer:

(a)    will not create or voluntarily permit to be created any debt, lien or charge on the Financed Eligible Loans which would be on a parity with, subordinate to, or prior to the lien of the Indenture;

(b)    will not take any action or fail to take any action that would result in the lien of the Indenture or the priority of that lien for the Notes thereby secured being lost or impaired; and

(c)    will pay or cause to be paid, or will make adequate provisions for the satisfaction and discharge of all lawful claims and demands which if unpaid might by law be given precedence to or any equality with the Indenture as a lien or charge upon the Financed Eligible Loans.

**Representations and Warranties**

The Issuer will represent and warrant in the Indenture, among other things, that:

(a)    it is duly authorized to issue the Notes and to execute and deliver the Indenture;

(b)    all necessary action for the issuance of the Notes and the execution and delivery of the Indenture has been duly and effectively taken; and

(c)     the Notes in the hands of the Noteholders are and will be valid and enforceable obligations of the Issuer secured by and payable solely from the Trust Estate created under the Indenture.

**Sale of Financed Eligible Loans**

Except under limited circumstances described in the Indenture, Financed Eligible Loans may not be sold, transferred or otherwise disposed of by the Issuer free from the lien of the Indenture while any Notes are outstanding.  However, the Issuer may sell Financed Eligible Loans free from the lien of the Indenture, so long as the sale price for any Financed Eligible Loan is not less than the amount required to prepay in full such Financed Eligible Loan under the terms thereof, including all accrued interest thereon and any unamortized premium, and the collective aggregate principal balance of all such sales does not exceed 5% of the initial Pool Balance and the collective aggregate principal balance of all such sales in any calendar year does not exceed 1% of the Pool Balance as of the first date of such calendar year (or as of the Date of Issuance with respect to the first calendar year).

**Further Covenants**

The Issuer will cause financing statements to be filed in any jurisdiction necessary to perfect the security interest it grants under the Indenture.

Upon written request of the Trustee, the Issuer will permit the Trustee or its agents, accountants and attorneys, to examine and inspect the property, books of account, records, reports and other data relating to the Financed Eligible Loans, and will furnish the Trustee such other information as it may reasonably request.  The Trustee will be under no duty to make any examination unless requested in writing to do so by the Noteholders of at least 66-2/3% of the Outstanding Amount of the Notes at the time outstanding, and unless those Noteholders have offered the Trustee security and indemnity satisfactory to it against any costs, expenses and liabilities which might be incurred in making any examination.

The Issuer will keep and maintain proper books of account relating to its program of financing Eligible Loans under the Indenture (the "Program") including all dealings or transactions of or in relation to the business and affairs of the Issuer which relate to the Notes.  Within 180 days of the close of each fiscal year, the Issuer will receive an audit of the Program and the Issuer by an independent certified public accountant.  A copy of the audit report showing in reasonable detail the financial condition of the Program and the Issuer as at the close of each fiscal year will be filed with the Trustee within 60 days after it is received by the Issuer and will be available for inspection by any Noteholder.

The Issuer shall deliver to the Trustee, within 180 days after the end of each fiscal year, a brief certificate from an authorized representative of the Issuer including (a) a current list of the authorized representatives of the Issuer, and (b) a statement indicating whether or not, to the knowledge of the signers thereof, the Issuer is in compliance with all conditions and covenants under the Indenture and, in the event of any noncompliance, specifying such noncompliance and the nature and status thereof.

The Issuer makes a number of negative covenants in the Indenture, including, without limitation, that it will not (a) sell, transfer, exchange or otherwise dispose of any portion of the Trust Estate except as expressly permitted by the Indenture; (b) claim any credit on, or make any deduction from, the principal amount of any of the Notes by reason of the payment of any taxes levied or assessed upon any portion of the Trust Estate; (c) permit the validity or effectiveness of the Indenture, any supplemental indenture or any grant thereunder to be impaired, or permit the lien of the Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any person to be released from any covenants or obligations under the Indenture, except as may be expressly permitted thereby; (d) except as otherwise

provided in the Indenture, permit any lien, charge, security interest, mortgage or other encumbrance (other than the lien of the Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof or any interest therein or the proceeds thereof; or (e) permit the lien of the Indenture not to constitute a valid first priority, perfected security interest in the Trust Estate.

**Statements to Noteholders**

Two Business Days preceding each Monthly Distribution Date, the Issuer shall prepare and provide a report to the Trustee, including the following:

(a)       descriptions of portfolio characteristics;

(b)       identification of remaining applicable Note balances;

(c)       descriptions of amounts of the distribution allocable to principal and interest of the Class A Notes and the Class B Notes;

(d)       changes in Pool Balance over the distribution period;

(e)       fees paid by the Trust Estate; and

(f)       limited descriptions of activity in the Capitalized Interest Fund, Reserve Fund, Collection Fund and Student Loan Fund.

Such report shall also be posted on the Issuer's website.  See the caption "ADDITIONAL INFORMATION; REPORTS TO NOTEHOLDERS" herein.  The Trustee shall provide or make electronically available a copy of any Monthly Distribution Date Certificate of the Issuer to any Noteholder who requests such in writing.

**Servicing and Enforcement of the Servicing Agreements**

The Issuer will at all times appoint, retain and employ competent personnel for the purpose of carrying out its respective programs under the Authorizing Act and the Program and will establish and enforce reasonable rules, regulations, tests and standards governing the employment of such personnel.

The Issuer will cause to be diligently enforced and taken all reasonable steps, actions and proceedings necessary for the enforcement of, all material terms, covenants and conditions of all servicing agreements, including, without limitation, the prompt payment of all principal and interest payments and all other amounts due the Issuer thereunder, including, all grants, subsidies, donations, insurance payments, Special Allowance Payments, Interest Benefit Payments and all Guarantee payments by a Guaranty Agency which relate to any Financed Eligible Loans.  Collections received on the Financed Eligible Loans once identified by the Issuer or applicable Servicer as such shall be transferred to the Trustee for deposit into the Collection Fund on average within two Business Days of receipt as cleared funds.  Except to the extent expressly permitted by the Indenture, the Issuer:

(a)       will not permit the release of any material obligations of a Servicer under its servicing agreement, except in conjunction with amendments or modifications permitted by the Indenture and will defend, enforce, preserve and protect the material rights of the Issuer and the Trustee thereunder;

(b)    will not consent or agree to or permit any amendment or modification of a servicing agreement which will materially adversely affect the rights or security of the Trustee or the Noteholders; and

(c)    will duly and punctually perform and observe each of its obligations to each Servicer under its servicing agreement in accordance with the terms thereof.

Notwithstanding the foregoing, the Indenture does not prevent the Issuer from taking any action to replace a Servicer or from consenting or agreeing to, or permitting, any amendments, modifications to, or waivers with respect to, any servicing agreement, subject to the conditions set forth in the Indenture.

If at any time a Servicer fails in any material respect to perform its obligations under its Servicing Agreement or under the Higher Education Act or (in the case of the Issuer as Servicer) under the Indenture, or if any servicing audit shows any material deficiency in the servicing of Financed Eligible Loans by a Servicer, the Issuer will, or will cause the Servicer to, cure the failure to perform or the material deficiency or remove such Servicer and appoint another Servicer.  From the date of the Indenture until all of the obligations of the Issuer under the Indenture shall be paid in full, each Servicer (including in the Issuer as Servicer under the Indenture) will service, administer and make collections with respect to the Financed Eligible Loans in all material respects with Accepted Servicing Procedures.  The Issuer agrees to send notice to the Rating Agencies of any change in Servicer.

If any Financed Eligible Loan ceases to be Guaranteed or Insured, and as a result thereof, a Guarantee or Insurance claim with respect to such Financed Eligible Loan is rejected by the applicable Guaranty Agency or an insurance claim is not paid by the United States and the same is not cured within 180 days after such rejection or if any Financed Eligible Loan is determined to be encumbered by any lien other than the lien of the Indenture, then the Issuer will either: (a) purchase such Financed Eligible Loan from the Trust Estate created under the Indenture for a purchase price equal to its principal amount plus unamortized premium, if any, and interest accrued thereon; or (b) replace such Financed Eligible Loan with another Financed Eligible Loan of substantially identical characteristics; and provided, however, that, with respect to a third-party Servicer, this provision shall be applicable only to the extent that such repurchase or replacement is provided by the applicable Servicing Agreement.

The Issuer covenants to maintain a Backup Servicing Agreement with a third-party servicer and agrees to pay the fees and expenses associated therewith from moneys available as provided in the Indenture.

**Additional Covenants With Respect to the Higher Education Act**

The Issuer is responsible for the following actions, among others, with respect to the Higher Education Act:

(a)    maintaining its status as an Eligible Lender and administering, operating and maintaining the Issuer's Program with respect to Eligible Loans in such manner as to ensure that the Program and the Financed Eligible Loans are in material compliance with and will benefit from the benefits available under the Higher Education Act and the federal program of reimbursement for Eligible Loans pursuant to the Higher Education Act and will comply with the material provisions of the Higher Education Act and all other United States and state statutes and regulations which apply to the Program and to the Financed Eligible Loans;

(b)    entering into any Guarantee Agreement (or supplements thereto), maintaining such Guarantee Agreement and diligently enforcing its rights thereunder and not voluntarily consenting to or permitting any rescission of or consenting to any amendment to or otherwise taking any action under or in connection with any Guarantee Agreement or similar or supplemental agreement which in any manner would materially adversely affect the rights of the Noteholders under the Indenture;

(c)    maintaining all Certificates of Insurance and diligently enforce its rights thereunder, enter into such other similar or supplemental agreements as shall be required to maintain benefits for all Financed Eligible Loans covered thereby, and not voluntarily consent to or permit any rescission of or consent to any amendment to or otherwise take any action under or in connection with any such Certificates of Insurance or any similar or supplemental agreement which in any manner will materially adversely affect the rights of the Noteholders under the Indenture;

(d)    causing to be diligently enforced, and causing to be taken all reasonable steps necessary for the enforcement of all terms, covenants and conditions of all Financed Eligible Loans and agreements in connection with the Financed Eligible Loans, including the prompt payment of all principal and interest payments and all other amounts due to the Issuer thereby; not releasing the obligations of any borrower or agreeing to, permitting, allowing or causing any amendment or modification of any Financed Eligible Loan except to the extent permitted by the Indenture and making, or causing to be made by the applicable Servicer, every effort to perfect the Issuer's or such Servicer's claims for payment from the Secretary or such Guaranty Agency, of all payments related to such Financed Eligible Loans, no later than required by the Higher Education Act and the applicable Guarantee Agreement.  Nothing in the Indenture shall be construed to prevent the Issuer from (i) granting a reasonable forbearance to a borrower pursuant to the terms of the Higher Education Act; (ii) settling a default or curing a delinquency on any Financed Eligible Loan on such terms as shall be permitted by law; (iii) charging interest at a lower rate than is required by the Higher Education Act to the extent provided in an exhibit to the Indenture; (iv) establishing a program of discounts, fee reduction or waiver, rate reduction or waiver or forgiveness of principal of or interest on Financed Eligible Loans to the extent as provided in an exhibit to the Indenture hereto; or (v) allowing a borrower to repay a Financed Eligible Loan pursuant to any repayment plan pursuant to the Higher Education Act;

(e)    complying in all material respects with all United States and state statutes, rules, and regulations which apply to the Program and to the Financed Eligible Loans; and

(f)    administering and collecting (or causing to be administered and collected) all Financed Eligible Loans in a competent, diligent, and orderly fashion and in accordance with all applicable requirements of the Higher Education Act, the Secretary, the regulations of the Secretary and each Guaranty Agency, and the Indenture.

For the avoidance of doubt, the Trustee will have no obligation to administer, service or collect the Financed Eligible Loans or to maintain or monitor the administration, servicing or collection of such loans.

**Continued Existence; Successor**

The Issuer will do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights and franchises as a body politic and corporate constituting a public instrumentality of the State of Missouri, except as set forth below.  The Issuer will not (a) sell, transfer or otherwise dispose of all or substantially all, of its assets (except Financed Eligible Loans as permitted by the Indenture); (b) consolidate with or merge into another entity; or (c) permit one or more other entities to

112

consolidate with or merge into it. The preceding restrictions will not apply to a transaction if the transferee or the surviving or resulting entity, if other than the Issuer, by proper written instrument for the benefit of the Trustee, irrevocably and unconditionally assumes the obligation to perform and observe the agreements and obligations of the Issuer under the Indenture.

**Events of Default**

The Indenture will define the following events as events of default (each, an "Event of Default"):

(a) default in the due and punctual payment of any interest on any Note when the same becomes due and payable and such default will continue for a period of five days; provided, however, that a default in the due and punctual payment of any interest on any Class B Notes shall not be an Event of Default under the Indenture so long as the Class A Notes are outstanding;

(b) default in the due and punctual payment of the principal of any Note when the same becomes due and payable on the final Maturity Date of the Note;

(c) default in the performance or observance of any other of the Issuer's covenants, agreements or conditions contained in the Indenture or in the Notes, and continuation of such default for a period of 90 days after written notice thereof is given to the Issuer by the Trustee (to extent a Responsible Officer of the Trustee has actual knowledge or has received written notice thereof), or such later time if diligent care to cure such default is being pursued by the Issuer and a remedy cannot reasonably be effected within 90 days; and

(d) the occurrence of an Event of Bankruptcy in respect of the Issuer.

Notwithstanding anything to the contrary contained herein, in no event shall there be an Event of Default as a result of there being insufficient available funds in the Collection Fund to pay the principal on any Monthly Distribution Date other than a Note Final Maturity Date.

**Remedies on Default**

***Possession of Trust Estate***. Upon the happening and continuance of any Event of Default, the Trustee may (except with respect to an Event of Default described in the clause (c) (covenant default) under the caption "—Events of Default" above which has not resulted in an acceleration of the Notes) and upon its receipt of security or indemnity satisfactory to it, as described herein, at the written direction of the Noteholders representing not less than a majority of the Outstanding Amount of the Highest Priority Notes outstanding will, enter into and upon and take possession of any portion of the Trust Estate of the Issuer created under the Indenture that may be in the custody of others, and all property comprising the Trust Estate, may exclude the Issuer wholly therefrom and may have, hold, use, operate, manage and control those assets. The Trustee may also, in the name of the Issuer or otherwise, conduct such Issuer's business and collect and receive all charges, income and revenues of the Trust Estate. After deducting all fees, costs and expenses incurred and all other proper outlays authorized in the Indenture, and all payments which may be made as reasonable compensation for its own services, and for the services of its attorneys, agents, and assistants, and for indemnity payable to the Trustee, the Trustee will apply the rest and residue of the money received by the Trustee as follows:

FIRST, to the Department of Education, any department SAP rebate interest amount and Monthly Consolidation Rebate Fees due and owing thereto, to any Guaranty Agency amounts due and owing to such Guaranty Agency, and to any party to any Joint Sharing Agreement to which the Issuer may be a party or to any other person entitled to any amounts deposited in the Trust Estate

which represent amounts that are allocable to Eligible Loans that are not Financed Eligible Loans, any amounts due and owing thereto;

SECOND, to the Trustee for fees and any costs and out-of-pocket expenses of the Trustee due and owing, including, without limitation, the fees and expenses of its counsel;

THIRD, to (a) the Servicer (initially the Issuer), any Servicing Fee due and remaining unpaid; (b) the Issuer, any Administration Fee due and remaining unpaid; and (c) to the persons due any Program Fees, any remaining unpaid Program Fees;

FOURTH, to the Class A Noteholders for amounts due and unpaid on the Class A Notes for interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Class A Notes for such interest;

FIFTH, to Class A Noteholders for amounts due and unpaid on the Class A Notes for principal, ratably, without preference or priority of any kind, according to the amounts due and payable on the Class A Notes for principal until paid in full;

SIXTH, to the Class B Noteholders for amounts due and unpaid on the Class B Notes for interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Class B Notes for such interest;

SEVENTH, to Class B Noteholders for amounts due and unpaid on the Class B Notes for principal, ratably, without preference or priority of any kind, according to the amounts due and payable on the Class B Notes for principal until paid in full; and

EIGHTH, to the Issuer, but only after all amounts payable have been paid pursuant to the Indenture;

provided, however, that no amount that is deposited in the Department SAP Rebate Fund, or required hereby to be so deposited, shall be applied to any purpose, other than as expressly provided herein for amounts so deposited, prior to the full funding of such expressly provided purposes.

**Remedies on Default; Advice of Counsel**.  Upon the happening of any Event of Default, the Trustee may, and, subject to the provisions of the Indenture described under the caption "—The Trustee" below, at the written direction of the Noteholders representing not less than a majority of the Outstanding Amount of the Highest Priority Notes outstanding, shall, proceed to protect and enforce the rights of the Trustee and the Noteholders in such manner, whether for the specific performance of any covenant, condition, agreement or undertaking contained in the Indenture or in aid of the execution of any power therein granted; or for the enforcement of such other appropriate legal or equitable remedies as the Trustee or such Noteholders may deem to protect and enforce the rights aforesaid.  The Trustee will be entitled to rely upon the advice of counsel, which for this purpose may be note counsel, in exercising remedies under, or otherwise acting under or in enforcement of the Indenture.

**Sale of Trust Estate**.  Upon the happening of any Event of Default and if the principal of all of the outstanding Notes will have been declared due and payable in accordance with the Indenture as described below under the caption "—Accelerated Maturity" below, then the Trustee may, and, subject to the provision of the Indenture described under the caption "—The Trustee" below, at the written direction of the Noteholders representing not less than a majority of the Outstanding Amount of the Highest Priority Notes outstanding, will, sell the Trust Estate created under the Indenture, to the highest bidder in accordance with the requirements of applicable law; provided, however, that, the Trustee may engage a third party with

nationally recognized experience in the sale of student loan assets, such as the Trust Estate, to undertake such sale; and further provided, that any sale shall be subject to prior compliance with the succeeding paragraph. In addition, the Trustee may proceed to protect and enforce the rights of the Trustee and the Noteholders in the manner as counsel for the Trustee may advise, whether for the specific performance of any covenant, condition, agreement or undertaking contained in the Indenture, or in aid of the execution of any power therein granted, or for the enforcement of such other appropriate legal or equitable remedies as may be more effectual to protect and enforce the rights aforesaid. The Trustee is required to take any of these actions if requested to do so in writing by the Noteholders of at least a majority of the Outstanding Amount of the Highest Priority Notes outstanding under the Indenture and indemnified to its satisfaction.

However, the Trustee is prohibited from selling the Financed Eligible Loans following an Event of Default (whether or not the principal of all outstanding Notes will have been declared due and payable), other than a default in the payment of any principal or any interest on any Note, unless:

  (a) the Noteholders of all of the Highest Priority Notes at the time outstanding consent to such sale;

  (b) the proceeds of such sale are sufficient to discharge all outstanding Notes at the date of such sale pursuant to terms of the Indenture describing discharge of the Indenture; or

  (c) the Issuer determines that the collections on the Financed Eligible Loans would not be sufficient on an ongoing basis to make all payments on such Notes as such payments would have become due if such Notes had not been declared due and payable, and the Trustee obtains the consent of the Noteholders of at least 66-2/3% in Outstanding Amount of the Highest Priority Notes outstanding to such sale.

Such a sale following an Event of Default, other than a default in the payment of any principal or interest on any Note, will also require the consent of all the Noteholders of the Class B Notes (to the extent such Class B Notes are not the Highest Priority Notes outstanding at such time) unless the proceeds of such a sale would be sufficient to discharge the Class B Notes pursuant to the terms of the Indenture describing discharge of the Indenture at the date of such a sale.

*Appointment of Receiver*. If an Event of Default occurs, and all of the outstanding Notes under the Indenture have been declared due and payable in accordance with the Indenture as described below under the caption "—Accelerated Maturity," and if any judicial proceedings are commenced to enforce any right of the Trustee or of the Noteholders under the Indenture or otherwise, then as a matter of right, the Trustee will be entitled to the appointment of a receiver for the Trust Estate created under the Indenture.

*Accelerated Maturity*. If an Event of Default specified in clause (a), (b) or (d) above under the caption "—Events of Default" above) occurs and is continuing, the Trustee at the written direction of the Noteholders representing not less than a majority in Outstanding Amount of the Highest Priority Notes then outstanding under the Indenture will declare the principal of all Notes issued under the Indenture, and then outstanding, and the interest thereon, immediately due and payable. If an Event of Default specified in clause (c) under the caption "—Events of Default" above occurs and is continuing, the Trustee at the written direction of the Noteholders representing not less than a majority in Outstanding Amount of each class of Notes then outstanding under the Indenture will declare the principal of all Notes issued under the Indenture, and then outstanding, and the interest thereon, immediately due and payable. Such declaration of acceleration may be rescinded before a judgment or decree for the payment of the money due has been obtained by the Trustee if a majority of the Noteholders of the Highest Priority Notes then outstanding (with respect to the first sentence above) or a majority of the Noteholders of each class of Notes then outstanding under the Indenture (with respect to the second sentence above) provide written notice to the Issuer and the

Trustee and (a) if the Issuer has paid or deposited with the Trustee amounts sufficient, along with other amounts available in the Trust Estate for such purposes in accordance with the provisions of the Indenture, to pay all principal and interest due on all Notes and all other amounts that would then be due under the Indenture upon such Notes if such declaration of acceleration and the Event of Default giving rise to such acceleration had not occurred and all sums paid or advanced by the Trustee under the Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, any Servicer, and their agents and counsel and, if applicable, any such other amounts due and owing to the Trustee; and (b) any other Event of Default has been cured or waived.

*Direction of Trustee*.  If an Event of Default occurs, except as expressly provided in the Indenture, the Noteholders of a majority in Outstanding Amount of the Highest Priority Notes then outstanding under the Indenture, upon indemnifying the Trustee for its fees and expenses, will have the right to direct and control the Trustee as to the method of taking any and all proceedings for any investment or sale of any or all of the Trust Estate (in accordance with and subject to satisfaction of the provisions of the Indenture described under the caption "—Sale of Trust Estate"), or for the appointment of a receiver, if permitted by law, and may at any time cause any proceedings authorized by the terms of the Indenture to be discontinued or delayed.

*Right To Enforce in Trustee*.  No Noteholder will have any right as a Noteholder to institute any suit, action or proceedings for the enforcement of the provisions of the Indenture or for the execution of any trust thereunder or for the appointment of a receiver or for any other remedy under the Indenture.  All rights of action under the Indenture are vested exclusively in the Trustee, unless and until the Trustee fails for 30 days to institute an action, suit or proceeding after the Noteholders of the requisite Outstanding Amount of the Notes then outstanding (such amount as specified in the applicable section of the Indenture as described under this caption "—Remedies on Default"):

(a)    will have given to the Trustee written notice of a default under the Indenture, and of the continuance thereof;

(b)    will have made written request upon the Trustee and the Trustee will have been afforded reasonable opportunity to institute such action, suit or proceeding in its own name; and

(c)    will have offered indemnity and security satisfactory to the Trustee against the costs, expenses, and liabilities to be incurred in or by an action, suit or proceeding in its own name.

*Waivers of Events of Default*.  The Trustee will waive an Event of Default under the Indenture and its consequences and rescind any declaration of acceleration of the Notes due under the Indenture upon the written request of the Noteholders of at least a majority of the Outstanding Amount of the Highest Priority Notes then outstanding under the Indenture, or with respect to an Event of Default, or resulting declaration of acceleration, based solely upon an Event of Default specified in clause (c) above under "—Events of Default," a majority of the Outstanding Amount of each class of Notes then outstanding under the Indenture. However, any Event of Default in the payment of the principal of or interest due on any Note issued under the Indenture may not be waived unless prior to the waiver or rescission, provision will have been made for payment of all arrears of interest or all arrears of payments of principal and all expenses of the Trustee in connection with such default.  A waiver or rescission of one default will not affect any subsequent or other default, or impair any rights or remedies consequent to any subsequent or other default.

**The Trustee**

*Acceptance of Trust*.  The Trustee will accept the express duties and obligations imposed upon it by the Indenture and will perform those express duties and obligations, but only upon and subject to the following terms and conditions:

(a)    except during the continuance of an Event of Default, the Trustee undertakes to perform only those duties as are specifically set forth in the Indenture and no implied duties (including fiduciary duties), covenants or obligations will be read into the Indenture against the Trustee;

(b)    except during the continuance of an Event of Default and in the absence of bad faith or negligence on its part, the Trustee may conclusively rely, not only as to due execution, validity and effectiveness, but also as to the truth of the statements and the correctness of the opinions expressed therein, upon Issuer Orders, Noteholder directions, certificates or opinions furnished to the Trustee and conforming to the requirements of the Indenture; but in the case of any such Issuer Orders, Noteholder directions, certificates or opinions which by any provisions of the Indenture are specifically required to be furnished to the Trustee, the Trustee will be under a duty to examine the same to determine whether or not they conform as to form with the requirements of the Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein);

(c)    in case an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee shall have actual knowledge or shall have received written notice thereof, the Trustee, in exercising the rights and powers vested in it by the Indenture, will use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs; and

(d)    before taking any action under the Indenture requested by Noteholders, the Trustee may require that it be furnished an indemnity bond or other indemnity and security satisfactory to it by the applicable Noteholders, for the reimbursement of all fees and expenses to which it may be put and to protect it against liability arising from any action taken by the Trustee.

No provision of the Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct (as determined by a court of competent jurisdiction), except that:

(a)    this provision shall not be construed to limit the effect of clause (a) of the prior paragraph;

(b)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(c)    the Trustee shall not be liable with respect to any action taken or omitted to be taken in accordance with the written directions of (A) the Noteholders of not less than a majority of the Outstanding Amount of the Highest Priority Notes, or, with respect to a declaration of acceleration based solely upon an Event of Default specified in clause (c) under the caption "— Events of Default" above, or waiver of such declaration or of the underlying Event of Default, of a majority of the Outstanding Amount of each class of Notes, relating to the time, method and place of conducting any proceedings for any remedy available to the Trustee, or exercising any trust or

117

power conferred upon the Trustee pursuant to the provisions of the Indenture described under this caption "—The Trustee"; or (B) the Issuer, relating to any other actions that the Trustee may be required or permitted to take under the Indenture; subject, however, to satisfaction of any express requirements in the Indenture that may be applicable thereto; and

(d)      no provision of the Indenture or any other basic document shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers.

*Trustee May Act Through Agents*.  The Trustee may execute any of the trusts or powers under the Indenture and perform any duty thereunder, either itself or by or through its attorneys or agents, and it shall not be answerable or accountable for any default, bad faith, negligence or willful misconduct of any such attorneys or agents, if reasonable care has been exercised in the appointment of such attorneys or agents and, unless the Issuer is contractually entitled to supervise and monitor the performance of any such attorneys or agents (other than during the continuance of an Event of Default), in such supervision and monitoring.  All reasonable costs incurred by the Trustee and all reasonable compensation to all such persons as may be appointed by the Trustee in connection with the trusts under the Indenture shall be paid by the Issuer as part of the Trustee Fee (including after the occurrence and continuation of an Event of Default, as described under the caption "–Remedies on Default–Possession of Trust Estate" above).

*Recitals of Others*.  The Trustee will not make any representations as to the title of the Issuer in the Trust Estate created under the Indenture or as to the security afforded thereby and by the Indenture, or as to the validity or sufficiency of the Indenture or the Notes issued thereunder or of any offering materials.

*Trustee's Right to Reliance*.  The Trustee will be protected in acting upon any notice, resolution, request, consent, order, instruction, direction, certificate, report, appraisal, opinion, or document of the Issuer or a Servicer or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.  The Trustee may consult with experts and with counsel (who may but need not be counsel for the Issuer, the Trustee or a Noteholder) and who may be note counsel, and the written advice or opinion of such counsel will be full and complete authorization and protection in respect of any action taken or suffered, and in respect of any determination made by it under the Indenture in good faith and in accordance with the written advice or opinion of such counsel.

The Trustee shall not be liable for any action taken, suffered or omitted by it in good faith in accordance with the Indenture or any other basic document or at the direction of the Noteholders evidencing the appropriate percentage of the Outstanding Amount of the Notes relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under the Indenture or any other basic document and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Indenture; provided, however, that the Trustee shall be liable for its bad faith, negligence or willful misconduct in taking such action (as determined by a court of competent jurisdiction).

*Indemnification of Trustee*.  The Trustee is generally under no obligation or duty to perform any act at the request of Noteholders or to institute or defend any suit to protect the rights of the Noteholders under the Indenture unless properly indemnified and provided with security to its satisfaction.  However, the Trustee may begin suit, or appear in and defend suit, execute any of the trusts created by the Indenture, enforce any of its rights or powers under the Indenture, or do anything else in its judgment proper to be done by it as Trustee, without assurance of reimbursement or indemnity.  In that case, the Trustee will be reimbursed or indemnified by the Noteholders requesting that action, if any, or, subject to the limitations set forth in the Indenture, by the Issuer in all other cases, for all reasonable and documented fees, costs and expenses (including reasonable attorneys' fees and expenses and court costs and any losses incurred in

connection with a successful defense, in whole or in part, of any claim that the Trustee breached its standard of care) reasonably incurred unless such fees, costs and expenses reasonably incurred in connection therewith are adjudicated to have resulted from the negligence or willful misconduct of the Trustee. In furtherance and not in limitation of this paragraph, the Trustee will not be liable for, and will be held harmless by the Issuer from, any liability arising from following any Issuer Orders, instructions or other directions, and the Trustee is authorized to conclusively rely under the Indenture or any other agreement to which it is a party on such Issuer Orders, instructions or other directions. If the Issuer or the Noteholders, as appropriate, shall fail to make such reimbursement or indemnification promptly, the Trustee may reimburse itself from any money in its possession as described under the captions "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—Collection Fund; Flow of Funds" and "SUMMARY OF THE INDENTURE PROVISIONS—Remedies and Default–Possession of Trust Estate" herein.

The Trustee and its officers, directors, employees and agents (each a "Trustee Indemnified Person") shall further be indemnified for and held harmless by the Issuer from and against any loss, liability or expense incurred without bad faith, negligence or willful misconduct on the part of the Trustee or any other Trustee Indemnified Person arising out of or in connection with the Trustee's acceptance or administration of the trust created under the Indenture or its duties thereunder, including the reasonable costs and expenses of the Trustee Indemnified Persons in defending themselves against any claim or liability in connection with the exercise or performance of any of the Trustee's duties thereunder (collectively, "Losses"). The obligations of the Issuer under the Indenture, including without limitation any payment obligations of the Issuer arising under the Indenture provisions summarized in this caption, are limited to amounts held under the Indenture and available therefor. If the Issuer or the Noteholders, as appropriate, shall fail to make such reimbursement or indemnification, the applicable Trustee Indemnified Person, subject to the provisions of the Indenture described under the caption "Remedies on Default—Possession of Trust Estate" above and the other provisions of the Indenture described under this caption (including without limitation that there has been no negligence or willful misconduct by such Trustee Indemnified Person), may reimburse itself from any money held under the provisions of the Indenture (other than the Department SAP Rebate Fund), subject only to the prior lien of the Notes for the payment of the principal thereof and interest thereon from the Collection Fund, including any required transfers thereto.

The provisions of the Indenture described under this caption to the contrary notwithstanding, and without limitation to the generality of the limitations in the Indenture described in the second paragraph (the legend) under the caption "Parity and Priority of Lien" above, all payment obligations of the Issuer under the Indenture provisions described in this caption, or otherwise resulting from or arising from the actions described under this caption, are expressly limited as to source of payment as provided in Indenture as described in the second paragraph (the legend) under the caption "Parity and Priority of Lien" above.

***Compensation of Trustee***. Except as otherwise expressly provided in the Indenture, all Trustee Fees shall be paid by the Issuer as provided in the Indenture, but will be payable from the Trust Estate solely as expressly provided therein. Subject to the limitations in the Indenture described in the second paragraph (the legend) under the caption "Parity and Priority of Lien" above, the compensation of the Trustee will not be limited to or by any provision of law in regard to the compensation of trustees of an express trust. The Trustee Fees will be applicable so long as the Notes are outstanding. In the event a successor Trustee is appointed under the Indenture, Trustee Fees will be agreed upon prior to the Trustee's succession and will be applicable so long as the Notes are outstanding; provided, however, the successor Trustee may not materially increase the Trustee Fees upon its appointment without an Issuer Order evidencing satisfaction of the Rating Agency Condition. If not paid by the Issuer, the Trustee shall have a lien against all money held pursuant to the Indenture (other than the Department SAP Rebate Fund), subject only to the prior lien of the Notes for the payment of the principal thereof and interest thereon, for the Trustee Fees and such other reasonable fees, costs and expenses incurred in and about the execution of the trusts hereby created and the exercise and performance of the powers and duties of the Trustee thereunder

and the fees, costs and expenses incurred in defending against any other liability payable from the Trust Estate (other than pursuant to the Indenture) of any character whatsoever (unless such liability is adjudicated by a court of competent jurisdiction to have resulted from the bad faith, negligence or willful misconduct of the Trustee or any other Trustee Indemnified Person) and any other amounts due and owing the Trustee or any other Trustee Indemnified Person as described under the caption "—*Indemnification of Trustee*" above.

*Resignation of Trustee*.  The Trustee and any successor to the Trustee may resign and be discharged by giving the Issuer 30 days prior written notice specifying the date on which the resignation is to take effect; provided, however, that such resignation will only take effect on the day specified in such notice if a qualified successor Trustee will have been appointed pursuant to the Indenture.  If no successor Trustee has been appointed by that date or within 90 days of the Issuer receiving the Trustee's notice, whichever period is longer, then the Trustee may petition a court of competent jurisdiction to (a) require the Issuer to appoint a temporary successor, within three days of the receipt of citation or notice by the court, or (b) appoint a successor Trustee meeting the eligibility requirements of the Indenture.  In no event may the resignation of the Trustee be effective until a qualified successor Trustee shall have been selected and appointed.  In the event a temporary successor Trustee is appointed pursuant to clause (a) above, the Issuer may remove such temporary successor Trustee and appoint a successor thereto meeting the eligibility requirements of the Indenture pursuant to the terms thereof.

*Removal of Trustee*.  The Trustee or any successor to the Trustee may be removed:

(a)    at any time by the Noteholders acting on behalf of the Noteholders of a majority of the Outstanding Amount of the Notes then Outstanding, upon thirty (30) days' prior written notice to each of the Trustee and the Issuer;

(b)    by the Issuer for cause or upon the sale or other disposition of the Trustee or its trust functions, upon thirty (30) days' prior written notice to each of the Trustee and the Noteholders; or

(c)    by the Issuer without cause so long as no Event of Default exists or has existed within the last 30 days, upon payment to the Trustee so removed of all money then due to it under the Indenture and appointment of a successor thereto by the Issuer and acceptance thereof by said successor and upon thirty (30) days' prior written notice to each of the Trustee and the Noteholders.

In the event the Trustee (or any successor to the Trustee) is removed, such removal will not become effective until:

(a)    in the case of removal by the Noteholders, such Noteholders by instrument or concurrent instruments in writing (signed and acknowledged by such Noteholders or their attorneys in fact) filed with the Trustee removed have appointed a successor Trustee or otherwise the Issuer shall have appointed a successor; and

(b)    the successor Trustee has accepted that appointment.

*Successor Trustee*.  In case at any time the Trustee or any successor to the Trustee resigns, is dissolved, is removed or otherwise is disqualified to act or is incapable of acting, or in case control of the Trustee or of any successor to the Trustee or of its officers is taken over by any public officer or officers, the Issuer may appoint a successor Trustee.  The Issuer will cause notice of the appointment of a successor Trustee to be mailed to the Noteholders at the address of each Noteholder appearing on the Note registration books maintained by the Trustee, as registrar.

Every successor Trustee will be required to meet the following eligibility criteria (which also apply to the initial Trustee):

  (a) will be a bank or trust company in good standing, organized and doing business under the laws of the United States or of a state therein;

  (b) will have a reported capital and surplus of not less than $50,000,000;

  (c) will be authorized under the law to exercise corporate trust powers in the State, be subject to supervision or examination by a federal or state authority; and

  (d) will be an Eligible Lender so long as such designation is necessary to maintain guarantees and federal benefits under the Higher Education Act with respect to the Financed Eligible Loans.

***Merger of the Trustee***.  Any entity into which the Trustee is converted or may be merged or with which it may be consolidated, or any entity resulting from any merger or consolidation to which the Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under the Indenture, provided such entity shall be otherwise qualified and eligible under the Indenture, without the execution or filing of any paper or any further act on the part of any other parties thereto.  The Trustee shall promptly notify the Issuer after the effectiveness of any merger or consolidation as described in the Indenture provisions summarized under this caption.

## Force Majeure

In no event will the Trustee or, except with respect to its obligation to fund the timely payment of principal and interest as due upon Notes, the Issuer be responsible or liable for any failure or delay in the performance of its obligations under the Indenture arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation to the generality of the foregoing, any provision of any present or future law or regulation thereunder, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, accidents, national emergencies, natural disasters, epidemics, pandemics, the adoption or imposition of quarantine, shelter-in-place or similar requirements, directives, guidance, or government action, including policies and any other laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by the Indenture, inability to obtain material, equipment or communications or computer facilities, or the failure of equipment or interruption of communications or computer facilities, and other causes beyond its control whether or not of the same type or kind as specifically named above it being understood that the Issuer will use reasonable efforts, and that the Trustee will use reasonable efforts which are consistent with accepted practices in the banking industry, respectively, to resume performance as soon as practicable under the circumstances.

## Supplemental Indentures

***Supplemental Indentures Not Requiring Consent of Noteholders***.  The Issuer can agree with the Trustee to enter into any indentures supplemental to the Indenture for any of the following purposes without notice to or the consent of Noteholders (except for clause (m) as described below):

  (a) to cure any ambiguity, inconsistency or formal defect or omission in the Indenture or to conform to the offering memorandum related to the initial offering of the Notes;

(b)      to grant to or confer upon the Trustee for the benefit of the Noteholders any additional benefits, rights, remedies, powers or authorities that may lawfully be granted to or conferred upon the Noteholders or the Trustee;

(c)      to subject to the Indenture additional revenues, properties or collateral;

(d)      to modify, amend or supplement the Indenture or any indenture supplemental thereto in such manner as to permit the qualification of the Indenture or any indenture supplemental thereto under the Trust Indenture Act of 1939 or any similar federal statute or to permit the qualification of the Notes for sale under the securities laws of the United States of America or of any of the states of the United States of America, and, if they so determine, to add to the Indenture or any indenture supplemental thereto such other terms, conditions and provisions as may be permitted by said Trust Indenture Act of 1939 or similar federal statute;

(e)      to evidence the appointment of a separate or co-Trustee or a co-registrar or transfer agent or the succession of a new Trustee under the Indenture, or any additional or substitute Guaranty Agency or Servicer;

(f)      to add such provisions to or to amend such provisions of the Indenture as may be necessary or desirable to assure implementation of the Program in conformance with the Higher Education Act if along with such supplemental indenture there is filed a note counsel's opinion addressed to the Issuer and the Trustee to the effect that the addition or amendment of such provisions will not materially impair the existing security of the Noteholders of any outstanding Notes;

(g)      to make any change as may be necessary in order to obtain and maintain for any of the Notes an investment grade rating from a nationally recognized rating service, if along with such supplemental indenture there is filed a note counsel's opinion addressed to the Issuer and the Trustee to the effect that such changes will not materially adversely impact the existing security of the Noteholders of any outstanding Notes;

(h)      to make any changes necessary to comply with or to obtain more favorable treatment under any current or future law, rule or regulation, including, but not limited to, the Higher Education Act or the regulations thereunder;

(i)      to create any additional funds or accounts or subaccounts under the Indenture deemed by the Trustee to be necessary or desirable;

(j)      to amend the Indenture to provide for use of a surety note or other financial guaranty instrument in lieu of cash and/or Investment Securities in all or any portion of the Reserve Fund, so long as such action shall not adversely affect the Ratings of any of the Notes;

(k)      to make Benchmark Replacement Conforming Changes from time to time in connection with the implementation of a Benchmark Replacement (see the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein);

(l)      to make any other change (other than changes with respect to any matter requiring the satisfaction of a Rating Agency Condition unless such Rating Agency Condition has been satisfied) which based upon an opinion of counsel will not materially adversely impact the Noteholders of any Notes; or

(m)    with the consent of all of the Class B Noteholders, to make any changes to the terms of the Class B Notes provided that such changes to the Class B Notes become effective only after the Class A Notes are no longer outstanding;

provided, however, that nothing in the Indenture provisions described under this caption shall permit, or be construed as permitting, any modification of the trusts, powers, rights, duties, remedies, immunities and privileges of the Trustee without the prior written approval of the Trustee, which approval shall be evidenced by execution of a supplemental indenture.

*Supplemental Indentures Requiring Consent of Noteholders*.  Any amendment of the Indenture other than those listed above or pursuant to a LIBOR Related Amendment must be approved by the Noteholders representing not less than a majority of the Outstanding Amount of the Notes; provided that the changes described below, other than Benchmark Replacement Conforming Changes or a LIBOR Related Amendment, may be made in a supplemental indenture only with the consent of the Noteholders of each affected Note then outstanding:

(a)    an extension of the Maturity Date of the principal of or the interest on any Note;

(b)    a reduction in the principal amount of any Note or the rate of interest thereon;

(c)    a privilege or priority of any Note under the Indenture over any other Note except as otherwise provided in the Indenture;

(d)    a reduction in the principal amount of the Notes required for consent to such supplemental indenture; or

(e)    the creation of any lien other than a lien ratably securing all of the Notes at any time outstanding under the Indenture except as otherwise provided in the Indenture.

Nothing in the Indenture provisions described under this caption shall permit, or be construed as permitting, any modification of the trusts, powers, rights, duties, remedies, immunities and privileges of the Trustee without the prior written approval of the Trustee, which approval shall be evidenced by execution of a supplemental indenture.

*Additional Limitation on Modification of Indenture*.  None of the provisions of the Indenture permit amending the Indenture to provide for the transfer of all or part of the Financed Eligible Loans or the granting of an interest therein to any person other than an eligible lender under the Higher Education Act or a Servicer, unless the Higher Education Act or regulations promulgated thereunder are modified so as to permit the same.

**Trusts Irrevocable**

The trust created by the Indenture is irrevocable until the Notes and interest thereon and all other payment obligations of the Issuer under the Indenture are fully paid or provision is made for their payment as provided in the Indenture.

**Satisfaction of Indenture**

If the Noteholders are paid all the principal of and interest due on their Notes at the times and in the manner stipulated in the Indenture and if all other persons are paid any other amounts payable and secured under the Indenture, then the pledge of the Trust Estate, except the Department SAP Rebate Fund,

will thereupon terminate and be discharged.  The Trustee will execute and deliver to the Issuer instruments to evidence the discharge and satisfaction, and the Trustee will pay all money held by it under the Indenture to the Issuer.

Notes will be considered to have been paid if money for their payment or redemption has been set aside and is being held in trust by the Trustee.  Any outstanding Note will be considered to have been paid if the Note is to be redeemed on any date prior to its stated maturity and notice of redemption has been provided for as provided in the Indenture and on said date there will have been deposited with the Trustee either money or certain non-callable governmental obligations which are unconditionally and fully guaranteed by the United States of America or any agency or instrumentality thereof, the principal of and the interest on which when due will provide money which, together with any money deposited with the Trustee at the time, will be sufficient to pay when due the principal of and interest to become due on the Notes on and prior to the redemption date or stated maturity, as the case may be.

**Optional Release of All Financed Eligible Loans**

The Issuer shall certify to and notify the Trustee in writing, within 15 days after the last Business Day of each Collection Period in which the then outstanding Pool Balance is 12% or less of the initial Pool Balance, of the percentage that the then outstanding Pool Balance bears to the initial Pool Balance.  The Issuer shall have the option to direct the release of all of the Financed Eligible Loans from the lien of the Indenture on the Monthly Distribution Date next succeeding the last day of the Collection Period on which the then outstanding Pool Balance is 10% or less of the initial Pool Balance and on each Monthly Distribution Date thereafter (each, an "Optional Release Date").  To exercise the option described in this paragraph, the Issuer shall deposit in the Collection Fund on or before the Optional Release Date, an amount that is sufficient to redeem all of the Notes, and pay any due and owing Administration Fees (including the amounts allocated for the payment of Program Fees), Servicing Fees, Program Fees, and Trustee Fees attributable to the Notes, as well as any other expenses that may be due at the time or following the payment of the Notes, less any amounts on deposit in the Funds and Accounts (other than the Department SAP Rebate Fund).  Upon exercise of the option to direct the release of all of the Financed Eligible Loans pursuant to this paragraph, the same shall be released from the lien of the Indenture.

**CREDIT ENHANCEMENT**

Credit enhancement for the Notes will consist of overcollateralization, excess spread, cash on deposit in the Capitalized Interest Fund and the Reserve Fund and, for the Class A Notes, the subordination of the Class B Notes.  "Excess spread" is created when interest collections received on the Eligible Loans held in the Trust Estate during a Collection Period and related investment earnings exceed the interest on the Notes at the related Note interest rates and certain fees and expenses of the Issuer.  There can be no assurance as to the rate, timing or amount, if any, of excess spread.

As described under the caption "USE OF PROCEEDS" herein, on the Date of Issuance, certain of the proceeds from the sale of the Notes will be deposited by the Issuer to the credit of the Reserve Fund and the Capitalized Interest Fund.  Certain of the remaining proceeds will be used to refinance FFELP Loans presently pledged by the Issuer under the Warehouse Agreement and certain FFELP Loans held unencumbered by the Issuer.  Such refinanced FFELP Loans will be pledged to the Trustee under the Indenture upon such refinancing.  After giving effect to the issuance of the Notes, deposits to the Capitalized Interest Fund and Reserve Fund and the pledge of the Financed Eligible Loans to the Trustee on the Date of Issuance, the parity ratio will be not less than 108.0% of the principal amount of the Class A Notes and not less than 105.5% of the principal amount of all Notes.  The FFELP Loans expected to be refinanced and pledged under the Indenture on the Date of Issuance have been identified and are described herein (as

of the Statistical Cut-Off Date) under the caption "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS" herein.

On the Date of Issuance, deposits in the amounts of $6,000,000 and $1,307,534 will be made to the Capitalized Interest Fund and the Reserve Fund, respectively. See the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES" herein. The Reserve Fund and Capitalized Interest Fund are intended to enhance the likelihood of timely distributions of interest to the Noteholders and to decrease the likelihood that the Noteholders will experience losses. To the extent of available funds, the Reserve Fund will be replenished so that amounts on deposit therein do not fall below the Specified Reserve Fund Balance. Amounts withdrawn from the Capitalized Interest Fund will not be replenished.

The amount of the Financed Eligible Loans to be deposited into the Student Loan Fund on the Date of Issuance, together with the cash to be deposited on the Date of Issuance into the Capitalized Interest Fund and the Reserve Fund will exceed the original principal balance of the Notes to be issued by the Issuer, which excess will represent the initial overcollateralization for the Trust Estate created under the Indenture and a portion of the credit enhancement.

Credit enhancement will not provide protection against all risks of loss and may not guarantee payment to Noteholders of all amounts to which they are entitled. If losses or shortfalls occur that exceed the amount of the credit enhancement, Noteholders, and particularly the Noteholders of the Class B Notes, will bear their allocable share of deficiencies. To the extent that the credit enhancement described above is exhausted, the Notes, and particularly the Class B Notes, will bear any risk of loss.

The Class B Notes are subordinate Notes. The rights of the Noteholders of the Class B Notes to receive payments of interest are subordinated to the rights of the Noteholders of the Class A Notes to receive payments of interest. Similarly, the rights of the Noteholders of the Class B Notes to receive payments of principal are subordinated to the rights of the Noteholders of the Class A Notes to receive payments of interest and principal. This subordination is intended to enhance the likelihood of regular receipt by the Noteholders of the Class A Notes of the full amount of the payments of interest and principal due to them and to protect the Noteholders of the Class A Notes against losses. See the caption "RISK FACTORS— Subordination of the Class B Notes may result in a greater risk of loss for holders of Class B Notes" herein.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of all material U.S. federal income tax consequences of the purchase, ownership and disposition of the Notes for the investors described below. This summary is based upon laws, regulations, rulings and decisions currently in effect, all of which are subject to change, which change may be retroactive. Except where noted, this summary is addressed to Noteholders who are U.S. persons that acquire Notes at original issuance and beneficially own their Notes as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Code. This summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a particular investor's decision to purchase Notes. For example, this summary does not deal with individual circumstances of particular investors or all federal tax consequences applicable to all categories of investors, some of which may be subject to special rules, including, but not limited to, partnerships or entities treated as partnerships, dealers in securities or currencies, financial institutions, life insurance companies, persons holding Notes as a part of a hedging, integrated constructive sale or conversion transaction or a straddle, Noteholders whose "functional currency" is not the U.S. dollar, pension plans, foreign investors or subsequent purchasers of the Notes, except as otherwise indicated. Prospective investors should note that no rulings have been or will be sought from the Service with respect to any aspect of the U.S. federal income tax treatment of the Issuer, the Notes or the Noteholders, including the U.S. federal income tax consequences discussed below, and no assurance can be given that the Service will not take contrary

positions to those discussed below. In addition, this summary does not address tax and withholding considerations that may be applicable to any hedge, constructive sale, straddle or conversion transaction, debt securities that are "contingent payment" debt instruments, alternative minimum taxes, the holding of Notes through entities treated as partnerships for U.S. federal income tax purposes, the Medicare tax on net investment income or the laws of any state, locality or taxing jurisdiction other than the U.S. federal income tax laws. Any discussion of U.S. federal tax issues in this Offering Memorandum (including any attachments or enclosures) is not intended or written by us to be relied upon or used by taxpayers for the purpose of avoiding penalties that may be imposed on taxpayers under the Code. Investors should consult their own tax advisors to determine the federal, state, local and other tax consequences of the purchase, ownership and disposition of Notes.

**Characterization of the Notes**

Based, in part, on the facts set forth herein, additional information and assuming the accuracy of and compliance with certain assumptions, representations and covenants, Kutak Rock LLP will render on the Date of Issuance its opinion to the effect that, for U.S. federal income tax purposes, when issued, the Notes will be characterized as debt if and to the extent beneficially acquired on the Date of Issuance by persons or entities unaffiliated with the Issuer. Unlike a ruling from the Service, such opinion is not binding on the courts or the Service. Therefore, it is possible that the Service could assert that, for purposes of the Code, the transaction contemplated by this Offering Memorandum constitutes a sale of the Financed Eligible Loans (or an interest therein) to the Noteholders or that one or more of the Classes of Notes is an equity interest in the Financed Eligible Loans or that the relationship which will result from this transaction is that of a partnership or an association taxable as a corporation.

If, instead of treating the transaction as creating secured debt, the transaction were treated as creating equity interests in a partnership held by the Noteholders, the resulting partnership would not be subject to U.S. federal income tax. Rather, each Noteholder would be taxed individually on its respective distributive shares of the partnership's income, gain, loss, deductions and credits which could have adverse tax consequences to certain Noteholders. For example, the amount, character and timing of items of income and deduction of the Noteholder could differ if the Notes were determined to constitute partnership interests, rather than indebtedness.

If, alternatively, it were determined that the relationship that will result from this transaction caused the trust arrangement to be classified as an association or characterized as a publicly traded partnership taxable as a corporation, the resulting entity would be subject to U.S. federal income tax at corporate income tax rates on its taxable income, including taxable income derived from the Eligible Loans, which would reduce the amounts available for payment to the Noteholders. Moreover, if the Noteholders were treated as equity holders in such an entity, payments to the Noteholders generally would be treated as dividends for tax purposes to the extent of such entity's accumulated and current earnings and profits.

The Issuer will express in the Indenture its intent that, for U.S. federal income tax purposes, the Notes will be indebtedness. The Issuer, and each Noteholder by accepting its Notes, agrees to treat the Notes as indebtedness for U.S. federal income tax and all applicable state and local income and franchise tax purposes in all tax filings, reports and returns and otherwise, and will not take, or participate in the taking of or permit to be taken, any action that is inconsistent with such tax treatment and tax reporting of the Notes, unless required by applicable law.

In general, the characterization of a transaction as a sale of property or a secured loan, for U.S. federal income tax purposes, is a question of fact, the resolution of which is based upon the economic substance of the transaction, rather than its form or the manner in which it is characterized for state law or other purposes. While the Service and the courts have set forth several factors to be taken into account in

determining whether the substance of a transaction is a sale of property or a secured indebtedness, the primary factor in making this determination is whether the transferee has assumed the risk of loss or other economic burdens relating to the property and has obtained the benefits of ownership thereof. Notwithstanding the foregoing, in some instances, courts have held that a transaction may be characterized as the form chosen by the taxpayer, even if the substance of the transaction does not accord with its form.

The Issuer believes that it has retained the preponderance of the primary benefits and burdens associated with ownership of the Financed Eligible Loans and that as a result, the Noteholders should not be treated as the owners of the Financed Eligible Loans for U.S. federal income tax purposes. If, however, the Service were successfully to assert that this transaction should be treated as a sale of the Financed Eligible Loans, the Service could further assert that the entity created pursuant to the Indenture, as the owner of the Financed Eligible Loans for U.S. federal income tax purposes, should be deemed engaged in a financial business and, therefore, characterized as a publicly traded partnership taxable as a corporation.

The remainder of the discussion below assumes that the Notes are characterized as debt for U.S. federal income tax purposes. The opinion of Kutak Rock LLP is not binding on the courts or the Service. Noteholders are strongly encouraged to consult with their own tax advisors regarding the possibility that the Notes could be treated as other than debt of the Issuer and any resulting consequences to the Noteholder.

The Secretary of Treasury has published final regulations under Section 385 of the Code that address the federal tax treatment of instruments held by parties related to the Issuer as debt or equity. Pursuant to these regulations, Notes purchased by an investor that is a member of the "expanded group" of the Issuer within the meaning of these regulations or by an investor after this initial offering from an affiliate of the Issuer may be treated as equity under certain circumstances. Prospective investors are urged to consult their tax advisors regarding the possible effects of these regulations. Each investor, by its purchase of a Note, whether upon original issuance or subsequent transfer, is deemed to have represented and agreed that it is not part of the "expanded group" of the Issuer within the meaning of Treasury Regulation Section 1.385-1(c)(4) and is not acquiring the Notes with a principal purpose of avoiding the purposes of Treasury Regulation Section 1.385-3.

**Taxation of Interest Income and Original Issue Discount**

If a Note is deemed to be issued with OID, the Code generally requires the current inclusion in gross income of OID on a constant yield basis. OID is the excess of the "stated redemption price at maturity" of a Note over its "issue price." Generally, the issue price of a Note should be the initial offering price to the public (other than to bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers) at which a substantial amount of the Notes of the same maturity are sold pursuant to the initial offering. The "stated redemption price at maturity" of a Note includes all payments with respect to the Notes other than "qualified stated interest." For purposes of computing OID, "qualified stated interest" is stated interest that is unconditionally payable (or that will be constructively received under Section 451 of the Code) at least annually at a single fixed rate, a "qualified floating rate" or an "objective rate" at fixed intervals of one year or less ("qualified stated interest"). Interest is unconditionally payable if reasonable legal remedies exist to compel timely payment or the debt instrument otherwise provides terms and conditions that make late payment or nonpayment sufficiently remote. With respect to a floating rate debt security, "qualified stated interest" will be determined solely for purposes of calculating the accrual of OID as though the debt security will bear interest in all periods at a fixed rate generally equal to the rate that would be applicable to interest payments on the debt security on its date of issue or, in the case of certain floating rate debt securities, the rate that reflects the yield to maturity that is reasonably expected for the debt security. Stated interest that is "qualified stated interest"

will be ordinary income when received or accrued by the Noteholders in accordance with their respective methods of tax accounting and the applicable provisions of the Code.

Due to the subordination of the Class B Notes to the Class A Notes and the possibility of interest deferral under the terms of the Class B Notes, it is uncertain whether the stated interest on the Class B Notes will qualify as "qualified stated interest" for purposes of determining whether the Class B Notes are issued with OID. Absent official guidance on this point, the Issuer does not intend to treat the stated interest on the Class B Notes as other than qualified stated interest solely because of the possibility that interest thereon may be deferred under the terms of the Class B Notes, although it may revise such treatment in the future if it should determine a change to be appropriate. If the Service were to treat the stated interest payments on the Class B Notes as includible in their "stated redemption price at maturity" because they are not "qualified stated interest," the Class B Notes would be treated as issued with OID (which would include the stated interest payments and the de minimis discount from par at issuance based on their initial offering price to the public).

Discount on a Note at issuance will be treated as de minimis (and therefore OID will be treated as zero) if the excess of the Note's "stated redemption price at maturity" over its issue price is less than 0.25% of the Note's "stated redemption price at maturity" multiplied by the number of years to its maturity, based on the anticipated weighted average life of the Note, calculated using the "prepayment assumption," if any, used in pricing the Note and weighing each payment by reference to the number of full years elapsed from the Date of Issuance prior to the anticipated date of such payment. For purposes of computing whether any such discount is de minimis, the Issuer will assume a constant prepayment rate of 4% for consolidation loans, 6% for non-consolidation loans and 8% for rehabilitation loans. No representation is made as to the actual rate at which the Financed Eligible Loans in the Trust Estate will prepay or that the Notes will prepay in accordance with this or any other prepayment assumption. Absent an election or a requirement to accrue all income from a Note under the OID rules, any de minimis discount on a Note at issuance would be includible in gross income in any taxable year as principal payments are received on the Notes in the proportion that each such principal payment in the taxable year bears to the original principal balance of the Note.

The annual statement regularly furnished to Noteholders for U.S. federal income tax purposes will include information regarding the accrual of payments of principal and interest with respect to the Notes. Although the Class A-1A Notes will be issued with a de minimis discount from par, the Class A Notes will not be issued with OID based on their initial offering price to the public. All of the stated interest payable with respect to the Class A Notes will constitute "qualified stated interest" for purposes of the OID provisions of the Code. Stated interest on the Class A Notes will be includible in gross income when received or accrued by the Class A Noteholders in accordance with their respective methods of tax accounting and the applicable provisions of the Code. Although the Class B Notes will be issued with a de minimis discount from par, the Class B Notes will not be issued with OID based on their initial offering price to the public. Stated interest on the Class B Notes will be includible in gross income when received or accrued by the Class B Noteholders in accordance with their respective methods of tax accounting and the applicable provisions of the Code, unless, as described above, the Class B Notes are treated as issued with OID due to the possibility of interest deferral under the terms of the Class B Notes. If so treated, the stated interest and the de minimis discount from par at issuance on the Class B Notes would be includible in gross income in accordance with the method under the Code that applies to OID. The Issuer will supply to the Trustee, at the time and in the manner required by the Code, for further distribution to the Noteholders, and to the extent required by the Code, information with respect to any OID accruing on the Notes, and the Trustee shall have no duty or obligation to determine, verify or confirm any original issue discount information. References below to "Discount Notes" are to the Class B Notes, if any, that are treated as having been issued with OID.

The Issuer expects that a Noteholder of any Discount Notes will be required to include a daily portion of its OID in gross income for U.S. federal income tax purposes under a constant yield to maturity method before the receipt of cash attributable to such income. The amount of OID generally includible in gross income is the sum of the "daily portions" of OID with respect to a Discount Note accrued for each day during the taxable year or portion of the taxable year in which the Noteholder holds the Discount Note. Special provisions apply to debt instruments on which payments may be accelerated due to prepayments of other obligations securing those debt instruments. Under these provisions, the accrual of OID on such debt instruments is based on the present value of the remaining payments on the debt instrument and adjusted by taking into account both the prepayment assumption, if any, used in pricing the debt instrument and the actual prepayment experience. As a result, the amount of OID on the Discount Notes that would accrue in any given accrual period (a) may increase to take into account (i) principal payments on the Discount Notes in the accrual period that exceed the expected principal payments based on the prepayment assumption and (ii) any increase in the "stated redemption price at maturity" due to any additional principal payments expected as a result of the compounding of deferred interest, if any, on the Discount Notes, and (b) generally may decrease (but not below zero for any period) if (i) the principal payments in the accrual period are slower than the expected principal payments based on the prepayment assumption; and (ii) total OID remaining to be accrued is reduced due to prior principal prepayments. For these purposes, the Issuer will assume a constant prepayment rate of 4% for consolidation loans, 6% for non-consolidation loans and 8% for rehabilitation loans. No representation is made as to the actual rate at which the Financed Eligible Loans in the Trust Estate will prepay or that the Discount Notes will prepay in accordance with this or any other prepayment assumption.

In addition, OID that accrues in each year to a Noteholder of a Discount Note is included in the calculation of the distribution requirements of certain regulated investment companies and real estate investment trusts. Moreover, the accrual of OID in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral U.S. federal income tax consequences although the Noteholder of such Discount Note has not received cash attributable to such OID in such year.

Noteholders of Discount Notes should consult their own tax advisors as to the amount, if any, calculation and treatment of any OID on, and the tax consequences of the purchase, holding and sale of, Discount Notes and as to the treatment of any OID for state tax purposes.

A purchaser (other than a person who purchases a Note upon issuance at the issue price) who buys a Note for an amount that is less than its "stated redemption price at maturity" will be treated as having purchased such Note at a "market discount," unless the amount of such market discount is less than a de minimis amount specified in the Code. In general, the market discount rules of the Code treat principal payments and gain on disposition of a debt instrument as ordinary income to the extent of the lesser of (a) the amount of such payment or realized gain; or (b) the market discount which has not previously been included in gross income and is treated as having accrued on the debt instrument at the time of such payment or disposition. Market discount will be considered to accrue in each accrual period, at the option of the Noteholder of such Note: (i) on the basis of a constant yield method; or (ii) in an amount that bears the same ratio to the total remaining market discount as the stated interest paid in the accrual period bears to the total amount of stated interest remaining to be paid on the Note as of the beginning of the accrual period, in each case, subject to a prepayment assumption. Although the accrued market discount on debt instruments such as the Notes which are subject to prepayment based on the prepayment of other debt instruments is to be determined under regulations yet to be issued, the legislative history of the market discount provisions of the Code indicates that the same prepayment assumption used to calculate OID should be utilized. Potential Noteholders should consult their own tax advisors concerning the application of the market discount rules to the Notes and the advisability of making any of the elections allowed under Sections 1276 through 1278 of the Code.

In the event that the Notes are considered to be purchased by a Noteholder at a price greater than their remaining "stated redemption price at maturity", they will be considered to have been purchased at a premium. The Noteholder may elect to amortize such premium (as an offset to interest income), using a constant yield method, over the remaining term of the Notes. Special rules apply to determine the amount of premium on a "variable rate debt instrument" and certain other debt instruments. Potential Noteholders should consult their tax advisors regarding the amortization of bond premium.

The OID regulations permit a Noteholder to elect to accrue all interest, discount (including de minimis market discount or de minimis discount at issuance) and premium in gross income as interest, based on a constant yield method. If such an election were to be made with respect to a Note acquired with market discount, the Noteholder would be deemed to have made an election to include in gross income currently market discount with respect to all other debt instruments having market discount that such Noteholder acquires during the year of the election or thereafter. Similarly, a Noteholder that makes this election for a Note acquired at a premium will be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that such Noteholder owns or acquires. The election to accrue interest, discount and premium on a constant yield method may only be revoked with the consent of the Service.

Under Public Law 115-97 (sometimes referred to as the Tax Cuts and Jobs Act), the Code was amended to require a Noteholder that uses the accrual method of accounting for tax purposes and reports its net income for financial accounting purposes on certain applicable financial statements to include in taxable income its items of gross income not later than when such items are taken into account as revenue in the financial statement. This amendment generally does not apply to timing rules for accrued market discount on bonds and the general OID timing rules, as well as the timing rules for OID determined with respect to special debt instruments (contingent payment and variable rate debt instruments, certain hedged debt instruments, and inflation-indexed debt instruments). Noteholders are urged to consult their tax advisors regarding the application of this amendment and its effect, if any, on the timing of the recognition of income related to the Notes under the Code.

### Sale or Exchange of Notes

A Noteholder generally will recognize gain or loss on the sale, exchange or retirement of its Notes equal to the difference between the amount realized on the sale, exchange or retirement and the Noteholder's adjusted tax basis in the Notes. The adjusted tax basis of a Note to a particular Noteholder generally will equal the Noteholder's cost for the Note, increased by any market discount and any OID and gain previously included by such Noteholder in gross income with respect to the Note, and decreased by the amount of bond premium, if any, previously amortized and by the amount of principal payments previously received by such Noteholder with respect to such Note. Any such gain or loss will be capital gain or loss if the Note was held as a capital asset, except for gain representing accrued interest, accrued market discount not previously included in gross income and in the event of a prepayment or redemption, any not yet accrued OID. Capital gains or losses will be long-term capital gains or losses if the Note was held for more than one year. The deductibility of capital losses is subject to certain limitations.

The Indenture permits Noteholders to waive an Event of Default or rescind an acceleration of the Notes in certain circumstances upon a vote of the requisite percentage of the Noteholders. Any such waiver or rescission, or any amendment of the terms of the Notes, could be treated for U.S. federal income tax purposes as a constructive exchange by a Noteholder for a new Note. In addition, if the terms of a Note were significantly modified, in certain circumstances, a new debt obligation would be deemed created and exchanged for the prior obligation in a taxable transaction. Among the modifications which may be treated as significant are those which relate to redemption provisions and, in the case of a nonrecourse obligation, those which involve the substitution of collateral.

The occurrence of a Benchmark Transition Event and the replacement of the current Benchmark for the Notes (One-Month LIBOR) with a Benchmark Replacement, and any associated alteration (such as a Benchmark Replacement Conforming Change), may also be treated as a significant modification of the Notes resulting in a deemed taxable exchange. The Service has proposed the LIBOR Proposed Regulations concerning certain U.S. federal income tax consequences related to the transition from interbank offered rates (such as LIBOR) to other reference rates in debt instruments. The LIBOR Proposed Regulations establish a safe harbor under which certain changes to the terms of a debt instrument and associated alterations in connection with the elimination of LIBOR will not be treated as a significant modification of the debt instrument resulting in a deemed exchange of the debt instrument under Section 1001 of the Code. See the caption "DESCRIPTION OF THE NOTES—Benchmark Transition Event" herein. The Indenture provisions relating to a Benchmark Transition Event are substantially similar to those recommended by the Alternative Reference Rates Committee of the Federal Reserve Bank of New York. Although the matter is not free from doubt, the Issuer expects that the modifications of the Indenture and any associated alterations (such as the Benchmark Replacement Conforming Changes) in connection with a Benchmark Transition Event and the implementation of the modifications and alterations should comply with the safe harbor in the LIBOR Proposed Regulations. However, there can be no assurance that each such modification, associated alteration or implementation thereof will comply with the safe harbor. See the caption "RISK FACTORS—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" herein.

For U.S. federal income tax purposes, if a deemed exchange occurs as a result of a significant modification of the Notes, a Noteholder could recognize gain or loss, and some or all of the resulting new Notes could be treated as (a) issued with original issue discount or with amortizable bond premium or (b) constituting equity interests in a partnership or a corporation. Potential Noteholders should consult their tax advisors concerning the circumstances in which the Notes could be deemed significantly modified and reissued and the possible U.S. federal income tax consequences to the Noteholder, including the application of the rules under Section 1001 of the Code.

## Backup Withholding

Certain Noteholders may be subject to U.S. federal backup withholding at the applicable rate determined by statute with respect to interest (including any OID) paid with respect to the Notes if the Noteholders, upon issuance, fail to supply the Trustee or their brokers (or other applicable intermediary) with their taxpayer identification numbers, furnish incorrect taxpayer identification numbers, fail to report interest, dividends or other "reportable payments" (as defined in the Code) properly, or, under certain circumstances, fail to provide the Trustee with a certified statement or certain other applicable documentation, under penalty of perjury, that they are not subject to U.S. federal backup withholding. Information returns will be sent annually to the Service and to each such Noteholder (except certain exempt Noteholders) setting forth the amount of interest paid with respect to the Notes and the amount of tax withheld thereon.

## State, Local or Foreign Taxation

Except as specifically set forth in this Offering Memorandum, the Issuer makes no representations regarding the tax consequences of purchase, ownership or disposition of the Notes under the tax laws of any state, locality or foreign jurisdiction. Investors considering an investment in the Notes should consult their own tax advisors regarding such tax consequences.

**Tax-Exempt Investors**

In general, an entity which is exempt from U.S. federal income tax under the provisions of Section 501 of the Code is subject to tax on its unrelated business taxable income. An unrelated trade or business is any trade or business which is not substantially related to the purpose which forms the basis for such entity's exemption. However, under the provisions of Section 512 of the Code, interest may be excluded from the calculation of unrelated business taxable income unless the obligation which gave rise to such interest is subject to acquisition indebtedness. Except to the extent any Noteholder incurs acquisition indebtedness with respect to a Note, interest paid or accrued with respect to such Note may be excluded by such tax-exempt Noteholder from the calculation of unrelated business taxable income. Each potential tax-exempt Noteholder is urged to consult its own tax advisor regarding the application of these provisions.

**Foreign Investors**

A Noteholder which is not a U.S. person ("foreign holder") will not be subject to U.S. federal income tax or withholding tax in respect of interest income (including any OID paid) or gain on the Notes if certain conditions are satisfied, including: (a) the foreign holder provides an appropriate statement, signed under penalties of perjury, identifying the foreign holder as the beneficial owner and stating, among other things, that the foreign holder is not a U.S. person; (b) the foreign holder is not a "10% shareholder" or "related controlled foreign corporation" with respect to the Issuer; and (c) the interest income is not effectively connected with a U.S. trade or business of the Noteholder. The foregoing exemption does not apply to certain contingent interest. To the extent these conditions are not met, a 30% withholding tax will apply to interest income on the Notes, unless an income tax treaty reduces or eliminates such tax or the interest is effectively connected with the conduct of a trade or business within the U.S. by such foreign holder. In the latter case, such foreign holder will be subject to U.S. federal income tax with respect to all income from the Notes at regular rates applicable to U.S. taxpayers, and may be subject to the branch profits tax if it is a corporation. A "U.S. person" is: (i) a citizen or resident of the U.S.; (ii) a partnership (or other entity treated as a partnership for U.S. federal tax purposes) or corporation (or other entity treated as a corporation for U.S. federal tax purposes) that is created or organized in or under the laws of the U.S. or any State thereof (including the District of Columbia); (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if a court within the U.S. is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of its substantial decisions. As noted earlier, in addition to certain other entities, this tax section does not deal with the treatment of partnerships (or entities treated as partnerships for U.S. federal tax purposes) or their members.

Generally, a foreign holder will not be subject to U.S. federal income tax on any amount which constitutes capital gain upon the sale, exchange, retirement or other disposition of a Note unless such foreign holder is an individual present in the U.S. for 183 days or more in the taxable year of the sale, exchange, retirement or other disposition and certain other conditions are met, or unless the gain is effectively connected with the conduct of a trade or business in the U.S. by such foreign holder. If the gain is effectively connected with the conduct of a trade or business in the U.S. by such foreign holder, such holder will generally be subject to U.S. federal income tax with respect to such gain in the same manner as U.S. holders, as described above, and a foreign holder that is a corporation could be subject to a branch profits tax on such income as well.

**Foreign Account Tax Compliance Act**

In addition to the U.S. income tax, withholding tax and backup withholding tax described above, under the Foreign Account Tax Compliance Act ("FATCA") and related administrative guidance, U.S.

withholding at a rate of 30% generally will be required in certain circumstances on interest payments (including OID) in respect of the Notes held by or through certain foreign financial institutions (including investment funds), unless such institution (a) enters into, and complies with, an agreement with the Service to report, on an annual basis, information with respect to interests in, and accounts maintained by, the institution that are owned by certain U.S. persons and by certain non-U.S. entities that are wholly or partially owned by U.S. persons and to withhold on certain payments or (b) if required under an intergovernmental agreement between the U.S. and an applicable foreign country, reports such information to its local tax authority, which will exchange such information with the U.S. authorities.   An intergovernmental agreement between the U.S. and an applicable foreign country, or other guidance, may modify these requirements.   Accordingly, the entity through which the Notes are held will affect the determination of whether such withholding is required.  Similarly, under FATCA, in certain circumstances interest payments (including OID) on the Notes held by an investor that is a non-financial non-U.S. entity that does not qualify under certain exemptions generally will be subject to withholding at a rate of 30%, unless such entity either (a) certifies that such entity does not have any "substantial United States owners"; or (b) provides certain information regarding the entity's "substantial United States owners," which the Trustee will in turn provide to the Service.  Noteholders will not receive additional amounts from the Trust Estate in respect of any amounts withheld.  This withholding will apply regardless of whether the payment would otherwise be exempt from U.S. nonresident withholding tax (e.g., under the portfolio interest exemption or as capital gain).  Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the U.S. governing FATCA may be subject to different rules.   A foreign entity will generally claim an exemption from FATCA withholding, if the exemption is available, by properly filling out and giving to the person making payments to it IRS Form W-8BEN-E, though other W-8 forms or a W-9 form may in certain cases need to be supplied.  While existing regulations would also require FATCA withholding on payments of gross proceeds, including the return of principal, from the sale or other disposition, including redemptions, of the Notes, the U.S. Treasury Department and the Service have indicated in proposed regulations their intent to eliminate the FATCA withholding requirement on gross proceeds.  The proposed regulations generally (i) provide that "withholdable payments" will not include gross proceeds from the disposition of property that can produce U.S. source dividends or interest, and (ii) state in the preamble that taxpayers may rely on these provisions of the proposed regulations until final regulations are issued.

Noteholders should consult their own tax advisors regarding the application and impact of FATCA, and should consult their bank or broker about the likelihood that payments to it (for credit to the Noteholder) could become subject to FATCA withholding.

## MISSOURI INCOME TAX

Interest on the Notes is exempt from income taxation by the State of Missouri.

## ERISA CONSIDERATIONS

The following summarizes certain aspects of The Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the Code that may affect a decision by employee benefit plans, tax favored retirement and savings arrangements and other entities in which such plans or arrangements are invested (collectively, the "Plans") to invest in Notes.  The following discussion is general in nature and not intended to be a complete discussion of the applicable law pertaining to a Plan's decision to invest and is not intended to be legal advice.  In addition, the following discussion is based on the law in effect as of the date of this Offering Memorandum, and neither the Issuer nor the Underwriter have undertaken any obligation to update this summary as a result of any changes in the applicable law or regulations.

ERISA imposes certain fiduciary obligations and prohibited transaction restrictions on employee pension and welfare benefit plans subject to ERISA ("ERISA Plans").  Section 4975 of the Code imposes

substantially similar prohibited transaction restrictions on certain Plans, including tax-qualified retirement plans described in Section 401(a) of the Code and on individual retirement accounts and annuities described in Sections 408(a) and (b) of the Code.  Certain employee benefit plans, such as governmental plans (as defined in Section 3(32) of ERISA), and, if no election has been made under Section 410(d) of the Code, church plans (as defined in Section 3(33) of ERISA) ("Non-ERISA Plans"), are not subject to the requirements set forth in ERISA or the prohibited transaction restrictions under Section 4975 of the Code.  However, investment by Non-ERISA Plans may be subject to the provisions of other applicable federal and state law ("Similar Laws").  Any Non-ERISA Plan that is qualified under Section 401(a) and exempt from taxation under Section 501(a) of the Code is, nevertheless, subject to the prohibited transaction rules set forth in Section 503 of the Code.  Further, some Plans, including certain ERISA Plans, may only be permitted to invest in certain types of investments (e.g., the Notes are not a permitted investment for Code Section 403(b) plans).

A Plan fiduciary should consider whether an investment in the Notes satisfies the requirements set forth in Part 4 of Title I of ERISA, including the requirements that (a) the investment satisfy the prudence and diversification standards of ERISA, (b) the investment be in the best interests of the participants and beneficiaries of the Plan and (c) the investment be permissible under the terms of the Plan's investment policies and governing instruments.  In determining whether an investment in the Notes is prudent for ERISA purposes, a Plan fiduciary should consider all relevant facts and circumstances, including, without limitation, the limitations imposed on transferability, whether the investment provides sufficient liquidity in light of the foreseeable needs of the Plan, and whether the investment is reasonably designed, as part of the Plan's portfolio, to further the Plan's purposes, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment.  A fiduciary of a Non-ERISA Plan should consider whether an investment in the Notes satisfies its fiduciary obligations under Similar Laws.

Section 406 of ERISA and Section 4975 of the Code prohibit a broad range of transactions involving assets of Plans with persons ("Parties in Interest" or "Disqualified Persons" as such terms are defined in ERISA and the Code, respectively) who have certain specified relationships to the Plans, unless a statutory, class or administrative exemption is available.  Parties in Interest or Disqualified Persons that participate in a prohibited transaction may be subject to a penalty (or an excise tax) imposed pursuant to Section 502(i) of ERISA or Section 4975 of the Code unless a statutory, class or administrative exemption is available.  Section 502(l) of ERISA requires the Secretary of the U.S. Department of Labor (the "DOL") to assess a civil penalty against a fiduciary who violates any fiduciary responsibility or commits any other violation of part 4 of Title I of ERISA or any other person who knowingly participates in such breach or violation.  If the investment constitutes a prohibited transaction under Section 4975(c) of the Code, an IRA may lose its tax-exempt status.  If the investment constitutes a prohibited transaction under Section 503 of the Code, a Non-ERISA Plan may lose its tax exemption.

The investment by a Plan may, in certain circumstances, cause the Plan's assets to be deemed to include an interest in each of the underlying assets of the entity issuing a security in which the Plan has an investment, such as the Issuer.  Certain transactions may be deemed to constitute prohibited transactions if assets of the Issuer are deemed to be assets of a Plan.  These concepts are discussed in greater detail below.

**Plan Assets Regulation**

The DOL has promulgated a regulation set forth at 29 C.F.R. § 2510.3-101, which has been amended by Congress in Section 3(42) of ERISA (the "Plan Assets Regulation"), concerning whether or not the assets of an ERISA Plan would be deemed to include an interest in the underlying assets of an entity (such as the Issuer) for purposes of the general fiduciary responsibility provisions of ERISA and for the prohibited transaction provisions of ERISA and Section 4975 of the Code, when a Plan acquires an "equity

interest" in such entity. For purposes of this section, the terms "plan assets" ("Plan Assets") and the "assets of a Plan" have the meaning specified in the Plan Assets Regulation as modified by Section 3(42) of ERISA.

Under the Plan Assets Regulation, the assets of the Issuer would be treated as Plan Assets if a Plan acquires an equity interest in the Issuer and none of the exceptions contained in the Plan Assets Regulation are applicable. An equity interest is defined under the Plan Assets Regulation as an interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features. If the Notes are treated as having substantial equity features, a Plan (including an entity in which a Plan is invested) that purchases Notes could be treated as having acquired an interest in the assets of the Issuer. In that event, the purchase, holding, transfer or resale of the Notes could result in a transaction that is prohibited under ERISA or the Code. While not free from doubt, on the basis of the Notes as described herein, it appears that the Notes at issuance should be treated as debt without substantial equity features for purposes of the Plan Assets Regulation.

In the event that the Notes cannot be treated as indebtedness for purposes of ERISA, under an exception to the Plan Assets Regulation, the assets of a Plan will not include an interest in the assets of an entity, the equity interests of which are acquired by the Plan, if at no time Plans in the aggregate own 25% or more of the value of any class of equity interests in such entity, as calculated under the Plan Assets Regulation and Section 3(42) of ERISA. Because the availability of this exception depends upon the identity of the Noteholders at any time, there can be no assurance that the Notes will qualify for this exception and that the Issuer's assets will not constitute a Plan Asset subject to ERISA's fiduciary obligations and responsibilities. Therefore, a Plan should not acquire or hold Notes in reliance upon the availability of this exception under the Plan Assets Regulation.

**Prohibited Transactions**

The acquisition or holding of Notes by or on behalf of a Plan, whether or not the underlying assets are treated as Plan Assets, could give rise to a prohibited transaction if the Issuer or any of its respective affiliates is or becomes a Party in Interest or Disqualified Person with respect to such Plan, or in the event that a Note is purchased in the secondary market by a Plan from a Party in Interest or Disqualified Person with respect to such Plan. There can be no assurance that the Issuer or any of its respective affiliates will not be or become a Party in Interest or a Disqualified Person with respect to a Plan that acquires Notes. Any such prohibited transaction could be treated as exempt under ERISA and the Code if the Notes were acquired pursuant to and in accordance with one or more statutory exemptions, individual exemptions or "class exemptions" issued by the DOL. Such class exemptions include, for example, Prohibited Transaction Class Exemption ("PTCE") 75-1 (an exemption for certain transactions involving employee benefit plans and broker-dealers, reporting dealers and banks), PTCE 84-14 (an exemption for certain transactions determined by an independent qualified professional asset manager), PTCE 90-1 (an exemption for certain transactions involving insurance company pooled separate accounts), PTCE 91-38 (an exemption for certain transactions involving bank collective investment funds), PTCE 95-60 (an exemption for certain transactions involving an insurance company's general account) and PTCE 96-23 (an exemption for certain transactions determined by a qualifying in-house asset manager).

The Underwriter, the Trustee or their affiliates may be the sponsor of, or investment advisor with respect to, one or more Plans. Because these parties may receive certain benefits in connection with the sale or holding of Notes, the purchase of Notes using plan assets over which any of these parties or their affiliates has investment authority might be deemed to be a violation of a provision of Title I of ERISA or Section 4975 of the Code. Accordingly, Notes may not be purchased using the assets of any Plan if any of the Underwriter, the Trustee or their affiliates has investment authority for those assets, or is an employer maintaining or contributing to the plan, unless an applicable prohibited transaction exemption is available and such prohibited transaction exemption covers such purchase.

**Purchaser's/Transferee's Representations
and Warranties**

Each purchaser and each transferee of a Note (including the person causing such purchaser or transferee to acquire an interest in the Note, including a Plan's fiduciary, as applicable, in its individual capacity) is deemed to represent and warrant that on each date on which such purchaser or transferee, as applicable, purchases or holds any interest in the Note that (a) it is not a Plan and is not acquiring the Note directly or indirectly for, or on behalf of, a Plan or with Plan Assets or any entity whose underlying assets are deemed to be Plan Assets or otherwise subject to Similar Law; or (b) the acquisition and holding of the Notes by or on behalf of, or with Plan Assets of, any Plan or any entity whose underlying assets are deemed to be Plan Assets is permissible under applicable law, and will not result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 or 503 of the Code by reason of the application of one or more of the following: PTCE 84-14, PTCE 90-1, PTCE 91-38, PTCE 95-60 or PTCE 96-23, all of the conditions of which shall be met, or, in the case of a purchaser or transferee that is subject to Similar Law, such purchase and holding will not result in a violation of Similar Law or otherwise result in any tax, rescission right or other penalty on the Issuer or the Underwriter, and, in any case, neither the purchase nor holding of such Note will subject the Issuer or the Underwriter to any obligation not affirmatively undertaken in writing.

**Consultation with Counsel**

Any Plan fiduciary or other investor of Plan Assets (including any entity whose underlying assets are deemed to be Plan Assets) considering whether to acquire or hold Notes on behalf of or with Plan Assets of any Plan or that proposes to acquire or hold Notes, should consult with its counsel with respect to the potential applicability of the fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code with respect to the proposed investment and the availability of any prohibited transaction exemption and the accuracy of the representations and warranties above. A fiduciary or other investor with respect to a Non-ERISA Plan that proposes to acquire or hold Notes should consult with counsel with respect to Similar Laws.

## CERTAIN INVESTMENT COMPANY ACT CONSIDERATIONS

The Issuer is not registered or required to be registered as an "investment company" under the Investment Company Act of 1940, as amended (the "Investment Company Act") pursuant to Section 2(b) of the Investment Company Act. The Issuer does not rely upon the exclusions from the definition of "investment company" set forth in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act. The Issuer does not constitute a "covered fund" for purposes of Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), also known as the Volcker Rule. See the caption "RISK FACTORS—New Rules Could Adversely Affect the Asset-Backed Securities Market and the Value of the Notes" herein. Since the Issuer has not registered, and does not intend to register, as an investment company under the Investment Company Act, Noteholders will not be afforded protections of the provisions of the Investment Company Act designed to protect investment company investors.

## ADDITIONAL INFORMATION; REPORTS TO NOTEHOLDERS

Monthly financial information concerning the Issuer and the Notes will be made available by the Issuer. These monthly reports will contain information concerning the Financed Eligible Loans and certain activities of the Issuer during the period since the previous report. These reports may be found at https://www.mohela.com/DL/common/publicInfo/investorInformation.aspx. The website is not incorporated into and shall not be deemed to be a part of this Offering Memorandum.

## UNDERWRITING

Subject to the terms and conditions set forth in a Note Purchase Agreement between the Issuer and BofA Securities, Inc. (the "Underwriter"), the Underwriter has agreed to purchase the Notes for a purchase price equal to $196,399,367.45, representing the aggregate principal amount of the Notes less an Underwriter's discount of $1,055,930.00, less net original discount of $44,702.55. After the initial offering, the prices of the Notes may change.

Until the initial distribution of Notes is completed, the rules of the SEC may limit the ability of the Underwriter to bid for and purchase the Notes. As an exception to these rules, the Underwriter is permitted to engage in transactions that stabilize the price of the Notes. These transactions consist of bids of purchase for the purpose of pegging, fixing or maintaining the price of the Notes. Purchases of a security for the purpose of stabilization or to reduce a short position could cause the price of the security to be higher than it might be in the absence of those purchases. Neither the Issuer nor the Underwriter makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the prices of the Notes. In addition, neither the Issuer nor the Underwriter makes any representation that the Underwriter will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

In the ordinary course of their respective businesses, the Underwriter and its affiliates have engaged and may in the future engage in investment banking or commercial banking transactions with the Issuer and may trade in its securities. See the caption "RELATIONSHIPS AMONG FINANCING PARTICIPANTS" herein.

BofA Securities, Inc., as an underwriter of the Notes, has entered into a distribution agreement with its affiliate Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"). As part of this arrangement, BofA Securities, Inc. may distribute securities to MLPF&S, which may in turn distribute such securities to investors through the financial advisor network of MLPF&S. As part of this arrangement, BofA Securities, Inc. may compensate MLPF&S as a dealer for their selling efforts with respect to the Notes.

During and after the offering, the Underwriter may engage in transactions, including open market purchases and sales, to stabilize the prices of the Notes. The Underwriter, for example, may over-allot the Notes for the account of the underwriting syndicate to create a syndicate short position by accepting orders for more Notes than are to be sold.

In general, over allotment transactions and open market purchases of the Notes for the purpose of stabilization or to reduce a short position could cause the price of a Note to be higher than it might be in the absence of those transactions.

The Underwriter or its affiliates may retain a material percentage of the Notes for their own accounts. The retained Notes may be resold by such Underwriter or such affiliates at any time in one or more negotiated transactions at varying prices to be determined at the time of sale.

The Issuer has agreed to indemnify the Underwriter and, under certain limited circumstances, the Underwriter will indemnify the Issuer, against certain civil liabilities, including liabilities under the Securities Act.

## FINANCIAL ADVISOR

SL Capital Strategies LLC is serving as financial advisor to the Issuer in connection with the issuance of the Notes. Although SL Capital Strategies LLC reviewed and commented on certain legal

documentation, including this Offering Memorandum, SL Capital Strategies LLC is not obligated to undertake, and has not undertaken to make, an independent verification or to assume responsibility for the accuracy, completeness or adequacy of the information contained in this Offering Memorandum or any of the other legal documents, and further, SL Capital Strategies LLC does not assume any responsibility for the information, covenants and representations with respect to the possible impact of any present, pending or future actions taken by any legislative or judicial bodies or Rating Agencies.

## LEGAL PROCEEDINGS

There is no controversy or litigation of any nature now pending or, to the knowledge of the Issuer, threatened to restrain or enjoin the issuance, sale, execution or delivery of the Notes, or in any way contesting or affecting the validity of the Notes, any proceedings of the Issuer taken with respect to the issuance or sale thereof, the pledge or application of any moneys or securities provided for the payment of the Notes or the due existence or powers of the Issuer.

The Issuer may be subject to various claims, lawsuits, and proceedings that arise from time to time.

## LEGAL MATTERS

The Issuer has been represented in connection with certain aspects of the authorization, issuance, offer, sale and delivery of the Notes by its note counsel, Kutak Rock LLP. Kutak Rock LLP has represented the Issuer as its counsel in connection with the preparation of this Offering Memorandum. Certain legal matters will be passed upon for the Issuer by its special counsel, Thompson Coburn LLP. Certain legal matters will be passed on for the Underwriter by Dorsey & Whitney LLP.

## CONTINUING DISCLOSURE

In order to assist the Underwriter in complying with Rule 15c2-12 promulgated by the SEC (the "Rule"), the Issuer will enter into a continuing disclosure agreement with respect to the Notes (a "Continuing Disclosure Agreement") setting forth the undertaking of the Issuer to provide certain annual financial information and operating data, and to provide notices of the occurrence of certain enumerated material events relating to the Notes. The proposed form of the Continuing Disclosure Agreement is set forth in Appendix C attached hereto. During the previous five years, the Issuer did not file one notice of rating change and did not timely file three notices of rating changes (all three rating changes occurring on the same date) and did not file notice of its failure to provide the aforementioned information on or before the date specified in its prior continuing disclosure undertakings.

## RELATIONSHIPS AMONG FINANCING PARTICIPANTS

The Underwriter and its affiliates are full service financial institutions engaged in various activities, that may include securities trading, commercial and investment banking, municipal advisory, brokerage and asset management. In the ordinary course of their respective businesses, the Underwriter and its affiliates have, from time to time, engaged, and may in the future engage, in various financial advisory, investment banking and commercial banking transactions with the Issuer, for which they received or will receive customary fees and expenses. An affiliate of the Underwriter provides the Warehouse Agreement that allowed the Issuer to temporarily finance certain of the Eligible Loans prior to the transfer from the Warehouse Agreement to the Trustee under the Indenture.

In the ordinary course of their various business activities, the Underwriter and its affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of

their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Issuer. The Underwriter and its affiliates may make a market in credit default swaps with respect to municipal securities in the future and may also communicate independent investment recommendations, market color or trading ideas and publish independent research views in respect of the Notes or other offerings of the Issuer.

Counsels to the Issuer with respect to the issuance of the Notes, Kutak Rock LLP and Thompson Coburn LLP, each represent the Trustee and the Underwriter (or their affiliates) in transactions unrelated to the issuance of the Notes.

## RATINGS

It is a condition to the Underwriter's obligation to purchase the Notes that (a) the Class A Notes be assigned the rating of at least "AAA(sf)" by DBRS and at least "AA+(sf)" by S&P and (b) the Class B Notes be assigned the rating of at least "A(sf)" by DBRS and "AA(sf)" by S&P.

On August 5, 2011, S&P lowered the long-term sovereign debt rating of the United States to "AA+" from "AAA," citing its concern with the fiscal, economic, and political challenges the government of the United States was facing. The S&P expected rating is a result of this action. The Notes will be secured by the Trust Estate including the Financed Eligible Loans, which consist of a pool of student loans originated under the FFEL Program. As such, the Financed Eligible Loans are eligible to receive certain federal benefits, such as Special Allowance Payments and interest subsidies, and the Guaranty Agencies for the Financed Eligible Loans receive reinsurance benefits to certain levels for guarantee payments that they make, and other federal benefits.

A securities rating addresses the likelihood of the receipt by owners of the Notes of payments of principal and interest with respect to their Notes from assets in the Trust Estate created under the Indenture. The rating takes into consideration the characteristics of the Financed Eligible Loans, and the structural, legal and tax aspects associated with the rated Notes.

A securities rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Neither the Issuer nor the Underwriter has undertaken any responsibility either to bring to the attention of the holders of the affected Notes any proposed change in or withdrawal of such ratings or to oppose any such proposed revision. Any such change in or withdrawal of the ratings could have an adverse effect on the market price of the affected Notes.

## OTHER MATTERS

The information set forth herein has been obtained from Issuer records and other sources which are considered reliable. There is no guarantee that any of the assumptions or estimates contained herein will ever be realized. All of the summaries of the statutes, documents and resolutions contained in this Offering Memorandum are made subject to all of the provisions of such statutes, documents and resolutions. These summaries do not purport to be complete statements of such provisions, and reference is made to such documents for further information. Reference is made to official documents in all respects. Any statement in this Offering Memorandum involving any matter of opinion, whether or not expressly so stated, is intended as such and not as a representation of fact. No representation is made that any such opinion will actually be borne out. This Offering Memorandum is not to be construed as a contract or agreement between the Issuer or the Underwriter and the purchasers or Noteholders. Prospective purchasers of the Notes are also cautioned that the accuracy of any statistical, demographic or economic projection or analysis

contained herein is not guaranteed and therefore investors are urged to consult their own advisors concerning such projections or analysis.

The Trustee did not participate in the preparation of this Offering Memorandum and makes no representations concerning the Notes, the collateral or any other matter stated in this Offering Memorandum. The Trustee has no duty or obligation to pay the Notes from its own funds, assets or corporate capital or to make inquiry regarding, or investigate the use of, amounts disbursed from the accounts held under the Indenture.

[Remainder of page intentionally left blank]

# GLOSSARY OF TERMS

Some of the terms used in this Offering Memorandum are defined below. Other terms are defined elsewhere in this Offering Memorandum. The Indenture contains the definitions of other terms used in this Offering Memorandum and reference is made to the Indenture for those definitions.

"*Accepted Servicing Procedures*" means, with respect to any Financed Eligible Loan, servicing procedures (including collection procedures) that comply with applicable federal (including but not limited to the Higher Education Act), state and local law and that are in accordance with standards set by the Secretary and the accepted student loan servicing practices of prudent lending institutions that service student loans of the same type in the United States.

"*Administration Fee*" shall mean the monthly fee for administering the duties of the Issuer and/or an administrator under this Indenture, which fee, for each calendar month shall initially be equal to (i) one-twelfth of 0.05% multiplied by (ii) the Pool Balance as of the close of business on the last Business Day of the preceding calendar month and may only be increased upon satisfaction of the Rating Agency Condition. The Administration Fee shall be payable each Monthly Distribution Date beginning with the November 2021 Monthly Distribution Date. The Administration Fee shall also include annual reimbursement of any expenses incurred by the Issuer and/or an administrator under the Indenture, which amount shall be payable solely on the Monthly Distribution Date in September of each year beginning in 2022; provided, that the maximum amount of such expense reimbursement payable to the Issuer and/or an administrator under the Indenture during any calendar year shall be limited to $100,000, less the portion of the Expense Cap paid to the Trustee pursuant to clause (ii) of the definition of Trustee Fee during such year.

"*Authorizing Act*" shall mean the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Sections 173.350 to 173.445 of the Missouri Revised Statutes, inclusive, as amended, and as the same may be in effect at any given time.

"*Available Funds*" means, with respect to a Monthly Distribution Date, the sum of the following amounts received to the extent not previously distributed: (a) all collections received by any Servicer on the Financed Eligible Loans (including late fees received by any Servicer with respect to the Financed Eligible Loans and payments from any Guaranty Agency received with respect to the Financed Eligible Loans) but net of (i) any collections in respect of principal on the Financed Eligible Loans applied by the Issuer to recall claims with respect to or repurchase Eligible Loans (which Eligible Loans were previously Financed Eligible Loans and, after purchase, will again become Financed Eligible Loans under the Indenture), from the Guaranty Agencies or any Servicer; provided, that such claim recall or repurchase is required by the terms of the Guarantee Agreement (including, for this purpose, any claim recall or repurchase which is "strongly encouraged" by the Department of Education's Common Manual), the related Servicing Agreement or Origination Agreement, as applicable, or such claim recall or repurchase is required by federal law or regulations, including, without limitation, the Higher Education Act and the related regulations; and (ii) amounts required by the Higher Education Act to be paid to the Department (including, but not limited to, any Monthly Consolidation Rebate Fees and any Department SAP Rebate Interest Amounts to be deposited into the Department SAP Rebate Fund or paid directly to the Department) or to be repaid to borrowers (whether or not in the form of a principal reduction of the applicable Financed Eligible Loan), with respect to the Financed Eligible Loans; (b) any Interest Benefit Payments and Special Allowance Payments received by the Trustee or the Issuer with respect to Financed Eligible Loans; (c) all Liquidation Proceeds from any Financed Eligible Loans which became Liquidated Financed Eligible Loans in accordance with the related Servicer's customary servicing procedures, and all other moneys collected with respect to any Liquidated Financed Eligible Loan which was written-off, net of the sum of any amounts expended by the related Servicer in connection with such liquidation and any amounts required by law to be remitted to the obligor on such Liquidated Financed Eligible Loan; (d) the aggregate Purchase Amounts

received for Financed Eligible Loans repurchased by a Seller, a Servicer, the Issuer or otherwise released from the lien of the Indenture; (e) the aggregate amounts, if any, received from a Seller or any Servicer as reimbursement of non-guaranteed interest amounts, or lost Interest Benefit Payments and Special Allowance Payments, with respect to the Financed Eligible Loans pursuant to a Student Loan Purchase Agreement or a Servicing Agreement, respectively; (f) other amounts received by a Servicer pursuant to its role as Servicer under the related Servicing Agreement and payable to the Issuer in connection therewith; (g) all interest earned or gain realized from the investment of amounts in any Fund or Account; and (h) any other amounts deposited to the Collection Fund.  "Available Funds" shall be determined pursuant to the terms of this definition by the Issuer and reported to the Trustee.  Amounts described in clauses (a)(i) and (a)(ii) hereof shall be paid by the Trustee upon receipt of a written direction from the Issuer.  The Trustee may conclusively rely on such determinations without further duty to review or examine such information.

"*Backup Servicer*" means the Pennsylvania Higher Education Assistance Agency, and any successor thereto, or any other entity with which the Issuer maintains a Backup Servicing Agreement.

"*Backup Servicing Agreement*" means the Backup Servicing Agreement between the Issuer and the Backup Servicer, as may be amended, supplemented, restated or otherwise modified from time to time, and replacements thereto.

"*Certificate of Insurance*" means any certificate of insurance issued by the Secretary pursuant to Section 428C or Section 429 of the Higher Education Act, Insuring an Eligible Loan.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time.  Each reference to a section of the Code in the Indenture shall be deemed to include the United States Treasury Regulations, including applicable temporary and proposed regulations, relating to such section which are applicable to the Notes or the use of the proceeds Notes.  A reference to any specific section of the Code shall be deemed also to be a reference to the comparable provisions of any enactment which supersedes or replaces the Code thereunder from time to time.

"*Collection Period*" means, with respect to the first Monthly Distribution Date, the period beginning on the Date of Issuance and ending on October 31, 2021 and with respect to each subsequent Monthly Distribution Date, the Collection Period means the calendar month immediately preceding such Monthly Distribution Date.  With respect to any Monthly Distribution Date, the "related" or the "preceding" Collection Period shall be the Collection Period ending on the last day of the month immediately preceding the month in which such Monthly Distribution Date occurs.

"*Custodian Agreement*" means any custodian agreement entered into by the Issuer and the Trustee with any other custodian or bailee related to the Financed Eligible Loans.

"*Cut-Off Date*" means, with respect to each Financed Eligible Loan, the date as of which receipts upon such Financed Eligible Loan are pledged as part of the Trust Estate, which shall be the date of acquisition by the Trust Estate.

"*DBRS*" means DBRS, Inc., its successors and their assigns.

"*Eligible Lender*" means the Issuer and all other entities which are "eligible lenders," as defined in the Higher Education Act (including, but not limited to, "eligible lender trustees") which have received an eligible lender number or other designation from the Secretary with respect to Eligible Loans made under the Higher Education Act.

"*Eligible Loan*" means any loan made to finance post-secondary education that is made under the Higher Education Act.

"*Event of Bankruptcy*" means (a) the Issuer shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall have made a general assignment for the benefit of creditors, or shall have declared a moratorium with respect to its debts or shall have failed generally to pay its debts as they become due, or shall have taken any action to authorize any of the foregoing; or (b) an involuntary case or other proceeding shall have been commenced against the Issuer seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property provided such action or proceeding is not dismissed within 60 days.

"*Expense Cap*" means, for each year ending June 30, an annual amount equal to $50,000.

"*Financed*" or "*Financing*" refers, when used with respect to Eligible Loans, to Eligible Loans (a) financed or refinanced by the Issuer with balances in the Student Loan Fund or otherwise pledged by the Issuer under the Indenture and constituting a part of the Trust Estate, including, without limitation, the Eligible Loans described in the Indenture, and (b) Eligible Loans substituted or exchanged for Financed Eligible Loans, but does not include Eligible Loans released from the lien of the Indenture to the extent permitted by the Indenture (unless such released Eligible Loans are substituted or exchanged in the future).

"*Guarantee*" or "*Guaranteed*" means, with respect to an Eligible Loan, the insurance or guarantee by a Guaranty Agency pursuant to such Guaranty Agency's Guarantee Agreement of the maximum percentage of the principal of and accrued interest on such Eligible Loan allowed by the terms of the Higher Education Act with respect to such Eligible Loan at the time it was originated and the coverage of such Eligible Loan by the federal reimbursement contracts, providing, among other things, for reimbursement to such Guaranty Agency for payments made by it on defaulted Eligible Loans insured or guaranteed by such Guaranty Agency of at least the minimum reimbursement allowed by the Higher Education Act with respect to a particular Eligible Loan.

"*Guarantee Agreements*" means a guaranty or lender agreement with any Guaranty Agency, and any amendments thereto.

"*Guaranty Agency*" means any entity authorized to guarantee student loans under the Higher Education Act and with which the Issuer maintains a Guarantee Agreement.

"*Higher Education Act*" means the Higher Education Act of 1965, as amended or supplemented from time to time, or any successor federal act and all regulations, directives, bulletins and guidelines promulgated from time to time thereunder.

"*Highest Priority Notes*" means at any time when Class A Notes are Outstanding, the Class A Notes, and at any time when no Class A Notes are Outstanding, the Class B Notes.

"*Indenture*" means the Indenture of Trust, between the Issuer and the Trustee including all supplements and amendments hereto.

"*Insurance*" or "*Insured*" or "*Insuring*" means, with respect to an Eligible Loan, the insuring by the Secretary (as evidenced by a Certificate of Insurance or other document or certification issued under

the provisions of the Higher Education Act) under the Higher Education Act of all or a portion of the principal of and accrued interest on such Eligible Loan.

"*Interest Benefit Payment*" means an interest payment on Eligible Loans received pursuant to the Higher Education Act and an agreement with the federal government, or any similar payments.

"*Investment Securities*" means:

      (a)     direct obligations of, or obligations on which the timely payment of the principal of and interest on which are unconditionally and fully guaranteed by, the United States Treasury having maturities of not more than 365 days;

      (b)     interest bearing time or demand deposits, certificates of deposit or other similar banking arrangements with a maturity of 12 months or less with any bank, trust company, national banking association or other depository institution, including those of the Trustee, provided that such depository institution (i) has a rating of "AA-/A-1+" by S&P and (ii) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition;

      (c)     bonds, debentures, notes or other evidences of indebtedness with a maturity of not more than 365 days issued or guaranteed by any of the following agencies: Federal Home Loan Mortgage Corporation; the Federal National Mortgage Association; Federal Home Loan Banks; provided, that such obligation: (i) is rated "AA+" or higher by S&P; and (ii) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition;

      (d)     repurchase agreements and reverse repurchase agreements, other than overnight repurchase agreements and overnight reverse repurchase agreements, with banks, including the Trustee and any of its affiliates, which are members of the Federal Deposit Insurance Corporation or firms which are members of the Securities Investors Protection Corporation, in each case, that: (i) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition; and (ii) satisfies the S&P rating requirements set forth in the last paragraph of this definition;

      (e)     overnight repurchase agreements and overnight reverse repurchase agreements at least 101% collateralized by securities described in subparagraph (a) of this definition and with a counterparty, including the Trustee and any of its affiliates, that: (i) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition; and (ii) satisfies the S&P rating requirements set forth in the last paragraph of this definition;

      (f)     investment agreements or guaranteed investment contracts, which may be entered into by and among the Issuer and/or the Trustee and any bank, bank holding company, corporation or any other financial institution, including the Trustee and any of its affiliates, that: (i) has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition or, in each case. with an insurance company whose claims paying ability is so rated; and (ii) satisfies the S&P rating requirements set forth in the last paragraph of this definition;

      (g)     "tax exempt bonds" as defined in Section 150(a)(6) of the Code, other than "specified private activity bonds" as defined in Section 57(a)(5)(C) of the Code, that have a

maturity of not more than 365 days and are rated in the highest category by S&P and has the required ratings from DBRS corresponding to the duration of such investment set forth below and that do not constitute "investment property" within the meaning of Section 148(b)(2) of the Code, provided that the fund has all of its assets invested in obligations of such rating quality;

(h)      commercial paper with a maturity of not more than 365 days, including that of the Trustee and any of its Affiliates, which is rated "A-1+" by S&P and has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition and which matures not more than 90 days after the date of purchase;

(i)      investments in a money market fund that is payable upon demand, including funds for which the Trustee or an Affiliate thereof acts as investment advisor or provides other similar services for a fee; provided, that such investment is rated at least "AAAm" by S&P and has the required ratings from DBRS corresponding to the duration of such investment set forth in the second to last paragraph of this definition; and

(j)      any other investment upon satisfaction of the Rating Agency Condition.

Each Investment Security or the provider of such Investment Security (other than those described in paragraphs (b), (d), (h) and (i) of this definition) shall have the following DBRS long term and or short term ratings corresponding to the duration of such investment:

| **Maximum Maturity** | **Minimum Ratings** |
|---|---|
| 30 days | "A"/"R-1 (middle)" |
| 90 days | "AA"/"R-1 (middle)" |
| 180 days | "AA"/"R-1 (high)" |
| 365 days | "AAA"/"R-1 (high)" |

"*Issuer Order*" means a written order signed in the name of the Issuer by an authorized representative of the Issuer.

"*Joint Sharing Agreement*" means mean any joint sharing agreement that may be entered into by the Issuer in the future with the Trustee and other trustees to properly pay to or from the correct trust estate or indenture amounts which should be reallocated to reflect payments (or liabilities) on the student loans securing each such trust estate or indenture.

"*LIBOR Related Amendment*" means a change to the related interest rates on the Class A-1B Notes and the Class B Notes to the applicable alternative index to LIBOR selected by the Department of Education plus or minus a comparable spread (if the Department of Education chooses to use an alternative index to LIBOR other than the Benchmark Replacement to calculate Special Allowance Payments) and any associated changes that are reasonably necessary to adopt or to implement such rate change, which changes shall become effective upon  either (i) obtaining the consent of the Noteholders representing not less than a majority of the Outstanding Amount of the Class A-1B Notes and the Class B Notes and satisfaction of the Rating Agency Condition, or (ii) obtaining the consent of the Noteholders representing not less than a majority of the Outstanding Amount of each Class of the Notes.  The Trustee is not obligated to enter into any LIBOR Related Amendment that adversely affects its duties or protections without its consent and shall have no liability for entering into a LIBOR Related Amendment.

"*Liquidated Financed Eligible Loan*" means any Financed Eligible Loan liquidated by a Servicer (which shall not include any Financed Eligible Loan on which payments are received from a Guaranty

145

Agency) or which such Servicer has, after using all reasonable efforts to realize upon such Financed Eligible Loan, determined to charge off.

"*Liquidation Proceeds*" means, with respect to any Liquidated Financed Eligible Loan which became a Liquidated Financed Eligible Loan during the current Collection Period in accordance with the Servicer's customary servicing procedures, the moneys collected in respect of the liquidation thereof from whatever source, other than moneys collected with respect to any Liquidated Financed Eligible Loan which was written off in prior Collection Periods, net of the sum of any amounts expended by such Servicer in connection with such liquidation and any amounts required by law to be remitted to the obligor on such Liquidated Financed Eligible Loan.

"*Monthly Consolidation Rebate Fee*" means the monthly consolidation rebate fee payable to the Department on the Financed Eligible Loans.

"*Note Final Maturity Date*" means, for a Class of Notes or for any Note of such Class, as the context may require, the Class A-1A Maturity Date, the Class A-1B Maturity Date or the Class B Maturity Date, as applicable.

"*Noteholder*" means the Person in whose name a Note is registered in the Note registration books of the Trustee and which initially shall be Cede & Co., as nominee of the initial Clearing Agency.

"*Outstanding*" means, when used in connection with any Note, a Note which has been executed and delivered pursuant to the Indenture which at such time remains unpaid as to principal or interest, excluding Notes which have been replaced and excluding Notes for which provision for payment has been made pursuant to the Indenture.

"*Outstanding Amount*" means, as of any date of determination, the aggregate principal amount of all Notes Outstanding or the applicable Class or Classes of Notes, as the case may be, Outstanding at such date of determination.

"*Person*" means an individual, corporation, partnership, joint venture, association, joint stock company, trust, limited liability company, unincorporated organization or government or agency, or political subdivision thereof, or any other entity recognized from time to time as a legally existing entity.

"*Program Fees*" means any fees and expenses (i) due to the Rating Agencies, (ii) due in connection with any financial or compliance audit of the Program or the Issuer, (iii) due to the Backup Servicer (while the Backup Servicer is acting in the backup servicing capacity) and (iv) any other fees related to the Program.

"*Purchase Amount*" means, with respect to any Financed Eligible Loan, the amount required to prepay in full such Financed Eligible Loan under the terms thereof including all accrued interest thereon and any unamortized premium, it being acknowledged that any accrued and unpaid Interest Benefit Payments or Special Allowance Payments will continue to be payable to the Trustee and constitute part of the Trust Estate.

"*Rating*" means one of the rating categories of each Rating Agency currently rating the Notes.

"*Rating Agency*" means DBRS and S&P or any other rating agency requested by the Issuer to maintain a Rating on any of the Notes.

146

"*Rating Agency Condition*" means a requirement, with respect to any proposed action, failure to act or other event expressly conditioned thereon in the Indenture that, prior to the effectuation thereof: (a) the Issuer shall have provided prior written notice to each Rating Agency at least 30 calendar days prior to such proposed action, failure to act, or other event specified therein; and (b) the Issuer shall have delivered an Issuer Order to the Trustee dated no less than 30 calendar days subsequent to the date of such written notice stating that, as of the date of such Issuer Order, the Issuer reasonably believes that completion of such proposed action, failure to act or other event will not result in a downgrade to any Rating then assigned to any of the Notes by any Rating Agency or cause such Rating Agency to suspend, withdraw or qualify any such Rating (other than a Rating that is then applicable only to Notes that will no longer be outstanding upon such completion).

"*Realized Loss*" means the excess of the principal balance (including any interest that has been capitalized or had been expected to be capitalized) of any Liquidated Financed Eligible Loan over Liquidation Proceeds with respect to such Financed Eligible Loan to the extent allocable to principal (including any interest that has been capitalized or had been expected to be capitalized).

"*Responsible Officer*" means, when used with respect to the Trustee, any officer within the principal office of the Trustee, including any vice president, assistant vice president, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of the Indenture and the other Basic Documents to which it is a party.

"*S&P*" means S&P Global Ratings and its successors and assigns.

"*Secretary*" means the Secretary of the Department or any successor to the pertinent functions thereof under the Higher Education Act.

"*Servicer*" means the Issuer, PHEAA or an affiliate thereof, and any other additional Servicer or successor Servicer with which the Issuer has entered into a Servicing Agreement with respect to the Financed Eligible Loans and for which the Issuer has satisfied the Rating Agency Condition.

"*Servicer Compliance Report*" means (a) any report generated by the Department's Office of the Inspector General, specifically relating to a Servicer, and (b) a third party review of a Servicer in the form of a "System and Organization Control 1 Report" or any replacement of the same, in either case, performed annually by a firm of independent public accountants.

"*Servicing Agreement*" means, collectively, (a) with respect to the Issuer as Servicer, the provisions in the Indenture governing the servicing of the Financed Eligible Loans, and (b) any other servicing agreements with any third party Servicer relating to the Financed Eligible Loans, as such servicing agreements may be amended from time to time.

"*Servicing Fee*" means the monthly fee due to any Servicer (other than the Backup Servicer while acting in the backup servicing capacity) for servicing the Financed Eligible Loans, which fee and expenses for each calendar month shall initially not exceed the greater of (a)(i) one-twelfth of 0.80% multiplied by (ii) the Pool Balance as of the close of business on the last Business Day of the preceding calendar month and may only be increased upon satisfaction of the Rating Agency Condition and (b) the Servicing Fee Floor.

"*Servicing Fee Floor*" means $2.50 per borrower per month, subject to 3% inflation per annum from the Date of Issuance.

"*Special Allowance Payments*" means the special allowance payments authorized to be made by the Secretary by Section 438 of the Higher Education Act, or similar allowances, if any, authorized from time to time by federal law or regulation.

"*Specified Reserve Fund Balance*" means, with respect to any Monthly Distribution Date, the greater of (a) 0.65% of the Pool Balance as of the close of business on the last day of the immediately preceding Collection Period and (b) $201,159; provided that in no event will such balance exceed the sum of the Outstanding Amount of the Notes; and provided further, that such Specified Reserve Fund Balance may be reduced upon satisfaction of the Rating Agency Condition.  The Specified Reserve Fund Balance shall be calculated by the Issuer and certified to the Trustee, upon which certification the Trustee may conclusively rely with no duty to further examine or determine such information.

"*Student Loan Notes*" has the meaning ascribed to such term in the Indenture.

"*Student Loan Purchase Agreement*" means a loan purchase agreement entered into by the Issuer in connection with the purchase by the Issuer of a Financed Eligible Loan, including any such Financed Eligible Loan that was purchased by the Issuer prior to being Financed hereunder.

"*Supplemental Indenture*" means an agreement supplemental hereto executed pursuant to the Indenture.

"*Trust Estate*" has the meaning set forth under the caption "SECURITY AND SOURCES OF PAYMENT FOR THE NOTES—General" herein.

"*Trustee Fee*" shall mean an amount equal to (a) the annual fees of the Trustee as set forth in the Trustee Fee Letter, dated July 29, 2021, a portion of which are payable quarterly beginning on the December 2021 Monthly Distribution Date or such other trustee fee letter as the Issuer may designate prior to a successor Trustee being appointed hereunder, which amount shall not exceed the greater of (i) 0.03% per annum of the outstanding principal amount of the Notes as of the beginning of the period for which such fees are paid and (ii) $1,500 per quarter, and (b) the reasonable expenses and extraordinary expenses of the Trustee or successor Trustee and any indemnities owed to the Trustee; provided, that the maximum amount of such expense reimbursement payable to the Trustee or any successor Trustee during any year (beginning November 25 of each year) shall be limited to the Expense Cap; provided that the Expense Cap shall not apply after and during the continuance of an Event of Default.

"*Warehouse Agreement*" means Revolving Credit and Security Agreement, dated as of December 19, 2018, as amended by that certain First Amendment to Revolving Credit and Security Agreement dated November 6, 2019 and that certain Second Amendment to Revolving Credit and Security Agreement dated December 2, 2020, each among the Issuer, Bank of America, N.A., as the lender, and U.S. Bank National Association, as collateral agent.

**APPENDIX A**

**DESCRIPTION OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM**

As of July 1, 2010, FFELP Loans made pursuant to the Higher Education Act were no longer originated, and all new federal student loans are originated solely under the Federal Direct Student Loan Program (the "Direct Loan Program"). However, FFELP Loans originated under the Higher Education Act prior to July 1, 2010 which have been originated or acquired by the Issuer continue to be subject to the provisions of the FFEL Program. The following description of the FFEL Program has been provided solely to explain certain of the provisions of the FFEL Program applicable to the approximately 99.08% in principal amount of the Financed Eligible Loans originated on or after July 1, 1998 and prior to July 1, 2010. Certain additional information about the FFELP Loans which comprise approximately 0.92% in principal amount of the Financed Eligible Loans originated prior to July 1, 1998 is also included. Notwithstanding anything herein to the contrary, after June 30, 2010, no new FFELP Loans (including Consolidation Loans) may be made or insured under the FFEL Program, and no funds are authorized to be appropriated, or may be expended, under the Higher Education Act to make or insure loans under the FFEL Program (including Consolidation Loans) for which the first disbursement is after June 30, 2010, except as expressly authorized by an Act of Congress.

The Higher Education Act provides for several different educational loan programs (collectively, the "Federal Family Education Loan Program" or "FFEL Program," and the loans originated thereunder, "Federal Family Education Loans" or "FFELP Loans"). Under the FFEL Program, state agencies or private nonprofit corporations administering student loan insurance programs ("Guaranty Agencies") are reimbursed for portions of losses sustained in connection with FFELP Loans, and holders of certain loans made under such programs are paid subsidies for owning such FFELP Loans. Certain provisions of the Federal Family Education Loan Program are summarized below. This summary does not purport to be comprehensive or definitive and is qualified in its entirety by reference to the text of the Higher Education Act and the regulations thereunder.

The Higher Education Act has been subject to frequent amendments and federal budgetary legislation, the most significant of which has been the passage of H.R. 4872 (the "Health Care & Education Affordability Reconciliation Act of 2010" or "HCEARA") which terminated originations of FFELP Loans under the FFEL Program after June 30, 2010 such that all new federal student loans originated on and after July 1, 2010 are originated under the Direct Loan Program.

**Federal Family Education Loans**

Several types of loans were authorized as Federal Family Education Loans pursuant to the Federal Family Education Loan Program. These included: (a) loans to students meeting certain financial needs tests with respect to which the federal government makes interest payments available to reduce student interest cost during periods of enrollment ("Subsidized Stafford Loans"); (b) loans to students made without regard to financial need with respect to which the federal government does not make such interest payments ("Unsubsidized Stafford Loans" and, collectively with Subsidized Stafford Loans, "Stafford Loans"); (c) loans to graduate students, professional students, or parents of dependent students ("PLUS Loans"); and (d) loans available to borrowers with certain existing federal educational loans to consolidate repayment of such loans ("Consolidation Loans").

Generally, a FFELP Loan was made only to a United States citizen or permanent resident or otherwise eligible individual under federal regulations who (a) had been accepted for enrollment or was enrolled and was maintaining satisfactory progress at an eligible institution; (b) was carrying at least one-half of the normal full-time academic workload for the course of study the student was pursuing, as

determined by such institution; (c) agreed to notify promptly the holder of the loan of any address change; (d) was not in default on any federal education loans; (e) met the applicable "need" requirements; and (f) had not committed a crime involving fraud or obtaining funds under the Higher Education Act which funds had not been fully repaid. Eligible institutions included higher educational institutions and vocational schools that complied with certain federal regulations. With certain exceptions, an institution with a cohort default rate that was equal to or greater than 25% for each of the three most recent fiscal years for which data was available was not an eligible institution under the Higher Education Act. However, beginning in fiscal year 2012, the threshold was raised from 25% to 30%. In addition, an institution with a cohort default rate that was equal to or greater than 40% for the most recent fiscal year for which data was available is also not an eligible institution under the Higher Education Act.

**Subsidized Stafford Loans**

The Higher Education Act provides for federal (a) insurance or reinsurance of eligible Subsidized Stafford Loans, (b) interest benefit payments for borrowers remitted to eligible lenders with respect to certain eligible Subsidized Stafford Loans, and (c) Special Allowance Payments representing an additional subsidy paid by the Secretary to such holders of eligible Subsidized Stafford Loans.

Subsidized Stafford Loans were eligible for reinsurance under the Higher Education Act if the eligible student to whom the loan was made had been accepted or was enrolled in good standing at an eligible institution of higher education or vocational school and was carrying at least one-half the normal full-time workload at that institution. In connection with eligible Subsidized Stafford Loans there were limits as to the maximum amount which could be borrowed for an academic year and in the aggregate for both undergraduate and graduate/professional study. The Secretary had discretion to raise these limits to accommodate students undertaking specialized training requiring exceptionally high costs of education.

Subject to these limits, Subsidized Stafford Loans were available to borrowers in amounts not exceeding their unmet need for financing as provided in the Higher Education Act.

**Unsubsidized Stafford Loans**

Unsubsidized Stafford Loans were available to students who did not qualify for Subsidized Stafford Loans due to parental and/or student income or assets in excess of permitted amounts. In other respects, the general requirements for Unsubsidized Stafford Loans were essentially the same as those for Subsidized Stafford Loans. The interest rate, the loan fee requirements and the Special Allowance Payment provisions of the Unsubsidized Stafford Loans were the same as the Subsidized Stafford Loans. However, the terms of the Unsubsidized Stafford Loans differ materially from Subsidized Stafford Loans in that the Secretary does not make interest benefit payments and the loan limitations were determined without respect to the expected family contribution. The borrower was required to pay interest from the time such loan was disbursed or capitalize the interest until repayment began.

**PLUS Loan Program**

The Higher Education Act authorized PLUS Loans to be made to graduate students, professional students, or parents of eligible dependent students. Only graduate students, professional students and parents who did not have an adverse credit history were eligible for PLUS Loans. The basic provisions applicable to PLUS Loans were similar to those of Stafford Loans with respect to the involvement of Guaranty Agencies and the Secretary in providing federal reinsurance on the loans. However, PLUS Loans differ significantly from Subsidized Stafford Loans, particularly because federal interest benefit payments are not available under the PLUS Program and Special Allowance Payments are more restricted.

**The Consolidation Loan Program**

The Higher Education Act authorized a program under which certain borrowers were permitted to consolidate their various student loans into a single loan insured and reinsured on a basis similar to Subsidized Stafford Loans. The authority to make such Consolidation Loans expired on June 30, 2010. Consolidation Loans were made in an amount sufficient to pay outstanding principal, unpaid interest and late charges on certain federally insured or reinsured student loans incurred under and pursuant to the Federal Family Education Loan Program (other than Parent PLUS Loans) selected by the borrower, as well as loans made pursuant to the Perkins Loan Program, the Health Professions Student Loan Programs and the Direct Loan Program. Consolidation Loans made pursuant to the Direct Loan Program must conform to the eligibility requirements for Consolidation Loans under the Federal Family Education Loan Program. The borrowers could have been either in repayment status or in a grace period preceding repayment, but the borrower could not still be in school. Delinquent or defaulted borrowers were eligible to obtain Consolidation Loans if they agreed to re-enter repayment through loan consolidation. Borrowers were permitted to add additional loans to a Consolidation Loan during the 180-day period following origination of the Consolidation Loan. Further, a married couple who agreed to be jointly and severally liable was treated as one borrower for purposes of loan consolidation eligibility. A Consolidation Loan was federally insured or reinsured only if such loan was made in compliance with the requirements of the Higher Education Act.

The Higher Education Act authorizes the Secretary to offer the borrower a Direct Consolidation Loan with repayment provisions authorized under the Higher Education Act and terms consistent with a Consolidation Loan made pursuant to the FFEL Program. In addition, the Secretary may offer the borrower of a Consolidation Loan a Direct Consolidation Loan for one of three purposes: (a) providing the borrower with an income contingent repayment plan (or income-based repayment plan as of July 1, 2009) if the borrower's delinquent loan has been submitted to a Guaranty Agency for default aversion (or, as of July 1, 2009, if the loan is already in default); (b) allowing the borrower to participate in a public service loan forgiveness program offered under the Direct Loan Program; or (c) allowing the borrower to use the no accrual of interest for active duty service members benefit offered under the Direct Loan Program for not more than 60 months for loans first disbursed on or after October 1, 2008. In order to participate in the public service loan forgiveness program, the borrower must not have defaulted on the Direct Loan; must have made 120 monthly payments on the Direct Loan after October 1, 2007 under certain income based repayment plans, a standard 10-year repayment plan for certain Direct Loans, or a certain income contingent repayment plan; and must be employed in a public service job at the time of forgiveness and during the period in which the borrower makes each of his 120 monthly payments. A public service job is defined broadly and includes working at an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended and restated (the "IRC"), which is exempt from taxation under Section 501(a) of the IRC. No borrower may, however, receive a reduction of loan obligations under both the public service loan forgiveness program offered under the Direct Loan Program and the following programs: (i) the loan forgiveness program for teachers offered under both the FFEL Program and the Direct Loan Program; (ii) the loan forgiveness program for service in areas of national need offered under the FFEL Program; and (iii) the loan repayment program for civil legal assistance attorneys offered under the FFEL Program.

**Federal Direct Student Loan Program**

The Student Loan Reform Act of 1993 established the Direct Loan Program. The first loans under the Direct Loan Program were made available for the 1994-1995 academic year. Under the Direct Loan Program, approved institutions of higher education, or alternative loan originators approved by the United States Department of Education (the "Department of Education"), make loans to students or parents without application to or funding from outside lenders or Guaranty Agencies. The Department of Education

A-3

provides the funds for such loans, and the program provides for a variety of flexible repayment plans, including extended, graduated and income contingent repayment plans, forbearance of payments during periods of national service and consolidation under the Direct Loan Program of existing student loans. Such consolidation permits borrowers to prepay existing student loans and consolidate them into a Federal Direct Consolidation Loan under the Direct Loan Program. The Direct Loan Program also provides certain programs under which principal may be forgiven or interest rates may be reduced. Direct Loan Program repayment plans, other than income contingent plans, must be consistent with the requirements under the Higher Education Act for repayment plans under the FFEL Program. Due to the enactment of HCEARA, FFELP Loans made pursuant to the Higher Education Act are no longer originated, and as of July 1, 2010 new federal student loans are originated solely under the Direct Loan Program.

## Interest Rates

***Subsidized and Unsubsidized Stafford Loans***. Subsidized and Unsubsidized Stafford Loans made on or after October 1, 1998 but before July 1, 2006 which are in in-school, grace and deferment periods bear interest at a rate equivalent to the 91-day T-Bill rate plus 1.70%, with a maximum rate of 8.25%. Subsidized Stafford Loans and Unsubsidized Stafford Loans made on or after October 1, 1998 but before July 1, 2006 in all other payment periods bear interest at a rate equivalent to the 91-day T-Bill rate plus 2.30%, with a maximum rate of 8.25%. The rate is adjusted annually on July 1.

Subsidized Stafford Loans disbursed on or after July 1, 2006 and before July 1, 2010 bear interest at progressively lowered rates described below. Subsidized Stafford Loans made on or after July 1, 2006 but before July 1, 2008 bear interest at a rate equal to 6.80% per annum. Subsidized Stafford Loans made on or after July 1, 2008 but before July 1, 2009 bear interest at a rate equal to 6.00% per annum. Subsidized Stafford Loans made on or after July 1, 2009 but before July 1, 2010 bear interest at a rate equal to 5.60% per annum.

Unsubsidized Stafford Loans made on or after July 1, 2006 and before July 1, 2010 bear interest at a rate equal to 6.80% per annum.

***PLUS Loans***. PLUS Loans made on or after October 1, 1998 but before July 1, 2006 bear interest at a rate equivalent to the 91-day T-Bill rate plus 3.10%, with a maximum rate of 9.00%. The rate is adjusted annually on July 1. PLUS Loans made on or after July 1, 2006 and before July 1, 2010 bear interest at a rate equal to 8.50% per annum.

***Consolidation Loans***. Consolidation Loans for which the application was received by an eligible lender on or after October 1, 1998 and that was disbursed before July 1, 2010 bear interest at a fixed rate equal to the lesser of (a) the weighted average of the interest rates on the loans consolidated, rounded upward to the nearest 1/8 of 1.00%; or (b) 8.25%. For Consolidation Loans disbursed before July 1, 1994, the applicable interest rate is fixed at the greater of 9% or the weighted average of the interest rates on the loans being consolidated, rounded to the nearest whole percent. For Consolidation Loans disbursed on or after July 1, 1994, based on applications received by the lender before November 13, 1997, the applicable interest rate is fixed and is based on the weighted average of the interest rates on the loans being consolidated, rounded up to the nearest whole percent. For Consolidation Loans (which do not include a HEAL loan) on which the application was received by the lender between November 13, 1997 and September 30, 1998, inclusive, the applicable interest rate is variable based on the bond equivalent rate of the 91-day Treasury bills, auctioned at the final auction before the preceding June, plus 3.1% (adjusted annually on July 1).

***Servicemembers Civil Relief Act—6.00% Interest Rate Limitation***. As of August 14, 2008, FFELP Loans incurred by a servicemember, or by a servicemember and the servicemember's spouse

jointly, before the servicemember enters military service may not bear interest at a rate in excess of 6.00% during the period of military service.

**Loan Disbursements**

The Higher Education Act generally required that Stafford Loans and PLUS Loans made to cover multiple enrollment periods, such as a semester, trimester, or quarter, be disbursed by eligible lenders in at least two separate disbursements. The Higher Education Act also generally required that the first installment of such loans made to a student who was entering the first year of a program of undergraduate education and who had not previously obtained a FFEL Program loan (a "First FFEL Student") must have been presented by the institution to the student 30 days after the First FFEL Student begins a course of study. However, certain institutions whose cohort default rate was less than 10% prior to October 1, 2011 and less than 15% on or after October 1, 2011 for each of the three most recent fiscal years for which data was available were permitted to (a) disburse any such loan made in a single installment for any period of enrollment that was not more than a semester, trimester, quarter, or four months; and (b) deliver any such loan that was to be made to a First FFEL Student prior to the end of the 30-day period after the First FFEL Student began his or her course of study at the institution.

**Loan Limits**

A Stafford Loan borrower was permitted to receive a subsidized loan, an unsubsidized loan, or a combination of both for an academic period. Generally, the maximum amount of Stafford Loans, made prior to July 1, 2007, for an academic year was not permitted to exceed $2,625 for the first year of undergraduate study, $3,500 for the second year of undergraduate study and $5,500 per year for the remainder of undergraduate study. The maximum amount of Stafford Loans, made on or after July 1, 2007, for an academic year was not permitted to exceed $3,500 for the first year of undergraduate study and $4,500 for the second year of undergraduate study. The aggregate limit for undergraduate study was $23,000 (excluding PLUS Loans). Dependent undergraduate students were permitted to receive an additional unsubsidized Stafford Loan of up to $2,000 per academic year, with an aggregate maximum of $31,000. Independent undergraduate students were permitted to receive an additional Unsubsidized Stafford Loan of up to $6,000 per academic year for the first two years and up to $7,000 per academic year thereafter, with an aggregate maximum of $57,500. The maximum amount of subsidized loans for an academic year for graduate students was $8,500. Graduate students were permitted to borrow an additional Unsubsidized Stafford Loan of up to $12,000 per academic year. The Secretary had discretion to raise these limits by regulation to accommodate highly specialized or exceptionally expensive courses of study.

The total amount of all PLUS Loans that (a) parents were permitted to borrow on behalf of each dependent student, or (b) graduate or professional students were permitted to borrow for any academic year was not permitted to exceed the student's estimated cost of attendance minus other financial assistance for that student as certified by the eligible institution which the student attends.

**Repayment**

*General.* Repayment of principal on a Stafford Loan does not commence while a student remains a qualified student, but generally begins six months after the date a borrower ceases to pursue at least a half-time course of study (the six-month period is the "Grace Period"). Repayment of interest on an Unsubsidized Stafford Loan begins immediately upon disbursement of the loan; however, the lender may capitalize the interest until repayment of principal is scheduled to begin. Except for certain borrowers as described below, each loan generally must be scheduled for repayment over a period of not more than 10 years after the commencement of repayment. The Higher Education Act currently requires minimum annual payments of $600, including principal and interest, unless the borrower and the lender agree to lesser

payments. Regulations of the Secretary require lenders to offer borrowers standard, graduated, income-sensitive, or, as of July 1, 2009 for certain eligible borrowers, income-based repayment plans. Use of income-based repayment plans may extend the 10-year maximum term.

Effective July 1, 2009, a new income-based repayment plan became available to certain FFEL Program borrowers and Direct Loan Program borrowers. To be eligible to participate in the plan, the borrower's annual amount due on loans made to a borrower prior to July 1, 2010 with respect to FFEL Program borrowers and prior to July 1, 2014 with respect to Direct Loan Program borrowers (as calculated under a standard 10-year repayment plan for such loans) must exceed 15% of the result obtained by calculating the amount by which the borrower's adjusted gross income (and the borrower's spouse's adjusted gross income, if applicable) exceeds 150% of the poverty line applicable to the borrower's family size. With respect to any loan made to a new Direct Loan Program borrower on or after July 1, 2014, the borrower's annual amount due on such loans (as calculated under a standard 10-year repayment plan for such loans) must exceed 10% of the result obtained by calculating the amount by which the borrower's adjusted gross income (and the borrower's spouse's adjusted gross income, if applicable) exceeds 150% of the poverty line applicable to the borrower's family size. Such a borrower may elect to have his payments limited to the monthly amount of the above described result. Furthermore, the borrower is permitted to repay his loans over a term greater than 10 years. The Secretary will repay any outstanding principal and interest on eligible FFEL Program loans and cancel any outstanding principal and interest on eligible Direct Loan Program loans for borrowers who participated in the new income-based repayment plan and, for a period of time prescribed by the Secretary (but not more than 25 years for a borrower whose loan was made prior to July 1, 2010 with respect to FFEL Program loans and prior to July 1, 2014 with respect to Direct Loan Program loans and not more than 20 years for a Direct Loan Program borrower whose loan was made on or after July 1, 2014), have (a) made certain reduced monthly payments under the income-based repayment plan, (b) made certain payments based on a 10-year repayment period when the borrower first made the election to participate in the income-based repayment plan, (c) made certain payments based on a standard 10-year repayment period, (d) made certain payments under an income-contingent repayment plan for certain Direct Loan Program loans, or (e) have been in an economic hardship deferment.

Borrowers of Subsidized Stafford Loans and of the subsidized portion of Consolidation Loans, and borrowers of similar subsidized loans under the Direct Loan Program receive additional benefits under the new income-based repayment program: the Secretary will pay any unpaid interest due on the borrower's subsidized loans for up to three years after the borrower first elects to participate in the new income-based repayment plan (excluding any periods where the borrower has obtained economic hardship deferment). For both subsidized and unsubsidized loans, interest is capitalized when the borrower either ends his participation in the income-based repayment program or begins making certain payments under the program calculated for those borrowers whose financial hardship has ended.

PLUS Loans enter repayment on the date the last disbursement is made on the loan. Interest accrues and is due and payable from the date of the first disbursement of the loan. The first payment is due within 60 days after the loan is fully disbursed, subject to deferral. For parent borrowers whose loans were first disbursed on or after July 1, 2008, it is possible, upon the request of the parent, to begin repayment on the later of (a) six months and one day after the student for whom the loan is borrowed ceases to carry at least one-half of the normal full-time academic workload (as determined by the school); and (b) if the parent borrower is also a student, six months and one day after the date such parent borrower ceases to carry at least one-half such a workload. Similarly, graduate and professional student borrowers whose loans were first disbursed on or after July 1, 2008 may begin repayment six months and one day after such student ceases to carry at least one-half the normal full-time academic workload (as determined by the school). Repayment plans are the same as in the Subsidized and Unsubsidized Stafford Loan Program for all PLUS Loans except those PLUS Loans which are made, insured, or guaranteed on behalf of a dependent student; such excepted PLUS Loans are not eligible for the income-based repayment plan which became effective

A-6

on July 1, 2009. Furthermore, eligible lenders were permitted to determine for all PLUS Loan borrowers (i) whose loans were first disbursed on or after July 1, 2008 that extenuating circumstances existed if between January 1, 2007 through December 31, 2009, a PLUS Loan applicant (A) was or had been delinquent for 180 days or less on the borrower's residential mortgage loan payments or on medical bills; and (B) did not otherwise have an adverse credit history, as determined by the lender in accordance with the regulations promulgated under the Higher Education Act prior to May 7, 2008; and (ii) whose loans were first disbursed prior to July 1, 2008 that extenuating circumstances existed if between January 1, 2007 through December 31, 2009, a PLUS Loan applicant (A) was or had been delinquent for 180 days or less on the borrower's residential mortgage loan or on medical bills, and (B) was not and had not been delinquent on the repayment of any other debt for more than 89 days during the period.

Consolidation Loans enter repayment on the date the loan is disbursed. The first payment is due within 60 days after all holders of the loan have discharged the liabilities of the borrower on the loan selected for consolidation. Consolidation Loans which are not being paid pursuant to income-sensitive repayment plans (or, as of July 1, 2009, income-based repayment plans) must generally be repaid during a period agreed to by the borrower and lender, subject to maximum repayment periods which vary depending upon the principal amount of the borrower's outstanding student loans (but no longer than 30 years for Consolidation Loans made after January 1, 1993). Consolidation Loans may also be repaid pursuant to the new income-based repayment plan which became effective on July 1, 2009. However, Consolidation Loans which have been used to repay a PLUS Loan that has been made, insured, or guaranteed on behalf of a dependent student were not eligible for this new income-based repayment plan.

FFEL Program borrowers who accumulate outstanding FFELP Loans on or after October 7, 1998 totaling more than $30,000 were permitted to receive an extended repayment plan, with a fixed annual or graduated payment amount paid over a longer period of time, not to exceed 25 years. A borrower may accelerate principal payments at any time without penalty. Once a repayment plan is established, the borrower may annually change the selection of the plan.

***Deferment and Forbearance Periods***. No principal repayments need to be made during certain periods prescribed by the Higher Education Act ("Deferment Periods") but interest accrues and must be paid. Generally, Deferment Periods include periods (a) when the borrower has returned to an eligible educational institution on a half-time basis or is pursuing studies pursuant to an approved graduate fellowship or an approved rehabilitation training program for disabled individuals; (b) not in excess of three years while the borrower is seeking and unable to find full-time employment; (c) while the borrower is serving on active duty during a war or other military operation or national emergency, is performing qualifying National Guard duty during a war or other military operation or national emergency, and for 180 days following the borrower's demobilization date for the above described services; (d) during the 13 months following service if the borrower is a member of the National Guard, a member of a reserve component of the military, or a retired member of the military who (i) is called or ordered to active duty, and (ii) is or was enrolled within six months prior to the activation at an eligible educational institution; (e) if the borrower is in active military duty, or is in reserve status and called to active duty; and (f) not in excess of three years for any reason which the lender determines, in accordance with regulations, has caused or will cause the borrower economic hardship. Deferment periods extend the maximum repayment periods. Under certain circumstances, a lender may also allow periods of forbearance ("Forbearance") during which the borrower may defer payments because of temporary financial hardship. The Higher Education Act specifies certain periods during which Forbearance is mandatory. Mandatory Forbearance periods include, but are not limited to, periods during which the borrower is (A) participating in a medical or dental residency and is not eligible for deferment; (B) serving in a qualified medical or dental internship program or certain national service programs; or (C) determined to have a debt burden of certain federal loans equal to or exceeding 20% of the borrower's gross income. In other circumstances, Forbearance may be granted at the lender's option. Forbearance also extends the maximum repayment periods.

**Master Promissory Notes**

Since July 2000, all lenders were required to use a master promissory note (the "MPN") for new Stafford Loans. Unless otherwise notified by the Secretary, each institution of higher education that participated in the FFEL Program was permitted to use a master promissory note for FFELP Loans. The MPN permitted a borrower to obtain future loans without the necessity of executing a new promissory note. Borrowers were not, however, required to obtain all of their future loans from their original lender, but if a borrower obtains a loan from a lender which does not presently hold an MPN for that borrower, that borrower was required to execute a new MPN. A single borrower may have several MPNs evidencing loans to multiple lenders. If multiple loans have been advanced pursuant to a single MPN, any or all of those loans may be individually sold by the holder of the MPN to one or more different secondary market purchasers.

**Interest Benefit Payments**

The Secretary is to pay interest on Subsidized Stafford Loans while the borrower is a qualified student, during a Grace Period or during certain Deferment Periods. In addition, Consolidation Loans made after August 10, 1993 that repay only Subsidized Stafford Loans are eligible for Interest Benefit Payments. Consolidation Loans made on or after November 13, 1997, are eligible for Interest Benefit Payments on that portion of the Consolidation Loan that repays subsidized FFELP Loans or similar subsidized loans made under the Direct Loan Program are eligible for interest benefit payments. The Secretary is required to make interest benefit payments to the holder of Subsidized Stafford Loans in the amount of interest accruing on the unpaid balance thereof prior to the commencement of repayment or during any Deferment Period. The Higher Education Act provides that the holder of an eligible Subsidized Stafford Loan, or the eligible portions of Consolidation Loans, shall be deemed to have a contractual right against the United States to receive interest benefit payments in accordance with its provisions.

**Special Allowance Payments**

The Higher Education Act provides for Special Allowance Payments to be made by the Secretary to eligible lenders. The rates for Special Allowance Payments are based on formulas that differ according to the type of loan, the date the loan was first disbursed, the interest rate and the type of funds used to finance such loan (tax-exempt or taxable). Loans made or purchased with funds obtained by the holder from the issuance of tax-exempt obligations issued prior to October 1, 1993 have an effective minimum rate of return of 9.50%. Amounts derived from recoveries of principal on loans made prior to October 1, 1993 may only be used to originate or acquire additional loans by a unit of a state or local government, or non-profit entity not owned or controlled by or under common ownership of a for-profit entity and held directly or through any subsidiary, affiliate or trustee, which entity has a total unpaid balance of principal equal to or less than $100,000,000 on loans for which special allowances were paid in the most recent quarterly payment prior to September 30, 2005. Such entities were permitted to originate or acquire additional loans with amounts derived from recoveries of principal until December 31, 2010. The Special Allowance Payments payable with respect to student loans acquired or funded with the proceeds of tax-exempt obligations issued after September 30, 1993 are equal to those paid to other lenders.

Public Law 112-74, dated December 23, 2011, amended the Higher Education Act, reflecting financial market conditions, to allow FFELP lenders to make an affirmative election to permanently change the index for Special Allowance Payment calculations on all FFELP Loans in the lender's portfolio (with certain limited exceptions) disbursed after January 1, 2000 from the Three Month Commercial Paper Rate (as hereafter defined) to the One Month LIBOR Rate (as hereafter defined), commencing with the Special Allowance Payment calculations for the calendar quarter beginning on April 1, 2012. Such election to permanently change the index for Special Allowance Payment calculations must have been made by

April 1, 2012 and must also have waived all contractual, statutory or other legal rights to the Special Allowance Payment calculation formula in effect at the time the loans were first disbursed. The Department of Education has not indicated what index it will use to calculate Special Allowance Payments presently based upon the One Month LIBOR Rate if the One Month LIBOR Rate is no longer available. See the caption "RISK FACTORS—LIBOR is being discontinued as a floating rate benchmark, and various aspects of the discontinuation are uncertain and will affect the financial markets and may also affect the Financed Eligible Loans and the Class A-1B Notes and the Class B Notes" in the body of this Offering Memorandum.

Subject to the foregoing, the formulas for Special Allowance Payment rates for Subsidized and Unsubsidized Stafford Loans are summarized in the following chart. The term "T-Bill" as used in this table and the following table, means the average 91-day treasury bill rate calculated at a "bond equivalent rate" in the manner applied by the Secretary as referred to in Section 438 of the Higher Education Act. The term "Three Month Commercial Paper Rate" means the 90-day commercial paper index calculated quarterly and based on an average of the daily 90-day commercial paper rates reported in the Federal Reserve's Statistical Release H-15. The term "One Month LIBOR Rate" means the one-month London Interbank Offered Rate for United States dollars in effect for each of the days in such quarter as compiled and released by Intercontinental Exchange Group (ICE).

| Date of Loans | Annualized SAP Rate |
|---|---|
| On or after October 1, 1992 | T-Bill Rate less Applicable Interest Rate + 3.10% |
| On or after July 1, 1995 | T-Bill Rate less Applicable Interest Rate + 3.10%[1] |
| On or after July 1, 1998 | T-Bill Rate less Applicable Interest Rate + 2.80%[2] |
| On or after January 1, 2000 (and before October 1, 2007) | Three Month Commercial Paper Rate[6] less Applicable Interest Rate + 2.34%[3] |
| On or after October 1, 2007 and before July 1, 2010 if an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[6] less Applicable Interest Rate + 1.94%[4] |
| On or after October 1, 2007 and before July 1, 2010 if an eligible lender other than an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[6] less Applicable Interest Rate + 1.79%[5] |

---

[1] Substitute 2.50% in this formula while such loans are in the in-school or grace period.

[2] Substitute 2.20% in this formula while such loans are in the in-school or grace period.

[3] Substitute 1.74% in this formula while such loans are in the in-school or grace period.

[4] Substitute 1.34% in this formula while such loans are in the in-school or grace period.

[5] Substitute 1.19% in this formula while such loans are in the in-school or grace period.

[6] Substitute "One Month LIBOR Rate" for "Three Month Commercial Paper Rate" in this formula where lenders made the affirmative election by no later than April 1, 2012 under Public Law 112-74, dated December 23, 2011, to permanently change the index for Special Allowance Payment calculations for all loans in the lender's portfolio.

The formulas for Special Allowance Payment rates for PLUS Loans are as follows:

| Date of Loans | Annualized SAP Rate |
|---|---|
| On or after October 1, 1992 | T-Bill Rate less Applicable Interest Rate + 3.10% |
| On or after January 1, 2000 (and before October 1, 2007) | Three Month Commercial Paper Rate[*] less Applicable Interest Rate +2.64% |
| On or after October 1, 2007 and before July 1, 2010 if an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 1.94% |
| On or after October 1, 2007 and before July 1, 2010 if an eligible lender other than an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 1.79% |

_____

[*] Substitute "One Month LIBOR Rate" for "Three Month Commercial Paper Rate" in this formula where lenders made the affirmative election by no later than April 1, 2012 under Public Law 112-74, dated December 23, 2011, to permanently change the index for Special Allowance Payment calculations for all loans in the lender's portfolio.

The formulas for Special Allowance Payment rates for Consolidation Loans are as follows:

| Date of Loans | Annualized SAP Rate |
|---|---|
| On or after October 1, 1992 | T-Bill Rate less Applicable Interest Rate + 3.10% |
| On or after January 1, 2000 (and before October 1, 2007) | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 2.64% |
| On or after October 1, 2007 and before July 1, 2010 if an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 2.24% |
| On or after October 1, 2007 and before July 1, 2010 if an eligible lender other than an eligible not-for-profit lender (or an eligible lender trustee on its behalf) is the holder of the loan | Three Month Commercial Paper Rate[*] less Applicable Interest Rate + 2.09% |

_____

[*] Substitute "One Month LIBOR Rate" for "Three Month Commercial Paper Rate" in this formula where lenders made the affirmative election by no later than April 1, 2012 under Public Law 112-74, dated December 23, 2011, to permanently change the index for Special Allowance Payment calculations for all loans in the lender's portfolio.

Special allowance payments are generally payable, with respect to variable rate FFELP Loans to which a maximum borrower interest rate applies, only when the maximum borrower interest rate is in effect. The Secretary offsets interest benefit payments and Special Allowance Payments by the amount of origination fees and lender loan fees described under the caption "—Loan Fees" below.

The Higher Education Act provides that a holder of a qualifying loan who is entitled to receive Special Allowance Payments has a contractual right against the United States to receive those payments during the life of the loan. Receipt of Special Allowance Payments, however, is conditioned on the eligibility of the loan for federal insurance or reinsurance benefits. Such eligibility may be lost due to violations of federal regulations or Guaranty Agencies' requirements.

The Higher Education Act provides that for FFELP Loans first disbursed prior to April 1, 2006, lenders are entitled to retain interest income in excess of the special allowance support level in instances

when the loan rate exceeds the special allowance support level. However, lenders are not allowed to retain interest income in excess of the special allowance support level on FFELP Loans disbursed on or after April 1, 2006, and are required to rebate any such "excess interest" to the Secretary on a quarterly basis. This modification effectively limits lenders' returns to the special allowance support level and could require a lender to rebate excess interest accrued but not yet received.

## Loan Fees

*Insurance Premium*. For loans guaranteed before July 1, 2006, a Guaranty Agency was authorized to charge a premium, or guarantee fee, of up to 1.00% of the principal amount of the loan, which may be deducted proportionately from each installment of the loan. Generally, Guaranty Agencies had waived this fee since 1999. For loans guaranteed on or after July 1, 2006 that are first disbursed before July 1, 2010, a federal default fee equal to 1.00% of principal was required to be paid into such Guaranty Agency's Federal Student Loan Reserve Fund (hereinafter defined as the "Federal Fund").

*Origination Fee*. Lenders were authorized to charge borrowers of Subsidized Stafford Loans and Unsubsidized Stafford Loans an origination fee in an amount not to exceed: 3.00% of the principal amount of the loan for loans disbursed prior to July 1, 2006; 2.00% of the principal amount of the loan for loans disbursed on or after July 1, 2006 and before July 1, 2007; 1.50% of the principal amount of the loan for loans disbursed on or after July 1, 2007 and before August 1, 2008; 1.00% of the principal amount of the loan for loans disbursed on or after August 1, 2008 and before July 1, 2009; and 0.50% of the principal amount of the loan for loans disbursed on or after July 1, 2009 and before July 1, 2010. The Secretary is authorized to charge borrowers of Direct Loans 4.00% of the principal amount of the loan for loans disbursed prior to February 8, 2006. A lender was permitted to charge a lesser origination fee to Stafford Loan borrowers so long as the lender did so consistently with respect to all borrowers who resided in or attended school in a particular state. For borrowers of Direct Loans other than Federal Direct Consolidation Loans and Federal Direct PLUS Loans, the Secretary may charge such borrowers as follows: 3.00% of the principal amount of the loan for loans disbursed on or after February 8, 2006 and before July 1, 2007; 2.50% of the principal amount of the loan for loans disbursed on or after July 1, 2007 and before August 1, 2008; 2.00% of the principal amount of the loan for loans disbursed on or after August 1, 2008 and before July 1, 2009; 1.50% of the principal amount of the loan for loans disbursed on or after July 1, 2009 and before July 1, 2010; and 1.00% of the principal amount of the loan for loans disbursed on or after July 1, 2010. These fees must be deducted proportionately from each installment payment of the loan proceeds prior to payment to the borrower. The lenders were required to pass the origination fees received under the FFEL Program on to the Secretary.

*Lender Loan Fee*. The lender of any FFELP Loan was required to pay to the Secretary an additional origination fee equal to 0.50% of the principal amount of the loan for loans first disbursed on or after October 1, 1993, but prior to October 1, 2007. For all loans first disbursed on or after October 1, 2007 and before July 1, 2010, the lender was required to pay an additional origination fee equal to 1.00% of the principal amount of the loan.

The Secretary collects from the lender or subsequent holder of the loan the maximum origination fee authorized (regardless of whether the lender actually charges the borrower) and the lender loan fee, either through reductions in interest benefit payments or Special Allowance Payments or directly from the lender or holder of the loan.

*Rebate Fee on Consolidation Loans*. The holder of any Consolidation Loan for which the first disbursement was made on or after October 1, 1993, is required to pay to the Secretary a Monthly Consolidation Rebate Fees equal to .0875% (1.05% per annum) of the principal amount plus accrued unpaid interest on the loan. However, for Consolidation Loans for which applications were received from

October 1, 1998 to January 31, 1999, inclusive, the Monthly Consolidation Rebate Fees is approximately equal to .0517% (.62% per annum) of the principal amount plus accrued interest on the loan.

**Insurance and Guarantees**

A Guaranty Agency guarantees Federal Family Education Loans made to students or parents of students by eligible lenders. A Guaranty Agency generally purchases defaulted student loans which it has guaranteed with its reserve fund (as described under the caption "Guaranty Agency Reserves" below). A Federal Family Education Loan is considered to be in default for purposes of the Higher Education Act when the borrower fails to make an installment payment when due, or to comply with other terms of the loan, and if the failure persists for 270 days in the case of a loan repayable in monthly installments or for 330 days in the case of a loan repayable in less frequent installments. If the loan is guaranteed by a Guaranty Agency in accordance with the provisions of the Higher Education Act, the Guaranty Agency is to pay the holder a percentage of such amount of the loss subject to a reduction (as described in 20 U.S.C. § 1075(b)) within 90 days of notification of such default. The default claim package submitted to a Guaranty Agency must include all information and documentation required under the Federal Family Education Loan Program regulations and such Guaranty Agency's policies and procedures.

The Higher Education Act gives the Secretary of Education various oversight powers over the Guaranty Agencies. These include requiring a Guaranty Agency to maintain its reserve fund at a certain required level and taking various actions relating to a Guaranty Agency if its administrative and financial condition jeopardizes its ability to meet its obligations.

*Federal Insurance*. The Higher Education Act provides that, subject to compliance with such Act, the full faith and credit of the United States is pledged to the payment of insurance claims and ensures that such reimbursements are not subject to reduction. In addition, the Higher Education Act provides that if a Guaranty Agency is unable to meet its insurance obligations, holders of loans may submit insurance claims directly to the Secretary until such time as the obligations are transferred to a new Guaranty Agency capable of meeting such obligations or until a successor Guaranty Agency assumes such obligations. Federal reimbursement and insurance payments for defaulted loans are paid from the student loan insurance fund established under the Higher Education Act. The Secretary is authorized, to the extent provided in advance by appropriations acts, to issue obligations to the Secretary of the Treasury to provide funds to make such federal payments.

*Guarantees*. If the loan is guaranteed by a Guaranty Agency in accordance with the provisions of the Higher Education Act, the eligible lender is reimbursed by the Guaranty Agency for a statutorily set percentage (100% for loans first disbursed prior to October 1, 1993, 98% for loans first disbursed on or after October 1, 1993, but before July 1, 2006, and 97% for loans first disbursed on or after July 1, 2006 but before July 1, 2010) of the unpaid principal balance of the loan plus accrued unpaid interest on any defaulted loan so long as the eligible lender has properly serviced such loan. Under the Higher Education Act, the Secretary enters into a guarantee agreement and a reinsurance agreement (the "Guarantee Agreements") with each Guaranty Agency which provides for federal reimbursement for amounts paid to eligible lenders by the Guaranty Agency with respect to defaulted loans.

*Guarantee Agreements*. Pursuant to the Guarantee Agreements, the Secretary is to reimburse a Guaranty Agency for the amounts expended in connection with a claim resulting from the death of a borrower; bankruptcy of a borrower; total and permanent disability of a borrower (including those borrowers who have been determined by the Secretary of Veterans Affairs to be unemployable due to a service-connected condition); inability of a borrower to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, has lasted continuously for at least 60 months, or can be expected to last continuously for at least 60 months;

A-12

the death of a student whose parent is the borrower of a PLUS Loan; certain claims by borrowers who are unable to complete the programs in which they are enrolled due to school closure; borrowers whose borrowing eligibility was falsely certified by the eligible institution; or the amount of an unpaid refund due from the school to the lender in the event the school fails to make a required refund.  Such claims are not included in calculating a Guaranty Agency's claims rate experience for federal reimbursement purposes.  Generally, educational loans are non-dischargeable in bankruptcy unless the bankruptcy court determines that the debt will impose an undue hardship on the borrower and the borrower's dependents.  Further, the Secretary is to reimburse a Guaranty Agency for any amounts paid to satisfy claims not resulting from death, bankruptcy, or disability subject to reduction as described below.  See the caption "—Education Loans Generally Not Subject To Discharge in Bankruptcy" below.

The Secretary may terminate Guarantee Agreements if the Secretary determines that termination is necessary to protect the federal financial interest or to ensure the continued availability of loans to student or parent borrowers.  Upon termination of such Guarantee Agreements, the Secretary is authorized to provide the Guaranty Agency with additional advance funds with such restrictions on the use of such funds as is determined appropriate by the Secretary, in order to meet the immediate cash needs of the Guaranty Agency, ensure the uninterrupted payment of claims, or ensure that the Guaranty Agency will make loans as the lender-of-last-resort.

If the Secretary has terminated or is seeking to terminate Guarantee Agreements, or has assumed a Guaranty Agency's functions, notwithstanding any other provision of law: (a) no state court may issue an order affecting the Secretary's actions with respect to that Guaranty Agency; (b) any contract entered into by the Guaranty Agency with respect to the administration of the Guaranty Agency's reserve funds or assets purchased or acquired with reserve funds shall provide that the contract is terminable by the Secretary upon 30 days' notice to the contracting parties if the Secretary determines that such contract includes an impermissible transfer of the reserve funds or assets or is inconsistent with the terms or purposes of the Higher Education Act; and (c) no provision of state law shall apply to the actions of the Secretary in terminating the operations of the Guaranty Agency.  Finally, notwithstanding any other provision of law, the Secretary's liability for any outstanding liabilities of a Guaranty Agency (other than outstanding student loan guarantees under the Higher Education Act), the functions of which the Secretary has assumed, shall not exceed the fair market value of the reserves of the Guaranty Agency, minus any necessary liquidation or other administrative costs.

***Reimbursement***.  The amount of a reimbursement payment on defaulted loans made by the Secretary to a Guaranty Agency is subject to reduction based upon the annual claims rate of the Guaranty Agency calculated to equal the amount of federal reimbursement as a percentage of the original principal amount of originated or guaranteed loans in repayment on the last day of the prior fiscal year.  The claims experience is not accumulated from year to year, but is determined solely on the basis of claims in any one federal fiscal year compared with the original principal amount of loans in repayment at the beginning of that year.  The formula for reimbursement amounts is summarized below:

| Claims Rate | Guaranty Agency Reinsurance Rate for Loans Made prior to October 1, 1993 | Guaranty Agency Reinsurance Rate for Loans Made Between October 1, 1993 and September 30, 1998 | Guaranty Agency Reinsurance Rate for Loans Made On or After October 1, 1998 and Prior to July 1, 2010[*] |
|---|---|---|---|
| 0% up to 5% | 100% | 98% | 95% |
| 5% up to 9% | 100% of claims up to 5%; and 90% of claims 5% and over | 98% of claims up to 5%; and 88% of claims 5% and over | 95% of claims up to 5% and 85% of claims 5% and over |
| 9% and over | 100% of claims up to 5%; 90% of claims 5% up to 9%; 80% of claims 9% and over | 98% of claims up to 5%; 88% of claims 5% up to 9%; 78% of claims 9% and over | 95% of claims up to 5%, 85% of claims 5% up to 9%; 75% of claims 9% and over |

_____

[*] Student loans made pursuant to the lender-of-last resort program have an amount of reinsurance equal to 100%; student loans transferred by an insolvent Guaranty Agency have an amount of reinsurance ranging from 80% to 100%. The Consolidated Appropriations Act, 2016, Pub. L. 114-113, signed by the President on December 18, 2015 changed the applicable reinsurance percentage for guaranty agencies on default claims in the FFEL program from 95% to 100% if such guaranty agency's "*trigger rate*" is below 5.0%.

The amount of loans guaranteed by a Guaranty Agency which are in repayment for purposes of computing reimbursement payments to a Guaranty Agency means the original principal amount of all loans guaranteed by a Guaranty Agency less: (a) guarantee payments on such loans, (b) the original principal amount of such loans that have been fully repaid, and (c) the original amount of such loans for which the first principal installment payment has not become due.

In addition, the Secretary may withhold reimbursement payments if a Guaranty Agency makes a material misrepresentation or fails to comply with the terms of its agreements with the Secretary or applicable federal law. A supplemental guarantee agreement is subject to annual renegotiation and to termination for cause by the Secretary.

Under the Guarantee Agreements, if a payment by the borrower on a FFELP Loan guaranteed by a Guaranty Agency is received after reimbursement by the Secretary, the Secretary is entitled to receive an equitable share of the borrower's payment. The Secretary's equitable share of the borrower's payment equals the amount remaining after the Guaranty Agency has deducted from such payment: (a) the percentage amount equal to the complement of the reinsurance percentage in effect when payment under the Guarantee Agreement was made with respect to the loan; and (b) as of October 1, 2007, 16% of the borrower's payments (to be used for the Guaranty Agency's Operating Fund (hereinafter defined)). The percentage deduction for use of the borrower's payments for the Guaranty Agency's Operating Fund varied prior to October 1, 2007; from October 1, 2003 through and including September 30, 2007, the percentage in effect was 23% and prior to October 1, 2003, the percentage in effect was 24%. The Higher Education Act further provides that on or after October 1, 2006, a Guaranty Agency may not charge a borrower collection costs in an amount in excess of 18.50% of the outstanding principal and interest of a defaulted loan that is paid off through consolidation by the borrower; provided that the Guaranty Agency must remit to the Secretary a portion of the collection charge equal to 8.50% of the outstanding principal and interest of the defaulted loan. In addition, on or after October 1, 2009, a Guaranty Agency must remit to the Secretary any collection fees on defaulted loans paid off with consolidation proceeds by the borrower which are in excess of 45% of the Guaranty Agency's total collections on defaulted loans in any one federal fiscal year.

***Lender Agreements***.  Pursuant to most typical agreements for guarantee between a Guaranty Agency and the originator of the loan, any eligible holder of a loan insured by such a Guaranty Agency is entitled to reimbursement from such Guaranty Agency, subject to certain limitations, of any proven loss incurred by the holder of the loan resulting from default, death, permanent and total disability, certain medically determinable physical or mental impairment, or bankruptcy of the student borrower at the rate of 100% for loans first disbursed prior to October 1, 1993, 98% for loans first disbursed on or after October 1, 1993, but before July 1, 2006, and 97% for loans in default made on or after July 1, 2006 but prior to July 1, 2010.  Certain holders of loans may receive higher reimbursements from Guaranty Agencies.  For example, lenders of last resort may receive reimbursement at a rate of 100% from Guaranty Agencies.

Guaranty Agencies generally deem default to mean a student borrower's failure to make an installment payment when due or to comply with other terms of a note or agreement under circumstances in which the holder of the loan may reasonably conclude that the student borrower no longer intends to honor the repayment obligation and for which the failure persists for 270 days in the case of a loan payable in monthly installments or for 330 days in the case of a loan payable in less frequent installments.  When a loan becomes at least 60 days past due, the holder is required to request default aversion assistance from the applicable Guaranty Agency in order to attempt to cure the delinquency.  When a loan becomes 240 days past due, the holder is required to make a final demand for payment of the loan by the borrower.  The holder is required to continue collection efforts until the loan is 270 days past due.  At the time of payment of insurance benefits, the holder must assign to the applicable Guaranty Agency all right accruing to the holder under the note evidencing the loan.  The Higher Education Act prohibits a Guaranty Agency from filing a claim for reimbursement with respect to losses prior to 270 days after the loan becomes delinquent with respect to any installment thereon.

Any holder of a loan is required to exercise due care and diligence in the servicing of the loan and to utilize practices which are at least as extensive and forceful as those utilized by financial institutions in the collection of other consumer loans.  If a Guaranty Agency has probable cause to believe that the holder has made misrepresentations or failed to comply with the terms of its agreement for guarantee, the Guaranty Agency may take reasonable action including withholding payments or requiring reimbursement of funds.  The Guaranty Agency may also terminate the agreement for cause upon notice and hearing.

***Rehabilitation of Defaulted Loans***.  Under the Higher Education Act, the Secretary of Education is authorized to enter into an agreement with each Guaranty Agency pursuant to which a Guaranty Agency sells defaulted student loans that are eligible for rehabilitation to an eligible lender.  For a defaulted student loan to be rehabilitated, the borrower must request rehabilitation and the applicable Guaranty Agency must receive an on-time, voluntary, full payment each month for 12 consecutive months.  However, effective July 1, 2006, for a student loan to be eligible for rehabilitation, the applicable Guaranty Agency must receive nine payments made within 20 days of the due date during 10 consecutive months.  Upon rehabilitation, a student loan is eligible for all the benefits under the Higher Education Act for which it would have been eligible had no default occurred.

A Guaranty Agency repays the Secretary an amount equal to 100% of the amount of the principal balance outstanding at the time of the sale of such student loan, multiplied by the reinsurance percentage in effect when payment under the guaranty agreement was made with respect to the student loan, and may charge to the borrower an amount not to exceed 16% of the outstanding principal and interest at the time of the loan sale.  The amount of such repayment is deducted from the amount of federal reimbursement payments for the fiscal year in which such repayment occurs, for purposes of determining the reimbursement rate for that fiscal year.

***Loans Subject To Repurchase***.  The Higher Education Act requires a lender to repurchase student loans from a Guaranty Agency, under certain circumstances, after a Guaranty Agency has paid for the

A-15

student loan through the claim process. A lender is required to repurchase: (a) a student loan found to be legally unenforceable against the borrower; (b) a student loan for which a bankruptcy claim has been paid if the borrower's bankruptcy is subsequently dismissed by the court or, as a result of the bankruptcy hearing, the student loan is considered non-dischargeable and the borrower remains responsible for repayment of the student loan; (c) a student loan which is subsequently determined not to be in default; or (d) a student loan for which a Guaranty Agency inadvertently paid the claim.

**Guaranty Agency Reserves**

Each Guaranty Agency is required to establish a Federal Fund which, together with any earnings thereon, is deemed to be property of the United States. Each Guaranty Agency is required to deposit into the Federal Fund any reserve funds plus reinsurance payments received from the Secretary, a certain percentage of default collections equal to the complement of the reinsurance percentage in effect when payment under the Guarantee Agreement was made, insurance premiums, 70% of payments received after October 7, 1998 from the Secretary for administrative cost allowances for loans insured prior to that date, and other receipts as specified in regulations. A Guaranty Agency is authorized to transfer up to 180 days' cash expenses for normal operating expenses (other than claim payments) from the Federal Fund to the Operating Fund at any time during the first three years after establishment of the Federal Fund. The Federal Fund may be used to pay lender claims and to pay default aversion fees into the Operating Fund. A Guaranty Agency is also required to establish an operating fund (the "Operating Fund"), which, except for funds transferred from the Federal Fund to meet operating expenses during the first three years after fund establishment, is the property of the Guaranty Agency. A Guaranty Agency was permitted to deposit into the Operating Fund loan processing and issuance fees equal to 0.40% of the total principal amount of loans insured during the fiscal year for loans originated on or after October 1, 2003 and first disbursed before July 1, 2010, 30% of payments received after October 7, 1998 for the administrative cost allowances for loans insured prior to that date, the account maintenance fee paid by the Secretary for Direct Loan Program loans in the amount of 0.06% of the original principal amount of the outstanding loans insured, any default aversion fee that is paid, the Guaranty Agency's 16% retention on collections of defaulted loans and other receipts as specified in the regulations. An Operating Fund must be used for application processing, loan disbursement, enrollment and repayment status management, default aversion, collection activities, school and lender training, financial aid awareness and related outreach activities, compliance monitoring, and other student financial aid related activities. For Subsidized and Unsubsidized Stafford Loans guaranteed on or after July 1, 2006 and first disbursed before July 1, 2010, Guaranty Agencies were required to collect and deposit a federal default fee to the Federal Fund equal to 1.00% of the principal amount of the loan.

The Higher Education Act provides for a recall of reserves from each Federal Fund in certain years, but also provides for certain minimum reserve levels which are protected from recall. The Secretary is authorized to enter into voluntary, flexible agreements with Guaranty Agencies under which various statutory and regulatory provisions can be waived; provided, however, the Secretary is not authorized to waive, among other items, any deposit of default aversion fees by Guaranty Agencies. In addition, under the Higher Education Act, the Secretary is prohibited from requiring the return of all of a Guaranty Agency's reserve funds unless the Secretary determines that the return of these funds is in the best interest of the operation of the FFEL Program, or to ensure the proper maintenance of such Guaranty Agency's funds or assets or the orderly termination of the Guaranty Agency's operations and the liquidation of its assets. The Higher Education Act also authorizes the Secretary to direct a Guaranty Agency to: (a) return to the Secretary all or a portion of its reserve fund which the Secretary determines is not needed to pay for the Guaranty Agency's program fees and contingent liabilities; and (b) cease any activities involving the expenditure, use or transfer of the Guaranty Agency's reserve funds or assets which the Secretary determines is a misapplication, misuse or improper expenditure.

**Lender-of-Last-Resort Program**

The FFEL Program allowed Guaranty Agencies and certain eligible lenders to act as lenders-of-last-resort before July 1, 2010. A lender-of-last-resort was authorized to receive advances from the Secretary in order to ensure that adequate loan capital exists in order to make loans to students before July 1, 2010. Students and parents of students who were otherwise unable to obtain FFELP Loans (other than Consolidation Loans) were permitted to apply to receive loans from the state's lenders-of-last-resort before July 1, 2010.

**Education Loans Generally Not Subject To
Discharge in Bankruptcy**

Under the U.S. Bankruptcy Code, educational loans are not generally dischargeable. Title 11 of the United States Code at Section 523(a)(8)(A)(i)-(ii) provides that a discharge under Section 727, 1141, 1228(a), 1228(b), or 1328(b) of Title 11 of the United States Code does not discharge an individual debtor from any debt for an education benefit overpayment or loan made, insured, or guaranteed by a governmental unit or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend unless excepting such debt from discharge under this section will impose an undue hardship on the debtor and the debtor's dependents.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX B

## WEIGHTED AVERAGE LIVES, EXPECTED MATURITIES AND PERCENTAGES OF ORIGINAL PRINCIPAL REMAINING AT CERTAIN MONTHLY DISTRIBUTION DATES FOR THE NOTES

Prepayments on pools of student loans can be calculated using a variety of models. Two models are used to calculate prepayments in this Offering Memorandum: a constant prepayment rate ("CPR") model, and a pricing prepayment curve ("PPC") model.

The CPR model is based on prepayments assumed to occur at a flat, constant prepayment rate. CPR is stated as an annualized rate and is calculated as the percentage of the loan amount outstanding at the beginning of a period (including accrued interest to be capitalized), after applying scheduled payments, that is prepaid during that period. The CPR model assumes that student loans will prepay in each month according to the following formula:

Monthly Prepayments = (Principal Balance after scheduled payments) x $(1-(1-CPR)^{1/12})$

Accordingly, monthly prepayments, assuming a $1,000 balance after scheduled payments would be as follows for various levels of CPR:

|  | 0% CPR | 2% CPR | 4% CPR | 6% CPR | 8% CPR |
|---|---|---|---|---|---|
| Monthly Prepayment | $0.00 | $1.68 | $3.40 | $5.14 | $6.92 |

The PPC model is based on a combination of prepayment rates. In the PPC model, prepayments are calculated as in the CPR model. For purposes of this Offering Memorandum, 100% PPC implies (a) 4% CPR for consolidation loans, (b) 6% CPR for non-consolidation loans, and (c) 8% CPR for rehabilitation loans. A rate of "x% PPC" implies the indicated multiple of each such CPR rate for each such loan type.

Neither the CPR model nor the PPC model purports to describe historical prepayment experience or to predict the prepayment rate of any actual student loan pool. The Financed Eligible Loans will not prepay according to such models, nor will all of the Eligible Loans prepay at the same rate. Noteholders must make an independent decision regarding the appropriate principal prepayment scenarios to use in making any investment decision.

**Cash Flow Assumptions for Structuring Runs**

The tables below have been prepared based on the assumptions described below (including the assumptions regarding the characteristics and performance of the rep lines, which will differ from the characteristics and performance of the actual pool of Financed Eligible Loans) and should be read in conjunction therewith. In addition, the diverse characteristics, remaining terms and loan ages of the Financed Eligible Loans could produce slower or faster principal payments than implied by the information in these tables, even if the dispersion of weighted average characteristics, remaining terms and loan ages are the same as the characteristics, remaining terms and loan ages assumed. Different assumptions will have a material impact on the information presented in this Appendix, and investors should make an independent assessment of the assumptions used herein.

For the purposes of calculating the information presented in the tables in this Appendix, it is assumed, among other things, that:

(a)    the statistical cutoff date for modeling the Financed Eligible Loans is June 30, 2021;

(b)    the Date of Issuance is September 21, 2021;

(c)    the Financed Eligible Loans have an initial principal balance plus accrued interest to be capitalized at issuance of $201,159,098.18 which equates, on a pro-rata basis, to the estimated principal balance plus accrued interest expected to be capitalized on the Date of Issuance;

(d)    all Financed Eligible Loans (as grouped in the "rep lines" described below), with the exception of in-school status loans and in-grace status loans, immediately move to repayment status and immediately capitalize accrued interest expected to be capitalized;

(e)    the Collection Period with respect to a Monthly Distribution Date will be the calendar month preceding such Monthly Distribution Date, with the first period being from the Date of Issuance to October 31, 2021;

(f)    none of the Financed Eligible Loans move into deferment or forbearance status;

(g)    the Financed Eligible Loans that are subsidized Stafford loans or subsidized Consolidation loans and are in-school, grace or deferment status have interest paid (Interest Subsidy Payments) by the U.S. Department of Education quarterly, based on a quarterly calendar accrual period;

(h)    there are government payment delays of 60 days for Interest Subsidy Payments and Special Allowance Payments;

(i)    no delinquencies or defaults occur on any of the Financed Eligible Loans, no repurchases occur, and all borrower payments are collected in full;

(j)    there are no minimum monthly payments from the borrowers;

(k)    index levels for calculation of borrower and government payments and interest rates on the Notes are:

(i)    91-day Treasury bill bond equivalent rate of 0.05%;

(ii)    One-Month LIBOR rate of 0.09%;

(l)    monthly distributions begin on November 25, 2021, and are made monthly on the twenty-fifth day of every month thereafter, whether or not the twenty-fifth is a Business Day;

(m)    the initial par amount of the Class A-1A Notes and the interest rate for the Class A-1A Notes at all times will equal: $15,000,000 and 1.58%, the initial par amount of the Class A-1B Notes and the interest rate for the Class A-1B Notes at all times will equal: $178,000,000 and 0.66% and the initial par amount of the Class B Notes and the interest rate for the Class B Notes at all times will equal $4,500,000 and 1.24%;

(n)    interest accrues on the Class A-1A Notes on a 30/360-day count basis and on the Class A-1B Notes and Class B Notes on an actual/360-day count basis (the initial Interest Accrual Period for the Notes begins on the Date of Issuance and ends on November 24, 2021);

(o)    the Administration Fees to be paid monthly are equal to 1/12 of 0.05% per annum on the outstanding principal balance of the Financed Eligible Loans and assumed to begin November 25, 2021 (the Administrative Fee for first Monthly Distribution Date is based on 40 days assuming a 360-day year);

(p)    the Servicing Fees to be paid monthly beginning on November 25, 2021 are equal to the greater of (1) 1/12 of 0.80% per annum on the outstanding principal balance of the Financed Eligible Loans with no inflation adjustment, and (ii) $2.50 per borrower per month, subject to 3% inflation per annum each January, starting January 2022;

(q)    a Program Fee equal to $100,000 per annum is paid each September beginning September 25, 2022;

(r)    a Trustee Fee equal to 0.03% per annum of the outstanding principal balance of the Financed Eligible Loans is paid each quarter beginning December 25, 2021 based on the outstanding Note balance as of the beginning of the period for which such fees are paid;

(s)    a Monthly Consolidation Rebate Fee equal to 1.05% per annum of the aggregate outstanding principal balance of the Financed Eligible Loans that are Consolidation loans is paid monthly by the Issuer to the Department of Education and no payment delays are assumed;

(t)    the Reserve Fund has an initial balance equal to $1,307,534.14, and at all times a balance equal to the greater of (i) 0.65% of the Pool Balance as of the close of business on the last day of the immediately preceding Collection Period and (ii) $201,159;

(u)    the Capitalized Interest Fund has an initial balance equal to $6,000,000; on the September 2023 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $4,400,000 shall be transferred to the Collection Fund; on the September 2025 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund in excess of $2,400,000 shall be transferred to the Collection Fund; and on the September 2027 Monthly Distribution Date, any amounts remaining in the Capitalized Interest Fund shall be transferred to the Collection Fund and the Capitalized Interest Fund will be closed;

(v)    amounts on deposit in any of the Funds or Accounts are not assumed to be reinvested;

(w)    receipts received on the first of any month are assumed to be available for distribution on the immediately succeeding distribution date;

(x)    prepayments on the Financed Eligible Loans are applied monthly in accordance with CPR or PPC, as described above;

(y)    optional redemption from a sale of Financed Eligible Loans occurs when the outstanding Pool Balance is 10% or less of the initial Pool Balance;

(z)    the Issuer makes no other purchases or originations of Eligible Loans under the Indenture; and

(aa)    the initial pool of Financed Eligible Loans was grouped into 169 representative loans ("rep lines"), which have been created, for modeling purposes, from individual Financed Eligible Loans based on combinations of similar individual Financed Eligible Loans characteristics, which include, but are not limited to, interest rate, loan type, SAP index and applicable margin, repayment status and remaining term.

The tables below have been prepared based on the assumptions described above (including the assumptions regarding the characteristics and performance of the rep lines, which will differ from the characteristics and performance of the actual pool of Financed Eligible Loans) and should be read in conjunction therewith.  In addition, the diverse characteristics, remaining terms and loan ages of the Financed Eligible Loans could produce slower or faster principal payments than implied by the information in these tables, even if the dispersions of weighted average characteristics, remaining terms and loan ages are the same as the characteristics, remaining terms and loan ages assumed.

**Weighted Average Lives and Expected Maturity Dates**
**of the Class A-1A Notes at Various Percentages of the PPC Model[1]**

| | Weighted Average Life (Years) [2] | | | | |
|---|---|---|---|---|---|
| | **0% PPC** | **50% PPC** | **100% PPC** | **150% PPC** | **200% PPC** |
| Class A-1A Notes | 7.53 | 6.66 | 6.08 | 5.42 | 4.86 |

| | Expected Maturity Date | | | | |
|---|---|---|---|---|---|
| | **0% PPC** | **50% PPC** | **100% PPC** | **150% PPC** | **200% PPC** |
| Class A-1A Notes | November 2035 | February 2035 | April 2034 | June 2033 | September 2032 |

---

[1]  Assuming for purposes of this table that, among other things, the optional redemption occurs on the Monthly Distribution Date immediately following the date on which the Pool Balance is less than or equal to 10% of the initial Pool Balance.

[2] The weighted average life of the Class A-1A Notes (assuming a 360-day year consisting of twelve 30-day months) is determined by:  (a) multiplying the amount of each principal payment on the Class A-1A Notes by the number of years from the Date of Issuance to the related Monthly Distribution Date, (b) adding the results, and (c) dividing that sum by the aggregate principal amount of the Class A-1A Notes as of the Date of Issuance.

[Remainder of page intentionally left blank]

**Weighted Average Lives and Expected Maturity Dates**
**of the Class A-1B Notes at Various Percentages of the PPC Model[1]**

**Weighted Average Life (Years)[2]**

|  | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Class A-1B Notes | 7.53 | 6.66 | 6.08 | 5.42 | 4.86 |

**Expected Maturity Date**

|  | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Class A-1B Notes | November 2035 | February 2035 | April 2034 | June 2033 | September 2032 |

_____

[1] Assuming for purposes of this table that, among other things, the optional redemption occurs on the Monthly Distribution Date immediately following the date on which the Pool Balance is less than or equal to 10% of the initial Pool Balance.

[2] The weighted average life of the Class A-1B Notes (assuming a 360-day year consisting of twelve 30-day months) is determined by: (a) multiplying the amount of each principal payment on the Class A-1B Notes by the number of years from the Date of Issuance to the related Monthly Distribution Date, (b) adding the results, and (c) dividing that sum by the aggregate principal amount of the Class A-1B Notes as of the Date of Issuance.

**Weighted Average Lives and Expected Maturity Dates**
**of the Class B Notes at Various Percentages of the PPC Model[1]**

**Weighted Average Life (Years)[2]**

|  | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Class B Notes | 14.18 | 13.43 | 12.59 | 11.76 | 11.01 |

**Expected Maturity Date**

|  | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Class B Notes | November 2035 | February 2035 | April 2034 | June 2033 | September 2032 |

_____

[1] Assuming for purposes of this table that, among other things, the optional redemption occurs on the monthly distribution date immediately following the date on which the Pool Balance is less than or equal to 10% of the initial Pool Balance.

[2] The weighted average life of the Class B Notes (assuming a 360-day year consisting of twelve 30-day months) is determined by: (a) multiplying the amount of each principal payment on the Class B Notes by the number of years from the Date of Issuance to the related Monthly Distribution Date, (b) adding the results, and (c) dividing that sum by the aggregate principal amount of the Class B Notes as of the Date of Issuance.

[Remainder of page intentionally left blank]

**Percentages of Original Principal Amount of the Class A-1A Notes Remaining at Certain Monthly Distribution Dates at Various Percentages of the PPC[*]**

| Dates | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Date of Issuance | 100% | 100% | 100% | 100% | 100% |
| September 25, 2022 | 96 | 94 | 92 | 90 | 88 |
| September 25, 2023 | 90 | 86 | 82 | 78 | 75 |
| September 25, 2024 | 84 | 78 | 73 | 68 | 63 |
| September 25, 2025 | 77 | 70 | 64 | 57 | 52 |
| September 25, 2026 | 71 | 63 | 56 | 49 | 43 |
| September 25, 2027 | 62 | 54 | 47 | 40 | 34 |
| September 25, 2028 | 55 | 46 | 40 | 33 | 27 |
| September 25, 2029 | 47 | 38 | 33 | 26 | 21 |
| September 25, 2030 | 39 | 31 | 26 | 20 | 15 |
| September 25, 2031 | 31 | 23 | 20 | 15 | 10 |
| September 25, 2032 | 22 | 16 | 14 | 10 | 0 |
| September 25, 2033 | 14 | 10 | 9 | 0 | 0 |
| September 25, 2034 | 8 | 5 | 0 | 0 | 0 |
| September 25, 2035 | 3 | 0 | 0 | 0 | 0 |
| September 25, 2036 | 0 | 0 | 0 | 0 | 0 |

_____
[*]Assuming for purposes of this table that, among other things, the optional redemption does occur.

**Percentages of Original Principal Amount of the Class A-1B Notes Remaining at Certain Monthly Distribution Dates at Various Percentages of the PPC[*]**

| Dates | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Date of Issuance | 100% | 100% | 100% | 100% | 100% |
| September 25, 2022 | 96 | 94 | 92 | 90 | 88 |
| September 25, 2023 | 90 | 86 | 82 | 78 | 75 |
| September 25, 2024 | 84 | 78 | 73 | 68 | 63 |
| September 25, 2025 | 77 | 70 | 64 | 57 | 52 |
| September 25, 2026 | 71 | 63 | 56 | 49 | 43 |
| September 25, 2027 | 62 | 54 | 47 | 40 | 34 |
| September 25, 2028 | 55 | 46 | 40 | 33 | 27 |
| September 25, 2029 | 47 | 38 | 33 | 26 | 21 |
| September 25, 2030 | 39 | 31 | 26 | 20 | 15 |
| September 25, 2031 | 31 | 23 | 20 | 15 | 10 |
| September 25, 2032 | 22 | 16 | 14 | 10 | 0 |
| September 25, 2033 | 14 | 10 | 9 | 0 | 0 |
| September 25, 2034 | 8 | 5 | 0 | 0 | 0 |
| September 25, 2035 | 3 | 0 | 0 | 0 | 0 |
| September 25, 2036 | 0 | 0 | 0 | 0 | 0 |

_____
[*]Assuming for purposes of this table that, among other things, the optional redemption does occur.

**Percentages of Original Principal Amount of the Class B Notes Remaining at Certain Monthly Distribution Dates at Various Percentages of the PPC**[*]

| Dates | 0% PPC | 50% PPC | 100% PPC | 150% PPC | 200% PPC |
|---|---|---|---|---|---|
| Date of Issuance | 100% | 100% | 100% | 100% | 100% |
| September 25, 2022 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2023 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2024 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2025 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2026 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2027 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2028 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2029 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2030 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2031 | 100 | 100 | 100 | 100 | 100 |
| September 25, 2032 | 100 | 100 | 100 | 100 | 0 |
| September 25, 2033 | 100 | 100 | 100 | 0 | 0 |
| September 25, 2034 | 100 | 100 | 0 | 0 | 0 |
| September 25, 2035 | 100 | 0 | 0 | 0 | 0 |
| September 25, 2036 | 0 | 0 | 0 | 0 | 0 |

---

[*]Assuming for purposes of this table that, among other things, the optional redemption does occur.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX C**

**FORM OF CONTINUING DISCLOSURE AGREEMENT**

**THIS CONTINUING DISCLOSURE AGREEMENT** (the "Continuing Disclosure Agreement") is executed and delivered by the Higher Education Loan Authority of the State of Missouri (the "Obligated Person") in connection with the issuance of $197,500,000 aggregate principal amount of its Taxable Student Loan Asset-Backed Notes, Series 2021-3, consisting of its Senior Series 2021-3A-1A Notes, Senior Series 2021-3A-1B and Subordinate Series 2021-3B Notes (collectively, the "Series 2021-3 Notes"). The Series 2021-3 Notes are being issued pursuant to an Indenture of Trust, dated as of September 1, 2021 (the "Indenture"), between the Obligated Person and U.S. Bank National Association, as trustee (the "Trustee"). The Obligated Person undertakes and agrees as follows:

**Section 1.        Purpose of the Continuing Disclosure Agreement**. This Continuing Disclosure Agreement is being executed and delivered by the Obligated Person for the benefit of the Noteholders and beneficial owners of the Series 2021-3 Notes and in order to assist the Underwriter (as defined below) in complying with the Rule (as defined below).

**Section 2.        Definitions**. In addition to the definitions set forth in the Indenture, which apply to any capitalized term used in this Continuing Disclosure Agreement unless otherwise defined in this Section, the following capitalized terms shall have the following meanings:

"*Annual Financial Information*" shall mean any Annual Financial Information provided by the Obligated Person pursuant to, and as described in, Sections 3 and 4 of this Continuing Disclosure Agreement.

"*Disclosure Representative*" shall mean the Treasurer of the Obligated Person or his or her designee, or such other person as the Obligated Person shall designate.

"*Dissemination Agent*" shall mean any Dissemination Agent designated by the Obligated Person.

"*EMMA*" means the Electronic Municipal Market Access facility for municipal securities disclosure of the MSRB.

"*Financial Obligation*" means (a) a debt obligation, (b) a derivative instrument entered into in connection with, or pledged as security or a source of payment for, an existing or planned debt obligation, or (c) a guarantee of either clause (a) or (b) above. The term "Financial Obligation" shall not include municipal securities as to which a final official statement has been provided to the MSRB consistent with the Rule.

"*Listed Event*" shall mean any of the events listed in Section 5(a) of this Continuing Disclosure Agreement.

"*MSRB*" shall mean the Municipal Securities Rulemaking Board, and any successors or assigns, or any other entities or agencies approved under the Rule.

"*Offering Memorandum*" shall mean the Offering Memorandum, dated September 9, 2021, of the Obligated Person with respect to its offering of the Series 2021-3 Notes.

"*Repository*" shall mean, until otherwise designated by the SEC, the Electronic Municipal Market Access website of the MSRB located at http://emma.msrb.org.

"*Rule*" shall mean Rule 15c2-12 adopted by the SEC under the Securities Exchange Act of 1934, as amended, as such rule may be amended from time to time.

"*SEC*" shall mean the United States Securities and Exchange Commission.

"*Underwriter*" means the "participating underwriter" as that term is defined in the Rule, and in relation to the Series 2021-3 Notes, shall mean BofA Securities, Inc. or any successors known to the Obligated Person.

**Section 3.    Provision of Annual Financial Information**.

(a)    The Obligated Person shall, or shall cause the Dissemination Agent to, not later than 180 days after the end of the Obligated Person's fiscal year, commencing with the report of the fiscal year ending June 30, 2021, provide to the Repository, at www.emma.msrb.org, in such electronic format accompanied by such identifying information (the "Prescribed Form") as shall have been prescribed by the MSRB and which shall be in effect on the date of filing of such information, the Annual Financial Information which is consistent with the requirements of Section 4 of this Continuing Disclosure Agreement.

(b)    The Annual Financial Information may be submitted as a single document or as separate documents comprising a package, or by specific cross reference to other documents which have been submitted to the Repository and available to the public on the Repository's website or filed with the SEC. If the document so referenced is a final offering document within the meaning of the Rule, such final offering document must be available from the Repository. The Obligated Person shall clearly identify each such other document so incorporated by cross-reference.

(c)    If the financial statements of the Obligated Person are audited, the audited financial statements of the Obligated Person must be submitted if and when available but may be submitted separately from the balance of the Annual Financial Information and later than the date required above for the filing of the Annual Financial Information if they are not available by that date.

**Section 4.    Content of Annual Financial Information**. The Obligated Person's Annual Financial Information shall contain or incorporate by reference the following:

(a)    annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America;

(b)    an update and a discussion of the financial information and operating data in the Offering Memorandum under the heading "HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI—Members and Staff," "—Previous Financings of the Issuer" and "—Lewis and Clark Discovery Initiative; Scholarship Funding"; and under the heading "CHARACTERISTICS OF THE FINANCED ELIGIBLE LOANS";

(c)    The following Indenture information:

(i)    balances in the Capitalized Interest Fund, the Collection Fund, the Department SAP Rebate Fund and the Reserve Fund; and

(ii)    outstanding principal amount of the Series 2021-3 Notes of each class issued under the Indenture then outstanding; and

(d)    changes to the Higher Education Act having a special financial impact on the program of the Obligated Person financed by the Series 2021-3 Notes which is not generally experienced in the student loan sector.

**Section 5.    Reporting of Significant Events**.

(a)    Pursuant to the provisions of this Section, the Obligated Person shall give, or cause to be given, on behalf of itself and any other persons providing undertakings under the Rule with respect to the Series 2021-3 Notes, notice to the Repository of the occurrence of any of the following events with respect to the Series 2021-3 Notes:

(i)    principal and interest payment delinquencies;

(ii)    non-payment related defaults, if material;

(iii)    unscheduled draws on debt service reserves reflecting financial difficulties;

(iv)    unscheduled draws on credit enhancements reflecting financial difficulties;

(v)    substitution of credit or liquidity providers, or their failure to perform;

(vi)    adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Series 2021-3 Notes, or other material events affecting the Series 2021-3 Notes;

(vii)    modifications to rights of Noteholders of the Series 2021-3 Notes, if material;

(viii)    any call of any Series 2021-3 Notes, if material, and tender offers;

(ix)    defeasances;

(x)    release, substitution or sale of property securing repayment of the Series 2021-3 Notes, if material;

(xi)    rating changes;

(xii)    bankruptcy, insolvency, receivership, or similar event of the Obligated Person;

(xiii)    the consummation of a merger, consolidation, or acquisition involving an Obligated Person or the sale of all or substantially all of the assets of the Obligated Person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material;

(xiv)    appointment of a successor or additional trustee or the change of name of a trustee, if material;

(xv)    incurrence of a Financial Obligation of the Obligated Person, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar

terms of a Financial Obligation of the Obligated Person, any of which affect security holders, if material; and

(xvi)    default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a Financial Obligation of the Obligated Person, any of which reflect financial difficulties.

(b)    If the Obligated Person obtains knowledge of the occurrence of a Listed Event, the Obligated Person shall file, in a timely manner not in excess of ten (10) Business Days after the occurrence of the Listed Event, a notice of such occurrence in Prescribed Form with EMMA.

(c)    The Obligated Person shall provide, in a timely manner, to the MSRB in Prescribed Form in accordance with EMMA, notice of any failure of the Obligated Person to timely provide the Annual Financial Information as specified in Section 4 hereof.

(d)    If the Obligated Person changes its fiscal year, it shall provide in Prescribed Form notice of the change of fiscal year to the Trustee and to the MSRB.

**Section 6.    Termination of Reporting Obligation**.  The Obligated Person's obligations under this Continuing Disclosure Agreement shall terminate upon the earliest to occur of (a) the legal defeasance, prior redemption or payment in full of all of the Series 2021-3 Notes; or (b) the date that the Obligated Person shall no longer constitute an  "obligated person" with respect to the Series 2021-3 Notes within the meaning of the Rule (or, if later, the date on which the Obligated Person determines to no longer voluntarily comply with the Rule in the event that the Rule does not apply to the Series 2021-3 Notes at the time).  The Obligated Person shall file a notice of any such termination with the Repository in the Prescribed Form in accordance with EMMA.

**Section 7.    Dissemination Agent**.  The Obligated Person may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under this Continuing Disclosure Agreement, and may discharge any such Dissemination Agent, with or without appointing a successor Dissemination Agent.

**Section 8.    Amendment: Waiver**.  Notwithstanding any other provision of this Continuing Disclosure Agreement, the Obligated Person may amend this Continuing Disclosure Agreement, and any provision of this Continuing Disclosure Agreement may be waived, if such amendment or waiver is consistent with the Rule, as determined by an opinion of counsel experienced in federal securities laws selected by the Obligated Person.  Written notice of any such amendment or waiver shall be provided by the Obligated Person to the MSRB in Prescribed Form in accordance with EMMA, and the next Annual Financial Information shall explain in narrative form the reasons for the amendment and the impact of any change in the type of information being provided.  If any amendment changes the accounting principles to be followed in preparing financial statements, the Annual Financial Information for the year in which the change is made will present a comparison between the financial statement or information prepared on the basis of the new accounting principles and those prepared on the basis of the former accounting principles.

**Section 9.    Additional Information**.  Nothing in this Continuing Disclosure Agreement shall be deemed to prevent the Obligated Person from disseminating any other information, using the means of dissemination set forth in this Continuing Disclosure Agreement or any other means of communication, or including any other information in any Annual Financial Information or notice of occurrence of a Listed Event, in addition to that which is required by this Continuing Disclosure Agreement.  If the Obligated Person chooses to include any information in any Annual Financial Information or notice of occurrence of a Listed Event, in addition to that which is specifically required by this Continuing Disclosure Agreement,

the Obligated Person shall have no obligation under this Continuing Disclosure Agreement to update such information or include it in any future Annual Financial Information or notice of occurrence of a Listed Event.

**Section 10.     Default**.  In the event of a failure of the Obligated Person to comply with any provision of this Continuing Disclosure Agreement, any Noteholder or beneficial owner of the Series 2021-3 Notes may take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Obligated Person to comply with its obligations under this Continuing Disclosure Agreement.  A default under this Continuing Disclosure Agreement shall not be deemed an Event of Default under the Indenture, and the sole remedy under this Continuing Disclosure Agreement in the event of any failure of the Obligated Person to comply with this Continuing Disclosure Agreement shall be an action to compel performance.

**Section 11.     Beneficiaries**.  This Continuing Disclosure Agreement shall inure solely to the benefit of the Obligated Person, the Dissemination Agent, the Underwriter, the Noteholders and beneficial owners from time to time of the Series 2021-3 Notes and shall create no rights in any other person or entity.

Date: September 21, 2021

HIGHER EDUCATION LOAN AUTHORITY
OF THE STATE OF MISSOURI

By _____
Name _____
Title _____

[THIS PAGE INTENTIONALLY LEFT BLANK]



Printed by: ImageMaster, LLC
www.imagemaster.com