## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

STATE OF MISSOURI,　　　　　　　）
STATE OF ARKANSAS,　　　　　　　）
STATE OF FLORIDA,　　　　　　　　）
STATE OF GEORGIA,　　　　　　　　）
STATE OF NORTH DAKOTA,　　　　　）
STATE OF OHIO, and　　　　　　　　　）
STATE OF OKLAHOMA　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　*Plaintiffs*,　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　　　　　）　Civil Action No. 24-cv-520
　　　　　　　　　　　　　　　　　　）
JOSEPH R. BIDEN, Jr., in his official　）
capacity as President of the United States,　）
　　　　　　　　　　　　　　　　　　）
MIGUEL A. CARDONA, in his official　）
capacity as Secretary, United States　　）
Department of Education, and　　　　　）
　　　　　　　　　　　　　　　　　　）
UNITED STATES DEPARTMENT OF　）
EDUCATION,　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　*Defendants*.　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTIONS FOR A STAY OR, IN THE ALTERNATIVE, A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 3

I.   The Higher Education Act of 1965 and Amendments ........................................ 3

II.  The Department Moves Unilaterally to Cancel Loans ....................................... 7

III. The Department Relies on ICR Authority to Promulgate the Final Rule. ......... 8

    A.   The Proposed Rule and Commenting Period ............................................. 8

    B.   The Final Rule ......................................................................................... 10

    C.   Early Implementation of the Rule ........................................................... 13

SUMMARY OF ARGUMENT ........................................................................................ 14

STANDARD OF REVIEW ............................................................................................. 17

ARGUMENT .................................................................................................................... 19

I.   The States Have Standing. ................................................................................. 19

    A.   The Final Rule harms the State of Missouri by harming MOHELA. ....... 20

    B.   The Final Rule harms North Dakota's banking business ......................... 23

    C.   The Final Rule injures the States' interests in using the Public Service Loan Forgiveness program to hire and retain public sector employees. ............................. 25

    D.   The Final Rule injures the States' financial interests in collecting tax revenues on forgiven student loans. ...................................................................................... 28

II.  The States Are Likely to Succeed on the Merits. .............................................. 29

    A.   The Final Rule violates separation of powers principles because the Secretary cannot identify "exceedingly clear language" in the statute authorizing the Secretary to cancel hundreds of billions in student loans. ........................................................... 29

    B.   The Final Rule is in excess of statutory authority. .................................. 32

    C.   The Final Rule is arbitrary and capricious ............................................... 39

    D.   The Final Rule was promulgated in violation of statutory procedures. ................... 44

III. Plaintiff States Face Irreparable Harm. ............................................................ 46

IV. The Balance of Harms and Public Interest Favor the Plaintiff States .............. 49

CONCLUSION ................................................................................................................. 50

CERTIFICATE OF SERVICE & COMPLIANCE ....................................................... 53

## INTRODUCTION

Just ten days after the Supreme Court struck down Defendants' first attempt at mass debt cancellation as patently illegal, Defendants rolled out their Plan B.  This newest plan relies on a different statute, but it clocks in at the same price tag and again seeks to shortchange the legislative process on a political topic that is highly salient.  Defendants' Plan B suffers from all the same flaws that led the Supreme Court to strike down their Plan A.

Because Defendants' Plan B carries the same price tag and covers the exact same topic as their first attempt at mass debt cancellation, it triggers the "major questions doctrine," just like the Supreme Court held their first plan did.  That means Defendants lose unless they can identify "exceedingly clear language" in a statute authorizing their action.  *Alabama Assn. of Realtors v. Dept. of Health and Human Services*, 594 U.S. 758, 764 (2021).  They cannot do so.

In fact, Defendants rely on one of the few provisions in the Higher Education Act that expressly *forbids* loan forgiveness.  They rely on the 1993 statutory amendments creating the "income-contingent repayment" plan.  But forgiveness is not available under those provisions. Although that program allows flexibility for timing of payments, it requires payment in full of all "the unpaid principal amount of the loan, any accrued interest, and any fees."  20 U.S.C. § 1087e(d)(1)(D)(5).  Congress perceived full payment under this program was a problem for a subset of borrowers and so created a later program in 2007, the "income-*based* repayment" plan, which expressly authorizes forgiveness for some borrowers on the income-contingent plans who shift over to the income-based repayment plans.  The problem for Defendants, however, is that program has statutory limits that Defendants cannot alter.

So Defendants are forced to rely on the one income-driven repayment plan that does *not* authorize forgiveness, and they are forced to read it so aggressively that their interpretation would

1

permit the Secretary to immediately forgive 100% of student loan debts for every borrower with the stroke of a pen.  "It strains credulity to believe that this statute grants the [Secretary of Education] the sweeping authority that it asserts."  *Alabama Assn. of Realtors*, 594 U.S. at 760.

This Court should speedily grant a stay or TRO and preliminary injunctive relief.  From the moment the Supreme Court ruled in *Biden v. Nebraska*, President Biden made clear he would "stop at nothing" to evade the decision.  *Statement from President Joe Biden on Supreme Court Decision on Student Loan Debt Relief*, The White House (June 30, 2023).[1]  Later, the President bragged that "the Supreme Court blocked it.  They blocked it.  But that didn't stop me."[2] And although the challenged rule, by its own text, was not supposed to take effect until this July, Defendants decided to start implementing it early and have already illegally cancelled billions of dollars in loans.  This unlawful action has already imposed millions of dollars of harm to the Plaintiff States, who experience irreparable harm every single day.

Defendants make almost no attempt to meaningfully distinguish their Plan B from their patently unlawful Plan A.  "This wolf comes as a wolf."  *Arizona State Legis. v. Arizona Indep. Redistricting Commn.*, 576 U.S. 787, 848 (2015) (Roberts, C.J., dissenting) (quoting *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting)) (capitalization accepted).  This Court should seal away that wolf in a pen.

---

[1] https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/30/statement-from-president-joe-biden-on-supreme-court-decision-on-student-loan-debt-relief/
[2] Remarks by President Biden on the Saving on a Valuable Education Plan, Culver City, CA, (Feb. 21, 2024), https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/02/21/remarks-by-president-biden-on-the-saving-on-a-valuable-education-plan-culver-city-ca/

**FACTUAL BACKGROUND**

I.     **The Higher Education Act of 1965 and Amendments**

In 1965, Congress enacted the Higher Education Act ("the HEA") to provide financial assistance to students.  20 U.S.C. §§ 1071 *et seq*.  The HEA provides for two forms of financial assistance: grants and loans.  §§ 1070 to 1087-4.  Initially, the HEA gave the Federal Government authority only to guarantee loans issued by private organizations; the Federal Government could not issue loans directly.

That changed in 1993 when Congress amended the HEA to authorize federal direct loans and created several "repayment plans" for borrowers receiving direct loans to repay them.  20 U.S.C. §§ 1087a *et seq*.  The first three "repayment plans" were a "standard repayment plan" (10 years, fixed payment amount); a "graduated repayment plan" (10 years, gradually increasing amounts); and an "extended repayment plan" (up to 25 years, fixed or graduated).  § 1087e(d)(1).

The fourth repayment plan is most important here, for that is the plan that Defendants believe provides them authority to enact the challenged rule.  88 Fed. Reg. 43,826–27.  This fourth plan, the "income contingent repayment plan" ("ICR") was the only plan created where the payment amount depended on a borrower's current income.  The ICR plan allowed for "varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years."  *See id.* § 1087e(d)(1)(D).  But like the first three plans, this plan called for "repayment of such loan, including principal and interest."  *Id.*  The program also expressly said that the "balance due" from each borrower on an "income contingent repayment" plan "*shall* equal the unpaid principal amount of the loan, any accrued interest, and any fees."  *Id.* § 1087e(d)(1)(D)(5) (emphasis added).

Consistent with the statutory requirement that ICR loans be "repa[id]" and that the "balance due" on those loans "equal the unpaid principal" and "interest," no ICR text expressly authorizes

forgiveness or cancelation of student loans. *Id.* The ICR authority thus differs from amendments passed just 7 years earlier in 1986, where Congress created an express forgiveness program for certain teachers, members of the military, and volunteers in the Peace Corps. § 1087ee; Pub. L. 99–498, title IV, § 405(a) (Oct. 17, 1986), 100 Stat. 1451.

In 1994, the Department relied on its ICR authority to prescribe a rule to limit annual loan payments under the ICR program to 20% of a borrower's income in excess of the federal poverty line. *See* 59 Fed. Reg. 66,132. That rule also—without explicit authorization—provided that borrowers who had loan balances remaining after 25 years of timely payments would be granted forgiveness of the outstanding amount of principal and interest. *Id.* at 66,135.

Even so, forgiveness was minimal. The Government Accountability Office ("GAO") estimated that only nine percent of borrowers participated in ICR, and of that only around 12% would not fully repay within the 25-year period, resulting in just 1% of borrowers receiving any cancellation of debt. *See GAO Direct Student Loans: Analysis of Borrowers' Use of Income Contingent Repayment Option* 7, 11 (1997).[3]

Not until 2007 did Congress expressly authorize forgiveness for a repayment plan where the payment amount depends on a borrower's current income. And when Congress did so, it created a new program instead of amending the ICR authority. The 2007 amendments created the "income-*based* repayment program" ("IBR"). (The rule challenged in this suit references ICR and IBR under the umbrella term "income-driven repayment" or "IDR.") This new, much more generous plan, was designed for borrowers for whom the ICR program temporarily was not generous enough. As originally passed, the IBR program offered relief for borrowers facing a *temporary* "financial hardship" by increasing the exempt-income threshold from 100% of the

---

[3] https://www.gao.gov/assets/hehs-97-155.pdf

federal poverty line (the amount in the ICR program) to 150% and reducing the annual payment cap from 20% (in the ICR program) to 15% of disposable income. *See* § 1098e(a)(3)(B), (b)(1).

Apart from the IBR program statutorily defining specific payment amounts, the IBR program is unlike the ICR program in three additional ways.

First, unlike with the ICR program, borrowers are only eligible for the IBR program "during any period the borrower has the partial financial hardship," *id.*, as that term is defined in 20 U.S.C. § 1098e(a)(3). The IBR statute expressly contemplates that borrowers in the ICR program will shift to the IBR program when facing a temporary "financial hardship." § 1098e(b)(7)(B)(iv).

Second, unlike with the ICR program, the Secretary has express authority under the IBR program to "cancel any outstanding balance" for borrowers who meet certain criteria, including payment over a period "not to exceed 25 years." § 1098e(b)(7). Indeed, the IBR statute for the first time created express authority to forgive borrowers enrolled under the *ICR* program, but it required those borrowers to switch from the ICR program to the IBR program first. § 1098e(b)(7)(A), (b)(7)(B)(iv) (authorizing forgiveness for borrowers who have "made payments under an income-contingent repayment plan" but requiring them to shift to the IBR program first).

Third, unlike with the ICR program, the IBR program authorizes the Secretary to subsidize the interest of borrowers whose payments are insufficient to cover interest, but only for up to 3 years. § 1098e(b)(3). If the borrower's payment during that time is insufficient to cover interest in a given month, the Secretary pays the remaining interest. *Id.* There is no parallel authority in the ICR program.

The 2007 amendments also established the Public Service Loan Forgiveness ("PSLF") program, which gives the Secretary authority to "cancel the balance of principal and interest" of

borrowers who make 10 years of payments while employed in a "public service job." § 1087e(m)(1).  Participants in that program first elect repayment plan (such as ICR or IBR), and then commit to serving in public service for 10 years.  If they stand by that commitment, their remaining balances are forgiven after 10 years.  *Id.*  This specific, shortened period and associated forgiveness were established to encourage careers in public service.  *See* H.R. Rep. No. 110–210 at 48–49 (2007) ("the Committee is concerned with the growing number of individuals who do not choose to enter into lower paying professions, such as public service . . . .  To further encourage public service, the legislation includes revisions to the Direct Loan Income Contingent Repayment program.  Individuals who choose public service will have the option to have their loans forgiven after 10 years if payments are made during that time period.").

Beyond PSLF and IBR, Congress limited the Department's authority to reduce or cancel loans to three narrow circumstances: when a borrower (1) has "died or been permanently and totally disabled, such that they cannot engage in any substantial gainful activity"; (2) has become bankrupt; or (3) was falsely certified by their schools, when the borrowers' schools close down, or when the schools failed to pay loan proceeds they owed to lenders.  *See Biden*, 143 S. Ct. at 2363 (internal quotes omitted) (citing 20 U.S.C. § 1087).

In 2010, President Obama urged Congress to pass a bill to make IBR more generous by lowering the payment cap from 15% to 10% of discretionary income and to accelerate forgiveness to 20 years, down from 25.  *See* Barack Obama, *Remarks by the President in State of the Union Address* at 5 (Jan. 27, 2010).[4]  Congress did so the same year, but restricted the amendments to "new borrower[s] on or after July 1, 2014."  20 U.S.C. § 1098e(e).

---

[4] https://www.govinfo.gov/content/pkg/DCPD-201000055/pdf/DCPD-201000055.pdf

6

## II.     The Department Moves Unilaterally to Cancel Loans.

Congress has not enacted any substantial amendments to the HEA since 2010, but the issue has attracted considerable congressional attention.  "'More than 80 student loan forgiveness bills and other student loan legislation' were considered by Congress during its 116th session alone." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (citation omitted).

In the face of congressional inaction since 2010, the Department has taken measures into its own hands.  For instance, in 2012, the Department established the Pay As You Earn ("PAYE") plan, which retroactively extended the 2010 statutory amendments to loans taken out as far back as 2007, despite statutory language stating that the amendments should apply only to loans taken out after July 1, 2014.  *See* 77 Fed. Reg. 66,088.  And in 2015, the Department established the Revised Pay As You Earn ("REPAYE") plan, extending the 2010 amendments to all borrowers. *See* 80 Fed. Reg. 67,204.  For each of these rules, the Department relied on purported ICR authority for implementation of the new plan.  77 Fed. Reg. 66,088; 80 Fed. Reg. 67,208.  Even with these changes, the average individual borrower under the REPAYE plan would still ultimately pay back more than the amount that they took out in loans.  *See* 88 Fed. Reg. 43,880.

More recently, on August 24, 2022, Defendants announced they would cancel $10,000 to $20,000 in student debt for all borrowers who have loans owned by the Department and whose annual income was less than $125,000 (or $250,000 for married borrowers who file jointly).  *See FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022).[5]  One study later credited by the Supreme Court found that the Department's plan would cost up to $519 billion over ten years, and the overall cost could rise to

---

[5] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

more than $1 trillion when factoring in the other aspects of the Department's announcement.  *See The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, Penn Wharton University of Pennsylvania (Aug. 26, 2022) ("Wharton Model").[6]

The Supreme Court ultimately declared that executive action unlawful.  The Supreme Court stressed the "staggering" "economic and political significance" of the executive action and noted that not only did Defendants lack any "clear" textual authority for their actions; but they did not even have plausible textual authority.  *See Biden v. Nebraska*, 143 S. Ct. at 2370, 2373 (citing *West Virginia v. EPA*, 597 U.S. 697 (2022) (cleaned up)).  Beyond "the ordinary tools of statutory interpretation," the Defendants' efforts were unlawful because "'the basic and consequential tradeoffs' inherent in a mass debt cancellation program 'are ones that Congress would likely have intended for itself.'"  *Id*. at 2375 (alterations accepted) (citation omitted).

### III.    The Department Relies on ICR Authority to Promulgate the Final Rule.

After the Department's interpretation of its authority under the HEROES Act was challenged in court, the President's administration changed gears and sought a Plan B.  Their new plan relied on using the Secretary's ICR authority from the 1993 amendments to the HEA.  88 Fed. Reg. 43,826–27.

### A.  The Proposed Rule and Commenting Period

On January 11, 2023, just one month after the Supreme Court granted certiorari in *Biden v. Nebraska*, the Department issues a proposed rule entitled "Notice of Proposed Rulemaking on Improving IDR for the Direct Loan Program" (the "Proposed Rule"), which the Secretary said would "restructure and rename" its existing repayment plans.  *See* 88 Fed. Reg. 1,894.  Interested parties were directed to submit comments "on or before February 10, 2023," just 30 days after the

---

[6] https://budgetmodel.wharton.upenn.edu/issues/2022/8/26/biden-student-loan-forgiveness

Proposed Rule was published.  *Id.* at 1894.  The Department denied requests to extend the comment period.  *Id.* at 43,875.

Commenters raised concerns about the legal authority of the Department to impose a new repayment plan, including that: (1) the Secretary and Department were acting in excess of statutory authority, *id*. at 43,826; (2) the proposed provisions implicated the major questions doctrine and violated the federal separation of powers, *id*. at 43,830; and (3) the proposed provisions are arbitrary and capricious, *id*. at 43,848–58.

Another commenter raised concerns with the Proposed Rule's cost estimate because that estimate expressly assumed the Department would prevail before the Supreme Court in *Biden v. Nebraska*.  The commenter suggested the Department "produce a secondary cost estimate in the event that the loan cancellation plan does not go into effect."  *Id*. at 43,875.  Following the conclusion of the comment period, but before the publication of the Final Rule, the Congressional Budget Office ("CBO") expressed a belief that the Proposed Rule would cost $230 million, $82 billion higher than the estimate in the Proposed Rule.  *See Congressional Budget Office, Re: Costs of the Proposed Income-Driven Repayment Plan for Student Loans,* Congressional Budget Office (Mar. 13, 2023).[7]  The CBO also noted that the Proposed Rule's estimate ignored the possibility that the August 2022 Rule would be permanently enjoined, and expressed a belief that such an outcome would increase the cost by another $46 billion in the first year alone.  *Id*. at 2, 7–8.

While the Proposed Rule remained pending, the Supreme Court ruled in *Biden v. Nebraska*, declaring the August 2022 Rule unlawful.  That same day, Defendant Biden released a statement calling "the Court's decision . . . wrong" and promising to "stop at nothing" to get around the

---

[7] https://www.cbo.gov/system/files/2023-03/58983-IDR.pdf

ruling.  *Statement from President Joe Biden on Supreme Court Decision on Student Loan Debt Relief*, The White House (June 30, 2023).[8]

### B.  The Final Rule

Just ten days after *Biden v. Nebraska* declared the August 2022 Rule unlawful, the President announced his plan to get around the Supreme Court's ruling.  On July 10, 2024, Defendants released the Final Rule.  *See* 88 Fed. Reg. 43,820.  The Final Rule amends 34 C.F.R. §§ 682, 685.  *Id.* at 43,889–905.  Except for limited designated provisions, the Final Rule is set to take effect just a few months from now, on July 1, 2024.  *Id.* at 43,820.

### i.  *Changes created by the Final Rule*

The Final Rule purports to use the Secretary's ICR authority—from the 1993 HEA amendments—to establish what the rule calls the Saving on a Valuable Education ("SAVE") plan. This new repayment program (1) defines "discretionary income" to be income above 225% of the applicable Federal poverty guideline, up from the current 150% established by the IBR program; (2) sets the monthly payment amount at $0 if the borrower's income falls below that threshold; (3) caps the monthly payment amount at 5% of the borrower's income that goes above that threshold for undergraduate loans, down from the current 10% to 15% from the IBR program; (4) forgives any interest that is not paid off each month, despite the statutory limit in the IBR program permitting interest subsidization only for the first 3 years; and (5) accelerates cancellation to as quick as 10 years (down from 20 to 25 years in the IBR program), even if a borrower is not enrolled in Public Service Loan Forgiveness.  *See id.* at 43,900–05.

The Final Rule states that, because of these changes, the typical undergraduate borrower will now pay only about $6,121 for every $10,000 borrowed.  *Id.* at 43,823, -80.  In contrast, under

---

[8] https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/30/statement-from-president-joe-biden-on-supreme-court-decision-on-student-loan-debt-relief/

the repayment plan before the Final Rule, the average borrower pays $10,956 for every $10,000 borrowed.  *Id.* at 43,880.  In other words, the typical borrower last year repaid more than they borrowed.  But going forward, the typical borrower will only pay back 61% of what they borrowed.

The new program also benefits borrowers in every quintile of lifetime income.  *Id.* at 43,878.  Undergraduate borrowers with *above*-median incomes will have the total amounts of their payments across the life of their loans reduced by as much as 30%.  *Id.*

> ii.  *The Final Rule rejects or ignores commenter concerns and reliance interests.*

The Final Rule rejects challenges to the Department's legal authority by arguing that the HEA "sets an explicit upper limit, but no lower limit for the 'extended period' time that a borrower must spend in repayment" and that the Secretary has "discretion as to how much a borrower must pay, specifying only that payments must be set based upon the borrower's annual adjusted gross income."  *Id.* at 43,826–27.  Indeed, the Secretary acknowledges its interpretation of the statute would permit the Department to de facto cancel all student loans.  The Final Rule expressly states, for example, that the Department believes it could exempt even 400% or more of the federal poverty line from income.  The Department simply does not believe there is a policy reason to do so "at this time."  *Id.* at 43,831.

Moreover, the Final Rule makes no mention of the reliance interests of Plaintiff States (1) in using PSLF to recruit talent and remain competitive in the job market or (2) in taxing forgiven student loan balances.

> iii.  *The Final Rule estimates cost based on assumptions that Defendants knew were grossly inaccurate.*

The Final Rule estimates that the cost of the program would be $156 billion across the span of ten years.  *Id.* at 43,820, -86.  That estimate is based on the indisputably false assumption that

the Department would prevail at the Supreme Court in *Biden v. Nebraska*. *See id.* at 43,875, -886 ("This estimate is based on … the August 2022 announcement that the Department will discharge up to $20,000 in Federal student loans for borrowers …."). Rather than heed the advice by one commenter to create a "cost estimate in the event that the [August 2022] loan cancellation plan does not go into effect," the Department dismissed the suggestion and stated it was "confident in our authority" on the issue—even though the Supreme Court had very publicly rejected its authority just ten days before. *Id.* at 43,875.

Independent review of the rule's provisions show the Department's estimation is a drastic undercount. After the Supreme Court decided *Biden v. Nebraska* and the Department published the Final Rule, the CBO assessed the 10-year cost of the Departments plan at $260.7 billion. *See At a Glance H.J. Res. 88, a joint resolution providing for Congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Department of Education relating to "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program*," CBO at 1 (Sept. 18, 2023).[9] That is $104 billion more than the estimate in the Final Rule. The CBO opined that the difference between its finding and the Final Rule's estimate stemmed from the Department's false assumption about *Biden v. Nebraska* and its failure to "include any costs for increased borrowing among eligible students in the future." *Id.* Other reviews have placed the true cost of the Final Rule at $475 billion and even over $1 trillion. *See Biden's New Income-Driven Repayment ("SAVE") Plan: Budgetary Cost Estimate Update*, Penn Wharton University of Pennsylvania (July 17, 2023);[10]

---

[9] https://www.cbo.gov/system/files/2023-09/hjres88.pdf
[10] https://budgetmodel.wharton.upenn.edu/issues/2023/7/17/biden-income-driven-repayment-budget-update

Travis Hornsby, *New REPAYE Plan Could Save Borrowers Over $1 Trillion Over 10 Years*, Student Loan Planner (Dec. 20, 2023).[11]

### C.  Early Implementation of the Rule

Though the Final Rule was generally forbidden, by statute, to come into full effect before July 1, 2024, Defendants have decided to forgive billions of dollars early.  On January 16, 2024, the Department of Education published a half-page notice in the Federal Register stating that the early forgiveness part of the Final Rule—34 C.F.R. § 685.209(k)(3)—would be implemented early even though the Final Rule never designated that provision for early implementation.  *See* 89 Fed. Reg. 2,489.  The half-page announcement also said the provision would not only be implemented early, but would be implemented just 5 days later, on January 21—despite Defendants previously saying they would wait until July.  *Id.*  Section 685.209(k)(3) provides that "a borrower receives forgiveness if the borrower's total original principal balance on all loans that are being paid under the [SAVE] plan was less than or equal to $12,000, after the borrower has satisfied 120 monthly payments or the equivalent, plus an additional 12 monthly payments or the equivalent over a period of at least 1 year for every $1,000 if the total original principal balance is above $12,000."  88 Fed. Reg. 43,903.  The Department provided no explanation for changing its position.

This acceleration has now led to the approval of $4.8 billion in student debt cancellation pursuant to the SAVE plan policy of providing debt forgiveness to borrowers who have been in repayment after as little as 10 years."  *See Biden-Harris Administration Announces Additional $7.4 Billion in Approved Student Debt Relief for 277,000 Borrowers*, U.S. Dep't of Ed. (Apr. 12, 2024) ("Today's announcement brings total relief approved underwi (sic) SAVE to $4.8 billion for

---

[11] https://www.studentloanplanner.com/new-repaye-plan-ten-year-cost/

almost 360,000 borrowers.").[12]  In Plaintiff States, early implementation has already resulted in $958 million of unlawful forgiveness.  *See Id.; Biden-Harris Administration Releases State-by-State Breakdown of $1.2 Billion in SAVE Plan Forgiveness*, U.S. Dep't of Ed. (Feb. 23, 2024) ("SAVE Plan Breakdown").[13]

## SUMMARY OF ARGUMENT

**I.** The Plaintiff States have standing.

**I.A.** Missouri has standing for the same reasons the Supreme Court found Missouri had standing last year to challenge Defendants' first attempt at mass debt cancellation.  Missouri has a public instrumentality—MOHELA—that services and owns student loans.  It gets paid an administrative fee by the Federal Government for every account it services.  By unlawfully forgiving loans and zeroing out accounts, the Final Rule harms MOHELA in exactly the same way the last rule did.  And any harm to MOHELA, the Supreme Court held, is also a harm to Missouri.  The Final Rule also harms MOHELA a second way: it induces borrowers to consolidate older loans that are owned by MOHELA into loans owned by the Federal Government, depriving MOHELA of the revenue it generates from the loans it owns (such as interest revenue).

**I.B.** North Dakota has standing because it runs a state-owned bank that is engaged in the business of providing loans to students enrolled in higher education courses.  The Final Rule unlawfully imposes a direct competitive harm against this state-owned bank.

**I.C.** All States have standing because they rely substantially on the Public Service Loan Forgiveness program—which is the only statutorily authorized program that offers loan

---

[12] https://www.ed.gov/news/press-releases/biden-harris-administration-announces-additional-74-billion-approved-student-debt-relief-277000-borrowers

[13] https://www.ed.gov/news/press-releases/biden-harris-administration-releases-state-state-breakdown-12-billion-save-plan-forgiveness

forgiveness in as few as 10 years.  The Final Rule makes this program comparatively much less attractive, harming the ability of the States to use this valuable program as a recruiting tool.

**I.D.** Several of the Plaintiff States also tax forgiven student loan revenue.  But because of a federal law, loans forgiven before 2026 will not be taxed.  The Final Rule deprives the States of taxation revenue by accelerating forgiveness of loans to before 2026.

**II.** The States need only establish a "fair chance of prevailing" on the merits.  They have done much more than that.

**II.A.** Last year, the Supreme Court held that Defendants' first attempt at mass debt cancellation triggered the "major questions doctrine," which requires the agency to identify "exceedingly clear language" in statute authorizing the agency action.  The Final Rule clocks in at the same dollar amount on the same topic, so as a matter of binding precedent, it necessarily also triggers the major questions doctrine.  And Defendants cannot identify any "exceedingly clear language."  In fact, the statutory provision on which they rely does not authorize loan forgiveness at all, much less "clearly" so.

**II.B.** Even applying the ordinary tools of statutory interpretation, Defendants' action must fall.  Defendants relied on the ICR program to promulgate the Final Rule, but the ICR program is the *only* income-driven program that does *not* authorize forgiveness.  "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023).  In fact, the ICR program expressly requires payment in full.

Defendants' interpretation of the ICR program also would render Congress's later-enacted IBR program pure surplusage.  Unlike the ICR program, the IBR program expressly authorizes

forgiveness, but only in statutorily determined amounts.  The Secretary's interpretation of the ICR program would render that careful legislative compromise irrelevant.

Defendants' statutory interpretation also makes no sense because it converts a "loan" program into a "grant" program.  By Defendants' own acknowledgment, the Final Rule would convert every loan into at least a partial grant for the typical borrower.  And Defendants' interpretation would even permit Defendants to forgive 100% of every loan at the stroke of a pen.  Their interpretation has no limiting principle.

**II.C.** Setting aside statutory arguments, the Final Rule is also arbitrary and capricious for other reasons.

Most notably, the Final Rule's cost estimate is undoubtedly and fundamentally flawed.  The Final Rule arrives at a $156 billion cost estimate by assuming that Defendants would prevail before the Supreme Court with respect to their first attempt at mass cancellation.  But they did not prevail, which they knew because the Supreme Court released its decision 10 days *before* Defendants released their Final Rule.  Because Defendants did not prevail before the Supreme Court, the actual cost of their program is at least $300 *billion* more.  The Final Rule entirely fails to consider this staggering increase in cost.

Defendants failed to consider many other things and adopted implausible assumptions.  They failed to consider the States' reliance on the PSLF program or state taxation.  They refuse to acknowledge that Defendants have departed from 30 years of regulatory practice.  They decided

on income thresholds based on the implausible assumption that persons below the poverty line are "statistically indistinguishable" from persons making more than twice as much.

And finally, Defendants initially said that they would not implement early forgiveness until July 2024.  They reversed course in January without even a single word of explanation.

**III.** The harms are irreparable.  The Federal Government generally has the benefit of sovereign immunity, so monetary harms cannot be rectified.  The Federal Government has already imposed millions of dollars in harm before the Final Rule is even set to go into effect.

**IV**. The balance of harms favor relief.  Defendants seek to impose a massive windfall on a comparatively small proportion of Americans, while saddling American taxpayers with $475 billion in national, taxpayer debt.  There is no harm to Defendants if they are forced to wait to implement the rule.  There is massive harm to Plaintiffs and the public if they are permitted to march forward.

<strong>STANDARD OF REVIEW</strong>

The APA expressly enables this Court "to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  "This APA provision authorizes reviewing courts to grant relief pending review."  *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 668 n.4 (D.C. Cir. 2016).  The only textual limit is that the Court can grant preliminary relief only "to the extent necessary to prevent irreparable injury."  § 705; *accord Texas v. U.S. Envtl. Protec. Agency*, 829 F.3d 405, 435 (5th Cir. 2016) ("We have the power to stay the agency's action 'to the extent necessary to prevent irreparable injury.'").

The stay power under § 705 thus authorizes broader relief than traditional equitable remedies against officials.  "[A]n injunction is a judicial process or mandate operating *in*

*personam*."  *Nken v. Holder*, 556 U.S. 418, 428 (2009).  "By contrast, instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself"—or, in this case, against the administrative proceeding itself.  *Id.*  The APA thus gives this Court broader authority to stay the Final Rule than would be true of an action for injunctive relief against a government official.

Even if this Court did not have specific statutory authority, it could still apply background equitable principles to issue a TRO or preliminary injunction *in personam* against Defendants.  In determining whether to issue traditional equitable relief, a court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

"While no single factor is determinative, the probability of success factor is the most significant."  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (cleaned up) (citing *Dataphase Sys., Inc.*, 640 F.2d at 113; *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013).  "Whether to grant a stay or injunction 'militates against a wooden application' of probabilities, because '[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'"  *Missouri v. Biden*, 576 F. Supp. 3d 622, 629 (8th Cir. 2021) (citing *Dataphase Sys., Inc.*, 640 F.2d at 113).  "[W]here the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less."  *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022) (quoting *Dataphase*, 640 F.2d at 113).

Here, Plaintiff States need only satisfy a lesser standard of "probability of success."  When a plaintiff challenges the validity of a "statute," the plaintiff must establish that it is "likely to prevail."  But where, as here, Plaintiffs do not challenge the validity of a statute, Plaintiffs need only establish a "fair chance of prevailing," which is *less* "than fifty percent likelihood."  *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 999–1000 (8th Cir. 2019).

## ARGUMENT

The States plainly have standing, and on the merits, Defendants' actions suffer from all the same flaws that doomed their first attempt at mass debt forgiveness.

### I.      The States Have Standing.

Plaintiff States easily have standing to challenge the Final Rule.  To establish standing, "the plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  *Biden v. Nebraska*, 143 S. Ct. at 2365.  "If at least one plaintiff has standing, the suit may proceed."  *Id.*

Financial harms, no matter how minor, constitute injuries-in-fact.  *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").  Intangible harms also constitute concrete harms.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (gathering sources).  And future injuries can support standing so long as "there is a substantial risk that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up).

"An injury is 'fairly traceable' to a challenged statute when there is a 'causal connection' between the two."  *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 779 (8th Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) ("Article III requires no more than *de facto* causality.")

(cleaned up).  "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself," though "[h]e need not show that a favorable decision will relieve his every injury."  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

Plaintiff States raise several claims under the APA, the first of which asserts a violation of separation of powers.  For a separation-of-powers claim, a plaintiff must show that it "sustains injury from an executive act that allegedly exceeds the official's authority."  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020) (cleaned up).  For APA claims that implicate a state's sovereign and quasi-sovereign interests, states are "entitled to special solicitude in [the] standing analysis."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007).  "[I]f nothing else, that means imminence and redressability are easier to establish here than usual."  *Texas v. Biden*, 20 F.4th 928, 970 (5th Cir. 2021), *rev'd on other grounds* 142 S. Ct. 2528 (2022).

Here, Plaintiff States have suffered, and will in the future suffer, injury from the Final Rule in four distinct ways: The Final Rule (1) harms Missouri through financial injury to its instrumentality, The Higher Education Loan Authority of the State of Missouri ("MOHELA"); it (2) harms the proprietary business of North Dakota; it (3) harms Plaintiff States' interest in hiring and retaining public sector employees who use the PSLF program; and it (4) harms Plaintiff States' financial interest in collecting tax revenues on forgiven student loan debt.

### A.  The Final Rule harms the State of Missouri by harming MOHELA.

For the same reason the Supreme Court found standing in *Biden v. Nebraska*, Missouri again has standing here.  As the Supreme Court ruled last year, because "MOHELA is a 'public instrumentality' of the State," any "harm to MOHELA is also a harm to Missouri."  *Biden v. Nebraska*, 143 S. Ct. at 2366 (quoting Mo. Rev. Stat. § 173.360).  Last year, the Supreme Court ruled that Missouri had standing because "MOHELA receives an administrative fee for each of the five million federal accounts it services" and early forgiveness decreases MOHELA's number

of accounts, thus decreasing its administrative fees.  *Id.*  The same is true here.  MOHELA services over 7.8 million accounts representing $344 billion in loans, and it earns fees from the Federal Government of $279.2 million each year to service those loans.  ECF 1-7 at 7 ("MOHELA FY 2023 Financial Statement" at 4).  The Final Rule accelerates forgiveness by as many as 10 to 15 years, causing account balances to prematurely go to $0, depriving MOHELA of administrative fees for accounts it otherwise would have been paid to service but for the Final Rule.  Even aside from accelerated forgiveness, *any* forgiveness deprives MOHELA of administrative fees and provides standing.  That makes this an open-and-shut case for standing under last year's Supreme Court decision.

MOHELA is also harmed a second way: the Final Rule deprives MOHELA of revenue it earns from loans MOHELA itself owns.  While much of what MOHELA does is service loans owned by the Federal Government, MOHELA itself owns $874 million of privately held loans.  *Id.* at 6, 8 (ECF 1-7 at 9, 11).  The Supreme Court also found this fact relevant to standing last year.  *Biden v. Nebraska*, 143 S. ct. at 2365 ("The Authority owns over $1 billion in FFELs.").  These are legacy loans issued when Congress still permitted private agencies to issue and hold loans.  MOHELA generates revenue from those FFELP loans.  *See Financial Statements: Higher Education Loan Authority of the State of Missouri As of and for the Years Ended June 30, 2021 and 2020 With Reports of Independent Auditors* 7, MOHELA (2021).[14]  But the Final Rule encourages borrowers to consolidate their FFELP loans into direct loans (held by the Federal Government) so they can participate in the SAVE plan and obtain drastically lower payments and accelerated forgiveness.

That consolidation harms MOHELA's assets in at least four ways.

---

[14] Available at https://www.mohela.com/DL/common/publicInfo/financialStatements.aspx

*First*, if a borrower consolidates a FFELP loan to take advantage of the SAVE Plan, MOHELA will no longer own that loan.  MOHELA will thus lose its ability to earn interest income generated by the FFELP assets that it owned.

*Second*, MOHELA will lose the ability to service most of these loans.  Because MOHELA is a smaller participant in the servicing industry, it is allocated only a minority percentage of all direct loans to service.  When FFELP loans held by MOHELA are consolidated into loans held by the Federal Government, at least some of those accounts will be given to other loan servicers. Even if MOHELA were able to service every consolidated loan, the service fee is less than the interest income MOHELA would otherwise earn.

*Third*, the SAVE Plan decreases the value for selling FFELP loans on the tradeable market. The Final Rule discourages FFELP borrowers from paying off their loans in full and encourages them to consolidate so they can obtain partial grants.  That decreases the expected return on investment for owners of FFELP loans and thus decreases their tradeable value on the market.

*Fourth*, consolidation will harm MOHELA in its capacity as an issuer of bonds.  MOHELA is an active issuer of "a significant number of series bonds."  ECF 1-8 at 60 ("MOHELA Taxable Student Loan Asset-Backed Notes" at 53).  These bonds help enable MOHELA to accomplish its statutory "'public function' of helping Missourians access student loans needed to pay for college" by issuing or financing student loans and scholarships for Missourians.  *Biden v. Nebraska*, 143 S. Ct. at 2366.  Issuing bonds also enables MOHELA to pay for "development projects at Missouri colleges and universities."  *Id.*  But MOHELA can only issue bonds by backing those bonds with specified MOHELA assets, one of which is "revenues derived from or by reason of the ownership of student loan notes or financing of student loans, or both."  Mo. Rev. Stat. § 173.385.1(6);

§ 173.390 (same).  So a reduction in FFELP loans held by MOHELA directly harms MOHELA's ability to issue bonds used to fund scholarships, student loans, and college development projects.

All these harms are directly traceable to the Final Rule.  By providing borrowers with accelerated loan forgiveness, the Final Rule drives borrowers' balances to zero and eliminates the revenue MOHELA receives from servicing those loans.  Moreover, the Final Rule provides a powerful incentive to borrowers to consolidate their FFELP loans into direct federal loans.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (finding traceability based "on the predictable effect of Government action on the decisions of third parties").  And Defendants in fact expressly encourage borrowers to consolidate.  ECF 1 ¶ 123 (citing federal sources).

Redressability is also satisfied for Missouri for each of these financial injuries.  A court order staying or enjoining and vacating the Final Rule will prevent Defendants from unilaterally driving outstanding loan balances to zero and thereby reducing the number of loans serviced by MOHELA.  Additionally, a court order will ameliorate the Final Rule's incentive to consolidate FFELP loans into direct loans and thus prevent associated financial losses.

### B.  The Final Rule harms North Dakota's banking business.

Plaintiffs also have standing through the Bank of North Dakota.  The State of North Dakota "maintain[s] a system of banking owned, controlled, and operated by it, under the name of the Bank of North Dakota."  N.D.C.C. § 6-09-01.  The bank funds and administers a state-sponsored student loan program and a student loan consolidation program.  *See* N.D. Cent. Code ch. 15-62.1.  The student loan offerings include the "Dakota Education Alternative Loan" or "DEAL" program for borrowers attending institutions of higher education in North Dakota.  *See* Bank of North Dakota, *DEAL Student Loan* (last visited Apr. 8, 2024).[15]  Interest earned by the Bank of North

---

[15] https://bnd.nd.gov/education-funding/apply-for-student-loan/deal-student-loan/

Dakota from student loans is used to implement, maintain, and administer state programs.  *See* N.D. Cent. Code §§ 15-62.1-01; 15-62.1-05.

The Final Rule harms the financial interests of this state-owned bank by undermining its ability to compete in the business of providing and consolidating student loans.  For example, the interest rate on federal student loans is set by a formula enshrined in statute.  20 U.S.C. § 1087e(b).  The state-owned bank can compete in the business of providing and consolidating student loans by offering more favorable interest rates and by offering the convenience of direct relationships with in-state universities and colleges.  But the Final Rule makes federal loans much more attractive than they were a year ago because under the Final Rule, the typical borrower will pay back only 61 cents for every dollar borrowed.  Thus, despite the convenience of the state-owned bank working directly with in-state post-secondary institutions and providing potentially lower interest rates, the Final Rule will foreseeably cause student loan borrowers to forego borrowing from the state-owned bank in favor of "borrowing"—really, receiving a grant—from the Federal Government.

The bank thus experiences Article III injury when the Federal Government begins engaging in loan forgiveness programs that are contrary to law.  And because the bank is the State of North Dakota engaged in business, harms to the bank are direct harms to the State itself.  *Biden v. Nebraska*, 143 S. Ct. at 2366; *see also Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (a party "suffer[s] constitutional injury in fact when agencies lift regulatory restrictions on their competitors").

This harm is directly traceable to Defendants' Final Rule.  By creating a new program where borrowers expect to repay only a small fraction of what they "borrowed," Defendants have drastically reduced the attractiveness of borrowing from other lenders, including the state-owned

Bank of North Dakota.  This would not have happened but for Defendants' unlawful Final Rule. An order of this court staying or enjoining and vacating the Final Rule would redress the harms to North Dakota's competitive business interests.

### C.  The Final Rule injures the States' interests in using the Public Service Loan Forgiveness program to hire and retain public sector employees.

The Final Rule injures Plaintiff States' interests in hiring and retaining public sector employees.  Each State relies substantially on the PSLF program to recruit, hire, and retain qualified state and local-government employees.  PSLF typically works like this: a borrower joins an income-driven repayment plan like ICR or IBR and then commits to work for a public-service employer (such as a state government) for 10 years.  PSLF is such a powerful recruitment and retention tool for the States because it is comparatively much more generous than any other federal loan repayment program.  That is true for two reasons.  First, it offers forgiveness after just 10 years rather than the typical 20 to 25.  Second, borrowers face no tax liability for the amount of loans forgiven under PSLF, 26 U.S.C. § 108(f), but they typically must pay taxes for amounts forgiven under other federal repayment programs.  26 U.S.C. § 61(a)(11).

Once the Final Rule takes full effect, however, PSLF will not be nearly as attractive compared to other income-driven repayment programs.  Its comparative advantage will shrink or disappear entirely for many borrowers.  Defendants have stated that most of the individuals currently auto-enrolled into the SAVE plan have monthly payments that equal $0 per month. Others will have loans forgiven after just ten years of repayment—the same amount of time required for public service loan forgiveness.  (Under the Final Rule, borrowers with principal balances of $12,000 or less will be eligible for forgiveness after 10 years, with an additional year added for each additional $1,000.  88 Fed. Reg. 43,903.)  Many borrowers will thus no longer choose to take on the additional burden PSLF requires—a 10-year commitment to public service—

because they will judge the commitment as no longer proportionate to the benefit. Fewer borrowers will enter the PSLF program, and many in the program will leave their jobs because the program no longer carries the comparative benefits it once did.

For example, in Missouri, the Attorney General's Office ("AGO") heavily emphasizes PSLF benefits when recruiting employees. *See* ECF 1-6 ¶¶ 5–7 ("Houser Decl."). "[A]t every single one" of the Office's ten recruiting events each year, "students have asked about whether the AGO is a qualifying employer for PSLF." *Id*. ¶5. The program is so popular that, of the 13 law school graduates hired by the AGO last year, "[a]lmost every one of these attorneys indicated that their decision to work for the AGO was informed, in part, due to the fact that employees in the public sector are eligible for PSLF." *Id*. AGO employees commonly are "attracted to public service . . . because of the rewarding and valuable work," but it is much easier for them to accept much lower salaries by the availability of "eventual public-service loan forgiveness." *See* ECF 1-4 ¶ 14 ("Lewis Decl.").

Part of what makes the program so valuable to Missouri is that it is comparatively much more generous than other repayment programs. "[I]f programs were rolled out that would have reduced my lower monthly payments or allowed my loans to be forgiven earlier, it would have been less likely that I would have chosen to advance my career in public service and the AGO." *Id*. ¶ 17; see also *id*. ¶ 22 ("If my monthly student loan payments were reduced significantly enough without needing to work in qualifying public service employment, then there would also be less financial reason for me to continue employment with the AGO or public service more generally.").

The program is also valuable for retaining employees in Missouri. "In the last 18 months, 2 attorneys in the labor division completed their PSLF requirements, and quickly left the AGO for jobs that pay substantially more. These attorneys stayed with the AGO for 10 years in pursuit of

26

PSLF, and would otherwise have left much sooner.  An employee leaving the office after satisfying PSLF often tells the office they stayed only because of PSLF."  Houser Decl. ¶ 8.  "Another attorney in the labor division was seeking new career opportunities, but limited her job search to other public sector employers because she was only 3 years away from PSLF, and its benefits far outweighed the higher salaries available to her in the private sector.  This attorney had determined that the benefits of PLSF meant that she would rather continue working in the public sector than seek private employment."  *Id*. ¶ 9.  PSLF becomes especially valuable the longer a person stays in public service because forgiveness grows nearer.  Lewis Decl. ¶ 16 (PSLF "has been critical to my decision to continue to work in public service").

In Arkansas, both the Attorney General's Office and state agencies advertise participation in the PSLF program to attract potential employees.  ECF 1-5 ("Calhoun Del.").  "[I]f the published rule takes effect, the Arkansas Attorney General's Office will lose a valuable tool for recruiting potential employees and retaining existing employees because the PSLF program will no longer carry the same comparative benefit that it once did."  *Id.* ¶ 13.

And in both Florida and Ohio, state entities advertise employees' participation in PSLF on their websites as part of their recruitment efforts.  *See, e.g., John R. Justice Grant Program, Florida Attorney General's Office* (last visited April 5, 2024) (providing information on grant programs available to public sector attorneys);[16] *Income – General Information, Does Ohio Tax Student Loan Debt That Has Been Forgiven?* (last visited April 5, 2024).[17]

This harm is directly traceable to Defendants' Final Rule.  By creating a new repayment program where many borrowers can expect to have $0 monthly payments, and also reducing the repayment period for non-public service employees to as few as 10 years, the Final Rule dilutes—

---

[16] https://www.myfloridalegal.com/home-page/john-r-justice-grant-program
[17] https://dam.assets.ohio.gov/image/upload/tax.ohio.gov/documents/studenloan.pdf

or, for some borrowers, entirely removes—the comparative advantages for the public sector loan forgiveness programs and harms Plaintiff States' interests in recruiting, hiring, and retaining employees.  This would not have happened but for Defendants' unlawful Final Rule.  As for redressability, an order of this Court staying or enjoining and vacating the Final Rule would retain the status quo with respect to the comparative advantages of the PSLF program compared to other repayment plans, and protect Plaintiff States' interests in recruiting, hiring, and retention for employees who accept lower public employment salaries in exchange for 10-year loan forgiveness.

### D. The Final Rule injures the States' financial interests in collecting tax revenues on forgiven student loans.

Plaintiff States face another form of financial harm from the Final Rule.  Missouri, Georgia, North Dakota, Ohio, and Oklahoma use federal adjusted gross income ("AGI") as a base for determining an individual's taxable state income.  *See* Mo. Rev. Stat. § 143.121; Ga. Code Ann § 48-7-27(a); N.D. Cent. Code § 57-38-01(13); Okla. Stat. tit. 68, §§ 2353, 2358; Ohio Rev. Code. §§ 5747.01, .02.  Doing so greatly simplifies filing and decreases confusion for taxpayers.  It also typically increases state revenue when loans are (other than through the PSLF program) because the amount of loan forgiveness normally is added to a taxpayer's federal AGI, increasing that person's tax liability.  *See* 26 U.S.C. § 61(a)(11).

That will not be true, however, through 2025.  Under the American Rescue Plan Act of 2021, the discharge amount will be *excluded* for student loan debts discharged before January 1, 2026.  § 108(f)(5).

That means that the Final Rule will deprive these States of revenue they otherwise would have obtained.  Before the Final Rule, many borrowers would not have been eligible for forgiveness until 2026 or later, but the Final Rule accelerates forgiveness for many borrowers to before 2026, when their loan forgiveness will not be taxed.  These harms are sufficient to establish

28

an injury-in-fact for Article III standing.  *See Wyoming v. Oklahoma*, 502 U.S. 437, 448, 454 (1992) (standing where a State experiences "loss of specific tax revenues").

These financial harms are directly traceable to the Final Rule.  For millions of borrowers, the Final Rule accelerates loan forgiveness, shifting it into the American Rescue Plan Act's tax-free period. This would not have happened but for the Final Rule.  As for redressability, an order of this court staying or enjoining and vacating the rule would prevent Defendants from unlawfully accelerating forgiveness into the tax-free period.

**II.      The States Are Likely to Succeed on the Merits.**

Although the States need only establish a "fair chance of prevailing," Plaintiff States have established much more.  Plaintiff States are likely to succeed on their claims that (1) the Final Rule violates separation of powers principals, (2) the Final Rule exceeds Defendants' authority under the HEA, (3) the Final Rule is arbitrary and capricious, and (4) the Final Rule was promulgated in violation of statutory procedures.

**A. The Final Rule violates separation of powers principles because the Secretary cannot identify "exceedingly clear language" in the statute authorizing the Secretary to cancel hundreds of billions in student loans.**

Plaintiff States are likely to prevail on Count I because the Final Rule flouts the "major questions doctrine."  Under that doctrine, an agency action involving a matter of "vast economic and political significance" will stand only if the agency can identify "exceedingly clear language" authorizing its actions.  *Alabama Assn. of Realtors v. Dept. of Health and Human Services*, 594 U.S. 758, 764 (2021); *see also West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (requiring "clear congressional authorization" rather than a "plausible textual basis").  This doctrine rests on the premise "that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 597 U.S. at 722 (cleaned up).  The Supreme Court applied this doctrine

just last year to strike down Defendants' first unlawful mass cancellation program.  *Biden v. Nebraska*, 143 S. Ct. at 2375.  The doctrine compels the same result here.

         *i.   The Final Rule triggers the major questions doctrine because it concerns issues of great economic and political significance.*

      The Supreme Court's holding last year in *Biden v. Nebraska* binds this Court and compels the conclusion that Defendants' latest attempt at mass debt cancellation triggers the major questions doctrine.

      Start first with great economic significance.  Last year, the Supreme Court said Defendants' last student-loan cancellation program was economically "staggering" because "[a] budget model issued by the Wharton School of the University of Pennsylvania estimates that the program will cost taxpayers 'between $469 billion and $519 billion.'"  *Biden v. Nebraska*, 143 S. Ct. at 2373.  The same is true here.  The same exact source (the Wharton School) gave this program a similar price tag—$475 billion.  The Final Rule is thus "staggering" as a matter of binding precedent.  Even under the Department's calculation of $156 billion—which is based on an indisputably false assumption that undercounts the cost—that Final Rule is far more than sufficient to trigger the major questions doctrine.  Indeed, it is more than triple the $50 billion that triggered the doctrine three years ago.  *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489.

      The same is true of "political" significance.  If mass loan forgiveness had "staggering" political significance last year—as the Supreme Court held—it obviously still does today.  "'More than 80 student loan forgiveness bills and other student loan legislation' were considered by Congress during its 116th session alone."  *Biden v. Nebraska*, 143 S. Ct. at 2373 (citation omitted).  Student loan debt cancellation is a highly salient political topic "that Congress would likely have intended for itself."  *Id.* at 2375.

ii. *The HEA includes no "clear statement" authorizing the breadth of power asserted in the Final Rule.*

Because the Final Rule triggers the major questions doctrine, the agency action must fall unless the agency can identify "a clear statement" in a statute that gives "clear congressional authorization" to the Secretary. *Id.* at 2375. And not just that. The clear statement must justify the full "breadth of the authority that the agency has asserted." *West Virginia*, 597 U.S. at 721 (cleaned up); *see also BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 617 (5th Cir. 2021) ("assertion of virtually unlimited power" raised separation of powers principles concerns over agency mandate.). Defendants have come nowhere close to satisfying that rigorous standard.

Through the Final Rule, the Secretary has asserted absolutely staggering power. The text on which the Secretary relies gives the Secretary authority to promulgate "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). The Secretary asserts that this statute has no limit other than that repayment cannot last longer than 25 years. The Secretary even contemplates shielding all income below 400% of the federal poverty line. 88 Fed. Reg. 43,831. The Secretary's assertion of limitless authority would mean the Secretary could forgive debts after any borrower made 1 monthly payment of just 1 penny. That is staggering authority beyond any measure.

The statute includes no text authorizing anything of that nature. It does not even include clear authority to forgive *any* student loans at all—even as other provisions in the HEA do. In fact, the text says the opposite: the Secretary has *no* authority to forgive loans under the ICR program. The statute describes ICR plans as "plans for *repayment* of such loan, *including principal and interest*," and it goes on to say the "balance due" from each borrower on an "income contingent

31

repayment" plan "*shall* equal the unpaid principal amount of the loan, any accrued interest, and any fees."  § 1087e(d)(1)(D) (emphasis added).  There is no authority under the ICR program for loan forgiveness, much less a "clear statement" authorizing this.

Moreover, departure from longstanding practice without new authorization from Congress is strong evidence the agency is acting without Congressional authorization.  *See Biden v. Nebraska*, 143 S. Ct. at 2372 ("The Secretary has never previously claimed powers of this magnitude under the HEROES Act."); *Nat'l Fed'n Indp. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022).  As discussed in more depth below in Part II.C, the Secretary has never interpreted ICR authority to permit forgiveness faster than 20 years, to transform a loan program into one that creates at least a partial grant for the typical borrower, or to subsidize interest.  The Secretary is trying to effectuate "fundamental revision of the statute" from one program to another. *West Virginia*, 597 U.S. at 701 (citing *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 231 (1994)).  Congress did not provide the Department with clear authorization under the HEA to undertake these actions.  The Final Rule is an open-and-shut violation of separation of powers principles under the major questions doctrine.

**B.  The Final Rule is in excess of statutory authority.**

Even if the major questions doctrine did not apply, Plaintiff States are likely to prevail on their claim that the Final Rule is in excess of statutory authority.  Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity, or "in excess of statutory . . . authority[,] . . . limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)–(C).  Applying "ordinary tools of statutory interpretation," *Biden v. Nebraska*, 143 S. Ct. at 2375, the statute forecloses the actions taken by the Final Rule.  This is true for at least four reasons.

**1.**      The text of the ICR provisions does not authorize the Secretary to forgive balances or subsidize interest.  As just explained, the text expressly says that the "balance due" from each borrower on an "income contingent repayment" plan "*shall* equal the unpaid principal amount of the loan, any accrued interest, and any fees." § 1087e(d)(1)(D) (emphasis added).  The statute also describes ICR plans as "plans for repayment of such loan, including principal and interest." *Id.* In the Final Rule, Defendants say the ICR statute implicitly authorizes forgiveness because it says repayment plans are "not to exceed 25 years."  That is a stretch.  The 25-year provision is a *limit* on the Secretary, not a grant of power.  The Secretary must create a program "for repayment of such loan" and the Secretary must make that program shorter than 25 years.  In other words, the Secretary must promulgate formulas *high* enough so that borrowers repay within 25 years.  The text simply does not authorize forgiveness.

What the text says, established canons of textual interpretation confirm.  In stark contrast to the ICR provisions, other provisions in the HEA (passed both before and after the 1993 amendments) expressly authorize forgiveness.  For example, amendments passed in 1986 authorize forgiveness for teachers, military service members, and Peace Corps volunteers.  20 U.S.C. § 1087ee.  And the IBR program, created in 2007, expressly permits forgiveness. § 1098e(b)(7).  In fact, the IBR program creates the only vehicle for forgiveness for borrowers on ICR.  ICR borrowers can obtain forgiveness, but only *after* switching to the IBR program. § 1098e(b)(7)(A), (b)(7)(B)(iv) (authorizing forgiveness for borrowers who have "made payments under an income-contingent repayment plan" but requiring them to shift to the IBR program first).

All this creates an extraordinarily strong inference that the ICR program does not authorize forgiveness.  "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in

meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023).  The HEA expressly authorizes forgiveness in many different provisions, but not in the ICR provision.

Contrary to the text, the Final Rule not only includes forgiveness; it makes forgiveness its central aim.  Before the Final Rule, ICR plans preserved the requirement of repaying all principal borrowed, along with at least some amount of interest.  As a result, the average borrower on the REPAYE plan would ultimately repay $10,956 for every $10,000 borrowed.  88 Fed. Reg. 43,880. Under the Final Rule, however, that drops to a mere $6,121 per $10,000 borrowed.  *Id.*  That is a $3,879 subsidy for principal per $10,000 borrowed and a 100% subsidy on interest for the typical borrower.  The Rule is even more generous for the bottom quintile, which is expected to repay only $873 per $10,000 borrowed.

The Final Rule thus turns a loan program into a grant program for the typical borrower— even though the HEA separately includes extensive provisions governing grants.  *E.g.*, 20 U.S.C. § 1070a.  In addition to authorizing loans, the HEA also authorizes the Federal Pell Grant program, the purpose of which is to "meet at least 75 percent of a student's cost of attendance." *Id.* § 1070a(b).  The Final Rule tries to use the "loan" program to give away even more money than the grant program.  Under the Final Rule, the Department will meet more than 91% of a former student's cost of attendance if the student is in the bottom quintile for income, more than the 75% aim of the Federal Pell Grant program.  A "loan" that gives *more* free money than the centerpiece grant program is not a loan; it is a grant.  The same is true of a "loan" program where the *typical* borrower repays 39% less than they borrowed.  The Final Rule effects "a fundamental revision of the statute, changing it from one sort of scheme of regulation [a loan program] into an entirely different kind [a grant program]." *Biden v. Nebraska*, 143 S. Ct. at 2373 (alterations accepted, quotation marks omitted).

Similarly, unlike the IBR program, the ICR text does not permit the Secretary to subsidize interest.  The IBR program permits subsidizing interest payments for up to 3 years.  § 1098e(b)(3).  The ICR program expressly *forbids* subsidizing interest payments.  For loans "disbursed before July 1, 2012," the Secretary may decrease interest rates, but "only if the Secretary determines the reductions are cost neutral."  § 1087e(b)(9).  There is no reasonable argument that the Final Rule's subsidization of interest is "cost neutral," and the Final Rule applies to loans disbursed after July 2012.

      **2.**      The HEA does not authorize Defendants to evade the statutory limits set by the IBR program.  In 2007, Congress heard the call for a more generous program and created IBR, which was more generous for student borrowers in every respect.  The IBR program applies only to persons—including persons in ICR programs—experiencing a temporary "financial hardship."  The program increased the exempt-income threshold from 100% in the ICR program to 150%, reduced the annual payment cap from the 20% in the ICR program to 15% of disposable income (10% for borrowers after 2014), and expressly authorized forgiveness.  *See* § 1098e(a)(3)(B), (b)(1).  It also expressly authorized subsidizing interest payments for up to 3 years.  § 1098e(b)(3).  IBR supplanted ICR for borrowers experiencing "financial hardship."  Because it was more generous in every respect, there was no reason for a student borrower to choose ICR over IBR if the borrower qualified for both.

      The Secretary does not rely on IBR authority because, as the Secretary acknowledges, the percentages for the IBR program are fixed by statute.  88 Fed. Reg. 43,832, -851.  Instead, the Secretary now tries to use older ICR authority to make the IBR program irrelevant.  The Final Rule's provisions are so generous that it now makes no sense for any borrower to choose the IBR program.  The Final Rule renders the IBR statutory limits pure surplusage.  Whatever authority

35

the Secretary has under the ICR program, it cannot make an ICR program more generous than the IBR program Congress specifically created for ICR borrowers experiencing temporary financial hardship.

The Secretary used to acknowledge this.  In its 2012 Final Rule, the Department provided that the changes to PAYE plan payment thresholds "will be consistent with the statutory changes to IBR."  77 Fed. Reg. 66,116.  During the comment period for that same rule, commenters requested that the Department reduce the maximum payment for income-driven plans to 5%.  *Id.* at 66,099.  Recognizing the 10% limit created by the IBR statute, the 2012 Final Rule responded, "The Department does not have the authority to change this statutory provision."  *Id.* at 66,100. The 2012 Final Rule did not reduce the IBR or PAYE payment thresholds to 5% and claimed no authority to do so.

In the 2015 Final Rule, the Department created the REPAYE plan, which was "modeled on the existing Pay As You Earn repayment plan," but extended eligibility to "borrowers regardless of when the borrower took out the loans."  80 Fed. Reg. 67,204.  The 2015 Final Rule adopted the same 10% payment threshold for REPAYE that was used in PAYE.  *Id.* at 67,205.  While the commenter suggested that the REPAYE plan use a 5% payment threshold, the Department dismissed the idea.  *Id.* at 67,213.  Separately, certain commenters "expressed support for streamlining the multiple IDR plans into one improved IDR plan that would cap monthly payments at 10 percent of income[ and] provide loan forgiveness after 20 years of payments" and suggested the Department use REPAYE as a model.  *Id.* at 67,209.  The Department responded, without caveat, that "such a change would require congressional action."  *Id.* at 67,210.  The 2015 Final Rule did not reduce the payment thresholds to 5% and disclaimed authority to do so.

There has been no congressional action since the 2012 and 2015 Final Rules. The Defendants have not gained discretionary authority to reduce the 10% payment threshold prescribed by the HEA to 5%. The Final Rule's purported goal of "streamlin[ing] the number of IDR options available to borrowers" through the REPAYE/SAVE plan, with a 5% payment threshold is directly contrary to the discretionary limits that the Department itself expressed in 2015. The Final Rule's amendment of this threshold to 5% is contrary to the HEA.

**3.**     The HEA precludes Defendants from authorizing an ICR program that lasts only 10 years. The Final Rule insists that there is "no lower limit" for how long a repayment plan must last. 88 Fed. Reg. 43,827. In other words, the Secretary could promulgate a plan requiring only 1 monthly payment of 1 penny. But the statute plainly precludes this. Not only does the ICR statute require actual "repayment," but the HEA also requires that ICR plans be "extended" in length beyond the standard repayment plans. § 1087e(d)(1)(D). The standard payment plan is 10 years. 20 U.S.C. § 1078(b)(9)(A)(i). The Final Rule flouts the statute by providing some borrowers with full debt forgiveness after just 10 years, eliminating any minimum difference in repayment length between ICR plans and standard payment plans.

The PSLF program, which is created by the very same statutory section, reinforces this conclusion. That program allows for forgiveness of loans after 10 years of payments while employed in a public service job. § 1087e(m)(1). That is the only 10-year IDR plan that Congress has ever authorized. Consistent the interpretive canon of *expressio unius est exclusio alterius*, it is implausible that Congress silently intended to give the Secretary authority to forgive loans for *non*-public service borrowers at the same rate or even faster than public service borrowers.

**4.**     The HEA precludes offering special repayment plans en masse to borrowers who fail to recertify their income information for income-driven repayment plans. The Final Rule

creates an "Alternative Plan" for borrowers who fail to recertify their income, and it permits them to count up to 12 months of payments while outside an IBR or ICR plan toward forgiveness.  *See* 88 Fed. Reg. 43,827, -866.  The Final Rule tries to justify this forgiveness for persons who have not recertified their income by asserting that "Sec. 455(d)(4) of the HEA provides the Secretary with discretion to craft 'an alternate repayment plan,' under certain circumstances."  88 Fed. Reg. 43,827 (quoting 20 U.S.C. § 1087e(d)(4)).   But the Final Rule omits necessary and relevant portions of that section. The full section reads: "[t]he Secretary may provide, *on a case by case basis*, an alternative repayment plan to a borrower of a loan made under this part who demonstrates to the satisfaction of the Secretary that the terms and conditions of the repayment plans available under paragraph (1) are not adequate *to accommodate the borrower's exceptional circumstances.*" 20 U.S.C. § 1087e(d)(4) (emphasis added).

The Final Rule's reliance on the section is improper because the statute does not permit the Secretary to grant relief in a class-wide fashion.  This provision permits action only on an individual case-by-case basis taking into account "the borrower's exceptional circumstances."  20 U.S.C. § 1087e(d)(4).  Section 455(d)(4) of the HEA does not provide the Secretary with the discretion he now claims.

Additionally, the Final Rule provides no evidence or argument that section 455(d)(4) is being used with respect to borrowers in "exceptional circumstances."  To the contrary, the Final Rule admits that "large numbers of borrowers currently fail to recertify" their information for their loans.  88 Fed. Reg. 43,882.  Failure to meet this minimum requirement, which the Final Rule acknowledges many borrowers do, is by its own terms not an exceptional circumstance and thus cannot serve as the basis for invocation of this section.

**C.  The Final Rule is arbitrary and capricious.**

Plaintiff States are likely to prevail on their claims that the Final Rule is arbitrary and capricious, and thus in violation of the APA.  The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

An agency action is arbitrary or capricious if, among other things, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), or otherwise did not "engage[] in reasoned decisionmaking," *Judulang v. Holder*, 565 U.S. 42, 53 (2011). At base, the "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commun. Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Here, Defendants' Final Rule is arbitrary and capricious for eight independent reasons:

**1.**      It cannot be seriously disputed that the Final Rule's cost estimate is arbitrary. The Final Rule estimates a cost of $156 billion but expressly bases this estimate on the assumption that Defendants would prevail at the Supreme Court in *Biden v. Nebraska*.  88 Fed. Reg. 43,820, 43,886.  The problem of course is that Defendants did *not* prevail, and Defendants knew this when they released the Final Rule just 10 days after losing in the Supreme Court.

Because Defendants knew that the cost estimates in the Final Rule were outdated and inaccurate before publication, failure to reassess the data or explain why it still relied on the old assumptions was arbitrary and capricious.  *See Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013); *see also Sierra Club v. EPA*, 671 F.3d 955, 966–68 (9th Cir. 2012) ("we should not silently rubber stamp agency action that is arbitrary and capricious in

its reliance on old data without meaningful comment on the significance of more current compiled data.").

This is particularly true because the Final Rule's false assumption makes the cost estimate not only inaccurate, but *grossly* inaccurate.  The Final Rule's analysis assumed that the new SAVE plan would go into effect only after nearly $500 billion in debt was wiped off the books by the first mass-cancellation plan.  Because that debt in fact was not wiped off the books, the actual cost of the Final Rule has ballooned to the tune of hundreds of billions of dollars.  Penn Wharton's model—which the Supreme Court credited last year, *Biden v. Nebraska*, 143 S. Ct. at 2373— estimates the cost of the Final Rule at $475 billion, more than $300 *billion* higher than the Final Rule's estimate.  This difference is about one-sixth the Federal Government's entire budget.  *Id.* at 2373.  Certainly any reasonable agency would reassess a rule after noticing that the rule will in fact cost $300 billion more than originally expected.

Defendants should have anticipated the possibility that they would lose at the Supreme Court.  Indeed, a commenter raised this very possibility and suggested that the Department produce a secondary estimate to reflect the very conceivable alternate outcome.  88 Fed. Reg. 43,875.  Yet Defendants failed to entertain the obvious possibility that they would lose before the Supreme Court or explain the rationale for their decision.  This is a violation of Defendants' statutory duty to "reasonably explain" the Rule, including by responding to "significant points" raised by the comments.  *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 343-344 (D.C. Cir. 2019).

**2.**     The Final Rule did not consider the Plaintiff States' many financial interests when passing the Final Rule.

First, the Final Rule does not consider that the States have a reliance interest in tax revenue from loan forgiveness.  The majority of Plaintiff States tax the income that is realized when student

loans are discharged.  And to simplify the tax process, these States rely on the federal AGI.  But after passage of the American Rescue Plan Act, the AGI will not include the amount of student loan discharge until 2026.  Any loan that is forgiven between now and that date is thus untaxable. The Final Rule accelerates the rate of forgiveness, meaning that the loans for millions of borrowers that would have been taxed after 2025 will no longer be taxed.  This deprives the States of expected revenue.  The Final Rule wholly fails to consider this cost.

Second and similarly, the Final Rule fails to consider Plaintiff States' reliance on the PSLF program.  As explained above in Part I.C., state and local government agencies in Plaintiff States rely on the comparative benefits that PSLF offers over other repayment plans to offset the lower salaries generally offered in public employment and to encourage more graduates to choose work in the public sector over private alternatives.  The Final Rule decimates this comparative advantage because it enables many borrowers to pay nothing or have their loans cancelled after ten years without working a day in public service.  Defendants ignored this issue when raised by commenters.  *See* 88 Fed. Reg. 43,880.

This failure to consider the States' reliance interests renders the rule arbitrary and capricious.  "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. . . . It [is] arbitrary and capricious to ignore such matters."  *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1913 (2020) (internal quotes omitted).

**3.**  The Final Rule fails to acknowledge that Defendants are departing from nearly thirty years of practice.  Before the Final Rule, the typical borrower on an income-driven plan paid back *more* than they borrowed.  88 Fed. Reg. 43,880 (noting a typical repayment rate of $10,956 for every $10,000 borrowed).  Now, for the first time ever, the typical borrower will pay back *less*

41

than they borrowed—almost 40% less.  Similarly, the Department has never previously tried to use the ICR program to subsidize interest, nor sought to use its authority to permit forgiveness sooner than 20 years—which is the statutory term of years created for forgiveness by the IBR program.  20 U.S.C. § 1098e(e).

Defendants try to justify the Final Rule by arguing that previous rulemakings were not challenged.  But no previous rule is similar.  The Department has simply never done this before. In any event, there is no "adverse possession" rule that permits an agency to change the meaning of a statute simply because its previous rulemaking went unchallenged.  *See Career Colleges & Sch. of Texas v. U.S. Dep't of Edu.*, No. 23-50491, 2024 WL 1461737, at *13 (5th Cir. Apr. 4, 2024).

Moreover, the Department previously disclaimed legal authority to reduce the 10% payment threshold prescribed by the HEA to 5%.  *See* 88 Fed. Reg. 43,880 ("such a change would require congressional action.").  The Department's refusal to acknowledge its change in position is sufficient to declare the Final Rule arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("[U]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  (internal quotation marks omitted)).

4.      The Final Rule is also arbitrary and capricious because it contains unreconciled internal contradictions. Specifically, the Final Rule suggests that its new, more lenient income-driven repayment plans will result in fewer delinquencies and defaults, but at the same time complains that past repayment plans increased delinquencies and defaults.  *Compare* 88 Fed. Reg. 43,822 with 43,827.  This unresolved, inherent inconsistency is sufficient to hold that the Final Rule is arbitrary and capricious.  *See id.*

5.      The Final Rule failed to consider in a reasonable manner the inflationary effects of its implementation.  The Brookings Institute found "good evidence" for the proposition that the provisions to raise the discretionary income threshold and lower the monthly repayment cap "will cause institutions to raise tuition."  Adam Looney, *Biden's Income-Driven Repayment plan would turn student loans into untargeted grants*, Brookings Institute (Sept. 15, 2022).[18]  The enormous inflationary pressures are an "important aspect of the problem" that Defendants were obliged to evaluate because inflation in the cost of education will only exacerbate the cost of higher education. *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015)).  They failed to do so and thus the Final Rule is arbitrary and capricious.

6.      The Final Rule insists that its provisions are not a grant, 88 Fed. Reg. 43,830 ("The Department does not agree with the claim that the REPAYE plan turns a loan into a grant."), when the result is exactly that.  The Department's own data establishes that the typical undergraduate borrower will pay back significantly less than the amount borrowed. *Id.* at 43,823, -80.  Because this Final Rule is not the product of a well-reasoned decision, it is arbitrary and capricious and violates the APA.

7.      The Final Rule's income-exemption threshold (an increase from 150% to 225%) and the payment threshold (down to 5% from 10%) are built on unlikely and implausible conclusions.  The Department justifies the 225% threshold, for example, by arguing that persons at that income threshold are "statistically indistinguishable from those with incomes below 100 percent of the FPL [federal poverty line]." *Id.* at 43,839.  The Department arrived at this unlikely conclusion by relying on data where persons self-reported experiencing financial hardship. *Id.* at 43,840.  But the idea that certain individuals are "indistinguishable" financially from others

---

[18] https://www.brookings.edu/articles/bidens-income-driven-repayment-plan-would-turn-student-loans-into-untargeted-grants/

making more than *twice* their income is self-refuting.  Americans of many different income levels experience financial difficulties, but the financial difficulties of a person with twice the income of another are qualitatively and quantitatively different.  Because these provisions are not the product of a well-reasoned decision, they are arbitrary and capricious and violate the APA.

    **8.**    The Department provided no justification at all for implementing the early forgiveness part of the rule—34 C.F.R. § 685.209(k)(3)—in January instead of July 2024, when that part of the Final Rule was originally scheduled to go into effect.  Instead, it merely announced in a half-page notice—without explanation—that the section would be implemented early.  The early implementation, nearly six months before the Final Rule was set to become effective, resulted in an immediate $1.2 billion cost to the public fisc and deprived the States of tax revenue.  That number increased by an additional $3.6 billion when the Defendants exercised an additional round of unlawful forgiveness on April 12, 2024 (three days after Plaintiff States filed the instant suit).  That cost continues to grow as the Defendants further implement this provision.  The failure to reasonably explain this change makes the Defendants action arbitrary and capricious, and thus a violation of the APA.

### D.  The Final Rule was promulgated in violation of statutory procedures.

    Plaintiff States are likely to succeed on their claim that the Final Rule violates the APA because it was promulgated in violation of statutory procedures.  The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. §§ 553(b), (c).  "Notice and comment gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision."  *Azar v. Allina Health Servs.*, 587 U.S. 566, 582 (2019).

Here, the Proposed Rule had a limited comment period of just 30 days. *See* 88 Fed. Reg. 43,821. "[A] thirty-day period is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data.' The Administrative Conference itself thus suggests 'a sixty-day period as a more reasonable minimum time for comment.'" *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (quoting Admin. Conf. of the U.S., *A Guide to Federal Agency Rulemaking* 124 (1983)).

The short 30-day comment period was patently insufficient in light of the complexity and staggering significance of the Final Rule. In such a circumstance, "a sixty-day period [w]as a more reasonable minimum time for comment," *Id.* (internal quotes omitted). As discussed above, the Final Rule wades into issues of major economic and political significance, with an estimated cost ranging from $475 billion to over $1 trillion. At a minimum, the Final Rule commits to spending nearly double the Department's FY 2023 discretionary budget on these provisions, and at worst may be larger by an order of twelve.

Moreover, compounding the exorbitant cost estimates, the Final Rule concerns novel and at times contradictory interpretations of the HEA that require delicate consideration to avoid constitutional pitfalls. A short comment period fails to adequately accommodate necessary and fulsome participation of interested parties. Past administrations have recognized this reality and published executive orders instructing agencies to provide sixty days of commenting as the default. *See* 58 Fed. Reg. 51,735 (Sept. 30, 1995) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which *in most cases should include a comment period of not less than 60 days*." (emphasis added)); 76 Fed. Reg. 3821–22 (Jan. 21, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a

45

comment period that *should generally be at least 60 days*." (emphasis added)).  The Department's truncated approach here was a stark departure from traditional norms.

While the Proposed Rule asked for the public's help in "complying with the specific requirements of Executive Orders 12866 and 13563 and their overall requirement of reducing regulatory burden that might result from these proposed regulations," *see* 88 Fed. Reg. 1,895, it did not offer the public the 60-day commenting period called for in those orders.  By providing only thirty days, Defendants Final Rule was promulgated without observance of procedure and thus violated the APA.

### III.   Plaintiff States Face Irreparable Harm.

Absent immediate relief, Plaintiff States will suffer irreparable harm to their interests. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages," *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009), as is the case where "federal agencies generally enjoy sovereign immunity for any monetary damages," *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); see also 5 U.S.C. § 702 (providing for an action seeking relief "other than money damages").

Consider first the financial harms to Plaintiff States.   "[I]rreparable harm" includes the "threat of unrecoverable economic loss." *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) (citations omitted).  Absent immediate relief, Defendants will continue to illegally forgive debts up to 10 to 15 years early.  Just last week, the Defendants unlawfully cancelled another $7.4 billion in student debt from 277,000 borrowers. *See Statement from President Joe Biden on $7.4 Billion in Student Debt Cancellation for 277,000 More Borrowers*, The White House (Apr. 12,

2024) ("April 12 Statement").[19]  In Missouri alone, the Final Rule's early-forgiveness provision has already resulted in early forgiveness for more than 7,000 accounts to the tune of more than $100 million.  *President Joe Biden Announces Student Debt Cancellation for 6,230 More Borrowers in Missouri, Pursuing Every Path Available to Cancel Student Debt*, The White House (Apr. 12, 2024).[20]  It is far from clear that this egg can be unscrambled.  *See Nebraska v.* Biden, 52 F.4th at 1047 (loan forgiveness has an "irreversible impact.").  That is $100 million that the State ordinarily would have taxed but cannot because of accelerated forgiveness.  At the very least, this Court should grant a stay or a TRO against early implementation of the forgiveness part of the Final Rule so that no further irreparable harm can occur while the Court considers the remaining issues.

MOHELA similarly experiences irreparable harm every day.  Defendants continually induce borrowers to consolidate the loans that MOHELA loans into loans that MOHELA will no longer own and may not even service.  And Defendants are zeroing out accounts held by MOHELA.  This permanently deprives MOHELA of a stream of revenue.

Separately, North Dakota's competitive harms have no remedy at law.  "[C]ompetitive injuries . . . are difficult to quantify" and can serve as the basis of irreparable harm.  *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992).  Like the financial harms above, the competitive harm genie cannot be put back in the bottle.  If the Final Rule goes into full effect on as scheduled, student loan borrowers financing postsecondary education in North Dakota will be presented with a choice: receive or consolidate student loans with the Bank of North Dakota that must be paid back or participate in a federal "loan" program where the typical borrower can expect the Federal

---

[19] https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/12/statement-from-president-joe-biden-on-7-4-billion-in-student-debt-cancellation-for-277000-more-borrowers
[20] https://www.whitehouse.gov/wp-content/uploads/2024/04/Missouri-4.12.pdf

Government to convert their "loan" into a grant.  Once a borrower chooses the unlawful federal program, the Bank of North Dakota is left without remedy for its competitive harm.

Plaintiff States also have begun to suffer, and will continue to suffer, irreparable harm to their efforts to recruit, hire, and retain government employees through PSLF.  A later court order declaring the Final Rule unlawful will not have the effect of returning to government offices employees who left (or never started) because of the inducements created by the Final Rule.  The harms caused by the Final Rule diluting the comparative attraction of the PSLF program have already begun and are unrecoverable moving forward.

And Defendants show no evidence of slowing down.  To the contrary, speaking on behalf of the administration last week, Defendant Cardona boasted that Defendants had given away more money "than any other administration and we're just warming up."  Nicole Acevedo, *Education Secretary Cardona meets with teachers and borrowers as he touts new student debt relief plan*, NBC News (Apr. 8, 2024).[21]  Separately, the Undersecretary of Education James Kvaal conveyed that "[t]he President directed us to complete these programs as *quickly as possible*, and we are going to do just that."  *See Biden-Harris Administration Announces New Plans to Deliver Debt Relief to Tens of Millions of Americans*, U.S. Department of Education (Apr. 8, 2024).[22]  This is evidenced by Defendants' forgiveness of another $7.4 billion in student loans just last week, following the filing of this suit and a similar suit in the United States District Court for the District of Kansas, *see Kansas v. Biden*, 24-cv-01057 (D. Kan. Mar. 28, 2024).  *See* April 12 Statement.[23]

---

[21] https://www.nbcnews.com/news/latino/education-secretary-cardona-student-loan-forgiveness-biden-rcna146817
[22] https://www.ed.gov/news/press-releases/biden-harris-administration-announces-new-plans-deliver-debt-relief-tens-millions-americans
[23] https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/12/statement-from-president-joe-biden-on-7-4-billion-in-student-debt-cancellation-for-277000-more-borrowers/

## IV.    The Balance of Harms and Public Interest Favor the Plaintiff States.

This balance of harms and public interest heavily favors granting relief.  These two factors "merge" when a plaintiff seeks injunctive relief against the government.  *Nken*, 556 U.S. at 435. As described above, Plaintiff States currently face irreparable harm due to the early implementation of certain provisions of the Final Rule and will face additional irreparable harms if the remainder of the Final Rule is permitted to go into effect.

In contrast, the only potential harm to Defendants is a brief pause in implementation—and that will be true only in the unlikely event Defendants ultimately prevail.  An injunction will re-establish the status quo as it existed before the publication of the Final Rule and the Department's early implementation of various provisions.  "It will not harm the federal government to maintain the status quo while the courts decide the issues of the President's authority." *Missouri v. Biden*, 576 F. Supp. 3d 622, 635 (E.D. Mo. 2021).

The public interest also heavily favors a § 705 stay, a TRO, and a preliminary injunction. The Final Rule seeks to impose a huge windfall on the comparatively small proportion of Americans holding student loan debt (about 13%) while imposing a gargantuan price tag on all Americans and shortchanging the legislative process.  Though Defendants assert that the Final Rule advances interests of borrowers in reducing and eliminating their student loan debt, "the government may not 'act unlawfully even in pursuit of desirable ends.'" *Missouri v. Biden*, 576 F. Supp. 3d at 635 (citing *Alabama Ass'n of Realtors*, 594 U.S. at 766).  "[T]here is no public interest in the enforcement of an unlawful action."  *Id.* (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) ("There is generally no public interest in the perpetuation of unlawful agency action.").  Instead, "the public's true interest lies in the correct application of the law."  *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022).  Here, that requires a determination, on the merits, of whether the Defendants'

Final Rule violates the APA.  Up and until that decision, the public interest favors a TRO and a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that this Court grant their "Motion for a Stay or in the Alternative a Temporary Restraining Order" and their "Motion for a Stay or in the Alternative a Preliminary Injunction."  At the very least, immediate relief is appropriate to prevent any more early implementation of the Final Rule.  Plaintiff States further request that the Court grant their Motion with haste given the enormous economic consequences of the Final Rule.

Date: April 16, 2024

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine
Joshua M. Divine, #69875MO
   *Solicitor General*
Reed C. Dempsey #1697941DC
   *Deputy Solicitor General*
Samuel Freedlund, #73707MO
   *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
josh.divine@ago.mo.gov
samuel.freeland@ago.mo.gov
reed.dempsey@ago.mo.gov

*Counsel for Plaintiff*
*State of Missouri*
*Lead Counsel for State Plaintiffs*

**TIM GRIFFIN**
**Attorney General of Arkansas**

/s/Nicholas Bronni
Nicholas J. Bronni
   *Solicitor General*
Dylan L. Jacobs
   *Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for*
*State of Arkansas*

Respectfully Submitted,

**ASHLEY MOODY**
**Attorney General**

/s/James H. Percival
James H. Percival
   *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

**CHRISTOPHER M. CARR**
**Attorney General**

/s/Stephen J. Petrany
Stephen J. Petrany
   *Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

**DREW H. WRIGLEY**
**Attorney General**

/s/ Philip Axt
Philip Axt
   *Solicitor General*
North Dakota Attorney General's Office
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

**DAVE YOST**
**Ohio Attorney General**

/s/ T. Elliot Gaiser
T. Elliot Gaiser
   *Solicitor General*
Mathura J. Sridharan
   *Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for Plaintiff State of Ohio*

**GENTNER DRUMMOND**
**Attorney General of Oklahoma**

/s/ Garry M. Gaskins, II
Gentner Drummond, OBA #16645
   *Attorney General*
Garry M. Gaskins, II, OBA #20212
   *Solicitor General*
Office of the Attorney General
State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Fax:  (405) 522-4815
gentner.drummond@oag.ok.gov
garry.gaskins@oag.ok.gov

*Counsel for*
*State of Oklahoma*

## CERTIFICATE OF SERVICE & COMPLIANCE

I certify that on April 16, 2024, a true and accurate copy of the foregoing document was electronically filed through the Court's CM/ECF System and that a copy of the foregoing will be sent via email to all parties by operation of the Court's electronic filing system, consistent with Federal Rule of Civil Procedure 5(b).

I further certify that the foregoing document contains 50 pages, exclusive of matters designated for omission.

/s/ *Joshua M. Divine*

*Counsel for Plaintiff State of Missouri*
*Lead Counsel for Plaintiff States*