**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF MISSOURI, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>    *Defendants*. | Case No. 4:24-cv-520-JAR |

**DEFENDANTS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO
PLAINTIFFS' MOTIONS FOR A TEMPORARY RESTRAINING
ORDER AND A PRELIMINARY INJUNCTION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.   The Higher Education Act and Prior Income-Contingent Repayment Plans .........................3

    B.   The SAVE Plan .........................................................................................................4

    C.   Loan Forgiveness and Litigation Under the HEROES Act ..........................................6

    D.   This Lawsuit .............................................................................................................7

ARGUMENT ........................................................................................................................8

I.    THE CASE SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING...9

    A.   Plaintiff Missouri has not carried its burden to show standing based on an injury to MOHELA ...............................................................................................................10

    B.   Plaintiffs' tax-revenue theory is foreclosed by Supreme Court precedent. ............................16

    C.   Plaintiffs' recruiting theory is speculative and unsupported...........................................18

    D.   Plaintiff North Dakota's banking-business theory fails. ..............................................21

II.    THE CASE SHOULD BE DISMISSED FOR IMPROPER VENUE. ..........................24

III. PLAINTIFFS' MOTIONS FOR INJUNCTIVE RELIEF SHOULD BE DENIED....27

    A.   Plaintiffs are unlikely to succeed on the merits of their statutory-authority claims. ............28

        1.   The Final Rule is authorized by the Higher Education Act. .................................28

        2.   The major-questions doctrine does not warrant a different result................................39

    B.   Plaintiffs are not likely to succeed on their other APA claims................................................42

        1.   The Rule is not arbitrary and capricious. .................................................................42

        2.   The agency provided notice and an opportunity to comment..........................................50

    C.   Plaintiffs have not shown irreparable harm. ...................................................................52

    D.   A preliminary injunction would be contrary to the public interest. ....................................54

IV. PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD. ...........................................55

    A.   Any relief should be limited to redressing any cognizable injuries of any Plaintiff State that can establish standing. ...............................................................................55

    B.   The Final Rule is severable.....................................................................................58

    C.   The Court lacks authority to enter relief directly against the President...............................59

CONCLUSION....................................................................................................................59

## TABLE OF AUTHORITIES

### Cases

*Adventist Health Sys./SunBelt, Inc. v. HHS,*
  17 F.4th 793 (8th Cir. 2021) ............................................................................53

*Agred Found. v. Army Corps of Engr's,*
  3 F.4th 1069 (8th Cir. 2021) ............................................................................13

*Aguilar v. Garland,*
  60 F.4th 401 (8th Cir. 2023) ............................................................................45

*Air Excursions, LLC v. Yellen,*
  66 F.4th 272 (D.C. Cir. 2023) ..........................................................................24

*Air Transp. Ass'n v. FAA,*
  169 F.3d 1 (D.C. Cir. 1999) .............................................................................43

*Al Yatim v. Mukasey,*
  531 F.3d 584 (8th Cir. 2008) ............................................................................47

*Alabama Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021) .........................................................................................39

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
  452 U.S. 490 (1981) .........................................................................................43

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ............................................................................57

*B & D Land & Livestock Co. v. Conner,*
  534 F. Supp. 2d 891 (N.D. Iowa 2008) ...........................................................27

*Bartenwerfer v. Buckley,*
  598 U.S. 69 (2023) ....................................................................................28, 40

*Benisek v. Lamone,*
  585 U.S. 155 (2018) .........................................................................................53

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) .................................................................................passim

*Biden v. Texas,*
  597 U.S. 785 (2022) ....................................................................................35, 38

*Birnbaum v. Blum,*
  546 F. Supp. 1363 (S.D.N.Y. 1982) .................................................................25

*Bittner v. United States,*
    598 U.S. 85 (2023) ..................................................................................................33

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ................................................................................................36

*Bueno v. Experian Info. Sols., Inc.,*
    664 F. Supp. 3d 800 (N.D. Ill. 2023) ......................................................................11

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ..........................................................................................56, 57

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos,*
    344 F. Supp. 3d 158 (D.D.C. 2018) ........................................................................52

*California v. Texas,*
    593 U.S. 659 (2021) ................................................................................................13

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) ....................................................................................48

*Cato Inst. v. Cardona,*
    No. 1:23-cv-11906, --- F. Supp. 3d ----, 2023 WL 5232910 (E.D. Mich. Aug. 14, 2023) ...............20

*Chevron USA, Inc. v. Echazabal,*
    536 U.S. 73 (2002) ..................................................................................................31

*CHS, Inc. v. PetroNet, LLC,*
    No. 10-cv-94, 2010 WL 4721073 (D. Minn. Nov. 15, 2010) ..................................54

*City of Kennett v. EPA,*
    887 F.3d 424 (8th Cir. 2018) ...............................................................................9, 13

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ..........................................................................................*passim*

*Combat Veterans for Cong. Pol. Action Comm. v. FEC,*
    795 F.3d 151 (D.C. Cir. 2015) ..........................................................................45, 52

*Conn. Light & Power Co. v. NRC,*
    673 F.2d 525 (D.C. Cir. 1982) ................................................................................51

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ................................................................................................29

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................................................10

*Dakota Indus., Inc. v. Ever Best Ltd.,*
    944 F.2d 438 (8th Cir. 1991) ..................................................................................55

*Dakotans for Health v. Noem,*
52 F.4th 381 (8th Cir. 2022) .................................................................... 52, 56

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
640 F.2d 109 (8th Cir. 1981) ................................................................ 27

*Dep't of Commerce v. New York,*
139 S. Ct. 2551 (2019) ............................................................................ 13

*Dep't of Educ. v. Brown,*
600 U.S. 551 (2023) ...................................................................... *passim*

*DHS v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ............................................................................ 44

*El Paso Nat. Gas Co. v. FERC,*
50 F.3d 23 (D.C. Cir. 1995) ..................................................................... 23

*Facebook, Inc. v. Duguid,*
592 U.S. 395 (2021) ................................................................................ 31

*FCC v. Fox Television Stations,*
556 U.S. 502 (2009) ..................................................................... 42, 48, 50

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ..................................................................... 42, 47, 50

*FEC v. Cruz,*
596 U.S. 289 (2022) ................................................................................ 16

*Flandreau Santee Sioux Tribe v. Dep't of Agric.,*
No. 4:19-cv-04094-KES, 2019 WL 2394256 (D.S.D. June 6, 2019) ................ 55

*Florida v. Mellon,*
273 U.S. 12 (1927) ............................................................................ 17, 18

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ................................................................................ 59

*Garrison v. Dep't of Educ.,*
636 F. Supp. 3d 935 (S.D. Ind. 2022) ........................................................ 17

*Gill v. Whitford,*
585 U.S. 48 (2018) .................................................................................. 56

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
527 U.S. 308 (1999) ................................................................................ 56

*Haaland v. Brackeen,*
599 U.S. 255 (2023) ................................................................................ 18

*Jones v. Hendrix,*
    599 U.S. 465 (2023) ............................................................................29

*La. Energy & Power Auth. v. FERC,*
    141 F.3d 364 (D.C. Cir. 1998) ...........................................................23

*Labrador v. Poe,*
    144 S. Ct. 921 (2024) .........................................................................56

*Leonhart v. McCormick,*
    395 F. Supp. 1073 (W.D. Pa. 1975) ...................................................25

*Lewis v. Casey,*
    518 U.S. 343 (1996) ....................................................................56, 57

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020) .............................................................35, 45, 51

*Lomax v. Ortiz-Marquez,*
    140 S. Ct. 1721 (2020) .......................................................................36

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................*passim*

*Mandan, Hidatsa & Arikara Nation v. Dep't of the Interior,*
    95 F.4th 573 (8th Cir. 2024) .............................................................42

*Marx v. Gen. Revenue Corp.,*
    568 U.S. 371 (2013) .............................................................31, 34, 35

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ...........................................................................27

*MD/DC/DE Broads. Ass'n v. FCC,*
    236 F.3d 13 (D.C. Cir. 2001) .............................................................58

*MD/DC/DE Broads. Ass'n v. FCC,*
    253 F.3d 732 (D.C. Cir. 2001) ...........................................................59

*Mercier v. Dep't of Labor, Admin. Rev. Bd.,*
    850 F.3d 382 (8th Cir. 2017) .............................................................47

*Michigan v. EPA,*
    576 U.S. 743 (2015) .............................................................42, 44, 47

*Miller v. French,*
    530 U.S. 327 (2000) ...........................................................................57

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) .............................................................59

*Missouri v. Biden*,
  52 F.4th 362 (8th Cir. 2022) .................................................................................. 9, 15, 49

*Missouri v. Biden*,
  558 F. Supp. 3d 754 (E.D. Mo. 2021) ......................................................................... 49

*Morehouse Enters., LLC v. ATF*,
  78 F.4th 1011 (8th Cir. 2023) ....................................................................... 15, 52, 53

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................... 43, 44

*Muff v. Wells Fargo Bank*,
  71 F.4th 1094 (8th Cir. 2023) ........................................................................................ 19

*N. Haven Bd. of Educ. v. Bell*,
  456 U.S. 512 (1982) .......................................................................................................... 29

*NFIB v. OSHA*,
  595 U.S. 109 (2022) .......................................................................................................... 42

*N.Y. Tr. Co. v. Eisner*,
  256 U.S. 345 (1921) .......................................................................................................... 29

*Nat'l Truck Equip. Ass'n v. NHTSA*,
  711 F.3d 662 (6th Cir. 2013) ......................................................................................... 43

*Nebraska v. Biden*,
  52 F.4th 1044 (8th Cir. 2022) .......................................................................... 7, 12, 22, 57

*Nebraska v. Biden*,
  636 F. Supp. 3d 991 (E.D. Mo. 2022) ............................................................................. 7

*Nestor v. Hershey*,
  425 F.2d 504 (D.C. Cir. 1969) ....................................................................................... 25

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ..................................................................................... 59

*Ng v. Bd. of Regents of Univ. of Minn.*,
  64 F.4th 992 (8th Cir. 2023) ..................................................................................... 53, 54

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................................. 27, 54

*Novus Franchising, Inc. v. Dawson*,
  725 F.3d 885 (8th Cir. 2013) ......................................................................................... 53

*Oklahoma v. Biden*,
  577 F. Supp. 3d 1245 (W.D. Okla. 2021) ..................................................................... 59

*Oklahoma v. Castro-Huerta,*
 597 U.S. 629 (2022) ................................................................................................28

*O'Neill v. Battisti,*
 472 F.2d 789 (6th Cir. 1972) ...................................................................................25

*Org. for Competitive Markets v. USDA,*
 912 F.3d 455 (8th Cir. 2018) ...................................................................................43

*Owner-Operator Indep. Drivers Ass'n v. Dep't of Transp.,*
 831 F.3d 961 (8th Cir. 2016) ...................................................................................22

*Panhandle Co-op. Ass'n v. EPA,*
 771 F.2d 1149 (8th Cir. 1985) ........................................................................... 45, 52

*Pavek v. Simon,*
 467 F. Supp. 3d 718 (D. Minn. 2020)................................................................ 20, 27

*PDK Lab'ys, Inc. v. DEA,*
 362 F.3d 786 (D.C. Cir. 2004) ......................................................................45, 50, 52

*Pennsylvania v. Kleppe,*
 533 F.2d 668 (D.C. Cir. 1976) .................................................................................17

*Pennsylvania v. New Jersey,*
 426 U.S. 660 (1976) .................................................................................................16

*Perez v. Mortg. Bankers Ass'n,*
 575 U.S. 92 (2015) .......................................................................................44, 46, 50

*Perkins v. Snider,*
 No. Civ. A. 94-4785, 1994 WL 530045 (E.D. Pa. Sept. 2, 1994) ..........................25

*Petry v. Block,*
 737 F.2d 1193 (D.C. Cir. 1984) ...............................................................................51

*Phillips Petroleum Co. v. EPA,*
 803 F.2d 545 (10th Cir. 1986) .................................................................................51

*Phyllis Schlafly Revocable Tr. v. Cori,*
 924 F.3d 1004 (8th Cir. 2019) .................................................................................53

*Porter v. Warner Holding Co.,*
 328 U.S. 395 (1946) .................................................................................................57

*Quince Orchard Valley Citizens Ass'n v. Hodel,*
 872 F.2d 75 (4th Cir. 1989) .....................................................................................54

*Republic of Iraq v. Beaty,*
 556 U.S. 848 (2009) .................................................................................................26

*Rotkiske v. Klemm,*
  589 U.S. 8 (2019) ............................................................................................ 29, 35

*Salient Power Sols., LLC v. Cullari Indus., LLC,*
  No. 1:23-cv-479, 2023 WL 3847307 (D. Colo. June 6, 2023) ........................... 54

*Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.,*
  320 F.3d 1081 (10th Cir. 2003) ........................................................................ 52

*Sampson v. Murray,*
  415 U.S. 61 (1974) ........................................................................................... 57

*Shaffer v. Globe Prot., Inc.,*
  721 F.2d 1121 (7th Cir. 1983) .......................................................................... 54

*Sharp v. Parents in Cmty. Action,*
  172 F.3d 1034 (8th Cir. 1999) .......................................................................... 57

*Sherley v. Sebelius,*
  610 F.3d 69 (D.C. Cir. 2010) ...................................................................... 22, 23

*Shinseki v. Sanders,*
  556 U.S. 396 (2009) ................................................................................... 45, 52

*Simon v. E. Ky. Welfare Rts. Org.,*
  426 U.S. 26 (1976) ..................................................................................... 20, 21

*Sorenson Commc'ns, LLC v. FCC,*
  897 F.3d 214 (D.C. Cir. 2018) ......................................................................... 22

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ........................................................................................... 9

*St. Louis Effort for AIDS v. Huff,*
  782 F.3d 1016 (8th Cir. 2015) .......................................................................... 56

*Steen v. Murray,*
  770 F.3d 698 (8th Cir. 2014) ............................................................................ 26

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ......................................................................................... 10

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ...........................................................................8, 10, 49, 56

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ......................................................................................... 56

*Tumey v. Mycroft AI, Inc.,*
  27 F.4th 657 (8th Cir. 2022) ............................................................................ 27

*Turtle Island Foods, SPC v. Thompson*,
    992 F.3d 694 (8th Cir. 2021) ...................................................................................27

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .............................................................................................56

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
    590 U.S. 604 (2020) .............................................................................................37

*U.S. Navy SEALs 1-26 v. Biden*,
    578 F. Supp. 3d 822 (N.D. Tex. 2022) ..................................................................59

*U.S. Telecom Ass'n v. FCC*,
    295 F.3d 1326 (D.C. Cir. 2002) ...........................................................................23

*United States v. Richardson*,
    418 U.S. 166 (1974) ....................................................................................... 17, 23

*United States v. Texas*,
    599 U.S. 670 (2023) ..............................................................................1, 9, 18, 57

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) .............................................................................................55

*Utah v. Walsh*,
    No. 2:23-cv-016, 2023 WL 2663256 (N.D. Tex. Mar. 28, 2023)............................25

*Va. Uranium v. Warren*,
    139 S. Ct. 1894 (2019)..........................................................................................36

*Voyageurs Nat'l Park Ass'n v. Norton*,
    381 F.3d 759 (8th Cir. 2004) ......................................................................... 42, 44

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) .............................................................................................51

*Warth v. Seldin*,
    422 U.S. 490 (1975) .............................................................................................19

*Weight Watchers Int'l v. Luigino's*,
    423 F.3d 137 (2d Cir. 2005)..................................................................................53

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .............................................................................................40

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................. 27, 52, 54, 55

*Woodke v. Dahm*,
    70 F.3d 983 (8th Cir. 1995) ..................................................................................26

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) ..................................................................................53

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992) .............................................................................................. 7, 18

**Statutes**

5 U.S.C. § 553 ..........................................................................................................50

5 U.S.C. § 705 ....................................................................................................27, 57

5 U.S.C. § 706 ..................................................................................... 42, 45, 47, 50

20 U.S.C. § 1071 ......................................................................................................15

20 U.S.C. § 1077a ...................................................................................................14

20 U.S.C. § 1078-1 ..................................................................................................32

20 U.S.C. § 1078-3 ..................................................................................................14

20 U.S.C. § 1085 ......................................................................................................15

20 U.S.C. § 1087e .............................................................................................*passim*

20 U.S.C. § 1087i .....................................................................................................32

20 U.S.C. § 1087ee ..................................................................................................31

20 U.S.C. § 1089................................................................................................5, 49, 50

20 U.S.C. § 1098bb .......................................................................................6, 40, 42

20 U.S.C. § 1098e ........................................................................................33, 34, 35

26 U.S.C. § 61 ...................................................................................................16, 20

26 U.S.C. § 108 ........................................................................................................16

28 U.S.C. § 1391 .............................................................................................*passim*

28 U.S.C. § 1406 ......................................................................................................27

Mo. Rev. Stat. § 173.360 ..........................................................................................7

Mo. Rev. Stat. § 173.385 ........................................................................................15

Pub. L. No. 89-329, 79 Stat. 1219 (1965) .................................................................3

Pub. L. 110-84, 121 Stat. 784 (2007) .....................................................................34

Pub. L. No. 102-325, 106 Stat. 448 (1992) ...................................................................3

Pub. L. No. 103-66, 107 Stat. 312 (1993)...............................................................3, 34

Pub. L. No. 118-5, 137 Stat. 10 (2023)......................................................................6

**Rules**

Fed. R. Civ. P. 12...................................................................................................27

**Regulations**

34 C.F.R. § 682.101 ...............................................................................................15

34 C.F.R. § 682.200 ...............................................................................................15

34 C.F.R. § 682.202 ...............................................................................................14

34 C.F.R. § 685.208 ...............................................................................................30

34 C.F.R. § 685.209 ...............................................................................................49

34 C.F.R. § 685.219 ...............................................................................................19

34 C.F.R. § 685.220 ...............................................................................................14

34 C.F.R. § 682.406 ...............................................................................................14

59 Fed. Reg. 61,664 (Dec. 1, 1994) ..........................................................3, 4, 30, 41

77 Fed. Reg. 66,088 (Nov. 1, 2012) ..................................................................*passim*

80 Fed. Reg. 67,204 (Oct. 30, 2015) .................................................................*passim*

85 Fed. Reg. 79,856 (Dec. 11, 2020) ..........................................................................6

86 Fed. Reg. 28,299 (May 26, 2021)...........................................................................4

87 Fed. Reg. 61,512 (Oct. 12, 2022) ...........................................................................6

88 Fed. Reg. 1894 (Jan. 11, 2023).............................................................4, 5, 44, 45

88 Fed. Reg. 43,820 (July 10, 2023)................................................................*passim*

89 Fed. Reg. 2489 (Jan. 16, 2024).............................................................................49

Exec. Order 13,563 .................................................................................................51

Exec. Order 12,866 ............................................................................................43, 51

**Other Authorities**

15 Bus. & Com. Litig. Fed. Cts. § 162:39 (5th ed. 2022 update) ............................................................25

17 Moore's Federal Practice - Civil § 110.03 (2023) ............................................................................25

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012) ............................35

Bank of N.D., *Apply for a Student Loan* (May 6, 2024),
    https://perma.cc/CN76-XR3W ..............................................................................................................22

Danielle Douglas-Gabriel, *Biden Administration Begins Punishing Servicers for Student Loan Errors*, Wash.
    Post (Oct. 30, 2023),
    https://perma.cc/722U-7TJ4 ..................................................................................................................11

*Extended*, Merriam-Webster.com Dictionary (May 1, 2024),
    https://perma.cc/T4UD-SPZR ..............................................................................................................36

Press Release, Missouri Attorney General, *Att'y Gen. Bailey Announces Challenge to Biden's Latest Illegal
    Student Loan Plan* (Mar. 28, 2024),
    https://perma.cc/LRH7-SGPC ................................................................................................................7

Press Release, White House, FACT SHEET: President Biden Announces Student Loan Relief for
    Borrowers Who Need It Most (Aug. 24, 2022),
    https://perma.cc/R2ND-6RQJ ..............................................................................................................45

Tax Foundation, *State Individual Income Tax Rates, 2024* (Feb. 20, 2024),
    https://perma.cc/CU4A-5LT2 ..............................................................................................................16

U.S. Dep't of Educ., *Biden-Harris Administration to Shorten Path to Debt Cancellation for Some SAVE
    Borrowers* (Jan. 11, 2024),
    https://perma.cc/M5ND-VFEM ..........................................................................................................49

U.S. Dep't of Educ., *Combined Public Service Loan Forgiveness Form Report* (June 30, 2023),
    https://perma.cc/R87N-PQBX ..............................................................................................................20

U.S. Dep't of Educ., *Update for MOHELA Student Loan Borrowers*, HomeRoom Blog (Apr. 29, 2024),
    https://perma.cc/NTZ6-BVK6 ..............................................................................................................11

Wright & Miller, 14D Federal Practice & Procedure § 3805 (4th ed. 2023 update) ............................26

**INTRODUCTION**

With respect to federal student loans, Congress has long provided, and the Secretary of Education has long exercised, clear statutory authority to create "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). This lawsuit challenges the creation of exactly that sort of plan. That is all the Court needs to know to resolve the merits of most of Plaintiffs' claims.

But the Court should not reach the merits at all, because Plaintiffs have not carried their burden to show Article III standing. Plaintiffs clearly have policy and legal disagreements with the Secretary's approach to student loans, but their standing theories give them no basis to air those grievances in federal court. Their flagship theory relies on conjectural injury to the Higher Education Loan Authority of the State of Missouri (MOHELA), a Missouri-based student-loan servicer, and the Supreme Court's holding in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), that Missouri had standing through MOHELA. But standing in one case does not a perennial free pass on standing create. And Missouri's skeletal claims of injury to MOHELA here are bereft of factual support and ignore significant intervening factual developments that were not before the Supreme Court, which are fatal to this theory, on this record. Ultimately, "Article III standing is not merely a troublesome hurdle to be overcome if possible so as to reach the merits of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787." *United States v. Texas*, 599 U.S. 670, 675 (2023) (quotation omitted). Because Plaintiffs have not carried their burden on that critical threshold issue, their complaint should be dismissed, and their motions for injunctive relief should be denied.

Even if Plaintiffs could show standing, this is an improper venue. Plaintiffs try to establish venue in the Eastern District of Missouri based on the conclusory allegation that "Plaintiff Missouri is a resident of this judicial district." Compl. ¶ 35, ECF No. 1. But under the plain text of the venue statute, Missouri resides "only" in the Western District, where its "principal place of business" is located: Jefferson City. *See* 28 U.S.C. § 1391(c)(2). That defect independently warrants dismissal.

Regardless, even if Plaintiffs could show standing and had filed in a permissible venue, they are not likely to succeed on the merits. Plaintiffs' basic submission is that the relevant provision of the Higher Education Act (HEA) "does not authorize forgiveness" of loans at all, and in fact "expressly *forbids* loan forgiveness." Mem. in Supp. of Pls.' Mots. for a Stay or, in the Alternative, a TRO & Prelim. Inj. at 1, ECF No. 10 (Pls.' Br.). But that interpretation is hard to square with the text of the statute, which authorizes creation of "an income contingent repayment plan" just like this one. 20 U.S.C. § 1087e(d)(1)(D). Plaintiffs thus focus instead on various other statutory provisions, arguing that the statute, more generally, supports a "strong inference" that Congress did not authorize any loan forgiveness in the provision that the agency actually invoked. Pls.' Br. at 33. But those arguments cannot overcome the straightforward statutory text and are meritless on their own terms. Indeed, *every* Secretary since the enactment of this authority has offered plans that allow forgiveness of any remaining balance after a borrower has made payments for "an extended period of time" that does not "exceed 25 years," 20 U.S.C. § 1087e(d)(1)(D). So what Plaintiffs caricature as a "departure from longstanding practice," Pls.' Br. at 32, in fact reflects the consistent position of the Department of Education under Presidents Clinton, Bush, Obama, Trump, and Biden. Ultimately, even if the major-questions doctrine applies, the HEA is sufficiently clear to satisfy it.

Plaintiffs' remaining merits arguments fare no better. They contend the Department "entirely failed to consider" a host of issues, *id.* at 39-41, 43, even though the Rule explicitly addressed them. And the limited scope of arbitrary-and-capricious review under the Administrative Procedure Act (APA) asks only whether the agency's decision was reasoned, not whether Plaintiffs' policy views should trump the Department's. So these, and Plaintiffs' sundry other APA arguments, are doomed to fail. Finally, Plaintiffs quibble with the length of the comment period. But the APA does not specify any required timing, and Supreme Court precedent confirms that this sort of procedural detail is left to the agency's discretion.

This case should be dismissed, and Plaintiffs' motions should be denied.

## BACKGROUND

**A.      The Higher Education Act and Prior Income-Contingent Repayment Plans**

The Higher Education Act was signed into law by President Lyndon B. Johnson in 1965 "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Pub. L. No. 89-329, 79 Stat. 1219 (1965).  In 1992, bipartisan majorities in both Houses of Congress reauthorized and amended the statute, in revisions that were signed into law by President George H.W. Bush.  Pub. L. No. 102-325, 106 Stat. 448 (1992).  A year later, Congress enacted the Student Loan Reform Act as part of the Omnibus Budget Reconciliation Act of 1993, which was signed into law by President Bill Clinton. Pub. L. No. 103-66, 107 Stat. 312 (1993).  Those amendments, for the first time, provided for federal student loans issued directly by the Department of Education, and authorized the creation of income-contingent repayment plans, in language that (after additional reauthorizations and amendments over the years) is now codified at 20 U.S.C. § 1087e.

Under the HEA, the Secretary "shall offer a borrower" five different types of repayment plans from which "[t]he borrower may choose," 20 U.S.C. § 1087e(d)(1), including "a standard repayment plan," *id.* § 1087e(d)(1)(A), "a graduated repayment plan," *id.* § 1087e(d)(1)(B), "an extended repayment plan," *id.* § 1087e(d)(1)(C), "an income contingent repayment plan," *id.* § 1087e(d)(1)(D), and "an income-based repayment plan," *id.* § 1087e(d)(1)(E).  As relevant here, § 1087e(d)(1)(D) provides for:

> an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years, except that the plan described in this subparagraph shall not be available to the borrower of a Federal Direct PLUS loan made on behalf of a dependent student[.]

Before the agency action at issue in this case, the Secretary had used this authority three times: (1) to create the first income-contingent repayment plan in 1994, *see William D. Ford Federal Direct Loan Program*, 59 Fed. Reg. 61,664 (Dec. 1, 1994); (2) to create the PAYE plan in 2012, *see Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 77 Fed. Reg. 66,088 (Nov. 1, 2012); and (3) to create the REPAYE plan in 2015, *see Student Assistance*

3

*General Provisions, Federal Family Education Loan Program, & William D. Ford Federal Direct Loan Program*, 80 Fed. Reg. 67,204 (Oct. 30, 2015).  The parameters varied, but each plan involved determinations by the Secretary about the "amount of income protected from payments, the amount of income above the income protection threshold that goes toward loan payments, and the amount of time borrowers must pay before repayment ends."  *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program*, 88 Fed. Reg. 43,820, 43,827 (July 10, 2023).  And each included significant loan forgiveness at the end of the plan, as long as a borrower had already completed a specified period of time making payments.  *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the ICR plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. at 67,209 ("[T]he REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").

"Congress has made minimal changes to the Department's authority relating to [income-contingent repayment] in the intervening years, even as" the agency "has acted to create and then amend" those prior plans, 88 Fed. Reg. at 43,827.  Congress has never curtailed that authority.

**B.    The SAVE Plan**

Almost three years ago, the Department announced the establishment of negotiated rulemaking committees that would debate changes to student financial-aid programs, including to income-driven repayment (IDR) plans.[1]  *Negotiated Rulemaking Committee; Public Hearings*, 86 Fed. Reg. 28,299, 28,300 (May 26, 2021).  Then, fifteen months ago, the Department published a notice of proposed rulemaking (NPRM) soliciting comments on its intended changes to the IDR regulations.  *Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program*, 88 Fed. Reg. 1894 (Jan. 11, 2023).  Citing the immense (and growing) deleterious effects of student-loan debt on American borrowers, the NPRM took aim at elements of the repayment rules then in effect that

---

[1] Income-Driven Repayment is the "umbrella term" that the agency uses to describe both Income Contingent Repayment (ICR) and Income-Based Repayment (IBR).  88 Fed. Reg. at 43,820.

inhibited borrowers' ability to repay. *Id.* Among the anticipated changes, relevant here were several alterations to the REPAYE plan: an increase in the amount of income exempt from the calculation of monthly payments; a decrease in the share of discretionary income borrowers must pay monthly on their undergraduate loans; a shorter maximum repayment window for borrowers with low original balances (to be followed by discharge of remaining balances at the end of that window); the cessation of accrued interest charges in certain circumstances; and modifications to allow borrowers increased credit toward qualifying for loan forgiveness. *Id.* at 1895 (summarizing these changes).

In July 2023, nine months before this lawsuit was filed, the Department published the Final Rule, which created the "Saving on a Valuable Education" or "SAVE" Plan. 88 Fed. Reg. at 43,820. The Secretary signed the Rule and the Department sent it to the Federal Register for publication on June 14, 2023; it was published on July 10, 2023. *Id.*; Decl. of Levon Schlichter ¶ 3, Ex. 1 (Schlichter Decl.). Following the Department's transmission of the Rule to the Federal Register but before its publication, the Supreme Court issued its decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

The Rule's operative provisions track the broad contours of the NPRM. In particular, the Rule decreases monthly payments for REPAYE (now SAVE) borrowers and limits the repayment window to ten years (from 20 or 25) of qualifying payments for loans with original balances of $12,000 or less.[2] The Rule also addressed a wide range of comments on the NPRM. 88 Fed. Reg. at 43,821-80. Of the 13,621 comments received, none came from Plaintiffs. *See id.* at 43,821.

The HEA requires that proposed regulations be published by November 1 of the year preceding the award year (which begins July 1) those regulations will take effect. 20 U.S.C. § 1089(c)(1). The Rule, published in July 2023, thus provided an additional four months' notice beyond what the statute requires. The HEA also, however, confers on the Secretary discretion to designate certain provisions for early implementation before July 1 of the following year. *Id.* § 1089(c)(2). As announced in the Rule and a series of specific Federal Register notices published months in advance,

---

[2] The Rule provides for forgiveness after one additional year for each additional $1,000 in original loan balance above $12,000, up to the statutory 25-year maximum. 88 Fed. Reg. at 43,903; 20 U.S.C. § 1087e(d)(1)(D). A REPAYE borrower whose original balance was $14,000, for example, would be eligible for forgiveness after 12 years of qualifying payments.

the Secretary has exercised early implementation authority with respect to several provisions of the Rule, including the changed provision governing credit toward loan forgiveness eligibility.  88 Fed. Reg. at 43,820-21.  The result is that repayment plans have been modified and some loan balances have been forgiven under the SAVE Plan as early as February 23, well before this lawsuit was filed.

**C.      Loan Forgiveness and Litigation Under the HEROES Act**

During the COVID-19 pandemic, Congress and the Executive Branch took many steps to alleviate burdens on student-loan borrowers.  On March 20, 2020, the Secretary of Education announced the suspension of interest accrual and repayment obligations on federal student loans. *Federal Student Aid Programs*, 85 Fed. Reg. 79,856, 79,862 (Dec. 11, 2020).  In taking this step, the Secretary relied not on the HEA, but instead on distinct authority under the Higher Education Relief Opportunities for Students Act (HEROES Act) to "waive or modify any . . . provision applicable to the student financial assistance programs" during a "national emergency."  20 U.S.C. § 1098bb(a)(1). In the Coronavirus Aid, Relief, and Economic Security Act, Congress extended both pauses through October 2020.  85 Fed. Reg. at 79,857.  After that action lapsed, the Secretary invoked the HEROES Act on several occasions, ultimately suspending interest accrual and repayment obligations until August 28, 2023.  Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 271, 137 Stat. 10, 33.

To minimize disruption for borrowers who would transition back to repayment after a long period of suspension, the Secretary announced in August 2022 that the Department would provide additional forms of debt relief.  *See Federal Student Aid Programs*, 87 Fed. Reg. 61,512, 61,513 (Oct. 12, 2022).  Specifically, Pell Grant recipients earning less than $125,000 annually (or $250,000 for married couples) were eligible for $20,000 in federal debt cancellation.  *Id.*  For non-Pell Grant recipients satisfying the same income threshold, $10,000 in relief was announced.  *Id.*  Later that year, the Secretary published a notice identifying the waivers and modifications of the statutory and regulatory requirements needed to implement those policies, in accordance with the HEROES Act.  *Id.*

A group of six States challenged that HEROES Act loan relief, including Missouri.  *Nebraska v. Biden*, No. 4:22-cv-1040 (E.D. Mo. filed Sept. 29, 2022).  Missouri asserted standing vicariously through MOHELA, a servicer of federally held student loans, which Missouri argued was injured by

the reduction of fees MOHELA stood otherwise to receive by servicing loans that were to be forgiven. In addition, the *Nebraska* plaintiffs put forward alternative theories of injuries to the States themselves. Four claimed a "direct injury in the form of a loss of specific tax revenues," Pls.' Mem. in Supp. of Mots. for TRO & Prelim. Inj. at 20, *Nebraska v. Biden,* No. 4:22-cv-1040 (E.D. Mo. Sept. 29, 2022), ECF No. 5 (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992)), in that their tax codes defined "income" with reference to the federal definition, which Congress had temporarily altered to exclude student loan debt discharge. *Id.* at 21. The plaintiffs also alleged inchoate injuries to their "sovereign and quasi-sovereign" interests, including to Missouri's "chosen . . . regulatory scheme for accomplishing its constitutional prerogatives" and its "educational system," and to Nebraska's "interest in protecting the well-being of its public employees," through the harms that MOHELA and a Nebraska analogue stood to suffer. *Id.* at 22, 23, 24.

Judge Autrey denied the motion for a preliminary injunction, holding that no State had shown standing. *Nebraska v. Biden*, 636 F. Supp. 3d 991, 1002 (E.D. Mo. 2022). The Eighth Circuit entered an emergency injunction pending appeal. *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022). Two weeks later, the Supreme Court granted certiorari before judgment and set the case for argument. Ultimately, the Court held for the States. *Nebraska*, 143 S. Ct. at 2376. On standing, the Court held that Missouri could claim injury through MOHELA, which had alleged financial harm through the loss of servicing revenues. *Id.* at 2366. And Missouri could claim MOHELA's injury as its own, as MOHELA was a "public instrumentality" of the state. *Id.* (quoting Mo. Rev. Stat. § 173.360). The Court's analysis of the relationship between Missouri and MOHELA went beyond state-law labels into a fact-bound, functional analysis of MOHELA's origins, purpose, structure, and reporting scheme, based on the facts before the Court in that case. *See id.* Finding standing, the Court went on to conclude that the agency's action exceeded the authority in the HEROES Act. *Id.* at 2368-76.

## D.     This Lawsuit

Plaintiffs—the States of Arkansas, Florida, Georgia, Missouri, North Dakota, Ohio, and Oklahoma—announced plans to file this lawsuit "in the coming days" in a press release on March 28, 2024, *see* Press Release, Missouri Attorney General, *Att'y Gen. Bailey Announces Challenge to Biden's Latest*

*Illegal Student Loan Plan* (Mar. 28, 2024), https://perma.cc/LRH7-SGPC, though they did not actually sue for another month, on April 29. Plaintiffs named three Defendants: President Biden in his official capacity, the Department of Education, and Dr. Miguel A. Cardona in his official capacity as Secretary of Education. The complaint includes five counts: Counts I and II allege that the agency exceeded its statutory authority (with the only material distinction being references to the major-questions doctrine in Count I), *see* Compl. ¶¶ 162-204; Count III alleges that the Rule was arbitrary and capricious under the APA, *see id.* ¶¶ 206-50; Count IV alleges that the agency violated the APA by using a 30-day comment period instead of a 60-day comment period, *see id.* ¶¶ 252-62; and Count V alleges that the Secretary's exercise of early implementation authority was arbitrary and capricious, *see id.* ¶¶ 264-72.

## **ARGUMENT**

Plaintiffs clearly believe that the SAVE Plan is both unwise as a policy matter and unlawful as a legal matter. But it is the Secretary of Education, not Plaintiff States, to whom Congress has delegated both the authority and the responsibility to manage the large and growing burdens of federal student-loan debt faced by millions of Americans. Ultimately, Plaintiffs want this Court to supplant both Congress's judgment and the Secretary's about how to address these problems. But not every question of law or policy is to be resolved by the judiciary, and the animating premise of Article III standing doctrine is that the "[f]ederal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423 (2021). This case can and should be resolved on that bedrock principle of federal jurisdiction.

Plaintiffs also selected an improper venue. For purposes of the federal venue statute, the State of Missouri resides only in the Western District of Missouri (where its state capital is located), not the Eastern District, *see* 28 U.S.C. § 1391(c)(2), and Plaintiffs have not plausibly alleged any other basis for venue here, *see id.* § 1391(e)(1). That venue defect independently warrants dismissal of the entire case.

If the Court does get to the merits, it should reach the same conclusion reached by every Secretary of Education since 1993, under Presidents Clinton, Bush, Obama, Trump, and Biden: that Congress meant what it said when it authorized the creation of "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an

extended period of time prescribed by the Secretary, not to exceed 25 years," 20 U.S.C. § 1087e(d)(1)(D)—no more, no less. Because this plan satisfies all criteria listed in the statute, it is lawful—even if Plaintiffs would prefer, for policy reasons, additional restrictions that Congress omitted from the text. As for Plaintiffs' other APA claims, they seek judicial second-guessing of both the agency's detailed explanation for its policy choices and the procedures used during the rulemaking. Those attempts fail on their own terms and are also inconsistent with the APA's deferential standard of review, particularly on questions of policy and agency procedure. The remaining equitable factors for preliminary relief also weigh against this eleventh-hour attempt to halt further implementation of a rule that was published last summer, and that has already been implemented in part.

The case should be dismissed; the motions for injunctive relief should be denied.

## I.     THE CASE SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING.

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff who seeks to show standing "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The party invoking federal jurisdiction bears the burden of establishing these elements," which "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. More than a mere "troublesome hurdle to be overcome" in racing to adjudicate the merits of a case, standing "is 'built on a single basic idea—the idea of separation of powers.'" *Texas*, 599 U.S. at 675 (quotations omitted).

Several additional features of this case raise the bar Plaintiffs must surmount to allege standing. Where a plaintiff seeks to declare Executive Branch action unlawful, an "especially rigorous" standard of review applies. *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)), *cert. denied*, 144 S. Ct. 278 (2023). And "[i]n future injury cases" like this one, "the plaintiff must demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *City of Kennett v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018). Finally, because these Plaintiffs are "not [themselves] the object[s] of the government action or

inaction [they] challenge[], standing is not precluded, but it is . . . 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009) (quoting *Lujan*, 504 U.S. at 562).

A party generally lacks standing to challenge the provision of benefits to a third party. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-46 (2006). And the States do not have any direct or personal stake in the account balances of student-loan borrowers. Although the Supreme Court held that Missouri had standing through MOHELA in the litigation arising out of the Secretary's prior debt relief action, the State has not even attempted to show that the same conclusion is appropriate here, on this record, considering changed factual circumstances. Plaintiffs' remaining theories are legally deficient and speculative, meriting dismissal for lack of standing—just as many challenges to HEROES Act debt relief were dismissed. *See, e.g.*, *Dep't of Educ. v. Brown*, 600 U.S. 551, 568 (2023).

## A. Plaintiff Missouri has not carried its burden to show standing based on an injury to MOHELA.

Plaintiffs would have the Court go no deeper than a surface-level analysis of standing, asserting that because MOHELA had standing in *Nebraska*, it does here too, *ipso facto*. Pls.' Br. at 20-21; *see also* Pls.' Mot. for Scheduling Order at 5, ECF No. 16 ("Because Missouri has MOHELA, there is no standing issue."). To be sure, the Supreme Court in *Nebraska* accepted one fact-specific account of injury to MOHELA. Under the theory accepted in that case, MOHELA services direct loans on the federal government's behalf, receiving a fee for each loan. *Nebraska*, 143 S. Ct. at 2365-66. Because the discharges planned under the prior debt relief program would result in closed accounts, MOHELA stood to lose out on fees it might otherwise earn. *Id.* at 2366. So it had sufficiently alleged "a financial harm [that was] an injury in fact." *Id.* Now, Missouri says, the same theory's inclusion here makes "an open-and-shut case for standing under" *Nebraska*. Pls.' Br. at 21.

Not so. After all, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. On this record, Plaintiffs have not come close to making the necessary showing; specifically, that the SAVE Plan will cause MOHELA (and thus Missouri) an actual and imminent

financial harm.  And there are good reasons to think otherwise, none of which are accounted for by Plaintiffs, and each of which means that financial harm to MOHELA is no more than speculation.

**1.**  To start, significant intervening factual developments, which were not before the Supreme Court in *Nebraska*, have fundamentally changed the landscape for Missouri's theory of injury from reduced loan accounts.  Missouri's basic theory of injury to MOHELA is that it will suffer harm by losing borrowers due to the SAVE Plan, as well as the associated fees it earns for servicing those borrowers.  But just last month, MOHELA affirmatively *requested* that the Department reallocate "at least 1.5 million" of its borrowers to other servicers, justifying its request with an erroneous reading of its contract with the Department.[3]  Letter from MOHELA to Dep't of Educ., Ex. 3 (Apr. 16, 2024); Letter from Dep't of Educ. to MOHELA, Ex. 4, (May 6, 2024); *see* Declaration of James Kvaal ¶ 26, Ex. 2 (Kvaal Decl.); U.S. Dep't of Educ., *Update for MOHELA Student Loan Borrowers*, HomeRoom Blog (Apr. 29, 2024), https://perma.cc/NTZ6-BVK6 ("As part of this ongoing work to improve borrowers' experiences, this week FSA will begin transferring a portion of MOHELA's borrower accounts . . . MOHELA requested these transfers and FSA, as part of its work to ensure borrowers receive the best service and support, agreed to this path.").

To date, MOHELA has discharged approximately 28,000 borrowers' accounts under SAVE, and an estimated further 53,000 have been identified for forgiveness and are being processed.  Kvaal Decl. ¶ 33.  In other words, while Missouri claims in litigation that any reduction in the number of borrower accounts is a legally cognizable injury to MOHELA caused *by* the government, MOHELA itself is simultaneously requesting a massive reduction—equivalent to roughly eighteen-and-a-half times the number of borrowers identified for SAVE-related discharges thus far—in borrower accounts *from* the government.  A party cannot credibly claim to be injured by an event that in fact benefits it.  *See Bueno v. Experian Info. Sols., Inc.*, 664 F. Supp. 3d 800, 806 (N.D. Ill. 2023) ("A windfall isn't an injury.").  And according to MOHELA, it wants far *fewer* borrowers, not more.

---

[3] MOHELA's operational difficulties (including after *Nebraska*) have been well documented in the press.  *See, e.g.*, Danielle Douglas-Gabriel, *Biden Administration Begins Punishing Servicers for Student Loan Errors*, Wash. Post (Oct. 30, 2023), https://perma.cc/722U-7TJ4.

The number of MOHELA's borrowers is largely a proxy, of course, for the ultimate factual question raised by this theory of harm: the SAVE Plan's total effects on MOHELA's revenue. *Nebraska*, 52 F.4th at 1047 (considering MOHELA's "total revenue" in assessing the "financial impact on MOHELA"). Missouri claims that SAVE will decrease administrative fees by closing accounts, putting MOHELA in a worse financial position than before. Pls.' Br. at 21. But to negatively impact MOHELA's bottom line, any loss of administrative fees would have to outweigh, for example, the drop-off in error-related penalties that would presumably follow from a smaller and more manageable portfolio size. *See* Kvaal Decl. ¶ 13 (noting a recent $7.2 million penalty against MOHELA for servicing errors). Exacerbating Missouri's problem of underdeveloped math, MOHELA has in fact already received, and will soon receive additional, financial benefits under SAVE. The Department has paid MOHELA more than $1.6 million in transition costs that MOHELA requested as part of the switch to SAVE. *Id.* ¶ 27. Independently, MOHELA receives reduced payments to service delinquent borrowers (a diminution that increases over the length of the delinquency) and when its borrowers default. *Id.* ¶¶ 10-12. SAVE could reduce these diminished payments, as delinquencies and defaults should drop when the Rule takes effect. *Id.* ¶ 28.

Add to the financial picture the various ways the Department projects SAVE will reduce MOHELA's costs of doing business, beyond just the diminution in fee reductions described above. SAVE will result in more borrowers serviced by MOHELA paying $0 per month, and so their accounts will cost almost nothing to service while MOHELA still gets paid for them. *Id.* ¶ 17. The Rule will also decrease the number of delinquent borrowers, which cost more to service because they require additional outreach. *Id.* ¶ 16. Similarly, MOHELA stands to save on labor costs associated with annual recertification of income for SAVE borrowers and certification of income during periods not on SAVE for new enrollees, as borrowers will have the option under SAVE to enroll in automatic recertification. *Id.* ¶¶ 15, 31. And by decreasing the number of delinquencies and defaults while reducing monthly payments, *id.* ¶ 28; 88 Fed. Reg. at 43,826, SAVE will result in some borrowers' accounts remaining open longer, which will add to MOHELA's servicing earnings. All of these changes will improve MOHELA's finances, not hurt them.

Importantly, none of these critical factual questions are accounted for at all in Plaintiffs' filings. Both individually and collectively, these facts cast significant doubt on Missouri's theory that MOHELA (and thus Missouri) face a "certainly impending" financial injury from the SAVE Plan. *City of Kennett*, 887 F.3d at 431.  In light of that uncertainty, Plaintiffs have not carried their burden to show Article III standing. *Lujan*, 504 U.S. at 561.

**2.**  As a fallback theory of injury to MOHELA (which the Supreme Court did not reach in *Nebraska*), Missouri also contends that SAVE will encourage borrowers with Federal Family Education Loan (FFEL) loans owned by MOHELA to consolidate those loans into direct federal loans, harming MOHELA "in at least four ways."  Pls.' Br. at 21.  Under the first two theories MOHELA will lose income from interest on FFEL loans that it would have otherwise earned. *Id.* at 22.  The third theory relies on the notion that SAVE will reduce the value of FFEL loans, limiting their tradable value. *Id.* And the fourth theory is that MOHELA will have fewer assets to securitize its bond offerings, which support its educational mission. *Id.* at 22-23.  None supports any certainly impending injury.

At the outset, Plaintiffs' fallback theory ties a causation knot they cannot unravel: any harm caused by consolidation is in fact caused by the actions of an independent party, not the SAVE Plan. As such, while standing is not impossible to show in this context, it is "substantially more difficult." *California v. Texas*, 593 U.S. 659, 675 (2021) (quoting *Lujan*, 504 U.S. at 562).  To meet their burden, Plaintiffs must show at least that borrowers "will likely react" to SAVE "in predictable ways."  *Id.* (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)).  They have not done so.

The causes of consolidation are many, making it impossible to determine which stemmed from SAVE and which were caused by other factors.  Previous ICR plans might have encouraged consolidation too, as could have other statutory programs, such as the Public Service Loan Forgiveness Program.  Between December 2021 and December 2023, after all, MOHELA's FFEL portfolio declined by approximately $400 million, approximately 63 percent of which was due to consolidation. Kvaal Decl. ¶ 40.  Any continued consolidation at similar levels, in other words, cannot be said to be "fairly traceable" to the Rule.  *Agred Found. v. Army Corps of Engr's*, 3 F.4th 1069, 1073 (8th Cir. 2021)

13

("For causation to exist, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.").

Even if consolidation did occur by dint of the Rule's existence, it is not at all certain that MOHELA would suffer financial harm from increased consolidation.  In their first two FFEL theories, Plaintiffs argue that MOHELA will lose the interest revenue it would earn from a loan over its lifespan (baked in is a large assumption; namely, that the FFEL borrower will not default).  Pls.' Br. at 22.  To start, owning a FFEL loan does not guarantee payments, because approximately one quarter of MOHELA's FFEL borrowers are on IBR plans under which they have $0 monthly payments.  *See* MOHELA Financial Summary at 1, Ex. 6 (Mar. 31, 2024); MOHELA Investor Presentation at 23, Ex. 7 (Feb. 2024).  When a FFEL loan is consolidated, MOHELA receives payment for the full value of the principal and outstanding interest of the loan that is being paid off.  20 U.S.C. § 1078-3(b)(1)(D); 34 C.F.R. § 685.220(f)(1).  Yes, any interest that the borrower would pay on the debt thereafter goes directly to the federal government, not MOHELA.  But to be injured, Plaintiffs need to show that consolidation will put MOHELA in a worse financial position.  And as before, that proposition is far from certain.  For one, MOHELA is free to reinvest the loan's payoff amount into alternative financial products.  Because FFEL interest rates are set by statute, and in light of the current high interest-rate environment, MOHELA could easily earn more from investment in a higher-yield instrument on the market today.  20 U.S.C. § 1077a(k), (l).

Additionally, MOHELA holds a large proportion of FFEL loans on which it must pay a monthly rebate fee to the federal government that it may not pass on to the borrower.  20 U.S.C. § 1078-3(f); 34 C.F.R. §§ 682.406(a)(12), 682.202.  In fact, such loans account for 54 percent of MOHELA's FFEL holdings.  MOHELA 2023 Annual Filing at 12, Ex. 5 (Dec. 27, 2023).  Consolidation frees MOHELA of that liability, as evidenced by the servicer's $1.2 million reduction in rebate fees experienced during Fiscal Year 2023.  Kvaal Decl. ¶ 39.  Further complicating the picture is that MOHELA itself could, in the end, become the servicer of consolidated loans on the government's behalf, earning additional administrative fees.

As Plaintiffs' first two FFEL theories paint only a theoretical picture of harm, their third and fourth fail by extension.  The third theory alleges financial harm in the form of decreased tradable value for the FFEL loans MOHELA owns.  Pls.' Br. at 22.  A decrease in tradable value necessarily depends on consolidation being financially inferior to holding a FFEL loan; as explained above, that proposition is hypothetical at best.  But the tradable-value theory adds speculation on top of speculation, averring that the harm from consolidation will directly affect market value at some unknown point in the future, under unknowable economic conditions.  Put otherwise, any resulting financial injury is only speculative until the moment MOHELA actually sells, or will imminently sell, those loans at a lower value than it could have.[4]  The Constitution demands more than such a chain of "ifs" to enter federal court.  *Missouri*, 52 F.4th at 369.  So too for the fourth theory, which also assumes the financial collapse of MOHELA's FFEL portfolio and from there foretells a future impairment in its ability to issue bonds.  Pls.' Br. at 22-23.  As discussed, Missouri has not shown that harm to MOHELA's FFEL portfolio will come to pass.  Besides, Plaintiffs omit the state statutory language immediately following what they cite (*id.* at 22):  MOHELA may issue bonds backed by "student loan notes or financing of student loans, or both, and *investment income*."  Mo. Rev. Stat. § 173.385(1)(6) (emphasis added).  Missouri has offered no reason to think MOHELA's reinvestment of FFEL consolidation proceeds will not enable it to continue issuing bonds.

At best, it is therefore unclear what MOHELA's eventual financial position will be after the SAVE Plan is implemented.  But to bring a federal suit on the standing theories they have offered, Missouri must be able to whack through a thicket of independent causes and possibilities and come out on the other side with a clearly impending, concrete injury.  *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023).  It has not carried that burden.

---

[4] Further lowering the likelihood of a potential sale, the universe of eligible buyers is limited by law, and has shrunk considerably since the FFEL lending program ceased to generate new loans in 2010.  20 U.S.C. § 1071(d) (ending the issuance of new FFEL loans); *id.* § 1085(d) (defining "eligible lender" for FFEL purposes); 34 C.F.R. § 682.101 (restricting FFEL participation); *id.* § 682.200 (further defining "eligible lender").

### B.   Plaintiffs' tax-revenue theory is foreclosed by Supreme Court precedent.

Some of the Plaintiff States also assert that the Rule will diminish their tax revenues.  *See* Compl. ¶¶ 150-55; Pls.' Br. at 28-29.[5]  They contend that some student loans that might have been discharged in the future will instead be discharged under the SAVE plan.  *See id.*  That hypothesized shift in timing matters, they say, because the Internal Revenue Code normally treats "discharge of indebtedness" as a form of "gross income," 26 U.S.C. § 61(a)(11), but a temporary provision excludes discharges of student loans from 2021 to 2025, *see* 26 U.S.C. § 108(f)(5).  *See* Pls.' Br. at 28-29.  These States argue that, because they have chosen to incorporate the Internal Revenue Code's definition of "gross income" into their own state tax codes, a change in the timing of discharges will diminish their revenues.  *Id.*  That roundabout standing theory is incorrect for multiple independent reasons.

First, these States' alleged harm results from their own choices to tie their tax laws to the Internal Revenue Code.  The Supreme Court's decision in *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam), squarely forecloses a State's effort to claim standing on such a self-generated basis.  There, Pennsylvania sought to show standing to challenge a New Jersey tax by arguing that, because Pennsylvania provided a credit for taxes paid to other States, a tax increase in New Jersey would lead to a loss of tax revenue in Pennsylvania.  *Id.* at 664-65.  The Supreme Court rejected that theory, explaining that nothing required Pennsylvania to extend the credit, that any harm to Pennsylvania was thus "self-inflicted," and that "[n]o State can be heard to complain about damage inflicted by its own hand."  *Id.* at 664; *see also FEC v. Cruz*, 596 U.S. 289, 297 (2022) (summarizing *Pennsylvania*).

Any reduction in the States' tax revenues here is self-inflicted in the same way.  States need not use the same definition of gross income as the federal government does, and in fact they routinely exercise their independence in this area by defining income in a variety of different ways.  Plaintiff Florida, for example, chooses not to tax personal income at all.  *See* Tax Foundation, *State Individual Income Tax Rates, 2024* (Feb. 20, 2024), https://perma.cc/CU4A-5LT2.  All other States are likewise free to depart from the Internal Revenue Code's approach and to treat student-loan discharges from

---

[5] Missouri is the only Plaintiff that explicitly relies on this theory in the complaint, *see* ¶¶ 150-55, but Georgia, North Dakota, Ohio, and Oklahoma also try to do so in Plaintiffs' brief, *see* Pls.' Br. at 28.  Nothing turns on this discrepancy because the theory is meritless.

2021 to 2025 as taxable state income.  If they choose not to, any resulting reduction in their tax revenues is fairly traceable not to the Secretary's plan, but instead, as in *Pennsylvania*, to "decisions by their respective state legislatures" about how to structure their own tax laws.  426 U.S. at 664; *see also Garrison v. Dep't of Educ.*, 636 F. Supp. 3d 935, 937 (S.D. Ind. 2022) (no standing to challenge debt relief based on "an increased state tax burden" because "the Federal Government's student loan relief program did not injure" plaintiffs, rather, "[t]he State's legislative decision did").

Second, even apart from the self-inflicted nature of the States' asserted harm, the Supreme Court's decision in *Florida v. Mellon*, 273 U.S. 12 (1927), establishes that a federal policy's incidental effects on state tax revenues are not judicially cognizable injuries.  There, Florida sought to establish standing to challenge a federal inheritance tax by arguing that the tax would prompt the "withdrawal of property" from the State, diminishing its tax base.  *Id.* at 18.  The Supreme Court rejected that argument, explaining that Florida was required to show a "direct injury" and that any harm caused by the federal tax was, "at most, only remote and indirect."  *Id.* (emphasis omitted).  That analysis equally applies here: Just as Florida could not establish standing by claiming that state tax revenues would decline because of a federal policy, the States here cannot do so either.

Plaintiffs' contrary view has dramatic implications.  Virtually all federal actions—from prosecuting crime to imposing taxes to managing property—have some incidental effects on state finances.  If such incidental effects suffice for standing, every State would have standing to challenge almost any federal policy.  That would flout Article III's case-or-controversy requirement and convert the federal courts into "an open forum for the resolution of political or ideological disputes."  *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring); *see Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he unavoidable economic repercussions of virtually all federal policies . . . suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing.").  The Supreme Court has repeatedly acknowledged

those sorts of concerns in rebuffing broad theories of Article III standing, including in other recent litigation between States and the United States. *Cf., e.g.*, *Texas*, 599 U.S. at 670.[6]

Third, the States' theory of reduced tax revenues is speculative. "Standing is not 'an ingenious academic exercise in the conceivable'"; rather, a plaintiff must show that its asserted injury is "certainly impending." *Lujan*, 504 U.S. at 564 n.2, 566 (citations omitted); *Clapper*, 568 U.S. at 409. Plaintiffs' hypothesized loss of tax revenues starting in 2026 is neither certain nor impending. Instead, it depends on the assumption that if borrowers did not receive discharges under the plan, they would receive discharges for other reasons; that those discharges would not occur until 2026 or later; and that neither state nor federal law would change in the meantime. *See* Compl. ¶¶ 150-55. The States' theory thus depends on a "speculative chain of possibilities," which cannot suffice. *Clapper*, 568 U.S. at 410.

The only authority Plaintiffs cite in support of their tax-revenue theory, *Wyoming v. Oklahoma*, 502 U.S. at 448, 454, is not to the contrary. In *Wyoming*, there was "unrebutted evidence" of a loss of "hundreds of thousands of dollars in severance taxes" as a direct result of the challenged Oklahoma law, which had been adopted with the avowed purpose of reducing purchases of coal from Wyoming. *Id.* at 443. Wyoming thus had standing to invoke the Supreme Court's original jurisdiction and challenge the Oklahoma laws under the Commerce Clause because it had suffered "a direct injury in the form of a loss of specific [coal] tax revenues." *Id.* at 448. This is not a suit by one State against another in the forum the Constitution provides for such disputes. Nor do the States claim that the Secretary targeted or discriminated against them. They allege, at most, that the SAVE Plan will have incidental effects on their general tax revenues. That is not enough. *See Florida*, 273 U.S. at 18.

## C.    Plaintiffs' recruiting theory is speculative and unsupported.

Plaintiffs next point to a purported competitive disadvantage in "recruiting, hiring, and retention" of state and local employees that they predict will result from the Rule. Pls.' Br. at 28. The

---

[6] To that end, Plaintiffs' complaint (but not their preliminary-injunction motion) contains unexplained references to their "sovereign" and "quasi-sovereign" interests. Compl. ¶¶ 15-27. To the extent that Plaintiffs mean to invoke some sort of *parens patriae* theory, it is settled that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (citation omitted).

existence of the Public Service Loan Forgiveness (PSLF) program, the theory goes, incentivizes graduates burdened by student-loan debt to accept state and local public-service jobs that they could otherwise not afford to take. And the Rule, Plaintiffs say, will eliminate "the comparative advantages" of those jobs by reducing monthly payments and forgiving loans for borrowers in public and private sector jobs alike. *Id.* Accepting this theory requires crediting two assumptions: (1) that the Rule makes the PSLF program less attractive, and (2) that public-sector recruitment will actually suffer as a result.[7]

Both links in this causal chain are riddled with exactly the sort of logical inconsistency and speculation on which Article III does not permit a federal case to rest. *Clapper*, 568 U.S. at 409. Moreover, the second standing element, traceability, requires "a causal connection between the injury and the conduct complained of." *Muff v. Wells Fargo Bank*, 71 F.4th 1094, 1100 (8th Cir. 2023) (quotation omitted). If the causal chain alleged runs through an independent third party, the burden of demonstrating standing rises: "[T]he indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights. But it may make it substantially more difficult to . . . establish that, in fact, the asserted injury was the consequence of the defendants' actions[.]" *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975) (internal citation omitted). Plaintiffs' "speculative inferences" do not surmount that bar here.

Start with the notion that the Rule inhibits the attractiveness of the PSLF program. Under PSLF, a borrower is eligible for forgiveness of direct loan balances of any amount after she has made the equivalent of 120 qualifying monthly payments under a qualifying plan while working full-time for an eligible employer in public service. 20 U.S.C. § 1087e(m); 34 C.F.R. § 685.219(c), (d). In contrast, borrowers enrolled in the SAVE Plan will receive forgiveness of direct loan balances after ten years of regular monthly payments so long as the total original principal balance of the loan did not exceed

---

[7] As the source of Plaintiffs' purported recruiting harm, the preliminary-injunction motion cites only the Rule's (1) reduction of many borrowers' monthly payments via an increase in the ICR discretionary income percentage, and (2) forgiveness of eligible borrowers' loans after ten years. Pls.' Br. at 25; *see* 88 Fed. Reg. at 43,828, 43,903. As discussed elsewhere in this brief, however, the Rule enacts myriad regulatory changes apart from the discretionary-income and loan-forgiveness provisions. Following Plaintiffs' framing, the government responds here only to the notion that those two provisions have harmed Plaintiffs.

$12,000.  26 U.S.C. § 61(a)(11); 88 Fed. Reg. at 43,903.  For direct loans with original balances exceeding $12,000, the required years of regular monthly payments increases with each additional $1,000 of original principal balance.  *Id.*  In other words, the PSLF program will often allow for forgiveness of (1) a greater loan balance (2) after a shorter period of time (3) on a broader range of repayment plans.  That means the PSLF program retains significant benefits for public-service employment beyond what the SAVE Plan makes available.[8]  *See* 88 Fed. Reg. at 43,834, 43,880.  So it is not only speculative, but counterintuitive, to assume that the Rule will materially diminish the PSLF program's appeal.  *Lujan*, 504 U.S. at 560-61.[9]

What about the rest of the Rule?  There are good reasons to think that it incentivizes *more* public-sector work, not less.  As detailed above, a borrower intending to avail herself of the PSLF

---

[8] In fact, as of June 2023, the average balance of a borrower seeking PSLF was approximately $88,000—more than seven times the SAVE Plan's forgiveness threshold.  U.S. Dep't of Educ., *Combined Public Service Loan Forgiveness Form Report* (June 30, 2023), https://perma.cc/R87N-PQBX.

[9] This theory is even more meritless when considered in the context of Plaintiffs' motions for injunctive relief.  After all, standing to obtain a preliminary injunction requires more than conceivable allegations in the complaint alone.  *See Pavek v. Simon*, 467 F. Supp. 3d 718, 738 (D. Minn. 2020).

PSLF's *actual* utility in recruiting, intuitive or not, is supported only by anecdotal evidence in this record—all of which comes from the offices of Plaintiffs' counsel.  Plaintiffs attach a declaration from an attorney in the Missouri Attorney General's office who called PSLF "critical" to his decision to remain in that role, even while acknowledging that it was "not the primary factor."  Lewis Decl. ¶ 16, ECF No. 1-4.  The attorney went on to muse that if a plan like SAVE were available to him at any point before now, it would have been "less likely" that he would have remained.  *Id.* ¶ 17.  Even so, he notes that approximately two years of payments stand between him and PSLF forgiveness.  *Id.* ¶ 19.  The SAVE Plan, of course, takes effect before he will be eligible for PSLF.  But, perhaps tellingly, the attorney gives no indication he is contemplating leaving.  As additional support, Plaintiffs include a declaration from another attorney in the same office, who states that candidates have inquired about PSLF availability, that some current employees' decisions to work in her office were "informed" by PSLF, and that some employees have left the office after obtaining forgiveness under the PSLF program.  Houser Decl. ¶¶ 5, 6, 8, ECF No. 1-6.

Taken alongside a third declaration with even less detail, *see* Calhoun Decl., ECF No. 1-5, Plaintiffs' evidence serves at most to confirm a generic intuition:  PSLF can be a helpful recruiting tool.  What it does not answer is whether the Final Rule will actually affect that recruiting—a notable omission, in light of the harms Plaintiffs expected to have suffered under early implementation.  As a result, one is left with only speculative and anecdotal connections among SAVE, PSLF, and hiring in two of the seven Plaintiff States.  *Clapper*, 568 U.S. at 409; *Cato Inst. v. Cardona*, No. 1:23-cv-11906, --- F. Supp. 3d ----, 2023 WL 5232910, at *7 (E.D. Mich. Aug. 14, 2023) ("Plaintiffs' presidents' own declarations do not suggest that any employee was *actually impacted* by the [challenged action].  Their declarations merely assert that Plaintiffs plan to recruit PSLF participants in the future, some of whom may be impacted by the Adjustment.  This is far too speculative for standing." (citations omitted)).

program may enroll in SAVE, thereby obtaining discharge of certain loan balances on a faster timetable.  In addition, that borrower will benefit from lower monthly payments and limited interest accrual under SAVE, smoothing the road to PSLF forgiveness.  88 Fed. Reg. at 43,888 ("[T]he SAVE plan will produce lower monthly payments than those other plans for most borrowers[.]"); *id.* at 43,952 ("[A]ddressing the accrual of unpaid interest on a monthly basis will provide significant benefits to borrowers by ensuring they don't see their balances grow while they make required payments.").

More fundamentally, Plaintiffs' entire theory of standing based on PSLF is premised on the idea that student-loan debt makes public-sector employment less attractive than higher-paid private-sector work, if not downright infeasible.  Lewis Decl. ¶¶ 9, 12.  It stands to reason, then, that additional relief from such burdens—whether labeled "PSLF," the "SAVE Plan," or something else entirely—would make it *easier* for a borrower to pursue lower-paying jobs in the public sector.  Plaintiffs do not explain or account for this logical inconsistency in their own theory, even though it was discussed at length in the Rule itself.  *See* 88 Fed. Reg. at 43,884.  Ultimately, the relief they request might *exacerbate* any recruiting problems related to student debt, which is fatal to their reliance on this theory to establish Article III standing—as a matter of injury, causation, *and* redressability.

At day's end, many factors affect a job candidate's choice of where to work, and an employee's choice of whether to stay in or leave a job.  To be viable, Plaintiffs' theory of recruitment harm would need to simplify this multivariate equation through plausible allegations—and to obtain a preliminary injunction, a clear evidentiary showing—that any drop in recruitment can reasonably be attributed to the Rule, rather than unsupported speculation about "the independent action of some third party not before the court."  *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976).  They have not done so.

### D.    Plaintiff North Dakota's banking-business theory fails.

Training their fire on the SAVE Plan's provision of early loan discharge from a different angle, Plaintiffs assert that North Dakota has standing through a state-owned bank, the Bank of North Dakota.  Pls.' Br. at 23-25.  Their theory is that the Bank and the federal government compete for student loan borrowers, but the SAVE Plan gives the federal government a competitive advantage vis-

à-vis the Bank by making borrowing from the federal government more attractive than borrowing from the Bank. The Court should reject this flawed theory on grounds both legal and factual.

As a threshold matter, Plaintiffs barely address whether the Bank is an instrumentality of the State in the relevant sense. But in *Nebraska*, the Supreme Court deemed MOHELA an instrumentality of Missouri only after interpreting a state statute explicitly saying as much (and that MOHELA performed "essential public function[s]"); describing the supervision and control, including removal of officers, of MOHELA; analyzing where ultimate responsibility for the servicer lay; and considering the ultimate effect of the program at issue on the functions the State created MOHELA to advance. 143 S. Ct. at 2366. The *Nebraska* dissent, for its part, emphasized facts that would suggest instrumentality status was lacking. *Id.* at 2387-88 (Kagan, J., dissenting). In other words, the instrumentality inquiry is inescapably fact intensive. *See also Nebraska*, 52 F.4th at 1046 (considering similar factors, in addition to MOHELA's funding by the state legislature and MOHELA's financial contributions to the Missouri treasury).

Plaintiffs have not carried their burden on this issue. Rather, they cite only the statutes establishing the bank, providing for student loans, and prescribing the use of student-loan interest payments. Pls.' Br. at 23-24. As for the other factors the Supreme Court and the Eighth Circuit previously found relevant—control, supervision, accountability—Plaintiffs say nothing. That is fatal.

Compounding their problem, Plaintiffs invoke a line of case law with no apparent applicability here. In some circuits, a plaintiff may show standing by alleging that agency action "'lift[s] regulatory restrictions on [its] competitors or otherwise allow increased competition' against [it]." *Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 226 (D.C. Cir. 2018) (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)); *see also Owner-Operator Indep. Drivers Ass'n v. Dep't of Transp.*, 831 F.3d 961, 967 (8th Cir. 2016). Here, though, Plaintiffs have not cited any example of a court extending the competitor-standing doctrine to a case where the alleged competitor is the government itself. Pls.' Br. at 24 (citing only a D.C. Circuit opinion with no government competitor). And indeed, this lawsuit appears to be the first time even the Bank has considered itself a competitor with the federal government in the business of making student loans. Bank of N.D., *Apply for a Student Loan* (May 6, 2024),

https://perma.cc/CN76-XR3W ("After savings, grants and scholarships, BND recommends you take federal Direct Subsidized and/or Unsubsidized Student Loans before any others.").

There is good reason to doubt whether such an extension would be appropriate. The federal government takes countless regulatory steps that might affect public demand (and therefore price) for a given good or service on offer from private companies, like its own procurement decisions. To find standing wherever a commercial entity was aggrieved by such a choice would convert courts into "open forum[s] for the resolution of political or ideological disputes," *Richardson*, 418 U.S. at 192 (Powell, J., concurring), a result the Supreme Court has fastidiously rejected.

Consistent with that notion, courts have applied the competitor-standing doctrine only in the context of competition between two non-governmental actors. *Sherley*, 610 F.3d at 72, 74 (a party competing for a government grant had standing to challenge agency action that "benefit[ted] his rival" and "intensified the competition for a share in a fixed amount of money"); *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 366 (D.C. Cir. 1998) (allowing a "competitor and customer" of an energy company to challenge agency approval of the company's application "to sell . . . energy at market-based rates"); *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (finding that a party had standing to challenge an agency order permitting its competitor to "offer lower prices for the same telecommunications services"). This factual setting is materially dissimilar, given the absence of any non-governmental competitor.

In any event, looking beyond these legal problems with Plaintiffs' theory, it is also shot through with factual uncertainties that make any claim of actual or imminent injury far too speculative. *See Sherley*, 610 F.3d at 73 ("[T]he basic requirement common to all [competitor standing] cases" is that the allegedly unlawful competitive benefit must be shown to result in "an actual or imminent increase in competition."); *see also El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995) ("The nub of the 'competit[or] standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause [a plaintiff] to lose business, there is no need to wait for injury from specific transactions to claim standing."). Much like the recruitment theory discussed

23

above, this argument would reduce the many questions a student-loan borrower asks herself before choosing a lender into a single one: is the loan potentially eligible for forgiveness after ten years?

But a borrower's choice of lender is not so simple. As Plaintiffs themselves identify, a borrower from the Bank will enjoy certain benefits from that lending relationship that are unavailable to federal direct loan borrowers, like lower interest rates and "the convenience of direct relationships with in-state universities and colleges." Pls.' Br. at 24. Hypothesizing that these benefits will be outweighed by the prospect of loan discharge after ten years, Plaintiffs point simply to the Department's projection that an average borrower with only undergraduate debt will repay $6,121 for every $10,000 borrowed. *Id.* at 24. Far more is required to conclude that the SAVE Plan will move the needle for borrowers in one direction or another, and thus that North Dakota has shown standing through one bank. *Air Excursions, LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023) ("[T]he competitor standing doctrine supplies the link between increased competition and tangible injury but does not, by itself, supply the link between the challenged conduct and increased competition.").

\*     \*     \*

In sum, Plaintiffs' theories of standing reveal themselves to be nothing more than hypothetical claims of harm that could come to pass if various other events also occur, *see* Pls.' Br. at 20-23 (MOHELA), 23-25 (Bank of North Dakota), 25-28 (PSLF); or else injuries that Plaintiffs will suffer, if at all, at their own hands, *see id.* at 28-29 (state tax revenues). But Article III does not permit federal litigation built on speculation or self-inflicted harm. For these reasons, this suit must be dismissed.

## II.   THE CASE SHOULD BE DISMISSED FOR IMPROPER VENUE.

In cases brought against federal officials or a federal agency, venue is proper only in a "judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). None of these options applies here, so the suit should be dismissed for improper venue.

Plaintiffs' primary venue theory is that, under 28 U.S.C. § 1391(e)(1)(C), "Plaintiff Missouri is a resident of this judicial district." Compl. ¶ 35. But that conclusory allegation ignores the text of

24

the federal venue statute, which provides that "[f]or all venue purposes . . . an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside . . . if a plaintiff, only in the judicial district in which it maintains its principal place of business." 28 U.S.C. § 1391(c)(2).

The State of Missouri maintains its principal place of business where it performs its official duties—that is, in its capital, Jefferson City, located in the Western District. *See, e.g.*, *Leonhart v. McCormick*, 395 F. Supp. 1073, 1078 (W.D. Pa. 1975) (explaining "all defendants are state officers of statewide jurisdiction whose official residence is the state capitol at Harrisburg in the Middle District of Pennsylvania"); *cf.* 15 Bus. & Com. Litig. Fed. Cts. § 162:39 (5th ed. 2022 update) ("As a general rule, state officials sued in their official capacities will be deemed to reside where they conduct their official duties. State officials with 'statewide jurisdiction' may be deemed to reside in the state capitol."); *Perkins v. Snider*, No. Civ. A. 94-4785, 1994 WL 530045, at *1 (E.D. Pa. Sept. 2, 1994) (similar); *O'Neill v. Battisti*, 472 F.2d 789, 791 (6th Cir. 1972) ("The official residence of the Supreme Court of Ohio is in the place where it performs its official duties, that is, Columbus, the State Capital and the seat of State Government."); *Nestor v. Hershey*, 425 F.2d 504, 521 n.22 (D.C. Cir. 1969) ("Where a public official is a party to an action in his official capacity he resides in the judicial district where he maintains his official residence, that is where he performs his official duties."); *Birnbaum v. Blum*, 546 F. Supp. 1363, 1366 (S.D.N.Y. 1982) (same); 17 Moore's Federal Practice - Civil § 110.03 (2023) (same).

Plaintiffs seem to assume that a State resides for venue purposes in any location within its borders. Although some cases support this view, *see, e.g.*, *Utah v. Walsh*, No. 2:23-cv-016, 2023 WL 2663256, at *3 (N.D. Tex. Mar. 28, 2023), it is, respectfully, irreconcilable with the text and structure of the federal venue statute. Congress defined "residency . . . [f]or all venue purposes" only for the following litigants:

- "[N]atural person[s]," 28 U.S.C. § 1391(c)(1);
- "[E]ntit[ies] with the capacity to sue and be sued in [their] common name under applicable law, whether or not incorporated," *id.* § 1391(c)(2);
- Defendants "not resident in the United States," *id.* § 1391(c)(3); and

25

- "[C]orporations in States with multiple districts," *id.* § 1391(d).

Congress could have created a fifth category for States.  It did not.  Accordingly, because State sovereigns are not specifically enumerated—and being neither natural persons, non-residents of the United States, nor corporations—they fall into the residual category under § 1391(c)(2) for "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated."  *See id.* § 1391(c)(2); *see also Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009) ("[T]he whole value of a generally phrased residual clause . . . is that it serves as a catchall for matters not specifically contemplated—known unknowns[.]").  Such an entity, "if a plaintiff," resides "only in the judicial district in which it maintains its principal place of business."  28 U.S.C. § 1391(c)(2).

Here, that judicial district is the Western District of Missouri, which includes Jefferson City. And, because an entity plaintiff can reside in only one district at a time—the statute explicitly provides that an entity plaintiff resides "*only* in *the* judicial district in which it maintains its principal place of business"—Missouri cannot assert dual residency outside the Western District.  *See id.* § 1391(c)(2) (emphases added); *see also* Wright & Miller, 14D Federal Practice & Procedure § 3805 (4th ed. 2023 update) ("[R]eference to 'the' and the singular 'its principal place of business' compels the conclusion that an entity plaintiff (unlike an entity defendant) can reside in only one district at a time.").

Finally, Plaintiffs also allege, in equally conclusory fashion, that "a substantial part of the events or omissions giving rise to the Complaint occur within this district."  Compl. ¶ 35.  But the complaint does not identify any such event or omission—it instead describes allegedly unlawful actions taken by Defendants in the District of Columbia.  *See id.* ¶¶ 37-111.  And allegations of injuries felt by Missouri in the Eastern District of Missouri do not help.  That is because, under "controlling Eighth Circuit authority," the Court must focus on the "relevant activities of the defendant in the forum state, not on the effect of those activities on the plaintiff in the forum state."  *Steen v. Murray*, 770 F.3d 698, 703 (8th Cir. 2014) (citing *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995)).

For these reasons, even if Plaintiffs had adequately alleged Article III standing, this suit should still be dismissed for improper venue under Federal Rule of Civil Procedure 12(b)(3).  In the

alternative, the case could be transferred to another district in which it "could have been brought," 28 U.S.C. § 1406(a), such as the District of Columbia or the Western District of Missouri.

## III.    PLAINTIFFS' MOTIONS FOR INJUNCTIVE RELIEF SHOULD BE DENIED.

Because Plaintiffs have not carried their burden to plead either standing or venue, this suit can and should be dismissed in its entirety.  *See* Fed. R. Civ. P. 12(b)(1), (b)(3), (h)(3).  Plaintiffs' motions for a temporary restraining order and a preliminary injunction should then be denied as moot.  But even if the Court separately considers Plaintiffs' motions, they are meritless.

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and may only issue when the movant carries its burden of persuasion "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  The movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  Where, as here, the federal government is the defendant, the third and fourth factors merge into a consideration of the public interest.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "[T]he burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021).[10]

Plaintiffs are not likely to succeed on the merits of any of their claims.  That is not only because they are meritless (for the reasons below), but also because of their standing problems (for the reasons above).  Indeed, the burden to show standing to obtain a preliminary injunction is higher than it is to survive a motion to dismiss.  *See, e.g.*, *Pavek*, 467 F. Supp. 3d at 738; *see supra* at 20 n.9.  Plaintiffs also fail to show irreparable harm that would justify this "extraordinary remedy." *Winter*,

---

[10] Plaintiffs also move for a "stay" under 5 U.S.C. § 705, which permits a court to "postpone the effective date of an agency action" "to the extent necessary to prevent irreparable injury." Pls.' Br. at 17-18.  But they concede that the traditional four-factor preliminary-injunction test governs relief under that statute.  *Id.* at 18 (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981); *see also B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 905 (N.D. Iowa 2008).  Likewise, the standards governing the issuance of a temporary restraining order are the same as those that govern a preliminary-injunction motion. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022).

555 U.S. at 24, and the public interest weighs strongly against an injunction—particularly the sweeping nationwide relief that Plaintiffs request here, at the eleventh hour.  Their motions should be denied.

> **A.**     **Plaintiffs are unlikely to succeed on the merits of their statutory-authority claims.**

Relying heavily on *Nebraska*, Plaintiffs argue that "the statute forecloses the actions taken by the Final Rule."  Pls.' Br. at 32.  But *Nebraska* was a statutory-interpretation case about a different statute, and the Supreme Court has never "opine[d] on the substantive lawfulness of any action the Department might take under the HEA." *Brown*, 600 U.S. at 565 n.2.  Applying the traditional tools of statutory construction—most importantly, by reading the statute's plain text—the Rule fits comfortably within Congress's grant of authority to the Secretary in the HEA.  And to the extent necessary under the major-questions doctrine, that statutory authorization is "clear"—which is why the Department of Education has consistently interpreted it that way in enacting similar (albeit smaller) programs, for the past three decades, across five Presidential Administrations.

> **1.**     *The Final Rule is authorized by the Higher Education Act.*

Statutory interpretation starts, as always, "with the text of the statute." *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023).  After all, "[t]he Court may not replace the actual text with speculation as to Congress' intent.  Rather, the Court [should] presume more modestly that the legislature says what it means and means what it says." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (internal citations and quotations omitted).

**a.**  The HEA's text explicitly calls for the creation of "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D).  The authority to set the "repayment schedules" for such a plan is delegated to the Secretary: "Income contingent repayment schedules shall be established by regulations promulgated by the Secretary and shall require payments that vary in relation to the appropriate portion of the annual income of the borrower (and the borrower's spouse, if applicable) as determined by the Secretary." *Id.* § 1087e(e)(4). Congress also directed the Secretary to "establish procedures for determining the borrower's

28

repayment obligation on that loan for such year, and such other procedures as are necessary to implement effectively income contingent repayment." *Id.* § 1087e(e)(1).

The Rule is an exercise of this clear statutory authority. It sets "[i]ncome contingent repayment schedules" for federal student loans. *Id.* § 1087e(e)(4). It does so via "regulations promulgated by the Secretary." *Id.* Those regulations "require payments that vary in relation to the appropriate portion of the annual income of the borrower . . . as determined by the Secretary." *Id.* Those "varying annual repayment amounts" are "paid over an extended period of time prescribed by the Secretary." *Id.* § 1087e(d)(1)(D). That "extended period of time" does not "exceed 25 years." *Id.* And "the borrower's repayment obligation on that loan for such year" is "determin[ed]" by "procedures" created by the Secretary. *Id.* § 1087e(e)(1). No more was required, under the plain text of the statute.

**b.** Where, as here, "the words of a statute are unambiguous, th[e] first step of the interpretive inquiry is" also the "last." *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). Nevertheless, "[i]n understanding this statutory text, 'a page of history is worth a volume of logic.'" *See Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (quoting *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921))—and here, the relevant history further supports Defendants' interpretation of the plain text. Since this statutory authority was first enacted in 1993, the agency has consistently created "income contingent repayment plan[s]" structured like this one—that is, by setting "annual repayment amounts based on the income of the borrower," determining the "extended period of time for repayment," and then, at the end of that period (which is "not to exceed 25 years") forgiving the balance that remains. 20 U.S.C. § 1087e(d)(1)(D), (e)(7); *see supra* at 3-4 (discussing previous income-driven repayment plans). Congress has been fully on notice of this consistent and well-established practice. But despite making other adjustments to these programs over the years, Congress has never limited the agency's consistent approach.[11] *See, e.g.*, *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) ("Where an agency's statutory construction has been fully brought to the attention of the public

---

[11] "The only time Congress acted to constrain or adjust the Department's authority relating to [income-contingent repayment plans] was in 2007 legislation when it provided more specificity over the periods that can be counted toward the maximum repayment period. Even then, it did not adjust language related to how much borrowers would pay each month." 88 Fed. Reg. at 43,830.

29

and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.").

Despite this settled understanding, Plaintiffs' position is that under 20 U.S.C. § 1087e(d)(1)(D), "the Secretary has *no* authority to forgive loans" at all.  Pls.' Br. at 31.  That position proves too much. After all, the statute explicitly authorizes the creation of "an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, *not to exceed 25 years*."  20 U.S.C. § 1087e(d)(1)(D) (emphasis added).  And such plans exist as an alternative to standard repayment plans, *id.* § 1087e(d)(1)(A), which require borrowers to repay on fixed schedules in equal amounts that total the entire principal and interest accrued thereon.  34 C.F.R. § 685.208(b)(1).  On Plaintiffs' view, one wonders, what is supposed to happen to any outstanding loan balance after 25 years?  They do not say.  In fact, what has always happened—under consistent interpretations by the Department under Presidents Clinton, Bush, Obama, Trump, and Biden—is that any outstanding balance is then forgiven.  *See* 59 Fed. Reg. at 61,664; 77 Fed. Reg. at 66,088; 80 Fed. Reg. at 67,204.  After all, payment obligations beyond that time would effectively result in a "repayment plan" that *does* "exceed 25 years," which Congress explicitly prohibited.  20 U.S.C. § 1087e(d)(1)(D).  So Plaintiffs' position cannot be correct.

**c.**  In part as an effort to distinguish this past practice, Plaintiffs refer to the agency's own statistical projections about "the typical borrower."  Pls.' Br. at 34.  They point to the Rule's prediction that "the average borrower" would have paid more than the loan principal under the old REPAYE plan but will now pay less than that amount on the SAVE Plan.  *Id.* (citing 88 Fed. Reg. at 43,880).  But Plaintiffs never explain why the agency's statistical projections for "the typical borrower," considered in the aggregate, have any legal significance.  And whatever the policy implications for those statistics (e.g., regarding cost), ultimately, if the HEA authorizes loan forgiveness, then it authorizes loan forgiveness—for both typical and atypical borrowers, as long as they meet all of the criteria.

The flaws in Plaintiffs' statistical aggregation theory are laid bare by their failure to mention the third column of the very chart that they cite, about borrowers "with any graduate debt"— projections that cut sharply against their narrative, even otherwise accepting Plaintiffs' theory.  *See* 88

Fed. Reg. at 43,880-81 ($11,645 in total payments, on average, for every $10,000 borrowed). Ultimately, projected outcomes for "the typical borrower" or "the average borrower," Pls.' Br. at 34, have nothing to do with the statutory-interpretation question before the Court.

    **d.** Plaintiffs rely heavily on "the interpretive canon of *expressio unius est exclusio alterius*." Pls.' Br. at 37. Under this canon, courts sometimes conclude that "expressing one item of [an] associated group or series excludes another left unmentioned." *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 80 (2002). "The force of any negative implication, however, depends on context." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013). After all, "[l]inguistic canons are tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue." *Facebook, Inc. v. Duguid*, 592 U.S. 395, 404 n.5 (2021). Here, if the *expressio unius* canon even applies, it lends support for the Secretary's clear statutory authority to implement the SAVE Plan and not for Plaintiffs' atextual gloss.

    For example, Plaintiffs argue that the Public Service Loan Forgiveness (PSLF) program "is the only 10-year IDR plan that Congress has ever authorized," which makes it "implausible" that Congress gave "the Secretary authority to forgive loans" in other circumstances. Pls.' Br. at 37. But loan forgiveness under the PSLF program is statutorily mandated—that is, the Secretary does not have discretion to provide a PSLF program *without* loan forgiveness. *See* 20 U.S.C. § 1087e(m)(1) ("The Secretary shall cancel the balance of interest and principal due . . . for a borrower who . . . ."). By contrast, the Secretary does have the discretion to design an "income contingent repayment plan" without loan forgiveness (at least for the first 25 years). *See id.* § 1087e(d)(1)(D) (requiring only "varying annual repayment amounts"). For that reason, Congress had to enact 20 U.S.C. § 1087e(m) to create a permanent PSLF program—without that sub-section, the agency would have no statutory obligation to implement such a generous program, including loan forgiveness within 10 years. In other words, it is imprecise to say (as Plaintiffs do) that the HEA "*allows* for forgiveness of loans after 10 years of payments while employed in a public service job." Pls.' Br. at 37 (emphasis added)—in fact, the HEA expressly *requires* loan forgiveness in certain circumstances (*i.e.*, under 20 U.S.C. § 1087e(m)(1), which creates PSLF). The same could be said of the mandatory forgiveness programs created by 20 U.S.C. § 1087ee, for "certain teachers, members of the military, and volunteers in the

Peace Corps." Pls.' Br. at 3-4. Defendants have not invoked any statutory provision that *requires* loan forgiveness (at least, not within 10 years), so Plaintiffs' *expressio unius* argument fails.

If anything, taking this canon seriously favors Defendants' position. Plaintiffs repeatedly emphasize the Rule's cost. *See, e.g.*, Pls.' Br. at 30 (lamenting the Rule's "great economic significance"); *id.* at 35 (calling the Rule too "generous" to borrowers). But there are several other places in the HEA that *do* include the sort of cost limitations that do not appear in (but that Plaintiffs want this Court to read into) the text of the provisions at issue in this case. For example, 20 U.S.C. § 1087e(d)(4) allows for the creation of "an alternative repayment plan," but also requires "the Secretary [to] ensure that such plans do not exceed the cost to the Federal Government . . . of loans made using" other plans. Other examples abound. *See, e.g.*, 20 U.S.C. § 1078-1(b)(2)(B) ("[I]n no case may the cost to the Secretary of the agreement . . . exceed the cost to the Secretary . . . in the absence of the agreement."); *id.* § 1087e(b)(9)(A) ("may be offered only if the Secretary determines the reductions are cost neutral"); *id.* § 1087e(b)(9)(B) ("The Secretary shall not prescribe such regulations in final form unless an official report from [OMB] to the Secretary and a comparable report from [CBO] to the Congress each certify that any such reductions will be completely cost neutral."); *id.* § 1087i (authorizing the Secretary "to sell loans," but then providing that "any such sale shall not result in any cost to the Federal Government"). To borrow Plaintiffs' words, "it is implausible that Congress silently intended" to impose other similar but unmentioned cost constraints on the agency here. Pls.' Br. at 37.

**e.** Plaintiffs also spill much ink on a statutory provision that the Secretary did *not* rely on here: 20 U.S.C. § 1087e(d)(1)(E), which calls for the creation of an "income-based repayment plan that enables borrowers who have a partial financial hardship to make a lower monthly payment." In particular, Plaintiffs suggest that the restrictions on that "partial financial hardship" authority in § 1087e(d)(1)(E) should be read as an implicit limitation on the Secretary's separate authority to create an "income contingent repayment plan" in 20 U.S.C. § 1087e(d)(1)(D). These arguments fail.

The repayment plans listed in 20 U.S.C. § 1087e(d)(1)(A)-(E) create a menu of five partially overlapping options, all to be designed by the Secretary, from which "[t]he borrower may choose." Each comes with different statutory (and regulatory) authority, criteria, and limits. So the restrictions

on the "partial financial hardship" authority in § 1087e(d)(1)(E)—like how far above the poverty line the Secretary may go in modifying repayment obligations under that exception, *see* Pls.' Br. at 4-5—do not apply to the other four options.  That does not make those provisions "pure surplusage," *id.* at 35, because they still apply to all plans created under 20 U.S.C. § 1087e(d)(1)(E)—it is just that the SAVE Plan isn't such a plan.  Plaintiffs' own authority supports this common-sense understanding.  *See* Pls.' Br. at 33-34 (quoting *Bittner v. United States*, 598 U.S. 85, 94 (2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning.")).

Similarly, Plaintiffs assert (with no citation) that "[w]hatever authority the Secretary has under the ICR program, it cannot make an ICR program more generous than the IBR program Congress specifically created for ICR borrowers experiencing temporary financial hardship."  Pls.' Br. at 35-36.  But why not?  Plaintiffs do not say, and the statute says nothing of the sort.  In any event, the SAVE Plan is not limited to "borrowers experiencing temporary financial hardship," *id.* at 36, it also applies to borrowers experiencing long-term financial hardship, or (at least in theory) no financial hardship at all—as long as all of the relevant statutory and regulatory criteria are satisfied.

Plaintiffs assert that "[t]he Secretary used to acknowledge this" arbitrary and atextual limitation on his own authority, citing out-of-context references to 2012 and 2015 Federal Register publications. *Id.* at 36-37.  But Plaintiffs contort both of those prior statements far beyond what they say.  In 2012, a commenter proposed "[r]educing the maximum IBR payment amount to five percent of adjusted gross income."  77 Fed. Reg. at 66,099.  (Plaintiffs paraphrased that comment to be about "income-driven plans' more generally, not just IBR plans.  *See* Pls.' Br. at 36.)  The Secretary (correctly) responded that, "the Department does not have the authority to change this statutory provision"— that is, to change 20 U.S.C. § 1098e(a)(3)(B), which is not at issue in this case.  77 Fed. Reg. at 66,100.

The 2015 statement is also (to put it mildly) quite far afield.  There, the Secretary responded to a commenter who proposed that *all* outstanding repayment plans be consolidated into one "single income-driven repayment plan."  80 Fed. Reg. at 67,210.  But because Congress provided for five different types of (partially overlapping) repayment plans in 20 U.S.C. § 1087e(d)(1)(A)-(E), the

Secretary responded that "such a change would require congressional action." 80 Fed. Reg. at 67,210. That statement sheds no light at all on the Secretary's views about "reduc[ing] the payment thresholds to 5%," and plainly did not "disclaim[] authority to do so." Pls.' Br. at 36.

Plaintiffs also repurpose another version of the *expressio unius* argument addressed above, *see supra* at 33, arguing that the Secretary's "temporary financial hardship" authority under 20 U.S.C. § 1087e(d)(1)(E) "expressly permits forgiveness," Pls.' Br. at 33, 36, through a separate statutory provision that does not apply to 20 U.S.C. § 1087e(d)(1)(D). *See* 20 U.S.C. § 1098e(b)(7). But much like PSLF (as explained above), this provision does not just "permit[] forgiveness," Pls.' Br. at 33, it affirmatively *requires* it, at least in certain specified circumstances. *See* 20 U.S.C. § 1098e(b)(7). So Congress had good reason to enact that more specific and more mandatory language—regardless of the scope of authority it had already delegated, 14 years earlier, in 20 U.S.C. § 1087e(d)(1)(E).

To that end, the timing of congressional action (or lack thereof) further undercuts Plaintiffs' inferences from this otherwise-unrelated statutory language. After all, the Supreme Court has "long held that the *expressio unius* canon does not apply unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it," and that "the canon can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion." *Marx*, 568 U.S. at 381. And here, all historical and contextual indications cut against Plaintiffs' arguments about income-based repayment under 20 U.S.C. §§ 1087e(d)(1)(E) and 1098e(b)(7).

As discussed above, 20 U.S.C. § 1087e(d)(1)(D)—the provision at issue in this case—was enacted in 1993. *See* Pub. L. No. 103-66. In the decades since, there has been an unbroken, bipartisan consensus at the Department that this authority allows for forgiveness of any remaining loan balance after the borrower's "extended period of repayment" was completed. 20 U.S.C. § 1087e(d)(1)(D). *See supra* at 30.

The income-based repayment authority in 20 U.S.C. § 1087e(d)(1)(E), however, was not enacted until 2007. *See* Pub. L. 110-84, 121 Stat. 784 (2007). So to take Plaintiffs' negative inference seriously, one would have to assume that Congress's 2007 statute casts meaningful light on authority enacted 14 years prior. What is more, although the agency had been (on Plaintiffs' view) flouting

congressional intent for 14 years by allowing for loan forgiveness under 20 U.S.C. § 1087e(d)(1)(D), how did Congress respond?  Very strangely, by granting the agency *even more* authority to provide loan forgiveness—and without amending 20 U.S.C. § 1087e(d)(1)(D) at all, or otherwise curtailing the agency's authority.  That is a level of irrationality that the Court should not ascribe to Congress.  In short, there is no reason to think that Congress "meant to say no to" loan forgiveness in 20 U.S.C. § 1087e(d)(1)(D) by adding § 1087e(d)(1)(E), *Marx*, 568 U.S. at 381—which provides for *more* loan forgiveness.  At the very least, "[i]f Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote." *Biden v. Texas*, 597 U.S. 785, 798 (2022).

Indeed, to the extent the 2007 amendments had anything to say about income-contingent repayment plans, it was entirely consistent with Congress being comfortable with loan forgiveness for ICR borrowers.  The 2007 amendments explicitly contemplated that "the Secretary shall repay or cancel any outstanding balance" of loans held by certain borrowers in certain circumstances, including borrowers who have "made payments under an income-contingent repayment plan under section 1087e(d)(1)(D) of this title."  20 U.S.C. § 1098e(b)(7)(B)(iv).  Plaintiffs try to bend that language to their favor, asserting (again, without citation) that "ICR borrowers can obtain forgiveness, but only *after* switching to the IBR program." Pls.' Br. at 33.  Plaintiffs include no authority for this "switching" requirement, but even if it existed, it still sharply undercuts the notion that Congress has ever indicated—in 1993, 2007, or at any other time—that "the Secretary has *no* authority to forgive loans under the ICR program," as Plaintiffs insist.  *Id.* at 31 (emphasis added).

**f.**  Plaintiffs' remaining arguments are largely atextual—that is, they reflect implicit limitations that Plaintiffs think *should* be in the statute.  But "'[i]t is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'  This principle applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (quoting *Rotkiske*, 589 U.S. at 14 (in turn quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012))).  Plaintiffs might prefer that the statute were written differently, but the courts "may not narrow a provision's reach by inserting words Congress

chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020); *accord Bostock v. Clayton County*, 590 U.S. 644, 654-55 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives."). Many of Plaintiffs' arguments are foreclosed by this bedrock interpretive principle.

For example, Plaintiffs assert (yet again, without any citation) that "[t]he HEA precludes Defendants from authorizing an ICR program that lasts only 10 years," emphasizing that the Department has never before "use[d] its authority to permit forgiveness sooner than 20 years." Pls.' Br. at 37, 42. But all the statute says about timing is that the "extended period of time prescribed by the Secretary" is "not to exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). Ten years is an "extended period of time" that does not "exceed 25 years." *Id.*; *accord* 88 Fed. Reg. at 43,826-27 ("[T]he statute sets an explicit upper limit, but no lower limit for the 'extended period' [of] time that a borrower must spend in repayment."). This Court should "respect not only what Congress wrote but, as importantly, what it didn't write," *Va. Uranium v. Warren*, 139 S. Ct. 1894, 1900 (2019)—and Congress did not codify Plaintiffs' policy preferences about the length of the repayment period.

Plaintiffs go on, insisting that the statute "requires that ICR plans be 'extended' in length beyond the standard repayment plans. § 1087e(d)(1)(D)." Pls.' Br. at 37. But the actual statutory text makes no comparison to the length of any other repayment plans. Instead, Congress required only (1) an "extended period of time" for repayment; (2) "prescribed by the Secretary"; that (3) does not "exceed 25 years." 20 U.S.C. § 1087e(d)(1)(D). The plain meaning of an "extended period of time" is, quite simply, a long period of time. *See, e.g.*, *Extended*, Merriam-Webster.com Dictionary (May 1, 2024), https://perma.cc/T4UD-SPZR ("drawn out in length especially of time"). So Plaintiffs are mistaken to say that, on the agency's view, "the Secretary could promulgate a plan requiring only 1 monthly payment." Pls.' Br. at 37. In fact, a one-month repayment plan would not satisfy the requirement that a borrower first complete an "an extended period of time" in repayment, because one month is not an "extended period of time," at least in this context. 20 U.S.C. § 1087e(d)(1)(D). Ten years is.

Plaintiffs also rely heavily (Pls.' Br. at 31, 33, 37) on a statutory reference to "plans for repayment of such loan, including principal and interest on the loan." *Id.* § 1087e(d)(1). But that language is (at least) equally consistent with repayment plans that call for repayment of *some*, but not all, "principal and interest on the loan." 20 U.S.C. § 1087e(d)(1). That is because a plan for *partial* repayment of a loan or *slower* repayment of a loan are both still "plans for repayment of such loan, including principal and interest on the loan." *Id.* If Congress intended to authorize only "plans for" *full* or *complete* "repayment of such loan," it could have used those words in the statute. It did not.

In any event, the premise of Plaintiffs' "repayment" argument seems to be that, by calling something a "repayment plan" in 20 U.S.C. § 1087e(d) and (e), Congress has necessarily taken loan forgiveness off the table. That premise is demonstrably mistaken. Consider 20 U.S.C. § 1087e(m)—which creates the PSLF program—notably titled "Repayment plan for public service employees." The "repayment plans" at issue in that sub-section, however, do not just *contemplate* loan forgiveness, they affirmatively *require* it, at least in some circumstances. *See* 20 U.S.C. § 1087e(m)(1) ("The Secretary shall cancel the balance of interest and principal due . . . ."). So it cannot be right that Congress's use of the phrase "repayment plan," standing alone, confirms that loan forgiveness is off the table. If anything, just the opposite—20 U.S.C. § 1087e(m) shows that when Congress talks about a "repayment plan" in 20 U.S.C. § 1087e, it knows that loan forgiveness is *on* the table. After all, courts "do not lightly assume that Congress silently attaches different meanings to the same term in the same statute." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 614 (2020) (quotation omitted).

Although they get the citation wrong, Plaintiffs also place great weight on statutory language about the "balance due" on a loan. Pls.' Br. at 3-4, 31-33. On Plaintiffs' telling, "the 'balance due' from each borrower on an 'income contingent repayment' plan '*shall* equal the unpaid principal amount of the loan, any accrued interest, and any fees.'" *Id.* (quoting 20 U.S.C. § 1087e(d)(1)(D)(5), but probably intending to quote 20 U.S.C. § 1087e(e)(5)). But in truncating the statutory text, Plaintiffs distort its meaning. The full text reads: "The balance due on a loan made under this part that is repaid pursuant to income contingent repayment shall equal the unpaid principal amount of the loan, any accrued interest, and any fees, such as late charges, assessed on such loan." 20 U.S.C. § 1087e(e)(5).

37

In their brief, Plaintiffs repeatedly omit the phrase "that is repaid," which undermines their interpretation.  After all, if this provision only governs the outstanding balance for loans "that [are] repaid," it presupposes that there are some loans that might *not* be repaid, or not repaid in full.  *Id.*  So at a minimum, Plaintiffs' inference about the "balance due" would not apply, on the face of the statute, to the loans at the center of this case, which (at least on Plaintiffs' theory), are *not* being repaid in full.  Again, "[i]f Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote."  *Texas*, 597 U.S. at 798.

In any event, even setting aside the internal inconsistency of this feature of Plaintiffs' argument, it also misses a more fundamental point: knowing the "balance due" on a loan tells you nothing about whether (or under what circumstances) that loan might be forgiven.  20 U.S.C. § 1087e(e)(5).  After all, *every* forgiven loan has some "balance due" on the date that it is forgiven, by definition—otherwise, there would be no "balance" left to forgive.

Plaintiffs similarly contend that the Rule "turns a loan program into a grant program for the typical borrower."  Pls.' Br. at 34.  Again, the "typical borrower" is not a legally relevant concept in the HEA.  *See supra* at 30-31.  But even accepting Plaintiffs' framing, partial loan forgiveness is not at all inconsistent with the general concept of a "loan"—particularly after "an extended period of time" has passed.  20 U.S.C. § 1087e(d)(1)(D).  Loans are sometimes forgiven, in both the public and the private sectors, without anyone thinking that the forgiven loan was not actually a "loan" at all.  So nothing turns on the meaning of the words "loan" or "grant" standing in isolation.

Plaintiffs also assert that the Rule runs afoul of 20 U.S.C. § 1087e(b)(9)(A), which gave the Secretary authority "to prescribe by regulation such reductions in the interest rate or origination fee paid by a borrower of a loan made under this part as the Secretary determines appropriate to encourage on-time repayment of the loan."  But the Rule is not an exercise of that authority, and does not include any "reductions in the interest rate" on any loan.  *Id.*  So the cost-neutrality requirements of that provision are likewise irrelevant—other than as an example of Congress imposing exactly the sort of limits that Plaintiffs ask the Court to imply here, without any textual basis.  *See supra* at 32.

**g.**  Finally, Plaintiffs quibble with the comparatively minor changes made by the SAVE Plan to the regulations governing "alternative repayment plan[s]" for those who fail to certify their income. 20 U.S.C. § 1087e(d)(4).  They assert that the Secretary is now offering that separate sort of plan "en masse," Pls.' Br. at 37, instead of "on a case by case basis," 20 U.S.C. § 1087e(d)(4).

Plaintiffs are mistaken on multiple levels.  At the outset, these portions of the Rule do not "create[] a new "alternative repayment plan" at all, they just "simplify" existing rules that govern such plans, 88 Fed. Reg. at 43,866, which have long applied to "borrowers who fail to recertify their income" on income-contingent repayment plans.  Pls.' Br. at 37-38.  In any event, both now and under previous regulations, the alternative plan is "provide[d] on a case by case basis."  20 U.S.C. § 1087e(d)(4).  That is because, "[f]or most borrowers, the alternative plan payments will be based upon how much that borrower would have to pay each month to pay off the debt with 10 years of equally sized monthly payments."  88 Fed. Reg. at 43,827.  Ultimately, "[t]his amount will be specific to each borrower, as balances and interest rates vary for each individual" who is subject to one of these plans.  *Id.*

The regulations also "accommodate the borrower's exceptional circumstances," 20 U.S.C. § 1087e(d)(4), in that they are designed to avoid a sudden spike in payment obligations (described in the Rule as a "payment shock") that can greatly increase the risk of immediate "delinquency or default" for borrowers who do not recertify their income and therefore cannot stay on an income-contingent repayment plan.  88 Fed. Reg. at 43,866-67.  (Those details are largely immaterial to this litigation but are described at length in the Final Rule.  *See id.*)

## 2.  *The major-questions doctrine does not warrant a different result.*

The normal tools of statutory interpretation thus favor the Secretary's reading.  But Plaintiffs move the goalposts, arguing that the major-questions doctrine requires not just congressional authorization, but "*clear* congressional authorization" for the Secretary's action.  Pls.' Br. at 29 (emphasis added).  That is because, on Plaintiffs' view, this agency action involves "a matter of 'vast economic and political significance.'"  *Id.* (quoting *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021)).  But whether or not that doctrine applies, Plaintiffs' claims still fail.

**a.**  For all the reasons above, Congress provided sufficiently "clear" authorization for the Rule, by authorizing the creation of "an income contingent repayment plan," with certain specified textual requirements, all of which are satisfied here.  20 U.S.C. § 1087e(d)(1)(D).  So the Court could—and, in Defendants' view, should—resolve this case by holding that, whether or not the major-questions doctrine applies, there is sufficiently "clear congressional authorization" to satisfy it.  After all, the "the major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation."  *Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring).

**b.**  *Biden v. Nebraska*—a statutory-interpretation case about a different statute—is not to the contrary.  Defendants acknowledge the Supreme Court's statement that "[t]he basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself."  *Id.* at 2375 (quoting *West Virginia v. EPA*, 597 U.S. 697, 730 (2022)).  For that reason, the Court stated that the major-questions doctrine applied to the Secretary's invocation of different statutory authority to adopt a different loan-forgiveness plan, which the Court held exceeded the agency's authority under that statute.  *See id.*  But the majority also made clear that its holding was limited to the program before the Court, which relied on the HEROES Act.  *See* id. at 2371 n.5 ("We decide only the case before us.").  And in another case decided the same day, a unanimous Supreme Court correctly explained that "HEROES Act loan relief and HEA loan relief function independently of each other."  *Brown*, 600 U.S. at 567.  So the Supreme Court has never "opine[d] on the substantive lawfulness of any action the Department might take under the HEA."  *Id.* at 565 n.2.

In addition, there are several material distinctions between *Nebraska* and this case.  The most obvious is the starting point of the analysis, which is "the text of the statute."  *Bartenwerfer*, 598 U.S. at 74 (quotation omitted).  "The HEROES Act authorizes the Secretary to 'waive or modify any statutory or regulatory provision applicable to'" certain student-loan programs "in connection with a war or other military operation or national emergency."  *Nebraska*, 143 S. Ct. at 2368 (quoting 20 U.S.C. § 1098bb(a)(1)).  The word "modify," the Court held, "does not authorize basic and fundamental changes."  *Id.*  "Instead, that term carries 'a connotation of increment or limitation,' and must be read to mean 'to change moderately or in minor fashion.'"  *Id.* (citation omitted).  But none of that is true

of the relevant HEA provision, 20 U.S.C. § 1087e(d)(1)(D), which is not constrained by words like "modify," which carry any comparable "connotation of increment or limitation." *Id.* at 2368.

Second, much of the Court's analysis in *Nebraska* was about the unprecedented nature of the "waivers and modifications" issued by the Secretary under the HEROES Act, which differed in kind— not just in dollar amount—from previous invocations of that authority.  As the Court explained, "[p]rior to the COVID-19 pandemic, 'modifications' issued under the [HEROES] Act implemented only minor changes, most of which were procedural." *Id.* at 2369.  "Examples include reducing the number of tax forms borrowers are required to file, extending time periods in which borrowers must take certain actions, and allowing oral rather than written authorizations." *Id.*  In the plan at issue in *Nebraska*, however, in the Court's view, the Secretary had "created a novel and fundamentally different loan forgiveness program." *Id.*; *see also id.* ("The Secretary's plan has 'modified' the cited provisions only in the same sense that the French Revolution 'modified' the status of the French nobility—it has abolished them and supplanted them with a new regime entirely." (quotation omitted)).

Again, none of that is true here.  Before the SAVE Plan, the agency had used this HEA authority three times since its enactment: (1) to create the first income-contingent repayment plan in 1994, *see* 59 Fed. Reg. at 61,664; (2) to create the PAYE plan in 2012, *see* 77 Fed. Reg. at 66,088; and (3) to create the REPAYE plan in 2015, *see* 80 Fed. Reg. at 67,204.  To be sure, those programs were smaller in scope than the SAVE Plan.  But all three included similar and significant loan forgiveness, after a borrower completed a designated period in repayment.  *See* 59 Fed. Reg. at 61,666 ("Some borrowers in the ICR plan may not earn sufficient income to fully repay their loans within the statutory 25-year time period.  In this event, the Secretary will forgive any outstanding loan balance (principal plus interest) that is unpaid after 25 years."); 77 Fed. Reg. at 66,114 ("The revisions offer eligible borrowers lower payments and loan forgiveness after 20 years of qualifying payments."); 80 Fed. Reg. at 67,209 ("[T]he REPAYE plan requires 20 or 25 years of qualifying payments before a loan is forgiven.").  In other words, this is not "a novel and fundamentally different loan forgiveness program" that differs in kind from prior agency practice.  *Nebraska*, 143 S. Ct. at 2369.  Indeed, it is ultimately a revision to the REPAYE plan itself, which has been in effect for nearly a decade.

Third, *Nebraska* turned, at least in part, on the Supreme Court's skepticism that COVID-19—at least as the "pandemic wind[ed] down to its end," *id.* at 2374—was the sort of "war or other military operation or national emergency" that Congress had in mind, 20 U.S.C. § 1098bb(a)(1), when it enacted the HEROES Act in the aftermath of September 11th.  *Compare Nebraska*, 143 S. Ct. at 2364 (referencing President Biden's statement that "the pandemic is over"), *with id.* at 2363 (multiple references to "the September 11 terrorist attacks").  In that sense, it is of a piece with a series of pandemic-era opinions in which the Supreme Court scrutinized Executive Branch invocation of "emergency" powers.  *See, e.g.*, *NFIB v. OSHA*, 595 U.S. 109, 113 (2022) (OSHA vaccine mandate); *Ala. Ass'n of Realtors*, 594 U.S. at 766 (CDC eviction moratorium).

Yet again, none of those concerns apply here.  This Rule has nothing to do with any "national emergency" authority, *Nebraska*, 143 S. Ct. at 2364, nor did any of three similar rules that the Secretary previously issued under this statute.  For all these reasons, this Court should take the Supreme Court at its word: it has never "opine[d] on the substantive lawfulness of any action the Department might take under the HEA."  *Brown*, 600 U.S. at 565 n.2.

**B.      Plaintiffs are not likely to succeed on their other APA claims.**

**1.      *The Rule is not arbitrary and capricious.***

The APA directs that an agency action be set aside if it is arbitrary or capricious.  5 U.S.C. § 706(2)(A).  Plaintiffs' efforts notwithstanding, the APA does not permit the courts to become arenas of policymaking of second resort.  Nor does it permit a court to substitute its own—or a plaintiff's—judgment for that of the agency.  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Rather, the scope of inquiry is "narrow."  *FCC v. Fox Television Stations*, 556 U.S. 502, 513 (2009).  A reviewing court's task is only to determine whether an agency has engaged in "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015), by asking if the agency considered "the relevant factors and whether there has been a clear error of judgment."  *Mandan, Hidatsa & Arikara Nation v. Dep't of the Interior*, 95 F.4th 573, 579 (8th Cir. 2024) (quoting *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004)).  "'If an agency's determination is supportable on any rational basis,' then a

reviewing court 'must uphold it.'" *Id.* at 579 (quoting *Org. for Competitive Markets v. USDA*, 912 F.3d 455, 459 (8th Cir. 2018)).

Plaintiffs try to wedge their substantive policy disagreements with the agency into the APA's narrow lane for arbitrary-or-capricious review, taking aim at the Final Rule's consideration of costs, State reliance interests, and inflation; and at the agency's explanation of its decision in light of the record before it. Pls.' Br. at 39-44. The Court should rebuff these attempts.

a. One variety of arbitrary-and-capricious decisionmaking arises when an agency "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs assert that the Department committed such an error when it failed to consider the downstream cost effects of the Supreme Court's decision in *Nebraska*—which the Court handed down after the Secretary signed the Final Rule and sent it to the Federal Register for publication, but before that publication took place. Schlichter Decl. ¶ 3. On Plaintiffs' view, debt that would have been forgiven under the Secretary's prior action was not, and so the Department should have factored that debt into the cost of the Final Rule. Pls.' Br. at 40.

A threshold obstacle to this argument lies in its unreviewability. The HEA itself does not require *any* cost-benefit analysis, let alone a perfect one. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981) ("When Congress has intended that an agency engage in cost-benefit analysis, it has [generally] clearly indicated such intent on the face of the statute."). Here, the only reason the agency was obligated to conduct a cost-benefit analysis at all was for internal Executive Branch purposes, in accordance with Executive Order 12,866. *See* 88 Fed. Reg. at 43,867. But Executive Order 12,866 creates no rights enforceable by litigation plaintiffs outside the Executive Branch. Exec. Order No. 12,866, prmbl (Sept. 30, 1993). Accordingly, that analysis is not subject to judicial review. *See, e.g., Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 670 (6th Cir. 2013) ("Executive Order 12,866 does not create judicially enforceable rights, nor does it provide a basis for rejecting final agency action."); *Air Transp. Ass'n v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (rejecting plaintiff's argument that "it does not seek to assert rights under the order but is merely referencing it to provide evidence of the arbitrary and capricious nature of the . . . decision," calling it "nothing more than an indirect—

and impermissible—attempt to enforce private rights under the order"). So any errors in that analysis cannot be the basis for a conclusion that the Rule is arbitrary and capricious under the APA.

Even were the cost-benefit argument reviewable, this argument fails on the merits. To start, the Secretary signed the Final Rule on June 14, 2023, and his subordinates sent it to the Federal Register for publication later that day. Schlichter Decl. ¶ 3. Because that was two weeks before *Nebraska* was released, the factual development that Plaintiffs claim the agency failed to consider had not even happened as of the date that the Rule was finalized and signed by the Secretary. Subsequent factual developments cannot be held against the agency through the lens of hindsight. Instead, "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan*, 576 U.S. at 758); *see also, e.g.*, *Voyageurs Nat'l Park Ass'n*, 381 F.3d at 766 ("It is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision.").[12]

In any event, Plaintiffs' argument is without merit. In its summary of comments about the HEROES Act plan and the *Nebraska* litigation—as Plaintiffs acknowledge, Pls.' Br. at 40—the Department expressly noted that one commenter suggested producing "a secondary cost estimate in the event that the loan cancellation plan does not go into effect." 88 Fed. Reg. at 43,875. The Department responded, "[o]ur cost estimates account for the Department's current and anticipated programs and policies." *Id.* The Department thus explicitly considered and declined an invitation to prepare an alternative cost-benefit analysis, instead referring to its extensive considerations of cost and reaffirming the Secretary's multipart effort to reduce student-loan burdens. *See State Farm*, 463 U.S. at 43; *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). That the Department expressed confidence in its chances of prevailing in *Nebraska* is unsurprising and legally irrelevant, even if that confidence turned out in hindsight to be misplaced. Pls.' Br. at 22; 88 Fed. Reg. at 43,875.

_____

[12] This timeline further refutes Plaintiffs' overheated rhetoric about how the SAVE Plan was issued "to get around the Supreme Court's ruling," Pls.' Br. at 10—again, the NPRM was published in January 2023, 88 Fed. Reg. at 1894, and the agency completed its work on the Rule in mid-June 2023, Schlichter Decl. ¶ 3, both well before *Nebraska*.

In the alternative, were the Court inclined to disagree, to grant relief it would also be required to find that prejudice resulted from this error. *Aguilar v. Garland*, 60 F.4th 401, 407 (8th Cir. 2023) (citing 5 U.S.C. § 706). That is because the APA provides that "due account shall be taken of the rule of prejudicial error," 5 U.S.C. § 706, which is like "an administrative law harmless error rule," *Little Sisters of the Poor*, 591 U.S. at 684 (alteration and citation omitted). Accordingly, "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand." *PDK Lab'ys, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004). "The party claiming injury bears the burden of demonstrating harm; the agency need not prove its absence." *Combat Veterans for Cong. Pol. Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015); *see also Shinseki v. Sanders*, 556 U.S. 396, 409-11 (2009) (explaining that the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination") (citing *Panhandle Co-op. Ass'n v. EPA*, 771 F.2d 1149, 1153 (8th Cir. 1985)).

To find the agency's consideration of cost prejudicially erroneous here would effectively require the assumption that the Department was unaware that its multiple debt-relief policies would come at a large financial cost. That assumption defies common sense. For both the President and the Secretary, reducing the crushing burdens of student-loan debt is an important priority, and the Department undertook this rulemaking and its prior action under the HEROES Act as part of a multiprong effort to alleviate those burdens. 88 Fed. Reg. at 1894; *Press Release, White House, FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most* (Aug. 24, 2022), https://perma.cc/R2ND-6RQJ. The HEROES Act plan held unlawful in *Nebraska* and the SAVE Plan at issue here both reflect efforts to advance those policy priorities. 88 Fed. Reg. at 43,820; 87 Fed. Reg. at 61,512. There is little reason to think, then, that the Secretary would have found the additional costs not to be worthwhile if they were tied to this Rule, rather than to the prior plan.

**b.** Changing tack, Plaintiffs assert that the Department failed to consider their reliance interests on tax revenue and on the recruitment benefits of the PSLF program, as well as on the inflationary effects of the Final Rule, rendering its action arbitrary and capricious. Pls.' Br. at 40-41, 43. Those contentions are all without merit.

45

As the Rule details at some length, the agency received comments from individuals concerned that the plan would have "significant State-level budgetary implications because of the loan forgiveness provisions." 88 Fed. Reg. at 43,877. It also noted comments from those concerned that "borrowers may now be less inclined to pursue Public Service Loan Forgiveness (PSLF) since the greater generosity of the proposed plan would make that kind of relief less necessary." *Id.* at 43,879. Likewise, the Department documented comments "arguing that the IDR NPRM failed to consider the potential effects of the proposed changes on inflation." *Id.*

In each instance, the agency considered and responded to those comments. In declining to make any responsive changes regarding tax revenues, it explained that "a minority of States tax student loan forgiveness," and that the small number of borrowers on IDR plans to date had not established, in the agency's view, any significant evidence of those States' reliance on tax revenues that might be lost under the SAVE Plan. *Id.* at 43,877. And "[b]ecause only the original ICR plan has been around long enough for borrowers to reach the required number of monthly payments for forgiveness, only a few borrowers have earned forgiveness through an IDR plan." *Id.* Accordingly, there was no meaningful reliance interest, as States could not have accounted for a rise in that number. *Id.*

The same is true for the Department's consideration of impacts the Rule might have on the PSLF program and on inflation. Pls.' Br. at 41, 43. The Department considered but was unconvinced by concerns about PSLF, explaining that the commenters had provided no analysis of these purported effects, that revised repayment provisions of the Rule would benefit PSLF program participants, and that PSLF remained a program with valuable potential benefits to borrowers, the SAVE Plan's benefits notwithstanding. 88 Fed. Reg. at 43,880. In the same vein, the Department referred commenters concerned about inflation to its regulatory impact analysis, which "captured the costs and benefits that [it thought were] most likely to be affected by this final rule." *Id.* at 43,879. These discussions more than satisfy any legal obligation the agency had to consider state reliance on tax revenues from forgiven loans, on PSLF as a recruitment tool, and on inflation. *Perez*, 575 U.S. at 96.

**c.** Next, Plaintiffs endeavor to substitute their own views of the evidence for the agency's, asserting that several of the Department's conclusions are erroneous. Pls.' Br. at 41-44. But because

none of these arguments demonstrates an absence of "reasoned decisionmaking," whatever the result Plaintiffs themselves would have preferred, they fail. *See Michigan*, 576 U.S. at 750. Rather, the Court reviews only for "substantial evidence" supporting the agency's decision, 5 U.S.C. § 706(2)(E), which exists if a "reasonable mind would find it adequate to support" the agency's decision. *Mercier v. Dep't of Labor, Admin. Rev. Bd.*, 850 F.3d 382, 388 (8th Cir. 2017). Substantial evidence to support the decision is not lacking when the record might support an opposite conclusion, but rather only when the record compels such a conclusion. *Al Yatim v. Mukasey*, 531 F.3d 584, 587 (8th Cir. 2008).

First, Plaintiffs try to raise "internal contradictions" in the rule. Pls.' Br. at 42. Neither the law nor the facts are on Plaintiffs' side. As stated, it falls to the Department to resolve conflicts in the evidence. *Al Yatim*, 531 F.3d at 587. In any event, here, no contradiction lies in any of the facts Plaintiffs cite. Plaintiffs fault the agency for seeking to reduce future delinquencies and defaults while acknowledging that prior changes to income-driven repayment plans have not fully succeeded in doing so. Pls.' Br. at 42. That one set of changes to REPAYE in 2015 did not thereafter reduce defaults as much as the agency desired has no bearing on the changes outlined in the Rule, which are distinct. Nor does that fact undermine the need for further revisions to assist borrowers; if anything, it underscores a continuing need. But even if the Court perceived a contradiction, the Department's finding that reducing monthly payments reduces the likelihood of default is supported by substantial evidence (indeed, it is a matter of common sense). *Prometheus Radio Project*, 592 U.S. at 426; 88 Fed. Reg. at 43,881-85. That is enough.

Plaintiffs also fault the Department's analysis underlying the increase in the SAVE Plan's income-exemption threshold for its "unlikely and implausible conclusions." Pls.' Br. at 43. The Final Rule exempts a portion of a borrower's income from counting toward the borrower's monthly payment obligation up to 225% of the federal poverty line, representing an increase from the prior threshold of 150% of the poverty line. 88 Fed. Reg. at 43,839. Based on data it had reviewed, the Department described individuals earning 225% of the federal poverty line as "statistically indistinguishable" from those earning less than the line itself. *Id.* In particular, the Department focused on reports of individuals experiencing "material hardship." *Id.*

47

Tellingly, Plaintiffs make no effort to explain why the underlying data are flawed.  Instead, they ask the Court to rely on simplistic math:  how could two individuals each experience hardship if one makes twice what the other does?  Pls.' Br. at 43-44 ("[T]he financial difficulties of a person with twice the income of another are qualitatively and quantitatively different.").  But the question before the agency was not whether two such individuals lead materially identical lives.  Rather, the agency was obligated to offer substantial evidence for the proposition that an individual earning $14,580 annually and an individual earning $32,805 might each experience material hardship that would be assuaged by reduced monthly student loan payments.  Could a reasonable person so conclude?  Quite plainly yes. 88 Fed. Reg. at 43,839; *see also id.* at 43,842 (discussing the use and limits of the dataset available to the Department in considering hardships).

Wrapping up, Plaintiffs claim that the Rule "depart[s] from nearly thirty years of practice," Pls.' Br. at 41, and impermissibly classifies as a loan what is in fact a grant, *id.* at 43.  But it is black-letter administrative law that agencies are permitted to depart from prior policies so long as they reasonably explain such departures.  *Fox Television Stations*, 556 U.S. at 514.  Even so, the historical record, which was detailed in the Final Rule, flatly contradicts the notion that the Rule represents an aberration from past practice.  *See, e.g.*, 88 Fed. Reg. at 43,829 ("Forgiveness of the remaining loan balance after an established time has been a part of the IDR plans since the creation of the Direct Loan Program in 1993-1994." (footnote omitted)); *see also supra* at 3-4.

On the subject of historical practice, Plaintiffs' brief is ultimately at war with itself.  Eventually conceding the existence of this past agency precedent, Plaintiffs change course and insist that allowing an agency to rely on past practices would permit the government to acquire power through "adverse possession."  Pls.' Br. at 42 (quoting *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 241 (5th Cir. 2024)).  In other words, on Plaintiffs' view, unprecedented agency actions are unlawful, but prior agency precedent is also meaningless—heads Plaintiffs win, tails Defendants lose.  Moreover, they add, unprecedented agency action should raise questions about the agency's authority to act at all.  *Id.* Just as for Plaintiffs' (dubious) contentions that the Department previously disclaimed statutory authority to reduce the income threshold from 10% to 5% and that the SAVE Plan impermissibly

48

disguises grants as loans, the Court should (at best) treat these arguments as challenges to the Department's legal authority, *see supra* at 28-42, and analyze them accordingly.

**d.** Plaintiffs' final arbitrary-and-capricious theory is that the Secretary "failed to reasonably explain" the decision to exercise his statutory authority—explicitly granted by the HEA, 20 U.S.C. § 1089(c)(2)(A), as Plaintiffs do not dispute—to implement certain portions of the Rule roughly five months early. Pls.' Br. at 44. This argument fails for several independent reasons.

As a threshold matter, Plaintiffs do not even try to explain how they could have Article III standing to raise this claim. None of Plaintiffs' theories of injury, *see supra* at 10-24, have anything to do with the extent to which some parts of the Rule take effect in February 2024 versus July 2024. And even if the Court were to agree with Plaintiffs that the Secretary unlawfully invoked his early implementation authority, the result would (at most) be the Rule taking full effect on July 1—exactly the result that Plaintiffs elsewhere assert will *cause* them injury. *See* Pls.' Br. at 19-29. That is (at least) a redressability problem, because the relief that Plaintiffs request on this claim would not actually prevent any harm. *See, e.g.*, *Missouri v. Biden*, 558 F. Supp. 3d 754, 767 (E.D. Mo. 2021), *aff'd*, 52 F.4th 362 (8th Cir. 2022), *cert. denied*, 144 S. Ct. 278 (2023). So Count V of the complaint should be dismissed for lack of Article III standing (even if Plaintiffs could otherwise show standing more generally). After all, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431.

Regardless, this claim is meritless. Plaintiffs' argue only that "[t]he Department provided no justification *at all* for implementing the early forgiveness part of the rule—34 C.F.R. § 685.209(k)(3)— in January instead of July 2024." Pls.' Br. at 44 (emphasis added). That is incorrect. In addition to the Federal Register notice formally exercising this authority, *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan Program*, 89 Fed. Reg. 2489 (Jan. 16, 2024), the agency also published a lengthy and contemporaneous statement explaining the decision. *See* U.S. Dep't of Educ., *Biden-Harris Administration to Shorten Path to Debt Cancellation for Some SAVE Borrowers* (Jan. 11, 2024), https://perma.cc/M5ND-VFEM. Among other things, the agency explained that it was using early implementation to "kick[] off an outreach and email campaign

to encourage borrowers who are not currently enrolled in SAVE to sign up because they may benefit from this shortened repayment period." *Id.*  The goal was to "give[] borrowers an even greater reason to check out the SAVE plan and find out if they may qualify for earlier debt relief." *Id.*  And of course, "[g]iving borrowers with smaller loans a faster path to being debt free will help many borrowers avoid financial distress and have peace of mind." *Id.*  Plaintiffs may not share those policy goals, but they cannot ask this Court to "substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423; *Fox Television Stations*, 556 U.S. at 515 (requiring only a "reasoned explanation").

To be sure, the accompanying Federal Register notice was more succinct.  But Plaintiffs cite no statute, regulation, or case that required the agency to repeat the full public explanation a second time in the Federal Register.   And even if there were any such requirement, *but see* 20 U.S.C. § 1089(c)(2)(A), it is hard to think of a clearer example of a harmless error that "did not affect the outcome" and "did not prejudice" Plaintiffs.  *PDK Lab'ys*, 362 F.3d at 799 (citing 5 U.S.C. § 706); *see supra* at 45.  "[I]t would be senseless to vacate and remand," *PDK Lab'ys*, 362 F.3d at 799, just so the agency could reformat its explanation into three columns and smaller type.  And it would be especially odd to order such picayune relief for these Plaintiffs, whose most recent discussion of the Federal Register was to make a *joke* about the idea that anyone reads it.  *See* Pls.' Mot. for Scheduling Order at 3 n.3, ECF No. 16 (stating, incorrectly, that "it was not until late February that anybody other than daily readers of the Federal Register (if any exist) received notice" of early implementation).

> **2.**    *The agency provided notice and an opportunity to comment.*

**a.**    The APA "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'"  *Perez*, 575 U.S. at 96.  "First, the agency must issue a '[g]eneral notice of proposed rulemaking,' ordinarily by publication in the Federal Register." *Id.* (quoting 5 U.S.C. § 553(b)).  Second, "the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.'"  *Id.* (quoting 5 U.S.C. § 553(c)).  "Third, when the agency promulgates the final rule, it must include . . . 'a concise general statement of [its] basis and purpose.'"  *Id.* (quoting 5 U.S.C. § 553(c)).  "[G]enerally speaking this section of the [APA] established the maximum procedural requirements which Congress was willing to have the courts impose upon

agencies in conducting rulemaking procedures." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978). Although "[a]gencies are free to grant additional procedural rights in the exercise of their discretion," "reviewing courts are generally not free to impose them if the agencies have not chosen to grant them." *Id.*

*Vermont Yankee* is fatal to Plaintiffs' efforts to quibble with the length of the comment period. The APA "does not specify a minimum time for submission of comments in an informal rulemaking." *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984). To the contrary, some "opportunity to participate is all that the APA requires." *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986). Therefore, courts generally lack the authority to arbitrarily impose a minimum required comment-period length. *See id.* (citing *Vt. Yankee*, 435 U.S. at 543); *see also, e.g., Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 534 (D.C. Cir. 1982) ("We cannot say that the NRC's choice of a [30-day] comment period was unreasonable. Neither statute nor regulation mandates that the agency do more.").

Plaintiffs rely on forty-year-old nonbinding guidance from the Administrative Conference of the United States for the proposition that the agency should have "provide[d] sixty days of commenting." Pls.' Br. at 45. But in actual litigation, "[c]ourts have uniformly upheld comment periods of 45 days or less." *Phillips*, 803 F.2d at 559 (citing *Conn. Light & Power Co.*, 673 F.2d at 534 (30 days)). Plaintiffs likewise rely (at 45-46) on Executive Orders issued by Presidents Clinton and Obama. But those Executive Orders did not create judicially enforceable obligations, *see* Exec. Order 12,866 § 10; Exec. Order 13,563 § 7; *supra at* 43-44, and in any event they "do not require a 60-day comment period," as the agency explained in the Final Rule, 88 Fed. Reg. at 43,821.

**b.** In the alternative, any procedural notice-and-comment error was harmless. *See Little Sisters of the Poor*, 591 U.S. at 684. Nothing material would have changed had the agency offered a 60-day comment period instead of a 30-day comment period. In fact, none of these Plaintiffs even bothered to comment at all, and they nowhere suggest that their failure to participate had anything to do with the need for another 30 days. While Plaintiffs sat on the sidelines, the agency "received over 13,600 written comments," 88 Fed. Reg. at 43,821, including about issues that are now the subject of this litigation. That is all in addition to the "5,300 public comments" submitted "as part of the public

hearing process" required by the HEA's negotiated-rulemaking provisions, *id.*—which Plaintiffs do not dispute that the agency complied with fully, and that the Supreme Court has described as "a lengthy deliberative process involving many stakeholders." *Brown*, 600 U.S. at 557. Plaintiffs identify no novel issues that they (or anyone) would have raised during a longer comment period. So "it would be senseless to vacate and remand" (or issue an injunction) on this basis. *PDK Lab'ys*, 362 F.3d at 799.

In fact, Plaintiffs do not address the requirement of prejudice in their brief, and their complaint contains only the conclusory allegation that "[t]his error was prejudicial and denied the public (including Plaintiffs) an adequate opportunity to comment on the proposed rule." Compl. ¶ 262. That alone is fatal to this claim, because Plaintiffs bear the burden to show prejudice. *See Combat Veterans*, 795 F.3d at 157; *see also Shinseki*, 556 U.S. at 409-11 (citing *Panhandle Co-op. Ass'n*, 771 F.2d at 1153).

### C.    Plaintiffs have not shown irreparable harm.

**1.** A preliminary injunction requires more than a mere possibility of irreparable harm. *Winter*, 555 U.S. at 22. Plaintiffs must show "that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters.*, 78 F.4th at 1017 (quoting *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022)). Here however, despite the requirement to show (not just allege) irreparable harm, Plaintiffs rest on the same threadbare allegations and meager exhibits that fail even to establish standing. Pls.' Br. at 46-48; *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (the irreparable-injury showing is more stringent than injury-in-fact). Once again, those assertions are insufficient.

Take the tax-revenue argument first. Self-inflicted injuries do not establish irreparable harm for a preliminary injunction. *Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003). As explained above, the States possess the ability to alter their tax codes (now or later) to tax the income they fear they will lose forever. *See supra* at 16-18. Nor do speculative injuries fit the bill. *Morehouse Enters.*, 78 F.4th at 1017 (harm must be "certain"). Plaintiffs have not shown that the Final Rule will have any obvious effect on the attractiveness of their state and local public-service positions, *see supra* at 18-21, or on MOHELA's revenue stream, *see supra* at 10-15, or on North

52

Dakota's student loan offerings, *see supra* at 21-24—much less the clear showing of likely and imminent irreparable harm that equity demands. *Morehouse Enters.*, 78 F.4th at 1017. Rather, as Plaintiffs repeatedly emphasize, early implementation of SAVE's loan forgiveness began in February. Pls.' Br. at 46-48. So Plaintiffs should be able to point to actual (not just hypothetical) decreases in MOHELA's revenue and in North Dakota's loan enrollments, and to impacts on efforts to recruit the law students graduating this month. That they have not done so dooms their claim to injunctive relief.

**2.** Plaintiffs' claim of irreparable harm fails for an additional, independent reason: their significant delay in seeking this purportedly time-sensitive relief. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). For that reason, "delay alone may justify the denial of a preliminary injunction when the delay is inexplainable in light of a plaintiff's knowledge of the conduct of the defendant." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013); *accord Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (affirming denial of preliminary injunction solely on the basis of a 13-month delay). That settled rule of equity applies here, particularly in light of this Court's (correct) factual "find[ing]" that "Plaintiffs' urgency is of their own making," Mem. & Order, at 3, ECF No. 17.

Plaintiffs challenge a rule that was published in the Federal Register over nine months ago, on July 10, 2023. *See* 88 Fed. Reg. at 43,820. And even after Plaintiffs' counsel announced an intent to file the lawsuit in a press release, Plaintiffs waited another full month to actually sue, *see supra* at 7-8, and then a full additional week before they requested "emergency" relief. Courts within the Eighth Circuit and around the country have rejected claims of irreparable harm because of delays that are comparable to (or shorter than) Plaintiffs' nine-month delay here. *See, e.g.*, *Ng*, 64 F.4th at 999 (13-month delay fatal to request for injunctive relief); *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 806 (8th Cir. 2021) (same, for a 12-month delay); *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1010, 1010 n.4 (8th Cir. 2019) (same, for a five-month delay); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months— though not necessarily fatal—militates against a finding of irreparable harm."); *Weight Watchers Int'l v. Luigino's*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient

to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction.") (citation omitted); *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming denial of preliminary injunction, calling six months "a long delay in seeking relief" that "indicates that speedy action is not required") (citation omitted); *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (affirming denial of preliminary-injunction after plaintiffs "wait[ed] two months . . . to make the request," because "[s]uch a delay is inconsistent with a claim of irreparable injury"); *CHS, Inc. v. PetroNet, LLC*, No. 10-cv-94, 2010 WL 4721073, at *3 (D. Minn. Nov. 15, 2010) (a delay of "more than *eight months*" was a "lengthy delay" that was "sufficient" by itself "to rebut any presumption" of irreparable harm) (emphasis in original); *Salient Power Sols., LLC v. Cullari Indus.*, LLC, No. 1:23-cv-479, 2023 WL 3847307, at *3 (D. Colo. June 6, 2023) (plaintiffs' "considerable three-month delay in filing this TRO motion undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury").

To be sure, "the determination of the reasonableness of a delay is context dependent." *Ng*, 64 F. 4th at 998. But here, as this Court has explained, "Plaintiffs have had ample notice of the Final Rule, had notice by January 2024 at the latest of the Defendants' intent for early implementation of some portions of the Final Rule, then waited some months of file this case, and finally chose to wait a full week after filing the Complaint to file their motion requesting a TRO." Mem. & Order at 3. That "delay alone" is sufficient to "justify the denial" of Plaintiffs' motions. *Dawson*, 725 F.3d at 894.

### D. A preliminary injunction would be contrary to the public interest.

Where the federal government is the defendant in a suit seeking a preliminary injunction, the two latter factors of the *Winter* test merge into a single consideration: would an injunction, on balance, serve the public interest? *Nken*, 556 U.S. at 435. The public interest in this case favors Defendants. Certain harm to borrowers and, by extension, to the American public would result from putting the Rule's forgiveness provisions—debuted, it bears repeating, almost a year ago—on hold now. Unlike Plaintiffs, Defendants have identified certainly impending, serious harms in the form of student-loan defaults, 88 Fed. Reg. at 43,881, delinquency, *id.* at 43,882, adverse effects on credit scores, *id.*, decreased liquidity for important purchases, *id.* at 43,883, decreased enrollment in higher education,

*id.*, drags on national economic growth, *id.* at 43,884, and increased reliance on federal welfare programs, *id.*  The public can expect to suffer more of these harms without the Rule's timely implementation.  Weighed against, say, uncertain injuries to an unidentified instrumentality in an unknown state, it is easy to see where the public interest lies.  *See Winter*, 555 U.S. at 23-24, 26 (finding harm to the public interest dispositive in denial of a preliminary injunction).

Moreover, the public interest would not be served by a preliminary injunction modifying the status quo.  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (the purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held"); *Flandreau Santee Sioux Tribe v. Dep't of Agric.*, No. 4:19-cv-04094-KES, 2019 WL 2394256, at *3 (D.S.D. June 6, 2019) (plaintiff "bears a heavier burden" if "the requested relief would alter the status quo"); *see also, e.g.*, *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991) ("The burden of demonstrating that a preliminary injunction is warranted is a heavy one where, as here, granting the preliminary injunction will give plaintiff substantially the relief it would obtain after a trial on the merits.").  And as much as Plaintiffs would like to cast themselves as white knights arriving just in time, in reality the Secretary began to implement the shortened repayment period for SAVE forgiveness in February, as had already been announced in the Federal Register.  88 Fed. Reg. at 43,821. An injunction disrupting this ongoing plan would result in chaos and uncertainty, especially for borrowers and loan servicers.

## IV.   PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.

For the reasons above, the Rule is lawful.  Nevertheless, should the Court conclude otherwise, the relief that Plaintiffs' request is still overbroad, for several independent reasons.

### A.   Any relief should be limited to redressing any cognizable injuries of any Plaintiff State that can establish standing.

Plaintiffs call on the Court to exceed longstanding constitutional and historical limits on its equitable powers by staying or enjoining the Final Rule in its entirety.  Pls.' Br. at 17-18.  The Court should decline that invitation, even if Plaintiffs were to prevail on every other issue.

Article III demands that "a plaintiff's remedy . . . be 'limited to the inadequacy that produced his injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Such relief must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Dakotans for Health*, 52 F.4th at 392-93 ("A 'preliminary injunction "must be narrowly tailored to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law."'" (quoting *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015))). Thus, English and early American courts of equity typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).

These same principles suggest that any equitable relief issued here must be limited to any Plaintiff State that can establish standing. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."); *see also Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Mem.) (Gorsuch, J., concurring) ("The district court's universal injunction defied [equity's] foundational principles. It did not just vindicate the plaintiffs' access to the drug treatments they sought. It purported to bar the enforcement of 'any provision' of the law against anyone." (internal citation omitted)). It is thus incorrect to say, as Plaintiffs do, that if "Missouri has standing," that alone "is sufficient for *all* Plaintiffs here to proceed." Pls.' Mot. for Scheduling Order at 3. Again, "standing is not dispensed in gross." *TransUnion*, 594 U.S. at 431. So even if one plaintiff with standing is enough for the Court to reach the merits and offer relief *to that plaintiff*, at the remedies stage, one plaintiff's standing does not entitle the other plaintiffs to relief, absent independent showings of harm. *Lewis*, 518 U.S. at 349 ("It is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, *actual* harm." (emphasis added)). And although the Eighth Circuit found nationwide relief appropriate in *Nebraska* on the facts of that case, it did so only after recognizing that

56

"[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." 52 F.4th at 1048.

Honoring the remedial bounds of equity here would also mean limiting any injunctive relief not only to any Plaintiff State that can show standing (including Missouri, if it is deemed to have standing through MOHELA), but to the specific provisions of the Rule allegedly causing harm. *Lewis*, 518 U.S. at 357 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Here, the only relevant provisions reduce monthly payments and shorten the maximum repayment period for REPAYE loans, thus accelerating loan forgiveness. 88 Fed. Reg. at 43,828, 43,903. And Plaintiffs have not offered any serious argument that any other features of the Rule are unlawful, so the Court should leave them intact for that reason alone.

That Plaintiffs also move under § 705 of the APA, rather than for a preliminary injunction alone, is no basis to depart from these constitutional and equitable constraints. The text of the statute settles the point: 5 U.S.C. § 705 authorizes a court "to the extent necessary to prevent irreparable injury" "to issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." Definitionally then, relief here could not extend beyond the provisions challenged or the Plaintiffs bringing a challenge without exceeding what is necessary to remedy any irreparable injury shown.

Were the text not enough, Plaintiffs' prayer for relief runs headlong into the interpretive presumption that a statute not be construed "to displace courts' traditional equitable authority absent the 'clearest command,' or an 'inescapable inference' to the contrary." *Miller v. French*, 530 U.S. 327, 340 (2000) (quoting *Califano*, 442 U.S. at 705, then quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)); *see also Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974) (§ 705 "was primarily intended to reflect existing law."). Such a clear statement being absent from 5 U.S.C. § 705, the Court must exercise that traditional equitable authority, which manifests through the traditional preliminary-injunction factors (and their corresponding limits). *See Sharp v. Parents in Cmty. Action*, 172 F.3d 1034, 1038-39 (8th Cir. 1999); *see also Texas*, 599 U.S. at 693-702 (Gorsuch, J., concurring) (suggesting that the same limitations apply to actions seeking vacatur under the APA); *Arizona v. Biden*, 40 F.4th 375, 396-97 (6th

57

Cir. 2022) (Sutton, C.J., concurring) (similar).  Not only is a clear statement displacing traditional equitable principles missing, but rather the text of § 705 should be read to incorporate those principles itself through the phrase "necessary and appropriate process."  *Cf. Sharp*, 172 F.3d at 1038 (analyzing the similar phrase "just and proper" as incorporating equitable principles).  So here, the whole of equity, with all its guardrails, governs Plaintiffs' request for relief.

**B.     The Final Rule is severable.**

At a minimum, to the extent the Court concludes that only some portions of the Rule are unlawful (or that only some portions cause Plaintiffs a cognizable Article III injury) it should still decline Plaintiffs' invitation to enjoin the Rule in its entirety.  Although Defendants are not aware of Eighth Circuit precedent on this nuance, typically, "[w]hether the offending portion of a regulation is severable depends upon [1] the intent of the agency and [2] upon whether the remainder of the regulation could function sensibly without the stricken provision."  *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001).  This Rule satisfies both requirements.

As for "the intent of the agency," *MD/DC/DE Broads.*, 236 F.3d at 22, the Rule contains a lengthy discussion of the agency's explicit intent that the rule be severable.  *See* 88 Fed. Reg. at 43,828-29.  It "is composed of a series of distinct and significant improvements . . . that individually provide borrowers with critical benefits."  *Id.* at 43,828.  And, in the agency's view, "[e]ach of these new provisions standing independently is clearly superior to the current terms of REPAYE or any other IDR plan."  *Id.*  So the intent of the agency plainly favors severability.

The second and final severability question is "whether the remainder of the regulation could function sensibly without the stricken provision."  *MD/DC/DE Broads.*, 236 F.3d at 22.  Here again, the agency made explicit and detailed findings about why "each of the components of this final rule can operate in a manner that is independent and severable of each other."  88 Fed. Reg. at 43,828.  And it provided specific "[e]xamples" that "highlight how this is the case," addressing virtually all significant features of the rule in various combinations.  *Id.*; *see also, e.g.*, *id.* ("increasing the income protection" while "maintain[ing] the interest benefit in the existing REPAYE plan"); *id.* ("consider the reduction in payments without the increased income protection"); *id.* ("the increased income

protection by itself'"); *id.* at 43,829 ("[p]roviding forgiveness after as few as 120 payments for the lowest balance borrowers"); *id.* ("the awarding of credit toward forgiveness for periods spent in different types of deferments and forbearances").  Plaintiffs offer no basis to question the agency's reasonable resolution of any of these complicated and policy-laden judgments about how parts of the Rule could function independently.  Therefore, because enjoining only a portion of the Rule would still "leave a sensible regulation in place," *MD/DC/DE Broads. Ass'n v. FCC*, 253 F.3d 732, 735 (D.C. Cir. 2001), the Court should sever any unlawful portions of the Final Rule from the lawful remainder.

C. **The Court lacks authority to enter relief directly against the President.**

Plaintiffs have named President Biden as a defendant.  Compl. ¶ 30.  But "[w]ith regard to the President, courts do not have jurisdiction to enjoin him . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("[I]n general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *id.* at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President."); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866).  Accordingly, if the Court does not dismiss the case in its entirety, it should at least dismiss the President as a defendant, and likewise should not include him within the scope of any injunction.  *See, e.g.*, *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 829 (N.D. Tex. 2022); *Oklahoma v. Biden*, 577 F. Supp. 3d 1245, 1254 (W.D. Okla. 2021).

## <u>CONCLUSION</u>

For these reasons, the Court should (1) grant Defendants' motion to dismiss (either for lack of subject-matter jurisdiction under Rule 12(b)(1) or improper venue under Rule 12(b)(3)); and (2) deny Plaintiffs' motions for a stay, temporary restraining order, or preliminary injunction.

Dated: May 7, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*