**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

STATE OF MISSOURI,                 )
STATE OF ARKANSAS,          )
STATE OF FLORIDA,            )
STATE OF GEORGIA,           )
STATE OF NORTH DAKOTA,    )
STATE OF OHIO, and          )
STATE OF OKLAHOMA        )
                                 )
        *Plaintiffs*,         )
                                 )
v.                              )  Civil Action No. 24-cv-520
                                 )
JOSEPH R. BIDEN, Jr., in his official  )
capacity as President of the United States, )
                                 )
MIGUEL A. CARDONA, in his official  )
capacity as Secretary, United States    )
Department of Education, and       )
                                 )
UNITED STATES DEPARTMENT OF  )
EDUCATION,                 )
                                 )
        *Defendants*.        )
                                 )

**<u>PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS'
MOTIONS FOR A STAY OR, IN THE ALTERNATIVE, A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .......................................................................................................... 1

SUMMARY OF ARGUMENT ....................................................................................... 1

ARGUMENT .................................................................................................................. 6

I. Defendants' Arguments Against Standing Lack Merit. ..................................... 6

    A.   Defendants' own numbers show hundreds of millions of dollars of harm to MOHELA's current portfolio of direct loans. ............................................... 7

    B.   MOHELA also has standing because of its FFELP portfolio. ................................. 14

    C.   The Bank of North Dakota has established injury. ................................................ 16

    D.   By depriving the States of tax revenue, the Final Rule imposes a fiscal or sovereign injury. ................................................................................................ 19

    E.   The Final Rule harms the States' ability to recruit and retain employees. ................ 23

II. Venue Is Proper as Courts Have Unanimously Concluded That a State May Sue in any District in That State. ....................................................................... 24

III. The States Are Likely to Succeed on the Merits. .............................................. 26

    A.   Defendants' concessions doom their case under the Major Questions Doctrine. ..... 26

    B.   The Final Rule exceeds statutory authority. .......................................................... 30

    C.   The Final Rule is arbitrary and capricious. ........................................................... 37

    D.   The Final Rule's 30-day comment period was insufficient given the significance and complexity of the Final Rule. ....................................................................... 43

    E.   Plaintiffs have made a clear showing of irreparable harm. ..................................... 45

    F.   The public interest supports blocking further implementation of an unlawful action. .............................................................................................................. 48

IV. The States Seek Appropriate Relief, Vacatur of the Entire Rule Is Required, and the President Is a Proper Party .......................................................................... 49

    A.   Vacating or postponing the entire rule is the statutorily mandated remedy. ............. 49

    B.   The narrow severability exception does not apply. ................................................. 52

    C.   The President is a proper defendant. ..................................................................... 53

CONCLUSION ............................................................................................................. 55

CERTIFICATE OF SERVICE & COMPLIANCE ........................................................ 58

# TABLE OF AUTHORITIES

**Page No.**

**Cases**

*Air Transport Ass'n of Am., Inc. v. Natl. Mediation Bd.*,
   663 F.3d 476 (D.C. Cir. 2011) ..................................................................... 40, 44

*Alabama Assn. of Realtors v. Dept. of Health and Human Services*,
   594 U.S. 758 (2021) ............................................................... 26, 27, 28, 29

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) ................. 18, 19

*American Express Co. v. American Express Limousine Service Ltd.*,
   772 F. Supp. 729 (E.D.N.Y. 1991) ................................................................ 47

*Atlanta & F. R. Co. v. Western Ry. Co. of Ala.*, 50 F. 790 (5th Cir. 1892) ................................... 24

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ........ 1, 4, 5, 6, 7, 14, 17, 26, 28, 29, 38, 39, 44, 49, 52

*Biden v. Nebraska*, No. 4:22-cv-01040 (Aug. 15, 2023) ............................................. 52

*Bittner v. United States*, 598 U.S. 85 (2023) ..................................................... 32

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ....................................................... 25

*Career Colleges and Sch. of Texas v. U.S. Dept. of Educ.*, 98 F.4th 220 (5th Cir. 2024) .............. 6

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) .................................................. 51

*Carlson v. Postal Reg. Comm'n*, 938 F.3d 337 (D.C. Cir. 2019) ................................ 52

*Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178 (2d Cir. 2019) ............... 53

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................ 21

*Clinton v. City of New York*, 524 U.S. 417 (1998) ..................................................... 54

*Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789 (3d Cir. 1951) .......................... 50

*Data Mktg. Partnership, LP v. United States Dept. of Labor*,
   45 F.4th 846, 859 (5th Cir. 2022) ............................................................. 50, 51

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ................................ 15, 18, 22

*DHS v. Regents of the Univ. of Cal.*, 591 U.S 1 (2020) ........................................ 5, 41, 51

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ...................................... 28, 29

*Florida v. Mellon*, 273 U.S. 12 (1927) ................................................................. 22

*Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368 (5th Cir. 2022) ............................................ 51

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ................................................................. 53, 54

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) ............................................... 21

*Gundy v. United States*, 588 U.S. 128 (2019) ................................................................. 37

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) .................................................. 6

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) ................................................................. 54

*Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir. 1979) .......................... 47

*In re Goodvin*, No. 19-10623, 2020 WL 6821867 (Bankr. D. Kan. Sept. 1, 2020)..................... 30

*Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013) ........................................... 44

*Kansas v. Biden*, No. 6:24-cv-01057 ................................................................. 7

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) ................................................................. 37

*Knight First Amend. Inst. at Columbia U. v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) ...... 54

*Kuehl v. Sellner*, 887 F.3d 845 (8th Cir. 2018)............................................................. 20

*L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011) ............................................ 9

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................................... 49

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020)....... 30

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................................................. 22

*Maine v. Taylor*, 477 U.S. 131 (1986) ................................................................. 20

*McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119 (8th Cir. 2015) ......................... 47

*Missouri v. Biden*, 558 F. Supp. 3d 754 (E.D. Mo. 2021) ............................................. 25

*Missouri v. Biden*, 576 F. Supp. 3d 622 (E.D. Mo. 2021) ..................................... 25, 48

*Missouri v. Biden*, No. 4:21-CV-01329-MTS, 2021 WL 5631736 (E.D. Mo. Dec. 1, 2021) ...... 25

iii

*Missouri v. Yellen*, 538 F. Supp. 3d 906 (E.D. Mo. 2021)............................................................ 25

*Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
    78 F.4th 1011 (8th Cir. 2023) ............................................................................................ 45

*N. Dakota Retail Ass'n v. Bd. of Governors of the Fed. Rsrv. Sys.*,
    55 F.4th 634 (8th Cir. 2022) .............................................................................................. 39

*Nat. Res. Def. Council v. Perry*, 940 F.3d 1072 (9th Cir. 2018)................................................. 39

*Natl. Treas. Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) ................................... 54

*NCAA v. Gov. of New Jersey*, 730 F.3d 208 (3d Cir. 2013) ................................................... 9, 16

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022)..................................................................... 45

*Nebraska v. Biden*, No. 4:22-cv-01040 (2022) ......................................................................... 25

*New Jersey v. EPA*, 989 F.3d 1038 (D.C. Cir. 2021).............................................................. 20, 21

*New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021) ...................................................................... 21

*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010) ................................................................ 54

*Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992 (8th Cir. 2023)........................ 5, 46, 47

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) .................................................................... 20

*Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021)........................................................................ 9

*Phillips Petroleum Co. v. EPA*, 803 F.2d 545 (10th Cir. 1986)................................................... 43

*Prometheus Radio Project v. FCC*, 592 U.S. 414 (2021) ........................................................... 38

*Pugin v. Garland*, 599 U.S. 600 (2023)..................................................................................... 31

*Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217 (2d Cir. 2008) ............................................. 9, 16

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006)................. 49

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010) ..................................................................... 17

*Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020) .................................................................. 22

*South Dakota v. Dole*, 483 U.S. 203 (1987) .............................................................................. 21

*Sprint Commun. Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008)....................................... 6

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405 (2017)................................................ 34

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........................................ 2, 6, 15, 18, 23

*Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568 (6th Cir. 2005).................................................... 9

*Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014)................................. 47, 48

*Texas v. DHS*, 661 F. Supp. 3d 683 (S.D. Tex. 2023) .......................................................... 24, 25

*Texas v. New Mexico*, 462 U.S. 554 (1983)............................................................................. 20

*Texas v. United States*, 50 F.4th 498 (5th Cir. 2022)...................................................................... 9

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015)................................................................ 20

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)........................................................ 9, 20, 21

*Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) ............................................ 19

*U S ex rel Atty. Gen. v. Delaware & Hudson Co.*, 213 U.S. 366 (1909)..................................... 37

*United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011) .................................................. 35

*United States v. Students Challenging Reg. Agency Procedures (SCRAP)*,
   412 U.S. 669 (1973)............................................................................................................ 6, 18

*United States v. Texas*, 599 U.S. 670 (2023) ............................................................................... 51

*United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ...................... 50

*Utah v. Walsh*, No. 2:23-cv-016, 2023 WL 2663256 (N.D. Tex. 2023) .................................... 24

*Util. Air Reg. Group v. EPA*, 573 U.S. 302 (2014)...................................................................... 29

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) ................................................................ 6, 15

*West Virginia v. EPA*, 597 U.S. 697 (2022)................................................................................. 28

*Whitman v. American Trucking Ass'ns., Inc.*, 531 U.S. 457 (2001)............................................. 36

*Window Covering Manufacturers Ass'n v. Consumer Prod. Safety Comm'n*,
   82 F.4th 1273 (D.C. Cir. 2023)............................................................................................. 39

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) .............................................................................. 19

**Statutes**

20 U.S.C. § 1078 .................................................................................... 27, 32, 33

20 U.S.C. § 1087e .................................................... 27, 28, 30, 31, 32, 33, 36

20 U.S.C. § 1087ee ............................................................................................ 31

20 U.S.C. § 1089 ................................................................................................ 42

20 U.S.C. § 1098e .............................................................................................. 34

28 U.S.C. § 1391 ................................................................................................ 25

34 C.F.R. § 682.411 ........................................................................................... 13

5 U.S.C. § 705 .................................................................................................... 50

5 U.S.C. § 706 .................................................................................................... 50

7 U.S.C. § 3151a ................................................................................................ 31

N.D.C.C. § 15-62.1-01 ...................................................................................... 17

N.D.C.C. § 15-62.1-05 ...................................................................................... 17

N.D.C.C. § 6-09-01 ........................................................................................... 17

N.D.C.C. § 6-09-02 ........................................................................................... 17

N.D.C.C. § 6-09-05 ........................................................................................... 17

**Other Authorities**

*Am I eligible for the Saving on a Valuable Education (SAVE) Plan?*, Federal Student Aid ....... 35

*Biden-Harris Administration Allows Borrowers More Time to Consolidate Loans to
    Get Credit for Progress Toward Loan Forgiveness Programs*, Department of
    Education (May 15, 2024) ........................................................................ 14

*Black's Law Dictionary* (3d ed. 1933) ............................................................ 50

Erica Green & Zach Montague, *Inside the Blunders That Plunged the College Admission
    Season Into Disarray*, N.Y. Times (Mar. 13, 2024) ........................................ 12

*How the New SAVE Plan Will Transform Loan Repayment and Protect Borrowers*,
    Department of Education (July 10, 2023) ...................................................... 49

Ian Millhiser, *You Probably Won't Get Any Student Loan Relief,*
*Thanks to a GOP-Controlled Supreme Court*, Vox.com (Feb. 28, 2023) ........................ 40

MOHELA 2021-1 Indenture of Trust ............................................................................. 16

*Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time*
*Student Debt Relief Plan*, Department of Education (June 30, 2023) ............................. 38

*Webster's Third New International Dictionary* (1993) .................................................. 31

Wright & Miller, *Federal Practice & Procedure* ........................................................ 2, 9, 24, 45

## INTRODUCTION

Defendants press arguments foreclosed by long-settled precedent, evidently to preserve the option of asking the Supreme Court to reconsider those issues.  But they should at least let this Court know that many of their positions have already been rejected.  Instead, on issue after issue— from venue, to vacatur, to the one-plaintiff standing rule reaffirmed just last year—Defendants press arguments as if there were no relevant settled precedent.  At the same time, they make basic factual errors to support their arguments about irreparable harm, such as asserting that Plaintiffs filed their complaint three weeks after they actually filed it.

Sweeping away those distractions, this case becomes easy.  On standing, the Supreme Court already approved the States' first theory.  Defendants question whether harm to MOHELA offsets alleged benefits, like the $1.6 million Defendants say they paid MOHELA to implement the Final Rule.  But Defendants' own numbers show MOHELA will be harmed to the tune of hundreds of millions of dollars.  A $1.6 million payment does not offset a $987,228,000 loss.

The merits are similarly straightforward.  Under the major questions doctrine, whenever a regulation involves a matter of "vast economic and political significance," Defendants must identify "exceedingly clear language" giving them authority.  Defendants do not even dispute that the Final Rule is a matter of vast economic and political significance.  And they admit they can only find *implied* authority for the Rule.  That necessarily fails, and this Court should speedily enter an order against Defendants and the Final Rule.

## SUMMARY OF ARGUMENT

**I.** Standing is so easy that Defendants in effect conceded to the Kansas court that the Kansas coalition would have standing if only Missouri joined.  But here, they dispute the same exact theory of standing that prevailed just last year in *Biden v. Nebraska*.  They admit that they have already

1

cancelled 28,000 MOHELA accounts (with 53,000 more being cancelled imminently), and their own numbers reveal that this deprives MOHELA of up to $2.9 million in base fees *just this year*. Yet they say the Final Rule has benefits that offset these harms. But although benefits are relevant for calculating damages in a damages suit, they are irrelevant for standing. The settled rule is that "no attempt is made to ask whether the injury is outweighed by benefits." Wright & Miller, 13A *Federal Practice & Procedure* § 3531.4 (3d ed.). Defendants fail to inform this Court of this settled doctrine.

In any event, any "benefits" come nowhere near to offsetting the harms. According to Defendants' own numbers in the Kvall declaration (ECF 22-2), the Final Rule harms MOHELA to the tune of hundreds of millions of dollars based only on MOHELA's *current* loan portfolio. Considering just MOHELA's 2.77 million current borrowers who have original principal balances below $12,000, meaning they can obtain forgiveness ten years faster than normal, *id.* ¶¶ 3, 32, the Final Rule will cause MOHELA to lose up to $987,228,000 over the next ten years.

Defendants' arguments fail in part because they repeatedly employ the wrong standard. They assert that to establish injury Plaintiffs must identify specific dollars lost with "certain[ty]." ECF 22 at 9, 13–14, 18, 23. To be clear, Plaintiffs have done that, but the actual standard is much softer: a plaintiff must show "the threatened injury is 'certainly impending,' *or* there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (emphasis added). Defendants never mention the "substantial risk" standard. Plaintiffs need only show a "substantial risk" that the Final Rule will cause at least $1 of harm. The States have done that hundreds of millions of times over.

One wonders, in fact, why Defendants even bother to contest standing. In addition to the MOHELA theory that prevailed at the Supreme Court, Plaintiffs have at least four other theories.

First, MOHELA owns legacy loans that are being consolidated because of the Final Rule. Defendants say causation is speculative, but the States need only show a "substantial risk" that even one loan will be consolidated. MOHELA in fact experienced an enormous spike in consolidations right when Defendants announced they would start forgiving loans early.

Second, Defendants argue that it is "speculative" that borrowers will choose the Federal Government over the Bank of North Dakota. But the Final Rule requires the typical borrower to pay only 61 cents on the dollar for federal loans. It is hardly speculation to note that new borrowers will choose that over the Bank's requirement of actual repayment of all principal plus interest.

Third, Defendants assert that Plaintiff States cannot rely on a theory of loss of tax revenue because the States could change their laws. But that would trade a fiscal injury for a sovereign one. Courts regularly recognize that having to change the laws is a sovereign injury.

Fourth, there is a "substantial risk" that the Final Rule will harm state and local recruiting by making the Public Service Loan Forgiveness program comparatively less attractive. Defendants even admit that the PSLF program is helpful for recruiting.

**II.** Venue is proper. For over 100 years, every court to assess the issue has determined that a State "resides" in every federal district in the State, not just the district that encompasses the State's capital. Defendants fail to inform this Court of that unanimous, settled history. In addition, MOHELA resides in the Eastern District, so venue is proper under two distinct theories.

**III**. The States are likely to succeed on the merits.

**A.** Defendants' concessions doom their case under the major questions doctrine. That doctrine requires "exceedingly clear language" whenever a rule has substantial "economic and political significance." But Defendants admit their interpretation of the statute is "(at least) equally consistent" with Plaintiffs' reading. ECF 22 at 50. And they admit that they think forgiveness is

3

available under the income-contingent statute not by express language, but instead by implication. But language susceptible of two interpretations or language permitting forgiveness only by implication falls far short of the clear-statement rule required by Supreme Court precedent.

**B**. The Final Rule exceeds statutory authority.  Defendants do not dispute that the "average borrower" will never pay back the principal borrowed.  That converts "loans" into grants.  And they do not dispute that the ICR statute expressly requires "repayment."  They try to insert the term "partial" in front of "repayment," but they themselves put it best when they concede that "absent provisions cannot be supplied by the courts."  Defendants likewise do not dispute that the ICR statute nowhere includes express forgiveness language, unlike other provisions in the HEA.  They instead assert that the Secretary's forgiveness authority follows implicitly from the text that says he may create repayment plans for a period "not to exceed 25 years."  But that language *limits* the Secretary.  It requires "repayment" in "25 years" or less.  It does not permit forgiveness.  The argument also proves too much.  The ICR plan is not the only one the Secretary creates.  He must also create the "standard repayment plan" for a period "not to exceed 10 years."  Nobody thinks that same language gives the Secretary authority to forgive loans on the standard repayment plan.

At the very least, the canon of constitutional avoidance favors Plaintiffs.  Defendants do not dispute that they have asserted authority to cancel every penny of every student loan, with the only constraint being that they must do so through a promulgated rule.  That is an extraordinary assertion of authority that, if correct, would violate the nondelegation doctrine.

**C.** The Final Rule is arbitrary and capricious.  Most extreme is Defendants' decision to underestimate the cost by at least $300 *billion* based on the already-proven-false assumption that Defendants would prevail in *Biden v. Nebraska*.  The Rule did not become final until after the Supreme Court's decision.  Defendants should have reassessed.

**D.** The 30-day comment period was insufficient.  No court has upheld such a short period for such a monumental rule.  Indeed, it appears the purpose of the short period was to race to beat the Supreme Court, which had already hinted it would strike down the first attempt at mass loan cancellation when it declined Defendants' request to immediately vacate the Eighth Circuit's injunction.

**E.** Plaintiffs have clearly shown irreparable harm.  Defendants admit they have already cancelled 28,000 MOHELA loans and are continuing to cancel tens of thousands every month.  Defendants contend that Plaintiffs "delayed" their lawsuit, but even if that were true (it is not), binding Eighth Circuit precedent says "[d]elay is only significant if the harm *has occurred* and the parties cannot be returned to the status quo."  *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 998 (8th Cir. 2023) (emphasis added).  Where, as here, Plaintiffs are also asserting *future* harm, the delay argument is legally irrelevant.

**IV.** The States seek appropriately tailored relief.

Again, Defendants simply ask this Court to ignore Supreme Court precedent.  They say *every* State in this coalition must establish "independent showings of harm."  ECF 22 at 69.  But the Supreme Court in *Biden v. Nebraska* reaffirmed the standard rule: "If at least one plaintiff has standing, the suit may proceed."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023).

Equally unavailing is the attempt to avoid vacatur of the Final Rule.  As courts have repeatedly held, vacatur is the "default" remedy.  And it is what the Supreme Court said is required.  *DHS v. Regents of the Univ. of Cal.*, 591 U.S 1, 9 (2020) ("must be vacated").  Exceptions to this "default" rule are necessarily exceptional and do not apply here.

The President is also a proper party—which is no surprise given the many cases filed each year against the President.  At the very least, the Supreme Court has held that declaratory relief

often is permissible.  While injunctive relief is rarer, it is permitted where full relief cannot be obtained against subordinate officials.  The President has openly bragged that *Biden v. Nebraska* did not stop him.  An injunction against a subordinate official in this case might not either.  At the very least, Plaintiffs have alleged sufficient facts to establish that relief against the President may be warranted.  Dismissal at this early stage would be improper.

## ARGUMENT

Because this case is not yet at final judgment, the requirements for standing are more relaxed.  "At the preliminary injunction stage, the movant must clearly show only that each element of standing is *likely* to obtain in the case at hand."  *Career Colleges and Sch. of Texas v. U.S. Dept. of Educ.*, 98 F.4th 220, 233 (5th Cir. 2024) (citation omitted) (emphasis added).  The States have easily satisfied that standard and more.

### I.    Defendants' Arguments Against Standing Lack Merit.

Contrary to Defendants' repeated assertions otherwise, ECF 22 at 9, 13–14, 18, 23, the States need not establish harm with certainty.[1]  It is enough that they show that there is "likely" to be a "'substantial risk' that the harm will occur."  *Susan B. Anthony List*, 573 U.S. at 158.

The States have done that and much more.  Defendants do not dispute that even $1 of harm is sufficient for standing.  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) ($1); *Sprint Commun. Co., L.P. v. APCC Services, Inc*., 554 U.S. 269, 289 (2008) ("a dollar or two"); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 668 (1966) ($1.50); *United States v. Students Challenging Reg. Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n.14 (1973) (collecting sources).  The idea that the Final Rule is not even likely to create $1 of harm to the States is absurd.

---

[1] To avoid ambiguity, all page numbers in ECF documents are to the ECF number at the top of the page, not the different number at the bottom.

**A. Defendants' own numbers show hundreds of millions of dollars of harm to MOHELA's current portfolio of direct loans.**

In the Kansas case, Defendants all but conceded that the Kansas coalition would have standing if only Missouri had joined. *Kansas v. Biden*, No. 6:24-cv-01057, ECF 42 at 4 (Apr. 12, 2024); *see also Kansas v. Biden*, Brief in Opposition, ECF 46 at 46 (opposing standing because "Plaintiffs have not identified any analogue to MOHELA, and Missouri is not a plaintiff").[2]  But now Defendants have flipped their position, ignoring binding precedent in the process.  The standing analysis in *Biden v. Nebraska* was simple: because "MOHELA receives an administrative fee for each of the five million federal accounts it services," any forgiveness deprives MOHELA (and thus Missouri) of "fees that it otherwise would have earned," which is "an injury in fact directly traceable to the Secretary's plan." *Biden v. Nebraska*, 143 S. Ct. at 2366.

Defendants concede the same is occurring here.  They admit they already closed 28,000 MOHELA accounts under the Final Rule, that they are already processing 53,000 more closures, and that these closed accounts deprive MOHELA of at least $2.97 per month, per borrower.  ECF 22 at 24; ECF 22-2 ¶¶ 11, 33.  Each of those closed accounts—and the millions more that will prematurely close in the future under the Final Rule—imposes "an injury in fact directly traceable to the Secretary's plan." *Biden v. Nebraska*, 143 S. Ct. at 2366.

In an attempt to avoid this straightforward, binding precedent, Defendants raise two arguments.  Both fail.  Indeed, Defendants' own math shows that MOHELA will lose up to *hundreds of millions of dollars*.  Even forgiving only the subset of MOHELA's borrowers who had loan balances smaller than $12,000 would cost MOHELA between $535 million and $987 million.  Defendants' assertion that MOHELA cannot establish a risk of even $1 of loss is absurd.

---

[2] https://storage.courtlistener.com/recap/gov.uscourts.ksd.151881/gov.uscourts.ksd.151881.42.0.pdf; https://storage.courtlistener.com/recap/gov.uscourts.ksd.151881/gov.uscourts.ksd.151881.46.0.pdf

> ### i. Defendants are cancelling far more accounts than MOHELA requested to be transferred.

Defendants first purport to identify (at 24) "significant intervening factual developments" they think deprive this Court of jurisdiction: namely the Department, at MOHELA's request, reallocated 1.5 million accounts to a different servicer. But by their own admission, Defendants are removing *more* accounts than requested. Beyond the 1.5 million accounts, Defendants have removed 28,000 accounts with 53,000 more slated for removal. And already 2.24 million MOHELA account holders have enrolled in SAVE, with many more to come. Kvall Decl. ¶ 3 (ECF 22-2). To contend, as Defendants do, that MOHELA is not harmed because MOHELA voluntarily requested a transfer of *fewer* accounts than are being affected is like saying a person is not harmed by an illegal tax surcharge because the person voluntarily paid taxes last year.[3]

> ### ii. Purported "benefits" of the Final Rule are legally irrelevant to whether MOHELA has experienced injury, and those "benefits" pale in comparison to the hundreds of millions of dollars of harm.

Next, Defendants assert (at 25–26) that the Final Rule will create "benefits" that "outweigh" the clear harms. They assert, for example, that the Final Rule will lead to fewer

---

[3] Defendants also mischaracterize the background behind MOHELA's initial request. MOHELA became the sole servicer of PSLF accounts in July 2022. Those accounts are "more complex and costly" than others. ECF 22-3 at 3 (MOHELA letter). Under the new contract, PSLF now will be covered by "MOHELA and four other loan servicers." *Id*. at 2. MOHELA was about to lose its monopoly of PSLF accounts anyway, and so it asked Defendants to transfer 1.5 million of (mostly) PSLF accounts that already were "slated to be transferred to a different servicing platform." *Id*. at 2. MOHELA did so to save the expense and time of transitioning those accounts to a new operating system. *Id*. at 2–3 ("more work and time is required to transfer accounts off of the legacy platform and then onto MOHELA's new platform than to simply transfer the loan directly to another [loan] servicer"). The Secretary "agree[d] that movement of accounts" in this way "will improve customer service," and so the Secretary agreed to accept the transfer. ECF 22-4 at 2 (Dep't of Education letter); *id*. ("we are supporting the request to transfer").

So contrary to Defendants' incorrect insinuation that MOHELA is underwater and trying to shed accounts, both MOHELA and the Department agreed to transfer PSLF accounts at a time when MOHELA was already losing its status as the sole servicer of PSLF accounts. This does not justify cancelling millions of additional accounts.

contractual penalties for MOHELA and fewer delinquencies for borrowers.  *Id.*  They also assert that "some" unspecified number of accounts might actually last longer under the SAVE plan.  *Id.*  Their argument is wrong both legally and factually.

**1.** Legally, it is well settled that courts do not consider "offsetting" benefits for purposes of standing.  Instead, the rule is that "no attempt is made to ask whether the injury is outweighed by benefits."  Wright & Miller, 13A *Federal Practice & Procedure* § 3531.4 (3d ed.); *see also Texas v. United States*, 809 F.3d 134, 155–56 & n.59 (5th Cir. 2015) (collecting cases), *aff'd*, 136 S. Ct. 2271 (2016).  A court's "standing analysis is not an accounting exercise."  *NCAA v. Gov. of New Jersey*, 730 F.3d 208, 223 (3d Cir. 2013), *abrogated on other grounds by Murphy v. NCAA*, 584 U.S. 453 (2018).  "A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it."  *Id.*; *accord Peters v. Aetna Inc.*, 2 F.4th 199, 218 & n.10 (4th Cir. 2021) (citing sources); *Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022) (declining to engage in an "accounting exercise"); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 656–59 (9th Cir. 2011) (finding standing to challenge a regulation that increased costs in some ways while saving money in others); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570–75 (6th Cir. 2005) (patient had standing to sue over medical device that increased risks even though no complication materialized and device had benefited him).  Offsetting benefits may be "sufficient to defeat a claim for damages," but it "does not negate standing."  *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008).[4]

---

[4] The one exception is when "costs and benefits ar[i]se out of the same transaction" such that there is no injury felt at all from any aspect of a challenged action.  *Texas v. United States*, 809 F.3d at 156.  For example, "taxpayers lacked standing" to challenge a law authorizing a new kind of license plate because the fees paid by drivers purchasing the plate covered the expenses of producing and distributing the plate, so there were no tax expenditures on the program.  *Id.* Defendants of course have not agreed to pay MOHELA all its administrative fees for accounts that close under the Final Rule.

The Supreme Court last year likewise did not consider any "offsetting" benefits from the previous rule.  Defendants argue now that the Final Rule will somehow save MOHELA money because it will "decrease the number of delinquent borrowers, which cost more to service because they require additional outreach."  ECF 22 at 25.  But the last rule also decreased delinquent accounts (by getting rid of them).  And yet the Supreme Court did not consider that.

**2.** Defendants' suggestion that cancelling millions of MOHELA's accounts somehow *saves* MOHELA money is also preposterous.  Indeed, their own numbers shows that MOHELA is harmed up to hundreds of millions of dollars, which no alleged "benefits" come close to offsetting.

Consider the harms already imposed.  Defendants admit that they have already cancelled or are in the process of cancelling 81,000 MOHELA accounts.  Kvall Decl. ¶ 33.  In general, MOHELA earns a base fee of $2.97 per account per month with additional "per-task, per-borrower" fees.  *Id.* ¶ 8.  Even considering only the base fee, MOHELA will lose $35.64 per account closed this year.  That is $2.9 *million* in lost fees just this year for the 81,000 accounts already cancelled (or in the process of being cancelled).  MOHELA will suffer that same loss for every future year that these accounts would have been serviced.

Things will only get worse as the year wears on.  MOHELA services 8.2 million accounts, and 2.24 million have already enrolled in the SAVE plan, with millions more eligible to enroll. *Id.* ¶ 3.  And Defendants estimate that under the Final Rule, 42.8% of undergraduate borrowers will be eligible for forgiveness faster than the 20 years under the old plan, with more than half of those borrowers eligible for early forgiveness after 10 years instead of 20.  88 Fed. Reg. 43,891 (23.53% of all undergraduate borrowers estimated to be eligible for forgiveness after just 10 years). So just considering the 2.24 million MOHELA borrowers already enrolled in SAVE, MOHELA

will lose $187.8 million across ten years.[5]  (23.53% of the 2.24 million borrowers multiplied by $35.64 per borrower per year for 10 years.)  That does not include the 19% of undergraduate borrowers who will receive early forgiveness after more than 10 years but fewer than 20.

Once other borrowers in MOHELA's portfolio join the SAVE program, things will become worse.  Defendants note that 2.77 million MOHELA borrowers have original principal balances below $12,000, meaning they can obtain forgiveness in just 10 years instead of 20.   Kvall Decl. ¶¶ 3, 32.  Considering only these borrowers, the cost of the Final Rule to MOHELA under the current contract is up to $98.7 million *per year* of early forgiveness.  (2.77 million multiplied by $35.64 per borrower.)  Because MOHELA would be able to service many or all these borrowers for an additional 10 years absent SAVE, the Final Rule imposes a 10-year cost of up to $987,228,000 for this subset of borrowers.  This does not even include all the borrowers who will be eligible for forgiveness between 11 and 20 years.  And it reflects only the *base* fees the Federal Government owes MOHELA, not additional fees that are part of the contract.  *Id.* ¶ 8.

These figures also reflect only MOHELA's *current* portfolio.  Each year, MOHELA brings in potentially hundreds of thousands of new accounts as borrowers graduate.  Before the Final Rule, MOHELA could expect to earn administrative fees on many accounts for more than two decades.  After the Final Rule, Defendants estimate that nearly half these new borrowers (42.8%) will receive early forgiveness, depriving MOHELA of years of earnings.  88 Fed. Reg. 43,891.

**3.** None of the four alleged "benefits" of the Final Rule comes close to offsetting these astronomical harms.

---

[5] Defendants note that under a future contract (not yet in full effect), the monthly administrative fee for some borrowers may drop to as low as $1.61—54% of the current fee.  But even under that future contract, MOHELA will still be deprived of more than $101.8 million just for individuals currently enrolled in SAVE and currently in MOHELA's portfolio.

First, Defendants assert (at 25) that MOHELA will have fewer contractual penalties for errors if it services fewer accounts, citing a "$7.2 million penalty." That sum is the only "penalty" Defendants cite, it is not yet final (MOHELA is disputing the accusation), and it pales in comparison to the up to $987 million MOHELA will lose on just its *current* portfolio of direct loans for just those borrowers eligible for cancellation after 10 years.

Defendants fail to acknowledge their own culpability for the $7.2 million withholding. Defendants withheld that amount after accusing MOHELA of sending some billing statements late to borrowers. Kvall Decl. ¶ 13. But they neglect to mention that the alleged problem occurred after the Federal Government paused all loan payments for three years and then demanded that loan servicers turn repayment back on for everybody at the same time.[6] That was an extraordinary logistical demand that no servicer ever has had to do before.[7] Loan servicers typically have to turn on payments and send billing notifications only for the much smaller subset of borrowers who just graduated. And there is no reason to believe this logistical challenge will happen again. Even if Defendants were correct to withhold $7.2 million, MOHELA's alleged error was a one-off event.

Second, Defendants assert that MOHELA received $1.6 million in "transition costs" to help cover costs associated with administering the technical changes to switch to the SAVE plan. ECF 22 at 25. Even assuming that is accurate, $1.6 million does not even cover the $2.9 million

---

[6] This is just the tip of the iceberg for student loan problems recently caused by the Federal Government. Defendants recently "botched rollout of a new version of the Free Application for Federal Student Aid, known as FAFSA, that millions of families and thousands of schools rely on to determine how students will pay for college." Erica Green & Zach Montague, *Inside the Blunders That Plunged the College Admission Season Into Disarray*, N.Y. Times (Mar. 13, 2024). And Defendants improperly delayed processing PSLF forgiveness, which "led to a PSLF backlog at MOHELA not of its own making." Ex. 1, Divine Decl. (incorporating Ex. A, MOHELA letter at 3 (Mar. 25, 2024)).

[7] Indeed, in the lead up to that logistical challenge, MOHELA "dramatically increased its staffing . . . from 531 staff" in 2021 "to 3,419" by February 2024. Ex. 1, Divine Decl. (incorporating Ex. A, MOHELA letter at 2 (Mar. 25, 2024)).

MOHELA will lose in fees this year for just the accounts Defendants admit they are already in the process of cancelling (and may very well have already cancelled by the time this brief is filed).

Third, Defendants note that "MOHELA receives reduced payments to service delinquent borrowers" and that under the SAVE program, "delinquencies and defaults should drop." *Id.* But Defendants ignore that their solution for solving "delinquency" is to cancel loans.[8]  While MOHELA receives "reduced" payments for delinquent borrowers, MOHELA receives *some* payments—for example, $2.34 per borrower per month instead of $2.97, for borrowers in the first stage of delinquency.  Kvall Decl. ¶ 11.  Under the Final Rule, MOHELA will receive nothing when these loans are unlawfully cancelled.[9]

Finally, Defendants argue (at 25) that "some" unspecified number of borrowers might keep their accounts open longer due to the new $0 payments.  But Defendants cannot even estimate the number who will have $0 payments, Kvall Decl. ¶ 29, much less the number who might delay paying off their accounts.  If delaying payoff makes sense at all, it would make sense only for persons with very high debt loads and persistently low incomes.  And even then, because loans forgiven after 2026 are taxed, individuals right now have an incentive to speed up forgiveness, not delay it.  For all Defendants' (false) accusations of plaintiff speculation, it is Defendants who are guilty of speculating.

---

[8] Defendants also tellingly fail to provide statistics identifying either the number of borrowers who are typically delinquent or how many are expected to be under the Final Rule.

[9] Defendants also note that delinquent borrowers "cost more to service because they require additional outreach."  ECF 22 at 25.  But they fail to inform this Court that the "additional outreach" is often virtually costless.  Federal regulations, for example, require merely "one written notice" in the first stage of delinquency.  34 C.F.R. § 682.411(c).  That can be an automated email.  Even when a borrower goes through all stages of delinquency and into default, the "outreach" need only be a maximum of six automated emails and four attempts at phone calls.  *Id.* § 682.411(d)–(f).  Those attempted phone calls can be automated as well.

**B.  MOHELA also has standing because of its FFELP portfolio.**

Last year, the Supreme Court found it noteworthy that MOHELA "owns over $1 billion in FFELs." *Biden v. Nebraska*, 143 S. Ct. at 2365.  Unlike direct loans, these loans are held by MOHELA, not the Federal Government.  And rather than receive fees to administer those accounts (the revenue stream for direct loans), MOHELA draws a continuous stream of interest income from these FFELP loans.  The Final Rule harms MOHELA in this respect because it causes borrowers to consolidate their FFELP loans into direct loans so they can take advantage of the SAVE plan.  While the Federal Government gives MOHELA the unpaid principal for loans that are consolidated (principal that MOHELA eventually would have received anyway), MOHELA loses the continuous revenue stream of interest from those loans.  That is a financial injury.

Defendants raise two flawed arguments against this straightforward theory of standing.

**1.** They first say (at 26) it is speculative that borrowers will consolidate FFELP loans because of the SAVE Final Rule.  To the contrary, Defendants do not deny that they themselves expressly urge borrowers to consolidate to take advantage of the SAVE plan, including by reaching out directly to individual borrowers by email.  ECF 1 ¶ 123 (citing federal sources).  Just two days ago, Defendants' own declarant, James Kvall, said, "FFEL borrowers should consolidate as soon as possible" so they can make "progress . . . toward income-driven repayment (IDR) forgiveness." *Biden-Harris Administration Allows Borrowers More Time to Consolidate Loans to Get Credit for Progress Toward Loan Forgiveness Programs*, Department of Education (May 15, 2024) (press release with quote from Kvall).[10]  Defendants would not themselves expend resources urging borrowers to consolidate "as soon as possible" to take advantage of the Final Rule if they did not think it likely borrowers would do so.  Likelihood of at least $1 of consolidation is all

---

[10] https://www.ed.gov/news/press-releases/biden-harris-administration-allows-borrowers-more-time-consolidate-loans-get-credit-progress-toward-loan-forgiveness-programs

Plaintiffs need to show.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019); *Uzuegbunam*, 141 S. Ct. at 802.

In fact, consolidations at MOHELA spiked immediately after Defendants announced they were beginning to cancel loans under the Final Rule.  As Defendants recount, they notified the public in early January that they would begin forgiving loans earlier than July, and in February 2024, they announced they had already forgiven $1.2 billion under the Final Rule.  ECF 22 at 62; ECF 1 ¶ 107.  A month before the announcement, MOHELA saw $6.9 million in consolidations.  Ex. 1, Divine Decl. (incorporating Ex. B, MOHELA Consolidation data).  In January, that spiked to $11.5 million, the highest amount in more than a year.  *Id.*  In February, it shot up even higher to $20.5 million, triple the December 2023 numbers.  *Id.*  To suggest, as Defendants do, that *none* of these consolidations occurred because of the Final Rule is—to say the least—implausible.

So Defendants next protest (at 27) that it is "not at all certain" that consolidation will deprive MOHELA of funds.  That is the wrong standard.  MOHELA need only show it is "likely" there is a "substantial risk" of loss.  *E.g.*, *Susan B. Anthony List*, 573 U.S. at 158.  But in any event, loss of revenue is "certain."  Defendants do not dispute that when a loan is consolidated, MOHELA loses a stream of revenue: income on monthly interest.  ECF 22 at 27 ("Yes, any interest that the borrower would pay on the debt thereafter goes directly to the federal government, not MOHELA.").  That is enough.

**2.** In response, Defendants again raise an "offsetting benefits" argument: that MOHELA can offset losses by investing the paid principal into other assets in today's "current high-interest rate environment."[11]  *Id.*  Again, while offsetting benefits may "defeat a claim for damages," they

---

[11] Even assuming the current environment of high interest rates will continue for years, MOHELA is not able to access all those investment opportunities.  MOHELA's investment

"do[ ] not negate standing." *Ross*, 524 F.3d at 222.  Defendants' argument is a lot like saying a tort victim cannot sue for lost wages from missing work because he might be able to invest that time into starting a successful business.  A court's "standing analysis is not an accounting exercise." *NCAA*, 730 F.3d at 223.

Nor is it sufficient for Defendants to note (at 27) that MOHELA "could" become the servicer of consolidated loans and thus earn fees.  The current servicing fee of $35.64 per year is well below the interest income on even the smallest of loans.  (A $1,000 loan balance at 5%, for example, yields $50 in yearly interest.)  Defendants also do not dispute that MOHELA will *not* be selected for many consolidated loans, which are allotted among all servicing companies.

Similarly, Defendants assert that when loans are consolidated, MOHELA no longer has to pay a "rebate" fee on those loans.  *Id.*  But Defendants' own filings reveal that the "rebate" is just the amount of interest collected that *exceeds* regulatory limits.  ECF 22-5 at 11 (MOHELA Annual Disclosure) ("[MOHELA is] required to rebate any such 'excess interest' to the Secretary on a quarterly basis.").  That "excess interest" is a small portion of the overall interest received by MOHELA each year.  Defendants' argument is a lot like saying that complete loss of income is not an injury because the person no longer has to pay income taxes.  It betrays reason.

### C.  The Bank of North Dakota has established injury.

Similarly meritless are Defendants' attempts to dispute that North Dakota can sue on behalf its bank or that the Bank is harmed by the Final Rule.

**1.** Defendants contend (at 35) that Plaintiffs have not established that the Bank of North Dakota is an "instrumentality" of North Dakota because Plaintiffs "cite only the statutes establishing the bank, providing for student loans, and prescribing the use of student-loan interest

---

opportunities are limited by indentures of trust.  *E.g.*, MOHELA 2021-1 Indenture of Trust, *available at* https://www.mohela.com/DL/common/publicinfo/investorInformation.aspx.

payments." But those statutes in fact provide that the Bank of North Dakota is "*owned, controlled, and operated by*" the State of North Dakota for "the purpose of encouraging and promoting agriculture, commerce, and industry." N.D.C.C. § 6-09-01 (emphasis added); *see also, e.g.*, *id*. at § 6-09-02 (the Bank reports to the State Industrial Commission); *id*. at § 6-09-02.1 (the Governor appoints the Bank's board of advisory directors); *id.* at § 6-09-05 (the State Industrial Commission may remove Bank appointees); *id.* at §§ 15-62.1-01; 15-62.1-05 (interest earned by the Bank from student loans is used to implement, maintain, and administer state programs).

Regardless of whether the "instrumentality inquiry is inescapably fact intensive," ECF 22 at 35, the Bank of North Dakota is "inescapably" an instrumentality of the State. The Supreme Court held that MOHELA was an instrumentality of Missouri where "[i]t was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State." *Biden v. Nebraska*, 143 S. Ct. at 2367. So too here. As the President of the Bank puts it in a declaration, "the Bank of North Dakota is an instrumentality of the State of North Dakota by both law and practice." Ex. 2, Steinwand Decl. ¶ 4.

**2.** Defendants next dispute that North Dakota can raise the competitor-standing doctrine in a suit against the Federal Government. They contend the doctrine applies "*only* in the context of competition between two non-governmental actors." ECF 22 at 35–36 (emphasis added). But they fail to cite even a single case limiting that doctrine that way. Indeed, courts routinely describe the doctrine of competitor standing in generally applicable terms. *See, e.g.*, *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) ("Regardless how we have phrased the standard in any particular case, . . . the basic requirement common to all our cases is that the complainant show an actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact."); *see also, e.g.*, *id*. at 72 ("we have applied the doctrine of competitor standing to

17

the political 'market,' holding incumbent congressmen had standing to challenge new campaign finance regulations that made it easier for rival candidates to compete against them").  Regardless of who is responsible, the competitive *injury* is still an *injury* for standing purposes.

That makes sense because governments operate in more than one capacity.  Governments regularly engage in proprietary activities—that is, business activities—and both North Dakota and the Federal Government do so here.  Government "is bound to have a variety of proprietary interests." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601–02 (1982). "As a proprietor, it is likely to have the same interests as other similarly situated proprietors.  And like other such proprietors it may at times need to pursue those interests in court." *Id.*  If governments have similar interests as other proprietors, it follows that the competitor-standing doctrine applies to governmental organizations.

**3.** Defendants speculate that some borrowers may still choose to borrow from North Dakota (and thus pay back in full) rather than the Federal Government (and pay back only 61 cents on the dollar).  Even if true, a "predictable effect," *Dep't of Commerce*, 139 S. Ct. at 2566, of the Final Rule is that at least *some* borrowers will choose the Federal Government over the Bank because of the Final Rule.  The Bank need only establish it is "likely" there is a "substantial risk" of losing even one customer.  *SCRAP*, 412 U.S. at 690 n.14; *Susan B. Anthony List*, 573 U.S. at 158.  It has easily done so.  The Bank estimates the Final Rule will cost the bank $19 million in interest revenue over the next 15 years.  Steinwand Decl. ¶ 10.

That does not change simply because North Dakota encourages some borrowers to take out federal loans.  ECF 22 at 35–36.  The Bank competes with the Federal Government on the back end, offering refinancing services such as consolidation loans with interest rates lower than federal loans.  "[A]pproximately 16,000 student loan borrowers have consolidated federal student loans

18

with the Bank of North Dakota" because, before the Final Rule, the Bank "is able to offer better terms." Steinwand Decl. ¶ 8. The Final Rule harms the Bank's ability to do so because it guarantees that the typical borrower will only pay back 61 cents on the dollar, which the Bank of North Dakota cannot guarantee. Under the Final Rule, "borrowers will be strongly disincentivized to take or consolidate their loans with the Bank of North Dakota." *Id.* ¶ 9.

### D.  By depriving the States of tax revenue, the Final Rule imposes a fiscal or sovereign injury.

While general harm to the economy "caus[ing] a decline in general tax revenues" does not confer standing, "loss of specific tax revenues" does. *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). Several Plaintiff States tax student loan forgiveness by defining state income with reference to federal income. The Final Rule accelerates forgiveness to before 2026, when loan balances are not included in federal income, creating a "loss of specific tax revenues" for the States. Defendants make four attempts to evade the plain holding of *Wyoming*. None succeeds.

**1.** They assert (at 31) *Wyoming* is inapplicable because Defendants are the Federal Government. But they cite no case to support their novel argument that Article III analysis changes depending on who the defendant is. To the contrary, the constitutional purpose of standing is to identify which disputes can be classified as "'Cases' and 'Controversies.'" *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017). A plaintiff who experiences a "loss of specific tax revenues" is injured, regardless of who the defendant is.

**2.** Nor are Defendants correct to assert (at 29) that the States' harms are "self-inflicted" because they could change their tax codes. ECF 22 at 29. Defendants ignore the rule that forcing a State to choose between economic harm and changing its laws creates a sovereign injury. The States have "sovereign interests" in "the power to create and enforce a legal code." *Snapp*, 458 U.S. at 601. They also have a sovereign interest in not changing their laws because "a State clearly

has a legitimate interest in the continued enforceability of its own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986); *accord Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) ("[B]eing pressured to change state law constitutes an injury."). In fact, changing their laws would create administrative burdens and decrease tax revenues. States' Br., ECF 10 at 30. It would also force the States to give up other priorities in light of the limited legislative time. And for States whose legislative sessions have ended, changing the law to account for 2024 forgiveness is impossible.

Defendants rely on *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976), but that case is consistent with this principal. There, the Supreme Court declined to exercise "original jurisdiction" when Pennsylvania—citing a state law giving Pennsylvanians "credit for taxes paid to New Jersey"—challenged a New Jersey tax law. *Id.* at 664. The Court determined that Pennsylvania's injury was "self-inflicted." *Id.* Several courts, including the Eighth Circuit, have determined that this case only "concerned the Supreme Court's original jurisdiction as opposed to Article III standing." *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021); *accord Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018) ("In *Pennsylvania*, the Court ruled that its original jurisdiction over disputes between states could not be invoked when a state's own legislative decisions caused the alleged harm."). Article III and original jurisdiction are different. Original jurisdiction is statutory, and the Supreme Court has interpreted that statute "as providing [the Supreme Court] with substantial discretion to make case-by-case judgments as to the practical necessity" of permitting a case to proceed. *Texas v. New Mexico*, 462 U.S. 554, 570 (1983).

Courts also have noted that Wyoming, but not Pennsylvania, "sued in response to major changes in the defendant states' policies." *Texas v. United States*, 809 F.3d at 158. "Conversely, the *Pennsylvania v. New Jersey* plaintiffs sued not because of a change in the defendant states'

laws but because they believed that *Austin v. New Hampshire*, 420 U.S. 656 (1975), had rendered the defendants' laws unconstitutional." *Id.*

This case is much more like *Wyoming*. The States do not seek to leverage new Supreme Court doctrine to attack a longstanding law or regulation. The States instead sue in response to a change in policy. "The fact that [the States] sued in response to a significant change in the defendants' policies shows that its injury is not self-inflicted." *Id.* And in contrast to *Clapper v. Amnesty Int'l USA*, where plaintiffs tried to "manufacture standing by choosing to make expenditures," 568 U.S. 398, 402 (2013), "there is no allegation that [the States here] passed [their taxation] law[s] to manufacture standing." *Texas v. United States*, 809 F.3d at 159.

That makes this suit much like the many cases brought by state or local government that face economic injury even though they might mitigate that injury by changing their laws. For example, the Supreme Court permitted South Dakota to challenge a law conditioning highway funding on adopting a minimum drinking age. *South Dakota v. Dole*, 483 U.S. 203 (1987). South Dakota could have resolved its injury by changing its law, but the Supreme Court never suggested the State's injury was self-inflicted. Similarly, the Supreme Court held that a "reduction in property values directly injures a municipality by diminishing its tax base" even though a municipality could solve that injury by abolishing its property tax. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110–11 (1979). Lower courts routinely adopt similar analysis. *E.g.*, *New Jersey v. EPA*, 989 F.3d at 1046 ("[I]ntervenors' argument is contrary to this court's precedent, which has not treated a state's ability to change its laws to evade injury as precluding standing to challenge EPA's actions under the Act. EPA's actions injure states when those actions necessitate changes to state laws . . . ."); *New York v. Yellen*, 15 F.4th 569, 576 (2d Cir. 2021) (injury where State challenged reduction in federal credit for paying state taxes because reduced

federal credit "makes homeownership more expensive, the cap reduces demand in the housing market, causing lower prices and fewer sales, and leads to specific losses in tax revenue derived from property and real estate transfer taxes"); *Sierra Club v. Trump*, 977 F.3d 853, 868 (9th Cir. 2020), *cert. granted, judgment vacated as moot*, 142 S. Ct. 56 (2021) (injury where federal action interfered with "California's ability to enforce its state laws" even though California could eliminate injury by changing those laws); *id.* at 871 (injury because federal border wall construction would lead to "loss of tax revenues," even though States could change those tax laws).

**3.** Defendants next rely on a century-old case to argue that the States are "required to show a 'direct injury'" to tax revenue. ECF 22 at 30 (citing *Florida v. Mellon*, 273 U.S. 12 (1927)). But as Defendants well know, if a "direct injury" was required a hundred years ago, it no longer is. Defendants elsewhere concede that parties may rely on theories of *indirect* injury. *Id.* at 26 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)); *id.* at 32 ("indirectness of the injury does not necessarily deprive the person harmed of standing") (citation omitted). As established above, courts regularly permit parties to sue based on indirect loss of tax revenue.

Indeed, the injury here has a much tighter nexus than in *Department of Commerce*. There, the Supreme Court unanimously determined that States could sue under the theory that a citizenship question on the Census would have the "predictable" effect of encouraging private parties to "unlawfully" decline to fill out the Census, causing an undercount in various States and thus a loss in revenue. 139 S. Ct. at 2566. Here, the private actors would not even need to do anything unlawful. They need only sign up for the program created by the Final Rule, which necessarily will cause the States loss of tax revenue.

**4.** Finally, Defendants again raise (at 31) a baseless "speculation" argument, stating that the timing of loan cancellation is affected by many variables, and so it cannot be known for sure

whether the Final Rule will accelerate forgiveness of any loan to before 2026.  But Plaintiffs have established a "substantial risk" of losing tax revenue, *Susan B. Anthony List*, 573 U.S. at 158. Defendants have already cancelled billions of dollars in loans for individuals who have made payments for just 10 years.  By definition, those individuals would not be eligible for forgiveness until at least 2034—well after forgiven loans will again become taxable under the law.

### E.  The Final Rule harms the States' ability to recruit and retain employees.

Defendants admit that "PSLF can be a helpful recruiting tool."  ECF 22 at 33 n.9.  The States thus have standing because the Final Rule makes the Public Service Loan Forgiveness Program comparatively less attractive.  That creates a "substantial risk" of impeding the efforts of state and local governments to recruit.  *Susan B. Anthony List*, 573 U.S. at 158.

Defendants cannot seriously deny that PSLF will be comparatively less attractive because of the Final Rule.  This is especially true for the 23% of undergraduate borrowers who have less than $12,000 in debt.  An employee under PSLF who has been paying loans for seven years ordinarily would have a strong interest in staying for three more.  The Final Rule, however, tells borrowers they can achieve forgiveness on the same timetable even if they leave public-service employment.  Defendants note that PSLF will "often" still be more attractive for some borrowers: namely those with "a greater loan balance."  ECF 22 at 33–34.  But that implicitly concedes that it will *not* be more attractive for other borrowers—especially those with lower balances.  Similarly, Defendants note that PSLF still offers forgiveness "on a faster timetable" than the Final Rule for borrowers with "a greater loan balance."  *Id.*  But what does a "faster timetable" matter to the millions of people who will have a $0 payment?  Ten years or twenty of $0 payments makes no difference.  Indeed, Defendants elsewhere note that the $0 payments will make borrowers indifferent to their accounts remaining open longer.  ECF 22 at 25.

Because the Final Rule greatly diminishes the comparative attractiveness of the PSLF program, recruiting will be more difficult. The sworn Lewis declaration, for example, states that public service would have been less attractive had the Final Rule already existed. ECF 1-4 ¶¶ 17, 22. The Houser declaration similarly recounts that PSLF is a critical recruiting tool. ECF 1-6.

One reason Defendants err is because they misunderstand Plaintiffs' theory. They say the "entire theory" rests on the idea that the Final Rule "makes public-sector employment less attractive than higher-paid private-sector work." ECF 22 at 46. Not so. It also makes public-sector work less attractive than comparatively paid private-sector work. When borrowers enter the PSLF program, they limit their career options to public-service employers for ten years. Many are willing to do that because of loan forgiveness. But few will be willing if they can obtain forgiveness under the Final Rule at a private company with a comparatively equal salary.

## II.   Venue Is Proper as Courts Have Unanimously Concluded That a State May Sue in any District in That State.

Defendants' decision to contest venue is strange because courts have unanimously rejected their position for more than 100 years. They assert (at 25) that the State of Missouri somehow "resides" only in Jefferson City, the capital, which is located in the Western District. But "every court that has considered a state's residency, including the Fifth Circuit [more than 130 years ago], has rejected the argument that a state resides only in its capital city." *Texas v. DHS*, 661 F. Supp. 3d 683, 689 (S.D. Tex. 2023) (citing cases); *see also Utah v. Walsh*, No. 2:23-cv-016, 2023 WL 2663256, at *3 (N.D. Tex. 2023) (citing cases); *Atlanta & F. R. Co. v. Western Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) ("the state government … resides at every point within the boundaries of the state"). For purposes of venue, the settled and unanimous rule is that "[a] state is held to reside in any district within it." Wright & Miller, 14D *Federal Practice & Procedure* § 3815 (4th ed. 2023). That means Missouri can sue in either federal judicial district.

24

Against this unanimous, settled rule, Defendants cite nothing on point.  They fail to cite even one case concluding that a State resides only in one district.  (There is none.)  Instead, they cite cases stating that a *government official* resides in one district.  *See* ECF 22 at 25.  While that rule may make sense given that a public official can physically be only in one district at a time, the plaintiffs here are sovereign states, not individual officials, and "[a] state is ubiquitous throughout its sovereign borders."  *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).  Missouri routinely sues the Federal Government in the Eastern District, and did so in the last student loan case.[12]

Defendants fare no better on the text.  They drill in on subsection (c)(2) of the venue statute, which states that venue for "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated," shall be "only in the judicial district in which it maintains its principal place of business."  28 U.S.C. § 1391(c)(2).  And they say Missouri's place of "business" is Jefferson City.  But a State is not "an entity" for purposes of venue.  Missouri does not conduct "business" in the sense discussed by that statute, which "explicitly refers to the incorporation status of the 'entity,' indicating that the term refers to some organization, not a state."  *California v. Azar*, 911 F.3d at 570.  The statute itself reinforces that interpretation in the very next subsection by distinguishing States from entities.  *Id*. (citing 28 U.S.C. § 1391(d)).  Simply put, "Section 1391(c) makes no reference one way or the other as to the residency of a sovereign state."  *Texas v. DHS*, 661 F. Supp. 3d at 689.

---

[12] *E.g.*, *Nebraska v. Biden*, No. 4:22-cv-01040 (2022) (Missouri joining); *Missouri v. Biden*, 576 F. Supp. 3d 622 (E.D. Mo. 2021); *Missouri v. Biden*, 558 F. Supp. 3d 754 (E.D. Mo. 2021); *Missouri v. Biden*, No. 4:21-CV-01329-MTS, 2021 WL 5631736 (E.D. Mo. Dec. 1, 2021); *Missouri v. Yellen*, 538 F. Supp. 3d 906 (E.D. Mo. 2021).

Even accepting Defendants' invitation to upend 100 years of settled case law, venue is proper in the Eastern District because Missouri's public instrumentality, MOHELA, is located in the St. Louis metro, in the Eastern District of Missouri: 633 Spirit Drive Chesterfield, MO 63005. Missouri sues on behalf of the State in general and also on behalf of MOHELA, which the Supreme Court affirmed Missouri can do.  And as Defendants admit (at 11), their Final Rule has already affected, or is soon to affect, more than 80,000 MOHELA accounts in just three months.

One wonders why Defendants even raise this issue.  They did not raise it in *Biden v. Nebraska*.  Venue can be waived because it is not jurisdictional.  28 U.S.C. § 1406(b).  And Defendants cannot plausibly assert—and do not assert—that the Western District would be more convenient.  Dismissing or transferring to the Western District would just cause delay.  The decision to raise this argument—unanimously rejected for over 130 years—raises serious concerns that Defendants are trying to delay resolution of this case so as to cancel as many loans as possible before a court can rein them in.

## III.   The States Are Likely to Succeed on the Merits.

### A. Defendants' concessions doom their case under the Major Questions Doctrine.

**1.** When an agency action involves "vast economic and political significance," it will stand only if the agency can identify "exceedingly clear language" authorizing its actions.  *Alabama Assn. of Realtors v. Dept. of Health and Human Services*, 594 U.S. 758, 764 (2021).  Defendants do not and cannot deny that the Final Rule carries both the same economic effect (about $500 billion) and covers the same political topic as the rule in *Biden v. Nebraska*.  Indeed, they already told this Court that these are "important issues of nationwide significance."  Def.'s Resp. to Scheduling Notice, ECF 15 at 2.

Defendants thus must identify "exceedingly clear language" authorizing their actions.

That dooms their case, because Defendants concede they do not have exceedingly clear language.  For example, on the central issue whether the Secretary has ICR authority to forgive loans, the statute requires "repayment of such loan, including principal and interest on the loan." 20 U.S.C. § 1087e(d)(1).  Plaintiffs have noted that *partial* repayment or (for the millions who will pay $0 under the plan) *no* repayment is not consistent with this textual requirement.  ECF 10 at 33. In response, Defendants argue that the language is "(at least) equally consistent" with authority to forgive because the term "repayment" is preceded by no adjective at all—neither "partial" nor "full."[13]  ECF 22 at 50.  But under the major questions doctrine, it is not enough for language to be "equally consistent" with two readings.  The language must be "exceedingly clear" such that *only one* reading is plausible.  *Alabama Assn. of Realtors*, 594 U.S. at 764.

Similarly, the Final Rule depends on the Secretary's ability to forgive loans under ICR, but Defendants admit that, at best, the Secretary's authority is only implicit, not explicit.  They do not deny that the Secretary's ICR authority never expressly mentions forgiveness—even as the Secretary's IBR authority does.  So Defendants say forgiveness is *implicit* in ICR because the statute says repayment plans are "not to exceed 25 years."  ECF 22 at 43 ("On Plaintiffs' view, one wonders, what is supposed to happen to any outstanding loan balance after 25 years?"). Defendants ignore that the "25 years" language is a *limit* on the Secretary, not a grant of authority. And it is the same language used for the "standard repayment plan" and "graduated repayment plan," which are both plans "promulgated by the Secretary."  20 U.S.C. § 1078(b)(9)(A)(i)–(ii) (plans "not to exceed 10 years").  Nobody thinks *that* language gives the Secretary authority to forgive borrowers who are on the standard repayment plan.  The "25 years" language simply lets

---

[13] Indeed, they admit the Secretary can create a program "without loan forgiveness."  ECF 22 at 44.

the Secretary create plans where the payment is a function of income *so long as* the "loan, including principal and interest," § 1087e(d)(1)(D), is fully repaid within 25 years (rather than the standard 10 years).  But more importantly, Defendants' argument that forgiveness is only implicit in the language dooms Defendants' case.  Implicit authority is not "exceedingly clear" authority.

Under the major questions doctrine, Defendants must identify "exceedingly clear" language authorizing the Secretary to forgive loans because the authority the Secretary asserts is striking.  Defendants do not dispute their interpretation would "permit the Secretary to immediately forgive 100% of student loan debts for every borrower with the stroke of a pen."  ECF 10 at 4, 18.  They believe the *only* constraint (other than promulgating a plan by rule) is that *if* the Secretary makes anybody pay anything, payments must last fewer than 25 years.  *E.g.*, ECF 22 at 42.  That is an extraordinary assertion of authority and must, under the major questions doctrine, be backed by exceedingly clear authority.  Defendants' assertion that forgiveness authority is implicit is not good enough.  The phrase "not to exceed 25 years" is "a wafer-thin reed on which to rest such sweeping power." *Alabama Assn. of Realtors*, 141 S. Ct. at 2489.

**2.** Unable to dispute any of this, Defendants argue that the major questions doctrine does not apply because the HEA is a different statute than the HEROES Act, and *Biden v. Nebraska* interpreted only the latter.  ECF 22 at 53.  But Defendants ignore that the major questions doctrine is a general doctrine that applies to all statutes "from all corners of the administrative state" and goes back decades.  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).  That makes sense because the question whether an agency's assertion of authority is of "vast economic and political significance" is a factual question, not a statutory one.  Defendants are thus wrong to dismiss *Biden v. Nebraska* as nothing more than a "pandemic-era opinion[ ]."  ECF 22 at 55.

Nor does it matter that *Biden v. Nebraska* considered "the unprecedented nature" of Defendants' first attempt at mass cancellation.  ECF 22 at 54.  The Supreme Court made clear that the unprecedented nature of that rule merely reinforced the Court's decision.  A rule need not be unprecedented to trigger the major questions doctrine.  It need only be of substantial "economic and political significance."  *Biden v. Nebraska*, 143 S. Ct. at 2373 (not mentioning the unprecedented nature of the rule); *id.* at 2375 (same); *Alabama Assn. of Realtors*, 594 U.S. at 764 ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.") (quotation marks omitted) (citing two cases); *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014) (mentioning only "economic and political significance," not history); *Brown & Williamson Tobacco*, 529 U.S. at 133, 147, 160 (same).  Defendants do not dispute that the Final Rule, like the last rule, is of "staggering" "economic and political significance."  *Biden v. Nebraska*, 143 S. Ct. at 2373.  This is an easy case.

In any event, this Final Rule *is* unprecedented.  Defendants say (at 54) that all previous ICR plans were "smaller in scope" than the current plan.  What an understatement.  Never before has the Secretary used ICR authority to create a program more generous than the IBR program.  Never before has the Secretary promulgated a program to forgive faster than 20 years.  Never before has the Secretary promulgated a rule that would convert the typical loan into a 39% grant and millions of loans into a 100% grant.  And never before has the Secretary asserted an interpretation of ICR authority permitting the Secretary to forgive every dollar of every loan for every borrower at the stroke of a pen—about $2 trillion.  None of the three previous ICR rules "has even begun to approach the size or scope of" the Final Rule.  *Alabama Assn. of Realtors*, 141 S. Ct. at 2489.

### B.  The Final Rule exceeds statutory authority.

Even setting aside the major questions doctrine, the Final Rule rests on an unsupportable conclusion that the HEA has provided the Secretary with express statutory authority to entirely reorganize the student loan repayment ecosystem at his pleasure.  Defendants' responses do nothing to assuage those concerns.

**1.**  Defendants first fail on the text.  The ICR program affirmatively requires repayment in full, and it does not authorize any forgiveness.  Defendants contend (at 41–42) that the textual authority for the Final Rule is "explicit," "clear," and "unambiguous," yet elsewhere say (at 50) the text is "equally" susceptible to two different readings.  Defendants do not invoke *Chevron* deference, and for several reasons, only the States' interpretation is textually sound.

First, the text authorizes the Secretary to create "plans for *repayment* of such loan, including principal and interest."  20 U.S.C. § 1087e(d)(1)(D) (emphasis added).  Defendants argue that this text is "(at least) equally consistent with repayment plans that call for repayment of *some*, but not all, 'principal and interests on the loan.'"  ECF 22 at 50.  But the SAVE plan calls for *no* repayment, not even partial, for millions of borrowers.  It is also a nonsensical reading of the text.  As Defendants note two pages earlier, "[i]t is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'"  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (citation omitted).  While the statute only uses the word "repayment," Defendants want to add the modifier "partial."

 "Repayment" is expressly defined as "including principal and interest," not "some" principal and interest.  20 U.S.C. § 1087e(d)(1)(D).  That matches the ordinary meaning of the term "repayment."  "In the loan or finance context, repayment means paying the amount borrowed and the interest."  *In re Goodwin*, No. 19-10623, 2020 WL 6821867, at *8 (Bankr. D. Kan. Sept. 1, 2020), *aff'd*, No. 20-CV-1247-JWL, 2021 WL 1026801 (D. Kan. Mar. 17, 2021).  "Repayment"

does not mean "partial" repayment.  "To argue otherwise would strain credulity."  *Id.* at *6; *see also Webster's Third New International Dictionary* 1924, 1326 (1993) ("repayment" means to "pay back something lent to a borrower for his temporary use on condition that it or its *equivalent* be returned") (emphasis added).  No mortgage lender would take kindly to a borrower insisting that, by sending a check for $0, he has "repaid" his mortgage.

Had Congress intended to require only "partial repayment," it "knew how to do so."  *Pugin v. Garland*, 599 U.S. 600, 608 (2023).  It has done so in other statutes.  *See* 7 U.S.C. § 3151a(c)(2)(A) ("Agreements with program participants shall provide remedies for any breach of an agreement by a participant, including *repayment or partial repayment* of financial assistance received, with interest.") (emphasis added).

Defendants also argue (at 50) that by permitting forgiveness for other "repayment" programs, Congress must have meant for the term "repayment" to include forgiveness.  As evidence, Defendants point to the PSLF language at 20 U.S.C. § 1087e(m), titled "Repayment plan for public service employees."  But this *undermines* Defendants' argument.  It shows that where Congress means to permit forgiveness, it does so expressly because the term "repayment" by itself necessarily connotes—well, repayment.  The same is true for 20 U.S.C. § 1087ee, which again, creates an explicit exception to repayment obligations.  The Secretary's ICR authority, in contrast, does not mention forgiveness at all.  Defendants then argue that "loans are sometimes forgiven, in both the public and private sectors, without anyone thinking that the forgiven loan was not actually a 'loan' at all."  ECF 22 at 51.  But nobody talks about those loans as having been "repaid."

Second, the plain text is reinforced by the entire absence of any text expressly authorizing forgiveness.  Defendants do not dispute that other provisions in the HEA (like IBR) expressly authorize forgiveness, but the ICR authority does not.  That is a huge problem for Defendants

because "[w]hen Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023). Defendants argue that those other provisions *mandate* forgiveness. ECF 22 at 44. But even if true, so what? Under Defendants' reading, those provisions (1) create authority for the Secretary to forgive and then (2) direct the Secretary to do so. The ICR authority lacks any text giving the Secretary any forgiveness authority at all, which Defendants do not even dispute.

Instead, they argue that forgiveness authority is implicit in the Secretary's authority to create repayment plans for a period of time "not to exceed 25 years." But that language *limits* the Secretary. It lets the Secretary create plans "*for repayment*" of loans, "including principal and interest," but requires the Secretary's plans be 25 years or shorter, which is still 2.5 times as long as the standard plan. 20 U.S.C. § 1087e(d)(1)(D) (emphasis added). In other words, the Secretary is authorized to create plans where the payment is a function of income, but those plans must be 25 years or shorter and they still must require actual repayment. Defendants wonder (at 43) what is "to happen to any outstanding loan balance after 25 years?" Simple. If the Secretary sets payment amounts consistent with the statute, there will not be any remaining loan balance after 25 years.[14]

Defendants' "not to exceed 25 years" argument also proves far too much. Income-driven plans are not the only ones the Secretary is authorized to promulgate. The "standard repayment plan" and "graduated repayment plan" are also plans "promulgated by the Secretary," and the statute says both those plans are "not to exceed 10 years." § 1078(b)(9)(A)(i)–(ii); *see also*

---

[14] A person who defaults near the end might end up paying longer than 25 years, but the repayment "plan" would still be 25 years, just like the "standard plan" is 10 years, even if a person might pay longer because he defaults.

§ 1087e(d) (incorporating § 1078).  Not even the Secretary thinks that language creates authority to forgive loans on the standard repayment plan.  So why should the same text create forgiveness authority for ICR plans?  Certainly substituting "10" for "25" is not enough.

Third, even if the ICR authority included forgiveness (it does not), the ICR statute authorizes the Secretary to create plans that last an "extended period of time."  Defendants contend (at 49) that the term "extended period of time" simply means "a long period of time"—which could be even *less* than 10 years.  But "long" compared to what?  The statute tells us.  The standard plan is 10 years.  Any "extended" plan must necessarily be "longer" than 10 years.  Based on their own argument, any "extended" plan must be "a long period of time" *beyond* 10 years.  Again, the IBR statute has the answer: 20 years.

Fourth, Defendants misinterpret the "balance due" language by committing the error they project onto Plaintiffs.  That text says the "balance due" from each borrower on an "income contingent repayment" plan "*shall equal* the unpaid principal amount of the loan, any accrued interest, and any fees."  § 1087e(e)(5) (emphasis added).  Defendants accuse Plaintiffs (at 50) of "truncating the statutory text," noting that the full text reads: "The balance due on a loan made under this part that is repaid pursuant to income contingent repayment shall equal the unpaid principal amount of the loan, any accrued interest, and any fees, such as late charges, assessed on such loan."  Defendants contend (at 51) that this text only applies to a loan "that is repaid."  But it is Defendants who truncate the text.  This text applies to any loan "that is repaid *pursuant to income contingent repayment*" rather than, say, the IBR program.  That qualifier is necessary because the IBR program expressly permits forgiveness.  Under the IBR program, the "balance due" does *not* equal principal and interest.  This statute reinforces that ICR loans in fact must be paid in full.

**2.** Next, Defendants take issue with Plaintiffs' argument that the Final Rule converts a loan program into a grant program.  They argue (at 43) the States should not focus on how a "typical" undergraduate borrower receives a grant-equivalent of nearly $3,900 out of every $10,000 borrowed.  They suggest that the States skew the picture by not focusing on those with graduate school debt.  But undergraduates make up four out of every five borrowers entering repayment. 88 Fed. Reg. 43,869 ("about 79 percent of borrowers who recently entered repayment only have undergraduate loans").  And even considering "all borrowers"—undergraduate and graduate—the Final Rule says the "average borrower" would still receive a 30% grant, paying back only $7,069 for every $10,000 borrowed.  *See* 88 Fed. Reg. 43,880.

**3.** No stronger is Defendants' argument from legislative silence.  Defendants assert (at 42) that Congress has "fully been on notice" and "has never limited the agency's" approach under ICR and also (at 47) that "there has been an unbroken, bipartisan consensus at the Department that this authority allows for forgiveness."  But "congressional inaction lacks persuasive significance in most circumstances."  *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 408 (2017) (brackets adopted; quotation marks omitted).  That is especially true here because Congress *did* act in 2007 to create express forgiveness for the first time for income-driven plans.  And in doing so, Congress said borrowers on the ICR program obtain forgiveness by *switching* to the IBR program.  20 U.S.C. § 1098e(b)(7)(A), (b)(7)(B)(iv) (authorizing forgiveness for borrowers who switch to IBR after having "made payments under an income-contingent repayment plan").

Defendants' "legislative silence" argument is particularly weak because, since Congress created the IBR program, Defendants have only used their ICR authority to bring the ICR program into line with the IBR program.  The PAYE program and REPAYE programs simply applied the 2010 IBR amendments to borrowers under the ICR program.  ECF 10 at 7.  Never before has the

Secretary tried to use the ICR authority to supplant IBR (which is fixed by statute) by creating a program more generous than IBR.  So until now, Congress has never had anything to respond to.

The Secretary recognized this in previous rulemakings, stressing in 2012, for example, that the changes created using the ICR authority "will be consistent with the statutory changes to IBR." 77 Fed. Reg. 66,116.  Defendants argue that the Department's statements during previous rulemakings "shed[ ] no light at all on the Secretary's views" on reducing the payment thresholds, but they simultaneously admit that the Secretary previously acknowledged he does not have authority to create a "single income-drive repayment plan."  ECF 22 at 46 (quoting the 2015 rule). The SAVE plan does exactly that.  It has been made available to all borrowers (directly or through consolidation), unless the borrower is in default or the loans were taken out by a parent.  *See* A*m I eligible for the Saving on a Valuable Education (SAVE) Plan?*, Federal Student Aid.[15]  And it supplants the statutory IBR program.  Defendants do not dispute that "[t]he Final Rule's provisions are so generous that it now makes no sense for any borrower to choose the IBR program."  ECF 10 at 37.  Indeed, they expressly say "why not?" in response to the argument that they cannot make the ICR program more generous than the IBR program.  ECF 22 at 46.  Through SAVE, Defendants have created the exact plan the Department disclaimed in 2015.  They have rendered the IBR program superfluous.  *Cf. United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

**4.** Defendants further insist (at 45) that because certain sections of the HEA require repayment plans to be "cost neutral" but the ICR section contains no similar language, then Congress purposefully left the Secretary free to cancel trillions of dollars through ICR with no

---

[15] https://studentaid.gov/help-center/answers/article/eligible-for-the-save-plan

constraints.  But the idea that Congress was concerned that "an alternative payment plan" under § 1087e(d)(4) might cost the government $1, but simultaneously authorized the Secretary to spend trillions of dollars at his sole discretion is farcical.  Congress does not "hide elephants in mouseholes."  *Whitman v. American Trucking Ass'ns., Inc*., 531 U.S. 457, 468 (2001).  The reason the ICR authority does not specify that repayment plans must be cost neutral is because the only plans authorized by ICR are necessarily cost neutral: they require "repayment of such loan, including principal and interest."  20 U.S.C. § 1087e(d)(1).

**5.** The Final Rule also fails because, while the IBR program expressly *permits* subsidizing interest (for up to 3 years) the ICR program forbids it unless subsidization is "cost neutral."  ECF 10 at 37; 20 U.S.C. § 1087e(b)(9).  Defendants contend the Final Rule does not involve "reductions in the interest rate," and so the provision does not apply.  ECF 22 at 51.  This is another misapplication of the statutory language by removal of key language.  The statute does not relate to "reduction in the interest rate," but rather "reduction in the interest or origination fee rate *paid by a borrower*." 20 U.S.C. § 1087e(b)(9)(A) (emphasis added).  There is no reasonable dispute that the Final Rule reduces interest rates paid by a borrower and that those reductions are not cost neutral.  Under the SAVE plan, millions of borrowers pay nothing.  No principal.  No interest.

Defendants in fact previously conceded that the Final Rule would subsidize interest.  In a January 2023 letter to MOHELA, Defendants confirmed that the Final Rule would "[i]ncrease the *interest subsidy* … to covering 100% of the borrower's unpaid monthly interest."  Ex. 1, Divine Decl. (incorporating Ex. C, Federal Student Aid letter, at 2) (emphasis added).  Defendants cannot now deny that the Final Rule subsidizes interest when they expressly told MOHELA last year that it would.  *Id.* (stating that this decision to subsidize interest "will be made").

36

**6.** Defendants finally deny (at 52) that their blanket "alternative repayment plan" fails to comply with the requirement that alternative plans be created only on a case-by-case basis for a "borrower's exceptional circumstances." But their explanation proves the opposite. The Secretary is not offering plans "on a case by case basis," but instead is providing them class wide. Likewise, rather than "exceptional circumstances," these are—in Defendants' own words—"average borrower[s]." 88 Fed. Reg. 43,880. By definition, personal circumstances are not "exceptional" when shared by the average borrower.

*      *      *

At the very least, the canon of constitutional avoidance heavily favors Plaintiffs. It has long been settled that "if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity." *U S ex rel Atty. Gen. v. Delaware & Hudson Co*., 213 U.S. 366, 407 (1909). Here, Defendants do not deny that they have asserted extraordinary authority to cancel every penny of every single student loan, with the *only* constraint on cancellation being that they must promulgate the decision by rule. *E.g.*, ECF 22 at 42. That authority, unbounded by any kind of "intelligible principle to guide the delegee's use of discretion," *Gundy v. United States*, 588 U.S. 128, 135 (2019), "certainly would present non-delegation concerns," *Kentucky v. Biden*, 23 F.4th 585, 606 n.14 (6th Cir. 2022).

### C.  The Final Rule is arbitrary and capricious.

Defendants unsurprisingly try to mischaracterize the arbitrary and capricious arguments as mere "policy disagreements." ECF 22 at 56. A policy disagreement is what exists between members of Congress on the issue of student loan forgiveness, which has created the underlying gridlock resulting in no significant legislation on the HEA in nearly fifteen years. Plaintiffs'

37

arbitrary and capricious claims, on the other hand, evince serious legal concerns with the underlying reasonableness of Defendants' decision-making during the drafting of this Final Rule.

**1.** Most egregious is Defendants' decision to underestimate the cost of the rule by hundreds of billions of dollars based on an assumption that they would prevail in *Biden v. Nebraska*—when the Supreme Court had *already* ruled against them.  Defendants try to dodge this issue by arguing that "the HEA itself does not require" a cost estimate; only Executive Order 12,866 does.  *Id.* at 56.  But Plaintiffs are not arguing that this obviously wrong cost estimate violated the HEA. Plaintiffs are arguing it violated the APA.  The Executive Order might not create "rights enforceable by litigation," *id.*, but the APA does.  "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."  *Prometheus Radio Project v. FCC*, 592 U.S. 414, 423 (2021).  Once the Defendants undertook the cost estimate, they were required to do so in a reasonable manner.  They did not.

Recognizing the indefensible nature of publishing a Final Rule with deliberately false financial figures, Defendants accuse Plaintiffs of "overheated rhetoric" and assert that the Final Rule in fact was finalized as early as June 14, two weeks before *Biden v. Nebraska* was issued. But that contradicts the Secretary's own statement on June 30, issued hours *after* the Supreme Court ruled: "Additionally, *today* the Department finalized our new income driven repayment plan, Saving on A Valuable Education (SAVE), which will be the most affordable repayment plan in history."  *Secretary Cardona Statement on Supreme Court Ruling on Biden Administration's One Time Student Debt Relief Plan*, Department of Education (June 30, 2023) (emphasis added).[16]  The

---

[16] https://www.ed.gov/news/press-releases/secretary-cardona-statement-supreme-court-ruling-biden-administrations-one-time-student-debt-relief-plan

Secretary's statement that the Final Rule was not finalized until *after* the Supreme Court's decision flatly contradicts Defendants' statements now.

Even on June 30, the rule was not yet final. "[F]inal agency action accrues upon publication of the regulation." *N. Dakota Retail Ass'n v. Bd. of Governors of the Fed. Rsrv. Sys.*, 55 F.4th 634, 640 (8th Cir. 2022), *cert. granted sub nom. Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S. Ct. 478 (2023). Here, that was 10 days after the Supreme Court's decision. By the time the rule was finalized, Defendants knew of factual developments that completely undermined the cost estimate. Failure to examine relevant information that severely undermines a cost estimate violates the APA. *See Window Covering Manufacturers Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1288 (D.C. Cir. 2023) ("An agency contravenes the APA when it fails to examine the relevant data, which could reveal that the figures being used are erroneous.") (citations and quotations omitted). Up until publication, Defendants could withdraw the Final Rule and revise the false cost estimate. *See Nat. Res. Def. Council v. Perry*, 940 F.3d 1072, 1077 (9th Cir. 2018) ("[O]rdinarily, agencies are free to withdraw a proposed rule before it has been published in the Federal Register, even if the rule has received final agency approval.").

Defendants' argument also hides other serious omissions. For starters, the HEROES Act final rule was preliminarily enjoined by the Eighth Circuit on November 14, 2022, eight weeks before Defendants proposed this Rule. The Supreme Court *declined* to lift this injunction when Defendants asked. *Biden v. Nebraska*, 143 S. Ct. 477 (Dec. 1, 2022). And four months before the Rule was finalized, the Supreme Court held oral argument, expressing clear skepticism of Defendants' position. That same day, the media declared "[i]f you were hoping that your student loans would be forgiven under a program that President Joe Biden announced last summer, you should, unfortunately, make other plans." Ian Millhiser, *You Probably Won't Get Any Student*

*Loan Relief, Thanks to a GOP-Controlled Supreme Court*, Vox.com (Feb. 28, 2023).[17]  Defendants knew the Supreme Court would issue an opinion by the end of June, and contrary to the Final Rule's false expression of confidence, Defendants knew their position was in serious jeopardy.  It had already been enjoined, and the Supreme Court had declined to lift that injunction.  This timeline highlights just how unreasonable Defendants' estimate was.  It also strongly suggests that Defendants improperly rushed the Final Rule to try to evade the Supreme Court's decision.

So Defendants finally resort to harmless error, saying they would have plowed ahead with abandon even had they known the cost would be higher.  ECF 22 at 58.  But if underestimating a rule's cost by at minimum $300 *billion* is harmless—four times the size of the Departments' FY2025 budget request[18]—then everything is always harmless error.  In reality Defendants' confession is self-defeating, for it reveals Defendants had "an 'unalterably closed mind' and are 'unwilling or unable' to rationally consider" new facts.  *Air Transport Ass'n of Am., Inc. v. Natl. Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011).

In fact, Defendants' minds appear to have been made up as far back as August 2022.  In a letter to MOHELA drafted on August 1, 2022, but not sent until January 17, 2023 (just after the Final Rule was proposed), Defendants informed MOHELA of changes that "will be made" to the income-driven repayment program by upcoming regulation.  Ex. 1, Divine Decl. (incorporating Ex. C, Federal Student Aid letter).  One of those changes that Defendants said "will be made" was: "Increase the amount of income protected from 150% of the Federal Poverty Level (FPL) ($20,400

---

[17] https://www.vox.com/politics/2023/2/28/23618985/supreme-court-student-loan-forgiveness-biden-nebraska-education-brown

[18] https://www.ed.gov/news/press-releases/statement-secretary-cardona-presidents-fiscal-year-2025-budget

for a single individual) to 225% ($30,577.50 for a single individual)"—the exact amount ultimately chosen by the Final Rule. *Id.* at 2.

**2.** In disputing the States' reliance interests, Defendants in fact highlight how unreasonable their analysis was.  On tax revenue reliance interests, Defendants admit that they considered only the effect of the old rule, which necessarily omits the drastically increased amount of forgiveness in the new Rule.  ECF 22 at 59.  On PSLF interests, Defendants admit they dismissed concerns about the effect of the Rule on the program and only said that "PSLF remained a program with valuable potential benefits."  *Id.*  Defendants offer no response to the effect on the program's *comparative benefit* in light of the Final Rule.  And on inflation, Defendants admit that their consideration of inflationary effect was based on the same faulty cost analysis discussed above. *Id.*  The inflationary effect of the Final Rule cannot properly be understood or evaluated if it underestimates costs by $300–700 billion.

**3.** Defendants similarly fail to rebut the argument that the Final Rule is riddled with internal contradictions and unlikely and implausible conclusions.  For example, after Plaintiffs pointed out that Defendants irrationally equate individuals at 150% of the federal poverty line as "statistically indistinguishable" with individuals at 225%, Defendants move the goalposts, running away from their assertion that the two groups were "indistinguishable" and now saying both would materially benefit from "reduced monthly student loan payments."  ECF 22 at 61.  But "post hoc rationalizations of the agency cannot serve as a sufficient predicate for agency action."  *Regents of the Univ. of Cal.*, 591 U.S at 23 (ellipsis and citation omitted).  And *every* borrower would benefit from reduced payments and forgiveness, so even Defendants' new rationalization provides no justification for the numbers they chose.

41

**4.** Defendants are no stronger in responding to the argument that their decision to implement forgiveness months early (with no adequate explanation) was arbitrary and capricious.

Defendants first assert (at 62) that Plaintiffs lack standing to challenge early implementation. To the contrary, Defendants concede they have already cancelled 28,000 MOHELA loans early and are processing 53,000 more for cancellation. Defendants say cancellation would have happened anyway in July. But even assuming that were true, MOHELA would still receive fees for those additional months.

On the merits, Defendants assert (at 62–63) that their bare-bones notice in January should be read in conjunction with a "lengthy" Department of Education press release. Far from "lengthy," that press release contains just two sentences suggesting that early implementation was designed to encourage SAVE enrollments (which undermines Defendants' contention that the Final Rule will not encourage consolidation of FFELP loans). The Federal Register includes none of this. Vacating the early implementation would reinstate the status quo.

Defendants do not even have textual authority to implement the forgiveness provision early, so nothing about this error is "harmless." Section 1089(c)(2)(A) provides that "[t]he Secretary may designate any regulatory provision that affects programs under [HEA] . . . as one that *an entity subject to the provision* may, in the entity's discretion, choose to implement prior to the effective date described in paragraph (1)." 20 U.S.C. § 1089(c)(2)(A) (emphasis added). Paragraph (1), in turn, states that "any regulatory changes initiated by the Secretary affecting programs under this subchapter that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date." 20 U.S.C. § 1089(c)(1). The language "entity subject to the provision" refers to organizations like MOHELA and colleges and universities, not the Department

42

itself.  Even if Defendants could designate the forgiveness provision for early implementation, that should have simply *permitted* MOHELA, "in the entity's discretion," to implement forgiveness early.  § 1089(c)(2)(A).  Defendants instead required MOHELA to process forgiveness early.  To hold otherwise would mean that the Secretary can simply—by designating everything for early implementation—evade the general statutory requirement that regulations not take effect until the following year.

### D. The Final Rule's 30-day comment period was insufficient given the significance and complexity of the Final Rule.

Defendants cite no court that has ever upheld such a short comment period for a rule of this magnitude and complexity.  They rely on *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986) for the proposition that "[c]ourts have uniformly upheld comment periods of 45 days or less."  ECF 22 at 64.  But Defendants did not provide a 45-days comment period.  They contend that they were only required to offer "some opportunity to participate."  *Id.* at 64 (citations omitted).  But the APA requires the opportunity to be meaningful: "the agency shall give interested persons an opportunity to participate in the rule making."  5 U.S.C. § 553(c).  Under Defendants' telling, they could give the public just one day to comment, because that would be "some opportunity."

Additionally, Defendants (at 64) attack the guidance from the Administrative Conference of the United States for when it was published, but cannot rebut that guidance on its merits.  That document says a 60-day period is warranted for "proposals that are complex or based on scientific or technical data."  Defendants offer no example of a rulemaking process of this magnitude where an agency offered interested persons a mere 30 days to participate, and no explanation as to why a shortened period was necessary here.  They attempt to fault the States for not issuing comments

during the 30-day period, but that only reinforces that the comment period was too short for interested parties to conduct the necessary legal and economic analysis to comment meaningfully.

The only apparent reason for the unreasonably short comment period appears to be Defendants' desire to rush the rule to get ahead of the Supreme Court.  Defendants proposed the rule *after* the Eighth Circuit granted a nationwide injunction against the first attempt at mass forgiveness.  88 Fed. Reg. 1,894.  And they tried (but failed) to finalize the Final Rule just before the Supreme Court's decision.  Shortening a comment period to avoid having to assess a landmark case that Defendants knew was coming down is not legitimate.

With no supporting precedent, Defendants fall back on harmless error, stating "[n]othing material would have changed."  ECF 22 at 64.  But the States do not need to show something would have change.  Where, as here, they assert a "procedural right," they need only show "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision." *Iowa League of Cities v. EPA*, 711 F.3d 844, 871 (8th Cir. 2013) (citation omitted).  The States have shown that.  Defendants would have been forced to reckon with the Supreme Court's decision in *Biden v. Nebraska*—and forced to reconsider the flawed assumptions on which the Final Rule is based.  Moreover, Defendants' argument of inevitability is self-defeating.  By stating that they would have continued down this unprecedented path regardless of comment, Defendants have established that they had "an 'unalterably closed mind' and are 'unwilling or unable' to rationally consider arguments" raised in a comment period.  *Air Transport*, 663 F.3d at 487.

Defendants finally say (at 65) that Plaintiffs "nowhere suggest that their failure to participate had anything to do with the need for another 30 days," yet in the next paragraph they admit that the complaint alleges the limited period precluded "an adequate opportunity to comment

on the proposed rule."  Plaintiffs have sufficiently pleaded and shown that their procedural and substantive interests were harmed by Defendants' efforts to limit commenting to just 30 days.

### E.  Plaintiffs have made a clear showing of irreparable harm.

Defendants unfortunately begin their irreparable harm section, as with others, by misstating the standard.  They say irreparable harm must be "certain."  ECF 22 at 65 (quoting *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023)).  But that case, in the very next sentence, says harm need *not* be certain: "The plaintiffs must show the harm is not merely a 'possibility' but is *likely* to occur absent preliminary injunctive relief."  *Morehouse*, 78 F.4th at 1017 (emphasis added) (quotation marks omitted); *see also* Wright & Miller, 11A *Federal Practice & Procedure* § 2948.1 ("the injury need not have been inflicted when application is made or be certain to occur").

**1.** But even under Defendants' inaccurate standard, Plaintiffs have easily shown threat of irreparable injury.  Defendants concede they have already cancelled 28,000 MOHELA accounts and are processing 53,000 more MOHELA accounts for cancellation.  Under binding precedent established in the last student loan case, these account cancellations have an "irreversible impact."  *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022).

In contending otherwise, Defendants rely on their flawed standing arguments.  So their irreparable harm argument should be rejected for the reasons explained above in Part I.  For example, even setting aside that Defendants admit they have cancelled and will continue to cancel MOHELA accounts, the Bank of North Dakota is slated to lose more than $1 million each year from the Final Rule.  Ex. 2, Steinwand decl. ¶ 10.  Similarly, although Defendants assert (at 65) that there is no "obvious effect on the attractiveness of [Plaintiff States'] state and local public service positions," they simultaneously admit "PSLF can be a helpful recruiting tool," *id.* at 33 n.9.  As discussed above in Part I.E, Plaintiff States have offered clear evidence that individuals

undertake public employment *because* the PSLF program offers a comparative advantage over the private sector with its 10-year forgiveness, and that they would have been less likely to choose public employment had the Final Rule been in effect.  In the next few months, new graduates will enter the workforce.  If the Final Rule is not blocked, Defendants will unlawfully deprive Plaintiff States of the full benefits of PSLF during a critical recruiting season.

**2.**  Defendants next argue (at 66) that Plaintiff States waited too long to sue or move for a preliminary injunction, so there is no irreparable harm.  In support, they cite *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992 (8th Cir. 2023), for the proposition that a 13-month delay is sufficient to reject a preliminary injunction.  But that case expressly defeats Defendants' argument.  It holds that "[d]elay is only significant if the harm *has occurred* and the parties cannot be returned to the status quo."  *Id.* at 998 (emphasis added).  While *some* harm occurred in the time between late February (when Defendants first announced loans had been forgiven) and early April (when Plaintiffs sued), the vast majority of the harm is future harm.  Indeed, Defendants admit they are presently processing 53,000 MOHELA accounts for cancellation.  The harm from the loss of those accounts had not yet occurred when Plaintiffs sued and moved for a preliminary injunction.  Nor has the harm from all other future cancellations yet come to pass—though it is certainly impending.  That makes this case starkly different from *Ng*, where the plaintiff (a student athlete) did not sue over the disbanding of his athletics team until 13 months after it was disbanded.  *Id.*  As the Eighth Circuit reiterated there, "The goal of a preliminary injunction is 'to preserve the status quo until the merits are determined.'"  *Id.* (citation omitted).  That was not possible in *Ng*.  Here, it is—especially with respect to loans that have not been cancelled but will be.

Even if delay were relevant (it is not), whether the "delay" is "unreasonable" is "context dependent," *id.*, and there was no unreasonable delay here.  Defendants say the clock began in July

46

2023, but had the States sued then, Defendants no doubt would have argued the injury was not sufficiently imminent.  The clock instead began as recently as February 21, when Defendants announced they had begun implementing cancellation earlier than anticipated and had cancelled $1.2 billion of student loans.  That is when Plaintiff States first became aware of early implementation.  Plaintiff States promptly responded by filing suit 48 days later and marshalled significant time and resources to coordinate seven attorneys general offices in filing a 50-page preliminary injunction motion just seven days after that.  *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 244 (D.D.C. 2014) (delay not unreasonable when plaintiffs "have explained why they filed suit when they did").  This 48-day period "does not bar a finding of irreparable harm as complicated . . . disputes like this one require time to investigate and litigate."  *McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119, 1125 (8th Cir. 2015) (brackets accepted; quotations omitted).  As this Court already acknowledged, there is substantial "complexity and importance of the issues presented" by this suit.  ECF 17 at 3.  This 48-day period is so short, in fact, that Defendants feel the need to incorrectly (and repeatedly) contend that Plaintiffs sued on April 29, when in fact Plaintiffs sued three weeks earlier.  ECF 22 at 8, 66.

None of the cases cited by Defendants suggests that such a short timeframe counsels against issuing a preliminary injunction.  Indeed, "delays" much longer have been held to be reasonable—especially where the defendant is unable to identify prejudice.  *Ng*, 64 F.4th at 998 ("Delays of seven months have been held to be reasonable as well as delays of eight months.") (citations omitted); *see also Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir. 1979) (15-month delay reasonable); *American Express Co. v. American Express Limousine Service Ltd.*, 772 F. Supp. 729 (E.D.N.Y. 1991) (16-month delay reasonable where no prejudice caused).

Delay also is not a valid argument where a party "pursued non-litigation avenues first." *Texas Children's Hospital*, 76 F. Supp. 3d at 245. Here, the Missouri Attorney General's Office participated in negotiated rulemaking with the Department of Education about proposing a new rule with respect to student loan forgiveness, the administration's third loan cancellation rule since 2022. The subject of that rulemaking overlapped substantially with the topic of the Rule at issue in this litigation. Indeed, the recent notice of proposed rulemaking for the third rule explains that the third rule is "part of a *comprehensive* effort to address the burden of Federal student loan debt." 89 Fed. Reg. 27,564–65 (emphasis added). Like the Rule at issue here, the third rule considers authority under the HEA "for the waiver of certain student loan debts" and bases cancellation on "the amount of time since the loan first entered repayment." *Id.*

During the negotiations, there was thus reason to believe the third rule, as "part of a comprehensive effort," might materially alter the Rule at issue in this litigation. The Missouri Attorney General's Office participated in those negotiations until December 2023, when the Office withdrew after being unable to make progress. *See id.* at 27,568 (reflecting withdrawal); Tr. of Negotiated Rulemaking, Department of Education at 13–14 (Dec. 11, 2023) (same).[19] Plaintiffs cannot be faulted for any delay between July and December 2023, because the Missouri Attorney General's Office was pursuing non-litigation remedies first.

### F. The public interest supports blocking further implementation of an unlawful action.

Defendants' argument on the public interest is in direct conflict with this Court's precedent. "[T]here is no public interest in the enforcement of an unlawful action." *Missouri v. Biden*, 576 F. Supp. 3d 622, 635 (E.D. Mo. 2021) (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d

---

[19] https://www2.ed.gov/policy/highered/reg/hearulemaking/2023/negotiated-rulemaking-student-debt-relief-committee-december-11-2023-am-final.pdf

1, 12 (D.C. Cir. 2016)).  Defendants' professed "impending, serious harms" to student borrowers are entirely reliant on the premise that the Final Rule is lawful.  If it is unlawful, as Plaintiff States have shown, there is no interest to the Defendants or to the public in its implementation.

Separately, Defendants argue (at 68) that a preliminary injunction would "modif[y] the status quo."  But the exact opposite is true.  When the Final Rule was announced, the Department published a press release, which promised that the new regulations would "transform loan repayment."  *How the New SAVE Plan Will Transform Loan Repayment and Protect Borrowers*, Department of Education (July 10, 2023).[20]  Plaintiff States' motions ask the Court to put a pause on Defendants' feverish march toward "transforming" the status quo and stop further harms against their interests, until a determination is made on whether Defendants' Final Rule violates the law.

### IV.   The States Seek Appropriate Relief, Vacatur of the Entire Rule Is Required, and the President Is a Proper Party.

Plaintiffs are entitled to the same relief obtained in the last student loan case: vacatur of the entire Rule.  Defendants ask this Court instead to violate plainly established Supreme Court precedent.  While Defendants must make those arguments here to preserve them for Defendants' evident plan to ask the Supreme Court to revisit its precedent, that precedent binds this Court.

### A.   Vacating or postponing the entire rule is the statutorily mandated remedy.

**1.** Start first with Defendants' request for this Court to disregard *Biden v. Nebraska*. Defendants contend that it is "incorrect to say, as Plaintiffs do, that if 'Missouri has standing,' that alone 'is sufficient for *all* Plaintiffs here to proceed.'"  ECF 22 at 69 (emphasis in original).  There is nothing "incorrect" about that rule, which the Supreme Court reaffirmed just last year: "If at least one plaintiff has standing, the suit may proceed."  *Biden v. Nebraska*, 143 S. Ct. at 2365 (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc*., 547 U.S. 47, 52 n. 2 (2006)).

---

[20] https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/idrfactsheetfinal.pdf

Defendants' contention (at 69) that *every* State must establish "independent showings of harm" is squarely foreclosed by this precedent.

**2.** No better is Defendants' request (at 57) for this Court to take scissors to the 86-page Final Rule or limit a ruling only to borrowers in the Plaintiff States.  Defendants ignore that that the text of the APA by default requires vacatur of the rule.  It says the "reviewing court *shall . . .* hold unlawful and *set aside* agency action, findings, and conclusions found to be" contrary to law. 5 U.S.C. § 706 (emphasis added).  When Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke."  *Black's Law Dictionary* 1612 (3d ed. 1933).

Section 705 provides equivalent relief in the preliminary injunction posture.  It permits a court to "postpone the effective date of an agency action" during litigation.  5 U.S.C. § 705.  This is not a plaintiff-specific statutory remedy.  It is *defendant* specific.  By its plain text, it prohibits the Federal Government from applying a rule to anybody, even to parties not before the court.

Consistent with this text, courts across the country have for decades held that "[t]he default rule is that vacatur is the appropriate remedy."  *E.g.*, *Data Mktg. Partnership, LP v. United States Dept. of Labor*, 45 F.4th 846, 859 (5th Cir. 2022); *United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action").  Courts began adopting this holding very shortly after enactment of the APA.  *See Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951) (holding that § 706(2) "affirmatively provides for vacation of agency action").

This is the doctrine at the Supreme Court, too.  In 2020, the Supreme Court held that the Trump administration's rescission of the Deferred Action for Childhood Arrivals program "violated the APA," and so the Court determined that the federal action "*must* be vacated."

*Regents of the Univ. of Cal.*, 591 U.S 1 at 9 (emphasis added).  This Court is, of course, not free to overturn Supreme Court precedent.

Ignoring *Regents*, Defendants cite case law about traditional equitable relief.  But vacatur is "the only *statutorily* prescribed remedy for a successful APA challenge to a regulation." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (emphasis added), *cert. granted*, 144 S. Ct. 374 (2023) (quoting *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022)).  And vacatur is much broader than mere equitable relief.  "Unlike an injunction, which merely blocks enforcement, vacatur unwinds the challenged agency action." *Data Mktg*., 45 F.4th at 859 (citation omitted).

Against all this, Defendants rely (at 57) on a concurring opinion by Justice Gorsuch, which expresses preliminary "doubts about vacatur" and urges future "consideration" of the issue by the Supreme Court.  *United States v. Texas*, 599 U.S. 670, 693, 702 (2023) (Gorsuch, J., concurring).  That concurring opinion, of course, is neither a majority holding nor consistent with the Supreme Court's holding in *Regents*.  And even that concurring opinion recognizes that Defendants' position here would depart from "more than 30 years" of settled precedent. *Id.* at 701.

Perhaps Defendants' view will one day prevail, but it did not in *Regents* or *Texas*, and it is far from clear it ever will.  Indeed, in the same case in which Justice Gorsuch expressed doubts about vacatur, the Chief Justice said Defendants' anti-vacatur argument "sounded to me to be fairly radical and inconsistent with . . . what you do in an APA case."  Tr. Oral Arg., *United States v. Texas*, No. 22-58 at 35 (2022).  Justice Kavanaugh similarly said Defendants' argument is "a pretty radical rewrite, as the Chief Justice says, of what's been standard administrative law practice. . . . 'Set aside' means 'set aside.'  That's always been understood to mean the—the rule's no longer in place.  No one's really had this—no case has ever said what you're saying anywhere." *Id.*  at 54–

55.  Justice Jackson echoed these concerns, saying "there's a disconnect to say that the successful plaintiff only gets a remedy that is about the application of that rule to them, because their complaint is not about the application.  Their complaint is that the agency did not have the authority to do what it did because it didn't follow the procedures under the APA."  *Id.* at 68.

Equally as important, the Supreme Court did not accept Defendants' anti-vacatur position in the most on-point precedent, *Biden v. Nebraska*, even though Defendants pressed that argument. *See* App. to Vacate, No. 22A444 at 32–35 (Nov. 18, 2022).[21]   And on remand, Defendants expressly stipulated that its rule be "vacated and set aside as null and void … because the Supreme Court already has held Defendants' loan-forgiveness plan to be in excess of statutory authority." Joint stipulation, *Biden v. Nebraska*, No. 4:22-cv-01040, ECF 75 at 2 (Aug. 15, 2023); *see also* ECF 76 (entering the joint stipulation as a final judgment and vacating the rule).

### B.  The narrow severability exception does not apply.

Some courts have held that regulations can be severed, but only in exceptional cases. "[T]he APA permits a court to sever a rule by setting aside only the offending parts of the rule." *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).  But this partial-vacatur remedy, if available at all in this Circuit, is available only when a court first finds two things. "First, the court must find that 'the agency would have adopted the same disposition regarding the unchallenged portion of the regulation . . . ."  *Id.* (citation omitted) (brackets omitted).  "Second, the parts of the regulation that remain must be able to 'function sensibly without the stricken provisions.'"  *Id.* (citation omitted).

Just as Defendants conceded that severability did not apply last time they tried mass loan forgiveness, it does not apply here.  Defendants wrongly say that Plaintiffs challenge only the

---

[21] https://www.supremecourt.gov/DocketPDF/22/22-506/246931/20221118113829714_Nebraska%20Vacatur%20Application%20FINAL.pdf

provisions that "reduce monthly payments" and "accelerat[e] loan forgiveness."  ECF 22 at 57.

Not so.  Plaintiffs' also challenge Defendants' decision to unlawfully subsidize interest, *see* ECF

10 at 37, and challenge the ability of Defendants to use ICR authority to engage in *any* forgiveness.

It is clear Defendants could *not* "have adopted the same disposition" without the ability to use ICR

authority for forgiveness—nor could any remaining provision function sensibly.

As the party seeking severability (and thus a departure from the "default rule" of vacatur),

Defendants must identify parts of the Final Rule they think survive.  They have not.  Defendants

contend that the Final Rule expresses a preference for severability and includes "detailed findings

about why 'each of the components of [the Final Rule] can operate in a manner that is independent

and severable of each other.'"  ECF 22 at 71–72 (citing 88 Fed. Reg. 43,828–29).  But not one of

the examples covers the most significant "feature" of all: loan forgiveness.  Defendants fail to

identify—in their brief or in the Final Rule—a single provision that can survive if loan forgiveness

under the ICR program is found unlawful.  Loan forgiveness is the lynchpin of the entire unlawful

plan.  Without it, no aspect of the Final Rule can stand.

### C.  The President is a proper defendant.

In asserting (at 59) a categorical bar against granting injunctive or declaratory relief against

the President, Defendants drastically overstate the law.  Injunctive relief is unavailable only "in

general."  *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992).  There are exceptions.  *See,*

*e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178, 199 n.12 (2d Cir. 2019)

("[a] court could require the President to establish a blind trust"), *vacated as moot*, 141 S. Ct. 1262

(2021) (Mem.).

But more importantly, the "general" bar against injunctive relief does *not* apply to

declaratory relief.  *Franklin* made clear that, despite the restrictions on injunctive relief, "the

President's actions may still be reviewed for constitutionality."  505 U.S. at 801.  And just a few

years later, the Supreme Court imposed declaratory relief against President Clinton for his use of the line-item veto.  *Clinton v. City of New York*, 524 U.S. 417, 421, 425 n.9 (1998).  In doing so, the Supreme Court explicitly distinguished "injunctive relief against the President" from "a declaratory judgment" against the President.  *Id.* at 425 n.9.

Other courts have long done the same.  *E.g.*, *Natl. Treas. Employees Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (employing "the tool of declaratory relief" against the President); *Knight First Amend. Inst. at Columbia U. v. Trump*, 302 F. Supp. 3d 541, 578–79 (S.D.N.Y. 2018) (declining "to enjoin the President" because "declaratory relief remains available"), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021).  So Defendants are completely wrong to assert that courts "have never submitted the President to declaratory relief."  ECF 22 at 72 (quoting *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010)).  Defendants also cite Justice Scalia's concurrence in *Franklin*, where he separately opined that "we cannot issue a declaratory judgment against the President."  505 U.S. at 827.  But Justice Scalia made this statement before *Clinton*, where the Court did that over his dissent.  *See* 524 U.S. 417.

Even injunctive relief may be available against the President in this case.  Although it is not available "in general," *Franklin*, 505 U.S. at 802–03, it is available where an injury cannot be "redressed fully by injunctive relief against the remaining Defendants," *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated on other grounds*, 583 U.S. 941 (2017).  Here, Plaintiffs have alleged that the President has taken the actions with respect to the Final Rule as part of a pattern to evade the Supreme Court.  ECF 1 ¶¶ 1–14.  At the motion-to-dismiss stage, these allegations must be taken as true.  It is thus possible that the President will try to evade a future preliminary injunction or statutory relief against the Secretary by issuing the cancellation order himself, rather

than ordering the Secretary to do so.  The only way to give Plaintiffs relief in that circumstance would be to enjoin the President, and so the *Franklin* exception would exist.

At least at this stage in the proceedings, where this Court must accept every allegation, dismissal is improper.  Declaratory relief is warranted against the President, and Defendants have not proven that injunctive relief will be categorically barred in all factual circumstances. Defendants motion to dismiss under Rule 12(b)(1) thus must fail.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that this Court grant their "Motion for a Stay or in the Alternative a Temporary Restraining Order" and their "Motion for a Stay or in the Alternative a Preliminary Injunction."  At the very least, immediate relief is appropriate to prevent any more early implementation of the Final Rule.  Plaintiff States further request that the Court grant their Motion with haste given the enormous economic consequences of the Final Rule.  Finally, the Court should deny the motion to dismiss.

Date: May 17, 2024

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Joshua M. Divine_____
Joshua M. Divine, #69875MO
    *Solicitor General*
Reed C. Dempsey #1697941DC
    *Deputy Solicitor General*
Samuel Freedlund, #73707MO
    *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
josh.divine@ago.mo.gov
samuel.freeland@ago.mo.gov
reed.dempsey@ago.mo.gov

*Counsel for Plaintiff*
*State of Missouri*
*Lead Counsel for State Plaintiffs*

**TIM GRIFFIN**
**Attorney General of Arkansas**

/s/Nicholas Bronni_____
Nicholas J. Bronni
    *Solicitor General*
Dylan L. Jacobs
    *Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-3661
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for*
*State of Arkansas*

Respectfully Submitted,

**ASHLEY MOODY**
**Attorney General**

/s/James H. Percival_____
James H. Percival
    *Chief of Staff*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

**CHRISTOPHER M. CARR**
**Attorney General**

/s/Stephen J. Petrany_____
Stephen J. Petrany
    *Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

**DREW H. WRIGLEY**
**Attorney General**

/s/ Philip Axt_____
Philip Axt
    *Solicitor General*
North Dakota Attorney General's Office
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

**DAVE YOST**
**Ohio Attorney General**

/s/ T. Elliot Gaiser
T. Elliot Gaiser
   *Solicitor General*
Mathura J. Sridharan
   *Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for Plaintiff State of Ohio*

**GENTNER DRUMMOND**
**Attorney General of Oklahoma**

/s/ Garry M. Gaskins, II
Gentner Drummond, OBA #16645
   *Attorney General*
Garry M. Gaskins, II, OBA #20212
   *Solicitor General*
Office of the Attorney General
State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Fax:  (405) 522-4815
gentner.drummond@oag.ok.gov
garry.gaskins@oag.ok.gov

*Counsel for*
*State of Oklahoma*

## CERTIFICATE OF SERVICE & COMPLIANCE

I certify that on May 17, 2024, a true and accurate copy of the foregoing document was electronically filed through the Court's CM/ECF System and that a copy of the foregoing will be sent via email to all parties by operation of the Court's electronic filing system, consistent with Federal Rule of Civil Procedure 5(b).

I further certify that the foregoing document contains 55 pages, exclusive of matters designated for omission.

/s/ *Joshua M. Divine*

*Counsel for Plaintiff State of Missouri*
*Lead Counsel for Plaintiff States*

58