## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| STATE OF MISSOURI,<br>STATE OF ARKANSAS,<br>STATE OF FLORIDA,<br>STATE OF GEORGIA,<br>STATE OF NORTH DAKOTA,<br>STATE OF OHIO, and<br>STATE OF OKLAHOMA<br><br>　　　*Plaintiffs*,<br><br>v.<br><br>JOSEPH R. BIDEN, Jr., in his official<br>capacity as President of the United States,<br><br>MIGUEL A. CARDONA, in his official<br>capacity as Secretary, United States<br>Department of Education, and<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION,<br><br>　　　*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. 24-cv-520 |

## DECLARATION OF JOSHUA M. DIVINE

I, Joshua M. Divine, declare as follows:

1.　　　I am an attorney licensed to practice law before this Court and am the Solicitor General at the Office of the Attorney General for the State of Missouri.

2.　　　Attached, as **Exhibit A**, is a true and accurate copy of a letter sent from MOHELA on March 25, 2024, which is available on MOHELA's website at https://www.mohela.com/DL/common/PressRelease/CeaseAndDesist.aspx.

3.      In response to an open-records request under Missouri law, MOHELA produced several documents to the Missouri Attorney General's Office, two of which are attached to this declaration.

3.      MOHELA produced an excel sheet that depicts a chart showing the monthly summary of how many of its FFELP loans were consolidated each month from September 2019 until March 28, 2024. Attached, as **Exhibit B**, is a true and accurate copy of the chart.

4.      MOHELA produced a letter from Federal Student Aid, an office within the Department of Education.  The letter was drafted August 1, 2022, but submitted to MOHELA on January 17, 2023, six days after Defendants released the noticed of proposed rulemaking that became the Final Rule at issue in this litigation.  A true and accurate copy of the letter is attached as **Exhibit C**.

Pursuant to 28 U.S.C. § 1146, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 17, 2024,

_Josh Divine_
_____
Joshua M. Divine, #69875MO
*Solicitor General*

# Exhibit A



March 25, 2024

Mr. Mike Pierce
Executive Director
Student Borrower Protection Center
1025 Connecticut Avenue NW, Suite 717
Washington, DC 20005

Re: **MOHELA**

Dear Mr. Pierce:

The Student Borrower Protection Center ("SBPC") publication named "The MOHELA Papers," dated February 2024 (the "Publication"), made false, misleading and sensationalized claims and insinuations regarding MOHELA and its business activities. The Publication took a consistently one-sided position, ignoring many facts and circumstances favorable to MOHELA while exaggerating and falsely presenting other circumstances. It also referenced citations that did not support its claims and attributed actions to MOHELA that were the actions of others.

The description herein highlights some of the most blatant false assertions in the Publication and describes how they are false. Moreover, this description actually downplays the sensationalized effect of the combination of the overblown headings and false assertions in the Publication. The accusations in the Publication are not fairly supported by the complete facts. Almost none of these key facts are mentioned in the Publication. Not only are statements wholly wrong, but the Publication gives the unmistakable and false impression that all of the problems with the federal student loan program and related matters are MOHELA's responsibility.

The Publication includes clear cases of inaccurate and highly misleading statements set forth herein. If the SBPC, having knowledge of these facts, and understanding the recklessness and errors of its Publication, continues to publish such statements, or makes new statements to the same effect, because of its reckless disregard for the truth or its knowing falsity, it will be subject to liability for libel and other publication-based claims.

### <u>SOME OF THE MOST EGREGIOUS FALSE STATEMENTS</u>

- The Publication repeatedly alleges that MOHELA intended to mislead borrowers during R2R by maintaining a complex "call deflection scheme." As is well-known, "call deflection" is not a "nefarious scheme," rather it is the common name for the technique widely used in the business community, particularly by customer service call centers, to provide callers access to information even during periods of high call volume through self-service options. More importantly, this was a technique that MOHELA was directed to employ by the U.S. Department of Education's Office of Federal Student Aid ("FSA"). In connection with R2R, FSA directed all federal student loan servicers (not just MOHELA) to employ "call deflection" to address the anticipated dramatic call volume. FSA's July 2023 Communications Playbook for R2R, issued before the start of R2R, references the need for FSA's loan servicers to utilize call deflection. FSA references call deflection 13 times in that initial Playbook. In the 26

versions of the Playbook issued by FSA to the loan servicers from July to December 2023, there were 120 mentions of the use of "call deflection." As any fair-minded person would acknowledge, it was not possible for any of the federal loan servicers, to immediately answer the dramatic increase in call volume at the inception of R2R. This was recognized by FSA. One example of this increase in call volume is that the percentage of borrowers assisted by MOHELA customer service representatives increased by over 300% in October 2023 compared to February 2020.

- The Publication states that MOHELA has allowed the Public Service Loan Forgiveness ("PSLF") backlog to explode with over 800,000 unprocessed forms in February 2024. This is false. To the contrary, as of today, MOHELA has less than 15,000 new PSLF forms to process. Other forms are pending employer adjudication by FSA, consolidation loans to be made or loans to be transferred from another federal servicer. The volume of applications continues to fluctuate and an uptick may occur because of an April 30, 2024 deadline allowing borrowers to take advantage of additional payment adjustments.

- Contrary to the statements and insinuations throughout the Publication, MOHELA dramatically increased its staffing in an attempt to meet the challenges of both PSLF and R2R loan processing. MOHELA's staffing increased from 531 staff (September 2021) to 3,419 (February 2024), an increase of 543%. During the period from August 2022 to September 2023, MOHELA's hiring of customer service representatives increased over 200% from 330 to 1,022. During that same period, supervisor hiring increased 159%, from 22 to 57.

- Many of the footnote citations in the Publication for alleged "bad acts" by MOHELA are incorrect. Cited authorities often relate to time periods before MOHELA was involved with PSLF processing, actions that did not relate to MOHELA but that involved other loan servicers, the loan servicing industry in general, or to events that never occurred.

- The Publication repeatedly refers to millions of borrowers serviced by MOHELA experiencing a documented servicing failure and occasionally references a $7.2 million withholding by FSA of MOHELA servicing fees as evidence of same. The reference to servicing failures suggests some misapplication or misappropriation of funds, bad advice or other malicious action. In fact, the withholding by FSA relates to whether bills were timely sent to borrowers for their first payment after their payment pause. FSA's withholding of those fees was an initial protective measure, not yet even at the stage of a claim, and that action by FSA is in the early stages of review. FSA's action thus far fails to recognize that there was a constant stream of notifications by FSA and the loan servicers as to when payments were due and the multiple ways for borrowers to learn of when payments were due. More importantly, approximately 65% of the borrowers who allegedly received late bills and are the subject of the withholding, either paid on time or owed nothing. Many others were sent bills at least two weeks before payments were due. Accordingly, the statements in the Publication on this topic are incomplete and misleading.

- A major difficulty in pointing out false statements in the Publication is that it regularly "flip flops" between discussions involving PSLF and R2R, between time periods before and after MOHELA serviced PSLF on FSA's behalf, and as to matters not unique to MOHELA but applicable to all federal student loan servicers or to other servicers.

## DATA POINTS FOR BACKGROUND ON FALSE STATEMENTS

Most of the false assertions in the Publication are repeated throughout the 32-page text in various iterations of untruths. The following is a list of contextual data points so that they will not have to be repeated with each account.

- MOHELA is a public instrumentality of the State of Missouri.  It has no shareholders.  Its revenues above expenses and reserves are devoted to student financial aid.  Since 2011 MOHELA has been a federal loan servicer assisting student borrowers for FSA.  As a federal contractor, MOHELA follows FSA's requirements that dictate the assistance provided to FSA borrowers in the management of repayment of their federally owned loans.  FSA is the lender and owner of the loans and terms of the loans are set by Congress and FSA. Further, borrower loan payments are not sent to MOHELA but to a different federal contractor. Any refunds due to borrowers are made by FSA and not MOHELA.

- In almost every FSA survey performed historically, MOHELA has been rated the highest of the federal student loan servicers per FSA performance metrics.

- Much of the Publication is devoted to problems with the PSLF program which allows qualifying borrowers to obtain federal student loan forgiveness. At the request of FSA, MOHELA became the program's sole processor in July of 2022. This was just a few months before the filing deadline in October for a special FSA initiative to loosen the rules for PSLF forgiveness.  A flurry of late, unanticipated FSA communications about the initiative by FSA, the White House and others to borrowers led to an historic deluge of borrower inquiries to MOHELA and FSA starting in August 2022. Further, despite good intentions, in the summer of 2022, FSA was experiencing an upgrade to a main loan database, the National Student Loan Database ("NSLDS"). This delayed FSA's receipt of data files to validate PSLF counters and discharges. Only FSA has the authority to update PSLF counters and process PSLF discharges under the FSA special PSLF initiative, the Limited Waiver Program ("LWP"), and under a special income-driven repayment program adjustment. Further, MOHELA only has the authority to process PSLF discharges after FSA provides the PSLF discharge files to MOHELA.  FSA was only able to begin providing MOHELA with both types of files to effectuate loan processing by MOHELA on August 25 which was only a short time before the filing deadline for the LWP. This led to a PSLF backlog at MOHELA not of its own making. Notably, intermittent delays of delivering these data files by FSA have continued through 2024.  As said, these data file transfer delays, out of MOHELA's control, substantially contributed to PSLF processing delays and borrower unhappiness.

- MOHELA does not have authority to process loan forgiveness until authorization is provided by FSA and the final decision to discharge loans is with FSA, not MOHELA.

- MOHELA made a major effort to increase staffing for PSLF and R2R.  New staff members required many weeks of training and to be approved for a federal security clearance before starting work, all of which can take at least 60-90 days to complete.  Despite the early challenges, MOHELA had staffed up for PSLF and by March 2023 MOHELA's call queues and hold times for PSLF had dropped to less than one minute.  Also, March 2023 PSLF average speed to answer was 18 seconds. More importantly, MOHELA has been able to complete the processing of a historic number of PSLF loans.  In the nearly 20 months MOHELA has been the processor, nearly 1,750,000 loans have been discharged compared to the 14,172 discharged from 2007 to 2021.  These loans amounted to over $47 billion for over 662,000 borrowers as of February 29, 2024.  During the months of MOHELA's

processing, FSA has also been overwhelmed by the PSLF volume and it understandably often took months for FSA to provide MOHELA needed information, responses and approvals regarding PSLF matters.

- It was always intended that MOHELA was to be just an "interim" PSLF loan processor between the time the prior PSLF processor stepped down and the time that FSA was able to take over processing under its new long-term loan servicing solution (USDS). This was documented by FSA in its April 24, 2023 publication "The Next Generation of Loan Servicing." MOHELA has been advised by FSA that, consistent with the forgoing, its role as the sole PSLF processor is currently scheduled to end April 30, 2024. Thereafter, PSLF processing will be handled by FSA and contractors under a different contract. This will mark a dramatic change in MOHELA's role with respect to the PSLF program.

- Much of the rest of the Publication involved discussion of the challenges surrounding the return-to-repayment of nearly 43 million loan borrowers in Fall 2023 after over three years during which loan repayments were not required ("R2R"). FSA and all of the federal student loan servicers faced challenges in dealing with the onslaught of borrower inquiries. Close to the beginning of R2R, FSA and its servicers were also busy implementing a new income-driven repayment plan, Saving on A Valuable Education ("SAVE"). Accordingly, FSA directives to all of the federal student loan servicers (not just MOHELA) as to R2R and new programs were often provided up against deadlines which necessitated hurried verification and implementation by the loan servicers. Further, FSA's implementation of its on-ramp program providing that delinquent borrowers do not face negative credit reporting or being deemed in default, is an acknowledgement by FSA of the significant challenge presented by R2R.


### DETAILED DESCRIPTION OF FALSE STATEMENTS IN THE PUBLICATION

Attached hereto and submitted herewith as Attachment A is a multi-page description of false statements in the Publication entitled "DETAILED DESCRIPTION OF FALSE STATEMENTS IN THE PUBLICATION" (the "Detailed Description").


### MOHELA's DEMAND AND CONCLUSION

MOHELA has been advised by counsel as to the following legal standards applicable to the SBPC in this case. They have noted that Federal law sets certain minimum standards for truthfulness, honesty and fairness. Specifically, even those who report and comment on public affairs are required by Federal law not to make assertions with reckless disregard for the truth, or with knowing falsehood. This is the constitutional standard of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974).

Whether or not SBPC believes it has a professional or ethical obligation to retract and correct the many blatant errors in the Publication, it does have an unquestionable legal obligation not to make further such misstatements. Specifically, under *Sullivan* and *Gertz*, the United States Supreme Court, while recognizing the constitutional right of free speech, drew the line at publication of statements that the speaker knew to be false, or for which the speaker acted with reckless disregard of truth or falsity. This standard not only trumps the protection normally afforded for speech about public officials and public figures; it also permits awards of punitive damages. If SBPC, having knowledge of the facts set forth herein, and understanding the recklessness and

errors of its original report, continues to publish such statements, or makes new statements to the same effect, because of its reckless disregard for the truth or its knowing falsity, it will be subject to liability for libel and other publication-based claims, and having acted with the highest level of fault, it would be liable for punitive damages.

Perhaps SBPC hopes or believes that because the Publication sensationalized everything so much, that it will be legally protected as commentary.  But that is not so; as the U.S. Supreme Court has noted, statements couched as opinions may imply defamatory facts, and hence lead to liability for libel.  *Milkovich v. Lorain Journal, Inc.*, 497 U.S. 1 (1990).  That is exactly what has occurred with your use of the word "scheme" to describe MOHELA's use of its call diversion program—it clearly implies that MOHELA deliberately employed the program in a manner that benefits itself and harms applicants.  This, of course, is the opposite of what happened.  MOHELA followed the law and the directive of FSA to create and implement such a plan.

Perhaps SBPC believes that its reporting will be legally protected if the various individual statements it writes are accurate, even if they present a misleading picture overall—for example, mentioning the number of complaints or mistakes, without explaining the context which would show those problems to be a tiny portion of the processed applications.  But that belief is not correct.  A published report can be held to be libelous or false even if it contains some true facts, or if those facts fail to tell the entire story and if they leave ordinary readers with an incorrect conclusion.  *See, for example, Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978) ("The published statement, therefore, so distorted the truth as to make the entire article false and defamatory.  It is no defense whatever that individual statements within the article were literally true."); *Cochran v. Indianapolis Newspapers, Inc.,* 372 N.E.2d 1211, 1217 (Ind. App. 19784) ("A false implication or impression may be created by the positioning of true statements and headlines").

Finally, perhaps SBPC believes that its purported intentions (helping student borrowers) are so pure that it is entitled to go ahead and hack away at MOHELA and FSA, taking whatever pot shots it can, using whatever claims it can find, here and there, that show that their performance has been less than perfect.  Perhaps that is what happened here, since the Publication uses a patchwork of statements — some false, and some perhaps arguably true on their own, but used without the proper explanatory context — to portray MOHELA in a false and misleading light.  But even a purported idealist's motives will not protect SBPC legally, because it has an obligation to be truthful not just in individual particulars, but in the general message it conveys.  Where, by any means, you create, directly or by implication, a highly disparaging and false portrayal of MOHELA, that can be actionable.  SBPC's obligation is to fully and fairly research and consider, not to begin with hatchet flying and a "facts be damned" attitude—even if that fair approach goes against the grain of SBPC's ideology and prejudices.  The U.S. Supreme Court has held that a "purposeful avoidance of the truth" is the equivalent to reckless disregard for the truth, and knowing publication of falsehood. *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 691 (1989).

MOHELA has suffered serious damage from the Publication. The false assertions in the Publication are particularly distressing because, in a breach of basic journalistic responsibilities, the SBPC failed to contact MOHELA and afford it the opportunity to explain the true facts and correct SBPC's many mistakes.  MOHELA demands that you immediately cease and desist from publishing further false or misleading statements about MOHELA. Further, MOHELA also demands that you delete the Publication from your website and discontinue any further distribution of it. Failure to comply with these demands, and distribution or publication, will be viewed by MOHELA as a deliberate refusal to address the errors.

Page 6

This letter provides the SBPC with notice of the falsity of the above-described statements and insinuations. Consequently, if the SBPC continues to make and publish any of these false and misleading statements, MOHELA will treat that continuation as done with knowledge of the statements' falsity or with reckless disregard of their truth or falsity, which can lead to punitive damages under libel laws and other related laws. MOHELA is hopeful that you understand that MOHELA will take all appropriate action necessary to stop this conduct if you persist. MOHELA greatly values and aggressively protects its rights and reputation and intends to vigorously enforce its rights.

Very truly yours,

Higher Education Loan Authority
    of the State of Missouri

<u>**Attachment A**</u>

<u>**DETAILED DESCRIPTION OF FALSE STATEMENTS IN THE PUBLICATION**</u>

<u>**Publication – page 5**</u>

**Statement:** MOHELA's servicing failures have affected more than four in ten of its customers. Instead of performing basic servicing functions such as providing borrowers with access to correct information about their loans and options, and processing basic forms, MOHELA has chosen a complex "call deflection" scheme – a byzantine loop of misinformation and false promises.

**MOHELA Response:** The Publication does not cite or present evidence that MOHELA did not perform its basic servicing functions for 40% of its borrowers. MOHELA services loans for nearly 8 million federal student loan borrowers and many millions of private student loans. As stated above, MOHELA has, in almost every survey, been rated the highest federal student loan servicer per FSA performance metrics. Further, as described above, what the Publication refers to as a "call deflection scheme and a byzantine loop of misinformation" is categorically false as described above as MOHELA was following good business practices and FSA's direction to employ call deflection strategies.

---

<u>**Publication – page 6**</u>

**Statement:** The obtained documents uncover that MOHELA's processing of PSLF has prevented hundreds of thousands of borrowers from progressing towards relief. Specifically:

- MOHELA allowed the PSLF backlog to explode with over 800,000 unprocessed forms;
- MOHELA provided borrowers with incorrect payment counts; and
- MOHELA is denying PSLF credit to public service workers with eligible employment.

**MOHELA Response:** It is categorically false that MOHELA's processing prevented anyone from progressing to PSLF relief. Every entitled borrower that it processed for PSLF debt relief has or will obtain debt forgiveness. The challenges (not of MOHELA's making) at the time it began servicing PSLF on FSA's behalf for processing and which led to a substantial initial backlog are set forth in the section above titled "Data Points for Background on False Statements." The initial backlog of new PSLF applications was largely worked through by March 2023. As mentioned in the section above titled "Some of the Most Egregious False Statements," as of today, MOHELA has less than 15,000 new PSLF forms to process with some forms pending action outside MOHELA's control. However, relief is ultimately determined by FSA, not MOHELA, and it can understandably take FSA substantial time to provide communications and directions to MOHELA as to its PSLF processing. Except in rare and isolated cases, MOHELA does not wrongfully deny credit to workers with eligible employment and any missteps are quickly corrected when identified. Many so-called "denials" as to PSLF applications are simply requests by MOHELA for further information.

---

<u>**Publication – page 6**</u>

**Statement:** Troublingly, the documents expose MOHELA's potential financial windfall for making improper denials: MOHELA is paid for each processed application—for the wrongful denial and then again for the approval—a backwards incentive.

**MOHELA Response:** Pursuant to MOHELA's contract with FSA, MOHELA is paid a fee to process PSLF applications. It receives the same amount whether an application is approved or denied. MOHELA's processing role as to PSLF has been and is heavily monitored by FSA and any wrongful application denial scheme would have been uncovered by FSA long ago. MOHELA has never been accused by any investigatory body or reputable source of intentionally denying applications to make money. You present no evidence of a MOHELA scheme or history of wrongful denials to increase payments and, without evidence, this is a defamatory insinuation and statement.

---

## Publication – page 6

**Statement:** MOHELA's customer service problems—including the "call deflection" scheme—exacerbated problems for both public service workers and vulnerable, often low-income, borrowers alike. Evidence showed that:

- MOHELA borrowers were unable to reach customer service representatives to address errors;
- MOHELA miscalculated borrowers' payment amounts;
- MOHELA lost borrowers' payments, refunds, and records; and
- MOHELA misinformed borrowers about their options.

**MOHELA Response:** For the reasons previously mentioned above, including in the section titled "Some of the Most Egregious False Statements," it is factually incorrect to state that MOHELA engaged in a call deflection scheme when it was merely following FSA Playbook guidance and accepted business practices. The statement is also incorrect in claiming that MOHELA intentionally did not provide adequate customer service to borrowers. As mentioned, FSA and all federal student loan servicers suffered a massive influx of calls and other communications during R2R and there were times of inability to reach company representatives quickly. However, it is false and incomplete to state that this was only a problem for MOHELA. Further, there was only a small percentage of actual documented instances involving miscalculation of borrower payment amounts or refunds by MOHELA during R2R. In many cases when these acts are alleged by borrowers, it turns out not to be true.

---

## Publication – pages 6-7

**Statement:** In all, nearly 3.5 million student loan borrowers serviced by MOHELA have experienced a documented servicing failure since loan payments resumed in September 2023 after a three-and-a-half-year-long pause on bills and interest charges. The following investigation shows that the errors and abuses outlined in this report can be directly attributed to choices made by MOHELA. While the U.S. Department of Education (ED) has taken some actions to hold MOHELA accountable—withholding $7.2 million in payment for failing to perform on its contract and providing some borrowers with zero percent interest forbearances—these actions fail to provide a full and adequate remedy to borrowers who have been harmed, may be subject to their own implementation errors by MOHELA, and do not hold the company's executives accountable.

**MOHELA Response:** As mentioned in the prior sections hereof, MOHELA is only aware of a small percentage of borrowers who experienced any real "errors" in servicing. As mentioned in the section above titled "Some of the Most Egregious False Statements," the $7.2 million

withholding by FSA is a protective measure, has not risen to a claim and is subject to the equitable fact that 65% of involved borrowers paid on time or owed nothing.

---

### Publication – page 11

**Statement: "MOHELA's Central Role in Ripping Debt Relief from Millions of Borrowers"**

**MOHELA Response:** This heading indicates that MOHELA "ripped debt relief" from borrowers. This is an example of an overstated headline that is highly misleading, false and sensationalized. Further, the headline is not supported by the discussion that follows the headline. In addition as is well-known, MOHELA was not a named or active party in the legal challenge before the Supreme Court that challenged President Biden's debt relief plan.

---

### Publication – page 12

**Statement:** Reports from the CFPB just before the return to repayment also show cause for alarm.  From July 1, 2022, through September 30, 2023, the CFPB received nearly 3,000 complaints about MOHELA, the most of any federal student loan servicer.  Of those complaints, over 1,400 (53 percent) fell under the following categories: received bad information about your loan, trouble with how payments are being handled, or incorrect information on your report.  In its first year being the sole PSLF servicer, MOHELA itself received 36,309 complaints.

**MOHELA Response:** The foregoing is a terribly unfair, misleading and incomplete statement for obvious reasons. Historically, the PSLF program was the most criticized and complained about student loan program long before MOHELA began servicing PSLF on FSA's behalf. Of course, there would be more complaints about MOHELA than any other servicer because, as previously described, MOHELA had just started as to PSLF and was the sole PSLF processor during this time frame. As mentioned above, MOHELA took over PSLF under extremely difficult circumstances, received needed PSLF data late from FSA and performed as well (or better) than could have been expected under the circumstances.  Aside from that obvious explanation, your statement fails to note that historically what are referred to as borrower "complaints" do not all constitute complaints in any common sense meaning of that word.  Many of the complaints that MOHELA is aware of reflected the borrowers' unfamiliarity with student loan finance terms and programs like PSLF and R2R, not dissatisfaction with MOHELA's servicing.  Many other matters labeled "complaints" were actually borrowers seeking information, involved incorrect information by borrowers or complaints that lacked evidence of validity.  No federal student loan servicer is perfect, especially during the previously described circumstances of PSLF processing and R2R, but MOHELA works diligently to attempt to address all legitimate complaints and it is false to suggest all so-called "complaints" were legitimate.

---

### Publication – page 14

**Statement:** The following sections of this report detail how MOHELA has harmed borrowers, and more broadly how it is failing at its job as a federal student loan servicer. An examination of documents related to MOHELA's servicing of the PSLF portfolio show that public service workers pursuing PSLF have been left stranded, denied promised relief, left with no information, or misinformation, causing years-long setbacks. Beyond PSLF, MOHELA's broader servicing failures prevent borrowers from accessing their rights and getting critical information.

**MOHELA Response:** For the reasons previously set forth, it is inaccurate and misleading to state that borrowers were harmed by MOHELA, that it is failing at its job as a servicer, or that its failures prevent borrowers from accessing debt relief and getting information. You present no believable facts to support this position. As mentioned above, in almost every FSA survey performed historically, MOHELA has been rated the highest of the federal student loan servicers per FSA performance metrics. As to PSLF, as set forth, MOHELA has made the most of a challenging situation and has processed an incredible number of PSLF applications in its 18 months as the PSLF processor.  During times of high volume, it was not possible to answer every call or respond to every inquiry as soon as MOHELA preferred.

---

### Publication – pages 14-15

**Statement: MOHELA's Processing of PSLF has Prevented Hundreds of Thousands of Borrowers From Progressing Towards Relief.** Since 2022, MOHELA has served as the specialty servicer responsible for handling the loans of borrowers working towards cancellation through the PSLF program.  As described in greater detail in this section, MOHELA's handling of these borrowers' accounts is denying public service workers Congress's promise of debt relief. **PSLF Backlog has Exploded Under MOHELA.** As of the date of this report, MOHELA has a backlog of over 800,000 unprocessed PSLF forms submitted by public service workers. Many of these public service workers have made their 120 payments, and fulfilled their end of the deal, but are often left waiting more than six months for the loan relief that they have been promised. Others are attempting to do their due diligence and certify their employment regularly, as they have been instructed, only for their forms to be stuck in the backlog, resulting in uncertainty surrounding the relief they are working toward.  Now that the payment pause has ended, these borrowers are receiving bills and being told to make payments.  This means that thousands of borrowers whose debts should be cancelled are being forced to make payments or face the consequences of not paying, which can be severe. This causes both immediate and long-term harm.  These borrowers who received bills may have made payments on debt that should no longer exist.  Especially for low-income borrowers, MOHELA's processing failure may therefore jeopardize their abilities to make ends meet.  Borrowers may make loan payments to avoid delinquency but without any guarantee that overpayments will be refunded. Federal data show that the backlog has grown under MOHELA.  When MOHELA took over as the sole PSLF servicer in July 2022, there were roughly 250,000 unprocessed forms. Since then, the backlog peaked at more than one million forms and has remained at roughly 800,000.  If fact, the most recent available data indicate that nearly one-in-three PSLF borrowers are trapped in this backlog.  For some, now that payments have resumed,

**MOHELA Response:** The headline is sensationalized and obviously misleading. The statements following the headline are inaccurate and highly misleading for the reasons previously set forth above regarding PSLF.  MOHELA is not denying PSLF.  The Publication states that "as of the date of this report, MOHELA has a backlog of over 800,000 unprocessed PSLF forms."  To the contrary, as of today, MOHELA has less than 15,000 new PSLF forms to process with some other forms pending action outside of MOHELA's control. The backlog increased after MOHELA took over as the PSLF servicer because of the dramatic increase in the number of PSLF applications in the first four months of MOHELA's involvement due to the filing deadline for the aforementioned Limited Waiver Program.  The number of applications far exceeded any previously received by a huge number. Due to the unprecedented volume, there was a backlog at FSA and, as well, at MOHELA.  As mentioned, a significant reason for any backlog is due to FSA's role. Only FSA can determine PSLF relief. Borrowers regularly fail to provide the needed information to complete the

processing. Given the large volume facing FSA, MOHELA often has to wait for months for responses from FSA which causes a backlog at MOHELA. While relief for those entitled may sometimes take longer than hoped, FSA has indicated, and MOHELA agrees, that all individuals entitled to debt relief will receive it. Further, FSA has assured MOHELA that it has and will continue to make refunds of payments made by borrowers as required after they reached PSLF forgiveness. In addition, a fair reading of this section's footnotes do not support the claims.

---

**Publication – page 16**

**Statement: MOHELA Reported Incorrect Payment Counts to Borrower.** In 2022, the CFPB received more than 500 complaints about MOHELA, including many from borrowers who allege MOHELA provided incorrect payment counts. These problems have plagued the PSLF program for years. For example, in the fall of 2022, the federal agency announced that its examiners found "both wrongful denials and approvals of applications or ECFs," which resulted in borrowers receiving inaccurate and inconsistent information about their progress toward cancellation through the PSLF program."

**MOHELA Response:** The foregoing headline is false, misleading and sensationalized. Further, the statement is inaccurate and misleading as to MOHELA. First, the referenced CFPB Supervisory Highlights Report was issued in September 2022. As noted above, MOHELA did not begin receiving the data from FSA that was necessary to begin PSLF processing until late August/September 2022. Accordingly, the wrongful denials cited by the CFPB necessarily predated MOHELA's processing of PSLF applications, a fact that you could have discovered through a basic due diligence investigation. Second, as stated above, many of the so-called "complaints" are not really complaints in the common understanding of that term and many others are not supported by the evidence. Third, 500 out of the universe of borrowers serviced by MOHELA is less than .001% of the borrowers. Finally, this statement as to 500 complaints is said to be based on a SBPC analysis of CFPB complaints --- maybe these complaints were regarding the prior servicer too as in the CFPB Supervisory Report SBPC cited as referring to MOHELA.

---

**Publication – page 16**

**Statement: MOHELA is Denying Credit to Public Service Workers with Eligible Employment.** In 2022, the CFPB found that servicers improperly denied relief to borrowers such as public school workers. Specifically, it found occurrences where "ECFs were wrongfully denied when representatives erroneously determined the forms had invalid employment dates, were missing an employer EIN (Employer Identification Number) or were otherwise incomplete—when in fact they were not." These improper denials have the effect of postponing when otherwise eligible borrowers receive cancellation.

**MOHELA Response:** The headline cited is inflammatory and false. As mentioned in the immediately prior section, the statements after the headline are not based on activities during MOHELA's time as PSLF servicer. The CFPB Supervisory Highlights Report published in September 2022, shortly after MOHELA became the PSLF servicer, was based on the activities of the prior PSLF servicer. As further mentioned in the prior section, mistakes and complaints do occur given the volume of loan processing in PSLF occurring in a short amount of time.

---

### Publication – page 16

**Statement:** SBPC has uncovered that MOHELA continues to deny public service workers with qualifying employment.  In response to a request for all records related to PSLF denials by employers that MOHELA has produced for ED, the company has produced a document on June 17, 2023 that it denied nearly 5,000 borrowers and nearly 11,000 more in a "hold" status.

**MOHELA Response:** MOHELA does not deny or seek to deny PSLF applications incorrectly or to mislead borrowers. The Publication states, without meaningful evidence, that MOHELA erred in denying forgiveness to borrowers with qualifying employment. Rather than just admitting that the SBPC did not have sufficient information to determine whether a denial was proper or not, SBPC simply assumed that many were not proper.  Denials by MOHELA as to PSLF applications have been, with few exceptions, justified.  What the SBPC refers to as "denials" by MOHELA are often just requests for more information.  Further, the applications on hold are yet to be reviewed by either FSA or MOHELA.

---

### Publication – page 17

**Statement: MOHELA Financially Benefits From Improper PSLF Denials as Borrowers are Harmed**.  Under its contract with the Department, improper denials can turn out to be quite lucrative for MOHELA because the servicer gets paid for both denial and for the PSLF approval form it processes.  This means if they deny an application and the borrower resubmits forms or applies for reimbursement, the company is paid an additional $8.17.  This both rewards MOHELA for making improper determinations during its first review and create a perverse incentive for it to improperly deny borrowers in order to collect payment for a second review.

**MOHELA Response:** As discussed above in the third MOHELA Response, MOHELA does not benefit from improper denials.  To make this inference with no evidence of any intent on the part of MOHELA to perpetate fraud is a defamatory insinuation.

---

### Publication – page 18

**Statement: MOHELA's Poor Customer Service Made Everything Worse.** The problems identified in the following section demonstrate that MOHELA was unprepared and ill-equipped to deal with the servicing of the PSLF Waiver and the return to repayment. The company was unprepared even when it had foreknowledge of ED's plans and upcoming deadlines and announcements, increased activity, and other factors that would cause an increase in call center activity and borrower requests. For example, emails show that prior to sending out notices to borrowers about Biden's debt relief plan, ED explicitly warned the servicers of this influx in writing and to be prepared accordingly.

**MOHELA Response:** The foregoing headline is inaccurate and inflammatory.  For the reasons mentioned above including in the section titled "Some of the Most Egregious False Statements," the statements under the headline are false. MOHELA staffed up to meet the demand to the extent possible. The last sentence is also irrelevant because the statement and the authority for the statement cited in Footnote 65 is not referring to PSLF or R2R.  Rather, it has to do with staffing up for an anticipated event that never occurred, that is, the Biden debt relief plan which was ruled unlawful in June 2023.

---

## Publication – page 19

**Statement:** In advance of payments resuming, MOHELA adopted minor changes to its customer service options, but seemingly with minimal effect. It is one of the servicers that offers a call-back feature, so borrowers do not have to wait on hold but can hang up and request a call from a representative when it is their "turn" in line. Yet borrowers reported this feature failing, and never receiving a call back at all. Regulators have determined that when a servicer's call centers are understaffed for an extended period of time resulting in consistently and excessively long call wait times, the servicer is engaging in a prohibited practice. This is because, as a result, borrowers are left without an adequate avenue to timely resolve disputes by phone for an extended period, which is an unfair act or practice. By denying borrowers access to a MOHELA representative, MOHELA is preventing borrowers from accessing their rights and likely engaging in that very prohibited practice.

**MOHELA Response:** The foregoing statements give misimpressions and are highly inaccurate. MOHELA made major hiring and other service enhancements to address R2R.  Further, we note that many of the negative comments on this page related to all of the student loan servicers during R2R, not just to MOHELA yet this is not highlighted. In addition, the only citations for SBPC's borrower comments are to SBPC's own prior publications and also for the SBPC to rely on the comments of a few borrowers out of the millions serviced by MOHELA is misleading and does not support SBPC making broad generalizations as statements of fact regarding MOHELA's loan servicing. It should also be noted that, as previously stated, MOHELA was directed by FSA to refer borrowers to and encouraged the use of self-service options whenever possible, to help manage the anticipated surge of millions of borrowers returning to payment. This was being dona at a time when FSA apparently felt compelled to mandate that all federal loan servicers cut costs and limit customer servicer hours despite the anticipated high demand.

## Publication – pages 22 - 27

**Statement:** These pages contain the following misleading and sensationalized headlines: discussions following each headline:

> **MOHELA Lost Borrower's Payments, Refunds, and Records**
> **MOHELA Misinformed Borrowers About Their Options**
> **MOHELA's Actions Are Keeping Borrowers From the Benefits of the SAVE Plan**.

**MOHELA Response:** The headlines give a completely unfair and misleading impression of the discussion that follows and the sections are replete with errors and misimpressions. A large number of the statements cite as evidence what are described as borrowers that SBPC had contact with. These contacts are, of course, impossible to verify.  Further, the statement refers to random alleged complaints and intimates that they apply to a large swath of the eight million federal student loan borrowers served by MOHELA.  Also, the statements, and supporting footnotes, flip "back and forth" between references to the student loan industry generally, actions by other servicers and MOHELA, without adequately distinguishing between them. Ultimately, SBPC inappropriately attributes all bad actions to MOHELA.  Further, one statement criticizing MOHELA relies on a footnote (Footnote 106) from a 2019 article long before MOHELA's PSLF and R2R activities.

**Publication – pages 28-30**

**Statement:** These pages start with the headline **MOHELA's Call Deflection Scheme Ensures Servicing Failures Go Unresolved.**

**MOHELA Response:** The statements on these pages include references to a "call deflection" scheme by MOHELA intentionally giving borrowers the run-around instead of proper customer service and that in MOHELA's playbook call deflection is the prime strategy for R2R.  The tone of the pages is false and misleading.  The facts are that every fair-minded person understands that R2R presented a historic challenge for the student loan industry with nearly 43 million borrowers returning to repayment after three and half years.  FSA realized this and did what it could to communicate with borrowers about the difficult situation, the extended wait time on calls and the need for patience. FSA prepared and distributed a "playbook" which it provided to all loan servicers (not just MOHELA) before R2R.  Starting on the first page of all 26 versions of the FSA playbook provided to loan servicers in 2023, FSA directed servicers to use "deflection" because it understood that it was not possible for servicers to handle the call volume. MOHELA's playbook was based on the FSA playbook and MOHELA assumes all other federal loan servicers did the same.  As is well-known, "call deflection" is a technique used throughout this country's business community during times of high call volume to direct callers to websites for information and other digital options.  MOHELA knew that referring callers to relevant websites was the best way for the greatest number of borrowers to get the information and service needed, as well as to allow them to take actions to apply for new repayment plans which could lower their payment amounts, or to set up payments which were primary call reasons as borrowers were resuming repayment. MOHELA believes that the information on its website was accurate and accommodated a tremendous number of borrowers.  Others that needed more detailed information, and did not seek it in the months before the long-known R2R date, would occasionally have to wait for some period. However, it is false to suggest MOHELA intended to delay responses --- it would have no reason to do so. FSA repeatedly advised borrowers to expect long delays which any fair-minded individual would acknowledge.

# Exhibit B

Consolidation Activity - Dept of Education (Transaction Code 1070)
Monthly Summary

| Dates | Principal | Interest | Total Loan Balance | Borrower Count | Average Balance per Borrower | 12 Month Average |
|---|---|---|---|---|---|---|
| Sep-19 | $ 3,249,551.67 | $ 127,657.58 | $ 3,377,209.25 | 153 | $ 22,073.26 | |
| Oct-19 | $ 4,673,497.42 | $ 286,350.06 | $ 4,959,847.48 | 185 | $ 26,809.99 | |
| Nov-19 | $ 3,973,462.39 | $ 175,858.65 | $ 4,149,321.04 | 179 | $ 23,180.56 | $ 3,807,162.47 |
| Dec-19 | $ 3,937,704.85 | $ 204,341.45 | $ 4,142,046.30 | 173 | $ 23,942.46 | |
| Jan-20 | $ 3,232,030.34 | $ 136,324.28 | $ 3,368,354.62 | 165 | $ 20,414.27 | |
| Feb-20 | $ 3,953,934.30 | $ 228,580.78 | $ 4,182,515.08 | 164 | $ 25,503.14 | |
| Mar-20 | $ 4,733,304.98 | $ 207,266.84 | $ 4,940,571.82 | 197 | $ 25,079.04 | |
| Apr-20 | $ 3,268,939.09 | $ 83,350.97 | $ 3,352,290.06 | 172 | $ 19,490.06 | |
| May-20 | $ 4,832,658.64 | $ 295,848.70 | $ 5,128,507.34 | 153 | $ 33,519.66 | |
| Jun-20 | $ 2,970,485.25 | $ 153,727.58 | $ 3,124,212.83 | 127 | $ 24,600.10 | |
| Jul-20 | $ 3,029,381.36 | $ 127,528.01 | $ 3,156,909.37 | 117 | $ 26,982.13 | |
| Aug-20 | $ 2,975,014.43 | $ 120,416.81 | $ 3,095,431.24 | 114 | $ 27,152.91 | |
| Sep-20 | $ 3,012,062.23 | $ 194,234.71 | $ 3,206,296.94 | 128 | $ 25,049.19 | |
| Oct-20 | $ 3,723,782.56 | $ 115,710.38 | $ 3,839,492.94 | 101 | $ 38,014.78 | |
| Nov-20 | $ 2,759,038.07 | $ 114,386.83 | $ 2,873,424.90 | 114 | $ 25,205.48 | $ 3,929,942.60 |
| Dec-21 | $ 3,453,919.87 | $ 129,098.19 | $ 3,583,018.06 | 114 | $ 31,429.98 | |
| Jan-21 | $ 2,722,103.34 | $ 139,075.11 | $ 2,861,178.45 | 110 | $ 26,010.71 | |
| Feb-21 | $ 4,281,050.61 | $ 234,599.70 | $ 4,515,650.31 | 134 | $ 33,698.88 | |
| Mar-21 | $ 10,254,150.18 | $ 453,982.43 | $ 10,708,132.61 | 367 | $ 29,177.47 | |
| Apr-21 | $ 5,543,161.03 | $ 188,113.11 | $ 5,731,274.14 | 207 | $ 27,687.31 | |
| May-21 | $ 5,215,955.02 | $ 280,934.83 | $ 5,496,889.85 | 165 | $ 33,314.48 | |
| Jun-21 | $ 2,955,620.59 | $ 273,224.96 | $ 3,228,845.55 | 109 | $ 29,622.44 | |
| Jul-21 | $ 2,094,436.27 | $ 81,632.29 | $ 2,176,068.56 | 72 | $ 30,223.17 | |
| Aug-21 | $ 1,693,204.69 | $ 53,890.86 | $ 1,747,095.55 | 74 | $ 23,609.40 | |
| Sep-21 | $ 1,736,435.51 | $ 73,749.39 | $ 1,810,184.90 | 75 | $ 24,135.80 | |
| Oct-21 | $ 2,288,860.57 | $ 138,687.73 | $ 2,427,548.30 | 98 | $ 24,770.90 | |
| Nov-21 | $ 5,432,361.03 | $ 362,540.25 | $ 5,794,901.28 | 228 | $ 25,416.23 | $ 10,701,300.54 |
| Dec-21 | $ 6,640,755.64 | $ 235,503.59 | $ 6,876,259.23 | 272 | $ 25,280.36 | |
| Jan-22 | $ 4,809,174.50 | $ 223,263.83 | $ 5,032,438.33 | 220 | $ 22,874.72 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Feb-22 | $ 5,071,585.76 | $ 258,158.96 | $ 5,329,744.72 | 209 | $ 25,501.17 | | |
| Mar-22 | $ 11,399,248.51 | $ 603,998.08 | $ 12,003,246.59 | 468 | $ 25,647.96 | | |
| Apr-22 | $ 9,156,917.97 | $ 544,304.33 | $ 9,701,222.30 | 342 | $ 28,366.15 | | |
| May-22 | $ 7,032,132.07 | $ 571,172.44 | $ 7,603,304.51 | 294 | $ 25,861.58 | | |
| Jun-22 | $ 9,143,460.75 | $ 563,138.47 | $ 9,706,599.22 | 376 | $ 25,815.42 | | |
| Jul-22 | $ 11,231,795.96 | $ 756,257.29 | $ 11,988,053.25 | 522 | $ 22,965.62 | | |
| Aug-22 | $ 18,736,421.64 | $ 1,563,333.52 | $ 20,299,755.16 | 801 | $ 25,343.02 | | |
| Sep-22 | $ 13,438,223.36 | $ 1,177,512.51 | $ 14,615,735.87 | 547 | $ 26,719.81 | | |
| Oct-22 | $ 17,905,006.09 | $ 1,559,339.94 | $ 19,464,346.03 | 822 | $ 23,679.25 | | |
| Nov-22 | $ 26,232,142.65 | $ 2,004,162.31 | $ 28,236,304.96 | 1,107 | $ 25,507.05 | $ | 8,683,792.34 |
| Dec-22 | $ 17,387,592.20 | $ 1,502,988.23 | $ 18,890,580.43 | 653 | $ 28,928.91 | | |
| Jan-23 | $ 2,909,161.53 | $ 251,630.85 | $ 3,160,792.38 | 113 | $ 27,971.61 | | |
| Feb-23 | $ 9,588,125.65 | $ 616,769.31 | $ 10,204,894.96 | 354 | $ 28,827.39 | | |
| Mar-23 | $ 7,062,713.84 | $ 618,291.58 | $ 7,681,005.42 | 269 | $ 28,553.92 | | |
| Apr-23 | $ 3,706,433.74 | $ 336,279.74 | $ 4,042,713.48 | 126 | $ 32,085.03 | | |
| May-23 | $ 3,417,258.39 | $ 292,784.84 | $ 3,710,043.23 | 133 | $ 27,895.06 | | |
| Jun-23 | $ 4,000,504.03 | $ 408,411.60 | $ 4,408,915.63 | 146 | $ 30,198.05 | | |
| Jul-23 | $ 3,632,345.88 | $ 297,322.70 | $ 3,929,668.58 | 116 | $ 33,876.45 | | |
| Aug-23 | $ 5,495,888.71 | $ 448,613.91 | $ 5,944,502.62 | 179 | $ 33,209.51 | | |
| Sep-23 | $ 5,447,555.87 | $ 469,314.24 | $ 5,916,870.11 | 169 | $ 35,011.07 | | |
| Oct-23 | $ 7,424,193.24 | $ 655,022.99 | $ 8,079,216.23 | 283 | $ 28,548.47 | | |
| Nov-23 | $ 5,606,245.78 | $ 489,634.81 | $ 6,095,880.59 | 213 | $ 28,619.16 | $ | 11,005,370.61 |
| Dec-23 | $ 6,274,282.85 | $ 707,089.45 | $ 6,981,372.30 | 225 | $ 31,028.32 | | |
| Jan-24 | $ 10,393,568.30 | $ 1,122,753.02 | $ 11,516,321.32 | 412 | $ 27,952.24 | | |
| Feb-24 | $ 18,657,603.35 | $ 1,885,154.49 | $ 20,542,757.84 | 729 | $ 28,179.37 | | |
| Mar-24 | $ 8,984,452.62 | $ 906,068.38 | $ 9,890,521.00 | 386 | $ 25,623.11 | | |

# Exhibit C

# Business Operations Change Request Form

**As Of: 1/17/2023 1:22:26PM**

| Administrative Information |
|---|

**CR:** 6373          **Drafted:** 8/1/2022 2:13:25PM          **Submitted:** 8/3/2022 6:55:39PM

**Title:** Revised - IDR Plan Modifications

**Sponsor:** Mindy Chiat                    **Business Analyst:** Anita Deadwyler

**Anticipated Implementation Date:**    07/13/2023                    *EMERGENCY*

**Mandated Legislation Effective 7/1/2020**

| Change Request Details |
|---|

**Reason (Business Need):**

FSA is looking to provide relief to borrowers by implementing changes to various Income Driven Repayment (IDR) plans, acknowledging the current status of the Negotiated Rulemaking process and the potential that final regulation may change and need to be addressed in a future Change Request.

NON-DISCLOSURE STATEMENT AND RULES OF CONDUCT

All staff representatives of each impacted system / organization are reminded of the rules of conduct and terms and conditions as outlined in Non-Disclosure Agreements when being granted access to certain United States Government documents or material containing sensitive but unclassified information, including proprietary data, interpretations and/or derivatives of such data provided by the Federal Student Aid (FSA) Contracting Office and/or entities other than the contracting parties.

 Information for this change includes sensitive information and other proprietary data such as, documents, memoranda, reports, deliberations, and draft regulations provided through Federal Student Aid Contracting Office.  Staff representatives are being granted access to this sensitive but unclassified information (SUI) only as a courtesy by FSA for the purposes of awareness and proposal submissions for the timely implementation of the IDR Plan changes.

**Description (Requirements):**

 I. REPAYE Updates
    1. The following updates will be made to the IDR payment plans:
      a. Increase the amount of income protected from 150% of the Federal Poverty Level (FPL) ($20,400 for a single individual) to x% ($x for a single individual).
          i.   The exact percentage will be provided during requirements.
      b. Increase the interest subsidy on REPAYE from covering 50% of all unpaid monthly interest to covering x% of the borrower's unpaid monthly interest.
        i. The exact percentage will be provided during requirements.

 II.   Servicing Requirements
    2.   The Federal loan servicers (FLS) shall update all systems and calculators to calculate for the Phase 1 REPAYE Updates.
    3.   FLS shall offer and counsel borrower about the Phase 1 REPAYE Updates.
        a.   All communications, websites, customer service call scripts, borrower literature and internal policy and procedures shall be updated with the Phase 1 REPAYE Updates.
    4.   FLS shall implement all necessary updates to the Phase 1 REPAYE plan, as applicable.
        a.   FLS shall update all system calculations to reflect the Phase 1 REPAYE updates.
    5.   FLS will participate in requirements gathering discussions and other meetings with FSA and other FSA partners as identified by FSA.
    6. FLS shall recalculate REPAYE for current borrowers enrolled in the plan based on the updates to the calculation outlined in CR 6373.
        a. FLS shall send updated payment disclosures to the borrower.

b. FLS shall not retroactively recalculate REPAYE monthly payment amounts.

III. Digital Platform (DP) Requirements
   7. DP will update relevant content ONLY, no changes to calculations, to inform borrowers about the Phase 1 REPAYE updates on the Servicer side.
     a. Informational content will be added to the calculators informing borrowers about the Phase 1 REPAYE updates.
   8.  The DP Knowledge articles will be updated to include the Phase 1 REPAYE updates.
   9.  The Virtual Assistant content will be updated to include the Phase 1 REPAYE updates.

IV. IDR Plan Updates
10. The following updates will be made to the REPAYE plan:
a. Increase the amount of income protected from 150% of the Federal Poverty Level (FPL) ($20,400 for a single individual) to 225% ($30,577.50 for a single individual).
i. The exact percentage will be provided during requirements.
b. Increase the interest subsidy on REPAYE from covering 50% of all unpaid monthly interest to covering 100% of the borrower's unpaid monthly interest.
i. The exact percentage will be provided during requirements.
c. REPAYE spousal treatment will match other IDR plans.
d. When a borrower leaves REPAYE, PAYE, or ICR there will be no interest capitalization.

V. Digital Platform (DP) Changes
11. The DP will implement all necessary updates to the IDR plans to the relevant calculators and estimators housed on StudentAid.gov in alignment with the IDR Future Act changes.
12. The DP will allow borrowers to select the updated repayment plans in the IDR eApp, IDR/LC eApp, and Loan Simulator calculators with the implementation of SABER IDR.
13. The DP will perform calculations and out-year estimates for the new IDR plan updates
a. The DP will display the output for these calculations as dictated by the FSA Design Team SABER IDR designs.
14. The DP will modify Knowledge and Training materials and contact centers based on changes outlined in CR 6373.
15. The DP Knowledge articles will be updated to include the IDR plans updates
16. The Virtual Assistant content will be updated to include the IDR plans updates.
17. DP/DCC will participate in requirements gathering discussions and other meetings with FSA and other FSA partners as identified by FSA.

VI. Federal Tax Information (FTI) Module IDR Changes:
18. The FTI Module will implement all necessary updates to the IDR plans and relevant documentation, as applicable.
19. The FTI Module shall perform calculations for IDR plans with the updates.
20. The FTI Module shall align the implementation date of the IDR plans updates with the IDR Future Act Changes.
21. The FTI Module shall participate in requirements gathering discussions and other meetings with FSA and other FSA partners as identified by FSA.
22. FTI Module shall participate in IST with the servicers and COD for the IDR plan updates.

VII. Common Origination & Disbursement (COD) IDR Requirements
23. COD shall implement all necessary updates to the IDR plans, as applicable.
24. COD shall update the common application schema to include the IDR plans updates.
25. COD shall update the webservice with StudentAid.gov to receive details regarding the IDR plans Updates
26. COD shall update all calculators (as applicable) to calculate details for the IDR plans Updates.
27. COD shall include the IDR plans Updates in the file transfer(s) sent to the FTI Module for IDR plan calculation.
28. COD shall participate in requirements gathering discussions with FSA and other FSA partners as identified by FSA.
29. COD shall participate in IST with the servicers and the FTI Module for the IDR plan updates.

VIII. Servicing Requirements
30. The Federal loan servicers (FLS) shall update all systems and calculators to calculate monthly payment amounts based on changes in the IDR Plan Update section of this CR.
31. FLS shall offer and counsel borrower about the IDR plan updates
a. All communications, websites, customer service call scripts, borrower literature and internal policy and procedures shall be updated with the IDR plan updates.
32. FLS shall implement all necessary updates to the IDR plans as applicable.
a. FLS shall update all system calculations to reflect the IDR plan updates.
33. The FLS shall participate in IST with COD.
34. FLS will participate in requirements gathering discussions and other meetings with FSA and other FSA partners as identified by FSA.
35. FLS shall recalculate REPAYE for current borrowers enrolled in the plan based on the updates to the calculation outlined

in CR 6373.
a. FLS shall send updated payment disclosures to the borrower.
b. FLS shall not retroactively recalculate REPAYE monthly payment amounts.

**Does this change require a new network connection**
 **(Secure File Transfer Protocol is mandatory for all new connections)?**   No

**IST Anticipated?**                                                         Yes      05/01/2023

| FSA Service/System/Area Impacted |
|---|

COD
Digital Customer Care (DCC)
FTI - Module
AidVantage
*BPO - EdFinancial*
*BPO – Cann & Associates*
*BPO – Maximus*
*BPO – MOHELA*
EdFinancial
Great Lakes
MOHELA
Nelnet
OSLA
Perkins
Z - PHEAA (inactive 12-1-2022)
*Communications - Notification Only*
*Enterprise Security - Notification Only*
*Policy,Implement&Oversight (PIO)-Notifica*
*Vendor Oversight – Notification Only*

**Validation - Artifacts and Corresponding Requirement IDs (Required for Services)**
   Compliance statement, screenshots, updated communications, updated P&P and training materials.

**Artifacts Due Date:** 07/15/2023        **BU Reviewer:**   Sherika Roberts

bocm00050931