# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| STATE OF MISSOURI, *et al.*,<br><br>　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>　　　　　　*Defendants*. | Case No. 4:24-cv-520-JAR |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 514-2705
Email: simon.g.jerome@usdoj.gov

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**................................................................................................................**1**

**ARGUMENT**......................................................................................................................**1**

    A.   Plaintiffs have not shown financial injury to MOHELA ...........................................1

    B.   Plaintiffs have not shown competitive injury to the Bank of North Dakota. ..........................8

    C.   Plaintiffs' tax-revenue theory is foreclosed by binding precedent. .................................9

    D.   Plaintiffs have not established any injury to their recruiting interests. .......................13

    E.   Venue in the Eastern District of Missouri is improper...........................................14

**CONCLUSION** .................................................................................................................**15**

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Agred Found. v. Army Corps of Engr's,*
    3 F.4th 1069 (8th Cir. 2021) ..................................................................................................14

*Air Excursions LLC v. Yellen,*
    66 F.4th 272 (D.C. Cir. 2023) ..................................................................................................8

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ..................................................................................................................8

*Already, LLC v. Nike, Inc.,*
    568 U.S. 85 (2013) ....................................................................................................................8

*Arc of Iowa v. Reynolds,*
    94 F.4th 707 (8th Cir. 2024) ....................................................................................................1

*Ariz. Christian Sch. Tuition Org. v. Winn,*
    563 U.S. 125 (2011) ................................................................................................................11

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ..................................................................................................13

*California v. Texas,*
    593 U.S. 659 (2021) ................................................................................................................12

*Carney v. Adams,*
    592 U.S. 53 (2020) ....................................................................................................................8

*City of Kennett v. EPA,*
    887 F.3d 424 (8th Cir. 2018) ...............................................................................................1, 6

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .........................................................................................................*passim*

*Colorado v. EPA,*
    989 F.3d 874 (10th Cir. 2021) ..............................................................................................11

*Department of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ............................................................................................................13

*FEC v. Cruz,*
    596 U.S. 289 (2022) ...........................................................................................................9, 11

*Florida v. Mellon,*
    273 U.S. 12 (1927) ..................................................................................................................12

*Garrison v. Dep't of Educ.*,
   636 F. Supp. 3d 935 (S.D. Ind. 2022) ........................................................................9

*Gladstone Realtors v. Village of Bellwood*,
   441 U.S. 91 (1979) ....................................................................................................11

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ..................................................................................................12

*Iowa ex rel. Miller v. Block*,
   771 F.2d 347 (8th Cir. 1985) ...............................................................................12, 13

*Lamie v. U.S. Tr.*,
   540 U.S. 526 (2004) ..................................................................................................15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................................12

*Mackinac Ctr. for Pub. Pol'y v. Cardona*,
   No. 23-1736, -- F.4th ----, 2024 WL 2237667 (6th Cir. May 17, 2024) .................9, 14

*Missouri v. Biden*,
   52 F.4th 362 (8th Cir. 2022) .......................................................................................1

*Morehouse Enters., LLC v. ATF*,
   78 F.4th 1011 (8th Cir. 2023) .....................................................................................3

*Muff  v. Wells Fargo Bank*,
   71 F.4th 1094 (8th Cir. 2023) .....................................................................................6

*Nat'l Ass'n of Mfrs. v. DOD*,
   583 U.S. 109 (2018) ..................................................................................................15

*New Jersey v. EPA*,
   989 F.3d 1038 (D.C. Cir. 2021) ...............................................................................11

*Pennsylvania v. Kleppe*,
   533 F.2d 668 (D.C. Cir. 1976) .................................................................................12

*Pennsylvania  v. New Jersey*,
   426 U.S. 660 (1976) ..............................................................................................9, 10

*Shalala v. Ill. Council on Long Term Care, Inc.*,
   529 U.S. 1 (2000) ......................................................................................................13

*Sherley v. Sebelius*,
   610 F.3d 69 (D.C. Cir. 2010) .....................................................................................8

*Sierra Club v. Trump,*
    977 F.3d 853 (9th Cir. 2020)................................................................................11

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) ............................................................................................6

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ........................................................................................11

*Steen v. Murray,*
    770 F.3d 698 (8th Cir. 2014)............................................................................15

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ........................................................................................14

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ..........................................................................................1

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015)........................................................................2, 13

*Town of Chester v. Laroe Ests., Inc.,*
    581 U.S. 433 (2017) ........................................................................................10

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ......................................................................................2, 12

*United States v. Richardson,*
    418 U.S. 166 (1974) ..........................................................................................8

*United States v. Texas,*
    599 U.S. 670 (2023) ......................................................................................1, 12

*Valley Forge Christian Coll. v. Ams. Utd. for Separation of Church & State,*
    454 U.S. 464 (1982) ........................................................................................14

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..........................................................................................7

*Wendt v. 24 Hour Fitness USA, Inc.,*
    821 F.3d 547 (5th Cir. 2016)..........................................................................2, 7

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ........................................................................................12

**Statutes**

28 U.S.C. § 1391 ..................................................................................................14, 15

**Rules**

Federal Rule of Civil Procedure 12 ........................................................................15

**Regulations**

88 Fed. Reg. 43,820 (July 10, 2023).............................................................3, 4, 5, 6

**Other Authorities**

Br. for Petitioners, *Biden v. Nebraska*, 600 U.S. 477 (2023) (No. 22-506) ........................................................2

U.S. Dep't of Educ., *Biden-Harris Administration Allows Borrowers More Time to Consolidate Loans to Get Credit for Progress Toward Loan Forgiveness Programs* (May 15, 2025), https://perma.cc/QA8M-USMX.................................................................7

## INTRODUCTION

The "bedrock constitutional requirement" of standing, *United States v. Texas*, 599 U.S. 670, 675 (2023), demands that a plaintiff demonstrate that an alleged future injury is not merely "possible," but "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  And where independent third parties' decisions are relied on to prove future harm, the burden is heavier still.  *Missouri v. Biden*, 52 F.4th 362, 369 (8th Cir. 2022).  So too for suits alleging unconstitutional action by the judiciary's coordinate branches of government.  *Id.* at 368.  Plaintiffs have not satisfied these demanding standards.  They reduce complex financial decisions years in the future into simplistic, theoretical predictions about borrowers' behavior, offering a hollow veneer of certainty through numbers whose underlying calculations are shot through with guesswork.  Elsewhere, they allege injury caused by their own hands, and thus legally foreclosed from consideration.  Were these shortcomings not enough, Plaintiffs had several choices of judicial district in which to bring this suit, but still chose a courthouse not available under the plain text of the federal venue statute.  This case should be dismissed.

## ARGUMENT

### A.   Plaintiffs have not shown financial injury to MOHELA.

**1.**  Assessing Plaintiffs' claim that the SAVE Plan will diminish MOHELA's revenues has three components.  To what extent will SAVE benefit MOHELA financially?  How much will SAVE harm MOHELA financially?  And considering all the attendant uncertainties, does sufficient evidence exist to conclude that SAVE's harms will outweigh its benefits, such that injury can be said to be "certainly impending?" *City of Kennett v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018).[1]  Proven financial harm, large or small, is ordinarily sufficient.  Pls.' Reply Mem. in Supp. of Mots. for Inj. Relief & Mem. in Opp'n to Mot. to Dismiss (Pls.' Opp'n) at 6, ECF No. 26 (citing cases).  But speculative harm—of any amount—is not.  *Arc of Iowa v. Reynolds*, 94 F.4th 707, 711 (8th Cir. 2024).  For that reason, Missouri

---

[1] Plaintiffs cite *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), for the proposition that they need only establish a "substantial risk" of harm. Pls.' Opp'n at 6.  But "to the extent that the 'substantial risk' standard is relevant and is distinct from the 'clearly impending' requirement, [Plaintiffs] fall short of even that standard, in light of the attenuated chain of inferences necessary to find harm here." *Clapper*, 568 U.S. at 414 n.5.

lacks standing through MOHELA in this case, the factual circumstances of prior cases being of little import. Pls.' Opp'n at 7 (incorrectly citing the HEROES Act litigation[2] as "binding" on this issue); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross . . . plaintiffs must demonstrate standing for each claim that they press[.]").

Plaintiffs ask the Court to disregard the SAVE Plan's potential boons to MOHELA entirely, arguing that they are legally irrelevant to standing. Pls.' Opp'n at 9. On Plaintiffs' view, any financial loss on any part of the balance sheet can support Article III standing—even to challenge a program that will bring certain profit overall. Plaintiffs cite no binding precedent for that illogical proposition. But even accepting the notion that *some* "'offsetting' benefits," are not considered in some Circuits, *id.*, the SAVE Plan's benefits to MOHELA fall squarely within the "exception" that even Plaintiffs (and the Fifth Circuit) acknowledge, *id.* at n.4, for benefits "that are of the same type and arise from the same transaction as the costs." *Texas v. United States*, 809 F.3d 134, 155 & n.59 (5th Cir. 2015), *aff'd without opinion by an equally divided Court*, 579 U.S. 547 (2016).

Here, any monetary benefits and purported harms to MOHELA from the SAVE Plan are of the same type and arise from the same transaction—the SAVE Plan. So they must be considered, even under the Fifth Circuit's approach. *See Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 n.10 (5th Cir. 2016) (standing existed because "[i]n this case, all of the costs and benefits arise from a single transaction: Plaintiffs paid 24 Hour membership fees, and in return 24 Hour gave them access to its facilities"). And as Defendants have explained, there are good reasons to suppose that those benefits will be substantial. Defs.' Mem. in Opp'n to Mots. for Inj. Relief & in Supp. of Mot. to Dismiss (Defs.' Br.) at 12, ECF No. 22 (naming a potential reduction in error-related penalties, $1.6 million paid to MOHELA in transition costs, the lower costs of servicing delinquent accounts and accounts

---

[2] Even if the relevant material facts were identical, the government did not contest standing on the same grounds in the prior student-loan litigation. Br. for Petitioners at 26-30, *Biden v. Nebraska*, 600 U.S. 477 (2023) (No. 22-506) (arguing that MOHELA's hypothesized future failure to pay mandatory fees into the state treasury did not confer standing on Missouri, and that MOHELA was not a state instrumentality).

with $0 monthly payments, the possibility of further reductions in servicing costs through automatic income recertification, and an increase in the lifespan of accounts).

Plaintiffs' attempts to downplay the SAVE Plan's potential benefits are unconvincing. They complain, for example, that in their view the Department shares "culpability" for the $7.2 million servicing-related penalty it recently assessed against MOHELA. Pls.' Opp'n at 12. But the question of responsibility for MOHELA's errors is ultimately immaterial to whether they will recur. It is reasonable to presume that with a more manageable portfolio, the number of errors will drop. As for the reduced servicing costs associated with accounts enrolled in SAVE, Plaintiffs again choose bombast over substance, asserting that Defendants' "solution for solving 'delinquency' is to cancel loans."[3] *Id.* at 13. Tellingly, though, Plaintiffs do not dispute that if the Final Rule reduces delinquencies and defaults as anticipated, *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program*, 88 Fed. Reg. 43,820, 43,826 (July 10, 2023), it will save MOHELA money.

Otherwise attempting to avoid dealing with the implications of the SAVE Plan's several borrower- and servicer-friendly provisions, in fact, Plaintiffs have no recourse but to shift the burden. Pls.' Opp'n at 13 & n.8 ("Defendants cannot even estimate the number [of borrowers] who will have $0 payments, much less the number who might delay paying off their accounts." (citation omitted); "[I]t is Defendants who are guilty of speculating."; "Defendants also tellingly fail to provide statistics."). This rhetoric aside, a showing of standing remains Plaintiffs' burden alone. *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023).

As for which SAVE-related harms may be considered, Plaintiffs would stack the deck by having the Court ignore *MOHELA's* request that 1.5 million accounts be transferred to other servicers. Pls.' Opp'n at 8. They posit (without support) that any reduction in MOHELA's loan servicing portfolio will be a reduction above and beyond those 1.5 million transfers. *Id.* Such a conclusion is not warranted; in fact, only about a million of these transfers are in process or scheduled

---

[3] Plaintiffs also rebut the notion of reduced servicing costs under SAVE with the observation that additional outreach "is often virtually costless." Pls.' Opp'n at 13 n.9. While conceivably true, this brief aside in no way addresses MOHELA's actual costs, which are dispositive here.

for the near future.  Proposed Contract Mod. at 3, Ex. 1 (May 24, 2024).  Beyond these accounts, the Department can adjust downward the total number of transfers to account for SAVE-related discharges, if that is really what MOHELA wants.  *See* Letter from Dep't of Educ. to MOHELA, ECF No. 22-4, at 1 (May 6, 2024) (committing "to transfer *up to* 1.5 million borrowers" (emphasis added)).  They also juxtapose the servicer's request with the number of MOHELA-serviced borrowers currently enrolled in SAVE—2.24 million, Pls.' Opp'n at 10—seemingly to suggest that it outnumbers the requested transfers.  But of that figure, some borrowers may be eligible for forgiveness under SAVE in one year, while others will not be eligible for ten years (or more).  Without evidence to substantiate an estimate, the 2.24 million figure is of little utility.

In terms of estimated harms themselves, Plaintiffs' calculations are so farfetched as to be illusory.  Plaintiffs hypothesize a sum of $2.9 million in lost servicing fees for this year by multiplying the Legacy Contract's monthly base fee of $2.97 per account by 81,000 in anticipated forgiven accounts.  *Id.*  Baked into this calculation are myriad unfounded assumptions.  MOHELA earns not $2.97, but as little as $0.50 per borrower, for delinquent accounts.  Declaration of James Kvaal (Kvaal Decl.) ¶ 11, ECF No. 22-2.  Are all 81,000 accounts current?  Unlikely, as the Final Rule targets accounts at highest risk of delinquency.  *Id.* ¶ 28.  And is $2.97 the right starting point at all?  That amount falls to $2.18 per borrower under the USDS Contract for the first 2.5 million borrowers in MOHELA's portfolio, and is further reduced for additional borrowers beyond those 2.5 million, to a floor of $1.61 per borrower for accounts between 5 and 7.5 million in the portfolio.  *Id.* ¶ 9.  At present, MOHELA's portfolio exceeds 8 million loans.  *Id.* ¶ 3.  And the transition to the USDS Contract has begun.  *Id.* ¶ 4.  For Plaintiffs' $2.9 million figure to be even plausible, in other words, it would have to be the case that all 81,000 loans forgiven are current accounts serviced under the Legacy Contract.  Plaintiffs have not shown as much.

Building on these errors, Plaintiffs surmise that MOHELA will lose $187.8 million "across ten years" in base servicing fees.  Pls.' Opp'n at 10-11.  This amount comes from the Final Rule's estimated years to forgiveness for borrowers entering repayment in Fiscal Year 2024 alongside the fact that 2.24 million of MOHELA's borrowers are already enrolled in SAVE.  *Id.*; 88 Fed. Reg. at 43,891; Kvaal

Decl. ¶ 3. Again, unanswered questions abound. Why does this amount continue to use the inaccurate $2.97 monthly base fee? And more centrally, why do Plaintiffs assume that all of the 2.24 million SAVE Plan enrollees are undergraduate-only borrowers, 23.53 percent of whom the Department estimated could receive forgiveness in 10 years, and not borrowers with "any graduate" debt? Perhaps because the Department also estimated that 96.25 percent of the latter category would only attain forgiveness at 25 years, 88 Fed. Reg. at 43,891, and so the resulting math leads to a far less convenient result. In reality, a substantial portion of MOHELA-serviced borrowers have graduate debt. And the $187.8 million figure assumes, without support, that MOHELA's portfolio breakdown tracks the Department's estimates for all borrowers.

Furthermore, when Plaintiffs say "across ten years," they can actually only mean *in* ten years, and for the subsequent ten years—that is, between 2034 and 2044—because the cited estimates are for borrowers *entering* repayment in 2024. *See* 88 Fed. Reg. at 43,891. If that seems remote, it is. But while the Department was careful to highlight the limits of its estimates, Plaintiffs show no such circumspection. *Compare id.* ("The number of expected years to forgiveness in Table 5.6 is based on the borrower's balance and does not take into account any deferments, forbearances, or early payoffs."), *with* Pls.' Opp'n at 10-11 ("MOHELA will lose $187.8 million across ten years."). Equally problematic is the fact that the $187.8 million figure relies on Legacy Contract pricing, which will expire in 2024, long before 2034.[4]  Kvaal Decl. ¶ 4. With every bit of additional scrutiny, Plaintiffs' $187.8 million figure appears less and less grounded in fact.

Plaintiffs envision the costs to MOHELA increasing as other borrowers enroll in SAVE. Pls.' Opp'n at 11. They subtract the number of MOHELA-serviced borrowers with original balances exceeding $12,000 from MOHELA's total portfolio to arrive at a sum of "2.77 million MOHELA borrowers" who "can obtain forgiveness in just 10 years instead of 20." *Id.* This number is wrong (and Defendants did not "note" it, *id.*; Plaintiffs came up with it themselves)—many of these

---

[4] Plaintiffs concede in a footnote that the estimate perhaps should be lower, given the entry into force of the USDS Contract. Pls.' Opp'n at 11 n.5. But in light of the fact that the Legacy Contract will have expired a full *ten* years before the operative date of their estimates, one wonders why the larger figure was included at all.

borrowers will not be eligible for SAVE, like Parent PLUS borrowers, 88 Fed. Reg. at 43,835; others simply will not enroll. More still may pay off their low balances. For those that remain, Plaintiffs assume that forgiveness will be issued in one fell swoop, resulting in a $98.7 million loss (relying on Legacy Contract figures and again, the flawed $2.97 monthly base fee) to MOHELA per year. Pls.' Opp'n at 11. But the SAVE Plan measures time to forgiveness by *qualifying payments*, not simply the passage of time. In fact, many of these borrowers will—as is quite typical—default, pay in fits and starts, or start school again, with corresponding periods of time not counting toward the required ten years. As a consequence, forgiveness could take years to materialize. Plaintiffs do not account for this nuance and simply multiply the hypothesized $98.7 million cost by ten. *Id.*

Near the end of their discussion of conjectural costs to MOHELA, Plaintiffs come close to giving up the ghost, recognizing that their "estimates" account only for MOHELA's *current* portfolio. *Id.* That fact alone is emblematic of the central shortcoming of Plaintiffs' standing theory based on MOHELA: faced with future unknowns in the form of account reassignments, delinquencies, defaults, and infusions of new borrowers, Plaintiffs offer only incomplete, out-of-date, contextless numbers multiplied again and again to arrive at an impressive, but factually baseless, figure of $987.2 million. At day's end, Plaintiffs bear the burden of showing that SAVE will, on balance, lead to an "actual or imminent" injury to MOHELA that is "certainly impending," not just "possible." *City of Kennett*, 887 F.3d at 430-31. Their questionable math, riddled with guesswork, is not up to the task.

**2.** Changing tack, Plaintiffs continue to assert that the SAVE Plan will spur consolidation of MOHELA's FFEL portfolio (the loans in which it owns outright) into direct loans, costing the company future interest. Pls.' Opp'n at 14-16. To support the prospect of consolidation occurring, they highlight statements by Department officials encouraging borrowers to consolidate. *Id.* at 14. But putting aside that government encouragement supports only "unadorned speculation" as to causation, *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 44 (1976), and distinctly that any injury arising from the government's encouragement to consolidate would not be "fairly traceable" to the SAVE Plan, *Muff v. Wells Fargo Bank*, 71 F.4th 1094, 1100 (8th Cir. 2023), the cited statement encourages consolidation so borrowers can take advantage of an entirely distinct regulatory action—the payment-

count adjustment.  U.S. Dep't of Educ., *Biden-Harris Administration Allows Borrowers More Time to Consolidate Loans to Get Credit for Progress Toward Loan Forgiveness Programs* (May 15, 2025), https://perma.cc/QA8M-USMX.  It would thus defeat, not establish, causation here.

Plaintiffs turn next to data from MOHELA to show that the Rule will cause consolidation, focusing on three months' consolidation totals: from $6.9 million in consolidations in December 2023 to $11.5 million in January 2024 and $20.5 million in February 2024, "triple the December 2023 numbers."  Pls.' Opp'n at 15.  Plaintiffs would tie these increased consolidation figures to the Department's announcement of early-implemented loan forgiveness under the Final Rule.  *Id.*  But the larger context of the data Plaintiffs themselves include suggests at most correlation, not causation (to say nothing of the inherent difficulty of showing causation when independent actors are at play, *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975)).  Indeed, the same chart shows the number of borrowers consolidating, a number far more representative of the impact of supposed consolidation incentives than the total balance consolidated.  MOHELA Consolidation Monthly Summary, ECF No. 26-1.  And that figure varies considerably in the 55 months captured by the chart, from 225, 412, and 729 borrowers respectively in the months Plaintiffs cite, to 1,107 in November 2022 and 801 in August 2022.  *Id.*  Plaintiffs' chosen metric, the monthly consolidation total, is also elastic.  Between July and December 2022, for example, the total consolidated sum rose and fell from $11.9 million to $20 million to $14.6 million to $19.4 million to $28.2 million to $18.8 million, before dropping in January 2023 to $3.1 million.  *Id.*  All of this confirms the common-sense intuition that many factors affect consolidation, a complicated picture Plaintiffs' cherry-picked numbers do not simplify.

Even if consolidation did occur because of the Rule, would it harm MOHELA?  It is not "enough," Pls.' Opp'n at 15, *contra* Plaintiffs, merely to assume that MOHELA loses future interest income from a consolidated loan (indeed, such a conclusion rests on the baseless assumption that a FFEL borrower will not default).  Again, the dispositive question concerns the entire transaction: will consolidation, if it occurs and is fairly traceable to the Final Rule, harm MOHELA?  Accordingly, one must ask whether MOHELA could more profitably use the present value of the loan to more lucrative ends.  Plaintiffs make no serious attempt at engaging in this analysis, instead retorting that MOHELA

will not service *all* consolidated loans and dismissing the rebate fees MOHELA is obligated to pay on some FFEL loans. Pls.' Opp'n at 16. The point is not that servicing will replace interest income in a 1:1 fashion, or that rebate fees are dispositive per se. Instead, in a world of many unknowns, inclusion of these two relevant data points would help to analyze the ultimate issue of the impact of consolidation on MOHELA. That analysis was Plaintiffs' burden.

**B.      Plaintiffs have not shown competitive injury to the Bank of North Dakota.**

Plaintiffs continue to insist that the SAVE Plan will injure the Bank of North Dakota by making it a less attractive lender to students than the federal government. Pls.' Opp'n at 17-19. As a threshold matter, Plaintiffs have failed to cite a single case in which the government was deemed an appropriate "competitor" for competitive-injury standing purposes. And standing doctrine counsels against such a novel extension. After all, the competitive-injury doctrine relies on economic postulates to link competition to injury-in-fact. *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023). Finding such a link to the government as economic competitor would dramatically expand standing, given the many markets in which the government's regulatory actions might make privately produced goods and services more or less desirable. Defs.' Br. at 23; *see Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013) (rejecting a "boundless theory of standing" based on economic competition).

Such a result is irreconcilable with the Supreme Court's repeated admonitions concerning the proper role of the judiciary. *Carney v. Adams*, 592 U.S. 53, 59 (2020) ("[W]e should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch." (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring))). *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) does not suggest otherwise. *See* Pls.' Opp'n at 18. That decision espouses an uncontroversial proposition; namely, that sovereigns may have proprietary interests, injury to which can confer standing. *Alfred L. Snapp & Son*, 458 U.S. at 600-08. It does not, however, justify a dramatic expansion of standing based on economic theory alone.

More fundamentally, even if it does apply, competitive-injury doctrine merely furnishes a link between competition and injury-in-fact. *Air Excursions*, 66 F.4th at 281. It does not alleviate Plaintiffs'

burden to show an "imminent increase in competition," *id.* (quoting *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010)), which they have not done.  On that very basis, the Sixth Circuit recently rejected a competitive-injury argument where the plaintiffs failed to allege "'specific, concrete facts' to show" actual competition, in the precise context of student-loan market regulation.  *Mackinac Ctr. for Pub. Pol'y v. Cardona*, No. 23-1736, --- F.4th ----, 2024 WL 2237667, at *5 (6th Cir. May 17, 2024).  Fatally, those plaintiffs did not show that the future decisions of independent third parties—student loan borrowers—were both predictable and attributable to the program they challenged.  *Id.* at *8.

The same is true here.  Borrowers in North Dakota may choose one lender over another for myriad reasons.  Far from a "predictable effect," Pls.' Opp'n at 18 (quotation omitted), Plaintiffs' conjecture that a North Dakota borrower potentially eligible for 10-year forgiveness of balances at or below $12,000 more than ten years in the future will forgo a loan from the Bank of North Dakota in order to borrow from the federal government to take advantage of the SAVE Plan is no more than a "*possible* future injury."  *Clapper*, 568 U.S. at 409.   And the Bank president's unexplained and unsupported guess that his State could lose "approximately $19 million" in revenues "over the next fifteen years," Declaration of Todd Steinwand (Steinwand Decl.) ¶ 10, ECF 26-2, is a "broad, conclusory assertion" entitled to no weight.  *Mackinac Ctr.*, 2024 WL 2237667 at *6.

**C.     Plaintiffs' tax-revenue theory is foreclosed by binding precedent.**

**1.**  Some of the Plaintiff States continue to assert that the SAVE Plan will result in an "indirect loss of tax revenue."  Pls.' Opp'n at 22.  But *Pennsylvania v. New Jersey* holds that any harm to the States caused by application of their own tax code is "self-inflicted, resulting from decisions by their respective state legislatures."  426 U.S. 660, 664 (1976).  That is dispositive, as "[n]o State can be heard to complain about damage inflicted by its own hand."  *Id.*; *see also FEC v. Cruz*, 596 U.S. 289, 297 (2022) (describing the tax laws in *Pennsylvania* as created by "unilateral decisions by a group of States," which were thus "not a basis to attack the legality of" the challenged policy affecting state revenues).  During the HEROES Act litigation, in fact, one case was dismissed under this precise reasoning.  *See Garrison v. Dep't of Educ.*, 636 F. Supp. 3d 935, 942 (S.D. Ind. 2022) (no standing to challenge debt relief because "[t]he Department of Education does not give silent approval to Indiana's tax code; those decisions

are entirely within the discretion of the Indiana legislature").

In opposition, Plaintiffs seem to argue that they cannot in fact set their own tax policy; contending, for example, that they have "limited legislative time" and that "for States whose legislative sessions have ended, changing the law to account for 2024 forgiveness is impossible." Pls.' Opp'n at 20. That is both incorrect and irrelevant. Just as in *Pennsylvania*, as far as the federal government is concerned, "[n]othing required" the States to adopt in full the federal definition of gross income, and "nothing prevents" them from tweaking that definition now (or even retroactively in the future, to account for 2024 loan forgiveness). 426 U.S. at 664. States cannot manufacture standing by relying on obstacles created by their own legislative calendars, over which they have complete authority.

Plaintiffs next argue—in some tension with the argument above—that this suit implicates their "sovereign interest in not changing their laws." Pls.' Opp'n at 19. But the States retain that "sovereign interest" in full, *id.*—nothing in the SAVE Plan (nor any provision of federal law) requires any State to include or exclude loan forgiveness from its state-law definition of taxable income, nor otherwise constrains state tax law in any relevant sense. It is not that Plaintiffs are "force[d]" to "give up other priorities" or "chang[e] their laws," as they say—Plaintiffs cannot claim an Article III injury from "*their* laws" in the first place. *Id.* at 20 (emphasis added).

That is why it also does not matter if "changing their laws would create administrative burdens," as Plaintiffs assert (without any evidence or explanation). *Id.* Any such "administrative burdens" would still be attributable to state legislative choices, not to the Department of Education. Surely it would not have been costless for the States in *Pennsylvania* to change their tax codes either. What matters is that any "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures" about state tax law. *Pennsylvania*, 426 U.S. at 664.

Plaintiffs emphasize that *Pennsylvania* was filed under the Supreme Court's original jurisdiction, *see* Pls.' Opp'n at 20, but its holding about this sort of self-inflicted harm being insufficient to establish "a (justiciable) controversy" is equally applicable here, 426 U.S. at 663—after all, in Plaintiffs' own words, "the constitutional purpose of standing is to identify which disputes can be classified as 'Cases' and 'Controversies'" under Article III. Pls.' Opp'n at 19 (quoting *Town of Chester v. Laroe Ests., Inc.*,

581 U.S. 433, 438 (2017)).  That is why courts have often relied on *Pennsylvania* in the context of more routine standing disputes, including in suits filed by States against the federal government.  *See, e.g.*, *Cruz*, 596 U.S. at 290; *Clapper*, 568 U.S. at 416; *Colorado v. EPA*, 989 F.3d 874, 888 (10th Cir. 2021).

Plaintiffs now rely on *South Dakota v. Dole*, 483 U.S. 203 (1987), a case about the unconstitutional-conditions doctrine that does not even address Article III standing, making it irrelevant, *see Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).  But to the extent it matters at all, *Dole* supports Defendants.  There, Congress enacted a law that would "withhold a percentage of federal highway funds otherwise allocable from States" in which those under the age of 21 could purchase alcohol.  *Id.* at 205.  The goal, of course, was to offer "encouragement to the States to enact higher minimum drinking ages than they would otherwise choose," by threatening to withhold *federal* funding.  *Id.* at 211.  Here, by contrast, there is no federal funding to States at stake, and the SAVE Plan is not designed to "encourage[]" the States to do anything at all.  *Id.*  The Department of Education has no interest in how the States structure their tax codes.

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110 (1979), is even further afield.  *Gladstone* is a case about standing to bring race-discrimination claims under the Fair Housing Act, in which the relevant injury was to a municipality's "racial balance and stability."  *Id.* at 111.  The Court's passing remark about how a "reduction in property values directly injures a municipality by diminishing its tax base" was one illustrative example of the "harms flowing from the realities of a racially segregated community," *id.*; it was the harms of segregation itself that supported standing in *Gladstone*.

Finally, Plaintiffs cite (at 21-22) out-of-circuit decisions that are in fact consistent with Defendants' argument about self-inflicted harm.  For example, Defendants have no quarrel here with the proposition that the federal government's "actions injure states when those actions necessitate changes to state laws."  *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021).  But the SAVE Plan does not "necessitate changes to state laws," *id.*, so that theory is inapplicable.  Similarly, the (vacated) opinion in *Sierra Club v. Trump*, 977 F.3d 853, 868 (9th Cir. 2020), relied on federal action that "impact[ed] California's ability to enforce its state laws," in the face of federal preemption under the Supremacy Clause.  But here, with or without the SAVE Plan, state tax law remains in full effect.

11

**2.** As for *Florida v. Mellon*, 273 U.S. 12 (1927), Plaintiffs disparage it as "a century-old case." Pls.' Opp'n at 22. That is an odd charge; old Supreme Court precedent is as equally binding as new. To the extent that Article III standing doctrine has shifted since 1927, it is stricter in the modern era, *see, e.g.*, *TransUnion*, 594 U.S. at 413; *Clapper*, 568 U.S. at 398; *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)—including in suits between the States and the United States, *see, e.g.*, *Texas*, 599 U.S. at 670; *Haaland v. Brackeen*, 599 U.S. 255 (2023); *California v. Texas*, 593 U.S. 659 (2021).

Plaintiffs suggest that *Florida* is outdated because now "courts regularly permit parties to sue based on indirect loss of tax revenue," and that "if a 'direct injury' was required a hundred years ago, it no longer is." Pls.' Opp'n at 22. But the Eighth Circuit has squarely held to the contrary. In *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 348 (8th Cir. 1985), Iowa challenged the Department of Agriculture's implementation of "three federal agricultural disaster relief programs." Iowa's primary theory of standing was that "the Secretary's implementation of these disaster relief programs" would "forc[e] unemployment up and state tax revenues down." *Id.* at 353. The Eighth Circuit held that "the State's alleged injury is insufficiently proximate to the actions at issue," expressly distinguishing other cases in which "the link between the state and injury was more direct." *Id.* at 354. In short, when a standing theory relies on "this type of economic loss," the Eighth Circuit has "required 'some fairly direct link between the state's status as a collector and recipient of revenues and the legislative or administrative action being challenged.'" *Id.* at 353 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)). So Plaintiffs' effort to show standing "based on indirect loss of tax revenue," Pls.' Opp'n at 22, is inconsistent with binding precedent—not just from the Supreme Court, but also the Eighth Circuit.

Plaintiffs also rely on the (very brief) discussion of standing in *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), but Defendants already explained why it does not apply. *See* Defs.' Br. at 18. To be clear, that is not "because Defendants are the Federal Government." Pls.' Opp'n at 19. Instead, in *Wyoming*, there was "unrebutted evidence" of a loss of hundreds of thousands of dollars in "severance taxes" as a direct result of the challenged Oklahoma law, which had been adopted with the stated purpose of reducing purchases of coal from Wyoming. 502 U.S. at 445. There are no remotely similar "undisputed fact[s]" here, *id.* at 448, as the connection between the SAVE Plan and state tax receipts

is both indirect and incidental.[5]

Plaintiffs still fail to identify any meaningful limit to their contrary view. Virtually every federal policy has incidental effects on state tax revenues. Labor policy affects incomes (and hence state income taxes); agricultural policy affects food prices (and hence state sales taxes); foreign policy affects oil prices (and hence state gasoline taxes); and housing policy affects real-estate values (and hence state property taxes). A system where any State can challenge any federal policy that incidentally affects its tax revenues would "make a mockery" of Article III. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.). As the Eighth Circuit put it in *Miller*, "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing." 771 F.2d at 354.[6]

**3.** Finally, Defendants also explained why Plaintiffs' tax-revenue theory depends on an impermissibly "speculative chain of possibilities." *Clapper*, 568 U.S. at 410; *see* Defs.' Br. at 18. Plaintiffs' only response is to make a prediction about what state and federal tax laws will look like in the year 2034. *See* Pls.' Opp'n at 23. Plaintiffs' prognostication proves the point.

**D.   Plaintiffs have not established any injury to their recruiting interests.**

Defendants' opening brief established that Plaintiffs' theory that they are harmed by the Rule because it offers loan forgiveness to borrowers in public- and private-sector jobs, and thus reduces the benefit Plaintiffs obtain as public-sector employers under the Public Service Loan Forgiveness program (PSLF), is far too speculative and uncertain to satisfy Article III's requirement of an

---

[5] Plaintiffs' broad reading of *Wyoming*—as having effectively overruled both *Pennsylvania* and *Florida* sub silentio, *but see Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000)—depends heavily on the Fifth Circuit's several opinions about the policy of immigration-enforcement discretion known as DAPA. *See* Pls.' Br. at 20-21 (citing multiple opinions captioned "*Texas v. United States*"). But unlike here, in those cases, Texas did not have freedom to change the relevant state laws, again due to federal supremacy over immigration law. *See Texas*, 809 F.3d at 158 (in issuing driver's licenses "the state is required to use federal immigration classifications").

[6] Plaintiffs also rely on *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019), another case in which States established standing based on the loss of *federal* funding due to *federal* government choices—an injury that is neither self-inflicted (under *Pennsylvania*) nor unduly attenuated (under *Florida*), unlike the state tax revenue that is (perhaps indirectly) at issue here.

imminent injury traceable to the Rule.  Defs.' Br. at 18-21.  In opposition, Plaintiffs turn to theoretical incentives to support this theory of harm.  Pls.' Opp'n at 23-24.  But the Sixth Circuit's recent *Mackinac Center* decision, which rejected the precise theory Plaintiffs espouse, shows why they lack standing here.  2024 WL 2237667.  The *Mackinac Center* plaintiffs, both public-service employers, claimed standing to challenge a Department of Education program benefiting borrowers on the theory that the program rendered PSLF, on which the plaintiffs relied, less attractive.  *Id.* at *5.  Disagreeing, the court reasoned that those plaintiffs had not alleged "'specific, concrete facts' to show that" the alternative program "has caused or will cause [the plaintiffs] competitive injury."  *Id.*  "At bottom, how the adjustment impacts Plaintiffs is up to individuals who are not parties to this lawsuit."  *Id.* at *8.

So too here.  As in *Mackinac Center*, Plaintiffs "have not alleged that any employees have stopped working for them (or stated an intention to do so) based on the [Rule]," *id.* at *6, despite the Rule being published ten months ago and implemented (in part) more than two months ago.  Instead, Plaintiffs offer the examples of *hypothetical* current and prospective employees and predict how they might act.  Pls.' Opp'n at 23.  Economic assumptions alone were not enough for the Sixth Circuit, nor, for that matter, for the Supreme Court.  *E.g.*, *Clapper*, 568 U.S. at 409; *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("statistical probability" theory of standing would "make a mockery" of standing doctrine); *Valley Forge Christian Coll. v. Ams. Utd. for Separation of Church & State*, 454 U.S. 464, 489 (1982) ("The law of averages is not a substitute for standing.").  They should not be enough for this Court, either.  At base, career decisions are complicated, and PSLF is not the sole relevant incentive.  Plaintiffs have not simplified that complexity with evidence giving rise to a conclusion of certainly impending injury.  *Agred Found. v. Army Corps of Engr's*, 3 F.4th 1069, 1073 (8th Cir. 2021).

**E.    Venue in the Eastern District of Missouri is improper.**

In assessing venue here, Missouri's residence is dispositive.  Pls.' Opp'n at 24; *see* 28 U.S.C. § 1391(e)(1).  Plaintiffs do not contest that the federal venue statute lists only three options for determining residence.  Here, the second option—for "entit[ies] with the capacity to sue and be sued"—is the only viable one, as Missouri is undisputedly neither a natural person nor a resident abroad.  28 U.S.C. § 1391(c).  And the "entity" provision specifies that a plaintiff entity may bring suit

14

"*only* in *the* judicial district in which it maintains its principal place of business." *Id.* § 1391(c)(2) (emphases added). For Missouri, that is Jefferson City, in the Western District. Defs.' Br. at 25.

Plaintiffs' chief justification for their contrary position is only that § 1391's references to an "entity" and "place of business" seem to be odd fits for a State. Pls.' Opp'n at 25. Odd or not, though, the Court may not rewrite a statute to better fit the facts at hand, *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004), as it must do here if Plaintiffs' special venue rule for States is to be given effect. Because the plain text is unambiguous, it marks the beginning and end of the venue inquiry. *Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 127 (2018). And respectfully, that the Ninth Circuit and some district courts in Texas have erred by paying insufficient attention to the statutory text is no reason to repeat their mistakes here, *see* Pls.' Opp'n at 24-25; *see also* Defs.' Br. at 25 (acknowledging contrary case law), on what appears to be a question of first impression in the Eighth Circuit.[7] Nor is Plaintiffs' history of flouting the venue statute a reason to vindicate that misreading. *See* Pls.' Opp'n at 25 ("Missouri routinely sues the Federal Government in the Eastern District[.]").

Tellingly, Plaintiffs eventually retreat to the (largely unexplained) argument that "MOHELA[] is located in the St. Louis metro, in the Eastern District of Missouri," *id.* at 26, and that somehow that is enough. But the statute accounts only (in relevant part) for the residency of a "plaintiff," 28 U.S.C. § 1391(e)(1), and MOHELA is not a plaintiff, so its residence is irrelevant. And Plaintiffs do not dispute—nor could they, given "controlling Eighth Circuit authority"—that in assessing venue, the Court must focus on the "relevant activities of the defendant in the forum state, not on the effect of those activities on the plaintiff in the forum state." *Steen v. Murray*, 770 F.3d 698, 703 (8th Cir. 2014).

## CONCLUSION

The Court should grant Defendants' motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or for improper venue under Rule 12(b)(3).

---

[7] The Fifth Circuit case cited by Plaintiffs (at 24) long predates Congress's enactment of the statutory text that is dispositive here. So, to Defendants' knowledge, the Ninth Circuit is the only court of appeals to have rejected this argument.

Dated: May 27, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

/s/ Simon G. Jerome
STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 514-2705
Email: simon.g.jerome@usdoj.gov

*Counsel for Defendants*