# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| STATE OF MISSOURI, *et al.*,<br><br>             *Plaintiffs*,<br><br>     v.<br><br>JOSEPH R. BIDEN, JR., in his official<br>capacity as President of the United States,<br>*et al.*,<br><br>             *Defendants*. | Case No. 4:24-cv-520-JAR |

## NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants respectfully submit this notice of supplemental authority regarding a recent opinion in parallel litigation challenging the SAVE Plan, in which the U.S. District Court for the District of Kansas granted in part and denied in part Defendants' motion to dismiss.  *See* Mem. & Order, *Kansas v. Biden*, No. 24-cv-1057, ECF No. 68, 2024 WL 2880404 (D. Kan. June 7, 2024).  Some of the Article III standing issues discussed in the *Kansas* opinion are also relevant to the above-captioned matter, such that the Court might find it useful to read Judge Crabtree's analysis.  The opinion is attached to this notice.

Dated: June 10, 2024                Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
 Senior Trial Counsel
SIMON G. JEROME (D.C. Bar No. 1779245)
 Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **STATE OF KANSAS, et al.,** | |
| **Plaintiffs,** | **Case No. 24-1057-DDC-ADM** |
| **v.** | |
| **JOSEPH R. BIDEN, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM AND ORDER</u>

A plaintiff must have standing to bring a lawsuit. As future Justice Scalia once explained, standing asks, "What's it to you?"[1] And if a plaintiff can't answer that question, that plaintiff doesn't have standing.

This case requires the court to answer a daunting question: When do states have standing to sue the federal government? The Supreme Court addressed this question in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023). There, several states challenged a Department of Education student loan forgiveness plan. The Supreme Court held that one state had standing. Missouri had standing to sue on behalf of its "public instrumentality"—a nonprofit, government corporation that owned and serviced student loans. That public instrumentality had suffered harm because the Department's plan forgave student loan debt, thereby reducing the number of student loans, and, as a result, reducing the service fees the public instrumentality would collect. And so, harm to Missouri's public instrumentality conferred standing on Missouri. This case,

---

[1]    Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983) (revised version of Ninth Donahue Lecture at Suffolk University Law School) (cited in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

though it involves different states and a different student loan forgiveness plan, sits in the shadow of *Biden v. Nebraska*.

Plaintiffs here are 11 states challenging the Department of Education's new student loan regulations, called the SAVE Plan. As relevant here, the SAVE Plan does two things. *First*, it lowers monthly payments for eligible borrowers. *Second*, it shortens the maximum repayment period for eligible borrowers who took out small original loans. That is, if a student borrowed $12,000 or less, the new regulations require that borrower to make payments for 10 years—instead of 20 or 25 years. After 10 years of payments, the Department will forgive the remainder of the debt. Plaintiffs claim the new regulations violate the Constitution's separation of powers and the Administrative Procedures Act.

Defendants have moved to dismiss, arguing plaintiffs lack standing because the SAVE Plan doesn't cause the states any direct harm. Doc. 45. In response, plaintiffs argue the new regulations will harm them in three ways: (1) reduced revenue for the states' public instrumentalities who own student loans, (2) reduced tax revenue, and (3) a competitive harm to their ability to recruit and retain employees to state public service employment. The first theory works, thanks to *Biden v. Nebraska*. But the other two don't.

In short, plaintiffs have shouldered their burden to show the SAVE Plan likely will reduce the revenue of South Carolina, Texas, and Alaska's public instrumentalities—but just barely. Their standing theory is weaker than the one that prevailed in *Biden v. Nebraska*. And the allegations and declarations supporting their standing theory are conflicting. Plaintiffs even tried to sandbag their standing obligation. Their initial Complaint didn't allege standing facts adequately. Instead, plaintiffs wanted to hold onto their standing allegations until the preliminary injunction hearing. The court rejected that approach since standing, in federal court,

is an essential ingredient of subject matter jurisdiction. So, they eventually filed an Amended Complaint disclosing their standing assertion. This approach is far from perfect.

But despite these issues, plaintiffs have shouldered their burden to show that the new regulations, more likely than not, will injure South Carolina, Texas, and Alaska's public instrumentalities. The other eight states—those without a public instrumentality participating in the student loan market—haven't shouldered their burden to show that the regulations will cause them any direct harm.

The other eight plaintiffs assert that they have standing because the SAVE Plan will reduce their income tax revenues. But this is an incidental effect of the SAVE Plan, traceable to plaintiffs' own decisions about how to tax revenue. Alternatively, these eight plaintiffs also assert that the SAVE Plan harms them directly because it reduces their ability to recruit staff to public service within state agencies. No court has ever bought into this theory, and this court declines to become the first. These plaintiffs simply have no skin in the game. Their answer to Justice Scalia's colloquial expression of standing—What's it to you?—is this: It's nothing.

The court thus grants defendants' Motion to Dismiss (Doc. 45) in part and denies it in part. Plaintiffs South Carolina, Texas, and Alaska have standing based on their public instrumentalities. The other eight states don't, and, exercising discretion conferred by Circuit authority, the court dismisses them from this action. This is precisely how the court handles any lawsuit where some plaintiffs have viable claims and others don't. Fed. R. Civ. P. 1 (directing courts to "secure the just, speedy, and inexpensive determination of every action and proceeding"). The court explains this result, below, beginning with the relevant background.

## I.        Background

The court begins with the statutory scheme that defendants here used to enact the SAVE Plan. The court then recounts the details of the SAVE Plan and concludes this section with a short summary of this lawsuit.

### *The Higher Education Act (HEA)*

Congress enacted the Higher Education Act in 1965 "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education[.]" 20 U.S.C. § 1070. Initially, the HEA didn't authorize the federal government to loan money directly to students. Doc. 57 at 10 (1st Am. Compl. ¶ 46). Instead, the federal government guaranteed private loans. *Id.* That changed in 1993, when Congress amended the HEA and authorized the federal government to loan money directly to students. *Id.* This 1993 amendment also required the Department of Education to offer students a variety of repayment plans. *Id.*; *see also* 20 U.S.C. § 1087e(d)(1). Only one variety of repayment plan matters here:  income contingent repayment plans. Doc. 57 at 10 (1st Am. Compl. ¶ 47); *see also* 20 U.S.C. § 1087e(d)(1)(D). As the name implies, these plans base a borrower's loan repayments on the borrower's income. The relevant statute provides for "an income contingent repayment plan, with varying annual payments based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years[.]" 20 U.S.C. § 1087e(d)(1)(D).

### *The SAVE Plan*

Plaintiffs challenge the Department's SAVE Plan, which sets new rules for income contingent (also known as income driven) repayment plans. This section recounts the SAVE Plan's history and explains how it works.

In January 2023, the Department issued a Notice of Proposed Rulemaking (NPRM). Doc. 57 at 12 (1st Am. Compl. ¶ 57).  The NPRM "propose[d] to amend the regulations governing income-contingent repayment plans[.]"  Improving Income-Driven Repayment for the William D. Ford Federal Direct Loan Program, 88 Fed. Reg. 1894, 1894 (Jan. 11, 2023) (to be codified at 34 C.F.R. pt. 685).  After the NPRM and the comment period, the Department published the "Final Rule" in July 2023.  Doc. 57 at 14 (1st Am. Compl. ¶ 68); *see also* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820 (July 10, 2023) (to be codified at 34 C.F.R. pts. 682, 685).

Relevant here, the Final Rule[2] makes the following changes to income contingent repayment plans:

- Defines discretionary income as income above 225% of the applicable federal poverty guideline;

- Sets a borrower's monthly payment amount to $0 if the borrower's income falls below 225% of the applicable federal poverty guideline;

- For undergraduate loans, caps a borrower's monthly payment amount at 5% of the borrower's income above 225% of the applicable federal poverty guideline; and

- For borrowers whose original principal balance was $12,000 or less, cancels the remaining balance after the borrower has made 120 monthly payments or the equivalent.

Doc. 57 at 14 (1st Am. Compl. ¶ 70).  To summarize, the Final Rule decreases borrowers' monthly payments and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.

### *This Lawsuit*

---

[2]     This Memorandum and Order uses the terms "Final Rule" and "SAVE Plan" interchangeably.

Eleven states now sue Secretary of Education Miguel Cardona, the United States Department of Education, and President Joseph R. Biden.  According to these states, the Final Rule is "plainly unlawful" under the Constitution and the Administrative Procedures Act, especially in light of *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).  They bring four claims:  (1) agency action in excess of statutory jurisdiction and in violation of separation of powers, violating Article I of the Constitution; (2) agency action in excess of statutory authority, violating the Administrative Procedures Act (APA); (3) arbitration and capricious agency action, violating the APA; and (4) agency action in violation of APA procedures.  Doc. 57 at 25–38 (1st Am. Compl. ¶¶ 133–227).

With this background, the court next recites the legal standard governing defendants' Motion to Dismiss.[3]

## II.      Legal Standard

Defendants move for dismissal under Fed. R. Civ. P. 12(b)(1), arguing plaintiffs lack standing, and so this court lacks subject matter jurisdiction.  Rule 12(b)(1) motions take one of two forms:  a facial attack or a factual attack.  *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001).  "A facial attack asserts that the allegations in the complaint, even if true, are insufficient to establish subject matter jurisdiction.  By contrast, a factual attack on the complaint challenges the veracity of the allegations upon which subject matter jurisdiction depends." *Cnty. Comm'rs v. U.S. Dep't of the Interior*, 614 F. Supp. 3d 944, 951 (D.N.M. 2022) (citation and internal quotation marks omitted).  Here, defendants bring a factual attack.[4]

---

[3]      Though defendants filed their Motion to Dismiss before plaintiffs filed their First Amended Complaint, the parties previously asked the court and it agreed to apply the Motion to Dismiss arguments to plaintiffs' First Amended Complaint.  Doc. 60 at 3.

[4]      Though defendants present no evidence of their own, the parties agreed at the hearing that this is a factual attack on the court's subject matter jurisdiction.

A factual attack allows the court to "reference . . . evidence outside the pleadings" including "affidavits, other documents, and [even conduct] a limited evidentiary hearing to resolve disputed jurisdictional facts." *Stuart*, 271 F.3d at 1225 (citation and internal quotation marks omitted). "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). Instead, "when considering a Rule 12(b)(1) motion to dismiss, the court may weigh the evidence and make factual findings." *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1063 (10th Cir. 2012).

"If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence." *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir. 1994). So, when facing a factual attack, a plaintiff must "present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence." *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 n.5 (10th Cir. 1999); *see also Sapp v. F.D.I.C.*, 876 F. Supp. 249, 251 (D. Kan. 1995) ("The allegations contained in the complaint are initially accepted as true, but if challenged the plaintiff has the duty to support the allegations with competent proof."). Our Circuit has analogized plaintiffs' Rule 12(b)(1) burden to the nonmovant's burden under Fed. R. Civ. P. 56(e). *Hafter D.O.*, 190 F.3d at 1160 n.5 ("Whether we consider [defendant's] motion as a motion to dismiss under Rule 12(b)(1) or a motion for summary judgment, [plaintiffs'] burden remains essentially the same—they must present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence.").

Defendants seek dismissal of plaintiffs' claims under Rule 12(b)(1) because, they assert, plaintiffs lack Article III standing.  Article III of our Constitution limits federal courts' jurisdiction to "cases" and "controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To present a case or controversy under Article III, a plaintiff must establish that it has standing to sue.  *Id.* (citations omitted).  To have standing, "a plaintiff needs a 'personal stake' in the case."  *Biden v. Nebraska*, 143 S. Ct. at 2365 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).  "To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question:  'What's it to you?'"  *TransUnion*, 594 U.S. at 423 (citation and internal quotation marks omitted).  "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (citation and internal quotation marks omitted).

Article III's standing analysis requires three things:

(1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[;]"

(2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court[;]" and

(3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

Plaintiffs must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* at 561.  At "the pleading stage, the plaintiff must clearly

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 9 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 11 of 48 PageID
#: 962

allege facts demonstrating each element" of standing.  *Spokeo*, 578 U.S. at 338 (citation, internal

quotation marks, and ellipsis omitted).  "If at least one plaintiff has standing, the suit may

proceed."  *Biden v. Nebraska*, 143 S. Ct. at 2365 (citation omitted).

## III.        Analysis

Plaintiffs assert three[5] distinct theories of standing.  *First*, plaintiffs argue that the Final

Rule harms their public instrumentalities—organizations who own and service student loans.

*Second*, they argue that the Final Rule causes them direct injury because the Final Rule will

decrease their tax revenues.  *Last*, plaintiffs allege the Final Rule hurts their ability to recruit

employees into state employment.  The court considers each theory, in turn, below.

### A.        Public Instrumentalities

Plaintiffs' public instrumentality theory alleges, in a nutshell, that three of the plaintiff

states have government corporations who own and service student loans, and the Final Rule will

cause these organizations to lose revenue.  The organizations are public instrumentalities of the

states, plaintiffs argue, so a harm to three instrumentalities is a direct injury to the three states

themselves.  Because this standing theory relies on *Biden v. Nebraska*, 143 S. Ct. 2355, the court

reviews that case's standing discussion, in detail, below.

#### 1.        *Biden v. Nebraska*

*Biden v. Nebraska* involved student loan forgiveness under the Higher Education Relief

Opportunities for Students Act (HEROES Act) of 2003, a law enacted out of Congress's concern

for student loan borrowers in the wake of the September 11 terrorist attacks.  143 S. Ct. at 2363.

---

[5]        In their original Complaint, plaintiffs alleged a fourth kind of injury:  "increased law enforcement
costs[.]"  Doc. 1 at 21 (Compl. ¶ 113).  Plaintiffs alleged that the SAVE Plan "will create enormous
opportunities for fraudsters to exploit student debt borrowers that would not otherwise exist."  *Id.*
Plaintiffs' First Amended Complaint doesn't mention this injury.  *See generally* Doc. 57 (1st Am.
Compl.).  And during the hearing on this motion, plaintiffs' counsel confirmed.  Plaintiffs have
abandoned this theory.

The HEROES Act allows the Secretary of Education to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" during a "national emergency[.]"  20 U.S.C. § 1098bb(a)(1).  During the COVID-19 pandemic, the Secretary used the HEROES Act to suspend interest accrual and repayment obligations on federal student loans several times.  *Biden v. Nebraska*, 143 S. Ct. at 2364.  In August 2022, the Secretary took a step further, and cancelled student loan debt under the HEROES Act to address financial harm stemming from the COVID-19 pandemic.  *Id.*  This plan sought "to reduce and eliminate student debts directly."  *Id.*  Here's how that batch of loan forgiveness worked:

> For borrowers with an adjusted gross income below $125,000 in either 2020 or 2021 who have eligible federal loans, the Department of Education will discharge the balance of those loans in an amount up to $10,000 per borrower.  Borrowers who previously received Pell Grants qualify for up to $20,000 in loan cancellation.

*Id.* at 2364–65 (citations omitted).

Six states challenged this HEROES Act plan.  *Id.* at 2365.  The district court concluded the states lacked standing.  *Id.*  The Eighth Circuit disagreed, concluding the state of Missouri likely had standing based on the Missouri Higher Education Loan Authority (MOHELA).  *Id.*  The Supreme Court granted certiorari before judgment and, relevant here, concluded Missouri had standing because "the Secretary's plan harm[ed] MOHELA and thereby directly injure[d] Missouri[.]"  *Id.*

The Court explained that MOHELA, a nonprofit government corporation, participated in the student loan market.  *Id.*  MOHELA owned over $1 billion in Federal Family Education Loans (FFELs) and serviced $150 billion in federal loans.  *Id.* at 2365–66.  The Court's standing analysis focused on service fees.  *Id.*  The Department of Education had hired MOHELA "to collect payments and provide customer service to borrowers.  MOHELA receive[d] an

administrative fee for each of the five million federal accounts it services[.]"  *Id.* (citations omitted).

Enter the HEROES Act student loan forgiveness plan.  Under this "plan, roughly half of all federal borrowers would have their loans completely discharged."  *Id.* at 2366.  This meant "MOHELA could no longer service those closed accounts, costing it, by Missouri's estimate, $4 million a year in fees that it otherwise would have earned under its contract with the Department of Education."  *Id.*  The Court concluded that this financial harm from reduced service fees qualified as "an injury in fact directly traceable to the Secretary's plan[.]"  *Id.*  The Court went on to explain that MOHELA was a public instrumentality of Missouri, so a "harm to MOHELA in the performance of its public function [was] necessarily a direct injury to Missouri itself."  *Id.* On that basis, Missouri had standing to sue and challenge that iteration of loan forgiveness.

With *Biden v. Nebraska*'s standing analysis firmly in mind, the court outlines plaintiffs' public instrumentality arguments here.

### 2. Plaintiffs' Standing Theory Based on South Carolina, Texas, and Alaska's Public Instrumentalities

Plaintiffs allege that—like Missouri and MOHELA—South Carolina, Alaska, and Texas have "state instrumentalities or quasi instrumentalities" who will suffer financial harm under the SAVE Plan.  Doc. 57 at 23 (1st Am. Compl. ¶ 116).  These instrumentalities "(1) provide student loans to residents of the state, (2) hold loans issued by the Federal Family Education Loan Program ("FFELP[6] loans"), and/or (3) service student debt taken out by residents, former residents, and out-of-state students."  *Id.*  The court pauses here to explain FFEL loans because they provide an important part of plaintiffs' public instrumentality harm theory.

---

[6]  Plaintiffs use the acronym "FFELP" in their First Amended Complaint to describe Federal Family Education loans.  Defendants use the acronym "FFEL" to reference these loans.  *Biden v. Nebraska* used the acronym "FFEL".  This Order uses FFELP and FFEL interchangeably.

FFEL loans are student loans held by private corporations and guaranteed by the federal government.  "While FFELs . . . are no longer issued, many remain outstanding." *Biden v. Nebraska*, 143 S. Ct. at 2362.  Holders of FFEL loans own the assets outright.  Doc. 65 at 14. The federal government doesn't pay the holder to service the loans.  *Id.*  And federal law requires FFEL holders to pay rebate fees on certain FFEL loans to the government—fees the holders can't pass on to the borrower.  *Id.* (first citing 20 U.S.C. § 1078-3(f), then citing 34 C.F.R. §§ 682.406(a)(12), 682.202).

To understand plaintiffs' standing theory, the court also must explain FFEL loan consolidation.  Borrowers with FFEL loans can "consolidate" their loans into federal direct loans.  "Consolidate" is something of a term of art here because, it appears, consolidate seems to mean *convert* FFEL loans into federal direct loans.  That is, borrowers can exchange their FFEL loans—ones owned by private corporations—into direct loans owned by the federal government. When borrowers consolidate their FFEL loans, the federal government pays the loan's holder the principal loan amount owed and accrued interest.  Putting it more succinctly, a consolidation cashes out the private corporation holding the FFEL loan.

Returning to plaintiffs' public instrumentality theory, plaintiffs allege that South Carolina, Texas, and Alaska have public instrumentalities who hold FFEL loans.  Plaintiffs allege the three instrumentalities "derive income from their loan portfolios, such as through collecting interest owed or service fees."  Doc. 57 at 23 (1st Am. Compl. ¶ 117).  So, plaintiffs allege, the instrumentalities' "amount of income thus collected is directly proportional to the size of the debt portfolio:  *i.e.*, decreasing the size of the portfolio will decrease the income collected by the instrumentalities/quasi-instrumentalities."  *Id.* (1st Am. Compl. ¶ 119).

Enter the Final Rule.  Plaintiffs allege the "Final Rule is virtually certain to decrease the size of these student-debt portfolios by inducing individuals to consolidate their FFELP loans into direct federal loans in order to take advantage of the extraordinary (and unlawful) generosity of the Final Rule." *Id.* (1st Am. Compl. ¶ 120).  Put a slightly different way, plaintiffs argue that the SAVE Plan will incentivize debtors to consolidate these FFEL loans into direct federal loans, shrinking the instrumentalities' debt portfolios, and decreasing their revenue.  Doc. 50 at 17–18. Defendants have several problems with this theory.

Defendants correctly point out that plaintiffs' theory of public instrumentality harm is different—and weaker—than the public instrumentality harm that prevailed in *Biden v. Nebraska*.  *Biden v. Nebraska* says nothing about FFEL loans and consolidation.  That case involved a simpler student loan forgiveness plan and a simpler state instrumentality harm.  Start with the plan.  The student loan forgiveness under the HEROES Act forgave $10,000 to $20,000 per eligible loan.  Here, the SAVE Plan operates with more finesse.  It reduces monthly payment amounts and, for loans with original balances of $12,000 or less, limits a borrower's repayment window to 10 years (from 20 or 25) of qualifying payments.  Next consider the harm to the state instrumentality.  In *Biden v. Nebraska*, the HEROES Act loan forgiveness would result in millions of fully forgiven loans.  So, MOHELA no longer could service those closed accounts, costing it revenues formerly derived from servicing direct loans.  Here, in contrast, plaintiffs haven't alleged any loss of revenue from *servicing* loans.  Instead, plaintiffs allege that the Final Rule will cost them interest revenue because third parties have incentive to consolidate their FFEL loans into direct loans—and thus pay interest to the federal government as the sole lender of direct loans.[7]

---

[7]     It's not clear from plaintiffs' First Amended Complaint or briefing how, exactly, the SAVE Plan will reduce the instrumentalities' revenue.  Plaintiffs talk about "revenue" without differentiating between

At bottom, plaintiffs' theory of standing is more attenuated—and therefore weaker—than MOHELA's standing in *Biden v. Nebraska*.  Despite these issues, the court nonetheless concludes that South Carolina, Texas, and Alaska have pleaded plausibly and sufficiently established a likely injury to their state instrumentalities.

### 3.     Plaintiffs Plausibly Have Alleged an Injury in Fact to South Carolina, Texas, and Alaska's Public Instrumentalities, Fairly Traceable to the SAVE Plan

Because plaintiffs' theory of harm differs from MOHELA's harm in *Biden v. Nebraska*, the court must look beyond that case's holding.  It must consider additional precedent defining the standing inquiry that applies to this dispute.  Defendants argue that plaintiffs' public instrumentality theory fails two elements of standing:  injury in fact and traceability.  The court thus briefly recites the governing law.

To demonstrate Article III standing, a "plaintiff must have suffered an 'injury in fact'" and that injury must be "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560–61 (citations and internal quotation marks omitted).  Plaintiffs allege an imminent injury, claiming the Final Rule will cause them financial harm in the future.  Under *Clapper*, a future injury satisfies the "imminence" requirement only if it is "certainly impending."  568 U.S. at 401.  The Supreme Court has "repeatedly reiterated that threated injury be *certainly impending* to

---

revenue from interest and revenue from fees.  Plaintiffs' First Amended Complaint glosses over the difference, alleging the instrumentalities "derive income from their loan portfolios, such as through collecting interest owed or service fees."  Doc. 57 at 23 (1st Am. Compl. ¶ 117).  And plaintiffs' briefing applies more gloss, arguing that each instrumentality "holds a portfolio of FFELP loans, and the interest/fees that they receive from those portfolios is directly proportional to their portfolio's size."  Doc. 50 at 17 (emphasis added).

Fortunately, at the hearing, plaintiffs confirmed that their public instrumentality theory relies on reduced *interest* revenue—not fees.

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 15 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 17 of 48 PageID
#: 968

constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* at

409 (emphases in original) (citation, brackets, and internal quotation marks omitted).

In addition to a future injury, plaintiffs also allege an indirect injury. When "a plaintiff's

asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*,"

the Supreme Court has instructed courts to require "much more." *Lujan*, 504 U.S. at 561–62

(emphasis in original). "In that circumstance, causation and redressability ordinarily hinge on

the response of the regulated . . . third party the government action or inaction—and perhaps on

the response of others as well." *Id.* at 562. When such

> essential elements of standing depend[] on the unfettered choices made by
> independent actors not before the courts and whose exercise of broad and legitimate
> discretion the courts cannot presume to either control or to predict . . . , it becomes
> the burden of the plaintiff to adduce facts showing that those choices have been or
> will be made in such a manner as to produce causation and permit redressability of
> injury.

*Id.* (citations and internal quotation marks omitted).

So, to show standing, plaintiffs must show two things: (1) borrowers likely will

consolidate their FFEL loans into direct federal loans and (2) this consolidation likely will reduce

the instrumentalities' revenue. To meet this burden, plaintiffs have provided declarations from

each of the three state instrumentalities. The court reviews the evidence submitted by each

instrumentality below, starting with South Carolina. After its review of each package of

evidence, the court evaluates the evidence together. And, ultimately, the court concludes South

Carolina, Texas, and Alaska have standing—at least for now.

### a.    South Carolina's SEAA

Plaintiffs allege that South Carolina has a public instrumentality called the State

Education Assistance Authority (SEAA). Doc. 57 at 23–24 (1st Am. Compl. ¶ 121). The First

Amended Complaint alleges that "since 2011, SEAA's portfolio has decreased from

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 16 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 18 of 48 PageID
#: 969

approximately $31.3 million to $6.4 million, which has reduced the amount of income generated

for South Carolina's benefit[.]"  *Id.* at 24 (1st Am. Compl. ¶ 122).  Plaintiffs allege the SAVE

Plan "will further decrease the size of SEAA's portfolio as borrowers convert FFELP loans to

take advantage of available debt forgiveness."  *Id.*

      Plaintiffs submitted a declaration from South Carolina officials confirming the

information about SEAA.  Doc. 53-6 (Spate Decl.).  The declaration's exhibits confirm that

SEAA holds FFEL loans, *id.* at 7 (Spate Decl. Ex. 2), and SEAA's FFEL portfolio has decreased

steadily since 2011, *id.* at 8 (Spate Decl. Ex. 2).  The exhibit provides three figures.  The first

figure shows SEAA's FFEL loan portfolio decreasing over time:

**History of SEAA's FFELP portfolio from 2010 to present:**

| Month End | Principal Balance |
|---|---|
| 6/30/2011 | $31,324,566.17 |
| 6/30/2012 | 29,589,044.81 |
| 6/30/2013 | 26,776,811.11 |
| 6/30/2014 | 24,974,750.48 |
| 6/30/2015 | 22,797,591.92 |
| 6/30/2016 | 20,975,542.24 |
| 6/30/2017 | 19,218,505.43 |
| 6/30/2018 | 16,654,982.40 |
| 6/30/2019 | 15,026,548.26 |
| 6/30/2020 | 12,872,804.70 |
| 6/30/2021 | 11,889,724.29 |
| 6/30/2022 | 10,771,880.55 |
| 6/30/2023 | 8,059,252.66 |
| 3/31/2024 | 6,423,362.52 |

*Id.*

      The exhibit's second figure attributes this decrease to borrower consolidation, showing

that borrowers have consolidated SSEA's FFEL loans for years.  At the hearing on the Motion to

Dismiss, plaintiffs' counsel explained the following figure shows the total value of FFEL loans

consolidated each year (first column) and the value of FFEL loans paid down by FFEL

borrowers (second column):

**Proportion of SEAA's FFELP loans that were consolidated versus paid down**

| Period | Consolidation Payment | Other Principal Payments |
|---|---|---|
| 7/1/2010 - 6/30/2011 | -$1,019,123.26 | -$814,057.50 |
| 7/1/2011 - 6/30/2012 | -1,076,871.56 | -$658,649.80 |
| 7/1/2012 - 6/30/2013 | -1,365,846.14 | -$1,446,387.56 |
| 7/1/2013 - 6/30/2014 | -590,101.34 | -$1,211,959.29 |
| 7/1/2014 - 6/30/2015 | -1,231,047.88 | -$946,110.68 |
| 7/1/2015 - 6/30/2016 | -909,836.74 | -$912,212.94 |
| 7/1/2016 - 6/30/2017 | -1,081,806.83 | -$675,229.98 |
| 7/1/2017 - 6/30/2018 | -1,064,526.12 | -$1,498,996.91 |
| 7/1/2018 - 6/30/2019 | -415,796.86 | -$1,212,637.28 |
| 7/1/2019 - 6/30/2020 | -622,083.17 | -$1,531,660.39 |
| 7/1/2020 - 6/30/2021 | -174,407.04 | -$808,673.37 |
| 7/1/2021 - 6/30/2022 | -954,393.67 | -$1,320,063.19 |
| 7/1/2022 - 6/30/2023 | -2,112,224.90 | -$600,402.99 |
| 7/1/2023 - 3/31/2024 | -1,111,945.46 | -$523,944.68 |

*Id.*

But, though SEAA's FFEL portfolio has gone down each year since 2011, the interest

revenue doesn't follow that same pattern:

**Interest revenue generated by SEAA's FFELP loans per year**

| Period | Total Interest Revenue |
|---|---|
| 7/1/2010 - 6/30/2011 | $1,172,811.00 |
| 7/1/2011 - 6/30/2012 | $764,676.00 |
| 7/1/2012 - 6/30/2013 | $692,306.00 |
| 7/1/2013 - 6/30/2014 | $630,738.00 |
| 7/1/2014 - 6/30/2015 | $585,056.00 |
| 7/1/2015 - 6/30/2016 | $572,691.00 |
| 7/1/2016 - 6/30/2017 | $595,654.00 |
| 7/1/2017 - 6/30/2018 | $689,735.00 |
| 7/1/2018 - 6/30/2019 | $756,432.00 |
| 7/1/2019 - 6/30/2020 | $529,763.00 |
| 7/1/2020 - 6/30/2021 | $301,659.00 |
| 7/1/2021 - 6/30/2022 | $303,673.00 |
| 7/1/2022 - 6/30/2023 | $575,359.00 |
| 7/1/2023 - 3/31/2024 * | $432,455.00 |

*Id.*

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 18 of 46
Case: 4:24-cv-00520-JAR   Doc. #:  32-1   Filed: 06/10/24   Page: 20 of 48 PageID
#: 971

This SEAA evidence creates some evident problems for South Carolina's standing theory.  Remember, plaintiffs need to show two things:  (1) the SAVE Plan makes it likely that borrowers will consolidate their loans and (2) if borrowers consolidate their loans, the public instrumentalities likely will suffer financial harm in the form of reduced interest payments.  The SEAA evidence undermines both propositions.

The SEAA evidence casts doubt on plaintiffs' allegation that the SAVE Plan makes FFEL loan consolidation more likely.  The SEAA evidence shows that SEAA's FFEL loan portfolio has decreased steadily since 2010.  So, borrowers already were consolidating their loans long before the SAVE Plan's incentives.  This conclusion poses a causation problem for plaintiffs.  And this problem demonstrates the difficulty of establishing standing when a theory of harm relies on decisions by third parties.  Where "the independent action of some third party not before the court—rather than that of the defendant—was the direct cause of the plaintiff's harm, causation may be lacking." *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (citation and internal quotation marks omitted).  Trying to cure this problem, plaintiffs direct the court to Alaska's declaration.  It explains why the SAVE Plan incentivizes borrowers to consolidate their FFEL.  Critically, the Alaska declaration alleges that borrowers already are consolidating their loans.  More on Alaska in a moment.

The SEAA evidence also casts doubt on plaintiffs' theory that, as the instrumentalities' FFEL loan portfolios decrease, their interest revenue necessarily will decrease vis-à-vis interest revenue in the what if world where the SAVE Plan didn't happen.  SEAA's FFEL portfolio has decreased steadily over the years, but SEAA's interest revenue on FFEL loans has moved up and moved down.  Put differently, a graph of interest revenue wouldn't have the negative slope plaintiffs need.

At the hearing, plaintiffs introduced an additional layer of confusion about this data. Plaintiffs argued that the SEAA evidence demonstrates loan consolidation from the HEROES Act loan forgiveness. Plaintiffs argued that the jump from -$954,393.67 in consolidation in fiscal year 2021 to -$2,112,224.90 in fiscal year 2022 resulted from defendants announcing the HEROES Act forgiveness. This announcement, plaintiffs contend, led borrowers to consolidate their loans to take advantage. To be sure, this would support plaintiffs' view that borrowers respond to incentives created by federal student loan forgiveness programs—*i.e.*, when borrowers thought they could benefit from the HEROES Act, they consolidated their loans. But plaintiffs' argument makes it harder to attribute loan consolidation to the SAVE Plan loan forgiveness, and not the HEROES Act loan forgiveness.

And plaintiffs' argument is just that: an argument. Plaintiffs haven't adduced any evidence that purports to suss out the amount of consolidation caused by the HEROES Act, the SAVE Plan, and general market forces individually. This gap particularly presents a problem given the timing of the two loan forgiveness plans. Plaintiffs explained during the hearing that the fiscal year 2022 number captures HEROES Act-related consolidation. According to plaintiffs, this increase in loan consolidation—from -$954,393.67 in fiscal year 2021 to -$2,112,224.90 in fiscal year 2022— shows the effects of the HEROES Act loan forgiveness—*i.e.*, borrowers consolidated their FFEL loans to take advantage of the HEROES Act. That's all well and good, until the court considers the SAVE Plan. Defendants announced the proposed rule in January 2023—within fiscal year 2022. That leaves two loan forgiveness plans in play during one fiscal year. And the court has no way to tell how much loan consolidation to attribute to the HEROES Act and how much to attribute to the SAVE Plan.

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 20 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 22 of 48 PageID
#: 973

Given these issues with the South Carolina evidence, plaintiffs' theory finds its way to some thin ice. Fortunately, for them, plaintiffs' evidence from Texas helps them show that consolidation would cause reduced income revenue.

### b. Texas's THECB

Plaintiffs allege that Texas has an agency named the Texas Higher Education Coordinating Board (THECB). Doc. 57 at 24 (1st Am. Compl. ¶ 127). THECB is a "student debt servicing public entity[.]" *Id.* Plaintiffs allege "THECB owns over $1,1295,236 [*sic*] in FFELP loans" and "collected $114,479 in interest in 2023." *Id.* at 25 (1st Am. Compl. ¶ 130). The record isn't clear if this is $11.2 million in FFEL loans or $1.12 million. Plaintiffs allege that if the SAVE Plan "were to decrease the size of that student debt portfolio, the amount of income that the THECB would collect would decrease." *Id.* (1st Am. Compl. ¶ 131).

Plaintiffs submitted a declaration from THECB. *See* Doc. 53-7 (Keyton Decl.). The declaration confirms the above amounts. *Id.* at 2 (Keyton Decl. ¶ 3). And, critically, the declarant testifies:

> To the extent that federal policy results in borrowers consolidating their loans out of FFELP into the Direct Loan Program, those consolidations will cause the State of Texas to lose revenue. Upon consolidation, the federal government compensates the holder (THECB) only for principal and accrued interest. Thus, such consolidations will result in reduced revenue [to the] THECB and therefore the State of Texas. The THECB would no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio.

*Id.* (Keyton Decl. ¶ 4). So, declarant says, the "SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program." *Id.* (Keyton Decl. ¶ 5). Defendants point out that this declaration "skims over consolidation entirely." Doc. 65 at 14. That is, the declarant assumes, without explaining, that borrowers will consolidate their loans.

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 21 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 23 of 48 PageID
#: 974

Defendants have the better end of that narrow issue.  The Texas declaration doesn't help plaintiffs shoulder their burden to show that borrowers will consolidate their FFEL loans into direct loans—the first piece of the standing puzzle.  In contrast, the Texas declaration *does* help plaintiffs with the second piece of the standing puzzle:  it's evidence that consolidation will cause revenue loss to Texas through THECB.  The mismatched puzzle piece here is the SEAA exhibit, which contradicts the Texas evidence because the SEAA data shows that decreased FFEL portfolios don't necessarily mean decreased FFEL interest revenue.  Doc. 53-6 at 8 (Spate Decl. Ex. 2).

With these those two states behind us, the court turns to plaintiffs' strongest evidence: Alaska's declaration.

### c.   Alaska's ASLC

Plaintiffs allege that Alaska's instrumentality is a public corporation, known as the Alaska Student Loan Corporation (ASLC).  It owns $16.8 million in FFEL loans.  Doc. 57 at 24 (1st Am. Compl. ¶¶ 123–24).  Plaintiffs allege the SAVE Plan will cause Alaska to lose significant revenues.  *Id.* (1st Am. Compl. ¶ 125).  Specifically, plaintiffs allege "ASLC estimates that the Final Rule will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP loan holder."  *Id.* (1st Am. Compl. ¶ 126).

Plaintiffs also submitted a declaration from ASLC.  The declarant testifies, "The SAVE Plan entices borrowers to consolidate their loans away from FFELP into the Direct Loan Program (DLP), comprising loans held by the federal government."  Doc. 53-8 at 2 (Efird Decl. ¶ 6).  According to the declarant, three features of the SAVE Plan entice borrowers to consolidate their FFEL loans into direct loans:

1. The SAVE Plan offers benefits to direct loans only—*i.e.*, capped payments, waiving residual interest, and full forgiveness after ten years of payments;

2. The SAVE Plan doesn't treat consolidated loans as new loans, so borrowers' repayment clocks won't restart if they consolidate—a feature that previously disincentivized borrowers from consolidating; and

3. The federal government is advertising and encouraging borrowers to consolidate.

*Id.* at 2–3 (Efird Decl. ¶¶ 6–8). So, the declarant provides, "the federal government is strongly . . . incentivizing borrowers to consolidate their loans away from FFELP and into [direct] loans held by the federal government."[8] *Id.* at 3 (Efird Decl. ¶ 8).

This testimony resembles—at some level anyway—theoretical, in-a-vacuum, "basic economic theory" allegations that struggle to carry plaintiffs' standing burden. *See Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 2024 WL 2237667, at *8 (6th Cir. May 17, 2024) ("Plaintiffs' allegations regarding supply and demand and the impact of financial incentive on third-party student-loan debtors are wholly speculative."). But the ASLC declaration goes a step further. It testifies, "Because these benefits are not available to borrowers with commercially-held FFELP loans, borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct Loans held by the federal government." *Id.* at 2 (Efird Decl. ¶ 6).

ASLC's declarant testifies these "consolidations will cause Alaska to lose significant revenues." *Id.* at 3 (Efird Decl. ¶ 9). Here's how: an FFEL loan is a loan held by a corporation (here, ASLC) and guaranteed by the federal government. When a borrower consolidates an FFEL loan into a direct loan from the federal government, the federal government compensates the holder (here, ASLC) for principal and accrued interest. *Id.* So, consolidation means the

---

[8]    The ASLC declaration contains several legal conclusions. For example, the declarant testifies that "the federal government is strongly, *and likely unlawfully*, incentivizing borrowers to consolidate their loans away from FFELP and into loans held by the federal government." Doc. 53-8 at 3 (Efird Decl. ¶ 8) (emphasis added). The lawfulness of the SAVE Plan is a legal conclusion reserved for the court to decide. The court declines to consider the declaration's legal conclusions.

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 23 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 25 of 48 PageID
#: 976

holder (here, ASLC) will no longer collect interest on those consolidated FFEL loans. *Id.*
Because of this phenomenon, "ASLC estimates that the SAVE Plan will result in ASLC losing
approximately $100,000 over just the next two years that it would otherwise collect as a FFELP
holder." *Id.* (Efird Decl. ¶ 11). This declaration represents plaintiffs' best evidence.

The Alaska declaration provides evidentiary support for both pieces of the standing
puzzle: (1) borrowers are likely to consolidate their FFEL loans into direct loans because of the
SAVE Plan and (2) when borrowers consolidate, it will cause the public instrumentality to lose
interest revenue. Defendants fault this declaration for "nakedly" stating that ASLC will lose
$100,000 "because of the SAVE Plan, without explaining how or why." Doc. 65 at 14. While
there's some truth to defendants' criticism, Alaska has adduced some facts. The court can't say
the same for defendants. They've proffered no evidence of their own. Without any
contradictory evidence, defendants have given no facts to reach a different conclusion. In short,
the court currently has no reason to doubt ASLC's $100,000, nor any other part of the
declaration.

Having summarized all three components of the public instrumentality evidence, the
court, next, synthesizes this information.

### d.    Summary of State Public Instrumentality Theory

Considering all three sources of evidence together, plaintiffs have shouldered their
burden to allege standing. Recall that plaintiffs had to show two things to show an injury: (1)
the SAVE Plan makes it likely that borrowers will consolidate their loans and (2) if borrowers
consolidate their loans, the states' public instrumentalities will suffer harm. Plaintiffs have
shouldered their burden on both fronts.

*First*, plaintiffs have shown by a preponderance of the evidence that the SAVE Plan will
cause FFEL borrowers to consolidate their loans into direct loans. This inquiry relies on the

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 24 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 26 of 48 PageID
#: 977

choices of third parties not before the court, which means plaintiffs must allege "facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. Alaska's ASLC declarant testifies that consolidation makes economic sense for borrowers because the SAVE Plan provides benefits for direct loans that FFEL loan borrowers can't access. And, critically, the ASLC declarant alleges "borrowers are rapidly consolidating their loans away from FFELP loans held by ASLC and into Direct loans held by the federal government." Doc. 53-8 at 2 (Efird Decl. ¶ 6).

To be sure, plaintiffs' SEAA evidence presents some problems for this theory because it shows borrowers consolidating their FFEL loans without the SAVE Plan. The Alaska evidence overcomes these issues. Alaska's ASLC declaration, in contrast, explains the SAVE Plan's incentives for borrowers to consolidate and testifies that the SAVE Plan already is causing borrowers to consolidate. And defendants haven't rebutted this evidence with any evidence of their own. So, despite the SEAA evidence,[9] plaintiffs have shouldered their burden to show "that third parties will likely react in predictable ways to" the SAVE Plan. *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2566 (2019).

*Second*, plaintiffs have shown that, when borrowers consolidate their loans, the states' public instrumentalities—and therefore the states—will suffer harm in the form of reduced interest income. Plaintiffs' own evidence from SEAA casts doubt on this theory. SEAA's FFEL loan portfolio has decreased steadily overtime, but its interest income has both increased and decreased over the same period. Doc. 53-6 at 8 (Spate Decl. Ex. 2). Despite these issues, the

---

[9]     South Carolina has squeaked over the preponderance of the evidence standard thanks to Alaska's evidence and a lack of evidence from defendants. The court notes that the "need to satisfy the[] three [standing] requirements persists throughout the life of the lawsuit." *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016). Given its narrow victory here, the court questions whether South Carolina's evidence (at least the evidence plaintiffs have presented here) could survive if defendants submitted any contrary evidence at all.

24

Texas THECB and Alaska ASLC evidence suffices to confer standing to the three public instrumentalities.

The THECB declarant alleges that, if borrowers consolidate their FFEL loans into direct loans, "those consolidations will cause the State of Texas to lose revenue" because the "THECB will no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio." Doc. 53-7 at 2 (Keyton Decl. ¶ 4). And the THECB's declarant further testifies the "SAVE Plan could cause pecuniary harm to the State of Texas and THECB measured by a reduction in revenue to the State's FFELP program." *Id.* (Keyton Decl. ¶ 5). Defendants argue that this declaration doesn't help plaintiffs shoulder their burden because the THECB "declarant skims over consolidation entirely"—that is, the declarant assumes that borrowers will consolidate their loans. Doc. 65 at 14. But, as just explained, plaintiffs have marshaled some evidence that some borrowers likely will consolidate their FFEL loans into direct loans. And Alaska's evidence also shows borrowers already are consolidating. Because it's likely that borrowers will consolidate, it's likely that Texas will suffer harm.

The same goes for Alaska's ASLC. The ASLC declarant testifies that "consolidations will cause Alaska to lose significant revenues." Doc. 53-8 at 3 (Efird Decl. ¶ 9). The declarant explains how consolidation will affect revenues. *Id.* And "ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." *Id.* (Efird Decl. ¶ 11). Plaintiffs thus have shouldered their current burden to allege a non-speculative, imminent, future injury to the public instrumentalities,[10] traceable to the SAVE Plan. And so, on the current record, South Carolina, Texas, and Alaska have standing.

---

[10]     The court again notes that South Carolina has succeed in showing standing by the thinnest of margins.

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 26 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 28 of 48 PageID
#: 979

Before the court leaves the public instrumentality analysis altogether, it responds to another of defendants' arguments.

### 4.      Harm v. Benefit

Defendants argue plaintiffs haven't shown that these three instrumentalities likely will suffer an injury.  They argue that holding "a FFEL loan in no way guarantees interest income" for the instrumentalities.  Doc. 65 at 14.  According to defendants, many "FFEL borrowers are on income-based repayment plans under which they pay $0 monthly.  And a FFEL borrower is as susceptible to default as any other."  *Id.*  Defendants thus assert that the FFEL borrowers most likely to benefit from the SAVE Plan—and thus the borrowers most likely to consolidate— "would tend to be those borrowers at highest risk of delinquency and default[.]"  *Id.* at 14–15. Delinquency and default, of course, would reduce the instrumentalities' revenue.  *Id.* at 15. When a borrower consolidates an FFEL loan, however, the instrumentality avoids delinquency and default.  Indeed, "when a FFEL loan is consolidated, its prior owner receives payment for the full value of the loan's principal and outstanding interest."  *Id.* (first citing 20 U.S.C. § 1078-3(b)(1)(D), then citing 34 C.R.F. § 685.220(f)(1)).  So, defendants argue, the SAVE Plan actually could *benefit* the instrumentalities.

Tying this to standing, defendants argue plaintiffs

need to show that a potential loss of uncertain interest revenues to these entities is not outweighed by the certain profits of consolidation—including guaranteed payment and the elimination of rebate fees—to say nothing of the potential for reinvestment of the cash value of the loan at higher market interest rates.

*Id.* (citing 20 U.S.C. § 1107a(k), (l) (setting FFEL interest rates)).  While the court recognizes the logic of defendants' bottom-line, economic argument, it can't carry the day for them.

Plaintiffs cite authority that "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiffs has enjoyed from the relationship with the

defendant." 13A Edward H. Cooper, *Federal Practice & Procedure*, Jurisdiction § 3531.4 (3d ed. 2023). District courts within our Circuit have cited a rule from a Second Circuit case: "'the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.'" *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1044 n.36 (D. Kan. 2020) (quoting *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008)); *Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1179 (D.N.M. 2011) (same).

Plaintiffs' counterargument misses the point, defendants contend. Defendants' argument doesn't weigh harm against benefit. Instead, it asserts that there's simply no injury to begin with because the SAVE Plan will make money for the states' public instrumentalities. The problem with defendants' rejoinder is a basic one: they haven't adduced any evidence to support their theory. More problematic yet, plaintiffs have marshaled evidence nullifying the theory.

Alaska's "ASLC estimates that the SAVE Plan will result in ASLC losing approximately $100,000 over just the next two years that it would otherwise collect as a FFELP holder." Doc. 53-8 at 3 (Efird Decl. ¶ 11). Defendants may disagree with this calculation, but they don't proffer any evidence or accounting of their own. The court lacks any basis to find that this $100,000 doesn't account for the potential benefits of the SAVE Plan. Similarly, the Texas declarant alleges that, if borrowers consolidate their FFEL loans into direct loans, "those consolidations will cause the State of Texas to lose revenue" because the "THECB will no longer collect interest on FFELP loans that have been consolidated, diminishing the value of its portfolio." Doc. 53-7 at 2 (Keyton Decl. ¶ 4). Without any evidence to the contrary, the court accredits the declarant's testimony that the SAVE Plan will cause THECB, and therefore Texas,

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 28 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 30 of 48 PageID
#: 981

to lose interest revenue.  Again, there's no reason to believe that the THECB declarant failed to account for the SAVE Plan's potential benefits.

The court thus rejects defendants' argument that plaintiffs have failed to show an injury because the SAVE Plan might benefit the public instrumentalities.  As a result, South Carolina, Texas, and Alaska have suffered an injury in fact, fairly traceable to the SAVE Plan.  The court denies defendants' Motion to Dismiss South Carolina, Texas, and Alaska.

But what about the other states?  If some plaintiff states have standing, do they all have standing?

### 5.    "Standing for One is Standing for All"

When the court asked this question at the hearing, plaintiffs urged the court to answer this question yes.  They directed the court to *Biden v. Nebraska*, which held:  "If at least one plaintiff has standing, the suit may proceed."  143 S. Ct. at 2365 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).  And plaintiffs all bring the same legal claims.  Plaintiffs thus argue—correctly—that this suit will proceed.  And they ask the court to end its standing inquiry there:  conclude South Carolina, Texas and Alaska have standing and allow the suit to proceed with the other states tagging along.  The court declines this invitation.

Our Circuit, albeit in an unpublished opinion, has rejected the idea that "standing for one is" necessarily "standing for all."  *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011).  The Supreme Court, as shown in *Biden v. Nebraska*, doesn't *require* district courts to consider the standing of all plaintiffs.  143 S. Ct. at 2365; *see also Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit [the Court] to consider the petition for review.").  The court realizes that moving on after deciding that at least one plaintiff has standing may "encourage[] judicial efficiency by permitting a court to proceed to the merits of a case involving multiple plaintiffs seeking identical relief when it is

28

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 29 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 31 of 48 PageID
#: 982

clear that at least one plaintiff has standing." *Thiebaut*, 455 F. App'x at 802. "But . . . nothing in the cases addressing this principle suggests that a court *must* permit a plaintiff that *lacks* standing to remain in a case whenever it determines that a co-plaintiff has standing." *Id.* (emphases in original); *see also M.M.V. v. Garland*, 1 F.4th 1100, 1110–11 (D.C. Cir. 2021) ("The [*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*] line of cases stands only for the proposition that a court 'need not' decide the standing of each plaintiff seeking the same relief." (quoting *Clinton v. City of N.Y.*, 524 U.S. 417, 431 n.19 (1998))).

This alternative approach explains why the court "retain[s] discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs that lack standing." *Thiebaut*, 455 F. App'x at 802 (first citing *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1098 (10th Cir. 2006) (noting district court concluded one plaintiff had standing, so court declined to address other plaintiff's standing in interest of judicial economy); then citing *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451–53 (10th Cir. 1994) (analyzing individual plaintiffs' standing separately and dismissing some plaintiffs for lack of standing even though other plaintiffs had standing); and then citing *We Are Am./Somos Am. v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1091 (D. Ariz. 2011) ("Th[e] general rule [that only one plaintiff needs standing] does not strictly prohibit a district court, in a multiple plaintiff case such as this, from considering the standing of the other plaintiffs even if it finds that one plaintiff has standing.")); *see also M.M.V.*, 1 F.4th at 1111 (concluding the general rule—that court needn't decide standing of each plaintiff seeking same relief—"does not *prohibit* the court from paring down a case by eliminating plaintiffs who lack standing or otherwise fail to meet the governing jurisdictional requirements" (emphasis in original)).

Here, the court, in its discretion, concludes that paring down the case and dismissing the plaintiffs without standing aligns with the charter purposes recognized in Fed. R. Civ. P. 1.  At bottom, plaintiffs contend that uninjured plaintiffs can borrow another plaintiff's injury to satisfy Article III's standing requirement.  But that's not the way the court would approach any kind of lawsuit—especially a complicated one.  Narrowing the case to its viable claims and viable parties often narrows the burden of adjudicating the relevant issues, no matter whether the case is an auto accident or antitrust case.

The court also believes that winnowing the case is consistent with the holding in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).  There, the Court reversed a district court's decision (as affirmed by the Ninth Circuit) certifying a class that included some 6,300 uninjured class members.  *Id.* at 421–22, 427–28.  The Court rejected plaintiffs' argument that Congress, by adopting the Fair Credit Reporting Act, had conferred a right to recover on uninjured class members.  *Id.* at 434–35.  Justice Kavanaugh's opinion crafted a hypothetical to explain why:

> Suppose first that a Maine citizen's land is polluted by a nearby factory.  She sues the company, alleging that it violated a federal environmental law and damaged her property.  Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine.  The violation did not personally harm the plaintiff in Hawaii.
>
> Even if Congress affords both hypothetical plaintiffs a cause of action (with statutory damages available) to sue over the defendant's legal violation, Article III standing doctrine sharply distinguishes between those two scenarios.  The first lawsuit may of course proceed in federal court because the plaintiff has suffered concrete harm to her property.  But the second lawsuit may not proceed because that plaintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts.  An uninjured plaintiff who sues in those circumstances is, by definition, not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's "compliance with regulatory law" (and, of course, to obtain some money via the statutory damages).  Those are not grounds for Article III standing.

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 31 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page 33 of 48 PageID
#: 984

*Id.* at 427–28 (internal citations omitted); *see also id.* at 429 ("A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority.").  If all members of a class must have standing, then, of course, all plaintiffs here must have standing.  And if Article III bars a subset of plaintiffs—even if *all* plaintiffs have the same claim—then that subset shouldn't piggyback on the injured plaintiffs' standing.

So, the court, in its discretion, continues its standing analysis.  The court evaluates plaintiffs' argument that all 11 plaintiffs have standing based on assertions that (1) the SAVE Plan will decrease some of these states' income tax revenue and (2) the SAVE Plan harms these states' ability to recruit and retain talent.

If plaintiffs demonstrate that the other eight plaintiffs (or some of them) have standing on either one of these alternative standing theories, they will remain as plaintiffs.  If any plaintiff fails to do so, the court will dismiss that plaintiff.  This approach comports with Fed. R. Civ. P. 1, and it's consistent with the court's approach to any other lawsuit.

### B.     Income Tax Revenue

Plaintiffs argue they have standing because the Final Rule will cause nine of the 11 plaintiff states[11] to suffer a loss of state tax revenue.  To flesh out this theory, the court briefly must explain a few things about these states' income tax structure.

These nine states tie their definition of taxable income to the federal definition of income or adjusted gross income.  Doc. 57 at 17 (1st Am. Compl. ¶ 90).  And the federal tax code defines taxable income to include student loan forgiveness under income-driven repayment

---

[11]     These nine states are Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, South Carolina, and Utah.  Doc. 57 at 17 (1st Am. Compl. ¶ 87).  The two other plaintiffs have no state income tax.  The court already has concluded South Carolina, for now, has standing, but it includes South Carolina in the tax revenue analysis nonetheless.

plans.  Simply put, student debt forgiveness is taxable income and, therefore, revenue for these plaintiff states.  But the American Rescue Plan Act of 2021 provides that all student loan forgiveness won't "count toward the federal definition of taxable income until December 31, 2025."  Doc. 57 at 17 (1st Am. Compl. ¶ 89).  So, the states can't tax student loan debt forgiveness income until 2026.

According to plaintiffs, the Final Rule affects plaintiffs' tax revenues because it's timing that matters.  Plaintiffs allege the Final Rule "will reduce income tax revenue by decreasing the amount of outstanding student loan debt."  Doc. 57 at 18 (1st Am. Compl. ¶ 96).  This is so, they say, because the "Final Rule accelerates the timeline for cancelation on income-driven repayment plans to as low as 10 years for certain loan balances."  *Id.* (1st Am. Compl. ¶ 92). Under the old version of the rule, the federal government wouldn't forgive these loans for 20 to 25 years.  So, plaintiffs allege, "but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" for residents of the relevant states.  *Id.* (1st Am. Compl. ¶ 95).  In this but-for world, the relevant states would have more student loan forgiveness income to tax.  *Id.*  The challenged Final Rule, in contrast, "shift[s] forward some debt forgiveness that would otherwise occur in a period in which it would be taxable income . . . into a period where it is not taxable[.]"  *Id.* (1st Am. Compl. ¶ 96).  In sum, plaintiffs argue the Final Rule injures them directly because nontaxable forgiveness in 2024 and 2025 means less taxable forgiveness in 2026.

In response, defendants argue that the Final Rule's effects on state tax revenue are merely incidental.  And, according to defendants, a "federal policy's incidental effects on state tax revenues are not judicially cognizable injuries."  Doc. 46 at 24.  In support of this argument, defendants invoke *Florida v. Mellon*, 273 U.S. 12 (1927).

1.     *Florida v. Mellon*

In *Mellon*, Florida sought to invoke the Supreme Court's original jurisdiction in a suit against officers of the United States—specifically, the Secretary of the Treasury. *Id.* at 15. Florida sought to challenge a federal inheritance tax. *Id.* Florida had no inheritance tax. *Id.* So, Florida alleged the federal law directly injured it "because the imposition of the federal tax, in the absence of a state tax which may be credited, w[ould] cause the withdrawal of property from the state" and diminish Florida's tax base. *Id.* at 16. The Supreme Court rejected Florida's argument, concluding this "anticipated result [was] purely speculative, and, at most, only remote and indirect." *Id.* at 18. The Court explained, even if "as alleged, the supposed withdrawal of property will diminish the revenues of the state, [it's not certain] that the deficiency cannot readily be made up by an increased rate of taxation." *Id.* The Court thus concluded Florida had failed to demonstrate a direct injury and declined to exercise its original jurisdiction. *Id.*

Plaintiffs argue that *Mellon* doesn't apply here. According to plaintiffs, they have alleged a more direct theory of harm because, in *Mellon*, Florida's standing theory "relied on an unproven assumption about the actions of independent third parties[.]" Doc. 50 at 12. Plaintiffs argue that they allege a more direct harm here because "it is the Final Rule alone that will reduce taxable income without any additional action [by] any third party." *Id.* At the hearing, plaintiffs added that *Mellon* only speaks to indirect effects of a federal policy, whereas plaintiffs have shown the Final Rule to have a direct effect.

Unfortunately for plaintiffs, in general, reduced state tax revenue doesn't qualify as an injury in fact sufficient to confer standing on a state. Our Circuit has ruled that the "'unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact

33

to support state standing.'" *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)).  Fortunately, our Circuit also has explained when reduced tax revenue *does* confer standing to sue on a state.  A "state must show a 'fairly direct link between the state's status as a recipient of revenues and the legislative or administrative action being challenged.'" *Id.* (quoting *Kleppe*, 533 F.2d at 672).

The requisite "fairly direct link" is missing here.  Plaintiffs allege the Final Rule will reduce their tax revenue because it shifts loan forgiveness forward in time.  That is, the Final Rule will forgive student loan debt in 2024 and 2025, when plaintiffs can't tax it.  So, plaintiffs allege, "but for the Final Rule, significant amounts of federal loan cancellation would occur *after* December 31, 2025" and this "would result in taxable income being recognized from the loan cancelation and thus payment of income taxes to" the states.  Doc. 57 at 18 (1st Am. Compl. ¶ 95).  Put another way, absent the final rule, student loan debt would be forgiven after December 31, 2025, permitting the states to tax the forgiven loans as income.  This kind of harm is too distant from the SAVE Plan to justify standing for the states here.  The federal policy creates incentives, borrowers react to those incentives and consolidate their loans, and borrowers would've consolidated their loans later, when plaintiffs could tax it, but the American Rescue Plan prevents this.  Defendants correctly call the states' decreased tax revenue an "incidental" harm.  The SAVE Plan doesn't target plaintiffs or their tax policies. *See Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022) (explaining that federal policy did "not directly injure the States. It does not regulate the States by telling them what they can or cannot do in their jurisdiction.").  This distant, incidental harm doesn't persuade the court to deviate from our Circuit's general rule that reduced state tax revenue doesn't qualify as an injury in fact.

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 35 of 46
Case: 4:24-cv-00520-JAR    Doc. #: 32-1    Filed: 06/10/24    Page: 37 of 48 PageID
#: 988

And, even if this harm did qualify as an injury, plaintiffs' tax injury argument has a traceability problem.  The SAVE Plan didn't cause plaintiffs' injuries—plaintiffs' own tax policy caused them.

## 2.    Self-Inflicted

Defendants argue that plaintiffs' alleged harm is self-inflicted because it arises from plaintiffs' "own choice to tie their tax laws to the Internal Revenue Code."  Doc. 46 at 23.  To support this theory, defendants cite *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976).

In *Pennsylvania v. New Jersey*, Pennsylvania sought to challenge a New Jersey tax that taxed the New Jersey-derived income earned by nonresidents.  *Id.* at 662–63.  Pennsylvania reimbursed its residents for taxes levied by other states.  *Id.* at 663.  Pennsylvania asserted the law injured Pennsylvania because it "diverted" taxes from Pennsylvania's treasury.  *Id.*  The Supreme Court declined to exercise its original jurisdiction over this state v. state dispute, concluding Pennsylvania had failed to demonstrate "that the injury for which it s[ought] redress was directly caused by the action of another State."  *Id.*

The Court explained that "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective legislatures."  *Id.* at 664.  To put a finer point on it, the Court wrote, "nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey."  *Id.*  "No state can be heard to complain about damage inflicted by its own hand."  *Id.*  Defendants urge this court to apply this case's reasoning here because these nine states, like Pennsylvania, have made their own decisions about their tax codes.  So any taxation issues are ones caused by the states and the states alone.

Plaintiffs respond that *Pennsylvania* is inapposite; it involved two states suing each other and invoking the Supreme Court's original jurisdiction.  Plaintiffs argue that "Supreme Court original jurisdiction is reserved for 'a dispute between States of such seriousness that it would

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 36 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 38 of 48 PageID
#: 989

amount to *casus belli* if the States were fully sovereign.'"  Doc. 50 at 11 (quoting *Texas v. New Mexico*, 462 U.S. 554, 570 n.18 (1983)).  In other words, according to plaintiffs, the bar for Article III standing is much lower than the bar for invoking the Supreme Court's original jurisdiction.  Plaintiffs are wrong.

To be sure, *Pennsylvania* is a case in an unusual procedural posture.  Nonetheless, *Pennsylvania* addressed financial injury to a plaintiff state.  The Court held, quite simply, that the defendant state hadn't inflicted any injury upon the plaintiff state because plaintiff's injury was self-inflicted.  *Pennsylvania*, 426 U.S. at 664.  The injury to a state, of course, is an explicit component of the standing inquiry.

Plaintiffs also argue that, though defendants assert they have a choice, they really have no choice at all.  Plaintiffs point out that "[g]iven economic and administrative realities," 36 states tie their definition of taxable income to a federal definition.  Doc. 50 at 10.  Plaintiffs frame their dilemma this way:  under defendants' approach, plaintiffs must change their state tax laws to recapture the lost revenue, so the Final Rule will "depriv[e] the States of their sovereign choice to set their own tax policy."  *Id.*  And "the States will suffer financial injury under the Rule no matter what putative 'choice' they make."  *Id.*  The court finds this argument equally unpersuasive.

This argument stands federalism on its head.  Nothing requires plaintiffs to use the federal definitions of taxable income.  The SAVE Plan doesn't coerce or cajole plaintiffs into changing their tax code.  Plaintiffs have made their choice to tie their definition of income to the federal definition and, if they don't like that definition, they're fully free to change it.  Perhaps a change would produce some administrative costs, but those costs would trace to the state legislatures' decisions, not the SAVE Plan.  The Final Rule doesn't pose any threat to a state's

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 37 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page 39 of 48 PageID
#: 990

sovereign power to decide its own tax law. *See Garrison v. U.S. Dep't of Educ.*, 636 F. Supp. 3d

935, 942 (S.D. Ind. 2022) (dismissing claim for lack of standing where individual plaintiffs

challenged HEROES Act loan forgiveness, arguing loan forgiveness would increase his state tax

bill, because the "Department of Education does not give silent approval to Indiana's tax code;

those decisions are entirely within the discretion of the Indiana legislature" and concluding

plaintiffs' injuries were traceable only to state tax law decisions—not federal student loan

programs).

The court thus rejects plaintiffs' standing theory based on reduced income tax revenue.

Next, the court takes up plaintiffs' final standing theory.

### C.    Recruiting and Retention Competitive Harm

Plaintiffs proffer a second theory of harm:  a competitive disadvantage in recruiting and

retaining talent. *See* Doc. 57 at 20 (1st Am. Compl. ¶ 103).  This theory requires an

understanding of a different kind of student loan debt forgiveness:  The Public Service Loan

Forgiveness (PSLF) program.  Under the PSLF, borrowers are eligible for forgiveness of their

direct loans once they've made 120 qualifying monthly payments under a qualifying plan

while—and this is the critical part—working full time for an eligible employer in public service.

The incentive behind this program is evident:  work in public service for ten years and have your

remaining student loan debt forgiven.

Returning to the Final Rule, plaintiffs allege that they rely on the PSLF program "to

attract and maintain talent" because state "agencies typically cannot pay as much to recruit and

retain talent as private sector employees." *Id.*  Plaintiffs allege three states rely on the PSLF

program to attract employees:  the Kansas Office of Attorney General and other Kansas agencies

who use the PSLF to attract legal talent; South Carolina relies on the PSLF program to recruit

and retain teachers; and Alaska's Attorney General's office relies on the PSLF program to recruit

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 38 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 40 of 48 PageID
#: 991

and retain employees.  *Id.* at 20–21 (1st Am. Compl. ¶¶ 104–07).  According to plaintiffs, "the

more debt that can be forgiven under the PSLF Program, the more powerful of an inducement it

is."  *Id.* at 21 (1st Am. Compl. ¶ 108).  But, because the Final Rule will reduce "the amount of

student debt held by current and potential employees . . . , the relative attractiveness of public

employment for the Plaintiff States decreases."  *Id.*

     Plaintiffs' recruitment-based standing theory relies, in their words, on "basic economic

logic."  Doc. 50 at 13.  Plaintiffs argue that as "a matter of elementary economics, public service

employment will no longer be as attractive an option to those with a lower amount of debt

because of the direct effects of the Final Rule."  Doc. 50 at 13–14.  Plaintiffs proffer the

following example:

> [Imagine] a current employee who had an original loan balance of $12,000 and has
> been in public service for 8 years.  Without the Final Rule, he would have a strong
> incentive to stay in public service for 2 more years.  However, because of the Final
> Rule, he would get his debt canceled in the same amount of time regardless of where
> he's employed.

*Id.* at 14.  In sum, plaintiffs argue that the Final Rule reduces the attractiveness of the PSLF

program, and plaintiffs expect their current and prospective employees to respond to these

incentives, making it harder for plaintiffs to recruit and retain employees.  So, plaintiffs reason,

the Final Rule will injure plaintiffs.

     Not so, defendants contend.  Defendants argue that plaintiffs' theory has a traceability

problem.  Defendants point out that this theory of injury is an indirect one—it relies on the

actions of a third party.  This means it's harder for plaintiffs to show causation by such an

indirect injury.  "That an injury is indirect does not necessarily defeat standing, 'but it may make

it substantially more difficult to establish that, in fact, the asserted injury was the consequence of

the defendants' actions.'"  *Habecker*, 518 F.3d at 1225 (brackets and ellipsis omitted) (quoting

*Warth v. Seldin*, 422 U.S. 490, 504–05 (1975)).  Where "'the independent action of some third

party not before the court'—rather than that of the defendant—was the direct cause of the

plaintiff's harm, causation may be lacking." *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 40–41 (1976)).

Defendants are right. Recently, the Sixth Circuit explicitly rejected this very theory.

### 1.    *Mackinac Center for Public Policy v. Cardona*

In *Mackinac Center for Public Policy v. Cardona*, the Sixth Circuit addressed a challenge

to action taken by the Department of Education affecting student loans. 102 F.4th 343, 2024 WL

2237667 (6th Cir. May 17, 2024). In *Mackinac*, the Department of Education sought to address

problems with administration of the PSLF and income driven repayment (IDR) programs. *Id.* at

*2. Loan administrators allegedly steered "borrowers into long-term periods of forbearance in

violation of Department of Education rules[.]" *Id.* Under the PSLF and IDR programs at issue,

forbearance periods don't count toward the 120 month payments. *Id.* But, given the problems

administering the programs, the Department of Education decided to count certain forbearance

periods as payments. *Id.* As a result, about "40,000 borrowers would be eligible for immediate

discharge of debt under the PSLF program, and several thousand would be eligible for

forgiveness under IDR plans." *Id.*

Plaintiffs sued to enjoin the policies counting forbearance periods toward the payment

requirement. Those plaintiffs were "nonprofit, tax-exempt organizations that [were] qualified

public service employers under the PSLF program." *Id.* at *3. Plaintiffs alleged "that the action

would keep them from realizing the full statutory benefit to which they are entitled under PSLF

and make it more difficult for them to recruit and retain employees." *Id.* (internal quotation

marks omitted). Plaintiffs invoked competitor standing, which "recognizes that plaintiffs suffer

an economic injury when agencies lift regulatory restrictions on their competitors or otherwise

allow increased competition against them." *Id.* at *4 (citation and internal quotation marks

Case 6:24-cv-01057-DDC-ADM  Document 68  Filed 06/07/24  Page 40 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 42 of 48 PageID
#: 993

omitted).  A party invoking competitor standing must show an imminent injury from increased competition.  *Id.*  Plaintiffs argued the Department's forbearance adjustment increased their competition for employees because it reduced plaintiffs' competitive benefit—*i.e.*, reduced the financial incentive for student loan borrowers to seek and remain in public service jobs.  *Id.* at *5.  The district court, sua sponte, dismissed plaintiffs' complaint for lack of standing.  *Id.*  The Sixth Circuit affirmed.  *Id.*

The Sixth Circuit concluded plaintiffs had "failed to allege specific, concrete facts to show that the adjustment has caused or will cause them competitive injury."  *Id.* (citation and internal quotation marks omitted).  The Sixth Circuit faulted plaintiffs for their complaint's broad, conclusory allegations because they had "not alleged any facts showing how the adjustment affects their ability to recruit and retain college-educated employees."  *Id.* at *6 (internal quotation marks omitted).  Plaintiffs had "not identified any current employee that ha[d] received credit under the adjustment, nor d[id] they claim that they expect[ed] to imminently hire any employee who ha[d] received such credit."  *Id.*  Nor did plaintiffs allege "that any employees have stopped working for them (or stated an intention to do so) based on the adjustment."  *Id.*

The Sixth Circuit even assumed the Department's adjustment would affect plaintiffs' ability to fill vacancies.  Even with that benefit, "several factors beyond the adjustment could have a similar impact."  *Id.* at *8.  An "employee may choose to work for a different public service employer to satisfy part of their 120-month obligation of any number of reasons unrelated to the adjustment, such as pay, location, work-life balance, or any combination of factors."  *Id.*  The *Mackinac* plaintiffs thus failed to establish a competitive injury because they had failed to allege "how many of Plaintiffs' employees will be impacted by the adjustment and how many individuals may make employment decisions based on the adjustment."  *Id.*  The

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 41 of 46
Case: 4:24-cv-00520-JAR   Doc. #: 32-1   Filed: 06/10/24   Page: 43 of 48 PageID
#: 994

Sixth Circuit summarized plaintiffs' problem this way:  "At bottom, how the adjustment impacts

Plaintiffs is up to individuals who are not parties to this lawsuit."

So too here.  Plaintiffs rely, in their own words, on "elementary economics."  Doc. 50 at

13.  They theorize that their current and future employees will respond to the incentives created

by the Final Rule and reject public employment.  This will cause plaintiffs a "competitive harm."

*Id.*  And they have provided declarations that the states use public loan forgiveness as a

recruitment tool.  But these are the very kind of broad, conclusory allegations that the Sixth

Circuit flunked in *Mackinac*.  As there, plaintiffs here "have not identified any current employee

that has received" relief under the SAVE Plan.  *Mackinac*, 2024 WL 2237667, at *6.  Nor have

they alleged "that they expect to imminently hire any employee who" is SAVE-Plan-eligible.  *Id.*

And "they have not alleged that any employees have stopped working for them (or stated an

intent to do so) based on" the SAVE Plan.  *Id.*  So, like *Mackinac*, plaintiffs' hypotheticals

insufficiently plead an imminent injury in fact.  *Id.*; *see also id.* at *8 ("Plaintiffs' allegations

regarding supply and demand and the impact of financial incentive on third-party student-loan

debtors are wholly speculative.").

Separately, plaintiffs have a third party problem.  Recall that "where a causal relation

between injury and challenged action depends upon the decision of an independent third

party . . . , standing is not precluded, but it is ordinarily substantially more difficult to establish."

*California v. Texas*, 593 U.S. 659, 675 (2021) (citation and internal quotation marks omitted).

To meet this "more difficult" standard, "the plaintiff must show at least that third parties will

likely react in predictable ways."  *Id.* (citation and internal quotation marks omitted).  It's the

"likely" part that causes plaintiffs' problems here.

Plaintiffs' standing allegations provide no basis for the court to find that job seekers and employees likely will avoid public service employment because of the SAVE Plan.  As defendants correctly point out, "career-related decisions are complicated, and PSLF is not the sole incentive in this economic picture."  Doc. 65 at 11.  The Sixth Circuit mentioned a few of these other incentives:  "pay, location, work-life balance, or any combination of factors."  *Mackinac*, 2024 WL 2237667, at *8.  "At bottom, how the [SAVE Plan] impacts Plaintiffs is up to individuals who are not parties to this lawsuit."  *Id.*  Given all the factors that a person considers when making an employment decision, plaintiffs have failed to allege enough facts for the court to conclude that potential and current employments "will likely react in predictable ways."  *Dep't of Comm.*, 139 S. Ct. at 2566.

The court must abide by the Supreme Court's "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."  *Clapper*, 568 U.S. at 414.  Plaintiffs have failed to shoulder their burden to allege a competitive harm.  No court ever has embraced this competitive harm theory to hiring/retention theory.  Our court declines to become the first.

In a final bid to avoid this result, plaintiffs seek shelter from *Massachusetts v. EPA*, arguing they are entitled to "special solicitude" in the standing analysis.

### 2.  *Massachusetts v. EPA*

Plaintiffs rely on the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497, to support their competitive harm theory of standing.  In *Massachusetts v. EPA*, a group of states sued the EPA for failing to regulate certain greenhouse gases under the Clean Air Act.  *Id.* at 505.  The Court held Massachusetts had standing based on a risk that global warming would raise sea levels and thereby harm Massachusetts' coastal lands.  *Id.* at 526.  The Court explained, "according to petitioners' uncontested affidavits . . . the rise in sea levels associated with global

warming has already harmed and will continue to harm Massachusetts.  The risk of catastrophic harm, though remote, is nevertheless real." *Id.*

According to plaintiffs, *Massachusetts v. EPA* "relaxed" the standing requirements for states suing the federal government.  Doc. 50 at 15.  Relevant here, the *Massachusetts v. EPA* Court noted "that States are not normal litigants for the purposes of invoking federal jurisdiction."  549 U.S. at 518.  The Court emphasized "Massachusetts' well-founded desire to preserve its sovereign territory[.]"  *Id.* at 519.  And the Court stressed that the states were exercising a procedural right.  *Id.* at 520 (citing 42 U.S.C. § 7607(b)(1)).  "Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests," the Court held Massachusetts was "entitled to special solicitude in our standing analysis."  *Id.*  Based on *Massachusetts v. EPA*, plaintiffs argue for a "double relaxation of Article III standing requirements"—one for special solicitude and one for procedural rights.  Doc. 50 at 15.

*Massachusetts v. EPA* doesn't provide plaintiffs the safe harbor they find in the decision. Our Circuit has lamented "the lack of guidance on how lower courts are supposed to apply the special solicitude doctrine to standing questions."  *Wyoming*, 674 F.3d at 1238.  Despite this absence of guidance, the Tenth Circuit has held, "'special solicitude does *not* eliminate the state petitioner's obligation to establish a concrete injury, as Justice Stevens' [*Massachusetts*] opinion amply indicates.'"  *Id.* (emphasis in original) (quoting *Del. Dep't of Nat. Res. & Envt'l Control v. F.E.R.C.*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009)).  As our Circuit has explained, in *Massachusetts v. EPA*, the state of "Massachusetts proved that it had an 'actual' and 'imminent' injury."  But plaintiffs lack such evidence here.  Their competitive harm theory fails to plead an injury in fact, as shown by *Mackinac*.  Their theory of future harm simply is too speculative to qualify as an imminent injury.

The court also doubts that *Massachusetts v. EPA* even applies here.  At the hearing, plaintiffs argued that they are asserting quasi-sovereign interests, which brings them under the *Massachusetts v. EPA* umbrella.  "A quasi-sovereign interest generally concerns either the physical and economic health of a State's residents or the State's 'interest in not being discriminatorily denied its rightful status within the federal system.'"  *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1311 (D.N.M. 2018) (*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)).  There's no "exhaustive formal definition nor a definitive list of qualifying interests[.]"  *Snapp*, 458 U.S. at 607.  "Examples of quasi-sovereign interests include abating a public nuisance, preventing environmental pollution, or avoiding economic damage of such severity and pervasiveness that it causes injury not only to individual citizens, but to the welfare, prosperity, and economic standing of the State as a whole."  *Navajo Nation*, 344 F. Supp. 3d at 1311 (citing *Snapp*, 458 U.S. at 603–06).

Plaintiffs' ability to hire and retain an undefined number of employees doesn't qualify as the kind of quasi-sovereign interest that this caselaw imagines.  Plaintiffs haven't directed the court to any authority holding that a state's ability to hire or retain employees in public service jobs qualifies as a quasi-sovereign interest.  The court concludes plaintiffs aren't entitled to special solicitude.  *See also Arizona v. Biden*, 40 F.4th at 386 (declining to apply *Massachusetts v. EPA* where states did "not protest regulation of them as States of preemption of local lawmaking authority[,] . . . [nor] any threatened incursions on their property or territory[,]" and case did "not involve the classic sovereign case, public nuisances in which a State invokes a desire to safeguard its domain and its health, comfort and welfare" (citation and internal quotation marks omitted)).

### 3.     Procedural Rights

Plaintiffs also ask for a relaxed standing standard again because, they argue, they're asserting procedural rights. Doc. 50 at 15. They take this standard from *Lujan*, where Justice Scalia called procedural rights "special." 504 U.S. at 573 n.7. Justice Scalia explained, "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* He gave the following example:

> [O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.* So, plaintiffs argue, they "need not demonstrate that, if the Department [of Education] conducted a defensible cost estimate or provided a sufficient notice period, the result would be any different." Doc. 50 at 15.

But this argument can't solve plaintiffs' problem with their standing theory. Plaintiffs' problem is that their competitive harm theory is speculative and not traceable to the SAVE Plan because it relies on complicated employment decisions allegedly faced by an unknown number of third parties. So, even if the court relaxes standing requirements for plaintiffs because they assert procedural rights, they still haven't met their standing obligation. The court rejects this final standing theory.

## IV.     Conclusion

In sum, the court grants defendants' Motion to Dismiss (Doc. 45) in part and denies it in part. Plaintiffs South Carolina, Texas, and Alaska have established, for now, standing based on harm to their public instrumentalities. The court denies defendants' dismissal motion as it applies to the claims asserted by those three plaintiffs. In contrast, plaintiffs Kansas, Alabama,

Case 6:24-cv-01057-DDC-ADM   Document 68   Filed 06/07/24   Page 46 of 46
Case: 4:24-cv-00520-JAR    Doc. #:  32-1    Filed: 06/10/24    Page: 48 of 48 PageID
#: 999

Idaho, Iowa, Louisiana, Montana, Nebraska, and Utah haven't shouldered their burden to show that they have standing.  The court lacks subject matter jurisdiction over claims these eight plaintiffs wish to assert.  It dismisses them from this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 45) is granted in part and denied in part.  Exercising discretion conferred by our Circuit, the court, consistent with Fed. R. Civ. P. 1, grants defendants' Motion to Dismiss as it applies to Kansas, Alabama, Idaho, Iowa, Louisiana, Montana, Nebraska, and Utah.  The court dismisses without prejudice all claims made by these eight states and directs the Clerk to terminate them as parties to this action.

**IT IS SO ORDERED.**

**Dated this 7th day of June, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**