1      **UNITED STATES DISTRICT COURT**
       **EASTERN DISTRICT OF MISSOURI**
2

3  STATE OF MISSOURI et al.,      )
                                  )
4              Plaintiffs,        )
                                  )
5              vs.                )    Cause No. 4:24CV-520JAR
                                  )
6  JOSEPH R. BIDEN, JR., in his   )
   Official capacity as President)
7  Of the United States et al.,   )
                                  )
8              Defendants.        )
   _____

9              TRANSCRIPT OF PROCEEDINGS

10     **BEFORE THE HONORABLE JOHN A. ROSS**
       **UNITED STATES DISTRICT JUDGE**
11
               JUNE 3, 2024
12 _____

13                 <u>APPEARANCES</u>

14 <u>For Plaintiffs</u>:
   Mr. Josh Divine
15 Solicitor General
   Mr. Reed Dempsey
16 Missouri Attorney General's Office
   P.O. Box 899
17 Jefferson City, MO 65102

18 <u>For Defendants</u>:
   Mr. Stephen M. Pezzi
19 Mr. Simon G. Jerome
   United States Department of Justice
20 Civil Division, Federal Programs Branch
   1100 L. Street, NW
21 Washington, D.C. 20005

22
               <u>Stenographically Reported and Produced by</u>:
23             Lisa M. Paczkowski, CCR, CSR, RPR
                   Official Court Reporter
24             United States District Court
                   111 South 10th Street
25                 St. Louis, MO 63102

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 2 of 74 PageID #: 1181

State of Missouri, et al vs. Biden, et al - June 3, 2024                                                                    1

1        <u>JUNE 3, 2024</u>

2    (The proceedings commenced at 10:00 a.m.)

3            THE COURT:  Good morning.  We are here and on the

4    record in the case of the State of Missouri, et al., versus

5    Joseph R. Biden, Jr., et al.  It is cause number 4:24CV-520.

6            This case is brought by the State of Missouri and

7    six other states, including the States of Arkansas, Florida,

8    Georgia, North Dakota, Ohio, and Oklahoma.  The action was

9    brought on April 9th of this year 2024 against President

10   Joseph R. Biden, Jr., the Secretary of Education, Miguel

11   Cardona, and the United States Department of Education,

12   challenging the Department's Rule that is titled "Improving

13   Income Driven Repayment for the William D. Ford Federal

14   Direct Loan Program and the Federal Family Education Loan

15   Program."

16           The Final Rule was published in the Federal

17   Register on July 10, 2023, and that Final Rule makes several

18   amendments to the Department's policies regarding income

19   driven repayment plans for Federal student loan programs, by

20   among other things, creating The Savings on Valuable

21   Education Plan, which is referred to as the SAVE Plan, to

22   replace the revised Pay-As-You-Earn Plan, which was known as

23   the REPAYE Plan.

24           The record should reflect that the States -- the

25   State of Missouri appears by Josh Divine, and he is also lead

Case: 4:24-cv-00520-JAR   Doc. #:  55   Filed: 07/16/24   Page: 3 of 74 PageID #: 1182

State of Missouri, et al vs. Biden, et al - June 3, 2024

2

1    counsel for the other States, and also at counsel table is

2    Reed Dempsey.  I understand Mr. Dempsey is not going to be

3    speaking; is that correct, Mr. Divine?

4          MR. DIVINE:  That's correct, your Honor.

5          THE COURT:  Okay.  And the record should reflect

6    the Defendants appear by counsel, Stephen Pezzi and Simon

7    Jerome, and we also have -- and I entered an order with

8    regard to a conference line, a phone line, to allow counsel

9    who could not appear to listen in, and the public to listen

10   in, if they chose to do so.

11         We do have a Local Rule that relates to parties

12   listening in remotely, and so I'm going to ask the Clerk to

13   read our Local Rule with regard to that.

14         (At this time, the Deputy Clerk read the Local

15   Rule.)

16         THE COURT:  That Local Rule is in place simply so

17   those who are listening in remotely are treated as if they

18   were here in the courtroom.  So that's the reason for that

19   Local Rule.

20         Before the Court today is the Plaintiffs' motions

21   for stay, or in the alternative, a temporary restraining

22   order and preliminary injunction.  Defendants have filed an

23   opposition to that.  They have also filed a motion to

24   dismiss.  Those are the matters that we are going to take up

25   here today.

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 4 of 74 PageID #: 1183

State of Missouri, et al vs. Biden, et al - June 3, 2024                          3

1          In considering the oral argument today, the Court

2     had agreed to give each side up to an hour in total to argue

3     the issues.  What I determined was the most efficient and

4     beneficial method of dividing the time is I'm going to give

5     each side 15 minutes to take up the issues of standing and

6     venue.

7          As I understand, Mr. Jerome is going to be arguing

8     those issues on behalf of the Defendants; and again, Mr.

9     Divine is going to be arguing them on behalf of the

10    Plaintiffs.  At the conclusion of those arguments, I'll give

11    each side 45 minutes in total as it relates to the other

12    issues in this matter.

13         The Plaintiff has the burden of proof.  So I have

14    determined that splitting their time 40 minutes and 5 minutes

15    for any rebuttal, and Defendants will have 45 minutes.

16    Please don't feel like you have to use all of your time.  I

17    will be happy if you decide not to do that; but in any event,

18    that's how we are going to split the time.

19         So with that, Mr. Divine, I'm going to turn this

20    over to you to begin the arguments as it relates to standing

21    and venue.

22         I see that you do have a cane there, if you want to

23    pull up a chair.

24         MR. DIVINE:  I think standing will be fine, thank

25    you, your Honor.  I appreciate it though.

Case: 4:24-cv-00520-JAR   Doc. #:  55   Filed: 07/16/24   Page: 5 of 74 PageID #: 1184

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    4

1              May it please the Court, Joshua Divine, Solicitor

2      General of Missouri, appearing on behalf of the Plaintiff

3      States.  On standing, we have presented five different

4      theories in our briefs, but today, I want to focus on the

5      ones pertaining to MOHELA and the Bank of North Dakota.

6              On MOHELA, standing is really easy, because we are

7      asserting the same exact theory of standing that the Supreme

8      Court adopted last year in *Biden against Nebraska*.  Under

9      that case, all we had to show is that the Final Rule will

10     cancel MOHELA accounts, because cancelled accounts means loss

11     of administrative servicing fees with respect to those

12     accounts.

13             So far, 28,000 accounts have already been

14     cancelled, 53,000 more are scheduled for imminent

15     cancellation, and under the Final Rule, additional

16     cancellations are going to occur every single month.  My

17     friend on the other side says things are different now.  The

18     Final Rule might reduce delinquencies, and that might benefit

19     MOHELA'S other accounts.  The same kinds of arguments were

20     applicable last time with respect to their first attempt at

21     mass cancellation.

22             For example, if you decreased the amount of loans

23     by $10,000 across the board, as the Federal Government was

24     trying to do, that also would decrease delinquencies.  The

25     U.S. Solicitor General wisely conceded to the U.S. Supreme

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 6 of 74 PageID #: 1185

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    5

1    Court that MOHELA has standing to sue when its accounts are

2    cancelled.

3          The Solicitor General simply disputed that Missouri

4    could sue on behalf of MOHELA, but now that the Supreme Court

5    has ruled in our favor on that issue, and now that we are

6    back in Trial Court instead of the Supreme Courts, the

7    Defendants have reversed course.  But the Defendants were

8    right the first time.  The Supreme Court didn't do any kind

9    of offset and benefits analysis that they are arguing for

10   here, nor has any other courts.  In fact, against our army of

11   citations on page 17 of our brief, saying that courts don't

12   do this sort of thing, my friend on the other side has been

13   unable to identify even a single case of a court that has.

14         They considered how strange their argument would be

15   in any other context.  Think of a plaintiff who sues over an

16   unlawful increase of taxes of a thousand dollars.  Every

17   court in America would find that that Plaintiff has standing,

18   but my friend on the other side would say "Well, that injury

19   is speculative, after all, those taxes might go to better

20   roads, or better schools, or maybe Federal contracts that

21   benefit the plaintiff's employer."

22         And so just at the motion to dismiss stage, we are

23   going to have to bring in PhD economists who are going to

24   have to take the stand and testify that the costs outweigh

25   the benefits.  No court in America requires that sort of

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 7 of 74 PageID #: 1186

State of Missouri, et al vs. Biden, et al - June 3, 2024

6

1    analysis.

2         So next, they try to fit this into one narrow

3    exception recognized by the Fifth Circuit, which says that

4    "Benefits can be considered when they are the same type and

5    same transaction as the costs."  My friend's sole arguments

6    with respect to this case is to say that these must be of the

7    same transaction, because they come from the same Federal

8    regulation.

9         The *U.S. against Texas* case explicitly rejects

10   that.  That was a Fifth Circuit decision that was affirmed by

11   the Supreme Court.  Again, everybody recognizes that you can

12   challenge one part of the statute even if other parts of the

13   statute might benefit you.

14        Your Honor, we are worlds away from any kind of

15   same transaction exception here.  With respect to the actual

16   MOHELA accounts that are being cancelled, it is undisputed

17   that Missouri will not -- or MOHELA rather, will not receive

18   those administrative servicing fees.  With respect to those

19   accounts, there is no compensation at all, much less any kind

20   of offsetting compensation.  My friend on the other side

21   simply argues that well, maybe other accounts will be

22   benefited, or maybe other aspects of MOHELA's business will

23   benefit, but no court enters that kind of analysis.

24        But even if this Court does consider the offsetting

25   benefits arguments -- and we don't think it should -- here

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 8 of 74 PageID #: 1187

State of Missouri, et al vs. Biden, et al - June 3, 2024

7

1   the costs way exceed the benefits.  There is an old joke,

2   your Honor, that lawyers are bad at math.  That's why we went

3   to law school.  But here even under simple math, the costs

4   here are staggering.  Take the up to 2.77 million MOHELA

5   accounts that are going to be eligible for forgiveness up to

6   10 years early.  That's just a substantive of the portfolio.

7   If you multiply that by the $36 per account, multiply that by

8   the 10 years in which they will receive forgiveness, you get

9   $987 million dollars of loss to MOHELA.

10          My friend on the other side quibbles with those

11  numbers.  He says "Well, the new contract that's not yet in

12  place fully is going to pay less."  But even under the lowest

13  rate under that new contract, we are still talking about $530

14  million dollars.  I must stress that this is a conservative

15  estimate.  I have only estimated that people who are eligible

16  for forgiveness 10 years early, and not those who are

17  eligible for forgiveness one to nine years early.  It also

18  doesn't including new borrowers, and it doesn't include the

19  surcharges that are due sometimes on each account each month.

20          And against this, they really provide nothing.

21  They say, for example, that maybe the delinquency rates will

22  decrease.  I find it quite telling that they are unwilling to

23  put up actual numbers about what those delinquency rates are.

24  And perhaps that's because right now we have historically low

25  delinquency rates, hovering just above zero percent.  And now

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 9 of 74 PageID #: 1188

State of Missouri, et al vs. Biden, et al - June 3, 2024

8

1   maybe that's an outlier.  We had three years of deferments

2   for student loans, but even if you go back to 2019, before

3   the pandemic, the delinquency rates were about 10 percent.

4   So even assuming the Final Rule slashed entirely all

5   delinquency rates, and brought it down to zero, that is a

6   drop in the bucket compared to the 42 percent of loans that

7   are going to be forgiven early under this Rule.

8         Here, all we have to show is a single dollar of

9   harm, likelihood of a single dollar of harm, and you can be

10  SBA list case.  We have shown that a hundred million times

11  over.

12        Now, I do want to talk about this $1.5 million

13  dollar accounts that they discuss in their brief, and really

14  that's just a red herring.  The document that they attached

15  29-1 shows that all of those accounts are PSLF accounts.

16  Those are Public Service Loan Forgiveness accounts.  These

17  are accounts that aren't really affected by the Final Rule,

18  because they already get forgiveness at 10 years.  These are

19  also accounts that were already slated to be transferred by

20  the end of this June, and MOHELA essentially asks for them to

21  be transferred early to save some administrative costs.

22        So all of that is supposed to occur by the end of

23  June.  Well, what's going to happen in July?  Well, they are

24  going to cancel tens of thousands of more accounts.  They are

25  going do the same thing in August, end of September, and

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 10 of 74 PageID #: 1189

State of Missouri, et al vs. Biden, et al - June 3, 2024

9

1    every month from here on out.

2          The Bank of North Dakota, your Honor, is also

3    clearly injured.  The bank refinances Federal loans.  It

4    earns about a million dollars a year doing so.  And the

5    reason I say that to you is because the Federal Government

6    does not set individualized interest rates.  They set it

7    across the board.  And so the bank is able to come in, and

8    they are able to say "Well, you, I can see that you are low

9    credit risk.  So I am going to give you a more competitive

10   interest rate than the Federal Government is."  And the Bank

11   of North Dakota has done that about 16,000 times.

12          The harm here is that there is no reason for

13   anybody to refinance with the Bank of North Dakota anymore

14   after this Final Rule.  Why would you refinance with the Bank

15   of North Dakota, which requires actual repayments of your

16   loans.  And so the Federal Government, which is going to on

17   average require you to pay back only 61 cents on the dollar.

18   You don't have to be an economist to understand that free

19   money is appealing.

20          Now, my friend's arguments against this is

21   essentially to argue for Government exceptionalism.  They say

22   the competitor standing doctrine, which is well-established,

23   they say that that shouldn't apply when the Government is the

24   Defendant here.

25          Well, that doesn't make any sense, because the

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 11 of 74 PageID #: 1190

State of Missouri, et al vs. Biden, et al - June 3, 2024

10

1  Government -- well, I'm sorry, the competitor standing

2  doctrine, every case under that doctrine involves the

3  Government entering the market.  Sometimes they do so to

4  subsidize other private actors.  Sometimes they do so more

5  directly as a market participant themselves, which makes

6  sense, because the *Snapp* case -- the *Alfred L. Snapp* case

7  that we cite from the Supreme Court, expressly recognizes the

8  ability of the Government to enter the market as a market

9  participant on equal-standing with all other market

10  participants.

11        Now, the cite of the Sixth Circuit case that came

12  about just two weeks ago called *Mackinac Center*.  That case

13  has no applicability with respect to the Bank of North Dakota

14  for one clear reason, and that's this, and I want to quote,

15  that the Sixth Circuit faulted for the Plaintiffs for -- and

16  I quote "Plaintiffs have not established the markets in which

17  they or their competitors operate."

18        Here everybody knows what market we are talking

19  about.  We are talking about the market for student loans,

20  the market for refinancing loans, things of that nature.

21        Now, I do hope to save just a couple minutes of

22  time for rebuttal on standing, if the Court will allow us.

23  So I'll go ahead and get to venue real quickly.  Section

24  1391(e) says that "We, the State of Missouri, may sue where

25  ever we, the State of Missouri, reside."  Now, they say that

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 12 of 74 PageID #: 1191

State of Missouri, et al vs. Biden, et al - June 3, 2024

11

1   somehow Missouri does not reside everywhere in the State of

2   Missouri; but for 130 years, courts have unanimously rejected

3   that argument.  Their whole argument depends on their

4   assertion that this other section in the venue, or this other

5   provision in the venue section, which considers where a

6   business resides, they say that's essentially a catchall

7   section, and so it must include plaintiffs as well -- or it

8   must include states as well.

9           That provision does not even purport to be

10  exhaustive or purport to be a catchall.  It is the second

11  provision in a list of three, which is a very odd place to

12  find any catchall provision.  The venue statute simply

13  doesn't define where a state resides, and that's because when

14  Congress passed the venue statutes in the 1940's, there were

15  five decades of precedents of courts saying "A state resides

16  everywhere within the states borders."

17          And in any event, at page 15 of the reply brief, my

18  friend says what this Court should really do is assess the

19  relevant activities of Defendants in Missouri.  Well, those

20  activities are canceling tens of thousands of accounts from

21  MOHELA, and MOHELA is here in the St. Louis suburbs.  It is

22  in the Eastern District, and so venue was appropriate twice

23  over.  Your Honor, I would like to reserve the remaining --

24          THE COURT:  For whatever it is worth, for better or

25  for worse, I did not set aside time for you for rebuttal on

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 13 of 74 PageID #: 1192

State of Missouri, et al vs. Biden, et al - June 3, 2024

12

 1   the standing and venue issues.

 2           MR. DIVINE:  Okay.

 3           THE COURT:  So you have kind of anticipated some of

 4   the arguments that are going to be made by the Defendant.

 5           MR. DIVINE:  That's fair.  I'll make one more

 6   standing argument then.

 7           THE COURT:  Go ahead.

 8           MR. DIVINE:  An additional second reason why MOHELA

 9   has standing here is that recall that MOHELA doesn't just

10   process loans.  It also owns loans, about $874 million

11   dollars worth of these legacy loans that were issued up until

12   2010.  And it earns interest on those loans, $51 million

13   dollars last year.

14           The harm here is that the Final Rule expressly

15   urges and encourages people to refinance their MOHELA owned

16   loans into Federal Government owned loans, so that they can

17   take advantage of this Final Rule.  When it happens, MOHELA

18   loses a stream of interest income, which is an Article III

19   injury.

20           Now, my friend on the other side says "Well, people

21   refinance for all kinds of reasons, not just the Final Rule."

22   And that's true, but we need only show a substantial risk

23   that even one person will consolidate because of this Rule.

24   That is what the *Department of Commerce* case in effect holds,

25   and that's easy to show here.  Again, this Rule promises that

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 14 of 74 PageID #: 1193

State of Missouri, et al vs. Biden, et al - June 3, 2024

13

1   the average borrower pay back only 61 cents on the dollar,

2   and in January -- January is when my friend on the other

3   side, when the Defendants first announced this policy.  They

4   first announced that they were going to start canceling loans

5   under this Rule.  MOHELA immediately received a spike

6   in consolidations -- between December, before the

7   announcement was made, to February, the number of

8   consolidations more than tripled.

9         We didn't see numbers like that -- we haven't seen

10  numbers like that until back in 2022, when Defendants

11  announced their first cancellation policy.  In fact, the

12  consolidations decreased in December 2022 immediately after

13  the Eighth Circuit enjoined the previous first attempt at

14  mass cancellation, and the Supreme Court declined to vacate

15  that injunction pending appeal.

16        The idea that none of these consolidations are

17  because of the Final Rule just doesn't hold any water at all.

18  Thank you, your Honor.

19        THE COURT:  Okay.  Thank you, Mr. Divine.

20  Mr. Jerome, you may proceed.

21        MR. JEROME:  Thank you, your Honor.  Good morning,

22  my name is Simon Jerome on behalf of the Department of

23  Justice.  I'm here representing the Federal Defendants

24  alongside with my cocounsel.

25        Your Honor, I'll dive right in with MOHELA.  The

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 15 of 74 PageID #: 1194

State of Missouri, et al vs. Biden, et al - June 3, 2024

14

1   elephant in the room, of course, is *Biden vs. Nebraska*.  I

2   would say for that case, it was not pressed, as Mr. Divine

3   conceded.  It was not pressed at before the Supreme Court the

4   issues related to offsetting benefits, or in his words,

5   offsetting benefits.  The primary focus of contention in that

6   case was whether MOHELA was an instrumentality of Missouri,

7   and thus, was a properly injured entity to furnish standing

8   on Missouri's behalf.

9           I would say to you, your Honor, Plaintiffs make

10  much of this doctrine of what they call offsetting benefits.

11  I will say it is not -- that doctrine doesn't appear in

12  Supreme Court case law.  It doesn't appear in Eighth Circuit

13  case law.  And the notion I think is a common sense one.  Our

14  argument is that MOHELA cannot plausibly claim to be injured

15  by circumstances that in fact financially benefit it.

16          So leading right off then, I'll note that the same

17  figure that Mr. Divine made reference to, which is MOHELA's

18  request to have 1.5 million accounts removed from its

19  portfolio.  1.5 million is quite a bit large, about 18 times

20  larger, than the 81 thousand accounts slated for forgiveness

21  under the SAVE Plan in the immediate future.

22          Mr. Divine mentioned that, in his view, all of the

23  accounts are the PSLF accounts.  While certainly a large

24  number of them is, in fact, you will see -- I believe it is

25  line 26 of that chart -- that those accounts are referenced

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 16 of 74 PageID #: 1195

State of Missouri, et al vs. Biden, et al - June 3, 2024

15

1    by PSLF and non-PSLF.  Line 26, I believe it is, mentions

2    that 300 thousand accounts that are not PSLF are slated for

3    removal.  I would also add that I don't totally understand

4    the -- I don't concede that the idea that some accounts are

5    PSLF and some are not.  It is relevant to this inquiry.

6            In fact, your Honor, if what MOHELA is saying to

7    the Department of Education, and the letters we have attached

8    with our briefs, make this point, if they are saying they

9    can't service this number of accounts for whatever reason,

10   they can't plausibly claim to be injured by the removal of

11   those accounts.  And so if there were some way of saying that

12   what was going to be removed was more than 1.5 million, we

13   might be in the world where we are talking about all of the

14   other offsetting benefits, but I would just say, you know, at

15   the get-go, I think it is material that MOHELA has asked to

16   have those accounts removed.

17           THE COURT:  Counsel, let me ask you, even though

18   those accounts may be asked to -- MOHELA may be asking to

19   remove those accounts, it doesn't mean they are necessarily

20   wanting to remove 28,000 more accounts that have been

21   cancelled under this Rule.

22           MR. JEROME:  Yes, your Honor, I take that point,

23   and I think the proposed contract modification that has been

24   signed after we had submitted it along side a rely brief,

25   demonstrates that the Department of Education and MOHELA are

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 17 of 74 PageID #: 1196

State of Missouri, et al vs. Biden, et al - June 3, 2024

16

1    engaged in ongoing conversations about the precise number.

2    The Department, to be precise, has committed to removing up

3    to 1.5 million accounts from MOHELA's portfolio.

4         In other words, you Honor, I would submit that

5    there is room to right-size the number removed.  If MOHELA

6    doesn't want to be injured, or one would think if removal of

7    accounts injured it, there is room within these negotiations

8    to arrive at the right number that doesn't exceed what MOHELA

9    is looking for, and I think certainly when we are talking

10   about 50,000 here, or 20,000 there, we are nowhere near 1.5

11   million, your Honor.

12        I would add quickly that as the Department itself

13   observed in the Final Rule, there are predicted benefits to

14   servicers beyond just -- beyond just to borrowers under the

15   proposed Rule.  There will be reduced servicing costs.  The

16   Department anticipates that delinquencies and defaults will

17   drop.  There are all sorts of benefits for servicers, as we

18   have outlined in our brief, that will presumably come to

19   pass, and that at least should be accounted for in the

20   standing inquiry.

21        I would add, your Honor, we drew attention in the

22   briefing to the $7.2 million dollar penalty the Department

23   recently assessed against MOHELA.  In the briefing on the

24   other side, we read quite a bit about why that penalty was

25   assessed.  Ultimately, your Honor, that's immaterial.  The

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 18 of 74 PageID #: 1197

State of Missouri, et al vs. Biden, et al - June 3, 2024

17

1   point is that MOHELA took actions that led to a 7.2 million

2   dollar error penalty being assessed against it.  So the idea

3   is with fewer accounts, as they have requested, that will

4   give them the opportunity to be back on their feet.

5          THE COURT:  Aren't all of these potential benefits

6   that you are talking about, aren't they all speculative?

7          MR. JEROME:  Your Honor, I would say that we can't

8   predict with certainly that they will come to pass.  The

9   Department, on the basis of a lot of data, anticipates that

10  they will, and I think that that estimation deserves some

11  credence, although I'll add I think my impression -- our

12  impression -- reading the briefs from the other side is that

13  Plaintiffs have lost sight of whose burden it is to establish

14  standing.  The point simply is that given all of the

15  uncertainty, there is significant reason to doubt that

16  financial harm will come to pass to MOHELA.

17          Your Honor, I think, you know, I'll just say

18  quickly, because I know time is limited, that the figures

19  that the Plaintiffs rely on, $987 million dollars, is very

20  impressive, but there are a number of problems with that

21  number, with that figure, with the math underlying it.  Not

22  least is that it relies on a contract pricing that's going to

23  expire very soon.  We think that adds further reason to doubt

24  the math.

25          Turning to the purported consolidations of FFEL

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 19 of 74 PageID #: 1198

State of Missouri, et al vs. Biden, et al - June 3, 2024

18

1   loans, to distinguish -- just to make sure we are on the same

2   page -- there is the category of loans that MOHELA earns

3   money for servicing directly, and then there is those that it

4   earns interest on, because it owns the assets outright.

5   Looking at the same chart that the Plaintiff submitted,

6   MOHELA's numbers are all over the map.  They would trace the

7   certain increases in consolidation figures to the

8   announcement of -- announcements made by the Department of

9   Education.

10          I'd submit, your Honor, that shows no more than

11  correlation at best.  You know, the reality remains borrowers

12  make difficult decisions about their finances -- sometimes to

13  an outsider irrational decisions about their finances.  I'm

14  not saying that's the norm, but the point is a lot of factors

15  go into making a decision about whether to consolidate or

16  whether or not to.  And so to suppose that those

17  consolidations are related to this Rule, they need to be

18  caused by the operation of the Rule.  I think the Plaintiffs'

19  evidence falls well-short of showing that sort of direct

20  connection.

21          In addition to just the idea of consolidations

22  happening, the Plaintiffs need to show that consolidations

23  will harm MOHELA, which they have not done.  Borrowers under

24  FFELA loans default like any other borrower.  This purported

25  guaranteed interest income is not guaranteed after all.

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 20 of 74 PageID #:
1199
State of Missouri, et al vs. Biden, et al - June 3, 2024                                    19

1    There are a lot of reasons to suspect that holding is

2    uncertain -- this financial instrument with uncertain future

3    returns will, in fact, not be as beneficial as receiving the

4    face value and accrued interest of the loan and reinvesting

5    that funding elsewhere.

6              So again, I think there is -- we are harking into a

7    pretty common sense principle, your Honor, which is that

8    MOHELA, if it stands to benefit, cannot complain to be

9    injured, and there are so many unknowns about what's going to

10   happen that there is good reason to think it might end up

11   slightly ahead.

12             Turning to the Bank of North Dakota, your Honor,

13   make its symphony of themes, which is the theme of

14   speculation.  I'll add, as we noted in our opening brief,

15   that even the Bank of North Dakota on its website appears not

16   to consider itself a competitor with the Federal Government.

17   It seems to consider itself a subsidiary actor.  But I'd say

18   beyond that, you know, there is a quote that I'll take from

19   Mr. Divine that I think is indicative of the logic that he is

20   relying on, which is that free money is appealing.

21             Sure.  Perhaps.  But I would add, you know, I'm

22   disputing the premise that free money is necessarily a

23   guarantee.  The idea that it is -- that it is the sole

24   dispositive criteria in an individual deciding whether to

25   refinance, or whether to take out loans from a different

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 21 of 74 PageID #: 1200

State of Missouri, et al vs. Biden, et al - June 3, 2024

20

1    entity, is just not supportable.

2          The *Mackinac Center* case I would submit it is

3    squarely on point.  Whatever the Court said about the

4    plaintiffs in that case failing to identify an analogues

5    marketplace, the Court also noted at the end of the opinion

6    that the plaintiffs had not come forward with concrete

7    evidence about why an individual -- any individual who said

8    that they were going to take the action complained of.

9          I think the same can be said here.  For all of Bank

10   of North Dakota's borrowers, I haven't seen a single

11   affidavit, haven't seen a single statement from a borrower

12   saying "You know what, I'm going to consolidate because this

13   plan is coming into effect."  And on that point, your Honor,

14   it bears mentioning how long the public has been on notice of

15   this Rule.  Presumably, given that stretch of time in North

16   Dakota, the Plaintiffs could have found at least one

17   plaintiff who said "I'm going to consolidate."  They haven't

18   done so.

19         That underscores, I think, that individuals may

20   consolidate and might not.  They might refinance.  They might

21   take out loans from the Bank of North Dakota.  They might

22   not.  Just as in *Mackinac Center* though, that evidence is not

23   in the record.

24         Finally, your Honor, with reference to the motion

25   of venue, I think the statute speaks for itself.  There is a

Case: 4:24-cv-00520-JAR  Doc. #: 55  Filed: 07/16/24  Page: 22 of 74 PageID #: 1201

State of Missouri, et al vs. Biden, et al - June 3, 2024

21

1    specific provision, Section 1391(e), that specifies where a

2    suit may be brought when an officer or an employee of the

3    Federal Government is the defendant.  One of those options is

4    where the plaintiff resides.  That's the venue provision that

5    the Plaintiffs themselves have invoked.  And in turn, the

6    residency section of the statute, my friend on the other side

7    says that it doesn't define where a state lives, and that it

8    gives a catchall.  It doesn't do such thing.  It gives three

9    options, your Honor.

10          We generally presume when Congress has set out a

11   scheme for how things will work, even if the wording seems

12   slightly odd, you pick the best option, your Honor.  You pick

13   the one that makes the most sense.  And what my friend left

14   out, is that the first option is for a natural person, and

15   the third option is for a nonresident foreign plaintiff.

16   Missouri is not contestedly neither of those things.  The

17   only thing it can be -- it is not a business.  My friend said

18   the second provision refers to a business.  It says "An

19   entity with the capacity to sue and be sued."

20          Respectfully, your Honor, that's the best fit out

21   of those three.  So the statute pretty clearly requires that

22   the suit be dismissed, and it may be refiled in the Western

23   District of Missouri or one of the other venue locations

24   available to the Plaintiffs.

25          THE COURT:  Just so that we are clear, you agree

1    that if the Court were to find that MOHELA suffers injury,

2    and therefore, the State of Missouri has standing, that the

3    case goes forward.  The other states can go forward with the

4    lawsuit; is that correct -- along with Missouri?

5             MR. JEROME:  Your Honor, I would take issue with

6    two aspects of that.  To the extent MOHELA is relevant in the

7    venue inquiry, I think it is not actually.  The statute makes

8    no provision --

9             THE COURT:  I'm not talking about the venue issue.

10   I'm just talking about standing.

11            MR. JEROME:  I'm sorry, your Honor.  No, your

12   Honor, it would be our position that if one plaintiff --

13   every plaintiff to survive a motion to dismiss needs to show

14   standing.  The Court, in *Transunion*, said "standing is not

15   dispensed in gross."

16            I will tell you, your Honor, there are cases, of

17   course, from Appellate Courts saying "one plaintiff is

18   enough."  Our interpretation or reading of those cases, and

19   we think the best reading, in light of the standing, is not

20   "dispensed in gross" idea, is that for an Appellate Court,

21   with its subject matter jurisdiction and appellate

22   jurisdiction, to reach the merits of a controversy, at least

23   one Plaintiff has to have standing.

24            But at this juncture, your Honor, we'd submit all

25   of the Plaintiffs need to have proof of standing or else be

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 24 of 74 PageID #: 1203

State of Missouri, et al vs. Biden, et al - June 3, 2024

23

1    dismissed.  Thank you, your Honor.

2         THE COURT:  Okay.  Thank you very much.  With that,

3    Mr. Divine, you can approach the podium, and we will pivot to

4    the other issues in this matter.

5         MR. DIVINE:  Your Honor, during my presentation, I

6    would like to give the Court some statutory excerpts that I

7    intend to reference during that time.  I also have a copy for

8    opposing counsel, if that's okay with the Court.

9         THE COURT:  That's fine.  If you are going to read

10   from those statutory excerpts, you need to read slowly so

11   that the court reporter can get them down.

12        MR. DIVINE:  Absolutely.

13        THE COURT:  Thank you.

14        MR. DIVINE:  Permission to approach the bench.

15        THE COURT:  You may.

16        MR. DIVINE:  May it please the Court, it is often

17   said that Congress does not put elephants into mouse holes,

18   but forget the one elephant, into this mouse hole, the

19   Secretary tries to fit a whole circus.  Congress provided

20   that the length of the repayment plans relevant here is not

21   to exceed 25 years.  And from that rather unassuming text

22   about length, the Secretary asserts unlimited discretion to

23   cancel every penny of every student loan.

24        But as the Supreme Court has long held,

25   extraordinary assertions of power like this one require

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 25 of 74 PageID #: 1204

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    24

1  extraordinarily clear language from Congress, and this "not

2  to exceed" language just doesn't cut it.

3          Your Honor, the major questions doctrine is the

4  most straightforward path to success for the Plaintiff

5  States.  Under that doctrine -- or that doctrine is triggered

6  when two elements are present:  The agency action has

7  substantial economic significance, and the agency action has

8  substantial political significance.  When those two elements

9  are triggered, the agency must identify exceedingly clear

10 language authorizing its actions.  Here there is no dispute

11 that these two elements are present.

12         The Supreme Court last year applied the major

13 questions doctrine, and found that the first attempt at mass

14 cancellation involved these two elements, and this Rule

15 involves the same exact topic; and in fact, it is a little

16 bit more expensive than the last mass cancellation attempt.

17         It is also clear that my friend on the other side

18 does not dispute the lack text that explicitly authorizes

19 forgiveness.  Instead, they tried to draw an implicit

20 inference of forgiveness authority from this "not to exceed"

21 language.

22         But the major questions doctrine requires that the

23 text be explicit.  You cannot rely on an implicit inference.

24 So right off the bat, they fail under the major questions

25 doctrine.  Their attempt to rely on implicit inferences is

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 26 of 74 PageID #:
1205
State of Missouri, et al vs. Biden, et al - June 3, 2024                                              25

1   necessarily fatal under that doctrine.

2           Your Honor, I think their response is telling.

3   They don't dispute any of the things I have just said.

4   Instead, what they try to say is that, in fact, the major

5   questions doctrine involves three elements needed to trigger,

6   not two.  They take their two elements that we have

7   described, and they say a third one is required, that the

8   Rule be unprecedented.

9           But the Supreme Court has rejected that.  I'll read

10  for you the Rule statement from the *Alabama Association of*

11  *Realtors* case.  There the Supreme Court said, and I quote "We

12  expect Congress to speak clearly when authorizing an agency

13  to exercise powers of vast economic and political

14  significance."  That's at page 764 of that opinion.  There is

15  no mention at all in that Rule statement about the necessity

16  about a rule or a regulation be unprecedented.  *Biden against*

17  *Nebraska* last year, page 2374 of the that opinion, same

18  thing.

19          But in any event, even if the Court finds that

20  three elements are required, the Final Rule is unprecedented.

21  The previous three rule makings, and there have only been

22  three under the ICR program, have all been much more modest

23  than this one.  The first one, back in the early 1990's,

24  authorized forgiveness of just parts of loans for that one

25  percent of borrowers.  And then the second and third simply

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 27 of 74 PageID #: 1206

State of Missouri, et al vs. Biden, et al - June 3, 2024

26

1   brought the ICR program into line with the IBR program.

2         There is a good reason that none of these were

3   challenged, your Honor.  They are all very very modest.  But

4   never before has a Secretary asserted an interpretation of

5   the statute that would permit him to cancel every penny of

6   every student loan.  Never before has a Secretary asserted

7   authority to cancel $500 billion dollars worth of loans.

8   Well, I take that back, I guess there has been one instance,

9   and the Supreme Court rejected it last year.  And never

10  before has a Secretary used the ICR Program to render the

11  later passed IBR program entirely superfluous.  This

12  regulation is unprecedented by any measure of definition.

13        Your Honor, even setting aside the major questions

14  doctrine, the Final Rule fails on the basic text, and I want

15  to give the Court four reasons for that.  Number one, the

16  statute simply authorizes no forgiveness at all, which puts

17  this statute into sharp contrast with the later-passed IBR

18  Program, the later-passed Public Service Loan Forgiveness

19  Program, and the earlier-passed Teacher Loan Forgiveness

20  Program.

21        Your Honor, I would like to defer the Court to my

22  excerpts that I have provided.  Tab one, this is the ICR

23  authority.  If the Court flips to page two, paragraph D, this

24  is the section directing the Secretary to create the ICR

25  Plan, the Income Contingent Repayment Plan.  And it says that

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 28 of 74 PageID #: 1207

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    27

1  borrowers shall repay over a time period, and I quote "not to

2  exceed 25 years."  So this text is the linchpin that my

3  friend on the other side relies on.  This is the peg that

4  they hang their hat on.

5          But plainly nothing about this unassuming text

6  authorizes forgiveness at all.  And I think we do have to

7  remember that the Standard Repayment Plan is 10 years.  And

8  so all of this is saying is, well, the Secretary can let you

9  stretch out your payment beyond 10 years, and the Secretary

10 can let you stretch it out up until 25 years.  But you do

11 need to repay, and we are not going to let the Secretary

12 stretch it out to 50 years or a 100 years.  There is nothing

13 in this about forgiveness at all.

14         THE COURT:  Let me just ask you, so what is your

15 view of the interpretation, what happens at 25 years?

16         MR. DIVINE:  So I think what the Secretary must do

17 is they must create ratios and formulas so that you do pay

18 within 25 years.

19         THE COURT:  So what happens when you get to 25

20 years?

21         MR. DIVINE:  So if at 25 years, you haven't paid,

22 and the Secretary has, in fact, created these ratios so that

23 you would pay within 25 years, then it is the same thing that

24 would happen if you didn't pay under the Standard Repayment

25 Plan.  You would go into default, and once you go into

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 29 of 74 PageID #: 1208

State of Missouri, et al vs. Biden, et al - June 3, 2024

28

1    default, you come out of the plan.  So if you are -- let's

2    just take the standard repayment plan.  You are nine and a

3    half years in, and you decided, you know, for whatever reason

4    maybe economic difficulty, maybe you just decided you are fed

5    up with the system, you decide to stop paying.  So you've got

6    six months left.

7            Well, now you are outside the 10 year period where

8    you have defaulted, so you are no longer in the Standard

9    Repayment Plan.  You are outside the plan in default, and the

10   acceleration clause comes in, and you are required to pay

11   that.  So the same thing under 25 year plan.

12           THE COURT:  So again, your position would be --

13   your interpretation would be that at 25 years, anybody who

14   has a balance, they go into default.

15           MR. DIVINE:  No.  My interpretation is that the

16   Secretary must create the ratios so that you pay within those

17   25 years.

18           Now, the Secretary hasn't done that until -- has

19   not done that before now, and I would think that the -- the

20   borrowers would have very strong equitable defenses against

21   the Secretary if the Secretary tried to require repayments

22   from those individuals who did not fully repay because of the

23   fault of the Secretary.

24           What the Secretary must do is actually change the

25   ratios, so that you pay -- repay within 25 years.  And I'd

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 30 of 74 PageID #: 1209

State of Missouri, et al vs. Biden, et al - June 3, 2024

29

1  like to refer the Court to tab two, which is going to provide

2  more textural support for this.  So tab two, is the -- it is

3  Section 1078, is the direct Stafford Loan.  It is just a one

4  page handout.  This section is expressly incorporated into

5  the ICR program.  When the ICR references repayment plans, it

6  incorporates this specific section.  And this specific

7  section includes the same exact "not to exceed" language.

8         So if you look at paragraph 9A, Roman numeral (I),

9  this is the standard plan that we were just talking about.

10  It says you repay the same amounts month after month until

11  you are done.  It says that the Secretary shall create the

12  Standard Plan, and the Secretary shall create it so that it

13  is -- and I quote "not to exceed 10 years."

14         My friend on the other side, on page 43 of their

15  brief, they expressly admit that the Standard Plan does not

16  include authority to forgive.  So even though the Standard

17  Plan includes the exact same "not to exceed" language, as in

18  the ICR authority, they admit that there is no language here

19  authorizing them to forgive the Standard Plan Loans, even

20  though it is the exact same language.

21         If the Court looks at the next several Roman

22  Numerals, there is the Graduated Repayment Program "not to

23  exceed 10 years."  There is the Income Sensitive Repayment

24  Program "not to exceed 10 years."  There is the Extended

25  Repayment Program "not to exceed 25 years."  Defendants have

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 31 of 74 PageID #: 1210

State of Missouri, et al vs. Biden, et al - June 3, 2024

30

1   no theory why this exact same language here does not create

2   authority to forgive, but somehow Congress puts it over in

3   the ICR program, and then it magically takes on new meaning.

4           And the reason they don't have any theory for that,

5   is because there is a Cardinal Rule that when Congress takes

6   a similar text from one statute to the other, as Congress is

7   doing here, the old text -- or when Congress brings the old

8   soil with it, it retains the same meaning it had in the first

9   statute.  So if this doesn't authorize forgiveness here, and

10  the Secretary admits it doesn't, then it necessarily cannot

11  authorize forgiveness in the ICR Program.

12          The second reason, your Honor, why the Final Rule

13  fails on the text, is because the text expressly requires

14  repayment.  I refer to tab one.  Again, this is the ICR

15  Program again, on page one, paragraph D-1, it says that "The

16  Secretary shall offer a borrower of a loan made under this

17  part a variety of plans for repayment of such loan including

18  principal and interest."  And then on the next page, tab one,

19  page two, paragraph E-5 discusses the balance due.  It says

20  "The balance due under the Repayment Plan shall equal the

21  principal and interest."

22          Your Honor, the ordinary meaning of "repay" is

23  well, repay it, it means paying back what you borrowed.  We

24  cite dictionaries to this effect.  We cite case law to this

25  effect, but the Final Rule violates this ordinary meaning.

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 32 of 74 PageID #: 1211

State of Missouri, et al vs. Biden, et al - June 3, 2024                                                31

1   The Final Rule expressly calls for zero dollar checks.  Your

2   Honor, that's not even partial repayments.  It is no

3   repayments at all.  If I try to send a zero dollar check to

4   my mortgage lender, they'd foreclose.  The bank knows what

5   repay means.  I know what repay means, and Congress did too,

6   which is why when Congress wants to authorize forgiveness, it

7   does so expressly, because it knows that this repay language

8   by itself requires actual repayments.

9          THE COURT:  Let me just ask you, with regard to the

10  Public Service Loan Forgiveness Program, that program is also

11  referred to as a Repayment Plan for public service employees;

12  and in fact, it is a forgiveness program.

13         MR. DIVINE:  Yes, and in fact, you have to repay,

14  unless you satisfy the elements needed -- the elements to

15  obtain forgiveness.  In fact, a lot of people who are under

16  the Public Service Loan Forgiveness Program do repay, because

17  maybe they work for eight years in the program, and then they

18  decide to leave the program.  But the point here is that

19  Congress created a Repayment Program.  You must repay until

20  we tell you that you are authorized to forgive.

21         So Public Service Loan Forgiveness, they must repay

22  until they satisfy 10 years of public service.  The same

23  thing with the IBR authority.

24         The third reason texturally why the Final Rule

25  fails, it is because it converts what is supposed to be a

1    loan program into a grant program.  The Final Rule requires

2    that the average borrower pay back 61 cents on the dollar,

3    and essentially no interest, that's for undergrads.  If you

4    include graduates, it rises slightly, but only to 71 cents on

5    the dollar for all borrowers, undergraduates, and new

6    graduates.  In fact, a clear majority of individuals who are

7    currently on the plan are paying back zero dollars.  They are

8    paying back nothing at all.

9            And you don't, in fact, start to pay back the full

10   principal under a loan until you are making more than 80

11   percent of Americans.  And even after that, your interest is

12   still being subsidized up until about the 98th percentile for

13   income.  We are talking about, you know, first year, second

14   year, Ivy League graduate associates who are at fancy New

15   York law firms who are being subsidized under this Rule.

16           In fact, this Rule provides twice as much free

17   money as the Pell Grant Program.  And of course, the Pell

18   Grant Program is the centerpiece grants program under the

19   Higher Education Act.  So when you have this program that is

20   a grant for almost everybody, it is no longer a loan program,

21   and the Secretary has violated their authority to create loan

22   repayment programs rather than grant programs.

23           The fourth reason on the text, your Honor, why this

24   Final Rule fails, is that because it renders the IBR Program

25   superfluous.  Recall back in 1993, Congress creates the ICR

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 34 of 74 PageID #: 1213

State of Missouri, et al vs. Biden, et al - June 3, 2024

33

1  Program, and then later on in 2007, Congress creates the IBR

2  Program, which is intended to replace ICR with respect to

3  individuals who fall below a certain income-to-debt

4  threshold.  So ICR for everybody else, but if your

5  income-to-debt threshold is here and far below that, now you

6  get IBR.  And IBR is the only forgiveness plan, based on

7  income, that expressly authorizes forgiveness.  It is the

8  only one.

9        This plan was the product of years of negotiation.

10  It took until 2007 for Congress to pass this plan, and then

11  three years later, President Obama at his State of the Union

12  address, expressly called for Congress to take action to make

13  the IBR Program more generous.  Congress heeded that call and

14  did so.  But under the Final Rule, the Final Rule throws all

15  of that away.

16        On page 46 of their brief, my friend on the other

17  side is unable to identify even a single reason why anybody

18  would choose the IBR Program anymore.  The ICR Program is

19  more generous with respect to everybody.  In other words,

20  when Congress spends years passing this IBR Program, it took

21  -- you know, they did the legislative log, and the committee

22  hearings, and the all of that, and when they heeded President

23  Obama's request to make it more generous, all of that was for

24  naught.  Although back in 1993, the Secretary could have just

25  done this with the stroke of a pen.

Case: 4:24-cv-00520-JAR    Doc. #: 55    Filed: 07/16/24    Page: 35 of 74 PageID #: 1214

State of Missouri, et al vs. Biden, et al - June 3, 2024

34

1          Courts do not lightly interpret texts to render

2    other provisions, especially in the same act, superfluous.

3    So this Court should not interpret the ICR authority to be so

4    broad that renders the IBR Program entirely superfluous.

5          On the arbitrary and capriciousness issue, your

6    Honor, we raised eight claims.  I don't want to discuss all

7    eight of those.  I'm going to discuss only the first one,

8    which will be the most egregious.  And that is there is no

9    dispute that the cost estimate here is grossly inaccurate.

10   It underestimates the true cost of this Rule by at least $300

11   billion dollars, and it does so on the knowingly false

12   assumption that the Supreme Court would uphold their position

13   in the *Biden against Nebraska* case, even though the Supreme

14   Court had already decided that case against them before this

15   Rule was published.

16         Now, their arguments is that the Secretary signed

17   this Rule two weeks before the Supreme Court issued its

18   decision.  But there is no dispute that you can edit a rule

19   all of the way up until publication.  And in fact, the

20   Secretary said to the public that he did not finalize this

21   Rule until June 30th, after the Supreme Court had issued its

22   decision.  So he may or may not have signed it two weeks

23   before that, but he expressly said he did not finalize it

24   until after the Supreme Court's decision.

25         There is a basic rule of Administrative Law going

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 36 of 74 PageID #: 1215

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    35

1  all of the way back to *Chenery* that he can't reverse that

2  course now.  He can't -- they can't engage in post hoc

3  rationalizations, and say actually, it was finalized two

4  weeks before, even on June 30, 2023, he said it was finalized

5  on that day.

6          THE COURT:  Where is the requirement that they do

7  the cost benefit analysis.  Where is that found?

8          MR. DIVINE:  So we are not claiming violation of

9  the Higher Education Act, but the *FCC against Prometheus* case

10 says that if you do a kind of an analysis -- even if you are

11 not required to do it by any kind of substantive law -- the

12 APA requires that agency action be both reasonable and

13 reasonably explained.  So the Higher Education Act doesn't

14 require this cost benefit analysis, but if they are going to

15 do it, they must do it in a reasonable way.  And they did

16 that analysis.  They said that the President directed them to

17 do that analysis, and so they are required to do it in a

18 reasonable way.

19          Here, it was, you know, regardless of the timing,

20 whether it was final on June 14th, whether it was final on

21 June 30th, it doesn't matter.  It was arbitrary and

22 capricious for them not even to consider the possibility that

23 the Supreme Court would rule against them.  I think we have

24 to recall that when this Rule was proposed, January 2023,

25 before that, two months before that, the Eighth Circuit had

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 37 of 74 PageID #: 1216

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    36

1    already enjoined the Rule.

2          Then the U.S. Solicitor General writ up to the

3    Supreme Court and asked the Supreme Court "please vacate this

4    injunction pending appeal."  This is now December 2022.  The

5    Supreme Court declines that request.

6          So during the entirety of this rulemaking process,

7    the Rule was enjoined, and the Supreme Court, having already

8    refused to vacate that injunction, had kind of -- well, it

9    had shown the direction it was leaning.  And so it was

10   entirely arbitrary not even to consider the likely

11   possibility that the Supreme Court would rule against them in

12   that case.

13         And the real reason, your Honor, for all of this

14   haste, and the real reason that they decided not to go back

15   to the drawing board and do this again, is well, the

16   President has been very clear that the purpose of this Final

17   Rule is to evade the *Biden against Nebraska* decision.  He

18   said that two weeks ago at his Morehouse Commencement

19   address.  He said "when the Supreme Court told me I couldn't"

20   -- and he is talking about canceling loans -- "When the

21   Supreme Court told me I couldn't, I found two other ways to

22   do it."  He is talking about this Rule.

23         In February, when the Department announced the

24   first mass cancellation under this Rule, the President said,

25   and I quote, "The Supreme Court blocked it" -- talking about

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 38 of 74 PageID #: 1217

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    37

1    the first attempt -- "The Supreme Court blocked it.  They

2    blocked it, but that didn't stop me."  Your Honor, a desire

3    to evade a Supreme Court ruling is not justification to do a

4    rushed botched job that underestimates the cost of the Rule

5    by $300 billion dollars.

6          So then my friend says "Well, this is all harmless

7    error.  We are totally indifferent to the cost.  We would

8    have done this even if we knew it was going to cost $300

9    billion more."  Well, your Honor, that makes things worse.

10   The GDP of the entire State of Missouri is $300 billion

11   dollars.  The idea that you wouldn't even consider changing

12   the Rule at all because of a $300 billion dollar increase in

13   their cost is mind boggling, and if anything, it shows an

14   unalterably closed mind with respect to this Rule.

15         So my friend is stuck between a rock and a hard

16   place.  They have to pick their poison.  Either the cost

17   estimate was deliberately false, in which case it is

18   arbitrary and capricious, or they have an unalterably closed

19   mind, in which case it also fails.

20         Unless the Court has questions about this, I'll

21   move into the irreparable harm issue.  With respect to the

22   status quo, I think both sides agree that the purpose of this

23   proceeding here is to maintain the status quo.  They are the

24   ones who are trying to disrupt it.  They have said, as we

25   have explained in our briefing, in their own words, they say

Case: 4:24-cv-00520-JAR    Doc. #: 55    Filed: 07/16/24    Page: 39 of 74 PageID #:
1218

State of Missouri, et al vs. Biden, et al - June 3, 2024                                              38

1    that they are trying to "transform loan repayments."  They

2    are trying to "transform and disrupt an entire current system

3    that exists."  The status quo right now is that there are

4    millions of accounts that have not yet been cancelled, and

5    they are trying to cancel them.  Preserving the status quo

6    means blocking them from doing that until the final judgment

7    on the merits.

8           They also argue that we took too long to sue, and

9    that argument is foreclosed squarely by Eighth Circuit

10   precedent.  The *NG against The Board of Regents* -- that's *NG*

11   *against Board of Regents* case, says that "The delay is only

12   significant if harm has already occurred."  Here we are

13   seeking prospective relief.  We are trying to stop future

14   cancellations.  Section 705 authorizes this Court to pause

15   the Rule going forward.  And so the delay argument simply

16   doesn't matter when what we are doing is seeking purely

17   prospective relief with respect to these motions before the

18   Court today.

19          THE COURT:  Let me just ask you, on page 42 of your

20   brief, you have "Vacating the early implementation would

21   reinstate the status quo."  So that suggests that you are

22   trying to vacate all of the early implementation.

23          MR. DIVINE:  No, your Honor.  If this Court vacated

24   early implementation, for example, from what are we June 3rd

25   up until July 1st when this is supposed to go into effect,

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 40 of 74 PageID #: 1219

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    39

1   that's what we are talking about right now.  So the early

2   implementation is we are still in the period of early

3   implementation up until the Final Rule is triggered to go

4   into effect in July.  So we may have been imprecise in our

5   briefing, but that's what we are trying to convey to the

6   Court there.

7           THE COURT:  So again, for all of those people who

8   there has been early implementation, they have signed up for

9   the SAVE Program.  They have been processed under the SAVE

10  Program.  What are you suggesting that the Court should do

11  with those people?

12          MR. DIVINE:  Nothing at this stage, we are seeking

13  prospective relief only.  So it is not going to disrupt -- we

14  are not asking the Court to disrupt anything that's already

15  occurred with respect to those individuals.  At the

16  preliminary injunction stage, we are simply asking the Court

17  to prevent them from continuing to implement this Rule with

18  respect to additional -- with respect to additional accounts.

19          THE COURT:  Okay.

20          MR. DIVINE:  On vacatur, so here we are talking

21  about a Section 705 pause rather than the Section 706 vacate,

22  but for all purposes and respects, they are essentially the

23  same thing, just one at the PI stage, one at the final

24  judgment stage.  But the problem my friend on the other side

25  runs into, is they conflate equity with statutory remedies.

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 41 of 74 PageID #: 1220

State of Missouri, et al vs. Biden, et al - June 3, 2024

40

1        Now the Eighth Circuit has said, in the APA

2   context, you do the standard four factor test that you find

3   in the equity context.  But once we satisfy that, we get not

4   only equitable relief, but we also get statutory relief.  And

5   here, the statutory relief, Section 705, says it operates on

6   the Rule in its entirety, not just with respect to the

7   Plaintiffs, as you would have in an equitable situation.  But

8   with respect to the Rule, with respect to the Defendants, it

9   operates against the entire Rule.  That is the well-settled

10  -- that's well-settled authority.

11       My friend on the other side cites a concurrence by

12  Justice Gorsuch, who wants to -- and basically questioning

13  whether the Southern authority is correct, but until the

14  Supreme Court "square T's" that up, and decides to reverse

15  that, that has been the long-standing doctrine for at least

16  30 years, as even Justice Gorsuch recognized.

17       THE COURT:  So your position would be that the

18  Court couldn't sever certain portions of the Rule and keep in

19  tact other portions of the Rule; is that correct?

20       MR. DIVINE:  The D.C. Circuit has recognized an

21  exception.  They say it's an exception to the default rule of

22  in the PI stage, pause the entire thing, or at the final

23  judgment stage, vacate the entire thing.  I don't think they

24  have satisfied the -- the stringent standard for the

25  exception.

Case: 4:24-cv-00520-JAR   Doc. #:  55   Filed: 07/16/24   Page: 42 of 74 PageID #: 1221

State of Missouri, et al vs. Biden, et al - June 3, 2024

41

1          So, for example, we are primarily challenging the

2     ability to forgive.  If they lose that ability, then it is

3     unclear whether -- they haven't identified anything in the

4     Final Rule that stays with respect to, for example, the

5     payment thresholds.  They would have to revise the payment

6     thresholds, because those payment thresholds are not high

7     enough that somebody would actually repay within 25 years.

8          Now, there are some other provisions like do you

9     count a spouse's income if you are filing, you know, married

10     filing separately, and there are some ancillary tangential

11     things that we haven't discussed, and I don't think we take a

12     position with respect to those.  With respect to forgiveness,

13     with respect to the payment thresholds, with respect to

14     forgiving the interest, I don't think any of those can stand.

15          I'd also add that on the vacatur issue, last time

16     we were litigating against Defendants on this issue, they

17     expressly stipulated that these statutory remedies were

18     appropriate.  So after we prevailed in the Supreme Court,

19     once we went back to the Eastern District of Missouri, the

20     stipulated to the judge on that case that these statutory

21     remedies, Section 706 vacatur, was appropriate in that case.

22          Your Honor, I just want to very briefly touch on

23     the -- touch on the question whether the President is a

24     proper party.  There is a good reason that there are a lot of

25     cases called *State against Biden*, or *State against Trump*, or

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 43 of 74 PageID #: 1222

State of Missouri, et al vs. Biden, et al - June 3, 2024

42

1   whoever the next president will be, there will be more of

2   those cases, that is because in *Clinton against New York*, the

3   Supreme Court expresses -- well, my friend on the other side

4   is correct, that injunctive relief generally is unavailable

5   against the President.  We don't dispute that.  There are

6   exceptions, of course.

7          But *Clinton against New York* expressly

8   distinguishes between declaratory relief and injunctive

9   relief.  And in that Supreme Court case, over Justice

10  Scalia's objection, the Supreme Court determined that

11  declaratory relief was appropriate against the President.

12         We can seek that here, and because the question of

13  whether injunctive relief against the President is going to

14  be a very fact-specific inquiry that is, in large part, going

15  to depend on whether the President is going to decide to

16  continue doing this anyway, even if there is order relief

17  against the Secretary.  It is simply premature to dismiss him

18  at this stage.

19         If the Court has no questions, I'll yield until

20  rebuttal.

21         THE COURT:  I want you to go back and talk about

22  the timing of the filing of this case.  Before the Secretary

23  moved forward with this Rule, there were negotiated ruling

24  making committees.

25         MR. DIVINE:  That's correct.

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 44 of 74 PageID #: 1223

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    43

1          THE COURT:  I think that the State of Missouri

2    participated in those.

3          MR. DIVINE:  That's correct.

4          THE COURT:  And then withdrew?

5          MR. DIVINE:  That's right.

6          THE COURT:  And the Final Rule was actually

7    published in July of 2023.  There was language in the Final

8    Rule that talked about the fact that the Secretary was going

9    to move forward with early implementation.  There were

10   several provisions that were specifically designated for

11   early implementation on July 30th of 2023, and yet this

12   lawsuit wasn't filed until April of 2024.

13         So I am curious as to the timing, and how it

14   relates to your claim that there is imminent and permanent

15   harm to the Plaintiffs.

16         MR. DIVINE:  Yeah, a couple of things, your Honor.

17   Number one, I'll restate what I said about the *NG against*

18   *Board of Regents* case.  Again, we are not seeking any

19   retrospective relief.  We are not asking the Court to disrupt

20   anything that has already occurred.  We are seeking only

21   prospective relief.

22         And so the Eighth Circuit, they are squarely-held

23   that when you are seeking prospective relief -- sorry -- when

24   you are speaking prospective relief only, you are seeking

25   relief for accounts that have not yet been cancelled but are

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 45 of 74 PageID #: 1224

State of Missouri, et al vs. Biden, et al - June 3, 2024

44

1  going to be cancelled, and that's going to happen every month

2  from here on out.  Then the arguments about delay are just

3  totally irrelevant.

4          Now, with respect to the early forgiveness here, in

5  the Final Rule, there is mention that some aspects might be

6  designated for early implementation.  But the actual

7  forgiveness, the first time that is designated is in January.

8  And, of course, it is in a half page in the Federal Register.

9  I can't speak for other attorneys.  I don't read the Federal

10  Register every day.  And so, we didn't actually learn about

11  this until it was publically -- very publically announced in

12  February.

13          Now, with respect to the negotiated Rule making,

14  the *Texas Children's Hospital* case that we cite says that

15  when you are pursuing non-litigation remedies, as we were

16  doing by participating in the negotiated Rule making

17  sessions, when you are doing that, any kind of a delay cannot

18  be held against you.  So that runs until December.  And then

19  we don't find out about this in January, because we don't

20  read the Federal Register every day.  We find out about this

21  in late February.  And between late February and when we

22  sued, it is about a little bit over a month.

23          Of course, we had to learn all about the industry,

24  bring everything together, bring seven different Attorney

25  General's Offices together, which I think anybody who has

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 46 of 74 PageID #: 1225

State of Missouri, et al vs. Biden, et al - June 3, 2024                    45

1   worked in the AG's Office knows it is a monumental

2   undertaking just to get everybody on the same page.  And so

3   that's what we ran into there, and that is -- if it is delay

4   at all, and I don't think it is, then it is much shorter than

5   periods of the Eighth Circuit has permitted to proceed.

6            THE COURT:  Okay.

7            MR. DEVINE:  Thank you.

8            THE COURT:  All right, thank you very much, Mr.

9   Divine.  Mr. Pezzi, you may proceed whenever you are ready.

10  Thank you.

11           MR. PEZZI:  Good morning, your Honor.  Stephen

12  Pezzi from the Department of Justice on behalf of the United

13  States.

14           I would like to start with the plain text of the

15  statute.  And, in fact, for conveniences sake, I will use the

16  printout that Mr. Divine provided both to myself and to your

17  Honor.

18           I think it is telling the selections of this

19  printout that Mr. Divine has chosen to highlight, as well as

20  the selections that he has chosen not to highlight.

21           And, so first, I would like to refer your Honor to

22  20 U.S.C. -- and this is on page two of three in tab one.  So

23  the second page of the handout, 20 U.S.C.

24  1087(e)(d)(1)(a)(D), highlighted on this page is a statute

25  that provides for the creation of quote "An Income Contingent

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 47 of 74 PageID #: 1226

State of Missouri, et al vs. Biden, et al - June 3, 2024

46

1    Repayment Plan" and then the highlights stop "With varying

2    annual repayment amounts based on the income of the

3    borrower."  And then the highlights continue "Paid over an

4    extended period of time prescribed by the Secretary not to

5    exceed 25 years."

6            Defendants' position in this case relies on the

7    entirety of that phrase, not just the selections that Mr.

8    Divine has highlighted, and Defendants' interpretation is

9    consistent with an unbroken bipartisan precedent at the

10   Department of Education since this statute was first enacted

11   in 1993.  Every Secretary of Education, and since this

12   statute was enacted in 1993, has advanced the interpretation

13   we are here defending today, and it relies on the entirety of

14   that provision.

15           Why I emphasize the piece that was not highlighted

16   by Mr. Divine, is because there is a clear contrast between

17   that language, and language at the back of Mr. Divine's

18   handout.  This is now on tab two, page one of one is the

19   fourth page of the four page handout that your Honor has.

20   Mr. Divine makes reference to the alternatives for a standard

21   repayment plan, and a graduated repayment plan; but again,

22   the language for a standard repayment plan, language that is

23   not highlighted, calls for quote "A fixed annual repayment

24   amount paid over a fixed period of time."

25           And so Mr. Divine's interpretation of the Income

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 48 of 74 PageID #: 1227

State of Missouri, et al vs. Biden, et al - June 3, 2024

47

1   Contingent Repayment Plan authority that the Secretary of

2   Education has does not account for that distinct statutory

3   language.

4          Your Honor asked, I think correctly, the question

5   of what is supposed to happen after 25 years, and I think

6   today we got our first clear answer to that question from

7   Plaintiffs.  Mr. Divine's answer is that Plaintiffs are --

8   that the borrowers are simply supposed to default.

9          I would submit to your Honor that the distinctions

10  in this language between fixed annual payment amounts, and

11  amounts that vary in relation to the income of the borrower,

12  suggests that Congress was doing something intentionally by

13  describing those plans in different ways.  Again, that is

14  consistent with the unbroken bipartisan consensus at the

15  Department of Education.

16         Mr. Divine discussed some of that history, and I

17  think his primary response as to why those three agency

18  precedents for this plan somehow differ from the plan before

19  the Court today, ultimately boil down to some version of the

20  total dollar amount at stake in this plan is higher than it

21  was in those prior plans, and we don't dispute that

22  indisputable factual difference, although the biggest

23  explanation for the increased dollar amount really turns on

24  the size of the Federal student loan market which has grown

25  massively in the last 10 to 15 years.  The total amount of

1    Federal student loan debt used to be, you know, just

2    fractions of what it is today for a variety of reasons, many

3    which have nothing to do with the Department of Education,

4    not anything to do with increased college attendance in this

5    country, and increased tuition costs.

6         But it is, regardless, narrow legal principle to

7    say that the Secretary of Education has the authority to

8    implement cheap or medium-sized plans, but does not have the

9    authority to implement expensive plans.  Congress, of course,

10   could have designed the statute that way, or could have

11   exercised its appropriations power to place those sorts of

12   limits on the Secretary's authority, hasn't done so here.

13   Notably, Congress has done so in other sections of the Higher

14   Education Act, and so we cite in our brief several examples

15   throughout the statute where Congress took pains to say that

16   "This sort of actions the Secretary can take must be

17   cost-neutral."

18        And again, there is no such provision here.  So I

19   think Plaintiffs' inferences from other statutory language,

20   which I will get to in a moment, I think are inconsistent

21   with that feature of Plaintiffs' argument.

22        Mr. Divine spent a great deal of time in his brief,

23   and some time at the podium today, talking about authority

24   that is not before the Court, and that is the authority to

25   create Income Based Repayment Plans or IBR Plans.  Those are

1  different plans, subject to different statutory authority,

2  different statutory restrictions, different statutory

3  criteria, and I think Mr. Divine's primary argument is that

4  the Secretary's action today has rendered the IBR Plan

5  superfluous, and he draws an inference from that that

6  Congress wouldn't have permitted such a generous ICR Plan

7  that would render the IBR Plan superfluous.

8         Even taking that argument on its own terms, which I

9  think there are some problems with, which I hope to get to in

10  a moment, it is simply inaccurate to say that the IBR Plan

11  has been rendered superfluous by the SAVE Plan.  The -- no

12  doubt, the SAVE Plan is quite generous to many borrowers.  It

13  was designed to be, and most borrowers will find the SAVE

14  Plan the most advantageous available option.  Again, that was

15  the point.

16         It is not correct that all borrowers will find that

17  to be the case.  This is discussed in the Federal Register in

18  the Final Rule at 88 Fed Reg 43888, and it talks at length

19  about the tradeoffs that certain borrowers will face between

20  the benefits of the SAVE Plan, and some of the different

21  benefits provided by IBR Plans.  These are especially

22  pronounced for graduate student borrowers, and so while I do

23  not dispute that a majority of borrowers will likely prefer

24  the SAVE Plan to the IBR Plan, and they very well should, it

25  is not correct that the IBR Plan is off the books, or is

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 51 of 74 PageID #: 1230

State of Missouri, et al vs. Biden, et al - June 3, 2024

50

1    rendered superfluous, and anyone who reads the Federal

2    Register will see that explanation at length.

3         THE COURT:  Other than some graduate students, who

4    else would be benefited by the IBR Plan in light of the

5    changes that are made now to the Income Contingent Repayment

6    Plan under the SAVE provisions.  So who else is going to be

7    benefited.  Who else would choose to do that?

8         MR. PEZZI:  So I think in particular, those with

9    high, high discretionary incomes are more likely to be

10   interested in the IBR Plan just the way the payment

11   calculations work.  The other difference is that the IBR

12   Plans retain a specific payment cap.  So the highest possible

13   monthly payment under IBR Plans is capped, and that is not

14   true of the SAVE Plan.

15        Again, we don't dispute, especially for

16   undergraduate borrowers, that the vast majority will prefer

17   the SAVE Plan, but there no -- that's again, even setting

18   aside graduate borrowers, there is no statutory prohibition

19   on making one plan more generous than the other.  In fact, by

20   definition, either the ICR option or the IBR option is going

21   to be more generous than the other.

22        In this case, the Secretary has designed the latest

23   modifications to the Income Contingent Repayment Plan

24   authority to be more generous for most borrowers, but there

25   is no reason to think that that causes any legal problem.

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 52 of 74 PageID #: 1231

State of Missouri, et al vs. Biden, et al - June 3, 2024

51

1          Now, stepping back a moment -- even setting aside

2    that I think important factual correction about the nature of

3    these plans, what Mr. Divine really wants the Court to infer

4    is that in 2007, when Congress enacted the IBR authority,

5    that it somehow was implicitly rejecting the interpretation

6    that the Secretary was advancing then, and that the Secretary

7    is advancing today, that loan forgiveness at the end of the

8    extended repayment period is possible also on the ICR Plan,

9    and there is just no reason to think that that inference

10   applies here.

11          Justice Thomas' opinion in the *Marx* case, M-A-R-X,

12   talks about how the Supreme Court is careful to -- well,

13   avoids over reading Congressional actions of this very sort

14   under the *expressio unius* canon that Mr. Divine relies on,

15   and the question is whether, in context, is there any reason

16   to think that that's actually what Congress was doing, and

17   here there is not.

18          And, so again, I think under Mr. Divine's theory

19   what happened is that, although the Secretary of Education

20   was allowing for loan forgiveness under Income Contingent

21   Repayment Plans since 1993, despite Congress apparently not

22   wanting that outcome, its reaction was in 2007, to provide

23   additional loan forgiveness authority to the Secretary of

24   Education, both in terms of IBR Plans, and the Public Service

25   Loan Forgiveness provision, without any amendment at all to

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 53 of 74 PageID #: 1232

State of Missouri, et al vs. Biden, et al - June 3, 2024                                                52

1    the Income Contingent Repayment Plan authority that,

2    according to Mr. Divine, the Secretary had been incorrectly

3    reading the -- through that entire period, and there is just

4    no reason to draw that illogical inference about

5    Congressional alterations to separate statutory authority

6    that is otherwise irrelevant to the Court's task here today.

7            The major questions doctrine and *Biden vs. Nebraska*

8    is obviously discussed at some length in the briefs.  I

9    thought it was telling and interesting that Mr. Divine

10   started today with an argument that there is no requirement

11   for application of the major questions doctrine.  That an

12   agency action be unprecedented.  We have a relatively small

13   dataset for when the major questions doctrine is triggered,

14   of course, but in all of the cases that I have read, and I

15   think all of the cases cited in the parties' briefs, so *west*

16   *Virginia vs. EPA*, *Alabama Association of Relators vs. HHS*,

17   *Biden vs. Nebraska*, obviously, and the OSHA vaccine mandate

18   case.

19           In all of those cases, there is extensive

20   discussion by the Supreme Court of the unprecedented nature

21   of the agency action in question being quite meaningful to

22   the Supreme Court's analysis of the statutory interpretation

23   questions that were before the Court in those cases.  And so

24   I think it is absolutely relevant to the question of whether

25   this plan can survive scrutiny under the major questions

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 54 of 74 PageID #: 1233

State of Missouri, et al vs. Biden, et al - June 3, 2024

53

1   doctrine, that not only is it not unprecedented, I mean, this

2   is an amendment to an existing plan, the REPAYE Plan, that

3   has been in effect for roughly a decade, and it reflects,

4   again, an unbroken bipartisan consensus by every Secretary of

5   Education since this statute was first enacted.  So I think

6   that is a very significant difference with all of the recent

7   Major Questions Precedents from the Supreme Court that I do

8   not think this Court should overlook lightly.

9         *Biden vs. Nebraska* is obviously the most closely

10  analogous case to this one in that it involves student loans,

11  but the similarities really stop there.  Again, I have

12  already discussed the most significant difference about prior

13  agency precedent.  The statutory text there was also quite

14  different.  So there, the Supreme Court was particularly

15  troubled by language by the word "modify."  And so a key part

16  of the Department's unsuccessful argument in that case was

17  that it had a modification power that allowed it to implement

18  that prior loan forgiveness plan, and the Chief Justice's

19  opinion for the Court talks about how modification is a word

20  that is about incremental minor changes, and that, you know,

21  whatever one might say about that prior plan, it was

22  certainly a very significant departure from some of the prior

23  invocations of the Heroes Act authority that the Department

24  relied on in that case, which again, is not the authority at

25  issue here.  So that issue is, of course, not at all

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 55 of 74 PageID #: 1234

State of Missouri, et al vs. Biden, et al - June 3, 2024                                                    54

1    applicable to this particular plan.

2         THE COURT:  But again, the authority that you are

3    relying upon is that language "not to exceed 25 years."

4    That's the language that you are relying upon in terms of

5    giving the Secretary authority to forgive loans; is that

6    right?

7         MR. PEZZI:  So it is not just that language, your

8    Honor.  So, I mean, certainly the "not to exceed 25 years"

9    limitation we think is consistent with our theory, and then

10   some significant tension with Mr. Divine's theory, for the

11   reasons I have already addressed.  But again, what Congress

12   was doing was creating a different type of plan that differed

13   from the standard, and extended, and graduated plans, with

14   fixed payment amounts over a fixed period of time, that I

15   already pointed your Honor to the statutory language on that

16   subject.

17        In devising a plan that could extend as far out as

18   25 years, the Secretary not only can, but must, per Congress'

19   direction, vary the annual repayment amounts based on the

20   income of the borrower.  And so if -- I think under Mr.

21   Divine's interpretation, it is very hard to see what the

22   Secretary of Education was supposed to make of that language,

23   and I think the "not to exceed 25 years" is certainly part of

24   the picture, but the Supreme Court has always been clear that

25   the entire statutory text is appropriately considered, and we

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 56 of 74 PageID #: 1235

State of Missouri, et al vs. Biden, et al - June 3, 2024

55

1    think that that other statutory language, taken as a whole,

2    not only authorizes this plan, but provides clear

3    Congressional authorization for this plan to the extent that

4    is necessary under the major questions doctrine.

5         I will say there is -- Mr. Divine didn't say much

6    about this today, but much of the brief is about absence of

7    limiting principles.  We have engaged on that issue to some

8    extent in the briefs, and I don't want to tread over that

9    ground again too much here today.  I will just say, again, it

10   is a long and dense read.  It is an 80 page rule in the

11   Federal Register, but if you read the rule, you will see

12   extensive discussion of limiting principles, and a variety of

13   instances, in which commenters suggested that the plan be

14   more generous in a variety of ways, and the Secretary of

15   Education repeatedly had to explain to commenters that there

16   were limits to the powers of their -- to their authority

17   under the statute that could not be transgressed set by

18   Congress.

19        And because the Secretary respected those limits,

20   and I'm happy to talk about some specific ones, if necessary,

21   I mean, nobody has sued over them, because we plainly

22   complied with them.  So, you know, there are -- the key

23   statutory provision that we have been talking about it

24   actually goes on to talk about, you know, how these sorts of

25   plans are not available to what the Department calls

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 57 of 74 PageID #: 1236

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    56

1  "parent-plus borrowers," and the details of who a

2  "parent-plus borrower" is, for example, it is not

3  particularly relevant to this litigation, that's because the

4  Department respected those limits in the statute, and there

5  is several other examples as well.

6            Unless your Honor has more questions about the

7  statute, I'll move on to the arbitrary and capricious issue.

8            THE COURT:  Go ahead.

9            MR. PEZZI:  So we have several arguments there.  I

10 mean, the most -- perhaps the most formalist purely legal

11 threshold argument I think is an important one to focus on,

12 because I think it could relieve your Honor's burden of

13 getting into the weeds on some of these cost questions.

14            I think it is quite well-settled in a lot of

15 circuits, and certainly in the D.C. Circuit, and the Sixth

16 Circuit, which are the cases we cited in the brief, as well

17 as some others, that a cost benefit analysis that was

18 conducted, not because the statute required it, but instead

19 because the President required it via Executive Order 12866,

20 is not subject to judicial review.  That is, again, black

21 letter law in at least the D.C. Circuit and the Sixth

22 Circuit.

23            And Mr. Divine's response to that point I think was

24 to say that "Well, we are not seeking to enforce the

25 Executive Order.  We are seeking to enforce the APA, the

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 58 of 74 PageID #: 1237

State of Missouri, et al vs. Biden, et al - June 3, 2024                              57

1    Administrative Procedure Act."  That argument, of course,

2    would apply in every single case in which this issue comes

3    up.  It is a principle that only really applies in the

4    context of the Administrative Procedure Act, and so I'm

5    hard-pressed to see how that could be an exception to the

6    general rule.  That would mean that the general rule doesn't

7    exist.

8            And so, although I recognize it, I don't have

9    Eighth Circuit authority as clear as some of the D.C. Circuit

10   authority, for example, we have cited.  I would recommend,

11   your Honor, to Judge Silberman's opinion on the *Air Transport*

12   *Association* case.  That rejects this exact argument, and says

13   quite sensibly that if you were allowed to enforce the

14   Executive Order simply by saying your cost benefit analysis

15   was arbitrary and capricious under the Administrative

16   Procedure Act, that would be a sea change in the law as to

17   how courts review these sorts of cost benefit analyses.

18           So, I don't think the argument gets off the ground

19   for that reason alone.  Of course, I mean, if we were going

20   to analyze the question, it really boils down to an argument

21   that the Department entirely failed to consider an important

22   aspect of the problem.  That's the Supreme Court language in

23   the *State Farm* case originally, and that the Eighth Circuit,

24   and other Courts of Appeals have used over and over again.

25   It is simply not true that the agency entirely failed to

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 59 of 74 PageID #: 1238

State of Missouri, et al vs. Biden, et al - June 3, 2024

58

1   consider the question of cost.

2          They again, they did a cost benefit analysis that

3   Mr. Divine thinks was incorrect, but they also specifically

4   rejected the suggestion from some commenters that they

5   prepare a second cost benefit analysis.  Essentially, this

6   sort of cost benefit analysis that Mr. Divine now says they

7   should have prepared here, that would account for the

8   possibility that they, you know, turned into the reality that

9   the Supreme Court would rule against the Government on the

10  prior loan forgiveness plan.

11          The agency explained in the Final Rule that it

12  wasn't going to do that, and that was not an irrational

13  decision.  Again, in light of the principles we were just

14  discussing, since there was no legal obligation to conduct

15  one cost benefit analysis, there certainly was not a legal

16  obligation to conduct two cost benefit analyses.

17          The Eighth Circuit's March 2024 opinion in *Mandan*

18  M-A-N-D-A-N, 95 F. 4th 573, which we cite in our brief.  The

19  Eighth Circuit "Declines to adopt the novel position that an

20  agency must explain not evaluating a nonrelevant factor" --

21  which is a rational decision -- and I think, you know, there

22  are some differences with that case too, to be clear, but

23  that principle, I think, controls.  The agency did not have

24  an obligation to engage in a lengthy explanation of cost or a

25  variety of different cost and benefits scenarios.  The Higher

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 60 of 74 PageID #: 1239

State of Missouri, et al vs. Biden, et al - June 3, 2024                                    59

1    Education Act, unlike some other Federal statutes, simply

2    doesn't require that, and so this Rule cannot be held

3    arbitrary and capricious because of a mistake in a cost

4    benefit analysis.

5         Our last argument on that point is a harmless error

6    argument, and I think that argument too is quite

7    well-grounded in Supreme Court precedent and the text of the

8    APA.  So I mean the APA explicitly -- it is not a judgment

9    doctrine.  The APA explicitly says that a reviewing court

10   shall take account of the rule of prejudicial error, and here

11   we can be unusually confident that the agency was quite

12   comfortable with incurring significant costs to create this

13   sort of plan.

14        Really, the error that Mr. Divine is talking about,

15   is failing to attribute costs that the agency expected to be

16   associated with the Heroes Act Debt Relief Plan; and in fact,

17   they turn out that they will be associated with the SAVE

18   Plan, because the Heroes Act Debt Relief Plan was enjoined,

19   and so there is more outstanding student loan debt that may

20   now be subject to the SAVE Plan, than would be the case if

21   the Heroes Act Debt Relief Plan had gone into effect.

22   Obviously, in either case, the Department of Education was

23   comfortable with incurring that significant cost, and there

24   is no reason at all to think that if they had reprinted the

25   cost benefit analysis to move the cost from column A to

1   column B, that somehow that would have caused a change in the

2   agency's approach.

3         Mr. Divine's primary response to that is to invoke

4   a closed-mindedness doctrine, which when I went to law

5   school, and when Mr. Divine went to law school, was an

6   administrative law doctrine that allowed for judicial review

7   of the question of whether the agency had an impermissibly

8   closed mind in its rulemaking process.  That is no longer the

9   law, and so the *Little Sisters of the Poor* decision, another

10  Justice Thomas opinion from the Supreme Court in 2021, just

11  says quite clearly "Like the procedures that we have held

12  invalid, the open-mindedness test violates the general

13  proposition that courts are not free to impose upon agencies

14  specific procedural requirements that have no basis in the

15  APA."  That's 140 S. Ct. 2367 at page 2385.  We cite the case

16  in our brief as well.

17        So there simply is no closed-mindedness doctrine

18  anymore, and Mr. Divine's cases on that point all predate the

19  *Little Sisters of the Poor* decision.  Unsurprisingly, I think

20  it would be quite challenging to find one afterwards, and I

21  don't think it would be possible to find one afterwards

22  that's consistent with Supreme Court precedent.

23        So I think even if your Honor were troubled by that

24  cost benefit analysis, or were to conclude that it was

25  reviewable and violated the APA, it is Plaintiffs' burden to

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 62 of 74 PageID #: 1241

State of Missouri, et al vs. Biden, et al - June 3, 2024                                61

1     show prejudice, and I don't think they can do so here.

2               I'll just speak very briefly about Plaintiffs have

3     been noticed in comment argument.  They think the agency

4     should have had a longer comment period.  Again, the Supreme

5     Court opinion in *Vermont Jankee*, which we have talked about

6     at some length in our brief, that those same precedent that

7     Justice Thomas was referring to in the *Little Sisters of the*

8     *Poor* from the passage that I just read your Honor, prohibits

9     courts from establishing arbitrary limitations on agency

10    authority beyond what the text of the APA itself provides,

11    and we think that principle controls here, which is why

12    courts have not been frequently blessed common periods of 30

13    days, 45 days, and 60 days.  This is a matter for the

14    agency's discretion.  The agency absolutely could have, and

15    maybe Mr. Divine thinks they should have, offered a longer

16    comment period.

17              My understanding is sometimes the Department of

18    Education does 60 day comment periods.  Sometimes they do 30

19    day comment periods.  Here they did a 30 day comment period.

20    There is no reason to think that that's unlawful whether or

21    not it was best practices from Mr. Divine's prospective.

22              On irreparable harm and delay, I think your Honor

23    is correct to focus on that question.  It is beyond doubt

24    that the Eighth Circuit takes very seriously the idea that an

25    extensive delay in seeking preliminary injunctive relief

1    undermines an assertion of irreparable harm.

2         We have cited three, or four, or maybe even five

3    Eighth Circuit cases on this issue in our brief, and

4    Plaintiffs focus very intently on one of them.  The *NG* case,

5    N-G, I apologize if I'm pronouncing that incorrectly, but I

6    mean, I think Plaintiffs significantly over read what that

7    case says, especially in the context of the broader Eighth

8    Circuit precedent on the question of delay.  But even if we

9    were just going to accept the idea that this doctrine is only

10   applicable in a context in which the Plaintiff has not

11   suffered the harm yet, that test it plainly satisfied here,

12   and I don't understand Mr. Divine's argument to the contrary.

13   His brief is shot through with references to what he

14   considers to be the allegedly unlawful early implementation

15   of the Department.

16        We learned, I think for the first time today, that

17   the relief they are requesting from the Court does not extend

18   at all to any of that early implementation authority, which

19   is candidly news to us, and of course, we are happy to hear

20   it, but if that's a way out of this delay doctrine, I mean,

21   that argument could be made three years from now.  I mean,

22   they could sue three years from now and say "Sure, you know,

23   billions of dollars in debt has already been discharged, but

24   we are only seeking relief for the remaining three billion

25   dollars" -- you know, "remaining billion dollars."  And I

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 64 of 74 PageID #: 1243

State of Missouri, et al vs. Biden, et al - June 3, 2024

63

1  think it is quite hard to imagine that the Eighth Circuit

2  Panels who wrote those three, or four, or five opinions about

3  delay would think that that was an appropriate way to seek a

4  preliminary injunction.

5          Mr. Divine tried to rely on the fact that he does

6  not read the Federal Register.  Candidly, I think that

7  argument is just completely inconsistent with the notion of

8  judicial review under the APA.  There is a reason agencies

9  put these things in the Federal Register, and the purpose is

10 to provide public notice of the very things that Mr. Divine

11 claims he was not on notice of.

12         As your Honor noted, Missouri itself was an active

13 participant in the negotiated rulemaking proceedings on this

14 Rule, until it withdrew prematurely.  But the idea that

15 Missouri should be excused for failing to continue to keep an

16 eye on what they now claim is this incredibly significant

17 unprecedented agency action, I think any timing issue is a

18 problem of their own making, as your Honor I think correctly

19 recognized in the context of the scheduling dispute that was

20 before this Court.

21         I will also say, and feel free if I'm approaching

22 my time, your Honor, feel free to let me know.  I don't have

23 a watch for better or worse, but I'm --

24         THE COURT:  You have a few more minutes.

25         MR. PEZZI:  That's I think should be all I need,

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 65 of 74 PageID #: 1244

State of Missouri, et al vs. Biden, et al - June 3, 2024

64

1   unless your Honor has any more questions.

2          The early implementation is quite significant here.

3   I think Mr. Divine's argument might have more appeal, if what

4   we are talking about were some ancillary technical provisions

5   that aren't core to the litigation.  That is not the sort of

6   provisions that have been early implemented here.  So, I

7   mean, dating back to July 2023 itself, the provision changing

8   from 150 percent to 225 percent of the Federal poverty line

9   is the amount for discretionary income to be accounted for.

10  That provision was earlier implemented in the Final Rule

11  itself.

12         The January or February Federal Register activity

13  was about the -- what I think Mr. Divine would think is the

14  most significant provision of the entire Rule, which is about

15  a shortened path to forgiveness for certain low balance

16  borrowers, and so that provision is in effect as we speak,

17  and has been in effect for several months, including before

18  the lawsuit.

19         And, you know, the only remaining provision that I

20  think Mr. Divine thinks is, you know, a significant provision

21  at issue in this case is about reducing to a five percent of

22  that outstanding discretionary income, the amount of a

23  monthly payment from a higher threshold.  But I mean, of the

24  three biggest provisions of the Rule that I think, you know,

25  in a colloquial sense at least, are already in effect, and I

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 66 of 74 PageID #: 1245

State of Missouri, et al vs. Biden, et al - June 3, 2024

65

1  think that's quite significant under the equitable factors

2  that your Honor has to consider in the context of a

3  preliminary injunction.

4         THE COURT:  In the Final Rule, the Secretary

5  references that borrowers who earn 150 percent of the poverty

6  line are statistically indistinguishable from borrowers who

7  earn 225 percent of the poverty line.  What -- explain that

8  to me, if you can.

9         MR. PEZZI:  Yes, your Honor.  It is a very good

10  question.  So I do not think what the Secretary of Education

11  meant by that was that there were no differences between

12  someone making 100 percent of the poverty line and 225

13  percent.  They are obviously some differences.  They were

14  statistically indistinguishable in the context of the

15  particular dataset that the Secretary was analyzing on that

16  question, which is self-reported material hardship.

17         Essentially, in response to like a survey, for

18  example, someone could be asked whether you have suffered

19  material financial hardship, and the two criteria that I

20  think the Secretary was looking at most closely were food and

21  security.  I think it was the big one.  But basically the

22  question is like "Do you struggle paying your bills?"  That's

23  my paraphrase of it, to be clear, rather than an actual

24  quote.  But on that question, they looked at the statistical

25  data, and they didn't see statistically significant

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 67 of 74 PageID #: 1246

State of Missouri, et al vs. Biden, et al - June 3, 2024

66

1    differences in that dataset until 225 percent of the Federal

2    poverty line.  Plaintiffs have no basis to question that, and

3    I think given the standard review under the APA, there would

4    be no basis to do so here.  So that was not meant as like a

5    categorical statement that someone making "X" income or

6    "X-plus" $20,000 a year are indistinguishable in all

7    respects.

8         The last thing I will say, unless your Honor has

9    questions about any of the matters I have discussed so far,

10   is just on the scope of the relief question, I won't belabor

11   it.  We have cited a lot of cases in our brief that candidly

12   we cited in almost every case we litigate these days,

13   especially against State Attorney General's Office, about

14   traditional equitable on Article III limits on the judicial

15   power, and why relief should be tailored to the parties

16   before the Court, who can establish standing, and an actual

17   injury, rather than nationwide injunctive relief that has

18   admittedly become more common in recent years.

19        I think that papers suggested that this is somehow

20   a settled issue that the Supreme Court has already resolved.

21   That is plainly not the case.  There is a reason I think Mr.

22   Divine's briefs talk about oral argument transcripts, and

23   what Justice Kavanaugh said at a recent argument in a case

24   that didn't end up addressing the question.  So we recognize

25   that there is not some clear Eighth Circuit or Supreme Court

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 68 of 74 PageID #: 1247

State of Missouri, et al vs. Biden, et al - June 3, 2024

67

 1   precedent that resolves that question in our favor either,

 2   but I think the same could be true of Mr. Divine's position,

 3   and we think the general principles announced in the cases

 4   cited in our brief suggest that, you know, were the Court to

 5   issue any sort of relief, it should be limited to the

 6   provisions of the Rule, if any, that the Court concluded were

 7   unlawful, and they were actually causing some real injury to

 8   a particular Plaintiff.

 9          THE COURT:  So, again, in that regard, if the Court

10   found that loan forgiveness was beyond the authority of the

11   Secretary, and struck down the provisions that relate to, or

12   enjoined the provisions as it relates to loan forgiveness,

13   what would be left of the Rule -- what are you suggesting the

14   relief would be?

15          MR. PEZZI:  So, obviously, we hope that your Honor

16   doesn't reach that conclusion, but if your Honor would --

17          THE COURT:  I understand that.

18          MR. PEZZI: -- everything else in the Rule would be

19   left, and I think the Federal Register itself makes that

20   quite clear, but even just the passages we quote in our

21   brief, but there are even more in the Federal Register

22   itself.  The Secretary made quite clear the intent that to

23   the extent any provisions were found unlawful, that the rest

24   of the Rule would go into effect, and under the D.C. Circuit

25   precedent that we cite in our brief, and I agree with Mr.

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 69 of 74 PageID #: 1248

State of Missouri, et al vs. Biden, et al - June 3, 2024                                            68

1    Devine, that there is not clear Eighth Circuit precedent on

2    this question, the only other question then for the Court is

3    whether the Rule could function sensibly without the stricken

4    provisions.  And again, the agency explained at length why

5    that -- why it could, and there is no basis to question any

6    of those reasonable conclusions here.

7          So the last thing I will say very quickly, unless

8    your Honor has questions, is that I think it is clear from

9    Mr. Divine's presentation today, even more clearly from the

10   briefs, that to rule in favor of Missouri, or the other

11   Plaintiffs in this case, the Court would not only have to

12   conclude that the SAVE Plan was unlawful, or it would have to

13   effectively conclude that every single Income Contingent

14   Repayment Plan ever issued by the Secretary of Education

15   dating back to 1993, under Presidents of both parties, was

16   unlawful in the very same way.  We think that's a big ask.

17   We don't think it is justified by Mr. Divine's papers.  We

18   would ask the Court to deny Plaintiffs' motions for

19   injunctive relief.

20         THE COURT:  Okay.  Thank you very much, Mr. Pezzi.

21   Mr. Divine, you have five minutes.  Thank you.

22         MR. DIVINE:  Thank you, your Honor.  I'll try to be

23   as brief as possible.  On the major questions doctrine, it is

24   not correct that every single rule that has been struck down

25   under that doctrine has been unprecedented.  It is correct

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 70 of 74 PageID #: 1249

State of Missouri, et al vs. Biden, et al - June 3, 2024

69

1    that the first time the issue -- the Rule has been regulated,

2    it has always been unprecedented.  By definition, the first

3    time you do anything, it is unprecedented.

4           In the *Alabama Association of Relators* case, for

5    example, you had an eviction moratorium.  It wasn't the first

6    eviction moratorium.  I believe there was a third, a fourth,

7    and maybe even a fifth one that had been instituted.  And, in

8    fact, the previous one that that decision was issued in I

9    believe in September of 2021, and the previous eviction

10   moratorium had expired at the end of June, or early July, and

11   theme of present, had imposed another warning.  That later

12   eviction moratorium was the one that the Supreme Court struck

13   down under the major questions doctrine.

14          On the issue of whether their Final Rule makes the

15   IBR Program obsolete, the benchmark here is not the specific

16   way in which they had used the authority here.  The benchmark

17   is the authority that they have asserted, and their

18   regulation asserts authority to cancel every single loan,

19   every single penny of every student loan.  So they have

20   decided to only do $500 billion dollars here, but they have

21   expressly asserted authority to cancel everything.

22          So the idea that anybody would use IBR, you know,

23   when the ICR authority let's you forgive everything, it just

24   makes a mockery of the entire process between 2007 and 2010

25   when Congress spent a ton of time legislating on this issue.

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 71 of 74 PageID #: 1250

State of Missouri, et al vs. Biden, et al - June 3, 2024

70

1          With respect to the ICR text, so I understand the

2     briefs only discuss the "not to exceed 25 years."  My friend

3     on the other side has said "Well, there is this fixed period

4     of time language."  Well, that simply recognizes -- I mean,

5     that's inherent in any kind of program that is based on your

6     income.  The period of time has to be fixed under the

7     standard repayment plan, because it is a standard repayment

8     plan for everybody.  But when it is going to be based on your

9     income, of course the period of time is going to be

10    different.  If you have a higher income, maybe you are going

11    to pay it off in 15 years.  If you have a lower income, maybe

12    it going to be 25.  That doesn't create any authority to

13    forgive.

14          In fact, I'll skip over that issue.  On the

15    irreparable harm issue, I believe it is a *Texas Children's*

16    *Hospital* case.  It might be a different one, but it says that

17    things -- that delay is measured from the time when the State

18    or the Plaintiff first learns of the issue.  And for us, that

19    was February.  Again, under the *NG* case, the *NG* case is very

20    clear that when you are seeking prospective relief, delay

21    just simply doesn't matter at all.

22          Your Honor, unless you have any questions, I would

23    like to just briefly conclude.

24          THE COURT:  Go ahead.

25          MR. DIVINE:  The Defendants have asserted authority

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 72 of 74 PageID #: 1251

State of Missouri, et al vs. Biden, et al - June 3, 2024

71

1   to redistribute $500 billion dollars from teachers, farmers,

2   nurses, and truckers, to people who haven't paid off their

3   student loan, their student loans yet, all based on this

4   "not-to-exceed" language.  But Congress simply did not give

5   the President or the Secretary authority to make this massive

6   monumental policy leap.  But because the President has done

7   so, it has frozen the legislative sphere.  After all, why do

8   the hard work of writing legislation, holding committee

9   hearings, talking to constituents, and taking difficult

10  votes, if the Secretary can do everything that day with a

11  flick of a pen.

12          Your Honor, in the injunction here, it is not just

13  pro-rule of law, it is pro-democracy.  Thank you.

14          THE COURT:  I want to thank all of you for being

15  here and presenting the arguments that you had.  You have

16  briefed many of these issues.  The briefs I think are very

17  very well-done and helpful to the Court.

18          In terms of reaching a decision, and issuing an

19  order, I know looking at my schedule, and my calendar, I can

20  tell you it is going to be a couple of weeks before I get an

21  order out.  I understand the time-sensitive nature of all of

22  the issues, and that a full implementation is July 1st.  So

23  I'm certainly aware of the time-sensitive nature of this.

24          I will work to try to get you an order quickly, but

25  I know again, just looking at my schedule, and all of that,

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 73 of 74 PageID #: 1252

State of Missouri, et al vs. Biden, et al - June 3, 2024

72

1    it is going to be a couple of weeks, but I do expect to get

2    you an order in that kind of timeframe.

3             Again, I want to thank you for being here today,

4    and I appreciate all of that, and we will be in temporary

5    recess.  Thank you very much.

6    (The proceedings commenced at 11:39 a.m.)

Case: 4:24-cv-00520-JAR   Doc. #: 55   Filed: 07/16/24   Page: 74 of 74 PageID #: 1253

State of Missouri, et al vs. Biden, et al - June 3, 2024

73

1                    REPORTER'S CERTIFICATE

2

3        I, Lisa M. Paczkowski, Registered Professional

4 Reporter, do hereby certify that I am a duly appointed

5 Official Court Reporter for the United States District Court,

6 Eastern District of Missouri, and that the foregoing is a

7 true and accurate reproduction of requested proceedings had

8 in the matter of:

9 State of Missouri, et al vs. Biden, et al.

10        In the event copies are made of the transcript

11 herein, the court reporter takes no responsibility for

12 missing or damaged pages.

13        Dated this 16th day of July, 2024.

14

15

16          /s/  Lisa M. Paczkowski
           Lisa M. Paczkowski
17           Official Court Reporter
           United States District Court
18           Eastern District of Missouri

19

20

21

22

23

24

25