**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |
|---|---|
| STATE OF MISSOURI, *et al.,*<br><br>  Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.,*<br><br>  Defendants. | Civil Action No. 4:24-cv-00520-JAR |

<u>**PROPOSED INTERVENORS' CONSOLIDATED REPLY TO PARTIES'**</u>

<u>**OPPOSITIONS TO PROPOSED INTERVENORS' MOTION TO INTERVENE**</u>

1

**INTRODUCTION**

This case does not present a routine request to intervene after settlement. A final judgment vacating a major federal rule was entered without a final merits adjudication and without adversarial briefing on the propriety of that remedy. In a matter of eleven days, the case went from being dismissed as moot to judgment at the joint request of non-adversarial parties. This came after Congress passed a major student loan repayment overhaul that left SAVE intact for two years.

The interests of the borrowers most directly affected by the judgment were not represented in the settlement, and following the rapid sequence of events in early March, the necessity to intervene became clear. Recognizing the exceptional sequence that produced this judgment is critical: it is precisely what makes intervention timely, necessary, and appropriate, and it undercuts each of the arguments raised in opposition.

The United States and the Plaintiff States are now asking the Court to disregard the Proposed Intervenors' interests while relying on this judgment to circumvent agency rulemaking and disregard legislation. In the interests of judicial economy, and because the existing parties' arguments are so closely aligned, this reply responds to both oppositions in a single filing.

The parties to this case argue that intervention should be denied as untimely, that Proposed Intervenors lack standing, and that reconsideration is foreclosed by the mandate rule. When properly understood, none of those threshold arguments bar intervention. It is well within the discretion of this Court to grant intervention and reconsideration, and in this case, justice requires it.

**ARGUMENT**

The District Court has wide latitude to grant a motion to intervene and "must construe the motion in favor of the prospective intervenor." *Nat'l Parks Conservation Ass'n v. U.S. Envtl. Prot. Agency*, 759 F.3d 969, 974 (8th Cir. 2014). Parties do not point to any case law that requires the Court to find the motion to intervene untimely as a matter of law. They cannot, because the Supreme Court has endorsed allowing post-judgment intervention where intervenors satisfy Rule 24's requirements and file within the applicable time limits. *See United Airlines, Inc. v. McDonald*, 432 U.S. 385, 395 (1977); *Corby Recreation, Inc. v. General Electric Co.*, 581 F.2d 175, 177 (8th Cir. 1978). Rather, they point to a handful of cases where district courts were permitted to deny intervention that obviously say nothing about categorical bars on intervention and are readily distinguishable from the facts here. These differences are critical in evaluating timeliness as it "is to be determined from all of the circumstances." *NAACP v. New York*, 413 U.S. 345, 366 (1973).

Initially, parties argue the change in administration provided Proposed Intervenors with notice of the potential that the Department of Education would cease representing their interests. However, during this period the Administration was engaged in protracted negotiations with Congress over the OBBBA – which proposed, and ultimately codified – significant changes to student loan repayment. The legislation was negotiated with political alignment between Congress and the Executive, and Proposed Intervenors were reasonable in believing that the effect of that legislation would be reflected in the Administration's approach to any relevant court action, including this one.

Parties go on to suggest that Proposed Intervenors had notice of the position of the parties based on two status updates filed with this court, one on May 5, 2025, and a second

3

one August 4, 2025. However, it would have been impossible to determine the extent to which the Proposed Intervenors' interests were represented because the parties themselves did not know. In the August 4, joint status report, the parties represented to this court that they were still "evaluating [the OBBBA], and discussing the effect (if any) that it may have on the remainder of this litigation." ECF 81.

This leaves only two realistic moments when it became clear to Proposed Intervenors that their interests were not being protected in this case: either December 9, 2025, when the parties submitted their Joint Motion for Entry of Final Judgment, or March 5, 2026, when the parties submitted a joint request to the Eighth Circuit to direct vacatur of the SAVE Final Rule. ECF 91; Plaintiffs-Appellants' Emergency Motion for Stay of District Court Dismissal Order Pending Appeal, *Missouri v. Trump*, Nos. 24-2332/24-2351 (8th Cir. Mar. 5, 2026), ECF No. 00805469134.

As explained in the memorandum in support of intervention, if the Court views the March 5 date as the appropriate date to begin measuring timeliness, there is no delay to justify. The motion was filed well within the Rule 59(e) timeline for a motion to reconsider and within days of the Eighth Circuit's direction to enter final judgment. No party disputes this. March 5 is the appropriate date to measure timelines for two reasons. First, the Proposed Intervenors accrued new legal interests after February 27, making earlier intervention to represent those interests impossible. Second, March 5 is the first time the Proposed Intervenors' substantive and procedural rights were not represented in this matter and in fact the first time the United States advocated for eliminating the independent role of the District Court in this matter.

4

**I.      Proposed Intervenors Accrued New Legal Interests in this Matter on February 27**

Proposed Intervenors Havens and Robeson became entitled to loan discharge immediately following the initial dismissal of this case. Grunseth and Boykin gained the right to buy back periods of involuntary forbearance, making them immediately eligible for loan discharge. Both the United States and the Plaintiff States agree, because "after all, the Administrative Procedure Act does not allow the federal government to summarily revoke a regulation." Emergency Motion for Stay at 5, *Missouri v. Trump,* No. 26-1394 (8th Cir. Mar. 5, 2026).

Unlike Proposed Intervenors' continuous interests in the survival of the SAVE Final Rule, these interests are significantly more concrete. When the preliminary injunction was lifted, the United States was no longer prohibited from implementing the SAVE Final Rule and the benefits under that rule attached immediately.

In other words, Proposed Intervenors are not intervening to defend their interests should the Court ultimately decide the SAVE Final Rule is legal; they are intervening, in part, to defend their interests to receive the benefits under the rule that have already accrued. Those interests were never present during the initial litigation, and intervention prior to that date to protect them was impossible. It was not until the March 5 joint request to the Eighth Circuit that the United States joined with the Plaintiff States in requesting a reversal of that decision and a direction to vacate the SAVE Final Rule. In that filing, the parties ignored these newly vested interests seeking to sweep them away without analysis or discussion.

**II.      On March 5 the United States Abandoned its Representation of Proposed Intervenors' Substantive and Procedural Interests**

The March 5 joint request to the Eighth Circuit is the first moment "it became clear" that the Proposed Intervenors' interests would not be protected. *Cameron v. EMW Women's*

*Surgical Ctr., P.S.C.*, 595 U.S. 267, 279 (2022) (citing *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977)).

On March 5, the United States joined with the Plaintiff States to ask (in part) for the Eighth Circuit to reverse this Court's dismissal of the case and direct this Court to enter final judgment, claiming that there was "no action left to resolve this case." Emergency Motion for Stay at 16. This request is notable because it is the first time parties jointly requested that the Circuit Court direct judgment – thereby eliminating the District Court's independent role in the matter.

At all times prior to March 5, Proposed Intervenors' interests were protected by two procedural safeguards. First, the United States had publicly represented that the full settlement agreement would be submitted to the court for approval – providing the opportunity for a neutral judge to evaluate the agreement. Second, under binding Eighth Circuit precedent, the Court is required to conduct the *Allied-Signal* test to determine whether vacatur was appropriate. *Custom Commc'ns, Inc. v. FTC*, 142 F.4th 1060, 1074 (8th Cir. 2025). So, while the December 9 Joint Motion may have raised some questions about whether Proposed Intervenors' interests were being represented, because prior to the March 5 filing there was no indication that these safeguards were in jeopardy, it was not yet "clear" that they would not be.

The relevant question is not when Proposed Intervenors first became aware of a potential risk to their interests, but when it became clear that no party and no procedural mechanism would protect those interests. *Cameron, 595 U.S. at 279.* (quoting *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977)) (allowing intervention even after appellate decision was rendered, shortly after learning that the state official would cease

6

defending the rule and within the timeframe to seek *en banc* review). It was only in the March 5 request to the Eighth Circuit that both parties agreed that the Eighth Circuit should direct this Court to enter final judgment without further analysis of the equities of vacatur or submission of the settlement to this Court for review, that the United States's abandonment of the Proposed Intervenors' substantive and procedural interests became clear.

### III.    The Motion to Intervene is Timely Even Under Parties' Preferred Timeline

Even if this Court believes the December 9, 2025, date to be the operative date to assess timeliness, this motion to intervene is timely. Parties focus on two of the four factors in evaluating timeliness – prejudice to the parties and reason for delay. Both factors weigh in favor of intervention.

#### i.    Any delay does not prejudice the parties

The Eighth Circuit has drawn a critical distinction between prejudice caused by the delay in seeking intervention and prejudice caused by the intervenor's mere presence in the suit. *Mille Lacs Band of Chippewa Indians v. State of Minnesota*, 989 F.2d 994, 999 (8th Cir. 1993). Only the former is relevant to the timeliness inquiry. The latter — that existing parties may have to share the litigation with an additional participant — is inherent in any intervention and is "precisely [the] ability [that] Rule 24(a) protects." *Id.* Both oppositions conflate these two categories, treating the ordinary consequences of intervention as though they were cognizable prejudice from delay.

The motion to intervene was filed at most three months after the Joint Motion. No party identified any action taken in reliance on the mere filing of the Joint Motion or the subsequent judgment during that interval. All settlement activity and negotiation occurred prior to December 9, when parties argue that Proposed Intervenors should have known their

7

interests were not represented. No party identified any specific prejudice they face that occurred between December 9 and when the motion to intervene was filed – let alone between March 5 and the filing. No remedial proceedings have commenced. No rulemaking has been initiated to end the SAVE Final Rule. No guidance had been issued at the time of intervention to borrowers or loan servicers regarding next steps. The Plaintiff States obtained a judgment that requires them to do nothing — they need to take no affirmative steps and expend no resources to benefit from the order. The United States likewise bears no compliance obligation that would be disrupted by reconsideration. At this point, the United States has informed borrowers that their servicers will not be reaching out to them about the need to change repayment plans until July 1. Press Release, U.S. Dep't of Educ., U.S. Department of Education Announces Next Steps for Borrowers Enrolled in the Unlawful SAVE Plan (Mar. 27, 2026), https://www.ed.gov/about/news/press-release/us-department-of-education-announces-next-steps-borrowers-enrolled-unlawful-save-plan. The judgment, in practical terms, has not yet been operationalized.

Both the United States and the Plaintiff States invoke *Planned Parenthood of the Heartland v. Heineman*, 664 F.3d 716, 718 (8th Cir. 2011), for the proposition that intervention following a settlement-based final judgment is inherently prejudicial. But *Planned Parenthood* stands for no such categorical rule. In that case, the Eighth Circuit affirmed the denial of intervention where the proposed intervenor sought to reopen the underlying merits of the litigation. The court's prejudice finding rested on the totality of those circumstances — not on a rule that entry of judgment alone forecloses intervention.

Indeed, the federal courts allow intervention following a settlement judgment, particularly in circumstances where the government was a party to the agreement and that

resolution harmed third parties. In *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 136 (1967), the Court reversed the denial of intervention and set aside a consent decree entered between the United States and the defendant in an antitrust case, finding that the government had "fallen far short of representing" the interests of affected parties. The Court held that intervention was necessary precisely because no adversarial proceeding had tested the adequacy of the agreed-upon remedy. Here, as in *Cascade*, the government and the opposing parties share the same objective, no party represented borrowers' interests, and the remedy was entered without adversarial testing. *See Id.* At *135-36.*

The United States separately contends that "having to rebrief the case after the closing bell has rung is itself a form of prejudice," citing *Minnesota Milk Producers Ass'n v. Glickman*, 153 F.3d 632, 646 (8th Cir. 1998). ECF 111 at 5 n.6. Here, there is no rebriefing because the issues raised by Proposed Intervenors were never briefed in the first instance. The underlying merits of the APA claims in this matter have never been briefed while in *Minnesota Milk Producers* the District Court had made merits-based rulings that the agency action was arbitrary and capricious on three separate occasions. *Glickman*, 153 F. 3d at 640. By the time a coalition of highly sophisticated, state government agencies moved to intervene, the case had been in litigation for 7 years and the District Court had already remanded the relevant agency action without vacatur on two occasions before finally enjoining certain actions. *Id.* at 638-40, 646-47 (showing intervenors filed for post-judgment intervention after the case had been active from 1990 to 1997).

Further, any litigation cost of responding to a motion for reconsideration is prejudice from the intervenors' *presence*, not from any *delay*. Under *Mille Lacs*, that distinction

matters. 989 F. 2d at 999. The litigation costs of responding to a motion for reconsideration are not the type of prejudice that warrants denying intervention where the underlying judgment was entered without adversarial testing in the first place.

Unlike in *City of Chicago*, where the intervenor sought to unravel a comprehensive consent decree governing ongoing municipal operations, the relief sought here is narrow: reconsideration of whether vacatur — as opposed to remand without vacatur — is the legally appropriate remedy given the *Allied-Signal* factors and the intervening enactment of the OBBBA. *State v. City of Chicago*, 912 F.3d 979, 986–87 (7th Cir. 2019) (weighing prejudice from disruption to "complex and well-publicized" settlement negotiations).

The only parties facing irreversible prejudice are the Proposed Intervenors themselves. If intervention is denied, Havens and Robeson lose vested discharge rights and face potential tax liability on tens of thousands of dollars of forgiven debt. *See Decl. of Heather Havens ¶ 1, ECF No. 108; Decl. of Elizabeth Robeson ¶ 2, ECF No. 108.* Grunseth loses the ability to make a single $165 payment and receive immediate discharge, facing instead more than fifteen years of continued payments. *See* Decl. of Anna Grunseth ¶ 2, ECF No. 108. Boykin loses the ability to credit seventeen months of involuntary forbearance toward his discharge threshold. *See* Decl. of William Boykin ¶ 2, ECF No. 108. These consequences are immediate, concrete, and irreversible. The balance of equities weighs decisively in favor of permitting intervention.

ii.    **Any delay is reasonable because the United States made it impossible for Proposed Intervenors to assess their interests in the matter.**

To the extent there was any delay in moving to intervene, that delay is the direct result of the United States's inconsistent and inaccurate communications to Proposed Intervenors and the public. Unlike *Ritchie*, Proposed Intervenors were unaware that they had interests that could be

10

protected prior to the February 27 dismissal. *United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824, 833 (8th Cir. 2010). The United States's own actions obfuscated their ability to understand whether their interests were represented or even at stake.

The government's communications pointed in opposite directions. The Department of Education's political leadership repeatedly characterized the SAVE Plan as illegal and encouraged borrowers to move into a "legal" repayment plan.[1] Rather than providing notice that their interests were not being represented, these statements — including the Wall Street Journal article and press release referenced by the United States — represented that the issues were settled law, not a matter still live before the Court. Proposed Intervenor Boykin reasonably relied on this narrative, believing the SAVE Plan was already eliminated, and applied to change plans in January 2025 — long before the Joint Motion. *See* Decl. of William Boykin ¶ 1, ECF No. 108.

At the same time, the United States's direct communications told Proposed Intervenors the opposite. Through written letters and account status information on their student loan portals, the Department continuously represented that Proposed Intervenors would remain enrolled in SAVE until at least 2028. As recently as March 31, 2026, Proposed Intervenors Robeson and Grunseth's portals reflected enrollment in "SAVE Plan Pause Forbearance" through November 2028. Ex. 1  (Elizabeth Robeson Account Statement); Ex. 2 (Anna Grunseth Account Statement). Communications to Proposed Intervenor Havens were even more direct — as of March 31, 2026, her servicer's website listed her current repayment plan as "Saving on a Valuable Education plan – Ends 05/21/2029." Ex. 3. (Heather Havens Unsubsidized Loan Details); Ex. 4 (Heather Havens Subsidized Loan Details).

---

[1] Press Release, U.S. Dep't of Educ., U.S. Department of Education Continues to Improve Federal Student Loan Repayment Options, Addresses Illegal Biden Administration Actions (July 2025), perma.cc/RS88-TWF5.

These contradictory communications materially interfered with Proposed Intervenors' ability to assess their interests. The Department provided no guidance on the consequences of remaining in SAVE versus changing plans, how long borrowers would be allowed to remain enrolled, or the potential tax consequences of a transition. Up until the week of March 30, 2026, the Department was still allowing borrowers to make payments toward Public Service Loan Forgiveness under the SAVE payment amount.[2] Even if Proposed Intervenors understood that the United States was asking this Court to vacate the SAVE Final Rule, that did not automatically implicate their interests, as the United States retained significant operational flexibility to implement that goal in a way that preserved the benefits Proposed Intervenors are due. None of those interests crystallized until after the February 27 dismissal. Any delay in seeking intervention is the direct result of the United States's own conduct.

IV.     **Proposed Intervenors have Article III Standing**

Plaintiff States put the cart before the horse in arguing that Proposed Intervenors have no Article III standing; and in doing so construct an argument that is both ungrounded in the law and aptly demonstrates why the Eighth Circuit's direction to vacate the SAVE Final Rule was a manifest legal error. To establish standing, a proposed intervenor must show "an injury in fact, meaning the actual or imminent invasion of a concrete and particularized legal interest; a causal connection between the alleged injury and the challenged action; and a likelihood that the injury will be redressed by a favorable decision of the court." *Kuehl v. Sellner*, 887 F.3d 845, 850 (8th Cir. 2018). As detailed in the memorandum in support of the

---

[2] Adam Minsky, *Student Loan Forgiveness Just Got Much More Expensive For 88,000 Borrowers*, Forbes (Mar. 31, 2026), https://www.forbes.com/sites/adamminsky/2026/03/31/student-loan-forgiveness-just-got-much-more-expensive-for-88000-borrowers/ [archived at https://web.archive.org/web/20260331175416/https://www.forbes.com/sites/adamminsky/2026/03/31/student-loan-forgiveness-just-got-much-more-expensive-for-88000-borrowers/.

motion to intervene, each Proposed Intervenor faces concrete, quantifiable financial harm flowing directly from the vacatur of the SAVE Final Rule — injuries that would be immediately relieved by remand without vacatur.

The circularity of the Plaintiff States' position here is obvious upon consideration of the "settlement agreement," which parties argue, forms the basis for the voluntary resolution that justifies court-ordered vacatur. That agreement not only does not make any legal findings about the SAVE Final Rule or SAVE Plan, but it explicitly disclaims that purpose entirely. The parties explain that the agreement, "is entered into solely for the purpose of settling and compromising the claims in this action without further litigation, and that it shall not be construed as evidence or as admission regarding any issue of law or fact, or regarding the truth or validity of any allegation or claim raised in this action, or as evidence or as an admission by Defendants regarding Plaintiffs' entitlement to any relief…" Settlement Agreement ¶ 15, U.S. Dep't of Educ. (Dec. 9, 2025), perma.cc/T32E-7CLZ.

So, like the larger matter, the parties would have it both ways, expecting the Court to treat this SAVE Final Rule as illegal while disclaiming that result in their own settlement.

The crux of Plaintiff States' position is that Proposed Intervenors' injuries all stem from not having access to the benefits under the SAVE Final Rule. And according to them, there is no protectable interest in preventing the elimination of an illegal rule. However, Plaintiff States do not cite any opinion that says the SAVE Final Rule is illegal. Rather, to support the contention that, "the SAVE Plan has been adjudicated to be unlawful" Plaintiff States point to the March 9, 2026, mandate directing this Court to vacate the rule. That two-sentence order makes no determination about – nor gives analysis regarding – the legality of

13

the rule. Plaintiff States attempt to read into the March 9 mandate something that does not exist – a declaration that the SAVE Final Rule is illegal.

However, even assuming without agreeing that there was some determination of the legality of SAVE, the Plaintiff States' argument misses the mark. As explained previously, Proposed Intervenors are not attempting to relitigate the preliminary injunction, but rather to defend their interests in how this litigation is resolved. Even finding the rule violates the APA, vacatur is not the automatic remedy and Proposed Intervenors have a significant interest in the outcome of the required *Allied-Signal* analysis. *Custom Commc'ns*, 142 F.4th at 1074.

### V.       Motion to Reconsider is a Viable Remedy

The United States argues that the motion to intervene is futile because the Mandate Rule gives this Court no discretion in the matter. This mischaracterizes the doctrine and is wrong as a matter of law.

First, "law of the case is a doctrine of discretion, not a command to the courts." *Little Earth of United Tribes, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 807 F.2d 1433, 1440 (8th Cir. 1986). "Law of the case directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618 (1983) (citing *Southern R. Co.* v. *Clift*, 260 U.S. 316, 319 (1922); *Messenger* v. *Anderson*, 225 U.S. 436, 444 (1912)). As discussed in the memorandum in support of the motion to reconsider, district courts retain discretion to revisit issues that are subject to a mandate where the prior decision was based on a blatant error and will, if uncorrected, result in serious injustice.[3] The Eighth Circuit explained that courts can reconsider previously decided issues if the decision, "is clearly erroneous and

---

[3] The Eighth Circuit has gone so far as to hold that application of the law of the case doctrine is reviewed by appellate courts under an abuse of discretion standard. *Estrada-Rodriguez v. Lynch*, 825 F.3d 397 (8th Cir. 2016).

14

works manifest injustice." *Little Earth, 807 F.2d at 1440.* Indeed, the Eighth Circuit has said as much on multiple occasions.[4] In *Sulik v. Taney County,* the Eighth Circuit reversed a District Court's decision to apply an incorrect statute of limitations based on a prior Eighth Circuit mandate. In doing so, the Court explained that it is, "not bound to follow the law of the case when the earlier panel opinion contains a clear error on a point of law and works a manifest injustice." *Sulik v. Taney Cnty.*, 393 F.3d 765, 766 (8th Cir. 2005) (Citing *Little Earth of United Tribes, Inc. v. United States Dep't of Hous. & Urban Dev.*, 807 F.2d 1433, 1441 (8th Cir. 1986) (law-of-case doctrine does not apply when prior decision is "clearly erroneous and works manifest injustice"); *see also Zdanok v. Glidden Co.*, 327 F.2d 944, 952-53 (2d Cir.) (good sense exception to law-of-case doctrine includes "clear conviction of error on a point of law that is certain to recur"), *cert. denied*, 377 U.S. 934, (1964)).

This exception serves an essential function in maintaining the integrity of the judicial process. In the rare situation where a circuit court makes a clear error of law, there must be some mechanism to address the potential injustice that would occur. District Courts are not bound to implement an unlawful mandate and indeed have been reversed in the Eighth Circuit where they simply follow the letter of the mandate and in doing so create a manifest injustice. In the present case, the District Court should reconsider its judgment. The motion for reconsideration requires a similar showing of clear error of law with the added element of manifest injustice - here the same facts that would support reconsideration would also allow the District Court to reconsider its prior judgment notwithstanding the Eighth Circuit's mandate. Indeed, as explained throughout these memoranda, the Proposed Intervenors face a manifest injustice if they lose access to the SAVE Final Rule.

---

[4] *See United States v. Bartsh*, 69 F.3d 864 (8th Cir. 1995); *United States v. Callaway*, 972 F.2d 904 (8th Cir. 1992).

Alternatively, the Eighth Circuit's two-sentence order did not address the Allied-Signal analysis or the OBBBA — matters left open by the mandate that this Court retains authority to consider. *See Agostini v. Felton, 521 U.S. 203, 236 (1997)*. As discussed previously, there is no adversarial testing or opinions about the implications of the OBBBA or the *Allied-Signal* factors on the record. These issues are simply left open by the Eighth Circuit; knowing – at least in the case of *Allied-Signal* – that further analysis is a required prerequisite to vacatur, the mandate certainly implied that the responsibility for that analysis fell to the District Court. The *Allied-Signal* analysis, had it been conducted, would have required consideration of the very harms Proposed Intervenors have placed before this Court.

## CONCLUSION

For the foregoing reasons, Proposed Intervenors respectfully request that the Court grant their motion to intervene and consider the accompanying motion for reconsideration on its merits.

Date: April 6, 2026

Respectfully submitted,

*/s/ William Austin Hinkle*
William Austin Hinkle
Public Goods Practice LLP
1502 W 7th St.
STE 100
Erie, PA 16502
(215) 931-9240
austin@publicgoodspractice.com
313856(CA)

*Counsel for Intervenors*

16

**CERTIFICATE OF SERVICE**

I certify that on April 6, 2026, a true and accurate copy of the forgoing document was electronically filed through the Court's CM/ECF System and that a copy of the foregoing will be sent via email to all parties by operation of the Court's electronic filing system, consistent with Federal Rule of Civil Procedure 5(b).

*/s/ William Austin Hinkle*

*Counsel for Intervenors*